UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER UNDERWOOD, LOUIS OBERLANDER, and ZENEYDA PATIN on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>COINBASE GLOBAL, INC.<br><br>*Defendant.* | Case No. 1:21-cv-08353<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Christopher Underwood, Louis Oberlander, and Zeneyda Patin (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, alleges the following against defendant Coinbase Global, Inc. ("Coinbase" or "Defendant"), based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a federal securities class action on behalf of all persons and entities that purchased, sold, or otherwise transacted in securities on the online trading platform owned and operated by Defendant Coinbase Global, Inc. ("Coinbase") during the Class Period set forth herein (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws under Section 29 of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Coinbase operates two digital asset trading platforms: Coinbase and Coinbase Pro (the "Coinbase Digital Asset Platforms") that each and together meet the definition of an

"exchange" under federal securities laws. The Coinbase Digital Asset Platforms, at the agreement of its users (1) bring together the orders for digital assets that are investment contracts, and therefore securities ("Digital Asset Securities"), of multiple buyers and sellers; and (2) use established, non-discretionary methods under which Coinbase Digital Asset Platforms users' orders interact with each other.

3.      Despite the fact that the Coinbase Digital Asset Platforms, as operated by Defendant Coinbase, meet the definition of an "exchange" under federal securities laws, Coinbase has not registered the Coinbase Digital Asset Platforms as national securities exchanges, nor does Coinbase operate the Coinbase Digital Asset Platforms pursuant to an exemption from registration. Coinbase's failure to so register is therefore a violation of Section 5 of the Exchange Act.

4.      Plaintiffs, individually and on behalf of those similarly situated now seek, pursuant to Section 29(b) of the Exchange Act, to recover the consideration paid for Digital Asset Securities and the transaction fees paid to Defendant Coinbase in connection with their purchases of the Digital Asset Securities listed below.

## PARTIES

5.      Plaintiff Christopher Underwood is a citizen and resident of the State of Florida.

6.      Plaintiff Louis Oberlander is a citizen of the State of California.

7.      Plaintiff Zeneyda Patin is a citizen and resident of the State of New York.

8.      Defendant Coinbase Global, Inc. is a Delaware corporation.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of

the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and

most members of the proposed Classes are citizens of a state different from Defendant.

10.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and

18 U.S.C. §1965, because Defendant Coinbase transacts business in, is found in, and/or has agents

in this District, and because some of the actions giving rise to this complaint took place in this

District.

11.     The Court has personal jurisdiction over Defendant. Defendant Coinbase transacted

business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal

scheme and conspiracy throughout the United States, including in this District. The scheme and

conspiracy have been directed at, and have had the intended effect of, causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

## FACTUAL BACKGROUND

## I.      DIGITAL ASSETS & CRYPTOCURRENCIES

12.     "Cryptocurrencies" are digital assets designed to work as mediums of exchange,

stores of value, or both. The first cryptocurrency, Bitcoin, was designed to be a "purely peer-to-

peer version of electronic cash [that] would allow online payments to be sent directly from one

party to another without going through a financial institution."[1] Bitcoin's functionality is

primarily dependent on two important innovations: the "blockchain" and "mining."

13.     The Bitcoin "blockchain" is a ledger that records and tracks the ownership of

every Bitcoin in existence. A network of computers, or "nodes", constantly maintains the Bitcoin

---

[1] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System,* BITCOIN.ORG,
https://bitcoin.org/bitcoin.pdf (accessed Oct. 4, 2021).

blockchain. Specialized nodes, or "miners" also validate Bitcoin transactions and, once

validated, recording the transactions in a "block" on the ledger, hence the name "Blockchain."

14.     To incentive people to participate in this process, the specialized nodes, or

"miners" that devote their computing power to validating (*i.e.*, "mining") Bitcoin transactions are

rewarded with Bitcoins which can in turn be spent by the people running specialized nodes.

15.     Bitcoin's blockchain innovation inspired the development of the Ethereum

protocol (hereinafter "Ethereum"). Ethereum "builds on Bitcoin's innovation, with some big

differences" and is an open-source technology "programmable blockchain" that lets people "send

cryptocurrency to anyone for a small fee [and] also powers applications that everyone can use

and no one can take down."[2] Ether is the cryptocurrency that is native to the Ethereum

blockchain (hereinafter "Ether" or "ETH").

16.     A key innovation of the Ethereum protocol is the "smart contract" – that is, the

execution of transactions upon the occurrence, or nonoccurrence of predetermined conditions

pursuant to pre-negotiated terms. In this way, smart contracts are self-executing and self-

enforcing. Smart contracts have been likened to vending machines because smart contracts

eliminate the needs for third parties to enforce the conditions precedent and terms of the

transactions, just as vending machines eliminate the need for employees to collect money and

dispense goods.

17.     Another innovation of the Ethereum protocol is the Ethereum Request for

Comment. Relevant here is Ethereum Request for Comment No. 20, or ERC-20 (hereinafter

"ERC-20 Standard"). The ERC-20 Standard allows developers to create digital assets, in this

case called "tokens" (hereinafter "ERC-20 Token(s)") that behave according to a predetermined

---

[2] *What is Ethereum?*, Ethereum.org, https://ethereum.org/en/what-is-ethereum/ (accessed Oct. 7, 2021).

set of rules and conditions. This allows developers to "program how new tokens will function in this ecosystem [and] to accurately predict interaction between tokens . . . [including] how the tokens are transferred between addresses and how data within each token is accessed."[3] In this way, the ERC-20 Standard provides an "out of the box" way for developers to create their own digital tokens that can easily be listed and traded on digital asset exchanges such as Coinbase.

18.     The ERC-20 Standard was developed in November 2015 and is largely responsible for the explosive rise in the number of digital assets available for trading on exchanges from November 2015 to present, although non-ERC-20 Tokens and digital assets continue to be developed, listed, and traded on digital asset exchanges as well.

## II.     INITIAL COIN OFFERINGS

19.     In late 2016, the price of Bitcoin, Ether, and other digital assets began rising rapidly, triggering increased interest in digital assets. To illustrate, Ether (ETH) was trading at approximately $8.30 on December 29, 2016 and was trading at approximately $1,100.00 on January 11, 2018.

20.     Individual investors rushed into the digital asset space seeking to capitalize on the interest touting new projects. To raise money for their projects, project developers typically created digital tokens or coins (most of the time using the ERC-20 Standard) bearing the name of the project, generated interest in the project and the token or coin bearing its name by releasing information about the project, and sold it to the public for real world money issued by sovereign governments such as dollars or euros. Because the process above resembles the process typically

---

[3] *What is ERC-20*, COINBASE HELP CENTER, https://help.coinbase.com/en/coinbase/getting-started/crypto-education/what-is-erc20 (accessed Oct. 7, 2021).

undertaken in connection by companies issuing securities via an Initial Public Offering or IPO, the release of tokens or coins have been referred to as Initial Coin Offerings or ICOs.

21.     In order to generate interest in the token or coins, developers would typically write and release a "white paper" which extolled the virtues of the project and explained what the holders of the tokens or coins would be entitled to.

22.     Since the ERC-20 Standard's development and release in 2015, a popular use for ERC-20 Tokens has been to raise money for projects that seek to utilize the Ethereum Protocol. In order to raise funds to assist the company's projects' developments, a company will typically release a number of their own ERC-20 tokens which typically entitle the holders of the ERC-20 Tokens to something such as other ERC-20 tokens, digital assets (*i.e.*, Bitcoin or Ether), or access to application features. Because of the similarities between the release of ERC-20 Tokens and other digitals assets in this way and the typical Initial Public Offering of securities, the process described above is colloquially referred to as an Initial Coin Offering, or ICO.

23.     ICOs are a mechanism for raising capital in which crypto assets are sold online to launch either a native blockchain (a blockchain built to house its own utility token or coin), a cryptocurrency, blockchain application or project, or to sell access to features of applications.

24.     During 2017 alone it is estimated that as many as 5,500 digital assets were created and offered for purchase to the public.

## III.     THE COINBASE DIGITAL ASSET PLATFORMS

25.     Coinbase was founded in 2012. Coinbase operates an internet-based trading platform service that facilitates buying and selling certain digital assets in the secondary markets. Coinbase operates two digital asset trading services: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform" and collectively with the Coinbase Platform, the

"Coinbase Digital Asset Platforms").[4] The Coinbase Digital Asset Platforms serve two functions relevant here: *First,* the Coinbase Digital Asset Platforms serve as a digital asset marketplace, "listing", or making available, digital assets for purchase or sale by users of the Coinbase Digital Asset Platform users.[5] This provides Coinbase Digital Asset Platform users with an easy way to invest in digital assets which can, absent services like the Coinbase Platforms, be significantly more complicated to invest in. *Second*, the Coinbase Digital Asset Platforms facilitate and execute digital asset trades on the Coinbase Platforms for its users according to a predetermined non-discretionary algorithm.

### A.    THE COINBASE PLATFORM

26.    The Coinbase Platform is a beginner-friendly digital asset trading platform aimed at novice digital asset investors. In order to use the Coinbase Platform, a user must create a Coinbase account by providing personal information and either banking or credit card information. In order to buy or sell digital assets on Coinbase, a user must either "fund" the account by transferring money or digital assets into their Coinbaseaccount's "wallet" or alternatively (for a fee) a user can use a credit card or debit card to purchase digital assets.

27.    Coinbase maintains custody of Coinbase Platform users' money and digital assets and maintains an internal ledger that individually denominates the dollar and digital asset amounts belonging to a Coinbase Platform user. Once money or digital assets had been sent to the Coinbase Platform and credited to the wallet of a Coinbase Platform user, a Coinbase Platform can enter into trade agreements with other Coinbase Platform users for purchases and

---

[4] Brian Armstrong, *GDAX is now Coinbase Pro*, THE COINBASE BLOG (May 23, 2018), https://blog.coinbase.com/gdax-is-now-coinbase-pro-b062a12758a0 (accessed Oct. 7, 2021).

[5] As of October 6, 2021, 104 digital assets were listed as "tradable" on the Coinbase Platform.

sales of digital assets. Coinbase claims not to act as a principal to any of the transactions that take place on or through the Coinbase Platform.

28.     The Coinbase Platform only allows Coinbase Platform users to place market orders. That is, Coinbase Platform users can place orders to buy, sell, or exchange digital assets at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order.

29.     When Coinbase Platform users places an order, the Coinbase Platform's matching engine (the "Coinbase Platform Matching Engine") brings together the buy and sell orders of multiple buyers and sellers and uses predetermined, preprogrammed, and non-discretionary methods under which such orders interact with each other at the agreement of Coinbase Platform users.

30.     Defendant Coinbase makes money on the Coinbase Platform by charging transactions fees calculated based upon the United States dollar value of the transactions. The following table shows the fees charged by Coinbase on the Coinbase Platform:

**FLAT FEES**

| TOTAL TRANSACTION AMOUNT | TRANSACTION FEE |
|---|---|
| $10 or less | $0.99 |
| More than $10, less than or equal to $25 | $1.49 |
| More than $25, less than or equal to $50 | $1.99 |
| More than $50, less than or equal to $200 | $2.99 |

**VARIABLE FEES**

| PAYMENT METHOD (PURCHASE) OR PAYOUT METHOD (SALE) | EFFECTIVE RATE OF CONVERSION FEE (AFTER WAIVER) |
|---|---|
| UNITED STATES BANK ACCOUNT | 1.49% |
| COINBASE USD WALLET | 1.49% |
| DEBIT CARD BUY | 3.99% |
| INSTANT CARD WITHDRAWAL | Up to 1.5% of any transaction and a minimum fee of $0.55. |

**B.      COINBASE PRO PLATFORM**

31.      The Coinbase Pro Platform is designed for use by advanced and active digital asset traders. Similar to a Coinbase Platform account, in order to use the Coinbase Pro platform a user must create a Coinbase Pro account by providing personal information, banking and/or credit card information. In order to buy or sell digital assets on Coinbase, a user must either "fund" the account by transferring money or digital assets into their Coinbase's account's "wallet" or alternatively (for a fee) a user can use a credit card or debit card to purchase digital assets.

32.      Coinbase maintains custody of Coinbase Pro Platform users' money and digital assets and maintains an internal ledger that individually denominates the dollar and digital asset amounts belonging to a Coinbase Pro Platform user. Once money or digital assets have been sent to the Coinbase Pro Platform and credited to the wallet of a Coinbase Pro Platform user, a Coinbase Pro Platform user can enter into trade agreements with other Coinbase Pro Platform users for purchases and sales of digital assets. Coinbase claims not to act as a principal to any of the transactions that take place on or through the Coinbase Pro Platform.

33.     The Coinbase Pro Platform allows individuals to place three types of orders: a market order to buy or sell a digital asset at the best available price; a limit order to buy or sell a digital asset at a specific price or better, or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price.

34.     When Coinbase Platform users places an order, the Coinbase Platform's matching engine (the "Coinbase Platform Matching Engine") brings together the buy and sell orders of multiple buyers and sellers and uses predetermined, preprogrammed, and non-discretionary methods under which such orders interact with each other at the agreement of Coinbase Platform users.

35.     Defendant Coinbase makes money on the Coinbase Platform by charging transactions fees. The Coinbase Pro Platform employs a volume-tiered, "maker-taker" fee schedule. Orders that provide liquidity ("maker" orders) are charged different fees than orders that take liquidity ("taker" orders).  A Coinbase Pro Platform user's fee tier is based upon total dollar value trading volume over the trailing 30-day period.

36.     A Coinbase Pro Platform user whose order is matched immediately with an order already on the order book is considered a "taker" because they have "taken" an order off the order book removed liquidity from the market. A Coinbase Pro Platform user whose order is not matched immediately with an order on the order book is considered a "maker", because their order is placed on the order book provides market liquidity.

10

37.     The Coinbase Pro Platform Maker-Taker fee schedule is as follows:

| PRICING TIER | TAKER FEE | MAKER FEE |
|---|---|---|
| Under $10,000 | 0.50% | 0.50% |
| $10,000 - $50,000 | 0.35% | 0.35% |
| $50,000 - $100,000 | 0.25% | 0.15% |
| $100,000 - $1 Million | 0.20% | 0.10% |
| $1 Million - $20 Million | 0.18% | 0.08% |
| $20 Million - $100 Million | 0.15% | 0.05% |
| $100 Million - $300 Million | 0.10% | 0.02% |
| $300 Million - $500 Million | 0.08% | 0.00% |
| $500 Million - $750 Million | 0.06% | 0.00% |
| $750 Million - $1 Billion | 0.05% | 0.00% |
| $1 Billion+ | 0.04% | 0.00% |

## IV.     THE SECURITIES ACT OF 1933

38.     The Securities Act of 1933, 15 U.S.C. § 77a *et* seq. (the "Securities Act" or "'33 Act") requires that every offer and sale of securities within the United States be registered with the SEC, or qualify for an exemption from registration. The objective of the Securities Act is to ensure that the investing public receives complete and accurate information about securities being offered for sale before they purchase them.

39.     The registration and disclosure regime imposed by the Securities Act applies only to the non-exempt offer and sale of *securities*. The term "security" is defined by the Securities Act as follows:

any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract***, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[6]

40.     The term "investment contract" included within the statutory definition of security is not defined within the Securities Act. In *S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946)*, the United States Supreme Court found that an "investment contract" exists when there is (1) the investment of money; (2) in a common enterprise; with (3) a reasonable expectation of profits to be derived from the efforts of others.

41.     As the SEC has noted, this analysis (referred to as the "*Howey* test") "applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the Howey test is not only on the form and terms of the instrument itself but also on the circumstances surrounding the instrument and the manner in which it is offered, sold, or resold (which includes secondary market sales)."[7]

## V.     THE SECURITIES EXCHANGE ACT OF 1934

42.     The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*., (the "Exchange Act" or the "'34 Act"), among other things, regulates securities transactions in the secondary

---

[6] § 2(a)(1) of '33 Act.

[7] *Framework for "Investment Contract" Analysis of Digital Assets*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019).

market, between parties other than the original issuer of the securities, and regulates transactions

on securities exchanges and transaction facilitates by broker-dealers.

A.    REGULATION OF SECURITIES EXCHANGES

43.    The Exchange Act imposes registration and reporting requirements on

organizations, associations, or groups of persons acting as securities "exchange(s)" as the term is

defined in the Exchange Act. Section 3(a)(1) of the Exchange Act defines the term "exchange"

as:

> any organization, association, or group of persons, whether incorporated or
> unincorporated, which constitutes, maintains, or provides a marketplace or
> facilities for bringing together purchasers and sellers of securities or for otherwise
> performing with respect to securities the functions commonly performed by a
> stock exchange as that term is generally understood, and includes the marketplace
> and the market facilities maintained by such exchange. 15 U.S.C. § 78c.

44.    According to the Exchange Act, any organization, association, or group operating

as an Exchange must register as a "national securities exchange" with the United States

Securities & Exchange Commission (the "SEC" or the "Commission") and must make periodic

disclosures to the SEC, unless the SEC determines an exemption is warranted.

45.    Section 5 of the of the Exchange Act, makes failing to comply with the Exchange

Act's registration and reporting requirements illegal:

> It shall be unlawful for any broker, dealer, *or exchange*, directly or indirectly, to
> make use of the mails or any means or instrumentality of interstate commerce for
> the purpose of using any facility of an exchange within or subject to the
> jurisdiction of the United States to effect any transaction in a security, or to report
> any such transaction, unless such exchange (1) is registered as national securities
> exchange under section 78f of this title, or (2) is exempted from such registration
> upon application by the exchange because, in the opinion of the Commission, by
> reason of the limited volume of transactions effected on such exchange, it is not
> practicable and not necessary or appropriate in the public interest or for the
> protection of investors to require such registration. 15 U.S. Code § 78e -
> Transactions on unregistered exchanges (emphasis added).

46.     Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1) of the Exchange Act. Exchange Act Rule 3b-16(a) provides that an organization, association, or group of persons shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by an exchange" as those terms are used in Section 3(a)(1) of the Exchange Act if such an organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, nondiscretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[8]

47.     A system that meets the criteria of Exchange Act Rule 3b-16(a), and that is not excluded under Exchange Act Rule 3b-16(b), must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act[9] or operate pursuant to an appropriate exemption. One of the available exemptions is for Alternative Trading Systems, or "ATS(s)".[10] Exchange Act Rule 3a1-1(a)(2) exempts from the definition of

---

[8] See 17 CFR § 240.3b-16(a). The purpose of Rule 3b-16(b) is to explicitly exclude certain systems that the SEC believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems, hereinafter "Regulation ATS Adopting Release"), at 70852.

[9] See 15 U.S.C. §§ 78e-78f. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act.

[10] Rule 300(a) of Regulation ATS provides that an ATS is "any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16];

"exchange" under Section 3(a)(1) an organization, association, or group of persons that complies with Regulation ATS.[11]

48.     Regulation ATS requires an ATS to, among other things, register as a broker-dealer, file a Form ATS with the Commission to notice its operations, and establish written safeguards and procedures to protect subscribers' confidential trading information. An ATS that complies with Regulation ATS and operates pursuant to the Rule 3a1-1(a)(2) exemption is not required by Section 5 to register as a national securities exchange.

49.     Section 29(b) of the Exchange Act provides that transactions that occur on unregistered exchanges, *i.e.*, exchanges that have not complied with the registration and reporting requirements of Section 5 of the Exchange Act, are voidable at the option of the investor:

> [e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

Section 5 and Section 29(b) operate to provide individuals that purchased securities on an unregistered with a private right of action to seek rescission and damages, including fees.

---

and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading."

[11] See 17 CFR 240.3a1-1(a)(2). Rule 3a1-1 also provides exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. See 17 CFR 240.3a1-1(a)(1) and (3).

B.      REGULATION OF BROKER DEALERS

50.      Section 15 of the Exchange Act requires that any person operating as a broker in U.S. securities markets must register with the SEC and obtain membership with, and be regulated by, the Financial Industry Regulatory Authority, or "FINRA," or operate subject to an exemption from registration.[12]

51.      The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."[13] Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of a [securities] distribution."[14]

52.      Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market—frequently in exchange for transaction-based compensation.[15]

---

[12] 15 U.S.C. § 78o(a)(1), (a)(8).

[13] 15 USC § 78c(a)(4)

[14] *See e.g.*, *Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Sup. 411, 415 (D. Mass.) *aff'd.* 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

[15] *See e.g., SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Margolin*, No. 92 CIV. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).

## SUBSTANTIVE ALLEGATIONS

**I.      THE COINBASE DIGITAL ASSET PLATFORMS HAVE ALLOWED USERS TO TRANSACT IN DIGITAL ASSET SECURITIES**

53.      At all relevant times, Coinbase claimed to analyze whether a particular digital asset was a security in determining whether to list that digital asset for trading on the Coinbase Platforms. Coinbase has denied that the digital assets it lists on the Coinbase Digital Asset Platforms are securities and has denied that the Coinbase Digital Asset Platforms provide securities services to users of the Coinbase Digital Asset Platforms.

54.      On this basis, Coinbase has to date refused to register the Coinbase Digital Asset Platforms as national securities exchanges or as broker-dealers with the SEC. This is because Coinbase is well aware that if the digital assets it lists are securities, it would mean that the Coinbase Digital Asset Platforms would have to comply with the Exchange Acts requirements, which they have failed to do to date.

55.      However, as explained below, analysis of the facts and circumstances surrounding many of the digital assets listed for trading on the Coinbase Digital Asset Platforms shows that many assets offered for trading by Coinbase are investment contracts under *Howey*, and are therefore, securities.

**A.      DIGTAL ASSETS LISTED ON COINBASE ARE SECURUTIES**

56.      The SEC first examined how digital assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO Report"). In the 2017 DAO Report, the SEC examined the application of the Securities Act and the Exchange Act to the issuance and trading of digital assets.

57.     With respect to the application of the Securities Act to digital assets, the SEC concluded (1) that digital assets may qualify as securities pursuant to the Securities Act and the test articulated in *Howey* and that (2) issuers of digital assets that fit the definition of security under the *Howey* test are subject to the registration and reporting requirements of the Securities Act.[16]

58.     Similarly, the SEC concluded that digital asset trading platforms may satisfy the definition of exchange as defined by the Exchange Act as discussed above if they "provide[] users with an electronic system that matched orders from multiple parties to buy and sell [digital assets] for execution based on non-discretionary methods." [17] The SEC noted that a "system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the or operate pursuant to an appropriate exemption."

59.     Following the ICO boom of 2017, the SEC issued further guidance as to the application of the *Howey* test to digital assets in a report entitled *Framework for "Investment Contract" Analysis of Digital Assets* (the "Howey Framework Report").[18] The report reiterated that whether a particular digital asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the digital assets creation and issuance.

---

[16] The DAO, an unincorporated organization, was an issuer of securities, and information about The DAO was "crucial" to the DAO Token holders' investment decision. See Murphy, 626 F.2d at 643 ("Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, and receiving in return an entitlement to a percentage of the proceeds of the enterprise.") (citation omitted). The DAO was "responsible for the success or failure of the enterprise," and accordingly was the entity about which the investors needed information material to their investment decision. Id. at 643-44. (DAO Report p. 16).

[17] 2017 DAO Report, p. 16.

[18] *Framework for "Investment Contract" Analysis of Digital Assets,* U.S. Securities Exchange Commission (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (accessed Oct. 7, 2021).

60.     Coinbase recognized early on the significant impact classifying digital assets as securities would have on the operation of the Coinbase Digital Asset Platforms. On December 7, 2016, Coinbase first published its *Securities Law Framework* in recognition that "US federal securities laws . . . pose the biggest risk for crowdsales of blockchain tokens."[19] Coinbase's *Securities Law Framework* therefore (1) set out to estimate how likely a particular token is to be a security under US federal securities law; (2) sets out some best practices for crowdsales; and (3) set out a detailed securities law analysis.[20] The *Securities Law Framework* was given to issuers of digital assets seeking to be listed on the Coinbase Digital Asset Platforms.

61.     Similarly, in November 2017, Coinbase published the *GDAX Digital Asset Framework*, which set forth factors Coinbase evaluated "when considering which new assets to support on GDAX." [21]

62.     Finally, on September 30, 2019, Coinbase announced the creation of the *Crypto Rating Council*, "a member-operated organization formed to assist market participants that trade or support crypto assets to comply with U.S. federal securities laws."[22] To analyze whether a digital asset was likely to be deemed a security, the CRC "distilled a set of yes or no questions which are designed to plainly address each of the four Howey test factors: whether crypto purchasers (i) invested money, (ii) in a "common enterprise", (iii) with a reasonable expectation

---

[19] *Securities Law Framework*, COINBASE https://www.coinbase.com/legal/securities-law-framework.pdf (accessed Oct. 7, 2021).

[20] *Id.*

[21] *GDAX Digital Asset Framework*, WAYBACK MACHINE (Mar. 26, 2018) https://web.archive.org/web/20180326152504/https://www.gdax.com/static/digital-asset-framework-2017-11.pdf (accessed Oct. 7, 2021).

[22] *Introducing the Crypto Rating Council*, THE COINBASE BLOG (Sept. 30, 2019, https://blog.coinbase.com/introducing-the-crypto-rating-council-d6ee33a8f34d (accessed Oct. 7, 2021).

of profit, and (iv) based on the efforts of others."[23] The CRC gives each digital asset it reviews "a final rating between 1 and 5 [and] a score of 5 results when an asset appears to have many characteristics that are consistent with the Howey-test factors [and] a score of 1 results when an asset appears to have few characteristics that are consistent with the Howey-test factors."[24]

63.     Coinbase's publication of the *Securities Law Framework* and the *GDAX Digital Asset Framework*, together with the creation of the *Crypto Rating Council,* gave the impression that Coinbase would not list digital assets that were securities.

64.     Nevertheless, as digital asset popularity exploded, and presumably to increase revenue with an eye on its IPO, Coinbase began listing digital assets that qualify as investment contracts, and thus securities, in order to earn fees from Coinbase Digital Asset Platform user transactions. Coinbase listed these digital asset securities despite knowledge of the fact that there was a substantial likelihood that one or more of the digital assets were securities.

65.     For example, Coinbase listed several assets that the CRC determined had many characteristics outlined in *Howey* as consistent with an investment contract and thus a security. The CRC gave all of these digital assets a rating of at least 3.75 out of 5, or higher. These assets include Cosmos (ATOM) – 3.75 rating, EOS (EOS) – 3.75 rating, Steller (XLM) – 3.75 rating, Tezos (XTZ) – 3.75 rating, and XRP (XRP) – 4.00 rating.

66.     Given EOS's 3.75 rating, it is not surprising that on Sept. 30, 2019 the organization behind EOS digital asset, Block.one, agreed to pay $24 million to settle charges that

---

[23] https://www.cryptoratingcouncil.com/faq (accessed Oct. 6, 2021).

[24] https://www.cryptoratingcouncil.com/faq (accessed Oct. 6, 2021).

it raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token.[25]

67.     Similarly, on December 22, 2020, the SEC brought charges against the company behind the XRP (4.00 CRC rating) digital asset (Ripple Labs Inc.) and two of its executives alleging they had raised over $1.3 billion through an unregistered, ongoing digital asset securities offering.[26] The case is ongoing.

68.     On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off of securities and resemble derivatives, stating:

> Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities," .."These platforms – whether in the decentralized or centralized finance space – are implicated by the securities laws and must work within our securities regime.[27]

Gensler's comments were likely inspired by the fact on the previous day, July 20, 2021, Coinbase and its partner Circle implicitly admitted to lying for years about the purported all-cash backing of its stablecoin, the US Dollar Coin.. Coinbase's misrepresentations regarding USDC are discussing in greater detail below.

---

[25] *See SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2019), *https://www.sec.gov/news/press-release/2019-202* (accessed Oct. 8, 2021).

[26] *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://www.sec.gov/news/press-release/2020-338

[27] Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities,* NASDAQ (July 21, 2021), https://www.nasdaq.com/articles/sec-chair-hints-some-stablecoins-are-securities-2021-07-21 (accessed Oct. 7, 2021).

69.     On August 3, 2021, SEC Chairman Gensler commented on the state of the digital asset market:

> [R]ight now, we just don't have enough investor protection in crypto . . . [f]rankly, at this time, it's more like the Wild West . . . I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight . . . [t]his leaves prices open to manipulation. This leaves investors vulnerable . . . [w]hile each token's legal status depends on its own facts and circumstances, the probability is quite remote that, with 50 or 100 tokens, any given platform has zero securities.[28]

70.     On September 14, 2021, SEC Chairman Gary Gensler spoke at a Senate Banking Committee hearing and noted that the Coinbase Digital Asset Platforms have not registered as national securities exchanges "even though they have dozens of tokens that might be securities."[29]

71.     As of October 8, 2021, Coinbase listed over 100 digital assets as "tradable" on the Coinbase Digital Asset Platforms. Below are examples of the "dozens of tokens" that constitute Digital Asset Securities that were listed on the Coinbase Digital Asset Platforms and traded by Plaintiffs and the Class during the Class Period:

**1.     1inch (1INCH)**

72.     1inch ("1INCH") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes 1INCH as follows:

> 1INCH is an Ethereum token that powers 1inch, a decentralized exchange that aims to offer the "best rates by discovering the most efficient swapping routes across all leading DEXes." Decentralized exchanges (a.k.a. DEXes) like 1inch enable users to transact tokens without an intermediary. 1inch aggregates token prices across decentralized exchanges in order to find the best prices for users.[30]

---

[28] Will Gottsegen, *SEC's Gensler: Crypto Market Filled With Unregistered Securities, Prices 'Open to Manipulation'*, Decrypt (Aug. 3, 2021), https://decrypt.co/77574/gary-gensler-crypto-market-securities-aspen-institute (accessed Oct. 4, 2021).

[29] Jeff John Roberts, *SEC Chair: Coinbase Lists 'Dozens of Tokens that Might Be* Securities', Decrypt (Sept. 14, 2021), https://decrypt.co/80924/gensler-coinbase-sec-securities (accessed Oct. 4, 2021).

[30] https://www.coinbase.com/price/1inch (accessed Oct. 7, 2021).

73.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in 1INCH tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for 1INCH tokens and paid Coinbase a fee for executing the transaction. 1INCH token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their 1INCH tokens, which they expected to result predominantly, if not solely, from the efforts of 1INCH's creator, developer, and issuer.

### 2.    Aave (AAVE)

74.     AAVE is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes AAVE as follows:

> Aave (AAVE) is an Ethereum token that powers Aave, a decentralized non-custodial money market protocol where users can participate as depositors or borrowers. Depositors provide liquidity to the market to earn a passive income, while borrowers are able to borrow cryptocurrencies in exchange for paying a variable interest rate.

75.     The Aave project was previously known as ETHLend (LEND) and raised $16.2 million through the creation and unregistered sales of what were called LEND tokens to create a peer-to-peer lending platform.[31] LEND tokens were then later "migrated" or exchanged for AAVE tokens at a later date.

76.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in AAVE tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for AAVE tokens and paid Coinbase a fee for executing the transaction. AAVE token investor Coinbase Digital Asset Platform users expected to earn profits

---

[31] https://messari.io/asset/aave/profile (accessed Oct. 4, 2021).

through the appreciation in value of their AAVE tokens, which they expected to result

predominantly, if not solely, from the efforts of AAVE's creator, developer, and issuer.

### 3.   Alchemy Pay (ACH)

77.     Alchemy Pay (ACH) is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes ACH as follows:

> ACH is an Ethereum token that powers Alchemy Pay, a platform that enables
> payments using a wide variety of fiat and cryptocurrencies. Fees are paid using
> the ACH token and users can earn ACH rewards for purchase.[32]

78.     During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in ACH tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for ACH tokens and paid Coinbase a fee for executing the

transaction. ACH token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their ACH tokens, which they expected to result

predominantly, if not solely, from the efforts of ACH's creator, developer, and issuer.

### 4.   Cardano (ADA)

79.     Cardano (ADA) is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. ADA is the native token of the Cardano blockchain.

Coinbase describes ADA as follows:

> Cardano is a blockchain platform built on a proof-of-stake consensus protocol
> (called Ouroboros) that validates transactions without high energy costs . . .
> Cardano's goal is to be the most environmentally sustainable blockchain platform.
> It uses a unique proof-of-stake consensus mechanism called Ouroboros, as
> opposed to the energy-intensive proof-of-work system currently used by
> Bitcoin.[33]

---

[32] https://www.coinbase.com/price/alchemy-pay (accessed Oct. 7, 2021).

[33] https://www.coinbase.com/price/cardano (accessed Oct. 4, 2021).

80.     During the Class Period, members of the Class, including Plaintiff Underwood,

Plaintiff Oberlander, and Plaintiff Patin invested in ADA tokens on the Coinbase Digital Asset

Platforms by exchanging money or digital assets for ADA tokens and paid Coinbase a fee for

executing the transaction. ADA token investor Coinbase Digital Asset Platform users expected to

earn profits through the appreciation in value of their ADA tokens, which they expected to result

predominantly, if not solely, from the efforts of ADA's creator, developer, and issuer.

### 5.     Algorand (ALGO)

81.     ALGO is a Digital Asset Security that was listed on the Coinbase Digital Asset

Platforms during the Class Period. ALGO is the native token of the Algorand blockchain.

Coinbase describes ALGO as follows:

> Algorand is a cryptocurrency and blockchain protocol that aims to be
> simultaneously scalable, secure, and decentralized. It uses a consensus algorithm
> called pure proof-of-stake.[34]

82.     During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in ALGO tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for ALGO tokens and paid Coinbase a fee for executing the

transaction. ALGO token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their ALGO tokens, which they expected to result

predominantly, if not solely, from the efforts of ALGO's creator, developer, and issuer.

### 6.     Amp (AMP)

83.     AMP is a Digital Asset Security that was listed on the Coinbase Digital Asset

Platforms during the Class Period. Coinbase describes AMP as follows:

> Amp is an Ethereum token that aims to "collateralize payments on the Flexa
> Network, making them instant and secure." If a BTC or ETH payment fails due to

---

[34] https://www.coinbase.com/price/algorand (accessed Oct. 4, 2021).

unconfirmed or long transaction times "the Amp collateral can instead be liquidated to cover losses" while the vendor receives payment in fiat, potentially providing greater assurances to both parties.[35]

84.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in AMP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for AMP tokens and paid Coinbase a fee for executing the transaction. AMP token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their AMP tokens, which they expected to result predominantly, if not solely, from the efforts of AMP's creator, developer, and issuer.

**6.    ANKR**

85.    Ankr (ANKR) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ANKR as follows:

> Ankr (ANKR) is an Ethereum token that powers Ankr, a Web3 infrastructure and cross-chain staking DeFi platform that aims to make it easy and affordable for anyone to participate in blockchain ecosystems by building dapps, hosting nodes or staking. The ANKR token can be used to pay for services on the Ankr platform, such as node deployment and API services, participate in on-chain governance and also acts as an insurance for network participants.[36]

86.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in ANKR tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ANKR tokens and paid Coinbase a fee for executing the transaction. ANKR token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ANKR tokens, which they expected to result predominantly, if not solely, from the efforts of ANKR's creator, developer, and issuer.

**7.    Cosmos (ATOM)**

---

[35]https://www.coinbase.com/price/amp (accessed Oct. 4, 2021).

[36] https://www.coinbase.com/price/ankr (accessed Oct. 4, 2021).

87.     Cosmos ("ATOM") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes ATOM as follows:

> Cosmos (ATOM) is a cryptocurrency that powers an ecosystem of blockchains
> designed to scale and interoperate with each other. The team aims to "create an
> Internet of Blockchains, a network of blockchains able to communicate with each
> other in a decentralized way." Cosmos is a proof-of-stake chain. ATOM holders
> can stake their tokens in order to maintain the network and receive more ATOM
> as a reward.[37]

88.     During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in ATOM tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for ATOM tokens and paid Coinbase a fee for executing the

transaction. ATOM token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their ATOM tokens, which they expected to result

predominantly, if not solely, from the efforts of ATOM's creator, developer, and issuer.

### 8.     Avalanche (AVAX)

89.     Avalanche ("AVAX") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes AVAX as follows:

> Avalanche describes itself as an open, programmable smart contracts platform for
> decentralized applications. AVAX is used to pay transaction fees and can be
> staked to secure the network. Avalanche is compatible with Solidity, Ethereum's
> programming language, and can be used to deploy custom private or public
> blockchains as "subnets."[38]

90.     During the Class Period, members of the Class, including Plaintiff Oberlander,

invested in AVAX tokens on the Coinbase Digital Asset Platforms by exchanging money or

digital assets for AVAX tokens and paid Coinbase a fee for executing the transaction. AVAX

token investor Coinbase Digital Asset Platform users expected to earn profits through the

---

[37] https://www.coinbase.com/price/cosmos (accessed Oct. 4, 2021).

[38] https://www.coinbase.com/price/avalanche (accessed Oct. 7, 2021).

appreciation in value of their AVAX tokens, which they expected to result predominantly, if not solely, from the efforts of AVAX's creator, developer, and issuer.

### 9.  Balancer (BAL)

91.    Balancer ("BAL") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes BAL as follows:

> Balancer (BAL) is an Ethereum token that powers the Balancer protocol, an automated market maker that lets anyone create or add liquidity to trading pools while earning customizable trading fees. Balancer pools can have up to 8 tokens and each token can be individually weighted within the pool, such that one token can make up as little as 2% of the total.[39]

92.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in BAL tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for BAL tokens and paid Coinbase a fee for executing the transaction. BAL token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their BAL tokens, which they expected to result predominantly, if not solely, from the efforts of BAL's creator, developer, and issuer.

### 10.  Band Protocol (BAND)

93.    Band Protocol ("BAND") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes BAND as follows:

> Band is a cryptocurrency that describes itself as "a cross-chain data oracle platform that aggregates and connects real-world data and APIs to smart contracts." Band allows blockchains to access data, such as stock prices and weather, that are available via API. Note: Coinbase only supports the Band token running on Ethereum (ERC-20).[40]

---

[39] https://www.coinbase.com/price/balancer (accessed Oct. 4, 2021).

[40] https://www.coinbase.com/price/band-protocol (accessed Oct. 4, 2021).

94.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in BAND tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for BAND tokens and paid Coinbase a fee for executing the transaction. BAND token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their BAND tokens, which they expected to result predominantly, if not solely, from the efforts of BAND's creator, developer, and issuer.

### 11.    Basic Attention Token (BAT)

95.    Basic Attention Token ("BAT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes BAT as follows:

> BAT is an Ethereum token that powers Brave Software's blockchain-based digital advertising platform. Internet users who browse the web using Brave's free web browser (available at Brave.com) can choose to replace the ads they see with ads on Brave's ad network. Users then receive BAT from advertisers as compensation for their attention.[41]

96.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in BAT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for BAT tokens and paid Coinbase a fee for executing the transaction. BAT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their BAT tokens, which they expected to result predominantly, if not solely, from the efforts of BAT's creator, developer, and issuer.

### 12.    Bancor Network Token (BNT)

97.    Bancor Network Token ("BNT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes BNT as follows:

---

[41] https://www.coinbase.com/price/basic-attention-token (accessed Oct. 7, 2021).

> Bancor Network Token (BNT) is an Ethereum token that powers the Bancor protocol. The protocol describes itself as "a fully on-chain liquidity protocol that can be implemented on any smart contract-enabled blockchain."[42]

98.     During the Class Period, members of the Class, including Plaintiff Underwood, invested in BNT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for BNT tokens and paid Coinbase a fee for executing the transaction. BNT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their BNT tokens, which they expected to result predominantly, if not solely, from the efforts of BNT's creator, developer, and issuer.

### 13.     Braintrust (BTRST)

99.     Brainstrust (BTRST) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes BTRST as follows:

> BTRST is an Ethereum token that powers Braintrust, a decentralized talent network connecting freelancers with organizations. BTRST is used to govern the network and also as an incentive to refer new users.[43]

100.     During the Class Period, members of the Class, including Plaintiff Underwood, invested in BTRST tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for BTRST tokens and paid Coinbase a fee for executing the transaction. BTRST token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their BTRST tokens, which they expected to result predominantly, if not solely, from the efforts of BTRST's creator, developer, and issuer.

---

[42] https://www.coinbase.com/price/bancor-network-token (Oct. 4, 2021).

[43] https://www.coinbase.com/price/braintrust (accessed Oct. 4, 2021).

### 14. Cartesi (CTSI)

101.    Cartesi ("CTSI") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes CTSI as follows:

> CTSI is a utility token that powers the Cartesi network, which aims to solve
> blockchain scalability and high fees using a technology called Optimistic Rollups.
> CTSI can be used for staking and fees for processing data on the network.
> Notably, Cartesi enables smart contract creation using mainstream programming
> languages.[44]

102.    During the Class Period, members of the Class, including Plaintiff Oberlander,

invested in CTSI tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

assets for CTSI tokens and paid Coinbase a fee for executing the transaction. CTSI token

investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation

in value of their CTSI tokens, which they expected to result predominantly, if not solely, from

the efforts of CTSI's creator, developer, and issuer.

### 15. Celo (CGLD)

103.    Celo (CGLD) is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. Coinbase describes CGLD as follows:

> [CGLD] is the core utility, reserve, staking, and governance asset for the Celo
> platform. The platform aims to make financial tools borderless, easy to use, and
> accessible for anyone with a mobile phone.[45]

104.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in CGLD tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for CGLD tokens and paid Coinbase a fee for executing the

transaction. CGLD token investor Coinbase Digital Asset Platform users expected to earn profits

---

[44] https://www.coinbase.com/price/ctsi (accessed Oct. 7, 2021).

[45] https://www.coinbase.com/price/celo (accessed Oct. 4, 2021).

through the appreciation in value of their CGLD tokens, which they expected to result predominantly, if not solely, from the efforts of CGLD's creator, developer, and issuer.

### 16.   Compound (COMP)

105.   Compound ("COMP") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes COMP as follows:

> Compound (COMP) is an Ethereum token that enables community governance of the Compound protocol. The protocol is a series of decentralized interest rate markets that allow users to supply and borrow Ethereum tokens at variable interest rates. COMP token holders and their delegates can also debate, propose, and vote on changes to the protocol.[46]

106.   During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in COMP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for COMP tokens and paid Coinbase a fee for executing the transaction. COMP token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their COMP tokens, which they expected to result predominantly, if not solely, from the efforts of COMP's creator, developer, and issuer.

### 17.   Curve DAO Token (CRV)

107.   Curve DAO Token is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes CRV as follows:

> Curve (CRV) is an Ethereum token that powers Curve.fi, a decentralized exchange and automated market maker protocol. The protocol is designed to make it easy to swap between ERC-20 tokens, such as stablecoins (like USDC and DAI) and Ethereum-based Bitcoin tokens (like WBTC and renBTC). In order to minimize impermanent loss, most of the protocol's liquidity pools are made up of similar assets, although in June 2021, it introduced a USDT-WBTC-ETH "tricrypto" pool. The CRV token can be locked for various periods of time (up to 4 years) in order to vote on governance and claim protocol fees as a reward.[47]

---

[46] https://www.coinbase.com/price/compound (accessed Oct. 4, 2021).

[47] https://www.coinbase.com/price/curve-dao-token (accessed Oct. 4, 2021).

108.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in CRV tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for CRV tokens and paid Coinbase a fee for executing the transaction. CRV token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their CRV tokens, which they expected to result predominantly, if not solely, from the efforts of CRV's creator, developer, and issuer.

### 18.    Civic (CVC)

109.    Civic ("CVC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes CVC as follows:

> Civic (CVC) is an Ethereum token used to power Civic's identity verification protocol. Users who verify their information through Civic can then securely share both their info and the verification with service providers, reducing the need to constantly re-verify their identity. In return for this convenience, service providers may provide users and verifiers with CVC.[48]

110.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in CVC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for CVC tokens and paid Coinbase a fee for executing the transaction. CVC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their CVC tokens, which they expected to result predominantly, if not solely, from the efforts of CVC's creator, developer, and issuer.

### 19.    Dai (DAI)

107.    Dai ("DAI") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes DAI as follows:

> Dai (DAI) is a decentralized stablecoin running on Ethereum (ETH) that attempts to maintain a value of $1.00 USD. Unlike centralized stablecoins, Dai isn't backed

---

[48] https://www.coinbase.com/price/civic (accessed Oct. 4, 2021).

by US dollars in a bank account. Instead, it's backed by collateral on the Maker platform. Note: if the Dai credit system is upgraded or shutdown, Dai holders may need to convert their Dai to Ethereum through the Maker platform. Read more at makerdao.com/whitepaper.[49]

108.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in DAI tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for DAI tokens and paid Coinbase a fee for executing the transaction. DAI token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their DAI tokens, which they expected to result predominantly, if not solely, from the efforts of DAI's creator, developer, and issuer.

### 20.     **DASH (DASH)**

109.     DASH ("DASH") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes DASH as follows:

> Dash is a cryptocurrency with optional speed and privacy features. Its unique network architecture consists of both regular miners and privileged machines called Masternodes.[50]

110.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in DASH tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for DASH tokens and paid Coinbase a fee for executing the transaction. DASH token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their DASH tokens, which they expected to result predominantly, if not solely, from the efforts of DASH's creator, developer, and issuer.

---

[49] https://www.coinbase.com/price/dai (accessed Oct. 4, 2021).

[50] https://www.coinbase.com/price/dash (accessed Oct. 7, 2021).

### 21.    district0x (DNT)

111.    District0x ("DNT") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes DNT as follows:

> District0x is an Ethereum token that powers a network of decentralized
> marketplaces and communities called districts. The token is required for
> application to the District Registry and is used to signal support or disapproval for
> proposals made by network participants.[51]

112.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in DNT tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for DNT tokens and paid Coinbase a fee for executing the

transaction. DNT token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their DNT tokens, which they expected to result

predominantly, if not solely, from the efforts of DNT's creator, developer, and issuer.

### 22.    Dogecoin (DOGE)

113.    Dogecoin ("DOGE") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes DOGE as follows:

> Dogecoin (DOGE) was created in 2013 as a lighthearted alternative to traditional
> cryptocurrencies like Bitcoin. The Dogecoin name and Shiba Inu logo are based
> on a meme. Unlike Bitcoin, which is designed to be scarce, Dogecoin is
> intentionally abundant — 10,000 new coins are mined every minute and there is
> no maximum supply.[52]

114.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in DOGE tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for DOGE tokens and paid Coinbase a fee for executing the

transaction. DOGE token investor Coinbase Digital Asset Platform users expected to earn profits

---

[51] https://www.coinbase.com/price/district0x (accessed Oct. 4, 2021).

[52] https://www.coinbase.com/price/dogecoin (accessed Oct. 4, 2021).

through the appreciation in value of their DOGE tokens, which they expected to result predominantly, if not solely, from the efforts of DOGE's creator, developer, and issuer.

### 20.    Enjin Coin (ENJ)

115.    Enjin Coin ("ENJ") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ENJ as follows:

> Enjin Coin (ENJ) is an Ethereum token that aims to "make it easy for individuals, businesses, and brands to use non-fungible tokens (NFTs)." ENJ is used to directly back the value of NFTs minted within the Enjin ecosystem.[53]

116.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in ENJ tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ENJ tokens and paid Coinbase a fee for executing the transaction. ENJ token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ENJ tokens, which they expected to result predominantly, if not solely, from the efforts of ENJ's creator, developer, and issuer.

### 21.    Enzyme (MLN)

117.    Enzyme ("MLN") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes MLN as follows:

> MLN is an Ethereum token that powers Enzyme (formerly known as Melon Protocol), a protocol that aims to facilitate on-chain asset management for the DeFi ecosystem. MLN allows users to build, share, and explore DeFi investment strategies (called "vaults") while filtering by historical performance and risk profiles. MLN is used to pay for various functions throughout the vault creation process and investment lifecycle.[54]

118.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in MLN tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

---

[53] https://www.coinbase.com/price/enjin-coin (accessed Oct. 7, 2021).

[54] https://www.coinbase.com/price/enzyme (accessed Oct. 7, 2021).

assets for MLN tokens and paid Coinbase a fee for executing the transaction. MLN token

investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation

in value of their MLN tokens, which they expected to result predominantly, if not solely, from

the efforts of MLN's creator, developer, and issuer.

### 22.    EOS (EOS)

119.    EOS ("EOS") is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. Coinbase describes EOS as follows:

> EOS is a cryptocurrency designed to support large-scale applications. There are
> no fees to send or receive EOS. Instead, the protocol rewards the entities that run
> the network periodically with new EOS, effectively substituting inflation for
> transaction fees.[55]

120.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in EOS tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for EOS tokens and paid Coinbase a fee for executing the

transaction. EOS token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their EOS tokens, which they expected to result

predominantly, if not solely, from the efforts of EOS's creator, developer, and issuer.

121.    On Sept. 30, 2019, Block.one the organization that created and issued EOS,

agreed to pay $24 million to settle SEC charges that it raised several billion dollars through an

unregistered securities offering when it conducted an ICO for its EOS token.[56]

---

[55] https://www.coinbase.com/price/eos (accessed Oct. 4, 2021).

[56] See *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S.
Securities and Exchange Commission (Sept. 30, 2019), *https://www.sec.gov/news/press-release/2019-202*
(accessed

### 23.   **Harvest Finance (FARM)**

122.   Harvest Finance ("FARM") is a Digital Asset Security that was listed on the

Coinbase Digital Asset Platforms during the Class Period. Coinbase describes FARM as follows:

> FARM is an Ethereum token that powers Harvest Finance, a yield optimizer that
> moves funds around the decentralized finance (DeFi) ecosystem in an effort to
> generate yields. FARM can be used for staking and yield farming on Harvest
> Finance.[57]

123.   During the Class Period, members of the Class, including Plaintiff Underwood,

invested in FARM tokens on the Coinbase Digital Asset Platforms by exchanging money or

digital assets for FARM tokens and paid Coinbase a fee for executing the transaction. FARM

token investor Coinbase Digital Asset Platform users expected to earn profits through the

appreciation in value of their FARM tokens, which they expected to result predominantly, if not

solely, from the efforts of FARM's creator, developer, and issuer.

### 24.   **Fetch.ai (FET)**

124.   Fetch.ai ("FET") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes FET as follows:

> FET is an Ethereum token that powers Fetch.ai, a decentralized machine learning
> platform for applications such as asset trading, gig economy work, and energy
> grid optimization. Fetch.ai's first decentralized finance application helps Uniswap
> users automate trading according to predefined conditions.[58]

125.   During the Class Period, members of the Class, including Plaintiff Underwood,

invested in FET tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

assets for FET tokens and paid Coinbase a fee for executing the transaction. FET token investor

Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value

---

[57] https://www.coinbase.com/price/harvest-finance (accessed Oct. 4, 2021).

[58] https://www.coinbase.com/price/fetch (accessed Oct. 4, 2021).

of their FET tokens, which they expected to result predominantly, if not solely, from the efforts

of FET's creator, developer, and issuer.

### 25.    Filecoin (FIL)

126.    Filecoin ("FIL") is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. Coinbase describes FIL as follows:

> Filecoin (FIL) is a cryptocurrency that powers the Filecoin network, a
> decentralized peer-to-peer file storage network that aims to let anyone store,
> retrieve, and host digital information. FIL tokens are used as payment for these
> services and as an economic incentive to ensure files are stored reliably over
> time.[59]

127.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in FIL tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for FIL tokens and paid Coinbase a fee for executing the

transaction. FIL token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their FIL tokens, which they expected to result

predominantly, if not solely, from the efforts of FIL's creator, developer, and issuer.

### 26.    Ampleforth Governance Token (FORTH)

128.    Ampleforth Governance Token ("FORTH") is a Digital Asset Security that was

listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes

FORTH as follows:

> FORTH is a cryptocurrency that powers Ampleforth, a protocol that automatically
> adjusts the supply of its native token, AMPL, in response to demand. FORTH is
> Ampleforth's governance token. FORTH holders can vote on proposed changes to
> the Ampleforth protocol or delegate their votes to representatives who vote on
> their behalf.[60]

---

[59] https://www.coinbase.com/price/filecoin (accessed Oct. 4, 2021).

[60] https://www.coinbase.com/price/ampleforth-governance-token (accessed Oct. 4, 2021).

129.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in FORTH tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for FORTH tokens and paid Coinbase a fee for executing the transaction. FORTH token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their FORTH tokens, which they expected to result predominantly, if not solely, from the efforts of FORTH's creator, developer, and issuer.

### 27.    The Graph (GRT)

130.    The Graph ("GRT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes GRT as follows:

> The Graph (GRT) is an Ethereum token that powers The Graph, a decentralized protocol for indexing and querying data from blockchains. Just as Google indexes the web, The Graph indexes blockchain data from networks like Ethereum and Filecoin. This data is grouped into open APIs called subgraphs that anyone can query.[61]

131.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in GRT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for GRT tokens and paid Coinbase a fee for executing the transaction. GRT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their GRT tokens, which they expected to result predominantly, if not solely, from the efforts of GRT's creator, developer, and issuer.

### 28.    GreenTrust (GNT)

132.    GreenTrust ("GNT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. During the Class Period, members of the Class, including Plaintiff Oberlander, invested in GNT on the Coinbase Digital Asset Platforms by

---

[61] https://www.coinbase.com/price/the-graph (accessed Oct. 4, 2021).

exchanging money or digital assets for GNT tokens and paid Coinbase a fee for executing the transaction. GNT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their GNT tokens, which they expected to result predominantly, if not solely, from the efforts of GNT's creator, developer, and issuer.

### 29.   iExec RLC ("RLC")

133.    iExec RLC ("RLC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes RLC as follows:

> RLC is an Ethereum token for the iExec cloud platform in which users can monetize and rent computing power and data. iExec enables developers to power applications on what is described as "a decentralized marketplace for cloud resources."[62]

134.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in RLC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for RLC tokens and paid Coinbase a fee for executing the transaction. RLC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their RLC tokens, which they expected to result predominantly, if not solely, from the efforts of RLC's creator, developer, and issuer.

### 30.   Internet Computer (ICP)

135.    Internet Computer ("ICP") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ICP as follows:

> Internet Computer (ICP) is a utility token that allows users to participate in and govern the Internet Computer blockchain network. The network aims to help developers create websites, enterprise IT systems, internet services, and DeFi applications by "installing their code directly on the public Internet." ICP can also be staked or "converted into cycles" that can be used to power computation for dApps and traditional applications.[63]

---

[62] https://www.coinbase.com/price/rlc (accessed Oct. 7, 2021).

[63] https://www.coinbase.com/price/internet-computer (accessed Oct. 7, 2021).

136.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in ICP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ICP tokens and paid Coinbase a fee for executing the transaction. ICP token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ICP tokens, which they expected to result predominantly, if not solely, from the efforts of ICP's creator, developer, and issuer.

### 31.    IoTex (IOTX)

137.    IoTex ("IOTX") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes IOTX as follows:

> IOTX is an Ethereum token that powers IoTeX, a platform that aims to connect IoT devices (such as cameras and sensors) and decentralized applications. IOTX can be used to pay for transactions, for staking and governance, and to register new devices on the IoTeX network.[64]

138.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in IOTX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for IOTX tokens and paid Coinbase a fee for executing the transaction. IOTX token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their IOTX tokens, which they expected to result predominantly, if not solely, from the efforts of IOTX's creator, developer, and issuer.

### 32.    Keep Network (KEEP)

139.    Keep Network ("KEEP") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes KEEP as follows:

> KEEP is an Ethereum token that powers the Keep Network, a platform that aims to bridge public blockchains and private data. One of Keep Network's first

---

[64] https://www.coinbase.com/price/iotex (accessed Oct. 4, 2021).

products is an Ethereum token that represents 1 Bitcoin, called tBTC. Keep Network enables users to deposit Bitcoin and redeem tokenized tBTC, which can then be used in the Ethereum ecosystem without centralized intermediaries.[65]

140.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in KEEP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for KEEP tokens and paid Coinbase a fee for executing the transaction. KEEP token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their KEEP tokens, which they expected to result predominantly, if not solely, from the efforts of KEEP's creator, developer, and issuer.

### 33.    Kyber Network Crystal v2 (KNC)

141.    Kyber Network Crystal v2 ("KNC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. KNC is the ERC-20 token used to pay for services on the Kyber Network. The Kyber Network is a Singapore-based decentralized exchange that aims to facilitate Ethereum-based token transactions via smart contracts.

142.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in KNC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for KNC tokens and paid Coinbase a fee for executing the transaction. KNC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their KNC tokens, which they expected to result predominantly, if not solely, from the efforts of KNC's creator, developer, and issuer.

### 34.    Chainlink (LINK )

143.    Chainlink ("LINK") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes LINK as follows:

---

[65] https://www.coinbase.com/price/keep-network (accessed Oct. 7, 2021).

> Chainlink (LINK) is an Ethereum token that powers the Chainlink decentralized oracle network. This network allows smart contracts on Ethereum to securely connect to external data sources, APIs, and payment systems.[66]

144.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in LINK tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for LINK tokens and paid Coinbase a fee for executing the transaction. LINK token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their LINK tokens, which they expected to result predominantly, if not solely, from the efforts of LINK's creator, developer, and issuer.

### 35.    Loom Network (LOOM)

145.    Loom Network ("LOOM") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes LOOM as follows:

> Loom Network (LOOM) is an Ethereum token that powers a network of delegated proof of stake sidechains (a system that Loom dubs "EOS on Ethereum"). This allows for highly-scalable games and user-facing dApps backed by the security of Ethereum.[67]

146.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in LOOM tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for LOOM tokens and paid Coinbase a fee for executing the transaction. LOOM token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their LOOM tokens, which they expected to result predominantly, if not solely, from the efforts of LOOM's creator, developer, and issuer.

---

[66] https://www.coinbase.com/price/chainlink (accessed Oct. 4, 2021).

[67] https://www.coinbase.com/price/loom-network (accessed Oct. 7, 2021).

36.     **Loopring (LRC)**

147.     Loopring ("LRC") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes LRC as follows:

> Loopring is an Ethereum token that describes itself as "an open-sourced, audited,
> and non-custodial exchange protocol." It aims to allow anyone to build non-
> custodial, order book-based exchanges on Ethereum by leveraging zero-
> knowledge proofs.[68]

148.     During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in LRC tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for LRC tokens and paid Coinbase a fee for executing the

transaction. LRC token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their LRC tokens, which they expected to result

predominantly, if not solely, from the efforts of LRC's creator, developer, and issuer.

37.     **Decentraland (MANA)**

149.     Decentraland ("MANA") is a Digital Asset Security that was listed on the

Coinbase Digital Asset Platforms during the Class Period. Coinbase describes MANA as

follows:

> Decentraland (MANA) is an Ethereum token that powers the Decentraland virtual
> reality platform. MANA can be used to pay for virtual plots of land in
> Decentraland as well as in-world goods and services.[69]

150.     During the Class Period, members of the Class, including Plaintiff Underwood,

invested in MANA tokens on the Coinbase Digital Asset Platforms by exchanging money or

digital assets for MANA tokens and paid Coinbase a fee for executing the transaction. MANA

token investor Coinbase Digital Asset Platform users expected to earn profits through the

---

[68] https://www.coinbase.com/price/loopring (accessed Oct. 4, 2021).

[69] https://www.coinbase.com/price/decentraland (accessed Oct. 4, 2021).

appreciation in value of their MANA tokens, which they expected to result predominantly, if not solely, from the efforts of MANA's creator, developer, and issuer.

### 38.   Polygon (MATIC)

151.    Polygon ("MATIC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes MATIC as follows:

> Polygon was formerly called Matic Network . . . Polygon (MATIC) is an Ethereum token that powers the Polygon Network, a scaling solution for Ethereum. Polygon aims to provide faster and cheaper transactions on Ethereum using Layer 2 sidechains, which are blockchains that run alongside the Ethereum main chain. Users can deposit Ethereum tokens to a Polygon smart contract, interact with them within Polygon, and then later withdraw them back to the Ethereum main chain. The MATIC token is used to pay transaction fees and participate in proof-of-stake consensus.[70]

152.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander invested in MATIC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for MATIC tokens and paid Coinbase a fee for executing the transaction. MATIC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their MATIC tokens, which they expected to result predominantly, if not solely, from the efforts of MATIC's creator, developer, and issuer.

### 39.   Maker (MKR)

153.    Maker ("MKR") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes MKR as follows:

> Maker is an Ethereum token that describes itself as "a utility token, governance token, and recapitalization resource of the Maker system." The purpose of the Maker system is to generate another Ethereum token, called Dai, that seeks to trade on exchanges at a value of exactly US$1.00.[71]

---

[70] https://www.coinbase.com/price/polygon (accessed Oct. 4, 2021).

[71] https://www.coinbase.com/price/maker (accessed Oct. 4, 2021).

154.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander invested in MKR tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for MKR tokens and paid Coinbase a fee for executing the transaction. MKR token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their MKR tokens, which they expected to result predominantly, if not solely, from the efforts of MKR's creator, developer, and issuer.

### 40.     MurAll (PAINT)

155.     MurAll ("PAINT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. During the Class Period, members of the Class, including Plaintiff Oberlander, invested in PAINT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for PAINT tokens and paid Coinbase a fee for executing the transaction. PAINT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their PAINT tokens, which they expected to result predominantly, if not solely, from the efforts of PAINT's creator, developer, and issuer.

### 41.     New Kind of Network (NKN)

156.     New Kind of Network ("NKN") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes NKN as follows:

> New Kind of Network (NKN) is a public blockchain that aims to use economic incentives to motivate Internet users to share network connections and utilize unused bandwidth. NKN aims to be a network for building decentralized applications in a way that enhances peer-to-peer data transmission and connectivity.[72]

157.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in NKN tokens on the Coinbase Digital Asset Platforms by

---

[72] https://www.coinbase.com/price/nkn (accessed Oct. 4, 2021).

exchanging money or digital assets for NKN tokens and paid Coinbase a fee for executing the

transaction. NKN token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their NKN tokens, which they expected to result

predominantly, if not solely, from the efforts of NKN's creator, developer, and issuer.

### 42.    Numeraire (NMR)

158.    Numeraire ("NMR") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes NMR as follows:

> Numeraire is an Ethereum token that powers Numerai, a San Francisco-based
> hedge fund that crowdsources artificial intelligence to make investments in major
> stock markets around the world. Numeraire (NMR) holders can stake their NMR
> tokens every week on specific predictions. Successful predictions are rewarded
> with more NMR. [73]

159.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in NMR tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for NMR tokens and paid Coinbase a fee for executing the

transaction. NMR token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their NMR tokens, which they expected to result

predominantly, if not solely, from the efforts of NMR's creator, developer, and issuer.

### 43.    NuCypher (NU)

160.    NuCypher ("NU") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes NU as follows:

> NuCypher (NU) is an Ethereum token that can be staked to run a node on the
> NuCypher network. NuCypher describes itself as a threshold cryptography
> network that provides data privacy and key management for decentralized
> applications and protocols.[74]

---

[73] https://www.coinbase.com/price/numeraire (accessed Oct. 4, 2021).

[74] https://www.coinbase.com/price/nucypher (accessed Oct. 4, 2021).

161.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in NU tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for NU tokens and paid Coinbase a fee for executing the transaction. NU token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their NU tokens, which they expected to result predominantly, if not solely, from the efforts of NU's creator, developer, and issuer.

### 44.    OMG Network (OMG)

162.    OMG Network ("OMG") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes OMG as follows:

> The OMG Network (formerly OmiseGO) is a value transfer network for Ethereum and any ERC-20 token. It describes itself as the first production-grade layer-2 Ethereum scaling solution and aims to let people move money and a variety of digital values on the blockchain faster, cheaper, and without compromising on security.[75]

163.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in OMG tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for OMG tokens and paid Coinbase a fee for executing the transaction. OMG token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their OMG tokens, which they expected to result predominantly, if not solely, from the efforts of OMG's creator, developer, and issuer.

### 45.    Orchid (OXT)

164.    Orchid ("OXT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes OXT as follows:

> Orchid (OXT) is an Ethereum token that powers the Orchid network, a peer-to-peer privacy tool that includes a decentralized VPN and other features designed to

---

[75] https://www.coinbase.com/price/omg-network (accessed Oct. 4, 2021).

give users more control over their Internet connection. OXT can be used to pay for bandwidth or staked by bandwidth providers in order to operate a node.[76]

165.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in OXT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for OXT tokens and paid Coinbase a fee for executing the transaction. OXT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their OXT tokens, which they expected to result predominantly, if not solely, from the efforts of OXT's creator, developer, and issuer.

### 46.    Origin Token (OGN)

166.     Origin Token (OGN) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes OGN as follows:

> Origin Token (OGN) is an Ethereum token that powers the Origin platform, which aims to power decentralized and peer-to-peer marketplaces. OGN can be used for staking, governance, and advertising on the Origin platform.[77]

167.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in OGN tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for OGN tokens and paid Coinbase a fee for executing the transaction. OGN token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their OGN tokens, which they expected to result predominantly, if not solely, from the efforts of OGN's creator, developer, and issuer.

### 47.    Orion Protocol (ORN)

168.     Orion Protocol (ORN) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ORN as follows:

---

[76] https://www.coinbase.com/price/orchid (accessed Oct. 4, 2021).

[77] https://www.coinbase.com/price/origin-token (accessed Oct. 4, 2021).

ORN is an Ethereum token that powers Orion Protocol, which aims to aggregate liquidity from centralized and decentralized exchanges into one platform. ORN can be used to receive discounted trading fees, for staking, and to access advanced features within the Orion Protocol.[78]

169.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in ORN tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ORN tokens and paid Coinbase a fee for executing the transaction. ORN token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ORN tokens, which they expected to result predominantly, if not solely, from the efforts of ORN's creator, developer, and issuer.

### 48.    Plair (PLA)

170.    Plair ("PLA") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. During the Class Period, members of the Class, including Plaintiff Oberlander, invested in PLA tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for PLA tokens and paid Coinbase a fee for executing the transaction. PLA token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their PLA tokens, which they expected to result predominantly, if not solely, from the efforts of PLA's creator, developer, and issuer.

### 49.    Polkadot (DOT)

171.    Polkadot ("DOT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes DOT as follows:

Polkadot is a protocol that enables cross-blockchain transfers of any type of data or asset. By uniting multiple blockchains, Polkadot aims to achieve high degrees of security and scalability. DOT serves as the protocol's governance token and can be used for staking to secure the network or to connect ("bond") new chains.[79]

---

[78] https://www.coinbase.com/price/orion-protocol (accessed Oct. 7, 2021).

[79] https://www.coinbase.com/price/polkadot (accessed Oct. 7, 2021).

172.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in DOT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for DOT tokens and paid Coinbase a fee for executing the transaction. DOT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their DOT tokens, which they expected to result predominantly, if not solely, from the efforts of DOT's creator, developer, and issuer.

### 50.     Polymath (POLY)

173.     Polymath ("POLY") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes POLY as follows:

> POLY is an Ethereum token that aims to facilitate digital securities trading on the Polymath platform. By creating a compliance-focused standard (ST-20) to issue and manage security tokens, Polymath seeks to tokenize and support the trading of traditional and new classes of assets.[80]

174.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in POLY tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for POLY tokens and paid Coinbase a fee for executing the transaction. POLY token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their POLY tokens, which they expected to result predominantly, if not solely, from the efforts of POLY's creator, developer, and issuer.

### 51.     Quant (QNT)

175.     Quant ("QNT") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes QNT as follows:

> QNT is an Ethereum token that is used to power Quant Network's Overledger brand of enterprise software solutions, which aim to connect public blockchains

---

[80] https://www.coinbase.com/price/polymath-network (accessed Oct. 7, 2021).

and private networks. Quant Network allows the creation of so-called mDapps that enable decentralized applications to operate on multiple blockchains at once.[81]

176.   During the Class Period, members of the Class, including Plaintiff Oberlander, invested in QNT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for QNT tokens and paid Coinbase a fee for executing the transaction. QNT token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their QNT tokens, which they expected to result predominantly, if not solely, from the efforts of QNT's creator, developer, and issuer.

### 52.   **Quickswap (QUICK)**

177.   Quickswap ("QUICK") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes QUICK as follows:

> QUICK is an Ethereum token that powers QuickSwap, a decentralized exchange that runs on the Polygon Network in order to provide faster and cheaper transactions on Ethereum. QUICK can be used to create and vote on proposals governing QuickSwap and can be staked to earn a portion of trading fees.[82]

178.   During the Class Period, members of the Class, including Plaintiff Underwood, invested in QUICK tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for QUICK tokens and paid Coinbase a fee for executing the transaction. QUICK token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their QUICK tokens, which they expected to result predominantly, if not solely, from the efforts of QUICK's creator, developer, and issuer.

---

[81] https://www.coinbase.com/price/quant (accessed Oct. 7, 2021).

[82] https://www.coinbase.com/price/quickswap (accessed Oct. 4, 2021).

53.   **Ren (REN)**

179.   Ren ("REN") is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. Coinbase describes REN as follows:

> Ren (REN) is an Ethereum token that powers Ren's open protocol for transferring
> cryptocurrencies between blockchains. Ren aims to bring popular assets like
> Bitcoin and Zcash to blockchains including Ethereum, making it possible for
> these assets to participate in a multi-chain decentralized finance ecosystem.[83]

180.   During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in REN tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for REN tokens and paid Coinbase a fee for executing the

transaction. REN token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their REN tokens, which they expected to result

predominantly, if not solely, from the efforts of REN's creator, developer, and issuer.

54.   **Augur (REP)**

181.   Augur's Reputation token ("REP") is a Digital Asset Security that was listed on

the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes REP as

follows:

> Augur's Reputation token (REP) is an Ethereum token designed for reporting and
> disputing the outcome of events on online prediction markets. Reporters are
> rewarded for reporting the outcome of events correctly.[84]

182.   During the Class Period, members of the Class, including Plaintiff Underwood,

invested in REP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

assets for REP tokens and paid Coinbase a fee for executing the transaction. REP token investor

Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value

---

[83] https://www.coinbase.com/price/ren (accessed Oct. 4, 2021).

[84] https://www.coinbase.com/price/augur (accessed Oct. 4, 2021).

of their REP tokens, which they expected to result predominantly, if not solely, from the efforts

of REP's creator, developer, and issuer.

### 55.    Shiba Inu (SHIB)

183.    Shiba Inu ("SHIB") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes SHIB as follows:

> Shiba Inu (SHIB) is a token that aspires to be an Ethereum-based alternative to
> Dogecoin (DOGE), the popular memecoin. Unlike Bitcoin, which is designed to
> be scarce, SHIB is intentionally abundant — with a circulating supply of one
> quadrillion. The Shiba Inu Token ecosystem supports projects such as an NFT art
> incubator and the development of a decentralized exchange called Shibaswap.[85]

184.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in SHIB tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for SHIB tokens and paid Coinbase a fee for executing the

transaction. SHIB token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their SHIB tokens, which they expected to result

predominantly, if not solely, from the efforts of XX's creator, developer, and issuer.

### 56.    SKALE (SKL)

185.    SKALE ("SKL") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes SKL as follows:

> SKALE (SKL) is an Ethereum token that powers the Skale Network, which
> describes itself as "an Ethereum-compatible network with a leaderless consensus
> designed to run on an uncapped number of independent nodes." Nodes on the
> Skale Network provide resources to multiple decentralized elastic blockchains.
> The SKL token grants a right to participate as a network validator, stake as a
> delegator, or access a share of the network's resources as a developer.[86]

---

[85] https://www.coinbase.com/price/shiba-inu (accessed Oct. 4, 2021).

[86] https://www.coinbase.com/price/skale (accessed Oct. 4, 2021).

186.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in SKL tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SKL tokens and paid Coinbase a fee for executing the transaction. SKL token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SKL tokens, which they expected to result predominantly, if not solely, from the efforts of SKL's creator, developer, and issuer.

### 57.    Synthetix Network Token (SNX)

187.    Synthetix Network Token ("SNX") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes SNX as follows:

> Synthetix Network Token (SNX) is an Ethereum token that powers Synthetix, a decentralised synthetic asset issuance protocol. Synthetic assets are minted when token holders stake their SNX as collateral using Mintr, a decentralised application for interacting with the Synthetix contracts. The protocol currently supports synthetic fiat currencies, cryptocurrencies, and commodities.[87]

188.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in SNX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SNX tokens and paid Coinbase a fee for executing the transaction. SNX token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SNX tokens, which they expected to result predominantly, if not solely, from the efforts of SNX's creator, developer, and issuer.

### 58.    Storj (STORJ)

189.    Storj ("STORJ") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes STORJ as follows:

---

[87] https://www.coinbase.com/price/synthetix-network-token (accessed Oct. 4, 2021).

Storj (STORJ) is an Ethereum token that powers a decentralized cloud storage network for developers called Storj DCS (Decentralized Cloud Storage). After a customer uploads a file to Storj DCS, pieces of each file are distributed to a global network of independent nodes. When someone requests the file, it is then recompiled securely and made available for download. This means that anyone can store files on Storj DCS without having to trust a centralized data center. Developers can purchase cloud storage services with STORJ. Network participants earn STORJ in return for providing unused hard drive space and bandwidth to the network.[88]

190.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in SNX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SNX tokens and paid Coinbase a fee for executing the transaction. SNX token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SNX tokens, which they expected to result predominantly, if not solely, from the efforts of SNX's creator, developer, and issuer.

### 59.    SushiSwap (SUSHI)

191.    SushiSwap ("SUSHI") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes SUSHI as follows:

SushiSwap (SUSHI) is an Ethereum token that powers SushiSwap, a decentralized cryptocurrency exchange and automated market maker built on Ethereum. Holders of SUSHI can participate in community governance and stake their tokens to receive a portion of SushiSwap's transaction fees.[89]

192.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in SUSHI tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SUSHI tokens and paid Coinbase a fee for executing the transaction. SUSHI token investor Coinbase Digital Asset Platform users expected to earn profits through the

---

[88] https://www.coinbase.com/price/storj (accessed Oct. 4, 2021).

[89] https://www.coinbase.com/price/sushiswap (accessed Oct. 7, 2021).

appreciation in value of their SUSHI tokens, which they expected to result predominantly, if not solely, from the efforts of SUSHI's creator, developer, and issuer.

### 60.    Telcoin (TEL)

193.    Telcoin ("TEL") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. During the Class Period, members of the Class, including Plaintiff Oberlander, invested in TEL tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for TEL tokens and paid Coinbase a fee for executing the transaction. TEL token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their TEL tokens, which they expected to result predominantly, if not solely, from the efforts of TEL's creator, developer, and issuer.

### 61.    Tellor (TRB)

194.    Tellor (TRB) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes TRB as follows:

> Tellor is a decentralized oracle network that allows smart contracts on Ethereum to securely connect to external data sources. TRB (a.k.a. "Tributes") is an Ethereum token that powers the Tellor network and incentivizes honest reporting of external data.[90]

195.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in TRB tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for TRB tokens and paid Coinbase a fee for executing the transaction. TRB token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their TRB tokens, which they expected to result predominantly, if not solely, from the efforts of TRB's creator, developer, and issuer.

---

[90] https://www.coinbase.com/price/tellor (accessed Oct. 7, 2021).

### 62.    **UMA (UMA)**

196.    UMA ("UMA") is a Digital Asset Security that was listed on the Coinbase Digital

Asset Platforms during the Class Period. Coinbase describes UMA as follows:

> UMA is an Ethereum token that describes itself as "an open-source protocol that
> allows developers to design and create their own financial contracts and synthetic
> assets." The protocol's name comes from the team's goal of creating universal
> market access (UMA).[91]

197.    During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in UMA tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for UMA tokens and paid Coinbase a fee for executing the

transaction. UMA token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their UMA tokens, which they expected to result

predominantly, if not solely, from the efforts of UMA's creator, developer, and issuer.

### 63.    **Uniswap (UNI)**

198.    UNI, the native token of the Uniswap Platform, is a Digital Asset Security that

was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes

UNI as follows:

> Uniswap (UNI) is an Ethereum token that powers Uniswap, an automated
> liquidity provider that's designed to make it easy to exchange Ethereum (ERC-20)
> tokens. There is no orderbook or central facilitator on Uniswap. Instead, tokens
> are exchanged through liquidity pools that are defined by smart contracts.[92]

199.    On September 17, 2020 Uniswap launched the UNI token by distributing 400

UNI tokens to every Uniswap Platform account that used the Uniswap Platform before

September 1, 2020. Uniswap distributed an estimated 400 million UNI tokens which were

---

[91] https://www.coinbase.com/price/uma (accessed Oct. 4, 2021).

[92] https://www.coinbase.com/price/uniswap (accessed Oct. 4, 2021).

initially valued at $3 per UNI token, making the value of the UNI token distribution approximately $1.2 billion. Uniswap has announced its intention to distribute another 600 million UNI tokens to UNI token owner Uniswap Platforms users in the future.

200.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in UNI tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for UNI tokens and paid Coinbase a fee for executing the transaction. UNI token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their UNI tokens, which they expected to result predominantly, if not solely, from the efforts of UNI's creator, developer, and issuer Uniswap in developing and maintaining the Uniswap Platform.

### 64.    USD Coin (USDC)

201.    USD Coin ("USDC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. USDC was developed by Coinbase and payments company Circle in 2018.[93] In a perfect example of the dangers of allowing unregistered entities to operate as securities exchanges and broker-dealers, Coinbase "falsely described USD Coin as backed completely by dollars 'in a bank account'" from USDC's in 2018 launch until August 2021.[94] In reality, during this time USDC has been a synthetic security, and had been backed by financial instruments which have long been recognized as securities.

---

[93] *Coinbase and Circle announce the launch of USDC — a Digital Dollar*, THE COINBASE BLOG (Oct 23, 2018), https://blog.coinbase.com/coinbase-and-circle-announce-the-launch-of-usdc-a-digital-dollar-2cd6548d237 (accessed Oct. 7, 2021).

[94] *Joe Light & Vildana Hajric, Coinbase, Circle say USDC Reserves to Be In Cash, Treasuries*, BLOOMBERG (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-23/coinbase-circle-to-move-all-usdc-reserves-into-cash-treasuries

202.    When Coinbase and its partner Circle admitted that USDC was not, in fact, backed by $1 "in a bank account" as claimed, but was rather 60% backed by "cash and cash equivalents", 13% backed by certificates of deposit (13%), 12% backed by U.S. Treasuries (12%), 9% backed commercial paper (9%) with the remaining backing consisting of municipal and corporate bonds, it confirmed that USDC is a synthetic, or derivative, security.[95]

203.    Coinbase describes USDC as follows:

> USD Coin (USDC) is a stablecoin redeemable on a 1:1 basis for US dollars, backed by dollar denominated assets held in segregated accounts with US regulated financial institutions. The launch of USDC was powered by a collaboration between Coinbase and Circle through the co-founding of the CENTRE Consortium.[96]

204.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in USDC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for USDC tokens and paid Coinbase a fee for executing the transaction. Plaintiff and Class member USDC investors reasonably expected to profit from their USDC investments. For example, USDC investors who purchase USDC at a discount (*i.e.*, when the market value of 1 USDC is less than $1) expect to profit when USDC regains its 1:1 peg to the dollar, or when value of USDC exceeds $1. Second, when investors in non-USDC digital assets expect non-stablecoin digital assets to fall, they invest in USDC as a safe haven, expecting to lock in a dollar value by investing in USDC as alternative digital asset investments lose value. Finally, in periods of downturn, investors buy USDC with the hopes that increased demand for

---

[95] Nikhilesh De, *Circle Reveals Assets Backing USDC Stablecoin,* CoinDesk (July 20, 2021), https://www.coindesk.com/business/2021/07/20/circle-reveals-assets-backing-usdc-stablecoin/ (accessed Oct. 7, 2021).

[96] https://www.coinbase.com/price/usdc (accessed Oct. 7, 2021).

stablecoins will drive USDC prices over $1.00. These profit opportunities result from the efforts of the issuer, creator, and "minter" of USDC.

205.    Additionally, USDC's issuer and operator, which includes Coinbase, employs stabilization mechanisms which rely on Tether efforts in the initial development and ongoing management and verification of USDT issuances and the assets backing USDT in circulation.

206.    Finally, USDC token investor Coinbase Digital Asset Platform users expected to earn profits through the interest paid to them as a result of holding their USDC tokens, which they expected to result predominantly, if not solely, from the efforts of USDC creator, developer, and issuer.

### 65.   Tether (USDT)

207.    Tether ("USDT") is a "stablecoin" Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes USDT as follows:

> Tether (USDT) is an Ethereum token that is pegged to the value of a U.S. dollar (also known as a stablecoin). Tether's issuer claims that USDT is backed by bank reserves and loans which match or exceed the value of USDT in circulation. Important note: at this time, Coinbase only supports USDT on the Ethereum blockchain (ERC-20). Do not send USDT on any other blockchain to Coinbase.[97]

208.    USDT is backed by products which are themselves securities, including equities, other cryptocurrencies, and debt instruments such as commercial paper. The "economic reality" is thus that USDT is simply a derivative of a security.

209.    Additionally, USDT investors exchange money or other digital assets for USDT. Tether, the issuer of USDT, pools the money of USDT investors together to fund Tether's operations and to develop Tether's products and systems.

---

[97] https://www.coinbase.com/price/tether (accessed Oct. 7, 2021).

210.     USDT investors reasonably expect to profit from their USDT investments. For example, USDT investors purchase USDT at a discount (*i.e.*, when the market value of 1 USDT is less than $1) expect to profit when USDT regains its 1:1 peg to the dollar. Second, when investors in non-USDT digital assets expect non-stablecoin digital assets to fall, they invest in USDT as a safe haven, expecting to lock in a dollar value by investing in USDT as alternative investments lose value. Finally, in periods of downturn, investors buy USDT with the hopes that increased demand for stablecoins will drive USDT prices over $1.00. This scenario occurred when, on March 12, 2020 Bitcoin prices collapsed. As a result of the collapsing Bitcoin prices, demand for USDT increased, driving the market value of 1 USDT from $1.00 to $1.03 and as high as $1.06, opening profit opportunities for holders of USDT to sell.

211.     These profit opportunities result from the efforts of Tether, the issuer, creator, and "minter" of USDT. Tether, like most stablecoin issuers, employ stabilization mechanisms which rely on Tether efforts in the initial development and ongoing management and verification of USDT issuances and the assets backing USDT in circulation.

212.     During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in USDT tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for USDT tokens and paid Coinbase a fee for executing the transaction.  Coinbase Digital Asset Platform users expected to profit by, *inter alia*, using USDT to take advantage of digital asset arbitrage opportunities (*i.e.*, moving in and out of positions in other digital assets and parking funds in USDT in the interim) and earn profits through the appreciation in value of their USDT tokens, which they expected to result predominantly, if not solely, from the efforts of USDT's creator, developer, and issuer.

### 66.  **Stellar Lumens (XLM)**

213.   Stellar Lumens ("XLM") is a Digital Asset Security that was listed on the

Coinbase Digital Asset Platforms during the Class Period. Coinbase describes XLM as follows:

> Stellar's cryptocurrency, the Stellar Lumen (XLM), powers the Stellar payment
> network. Stellar aims to connect banks, payment systems, and individuals quickly
> and reliably.[98]

214.   During the Class Period, members of the Class, including Plaintiff Underwood

and Plaintiff Oberlander, invested in XLM tokens on the Coinbase Digital Asset Platforms by

exchanging money or digital assets for XLM tokens and paid Coinbase a fee for executing the

transaction. XLM token investor Coinbase Digital Asset Platform users expected to earn profits

through the appreciation in value of their XLM tokens, which they expected to result

predominantly, if not solely, from the efforts of XLM's creator, developer, and issuer.

### 67.  **XRP (XRP)**

215.   XRP ("XRP") is a Digital Asset Security created and distributed by Ripple Labs

Inc. that was listed on the Coinbase Digital Asset Platforms during the Class Period. On

December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its co-

founders alleging that XRP is a security, and that Ripple Labs Inc. and its co-founders'

distribution of XRP from 2013 up to December 22, 2020 constituted one large, ongoing

unregistered securities offering.[99]

216.   Coinbase describes XRP as follows:

> XRP is the cryptocurrency used by the XRP ledger, which supports international
> currency exchange and remittances. XRP can function as a bridge currency in

---

[98] https://www.coinbase.com/price/stellar

[99] *See SEC v. Ripple Labs, Inc. et al.* No. 20-cv-10832, Complaint (ECF No. 4), Dec. 22, 2020,
https://www.sec.gov/litigation/complaints/2020/comp-pr2020-338.pdf (accessed Oct. 7, 2021).

transactions involving different currencies such as US dollars, Japanese yen, Euros, Francs, and others in use on the XRP network.[100]

217.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in XRP tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for XRP tokens and paid Coinbase a fee for executing the transaction. XRP token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their XRP tokens, which they expected to result predominantly, if not solely, from the efforts of XRP's creator, developer, and issuer.

218.    Coinbase suspended trading of XRP on January 19, 2021 because of the SEC's enforcement action against Ripple Labs, Inc., issuer of XRP.

### 68.    Tezos (XTZ)

219.    Tezos ("XTZ") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes XTZ as follows:

> Tezos is a cryptocurrency and decentralized computing platform. Its features include proof of stake consensus, formal verification (which lets developers verify the correctness of their code), and the ability to let stakeholders vote on changes to the protocol. Tezos's block creation process is called "baking" — Tezos holders who stake their tokens can receive Tezos tokens as a reward for creating and verifying blocks. [101]

220.    During the Class Period, members of the Class, including Plaintiff Underwood and Plaintiff Oberlander, invested in XTZ tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for XTZ tokens and paid Coinbase a fee for executing the transaction. XTZ token investor Coinbase Digital Asset Platform users expected to earn profits

---

[100] https://www.coinbase.com/price/xrp (accessed Oct. 7, 2021).

[101] https://www.coinbase.com/price/xrp (accessed Oct. 7, 2021).

through the appreciation in value of their XTZ tokens, which they expected to result

predominantly, if not solely, from the efforts of XTZ's creator, developer, and issuer.

### 69.    XYO (XYO)

221.    XYO is a Digital Asset Security that was listed on the Coinbase Digital Asset

Platforms during the Class Period. Coinbase describes XYO as follows:

> XYO is an Ethereum token that powers XYO Network, a decentralized network
> of devices that anonymously collect and validate geospatial data. On the XYO
> World platform, XYO tokens can be traded for and staked against unique ERC-
> 721 tokens representing real-world locations.[102]

222.    During the Class Period, members of the Class, including Plaintiff Underwood,

invested in XYO tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

assets for XYO tokens and paid Coinbase a fee for executing the transaction. XYO token

investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation

in value of their XYO tokens, which they expected to result predominantly, if not solely, from

the efforts of XYO's creator, developer, and issuer.

### 70.    Yearn.finance (YFI)

223.    Yearn.finance ("YFI") is a Digital Asset Security that was listed on the Coinbase

Digital Asset Platforms during the Class Period. Coinbase describes YFI as follows:

> Yearn.finance (YFI) is an Ethereum token that governs the Yearn.finance
> platform. The platform is a yield optimizer that moves funds around the
> decentralized finance ("defi") ecosystem in an effort to generate a high return.[103]

224.    During the Class Period, members of the Class, including Plaintiff Oberlander,

invested in YFI tokens on the Coinbase Digital Asset Platforms by exchanging money or digital

assets for YFI tokens and paid Coinbase a fee for executing the transaction. YFI token investor

---

[102] https://www.coinbase.com/price/xyo (accessed Oct. 7, 2021).

[103] https://www.coinbase.com/price/yearn-finance.

Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their YFI tokens, which they expected to result predominantly, if not solely, from the efforts of YFI's creator, developer, and issuer.

### 71. <u>Zcash (ZEC)</u>

225.    Zcash ("ZEC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ZEC as follows:

> Zcash is a cryptocurrency that offers two types of addresses: transparent addresses that are publicly visible on the Zcash blockchain and shielded addresses that are more private. Coinbase customers can receive Zcash from both transparent and shielded addresses and send Zcash to transparent addresses. Sending to shielded addresses is not supported at this time.[104]

226.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in ZEC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ZEC tokens and paid Coinbase a fee for executing the transaction. ZEC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ZEC tokens, which they expected to result predominantly, if not solely, from the efforts of ZEC's creator, developer, and issuer.

### 72. <u>0x (ZRX)</u>

227.    0x ("ZRX") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Coinbase describes ZRX as follows:

> ZRX is an Ethereum token that is used to power the 0x protocol. The protocol itself is designed to allow Ethereum tokens to be traded at a low cost directly from your wallet.[105]

---

[104] https://www.coinbase.com/price/zcash (accessed Oct. 7, 2021).

[105] https://www.coinbase.com/price/0x (accessed Oct. 7, 2021).

228.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in ZRX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for ZRX tokens and paid Coinbase a fee for executing the transaction. ZRX token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their ZRX tokens, which they expected to result predominantly, if not solely, from the efforts of ZRX's creator, developer, and issuer.

## II.    THE COINBASE DIGITAL ASSET PLATFORMS ARE RULE 3b-16(a) SYSTEMS AND THEREFORE ARE "EXCHANGES" UNDER THE EXCHANGE ACT

229.    The Coinbase Digital Asset Platforms satisfy the criteria of Exchange Act Rule 3b-16(a) and are not exempted under Rule 3b-16(b).

230.    As described above, Coinbase and Coinbase Pro bring together orders of multiple buyers and sellers. Coinbase and Coinbase Pro receive and store digital asset buy and sell orders for digital asset securities from their users. Coinbase and Coinbase Pro provided the means for these orders to interact and execute through the combined use of the Coinbase and Coinbase Pro websites, mobile apps, order books, and pre-programmed trading rules protocols defined in the Coinbase and Coinbase Pro trading engine. These established non-discretionary methods allowed Coinbase and Coinbase Pro users to agree upon the terms of their trades in Digital Asset Securities on Coinbase and Coinbase Pro during the Class Period.

231.    Coinbase is thus an "organization . . . which . . . maintains [and] provides a marketplace or facilities for bringing together purchasers and sellers" of digital assets. *See* 15 U.S.C. § 78c. As discussed in further detail below, because many (if not all) of the digital assets listed on the Coinbase Platform are securities, the Coinbase Platform meets the statutory definition of an exchange under the Exchange Act. *Id*.

**III.     COINBASE OPERATES AS A BROKER-DEALER ON THE COINBASE PLATFORM**

232.     Coinbase's activities further meet the definition of both a "broker-dealer" under the Exchange Act. The Exchange Act defines "broker" in part as an entity that is "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

233.     For example, during the Class Period, Coinbase operated as a broker by effecting transactions in Digital Asset Securities for Coinbase Platform users by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker dealer by facilitating the sale of Digital Asset Securities as part of ICOs. For example, on February 28, 2019 Coinbase announced that the Digital Asset Security XRP was available for trading on the Coinbase Platform. As discussed above, the SEC has charged Ripple Labs Inc., the founder, developer, and issuer of XRP with operating one long continuous ICO from 2013 to the present, which includes the period of time during which Coinbase facilitated the sale of XRP by listing it for trading and facilitating transactions for XRP.

234.     Coinbase's activities also meet the Exchange Act's definition of "dealer", which includes entities that are "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." During the Class Period, Coinbase operated as a dealer as defined by the Exchange Act by, *inter alia,* (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Digital Asset Securities; (2)  maintaining custody over Coinbase Digital Asset Platform customers' Digital Asset Securities; (3) by providing customers services such as allowing purchase of Digital Asset Securities on credit; (4)  by having a regular

turnover inventory of Digital Asset Securities; (5) by purchasing Digital Asset Securities for accounts in Coinbase's name (often at a discount to the ICO price); and (6) and selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

## IV. PLAINTIFFS ARE ENTITLED TO FEES AND DAMAGES

235.    Despite the fact that the Coinbase Digital Asset Platforms meet the definition of exchange provided in Section 3(a)(1) *and* qualify as Rule 3b-16(a) systems, Coinbase has not registered the Coinbase Digital Asset Platforms as national securities exchanges pursuant to Section 6 of the Exchange Act; nor has Coinbase operated the Coinbase Digital Asset Platforms pursuant to exemptions from such registration. Accordingly, Coinbase violated Section 5 of the Exchange Act.

236.    Similarly, despite the fact that Coinbase's activities meet the criteria of a broker-dealer as defined by the Exchange Act, Coinbase has not registered with the SEC, nor has it registered with FINRA as required by Section 15 of the Exchange Act.

237.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

238.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase or sale agreements with Coinbase and to recover damages, including the fees they have paid under those agreements.

239.    Plaintiffs and the Class additionally seek to void their contracts and recover damages with respect to purchases or sales of Digital Asset Securities on the Coinbase Digital Asset Platforms *Id*. § 78cc(b).

## V.    PLAINTIFF UNDERWOOD

240.    Plaintiff Christopher Underwood is a citizen and resident of the State of Florida.

241.    During the Class Period, Plaintiff Underwood engaged in Digital Asset Securities transactions on the Coinbase Digital Asset Platforms, including transaction in the following Digital Asset Securities: AAVE, ACH, ADA, ALGO, AMP, ANKR, ATOM, BAL, BAND, BAT, BNT, BTRST, CGLD, COMP, CRV, CVC, DAI, DNT, DOGE, EOS, FARM, FET, FIL, FORTH, GRT, IOTX, KNC, LINK, LRC, MANA, MATIC, MKR, NKN, NMR, NU, OMG, OXT, QUICK, REN, REP, SHIB, SKL, SNX, STORJ, UMA, UNI, USDC, USDT, XLM, XRP, XTZ, XYO, ZRX.

## VI.    PLAINTIFF OBERLANDER

242.    Plaintiff Louis Oberlander is a citizen and resident of the State of California.

243.    During the Class Period, Plaintiff Oberlander engaged in Digital Asset Securities transactions on the Coinbase Digital Asset Platforms, including transaction in the following Digital Asset Securities: 1INCH, AAVE, ACH, ADA, ALGO, AMP, ANKR, ATOM, AVAX, BAL, BOND, BAT, CTSI, CELO, CETH, CVC, COMP, CRV, DAI, DASH, DNT, DOGE, DOT, ENJ, EOS, FIL, FORTH, GNT, GRT, ICP, KEEP, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, OGN, OMG, ORN, OXT, PAINT, PLA, POLY, QNT, REN, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TEL, TRB, UMA, UNI, USDT, USDC, XLM, XRP, XTZ, YFI, ZEC, ZRX.

## VII.   PLAINTIFF PATIN

244.   Plaintiff Zeneyda Patin is a citizen and resident of the State of New York.

245.   During the Class Period, Plaintiff Patin engaged in Digital Asset Securities transactions on the Coinbase Digital Asset Platforms, including transaction in the following Digital Asset Securities: ADA, FARM.

### TOLLING AND ESTOPPEL

## I.   DISCOVERY RULE TOLLING

246.   Coinbase has repeatedly made statements and representations designed to deceive its customers regarding whether the digital assets made available for trading by Coinbase on its platform as securities. For example, at all relevant times, Coinbase has stated that it "is not registered with the U.S. Securities and Exchange Commission and does not offer securities services in the United States or to U.S. persons." While Coinbase is open about its non-registration, it falsely claims that the reason for its non-registration is that it does not offer securities services; this is a misrepresentation

247.   As unsophisticated investors, Plaintiffs, the Class, and Subclasses had no way of knowing about Coinbase's conduct with respect to the securities offered on the Coinbase platform.

248.   Neither Plaintiffs nor any other members of the Class or Subclasses, through the exercise of reasonable care, could have discovered the conduct by Coinbase alleged herein. Further, Plaintiffs and members of the Class and Subclasses did not discover and did not know of facts that would have caused a reasonable person to suspect that Coinbase was engaged in the conduct alleged herein.

249.    For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs, the Class, and the Subclasses.

## II.    FRAUDULENT CONCEALMENT TOLLING

250.    Coinbase's actions concealed the nature of the Digital Asset Securities listed on the Coinbase Digital Asset Platforms and therefore concealed that the Coinbase Digital Asset Platforms are "exchanges" and, alternatively, acted as Broker-Dealers as defined by the Exchange Act.

251.    Upon information and belief, Coinbase intended its acts to conceal the facts and claims from Plaintiffs and members of the Classes and Subclasses. Plaintiffs and the members of the Class and Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes or Subclasses should be tolled.

## <u>CLASS ACTION ALLEGATIONS</u>

252.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

253.    Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

> **NATIONWIDE CLASS:** all persons or entities in the United States who, from the beginning of any applicable limitations period through the date of certification (the "Class Period"), purchased, sold, or otherwise transacted in securities on the Coinbase Digital Asset Platforms (the "Class").

254.    Plaintiffs seek certification on behalf of a subclass defined as follows:

> **CALIFORNIA SUBCLASS**: all persons or entities who were or are citizens of the State of California who, from the beginning of any applicable limitations period through the

date of certification (the "Class Period"), purchased, sold, or otherwise transacted in securities on the Coinbase Digital Asset Platforms (the "California Subclass").

255.    Plaintiffs seek certification on behalf of a subclass defined as follows:

**FLORIDA SUBCLASS**: all persons or entities who were or are citizens of the State of Florida who, from the beginning of any applicable limitations period through the date of certification (the "Class Period"), purchased, sold, or otherwise transacted in securities on the Coinbase Digital Asset Platforms (the "Florida Subclass").

256.    Plaintiffs seek certification on behalf of a subclass defined as follows:

**NEW YORK SUBCLASS**: all persons or entities who were or are citizens of the State of New York who, from the beginning of any applicable limitations period through the date of certification (the "Class Period"), purchased, sold, or otherwise transacted in securities on the Coinbase Digital Asset Platforms (the "New York Subclass").

257.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

258.    Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendant's and Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendant; and (f) the legal representatives, successors, and assigns of any such excluded persons.

259.    **Ascertainability**. The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if

they are part of a Class or Subclass.  Further, the Classes and Subclasses can be readily identified through records maintained by Defendant.

260.   **Numerosity (Rule 23(a)(1))**. The Classes and Subclasses are so numerous that joinder of individual members herein is impracticable.   The exact number of members of the Class and Subclasses, as herein identified and described, is not known, upon information and belief there are thousands of purchasers, if not more, who transacted on the Coinbase Digital Asset Platforms.

261.   **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

- whether Defendant Coinbase offered certain digital assets for sale;

- whether Defendant Coinbase offered digital assets for sale that constitute securities under the federal securities laws;

- whether Defendant Coinbase knew or should have known that certain digital assets it listed for trading were securities;

- whether Defendant Coinbase operated as a securities exchange as defined by the federal securities laws;

- whether Defendant Coinbase operated as a broker-dealer as defined by the federal securities laws;

- whether Defendant Coinbase violated the federal securities laws;

- whether Plaintiffs and the members of the Class and Subclasses are entitled to damages and the amount and measure thereof; and

- whether Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

262.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses. Plaintiffs and members of the Class and Subclasses (as applicable) suffered injuries as a result of Coinbase's wrongful conduct that is uniform across the Class and Subclasses.

263.    **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

264.    **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclasses is impracticable. The prosecution of separate actions by individual members of the Class and Subclasses would impose heavy burdens upon the Courts and Defendant, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual

litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

265.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

266.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant Coinbase acted or refused to act on grounds generally applicable to the Classes and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

267.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**CONTRACTS WITH AN UNREGISTERED EXCHANGE
SECTION(s) 5 AND 29(b) OF THE EXCHANGE ACT**

**(On Behalf of the Nationwide Class or, alternatively, the Subclasses)**

268.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

269.    Section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national

securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities." 17 C.F.R. § 240.3b-16.

270.    Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because Coinbase has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

271.    Coinbase has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

272.    During the Class Period, Coinbase entered into contracts with issuers of Digital Asset Securities Coinbase and made available for sale the issuer's Digital Asset Securities on Coinbase's unregistered exchanges, in violation of Section 5 of the Exchange Act.

273.    Additionally, Coinbase entered into contracts via the Coinbase User Agreement, with Plaintiffs and the members of the Class and Subclasses, pursuant to which Plaintiffs purchased Digital Asset Securities through Coinbase and paid Coinbase fees for the use of its securities exchanges despite their lack of registration with the SEC in violation of section 5 of the Exchange Act.

274.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Coinbase entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the

contracts reached agreements whereby and pursuant to which Coinbase would be and was operating in violation of section 5.

275.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

276.     Section 29(b) affords Plaintiffs and the Class the right to void their purchase or sale agreements with Coinbase and to recover damages, including fees paid, under those agreements. Plaintiffs and the Class therefore seek all appropriate damages pursuant to Section 29(b), including fees paid, in connection with and as a result of any Digital Asset Securities transactions Plaintiffs and the Class entered into on the Coinbase Digital Asset Platforms during the Class Period.

### SECOND CLAIM FOR RELIEF

**UNREGISTERED BROKER-DEALER**
**SECTION(S) 15(a)(1) AND 29(b) OF THE EXCHANGE ACT**

**(On Behalf of the Nationwide Class or, alternatively, the Subclasses)**

277.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

278.     In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase

or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

279.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, Coinbase made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

280.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering. As described above, Coinbase operated as a broker as defined by the Exchange Act during the Class Period.

281.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." As described above, Coinbase operated as dealer as defined by the Exchange Act during the Class Period.

282.    In the course of planning to operate and as operating as an unregistered broker-dealer, Coinbase has entered into contracts with issuers of Digital Asset Securities whereby the parties to those contracts agreed that Coinbase, operating as an unregistered broker-dealer within the United States,  would make available for sale the issuers' Digital Asset Securities. The parties to these contracts thus reached an agreement whereby and pursuant to which Coinbase would operate in violation of section 15(a)(1) of the Exchange Act.

283.     In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of Digital Asset Securities, and pursuant to and consistent with its Terms of Use, Coinbase has entered into contracts with the members of the Class pursuant to which the members purchased Digital Asset Securities through Coinbase and paid Coinbase fees for the use of its exchange. The parties to these contracts thus reached an agreement whereby and pursuant to which Coinbase was operating in violation of section 15(a)(1) of the Exchange Act.

284.     The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Coinbase entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Coinbase would be and was operating in violation of section 5.

285.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id*. § 78cc.

286.     Section 29(b) affords Plaintiffs and the Class the right to void their purchase or sale agreements with Coinbase and to damages, including fees paid, in connection with those agreements. Plaintiffs and the Class therefore seek all appropriate damages pursuant to Section 29(b), including any consideration and fees paid, in connection with and as a result of any Digital

Asset Securities transactions Plaintiffs and the Class entered into on the Coinbase Digital Asset Platforms during the Class Period.

### THIRD CLAIM FOR RELIEF

**TRANSACTING BUSINESS AS AN UNLICENSED BROKER-DEALER**
**Cal. Corp. Code § 25501.5(a)**

**(On Behalf of the California Subclass)**

287.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

288.     This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Digital Asset Securities on the Coinbase Digital Asset Platforms in California.

289.     The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *Id.* § 25210. Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). Upon recission and tender of the Digital Asset Securities, such purchaser is entitled to recover the consideration paid for the Digital Asset Securities plus interest at the legal rate, less the amount of any income received on the Digital Asset Securities. *Id.* § 25501.5(a)(2). A purchaser who no longer owns the Digital Asset Securities is entitled to damages in an amount equal to the difference between: (i) the price at which the security was brought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Digital Asset Securities by the purchaser. *Id.* § 25501.5(a)(4).

290.     When issued, the Digital Asset Securities were securities within the meaning of the California Securities Act. *Id.* § 25019. Coinbase transacted business as a broker-dealer or

agent when it offered or sold the Digital Asset Securities to at least one Plaintiff in California. *Id.* § 25004. 521. Coinbase transacted business as a broker-dealer or agent in California, including without limitation through solicitations directed by Coinbase to California and received in California.

291.   Coinbase was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

292.   Accordingly, Coinbase has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

293.   Plaintiffs and Class members therefore seek all available and appropriate relief available under the California Securities Act, including damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorney's fees, and interest.

## FOURTH CLAIM FOR RELIEF

### TRANSACTING BUSINESS AS AN UNREGISTERED DEALER
### Fla. Stat. § 517.2111

### (On Behalf of the Florida Subclass)

294.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

295.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Florida Subclass members who bought and sold Digital Asset Securities on the Coinbase Digital Asset Platforms in Florida during the Class Period.

296.   The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. Fla. Stat. § 517.12(1). Any person who offers or sells a security in violation of Section

517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

297.     When issued, the Digital Asset Securities were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). Coinbase transacted business as a dealer when it offered or sold the Digital Asset Securities to a Plaintiff in Florida. *Id.* § 517.021(6).

298.     Coinbase transacted business as a dealer in Florida, including without limitation through solicitations directed by Coinbase to Florida and received in Florida.

299.     Coinbase was not registered as a dealer in Florida, nor was it subject to any exemption from registration.

300.     Accordingly, Coinbase has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

301.     Plaintiffs and Class members therefore seek all available and appropriate relief available under the Florida Investor Securities and Investor Protection Act, including damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorney's fees, and interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Coinbase as to each and every count, including:

A. An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representatives of the Class and Subclasses, and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;

B. An order declaring that Defendant Coinbase's actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendant Coinbase is liable to Plaintiffs, the Class, and the Subclasses, as described herein, for damages arising therefrom;

C. An injunction enjoining Defendant Coinbase from offering the Digital Asset Securities for purchase or sale on the Coinbase Digital Asset Platforms without having registered the Coinbase Digital Asset Platforms as national securities exchanges or broker-dealers as required by the federal securities laws.

D. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant Coinbase from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant Coinbase's past conduct;

E. A judgment awarding Plaintiffs, the Class, and the Subclasses all appropriate damages, in an amount to be determined at trial;

F. A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement.

G. A judgment awarding Plaintiffs, the Class, and the Subclasses prejudgment and post-judgment interest, as permitted by law;

H. A judgment awarding Plaintiffs, the Class, and the Subclasses costs and fees, including attorneys' fees, as permitted by law; and

I.   Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:          October 8, 2021                    Respectfully submitted,

                                                   */s/ Ian W. Sloss*
                                                   Ian W. Sloss
                                                   Steven L. Bloch
                                                   **SILVER GOLUB & TEITELL LLP**
                                                   184 Atlantic Street
                                                   Stamford, Connecticut 06901
                                                   Telephone: (203) 325-4491
                                                   Facsimile: (203) 325-3769
                                                   isloss@sgtlaw.com
                                                   sbloch@sgtlaw.com