UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CHRISTOPHER UNDERWOOD et al., | : | |
| Individually and on Behalf of All Others Similarly Situated, | : | Case No. 1:21-cv-08353(PAE) |
| | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| COINBASE GLOBAL, INC., | : | |
| | : | |
| *Defendant*. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COINBASE GLOBAL, INC.'S OPPOSITION
## TO PLAINTIFFS' MOTION BY ORDER TO SHOW CAUSE
## <u>FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Jay B. Kasner
Lara A. Flath
Alexander C. Drylewski
Abigail E. Davis
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
lara.flath@skadden.com
alexander.drylewski@skadden.com
abigail.sheehan@skadden.com

*Attorneys for Defendant*

TABLE OF CONTENTS

Page

TABLE OF CONTENTS.............................................................................................ii

TABLE OF AUTHORITIES .....................................................................................iii

INTRODUCTION ....................................................................................................1

RELEVANT FACTUAL BACKGROUND.................................................................4

    A.    The Action .................................................................................................4

    B.    Coinbase's User Agreements....................................................................4

    C.    Global and Coinbase Offered to Delay Enforcement of the Dispute
        Resolution Provisions in the Updated User Agreement in Order to Address
        Plaintiffs' Concerns ..................................................................................6

ARGUMENT ...........................................................................................................7

I.      STANDARD..................................................................................................7

II.     PLAINTIFFS DO NOT AND CANNOT DEMONSTRATE IRREPARABLE
       HARM.........................................................................................................8

    A.    Plaintiffs Cannot Show Irreparable Harm Based on an Inability to Engage
        in  Allegedly Illegal Conduct ...................................................................8

    B.    Plaintiffs Cannot Show Irreparable Harm Based on the Fee-Shifting
        Provision Because They Already Face that Risk and that Risk Is Both
        Speculative and Curable. ..........................................................................9

    C.    Plaintiffs Cannot Show Irreparable Harm Based on the Updated User
        Agreement Because Customers Are Free to Withdraw Their Assets and
        Use A Different Platform..........................................................................10

III.    PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON
       THE MERITS ..............................................................................................12

    A.    Coinbase's Communication of the Forthcoming Updated User Agreement
        in the Ordinary Course of Business Was Entirely Proper......................12

    B.    The Updated User Agreement Does Not Substantively Alter the Rights
        and Remedies of the Parties vis-a-vis this Litigation..............................16

IV.    THE BALANCE OF EQUITIES FAVORS COINBASE ...............................20

V.      A TEMPORARY RESTRAINING ORDER IS NOT IN THE PUBLIC
        INTEREST....................................................................................................................21

CONCLUSION.....................................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Blanchard v. Tabulate, Inc.*,
  No. 18 CIV. 8631 (ER), 2018 WL 11383043 (S.D.N.Y. Oct. 22, 2018) .........................10

*Borey v. National Union Fire Insurance Co. of Pittsburgh, Pa.*,
  934 F.2d 30 (2d Cir. 1991)................................................................................................10

*Convergen Energy WI, LLC v. L'Anse Warden Electric Co. (Convergen I)*,
  No. 20-CV-5240 (LJL), 2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020)..............................11

*In re Apple Inc. Device Performance Litig.*
No. 18-MD-02827-EJD, 2018 WL 4998142 (N.D. Cal. 2016)……………………………...13, 14

*In re Facebook Biometric Information Privacy Litigation*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...........................................................................20

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)................................................................................................7

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)..................................................................................................7

*Haider v. Lyft, Inc.*,
  No. 20-cv-2997 (AJN), 2021 WL 3475621 (S.D.N.Y. Aug. 6, 2021)...................... passim

*Heller v. Rasier, LLC*,
  No. CV 17-8545 PSG (GJSx), 2020 WL 413243 (C.D. Cal. Jan. 7, 2020)................ 19-20

*Hettler v. Petters*,
  No. Civ.02–1837 ADM/SRN, 2005 WL 715933 (D. Minn. Mar. 29, 2005).....................8

*Jayaraj v. Scappini*,
  66 F.3d 36 (2d Cir. 1995)....................................................................................................9

*KDH Consulting Group LLC v. Iterative Capital Management L.P.*,
  No. Civ. 3274 (VM), 2020 WL 2554382 (S.D.N.Y. May 20, 2020)................................11

*Keitt v. New York City*,
  882 F. Supp. 2d 412 (S.D.N.Y. 2011)..............................................................................18

*Litwin v. OceanFreight, Inc.*,
  865 F. Supp. 2d 385 (S.D.N.Y. 2011)....................................................................7, 20-21

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
    892 F. Supp. 2d 489 (S.D.N.Y. 2012) ................................................................9

*Miracle-Pond v. Shutterfly, Inc.*,
    No. 19 cv 04722, 2020 WL 2513099 (N.D. Ill. May 15, 2020) ................................12, 15

*O'Connor v. Agilant Solutions, Inc.*,
    444 F. Supp. 3d 593 (S.D.N.Y. 2020) ......................................................15, 19

*Shulman v. Becker & Poliakoff, LLP*,
    No. 17CV9330VMJLC, 2018 WL 4961003 (S.D.N.Y. Oct. 15, 2018) ............................13

*Sussman v. Crawford*,
    488 F.3d 136 (2d Cir. 2007).....................................................................7

*USA Network v. Jones Intercable, Inc.*,
    704 F. Supp. 488 (S.D.N.Y. 1989) ..............................................................9

*Van Gemert v. Boeing Co.*,
    590 F.2d 433 (2d Cir. 1978), *aff'd*, 444 U.S. 472 (1980)....................................15

*Victorinox AG v. B & F System, Inc.*,
    2015 WL 9256944 (S.D.N.Y. Dec. 15, 2015), *aff'd*, 709 F. App'x 44 (2d Cir.
    2017) .......................................................................................21

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
    No. 09 Civ. 1148 (LBS), 2012 WL 432643 (S.D.N.Y. Feb. 8, 2012) ...........................15

*Wu v. Pearson Education Inc.*,
    Nos. 09 Civ. 6557(RJH)(JCF), 10 Civ. 6537(RJH)(JCF), 2011 WL 2314778
    (S.D.N.Y. June 7, 2011)................................................................11, 18, 19

## OTHER AUTHORITIES

*Contact By Counsel with Putative Members of Class Prior to Class Certification*,
    Formal Ethics Op. 07-445 (Am. Bar Ass'n 2007) ...............................................15

*Lawyers in Class Actions*,
    Formal Op. 2004–01 (N.Y.C. Bar Ass'n 2004), https://www.nycbar.org/member-
    and-career-services/committees/reports-listing/reports/detail/formal-opinion-
    2004-01-lawyers-in-class-actions ..............................................................15

## APPENDIX

    *Haider v. Lyft, Inc.*,
No. 20-cv-2997 (AJN), 2021 WL 3475621 (S.D.N.Y. Aug. 6, 2021)      passim

## INTRODUCTION

Plaintiffs are parties to existing user agreements with Coinbase[1] that *already* contain binding arbitration provisions with fee-shifting provisions. There is no emergency here. And even if those portions of the dispute resolution provisions had changed substantively, at best Plaintiffs are seeking a premature advisory opinion on an issue this Court may never have to address. Plaintiffs' feigned emergency application asks the Court to freeze Coinbase's current user agreements in place indefinitely and prevent Coinbase from communicating with millions of customers in the normal course of business. Plaintiffs' demand for emergency relief is even more egregious given Coinbase's express (and repeatedly rejected) offer to delay enforcement of any new dispute resolution provisions in the updated User Agreement as applied in this Action while the parties discuss stipulations to ameliorate any possible concerns Plaintiffs might have.

Plaintiffs cannot meet their burden of showing that any possible irreparable harm, let alone immediate irreparable harm, absent the Court's intervention. Plaintiffs rely entirely on speculation that *if* Defendant seeks to compel arbitration at some point in the future and *if* Plaintiffs decide to contest that motion, then they *may* be subject to fee-shifting provisions as a result of the updates to the User Agreement. Under the current schedule, none of this would be ripe for the Court's consideration until May, if ever. And critically, none of this is new. Plaintiffs have faced this exact risk since filing their original complaint. And that is quintessentially an issue of money damages that can be addressed if it ever occurs. Nothing has changed. Plaintiffs' claim of "uncontrollable losses" are also entirely monetary and specious. (Mot. at 11.) The only harm described is access

---

[1]   Plaintiffs seek relief against Coinbase Global ("Global") but the current and updated User Agreements is with non-party Coinbase, Inc. ("Coinbase"). (Declaration of Suellen Black Ex. B at 1.). Although Global is forced to respond here, it expressly reserves all rights, including to address the proper parties to this matter at the appropriate time.

to Plaintiffs' funds on Coinbase's platform, another monetary rather than irreparable harm, and Coinbase has expressly offered to provide that access through a link in the very customer communication about which Plaintiffs complain. (Black Ex. C at 3; Black Ex. E at 3.)

Plaintiffs also cannot show a likelihood of success on the merits as there is nothing false, misleading, or intimidating about Coinbase's regular course communications with its customers. *Haider v. Lyft, Inc.*, No. 20-cv-2997 (AJN), 2021 WL 3475621, at *2 (S.D.N.Y. Aug. 6, 2021)  As Judge Nathan recently explained in that case—which Plaintiffs ignore despite Coinbase alerting them to it before this motion was filed—there is nothing improper when a company substantively amends the terms of its updated user agreement, including via direct communication with putative class members. *Id.*, at *3. To find otherwise would disrupt the entire business operations of a company. *See id.* ("A large corporation may face a number of lawsuits at any given time, and prohibiting routine amendments to their terms of service would essentially freeze their contracts in place."). Here the "new" dispute resolution terms raised by Plaintiffs are not even new as in *Haider*. The Coinbase User Agreement has long included a binding arbitration clause and a fee-shifting provision—the same provisions at the heart of Plaintiff's demand for emergency relief. (Coinbase pointed this out to Plaintiffs before this Motion was filed.) And even if the terms were new as in *Haider*, the updated User Agreement expressly states it will not apply retroactively.

The only remaining issue is the narrow question of whether Coinbase's communication was somehow coercive. *Id* at *2. Even a cursory review of Coinbase's challenged communication shows that it was not so, and certainly not in any way false, misleading, or intimidating as this Court would need to find. *Id.* Indeed, the lack of coercion is evident from the current record based on undisputed facts: not only are Plaintiffs already subject to arbitration provisions but they continue to have the ability to not accept the terms of the updated User Agreement. There is no

2

precedent for what Plaintiffs demand: disallowing a company from conducting business in the normal course any time it faces a frivolous class action such as this, even before an amended complaint has been filed or a class certified.

Plaintiffs' sought relief would change nothing for Plaintiffs from the current status quo with respect to this Action. But it would substantially disrupt Coinbase's existing ability to communicate with and set the terms under which it operates with its users, including millions of potentially future customers based upon Plaintiffs' wildly overbroad class definition. The balance of harms weighs entirely against Plaintiffs' Motion.

Plaintiffs' Motion is not only baseless, but an egregious use of this Court's resources. The Court asked the parties to consider agreeing to delay the effective date of any User Agreement "amendments" at issue in this Motion to give the Court more time. To be explicit, that is exactly what Global and Coinbase offered to Plaintiffs in writing in advance of their filing this Motion: to "not enforce any new dispute resolution provisions (to the extent there are new provisions) in the January 31, 2022 User Agreement as applied to this Action for the next 7 days" so that the parties could negotiate stipulations to ameliorate Plaintiffs' concerns. Plaintiffs refused, and refused again even after the Court's request. This refusal only reinforces what Plaintiffs really seek to achieve: an extraordinary restraint on Coinbase's normal business operations to advance their own litigation interests.

Of course, for the benefit of the Court and its resources, Coinbase stands by the offer to delay the effective date of any new disputed terms for seven days for purposes of this Action. But fundamentally, the Court should decline to enter an advisory opinion based on Plaintiffs' false claims of an emergency. Plaintiffs' Motion should be denied in its entirety.

## RELEVANT FACTUAL BACKGROUND

### A. The Action

Non-party Coinbase, a wholly-owned subsidiary of Global, operates online trading platforms where its users can transact in certain digital assets. Like many online service providers, Coinbase offers its services to users pursuant to a User Agreement which they accept when they join the platform.

On October 8, 2021, plaintiffs Christopher Underwood and Louis Oberlander (along with Henry Rodriguez, "Plaintiffs") filed a putative class action complaint (the "Complaint") naming Global, but not Coinbase, as a defendant. (ECF 1.) The Complaint purports to alleges that Global operates as an unregistered securities exchange in violation of federal and state securities laws, and that as a result any corresponding contracts are unlawful and should be voided. (*Id.* ¶¶ 2-3, 273-75.) The Complaint defines the Class Period as the beginning of any applicable limitations period through the date of certification (*id.* ¶ 253), purporting to create an open-ended and indeterminate class.[2]

### B. Coinbase's User Agreements

Unsurprisingly, Coinbase updates its terms of use in the ordinary course of business. (Black ¶ 3.) On or around January 26, 2022, Coinbase sent an email to U.S. users notifying them that an updated User Agreement would go into effect on January 31, 2022 (the "updated User Agreement") (Black Ex. D.) Among other things, Coinbase specifically pointed out in the email that it had "revised [its] arbitration agreement to streamline the process for resolving problems you

---

[2]   On January 11, 2022, the Court appointed Underwood, Oberlander, and Henry Rodriguez lead plaintiffs. Pursuant to the Court's January 25, 2022 order, the consolidated amended complaint is due March 11, 2022, and Global's response is due May 10, 2022. (ECF 23.)

may experience." (*Id.* at 1.)[3] The email invited users to visit a help center article if they had any questions, and linked to that article, which also explains that if users do not want to accept the updated User Agreement, they can submit a request to close their account and withdraw their funds. (Black Ex. C at 3; Black Ex. E at 3.) Of course, users could also transfer their assets off the platform, as they could at any other time.

Although Plaintiffs portray the updated User Agreement, and particularly the arbitration and fee-shifting provisions, as an underhanded attempt to alter the rights and remedies of Plaintiffs in this litigation, **these provisions are not new and do not change the rights and remedies applicable to this Action**. Other portions of the dispute resolution provision changed, not these.[4] Section 8.3 of the current User Agreement provides:

> If we cannot resolve the dispute through the Formal Complaint Process, you and we agree that **any dispute arising out of or relating to this Agreement or the Coinbase Services**, including, without limitation, federal and state statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation, or any other legal theory, **shall be resolved through binding arbitration, on an individual basis . . .**

(Black Ex. A § 8.3 (emphasis added).) The current User Agreement also already has a fee-shifting provision that can be invoked if Coinbase moves to enforce the User Agreement:

> "To the extent permitted by law, the prevailing party in any action or proceeding to enforce this Agreement, any arbitration pursuant to this Agreement, or any small claims action shall be entitled to costs and attorneys' fees."

(Black Ex. A § 8.3; *see also* Black Ex. B § 8.3) Coinbase identified these existing provisions to Plaintiffs before they filed this motion. (Flath Ex. D.) Plaintiffs did not

---

[3]   In any event, even if Plaintiffs obtain any relief through this Motion—and they should not—Plaintiffs cannot seek this relief against Global, which is neither a party to the User Agreement nor the sender of the email.

[4]   The majority of the changes to the dispute resolution provisions relate to treating similar customer complaints more efficiently in arbitrations.

respond. And while other portions of the dispute provisions irrelevant to this Action have changed in the new User Agreement, the provisions Plaintiffs criticize have not substantively changed at all.

### C. Global and Coinbase Offered to Delay Enforcement of the Dispute Resolution Provisions in the Updated User Agreement in Order to Address Plaintiffs' Concerns

In their January 26, 2022 letter to Global's counsel, Plaintiffs demanded that Coinbase "not implement or seek to enforce" the updated User Agreement altogether. (Flath Ex. A) In an attempt to respond to Plaintiffs' concerns, Global's counsel asked Lead Counsel to "identify [] the specific provisions of the User Agreement you refer to in your Letter and the manner in which you believe that they would purportedly 'alter the parties' rights and remedies in the Pending Litigation.'" (Flath Ex. B at 2.) Three hours later, at 8:54 p.m. ET, rather than engage in a productive dialogue, Lead Counsel insisted it would seek this temporary restraining order to prevent the updated User Agreement from going into effect altogether unless its demands were accepted by 8 a.m. ET the following morning. (Flath Ex. C.)

Before 8 a.m. ET, Global's counsel responded again, highlighting that no emergency exists, and despite the extraordinary nature of Plaintiffs' request, offered expressly to "agree to not enforce any new dispute resolution provisions (to the extent there are new provisions) in the January 31, 2022 User Agreement as applied to this Action for the next seven days so we have time to discuss what an agreeable stipulation might be." (Flath Ex. D .) Global's counsel also pointed to the existence of fee-shifting provisions in particular in the current User Agreement, as those provisions were not new and could not possibly constitute an emergency. (Id.) Lead Counsel proceeded with this motion. (Flath Exs. E, G.)

Pursuant to the Court's January 28, 2022 request that the parties attempt to give the Court additional time to decide the Motion, counsel re-extended its offer to delay effectiveness of the

dispute resolution provision as applied to this Action for the next seven days. Once again, Lead Counsel rejected this proposal. (Flath Ex. H.) This offer stands, including as needed for the Court's benefit. (*See id.*)

## ARGUMENT

### I.   STANDARD

"A temporary restraining order, like a preliminary injunction, is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 391 (S.D.N.Y. 2011) (Engelmayer, J.); *accord Sussman v. Crawford,* 488 F.3d 136, 139-40 (2d Cir. 2007) (an injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing,* carries the burden of persuasion." (emphasis in original) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)); *see also Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) ("[T]he preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" (citation omitted)). "[A] plaintiff seeking a temporary restraining order 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Litwin*, 865 F. Supp. 2d at 391-92. Plaintiffs have not met, and fundamentally cannot meet, their burden to establish any of these elements here.

### II.   PLAINTIFFS DO NOT AND CANNOT DEMONSTRATE IRREPARABLE HARM

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). Plaintiffs come nowhere close for themselves, let alone for any

putative class members. There is no irreparable harm when you are being deprived of something you also claim is unlawful. There is no irreparable harm when, even if there were new dispute resolution terms, the application of those terms is entirely speculative. And customers will not be indefinitely prevented from moving their assets off the Coinbase platform.

### A. Plaintiffs Cannot Show Irreparable Harm Based on an Inability to Engage in Allegedly Illegal Conduct

It is important to remember what the underlying case here is about. Plaintiffs purport to allege that Global operates as an unregistered securities exchange. Yet in this "emergency" motion, Plaintiffs claim that they and other putative class members will be irreparably harmed if they are not permitted to keep trading all the while claiming this trading activity is illegal. (See ECF 1 ¶ 273-76.) Plaintiffs' underlying allegations are baseless. But Plaintiffs also cannot have it both ways. "Plaintiff[s] cannot claim to be injured by his inability to engage in wrongful or illegal conduct." *Hettler v. Petters*, No. Civ.02–1837 ADM/SRN, 2005 WL 715933 at *2 (D. Minn. Mar. 29, 2005). If the Plaintiffs truly believe their own activity on the platform is in violation of securities laws, they cannot now claim harm by not being able to continue to trade pursuant to it in a transparent attempt to compound the damages they seek in this case. By law, this is not harm.

**B. Plaintiffs Cannot Show Irreparable Harm Based on the Fee-Shifting Provision Because They Already Face that Risk and that Risk Is Both Speculative and Curable**.

The Motion attempts to demonstrate irreparable harm to the current Plaintiffs themselves, who supposedly will not be able to "proceed with this action without incurring the risk that they will be held liable for the fees accrued by Defendant's counsel prior to the resolution of the anticipated motion to compel arbitration." (Mot. at 10.) This purported harm is illusory because Plaintiffs, like all current putative class members, already face the risk of fee-shifting under the current User Agreement. The Court does not need to address this non-existent harm further, and should not address it as a premature advisory opinion. (*Supra* at 1.)

However, even if the dispute resolution terms were new, any harm remains completely speculative at this stage and entirely addressable at a later stage if the issue arises. First, Plaintiffs would have to continue to use Coinbase's platform and accept the updated User Agreement before any new terms would apply, which they have not even stated they intend to do. But second, at this stage, Plaintiffs can only speculate that they will face a motion to compel arbitration at all, let alone whether Global would seek to apply any terms in the updated User Agreement to this action. Until Global receives an amended complaint, which is not due to be filed until March, Global and is not required to make any decisions about how it will respond to Plaintiffs' claims procedurally or substantively. *See Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (noting that irreparable harm "must be imminent or certain, not merely speculative" and vacating preliminary injunction based on "evidence of speculative and attenuated injuries"); *see also USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491-93 (S.D.N.Y. 1989) ("'[M]ere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage' is insufficient[.]" (quoting *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755,

759 (2d Cir. 1979)); *see also LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 529 (S.D.N.Y. 2012) (Engelmayer, J.).

If Global does move to compel arbitration at the appropriate point in this case, then the parties will have a full opportunity to debate whether any provision of any specific user agreement is valid and enforceable. And even then, if Plaintiffs were ultimately ordered to pay attorneys' fees at some unspecified date in the future, that harm is not irreparable. It would only be the fees associated with a single motion. Monetary damages are by definition reparable. *See Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 34 (2d Cir. 1991) ("Monetary loss alone will generally not amount to irreparable harm."). Plaintiffs do not and cannot explain how any harm stemming from the need to pay attorneys' fees would be irreparable. *Cf. Blanchard v. Tabulate, Inc.*, No. 18 CIV. 8631 (ER), 2018 WL 11383043, at *2 (S.D.N.Y. Oct. 22, 2018) (denying motion for preliminary injunction seeking payment of attorneys' fees because the claimed harm—the payment of attorneys' fees—was not irreparable). And again, Plaintiffs face the same risk under the current User Agreement. Nothing has changed.

### C. Plaintiffs Cannot Show Irreparable Harm Based on the Updated User Agreement Because Customers Are Free to Withdraw Their Assets and Use A Different Platform.

Plaintiffs speculate that putative class members "will be exposed to harm through the illusory 'choice' presented by the new terms." (Mot. at 10-11.) According to Plaintiffs, customers who decline to agree to the updated User Agreement "will be locked out of the platform, faced with the prospect of uncontrollable losses from open positions." (*Id.* at 11.). This is untrue. Any user is free to withdraw their assets and move to another platform. In the very customer communication Plaintiffs call unlawful in this Motion, Coinbase provided instructions to users on how to remove their assets from the platform if they so choose.

10

Even if Plaintiffs did not want to take Coinbase at its word, however, Plaintiffs have not bothered to test it. Plaintiffs have been on notice of the updated User Agreement since at least January 26, 2022, but they make no showing that they have attempted to withdraw their funds and been stymied. *Convergen Energy WI, LLC v. L'Anse Warden Electric Co., LLC (Convergen I)*, No. 20-CV-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) ("[c]onclusory allegations lacking supporting evidence will not support a preliminary injunction").

Plaintiffs are not forced to use Coinbase, nor is any other putative class member. *See id.* 2020 WL 5894079 at *5 ("[i]f the harm complained of is self-inflicted, it does not qualify as irreparable"); *see also KDH Consulting Group LLC v. Iterative Cap. Mgmt. L.P.*, 2020 WL 2554382 at *7 (S.D.N.Y. May 20, 2020) (allegation that plaintiff would be diluted in post-restructuring entity insufficient to demonstrate irreparable harm where it "[wa]s not being forced to invest in the new entity" and could "choose instead to exit."). If Plaintiffs prefer the terms of a different digital asset trading platform, they are fully able to move their assets or otherwise withdraw their assets from Coinbase without agreeing to the updated User Agreement.

And although Plaintiffs reference the ability of the Court to exercise control over a class action and to enter orders governing the conduct of counsel (Mot. at 5), they do not seek an order under Rule 23 but choose instead to seek emergency injunctive relief.  As Magistrate Judge Francis has recognized expressly, although plaintiffs may "couch [an] application as a motion for preliminary injunction," such application can be "more accurately characterized as a request for an order under Rule 23." *Wu v. Pearson Educ. Inc.*, No. 09 CIV. 6557 RJH JCF, 2011 WL 2314778, at *5 (S.D.N.Y. June 7, 2011)

## III.   PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

Fundamentally, Plaintiffs cannot demonstrate a likelihood of success on the merits because Coinbase's communication about and update to the User Agreement are lawful. Plaintiffs are only entitled to the relief from the common sense and general rule that companies may directly communicate with their customers *if* they can show that Coinbase's communication was somehow false, misleading, or intimidating. *Haider*, 2021 WL 3475621, at *2 ("Defendants and their counsel generally may communicate with potential class members in the ordinary course of business' provided that their communications are not false, misleading, or intimidating.'" (quoting Manual for Complex Litigation (Fourth) § 21.12 at 249 (2004)). The communication at issue indisputably satisfied this standard: it was both "in the ordinary course of business" and "not false, misleading, or intimidating." It was routine communication about updated terms of service in no way targeted at this lawsuit that did not meaningfully alter the rights or remedies of the parties to the lawsuit.

### A.   Coinbase's Communication of the Forthcoming Updated User Agreement in the Ordinary Course of Business Was Entirely Proper

Coinbase's communication to its users was not, as the Motion contends, "coercive" or "inappropriate." (Mot. at 5.) It is well-established that "'[d]efendants and their counsel generally may communicate with potential class members in the ordinary course of business' provided that their communications are not false, misleading, or intimidating." *Haider*, 2021 WL 3475621, at *2; *see also Miracle-Pond v. Shutterfly, Inc.,* 2020 WL 2513099, at *9 (N.D. Ill. May 15, 2020) (rejecting plaintiff's Rule 23(d) argument, finding "no indication that Shutterfly engaged in improper conduct" by issuing a regular update to its terms of service). That is precisely what happened here.

There is nothing in any way coercive about the communication Coinbase sent.  Far from obscuring the fact that portions of the dispute resolution provisions would be updated, Coinbase specifically highlighted in its email that it had "revised [its] arbitration agreement to streamline the process for resolving problems you may experience." (*Supra* 4-5.) Global has disclosed this litigation in its public filings. (Flath Ex. I (Coinbase Global, Inc. 10-Q, Q3 2021).) Indeed, as this Court noted in its order appointing lead plaintiffs, Plaintiffs themselves have published notice of the Action. (ECF 21 at 4, n. 2.) As explained above and below (*infra* II.B), the updated terms Plaintiffs criticize—the arbitration and fee-shifting provisions—are terms that already exist. To the extent that Plaintiffs prefer the terms of the current User Agreement, they are free to choose to not accept the updated User Agreement. Coinbase's communication was entirely lawful.

Left with no ability to prove the improper nature of the communication itself, Plaintiffs contend that this routine customer communication is somehow impermissible because they have filed a class action such that Lead Counsel represents all putative class members and are therefore off limits with respect to any communication "that would affect the ongoing litigation." (Mot. at 6.) This is not the law. If Plaintiffs' view were to be adopted, filing a putative class action would effectively impose a de facto injunction against Coinbase ever updating its User Agreement while such action is pending. Such a result would be fundamentally unfair to any business. *See Haider*, 2021 WL 3475621 at \*3. ("A large corporation like Lyft may face a number of lawsuits at any given time, and prohibiting routine amendments to their terms of service would essentially freeze their contracts in place.") *See Shulman v. Becker & Poliakoff, LLP,* No. 17CV9330VMJLC, 2018 WL 4961003, at \*5 (S.D.N.Y. Oct. 15, 2018) (explaining "the Court cannot order [Defendant] to stop speaking to its clients," and two letters to putative class members regarding the nature of plaintiff's lawsuit were proper as they were neither "misleading" nor "coercive"); *In re Apple Inc.*

13

*Device Performance Litig.*, No. 18-MD-02827-EJD, 2018 WL 4998142, at *7 (N.D. Cal. Oct. 15, 2018) (finding "no basis" to take corrective measures from Apple's communication to putative class members because the communication was "not misleading, coercive, and [did] not potentially interfere with class members' rights."). This concern is even more heightened here given that the purported class period extends to an unknown, future date. Plaintiffs want to control Coinbase's relationship and communications even with *future* customers with respect to claims that have not yet occurred. This relief would be unprecedented.

Contrary to Plaintiffs' contentions, a company is free to communicate with its customers in the normal course of business, and customers are free to communicate with the company as well. Even while Plaintiffs complain about having been contacted directly by Coinbase, they have each affirmatively and directly reached out to Coinbase customer service since this litigation began. (Black ¶¶ 4-6.) Mr. Rodriguez sent a request on October 22, 2021 related to his professed concern that "Coinbase is an unregistered exchange." (*Id.* ¶ 16.)

Plaintiffs attempt to shoehorn their dispute with Coinbase's email into a purported ethical violation of New York Rule of Professional Conduct 4.2. But Plaintiffs ignore—yet again—that Judge Nathan rejected a similar argument in *Haider*, where the plaintiffs who received the communication *were* represented parties:

> The Court also disagrees that the New York Rules of Professional Conduct bar routine amendments to a company's terms of service. The drivers contend that because Lyft's December 2020 terms of service were drafted by an attorney, presenting those terms to the drivers violated the rule about attorney communications with represented parties. *See* 22 N.Y.C.R.R. § 1200, Rule 4.2(a). Lyft's counsel did not communicate with the drivers about the subject of the litigation by drafting revisions to Lyft's arbitration agreement. Lyft revised its terms of service, and the drivers, in order to continue driving for Lyft, agreed to these new terms. The drivers cite no authority for the proposition that an amendment to a company's terms of service may constitute a prohibited communication with a represented party.

14

*Id.* at *3; *see also Shutterfly*, 2020 WL 2513099 at *9 (finding "no indication that Shutterfly engaged in any improper conduct: [t]here is no evidence of deceptive conduct, no evidence of coercion, no evidence of targeting putative Class Members, no evidence of imposing arbitration without agreement or without additional consideration.").

Lead Counsel's earlier accusation that "direct contact with the Lead Plaintiffs and other members of the putative class–all of whom we represent in the Pending Litigation. . . is improper and a violation of applicable ethical rules" (Flath Ex. A) is yet another overreach with no basis in the law. Putative class members are not represented parties. "A certification under Rule 23(c) makes the Class the attorney's client for all practical purposes." *Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 n.15 (2d Cir. 1978), *aff'd*, 444 U.S. 472 (1980); *accord Whitehorn v. Wolfgang's Steakhouse, Inc.*, No. 09 CIV. 1148 LBS, 2012 WL 432643, at *1 (S.D.N.Y. Feb. 8, 2012) ("[C]lass certification gives rise to an attorney-client relationship between potential class members and class counsel . . . ."). Thus, in a Formal Ethics Opinion interpreting Model Rule of Professional Conduct 4.2, the American Bar Association concluded that "putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period," such that Rule 4.2 does not apply. *Contact By Counsel with Putative Members of Class Prior to Class Certification*, ABA Formal Op. 07-445 (2007).[5] Given that Plaintiffs have not yet even filed a consolidated amended complaint, any class certification decision could be years away. And Plaintiffs' case law is inapposite. To illustrate, Plaintiffs cite

---

[5]   The New York City Bar Association has reached the same conclusion. *See* N.Y.C. Bar Ass'n Formal Op. 2004–01, available at https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2004-01-lawyers-in-class-actions ("When the lawyer proposing to communicate represents a party opposing a class, the prohibition applies when the class has been certified, although it does not apply before certification.").

*O'Conner v. Agilant Solutions* for the proposition that "communications with putative class members prior to certification may also implicate ethical rules." (Mot. at 7.) Nowhere did the *Agilant* court suggest that putative class members were represented parties or that defense counsel had violated Rule 4.2.

### B. The Updated User Agreement Does Not Substantively Alter the Rights and Remedies of the Parties vis-a-vis this Litigation

In an attempt to recast Coinbase's lawful, routine communication with its users as a nefarious attempt to interfere with the ongoing litigation, Plaintiffs claim that Coinbase has sought "to impose new terms of use . . . that would have the purpose and effect of directly altering the parties' rights and remedies in the Pending Litigation" (Flath Ex. E at 1) and "purport to apply retroactively." (Mot. at 1.) This is not true.

First, Plaintiffs claim that a new change to the updated User Agreement is to require binding arbitration, but the current User Agreement already imposes this requirement:

| Current User Agreement § 8.3[6] | Updated User Agreement § 1.1[7] |
|---|---|
| If we cannot resolve the dispute through the Formal Complaint Process, you and we agree that **any dispute arising out of or relating to this Agreement or the Coinbase Services,** including, without limitation, federal and state statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation, or any other legal theory, **shall be resolved through binding arbitration, on an individual basis** (the "Arbitration Agreement"). | **[A]ny dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any products sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement**, including claims and disputes that arose between us before the effective date of these Terms …**will be resolved by binding arbitration** …. For purposes of this Arbitration Agreement, 'Dispute' will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the User Agreement …. |

---

[6]   (Black Ex. A at § 8.3.)

[7]   (Black Ex. D, App'x 5 § 1.1.)

16

Second, Plaintiffs seek to enjoin Section 1.7, which they contend would impose potential fees on Plaintiffs in this litigation. But, again, **this was already the case.**

| Current User Agreement § 8.3[8] | Updated User Agreement § 1.7[9] |
|---|---|
| "To the extent permitted by law, **the prevailing party in any action or proceeding to enforce this Agreement**, any arbitration pursuant to this Agreement, or any small claims action **shall be entitled to costs and attorneys' fees.**" | The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). **If you or Coinbase need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration.** The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Formal Complaint Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs. |

Notably, Global's counsel expressly and specifically pointed to this portion of the current User Agreement before this Motion was filed and reminded Lead Counsel of the obligation to have discussed these potential litigation costs with its clients before filing this matter in court, rather than in arbitration. (Flath Ex. B.) If Lead Counsel failed to properly advise their own clients on the inherent risks of bringing this Action, they should not be allowed to correct that error through this Motion.

---

[8]   (Black Ex A at § 8.3.)

[9]   (Black Ex. D, App'x 5 § 1.7.)

Plaintiffs also argue that the updated terms "requir[e] disputes that are heard in court to be resolved in California, which would prevent the litigation of this matter before this Court." (Mot. at 8.) Even setting aside that venue in this Court is measured at the time an action was commenced, not based on subsequent developments, *see Keitt v. New York City*, 882 F. Supp. 2d 412, 459 n. 44 (S.D.N.Y. 2011) ("Venue is determined based upon the parties and allegations at the time the operative complaint is filed, not subsequent events"), Global does not intend to transfer the Action to California.

Finally, Plaintiffs contend that the arbitration provision in the updated User Agreement "vastly increases the scope of the present arbitration clause" because they claim that Global could seek to enforce it retroactively. (Mot. at 2-3.) Plaintiffs ignore that the updated User Agreement says the opposite. The updated User Agreement states that "[f]or all users who sign up prior to January 31, 2022, the previous version of the User Agreement shall apply until you accept our updated terms of service which will govern from January 31, 2022" and generally that amendments "shall be effective as of the time it is posted but **will not apply retroactively**." (Black Ex. D at 1.) In other words, the updated User Agreement applies prospectively—not retrospectively as Plaintiffs assert. *See Wu*, 2011 WL 2314778, at \*7 (negotiating licensing agreements with putative class members did not violate Rule 23 where licenses were on "a going-forward basis."). And in any event, by its plain language that provision does not apply "retroactively" to claims properly filed already.

All of Plaintiffs' complaints about the updated User Agreement are demonstrably false. The current User Agreement already contains a binding arbitration clause and a fee-shifting clause, and the updated User Agreement applies prospectively.

Worse for Plaintiffs, even if their complaints were about truly new dispute resolution terms,

Coinbase is entirely within its rights to update its User Agreement even during pending litigation on a going forward basis. *See id.* (negotiating licensing agreements with putative class members did not violate Rule 23 where licenses were on "a going-forward basis."); *Haider*, 2021 WL 3475621 at *3. Although the Court does not have to address that issue to resolve this Motion, Courts have already rejected Plaintiffs' arguments as applied to actual changes to customer terms. Judge Nathan expressly distinguished cases on which Plaintiffs rely, including *Agilant* and *Uber* where "defendants who had *no* arbitration agreement with class members introduced arbitration agreements specifically targeted at the pending litigation" and sought to enforce those terms. *Haider*, 2021 WL 3475621 at *3 (emphasis added). But given that nothing has changed for Plaintiffs or putative class members here, Plaintiffs' reliance on *Agilant* and *Currency Conversion* is misplaced. In *Agilant*, the defendant in a class action brought on behalf of its employees rolled out a new policy requiring its employees to sign an arbitration agreement. The court found the defendants efforts to obtain signatures on the arbitration agreements were coercive because they failed to disclose that the agreement would effectively have forfeited their rights to participate in the case. Here, putative class members are already subject to the arbitration clause and fee-shifting provision of the current User Agreement, so the new agreement did not "threaten the 'choice of remedies' available to putative plaintiffs." 444 F. Supp. 3d at 601. Similarly, in *Currency Conversion*, defendants sought to eliminate purported class members' rights by introducing a *new* arbitration clause during the pendency of the litigation. That has not happened here.[10]

---

[10] Plaintiffs' argument concerning whether fee-shifting generally is appropriate under California law is neither new nor an emergency because, as explained above, the provision itself has not altered the rights or risks of the parties in this litigation. While Plaintiffs argue that the updated User Agreement is unconscionable and a contract of adhesion (Mot. at 8-9), there is no need for the Court that issue. But Courts in the Ninth Circuit have regularly upheld amendments to User Agreements like Coinbase's that allow a service provider to modify or update terms of service. *See, e.g.*, *Heller v. Rasier, LLC,* No.

Customers will only be harmed if companies cannot provide them with routine information any time a frivolous class action is pending.

## IV.   THE BALANCE OF EQUITIES FAVORS COINBASE

"A preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant." *Litwin*, 865 F. Supp. 2d at 401. Any purported harm to Plaintiffs or the putative class flowing from implementation of the amended User Agreement is illusory, easily remedied or avoided without an injunction, and speculative at best.  In contrast, Coinbase will suffer substantial harm if the injunction is granted. The injunction Plaintiffs seek would be highly intrusive into Coinbase's business, as exemplified by Plaintiffs' request for an order requiring Coinbase to clear *with Lead Counsel* any further changes to the dispute resolution provision that could apply to this Action, unrestricted to the specific terms that Plaintiffs identify in the Motion and conceivably relating to any future change that Coinbase may wish to make for years given that Plaintiffs' allegations in the Action encompass over 70 digital assets and includes within the class, future users who do not even yet exist. Also as explained above, as a matter of law Lead Counsel does not represent any absent class members and will not until a class is certified. Plaintiffs have yet to file their amended complaint, the merits of their claims have yet to be tested, and they have not sought, let alone obtained class certification, or even proposed a schedule for doing so.

---

CV178545PSGGJSX, 2020 WL 413243, at *11 (C.D. Cal. Jan. 7, 2020) (updated Uber Terms of Service (which included updated arbitration provision) was valid and binding where Uber emailed users updated terms, expressly stated in the email that Uber had revised the arbitration agreement, and stated that the continued use of the Uber App would serve as consent to the updated terms); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167-68 (N.D. Cal. 2016), (enforcing updated user agreement where users "were provided notice that the terms of the user agreement were changing through an email from Facebook sent directly to the email addresses each plaintiff had on file with Facebook").

An injunction would also interfere enormously with Coinbase's ability to update its User Agreement in the ordinary course and impose substantial harm on Coinbase. Plaintiffs' putative class action claims feature a poorly defined class with an unbounded Class Period that would sweep in even future Coinbase users, who have yet to agree to any version of the user agreement, and who join the platform up through the time of class certification, which could be years from now. (*See* ECF 1 ¶ 253 (defining Class Period as being "from the beginning of any applicable limitations period through the date of certification").) Plaintiffs' proposed injunction "would essentially freeze [Coinbase's] contracts in place" and prevent Coinbase from updates that are material to its operations or its customers. *See Haider*, 2021 WL 3475621 at *3. Even pressing pause imposes substantial harm to Coinbase and its millions of users, both current and future. Considering the lack of any harm whatsoever to Plaintiffs, and the real and substantial harm to Coinbase, the balance of equities tips decidedly in favor of denying any injunctive relief.  *See Litwin*, 865 F. Supp. 2d at 401-02.

## V.    A TEMPORARY RESTRAINING ORDER IS NOT IN THE PUBLIC INTEREST

Finally, granting an injunction in this scenario would not be in the public interest. If Plaintiffs' argument carries the day, that will open the door to every putative class plaintiff subject to a defendant's terms of use to place a stranglehold over that defendant's ability to conduct its business. Not only would such a result be harmful to businesses, but it would encourage the worst kind of legal gamesmanship. *See Victorinox AG v. B & F Sys., Inc.*, No. 13-CV-04534 (JSR), 2015 WL 9256944 at *7 (S.D.N.Y. Dec. 15, 2015) ("The public pays a price when litigants use up the courts' time[] with gamesmanship and repetition, and it is ultimately in the public interest for litigation to move forward.") *aff'd*, 709 F. App'x 44 (2d Cir. 2017). Every issue that Plaintiffs want

to be heard still has a time and place to be heard. Emergency motions should only be granted when there is an actual emergency.

## CONCLUSION

Plaintiffs seek an unprecedented remedy despite the complete absence of any issue ripe for the Court's attention, let alone an emergency. Plaintiffs seek a remedy on behalf of Coinbase customers they do not represent and against Coinbase Global, which is not even a party to the User Agreement at issue. Even if any relief were appropriate, it could not reach anyone but the named plaintiffs nor be imposed against Coinbase Global as a non-party to the User Agreement. Thankfully, the Court does not need to address these issues. For all the reasons set forth here, Plaintiffs cannot demonstrate any of the requisite elements for a temporary injunction, and their request should be DENIED.

January 30, 2022                                Respectfully submitted,

                                                /s/ *Lara A. Flath*
                                                Jay B. Kasner
                                                Lara A. Flath
                                                Alexander C. Drylewski
                                                Abigail E. Davis
                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
                                                One Manhattan West
                                                New York, NY 10001
                                                Phone: (212) 735-3000
                                                Fax: (212) 735-2000
                                                jay.kasner@skadden.com
                                                lara.flath@skadden.com
                                                alexander.drylewski@skadden.com
                                                abigail.sheehan@skadden.com

                                                *Attorneys for Defendant*