UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER UNDERWOOD, LOUIS OBERLANDER, and HENRY RODRIGUEZ on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG<br><br>*Defendants.* | Case No. 1:21-cv-08353-PAE<br><br>AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ....................................................................................................1

PARTIES ...............................................................................................................3

JURISDICTION AND VENUE ...............................................................................4

SUBSTANTIVE ALLEGATIONS ...........................................................................6

I.      DIGITAL ASSETS, COINBASE, AND CRYPTO-SECURITIES ..................6

        A.      The Blockchain and The Foundations of Digital Assets .........................6

        B.      Crypto-Exchanges and Coinbase .........................................................8

        C.      Crypto-Securities and Centralization...................................................13

        D.      Coinbase's Failure to Register as a Securities Exchange or Broker-Dealer ..........20

II.     COINBASE LISTS AND SELLS SECURITIES BUT IS NOT REGISTERED
        AS A SECURITIES EXCHANGE...........................................................24

        A.      DIGITAL ASSETS LISTED ON COINBASE ARE SECURITIES....................24

                1.      1INCH.........................................................................24

                2.      AAVE.........................................................................25

                3.      ACH...........................................................................26

                4.      ADA...........................................................................27

                5.      AGLD .........................................................................35

                6.      ALGO .........................................................................36

                7.      AMP...........................................................................43

                8.      ANKR.........................................................................49

                9.      ARPA .........................................................................50

                10.     ATOM .........................................................................51

                11.     AUCTION....................................................................55

                12.     AXS............................................................................56

13.   BAL .................................................................................................... 59

14.   BAND ................................................................................................. 60

15.   BAT ..................................................................................................... 61

16.   BNT ..................................................................................................... 62

17.   BOND .................................................................................................. 64

18.   BTRST ................................................................................................ 65

19.   CGLD .................................................................................................. 66

20.   CLV ..................................................................................................... 67

21.   COMP .................................................................................................. 68

22.   CRO ..................................................................................................... 71

23.   CRV ..................................................................................................... 77

24.   CTSI .................................................................................................... 78

25.   CVC ..................................................................................................... 79

26.   DNT ..................................................................................................... 81

27.   DOGE .................................................................................................. 82

28.   DOT ..................................................................................................... 86

29.   ENJ ...................................................................................................... 91

30.   EOS ..................................................................................................... 92

31.   FARM .................................................................................................. 96

32.   FET ...................................................................................................... 97

33.   FIL ....................................................................................................... 98

34.   FORTH .............................................................................................. 102

35.   GNT ................................................................................................... 103

36.   GRT ................................................................................................... 104

37.   GTC ................................................................................................... 108

38.    ICP ......................................................................................................... 109

39.    IOTX ......................................................................................................117

40.    KEEP ......................................................................................................118

41.    KNC ........................................................................................................119

42.    LINK ......................................................................................................120

43.    LOOM ....................................................................................................126

44.    LRC ........................................................................................................127

45.    MANA ....................................................................................................128

46.    MATIC ...................................................................................................132

47.    MKR .......................................................................................................136

48.    MLN ........................................................................................................137

49.    NKN ........................................................................................................138

50.    NMR ......................................................................................................139

51.    NU ...........................................................................................................140

52.    OGN ........................................................................................................141

53.    OMG .......................................................................................................142

54.    ORN ........................................................................................................143

55.    OXT ........................................................................................................144

56.    PLA ........................................................................................................145

57.    POLY ......................................................................................................146

58.    QNT ........................................................................................................147

59.    QUICK ...................................................................................................150

60.    RARI .......................................................................................................151

61.    REN .........................................................................................................155

62.    REP .........................................................................................................156

63.   RLC ...................................................................................................157

64.   SHIB .................................................................................................158

65.   SKL ..................................................................................................165

66.   SNX ..................................................................................................166

67.   SOL ..................................................................................................167

68.   STORJ ..............................................................................................175

69.   SUSHI ..............................................................................................176

70.   TRB ..................................................................................................177

71.   TRIBE ..............................................................................................178

72.   UMA .................................................................................................179

73.   UNI ..................................................................................................180

74.   XLM .................................................................................................186

75.   XRP ..................................................................................................192

76.   XTZ ..................................................................................................201

77.   XYO .................................................................................................208

78.   YFI ...................................................................................................209

79.   ZRX ..................................................................................................212

B.   COINBASE OFFERS AND SELLS UNREGISTERED SECURITIES ............213

C.   THE COINBASE EXCHANGES ARE RULE 3b-16(a) SYSTEMS AND
     THEREFORE ARE UNREGISTERED "EXCHANGES" UNDER THE
     EXCHANGE ACT...................................................................................214

D.   COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER
     ON THE COINBASE EXCHANGES..............................................................214

CLASS ACTION ALLEGATIONS .................................................................215

CLAIMS FOR RELIEF ................................................................................219

FIRST CAUSE OF ACTION ........................................................................219

iv

SECOND CAUSE OF ACTION ............................................................................................222

THIRD CAUSE OF ACTION ..............................................................................................224

FOURTH CAUSE OF ACTION ..........................................................................................226

FIFTH CAUSE OF ACTION ...............................................................................................228

SIXTH CAUSE OF ACTION ...............................................................................................231

SEVENTH CAUSE OF ACTION ........................................................................................234

EIGHTH CAUSE OF ACTION ...........................................................................................236

NINTH CAUSE OF ACTION ..............................................................................................238

TENTH CAUSE OF ACTION ..............................................................................................241

ELEVENTH CAUSE OF ACTION ......................................................................................243

TWELFTH CAUSE OF ACTION ........................................................................................245

THIRTEENTH CAUSE OF ACTION ..................................................................................247

FOURTEENTH CAUSE OF ACTION .................................................................................249

FIFTEENTH CAUSE OF ACTION .....................................................................................251

PRAYER FOR RELIEF .......................................................................................................254

DEMAND FOR JURY TRIAL ............................................................................................255

Plaintiffs Louis Oberlander, Henry Rodriguez, and Christopher Underwood (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc. (together with Coinbase Global, "Coinbase"), and Brian Armstrong (collectively with Coinbase Global and Coinbase, Inc., "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Coinbase is an American company that created and operates a website from which customers can buy and sell digital assets. During the period between October 8, 2019 and the present (the "Class Period"), Coinbase has used this platform to buy from and sell to customers 79 different digital assets at issue in this action.[1] But what Coinbase has not disclosed is that the Tokens are in fact securities, and Coinbase is selling these securities despite the fact that there is no registration statement in effect for these securities and despite the fact that Coinbase has refused to register either as a securities exchange or as a broker-dealer. Because Coinbase's sale of these tokens violates both federal and state law, Plaintiffs, individually and on behalf of all persons or entities who transacted in the Tokens on the Coinbase Platform (as defined herein) and/or the Coinbase Pro Platform (as defined herein) during the Class Period (the "Class"), bring claims to

---

[1] Specifically, this action concerns the digital assets traded under the following symbols: 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, ZRX. These assets are referred to collectively as the "Tokens."

recover damages, consideration paid for Tokens, and trading fees, together with interest thereon, as well as attorneys' fees and costs, to the fullest extent permitted by law.

2.      Coinbase sells digital assets or "crypto-assets" that exist on a blockchain, which is a decentralized digital ledger that records all transactions. Following the creation of Bitcoin, which was the first prominent digital asset, the number of digital assets has increased dramatically. There are many different kinds of crypto-assets; some closely resemble Bitcoin or other commodities, in that they are decentralized. For decentralized commodities, prices may rise or fall based upon supply and demand, but there is no centralized mechanism for creating more such commodities.

3.      By contrast, other digital assets are similar to traditional securities in that they represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Like traditional securities, investors purchase these tokens with the hope that their value will increase as the issuer that created the token uses its managerial efforts to create some use—typically described to investors in a "whitepaper"—that will give the token value. This similarity with traditional securities is enhanced by the fact that these tokens are offered to the public in an Initial Coin Offering ("ICO") that is modeled on the IPO of a traditional security.

4.      But, despite the fact that each of the Tokens is a security, none of them is registered with the U.S. Securities and Exchange Commission ("SEC") or with state regulators. This means that purchasers do not have access to the disclosures that accompany the issuances of traditional securities. Rather, investors receive—at most—only the so-called whitepapers, which describe the token, but do not satisfy the requirements for a prospectus under federal and state securities laws. These whitepapers are often supplemented by advertisements and social media postings that promote the token, including giveaways and other promotions.

5.      Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform" and collectively with the Coinbase Platform, the "Coinbase Exchanges"). Crypto-securities, including the Tokens, have been and continue to be sold on the Coinbase Exchanges. Because Coinbase brings together buy and sell orders for the Tokens and the Tokens are securities, the Coinbase Exchanges are securities exchanges, but Coinbase has not registered as a securities exchange under federal or state law and is not subject to any exemption from such registration. Indeed, SEC chair Gary Gensler recently told the Senate Banking Committee that Coinbase had not registered with the SEC, "even though they have dozens of tokens that may be securities."

6.      In addition, Coinbase is an intermediary in every transaction it effects, in contrast to electronic "bulletin boards" such as Craigslist, which match a buyer and seller. Coinbase stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform. Coinbase's operating as an unregistered broker-dealer and exchange on which securities transact, and its offer and sale to investors of those securities, violates federal and state securities laws.

## PARTIES

7.      Plaintiff Louis Oberlander is a citizen and resident of California. During the Class Period, Oberlander transacted in a number of the Tokens on the Coinbase Exchanges from California.

8.      Plaintiff Henry Rodriguez is a citizen and resident of New Jersey. During the Class Period, Rodriguez transacted in a number of the Tokens on the Coinbase Exchanges from New Jersey.

9.      Plaintiff Christopher Underwood is a citizen and resident of Florida. During the Class Period, Underwood transacted in a number of the Tokens on the Coinbase Platform from Florida.

10.     Defendant Coinbase Global, Inc. is a Delaware corporation.

11.     Defendant Coinbase, Inc. is a Delaware corporation that is a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase Global and Coinbase, Inc. are operated as one corporation, and users have no visibility into which entity they are transacting with. Indeed, Coinbase refers to the two entities jointly as the "Company" in its SEC filings. Coinbase, Inc. and Coinbase Global share an office in New York City.

12.     Defendant Brian Armstrong is the founder of Coinbase and the CEO of both Coinbase Global and Coinbase, Inc. Upon information and belief, he is a citizen and resident of California. He has been reported to own a 19-percent stake in Coinbase. He has consistent and daily management of Coinbase's operations, including the decision not to register as a securities exchange or a broker-dealer and the decision to list unregistered securities, including the Tokens. Armstrong has repeatedly and publicly discussed his role in Coinbase, including his disagreements with the SEC's enforcement of securities laws against Coinbase.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Classes are citizens of a state different from Defendant.

14.     Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Amended Complaint asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933

(the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

15.     Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1) and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78cc(b).

16.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District. In particular, Coinbase has an office located in New York City. Armstrong has also often traveled to New York City to promote Coinbase, including attending crypto-conference Consensus 2019 in May 2019, and attending a conference dedicated to non-fungible tokens ("NFTs") in November 2021.

17.     The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

18.     The Court also had personal jurisdiction over Defendants and proper venue over this action under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

## SUBSTANTIVE ALLEGATIONS

### I.   DIGITAL ASSETS, COINBASE, AND CRYPTO-SECURITIES

#### A.   The Blockchain and The Foundations of Digital Assets

19.    This case concerns crypto-assets.[2] Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. The key technology allowing the creation of crypto-assets is the blockchain.

20.    The challenge that had previously prevented the creation of digital assets is the need to allow for secure transfers to exactly one recipient at a time. In general, digital files are transmitted by duplication; if someone emails a photograph to a friend, both the sender and the recipient now have copies of the photograph. While that duplication is helpful for a photograph, it would quickly make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties. The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

21.    Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every Bitcoin in existence. Each Bitcoin user has a digital "address" used to receive Bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address. By looking at the blockchain, anyone can see every Bitcoin transaction in which that address has engaged.

---

[2] One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets.

22.     By providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin. Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin. There is thus no effective way to counterfeit Bitcoin.

23.     The blockchain has become the foundational technology for crypto-assets. While crypto-assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

24.     Control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets.

25.     To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, like a long PIN or password for a conventional bank account.

26.     Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

27.     A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is,

anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are not recorded on the blockchain and not accessible to the public.

### B. Crypto-Exchanges and Coinbase

28.     While the blockchain allows for secure and non-duplicable transfers of digital assets, it does not do anything to connect users to each other or to automate both sides of a transfer. The desire for locations that enabled the trading of digital assets led to the creation of crypto-exchanges. Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities.

29.     There are two primary types of crypto-exchange: decentralized exchanges and centralized exchanges.

30.     Decentralized exchanges may use the blockchain itself to match and execute transactions among traders. There is no intermediary individual or corporation that matches or clears transactions; instead, they use a blockchain technology called a "smart contract" to automatically facilitate trading. While different decentralized exchanges use different approaches, what they have in common is that the crypto-assets are transferred between individual accounts. Thus, if Angela exchanges one Bitcoin for 10 Ethereum using a decentralized exchange, her one Bitcoin will be sent to Brian, another user on the platform, and Brian's 10 Ethereum will be sent to Angela.

31.     These decentralized exchanges resemble Craigslist in their operation. Just like a purchase of a collectible baseball card on Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending each other the goods being transacted. These decentralized exchanges, like Craigslist, do not own

or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (*e.g.*, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

32.    The other type of crypto-exchange—which includes the Coinbase Exchanges—is the centralized exchange. When a customer wishes to trade crypto-assets on a centralized exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset. The exchange will typically then transfer the crypto-assets into one of its other addresses for storage.

33.    The trades conducted within that exchange, however, do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller.  Thus, if Angela wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit Angela's account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain. Nor is there any sense in which Angela's Bitcoin is transferred to anyone other than Coinbase: while Coinbase may use other traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Coinbase and (b) the seller and Coinbase. The buyer and seller are *not* in privity with one another. When a user wants to withdraw crypto-assets from Coinbase or another centralized exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of

crypto-asset from the *exchange's* reserves to that address. The withdrawn assets come directly from the centralized exchange.

34.     Both of the Coinbase Exchanges operate as centralized exchanges. They differ in the services and fees involved, but both place all deposited assets into a centralized wallet and reflect transactions only through internal updates to each customer's account.

35.     The Coinbase Platform, which is marketed towards newer users, allows users to place only market orders. That is, Coinbase Platform users can place orders to buy, sell, or exchange digital assets at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order.

36.     The following tables show the fees charged by Coinbase on the Coinbase Platform:

**FLAT FEES**

| TOTAL TRANSACTION AMOUNT | TRANSACTION FEE |
|---|---|
| $10 or less | $0.99 |
| More than $10, less than or equal to $25 | $1.49 |
| More than $25, less than or equal to $50 | $1.99 |
| More than $50, less than or equal to $200 | $2.99 |

**VARIABLE FEES**

| PAYMENT METHOD (PURCHASE) OR PAYOUT METHOD (SALE) | EFFECTIVE RATE OF CONVERSION FEE (AFTER WAIVER) |
|---|---|
| UNITED STATES BANK ACCOUNT | 1.49% |
| COINBASE USD WALLET | 1.49% |
| DEBIT CARD BUY | 3.99% |
| INSTANT CARD WITHDRAWAL | Up to 1.5% of any transaction and a minimum fee of $0.55. |

37.    The Coinbase Pro Platform is designed for use by advanced and active digital asset traders. The Coinbase Pro Platform allows individuals to place three types of orders: a market order to buy or sell a digital asset at the best available price; a limit order to buy or sell a digital asset at a specific price or better, or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price.

38.    The Coinbase Pro Platform employs a volume-tiered, "maker-taker" fee schedule. Orders that provide liquidity ("maker" orders) are charged different fees than orders that take liquidity ("taker" orders). A Coinbase Pro Platform user's fee tier is based upon total dollar value trading volume over the trailing 30-day period.

39.    A Coinbase Pro Platform user whose order is matched immediately with an order already on the order book is considered a "taker" because they have "taken" an order off the order book and removed liquidity from the market. A Coinbase Pro Platform user whose order is not matched immediately with an order on the order book is considered a "maker", because their order is placed on the order book and provides market liquidity.

11

40.   The Coinbase Pro Platform Maker-Taker fee schedule is as follows:

| PRICING TIER | TAKER FEE | MAKER FEE |
|---|---|---|
| Under $10,000 | 0.50% | 0.50% |
| $10,000 - $50,000 | 0.35% | 0.35% |
| $50,000 - $100,000 | 0.25% | 0.15% |
| $100,000 - $1 Million | 0.20% | 0.10% |
| $1 Million - $20 Million | 0.18% | 0.08% |
| $20 Million - $100 Million | 0.15% | 0.05% |
| $100 Million - $300 Million | 0.10% | 0.02% |
| $300 Million - $500 Million | 0.08% | 0.00% |
| $500 Million - $750 Million | 0.06% | 0.00% |
| $750 Million - $1 Billion | 0.05% | 0.00% |
| $1 Billion+ | 0.04% | 0.00% |

41.   Brian Armstrong, as the founder and current CEO of Coinbase, was involved in the decision to run the Coinbase Exchanges as centralized exchanges. Both Coinbase Exchanges have been centralized from the time they were founded by Armstrong.

**C.      Crypto-Securities and Centralization**

42.      Bitcoin, in addition to pioneering the use of the blockchain, is also notable for being decentralized and having a limited supply. These features are core to the idea of Bitcoin, but, unlike the blockchain, are not universal among crypto-assets generally.

43.      Bitcoin maintains its blockchain and provides for new Bitcoin to enter the economy through a consensus mechanism known as "mining." Individuals "mine" Bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain. Those who mine Bitcoin—"miners"—are rewarded with new Bitcoin.

44.      The mining process creates a scarcity that underlies the value of Bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more Bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new Bitcoin. This process ensures that the supply of Bitcoin will not rise sharply or unpredictably, thus preventing a flood of new Bitcoin that could undercut the value of the preexisting Bitcoin. Likewise, the number of Bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all Bitcoin have been mined, at which point miners will receive fees paid solely by network users.

45.      Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of Bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and Bitcoin is not devalued. This ensures market participants that their Bitcoin will not diminish in value due to sudden inflation.

46.      Bitcoin's architecture ensures that it is entirely decentralized. The Bitcoin protocol was first released on October 31, 2008 through a whitepaper authored under the pseudonym

Satoshi Nakamoto. That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust." While the first 50 Bitcoin were mined into existence by Satoshi Nakamoto three months after the release of the whitepaper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

47.     Accordingly, there is no "Bitcoin Inc." that administers or manages Bitcoin as a whole. If Bitcoin were run on centralized servers, the underlying value of Bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more Bitcoin at a whim, the value of Bitcoin would reflect that uncertainty. But because Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

48.     This decentralization distinguishes Bitcoin from other assets. The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them. The value of a fiat currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for Bitcoin.

49.     The controlled supply and decentralized nature of Bitcoin is shared with some other crypto-assets, including Ethereum, which has become the second-largest crypto-asset by maker volume. Because of their decentralized nature, Bitcoin and Ethereum have been recognized as commodities by courts and regulators.[3]

---

[3] *See, e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *adhered to on denial of reconsideration,* 321 F. Supp. 3d 366 (E.D.N.Y. 2018)

50.     Other crypto-assets, however, are centralized and do not have a controlled supply. Stablecoins, for example, are intended to mirror real-world assets, such as the U.S. dollar or the price of gold. These stablecoins can be created and managed by a single entity that has the power to create new coins on demand; the value of these coins derives from the promise that the issuing entity will maintain a reserve of the asset to which the stablecoin is pegged and only issue new coins in response to new deposits into the reserve. Coinbase created and manages one such stablecoin, known as USDC.

51.     Another type of crypto-asset is the token or crypto-security. These crypto-assets are centralized and are not generated by mining or a similar decentralized process. Instead, they are generally created by a company, known as an issuer.

52.     Often, a crypto-security will begin with an initial coin offering, or "ICO." This ICO will allow members of the public to buy tokens directly from the issuer. On other occasions, the issuer will distribute some tokens for free to users in an "airdrop" and then begin selling the tokens on the secondary market through one or more exchanges. Regardless, the tokens, which were generated by the issuer themselves, do not derive value through algorithmic scarcity (and are thus unlike Bitcoin and Ethereum) and are not backed by a reserve (and are thus unlike stablecoins).

53.     Instead, the nominal value proposition of a token comes from the promise that the issuer will use the funds raised in the ICO to create an ecosystem in which the token is useful; the

---

(recognizing that Bitcoin can be regulated as commodity). On August 14, 2021, CFTC Commissioner Brian Quintenz stated on Twitter that Ethereum was "a non-security commodity." Brian Quintenz (@CFTCquintenz), Twitter (Aug. 14, 2021), https://web.archive.org/web/20220311133718/https://twitter.com/CFTCquintenz/status/1426570174036168704?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1426570174036168704%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.ledgerinsights.com%2Fcftc-commissioner-clarifies-role-in-digital-assets-regulation%2F.

token would then become valuable because it could be sold to those who wish to engage with the new ecosystem. In reality, many tokens issued during an ICO never have an actual use case because the issuer never actually creates the relevant ecosystem; even for the tokens that eventually acquire a nominal use, those tokens are overwhelmingly used to trade and possessed by individuals who will never interact with the ecosystem for which they are designed, but instead acquire the tokens to speculate on their future market value. In this way, they are similar to traditional securities, which entitle owners to voting rights for the board of directors but are often owned by those with no intention of casting such a vote and who hope to profit from the managerial efforts of those running the issuer.

54.     The tokens issued in these ICOs are therefore investment contracts and securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Investors invest money by purchasing the tokens. The investors are participating in a common enterprise because their collective purchases fund the creation of the ecosystem that will supposedly give value to the tokens they have purchased. They expect profits by reselling the tokens to others at a higher price when the ecosystem is created. And they depend on the efforts of the issuer to create that ecosystem.

55.     Because these tokens are securities, the SEC has repeatedly both provided guidance and engaged in enforcement actions on that basis. The SEC first examined how digital assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section*

*21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO Report").[4] In the 2017 DAO Report,

the SEC examined the application of the Securities Act and the Exchange Act to the issuance and

trading of digital assets.

56.   With respect to the application of the Securities Act to digital assets, the SEC

concluded (1) that digital assets may qualify as securities pursuant to the Securities Act and the

test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that (2) issuers of digital assets

that fit within the definition of security under the *Howey* test are subject to the registration and

reporting requirements of the Securities Act.[5]

57.   Similarly, the SEC concluded that digital asset trading platforms may satisfy the

meaning of "exchange" as defined by the Exchange Act if they "provide[] users with an electronic

system that matched orders from multiple parties to buy and sell [digital assets] for execution based

on non-discretionary methods." [6] The SEC noted that a "system that meets the criteria of Rule 3b-

16(a), and is not excluded under Rule 3b16(b), must register as a national securities exchange

pursuant to Sections 5 and 6 of the Exchange Act or operate pursuant to an appropriate exemption."

58.   Following an ICO boom in 2017, the SEC issued further guidance as to the

application of the *Howey* test to digital assets in a 2019 report entitled *Framework for "Investment*

---

[4] *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO,* SECURITIES AND EXCHANGE COMMISSION (Jul. 25, 2017), https://web.archive.org/web/20220306215515/https://www.sec.gov/litigation/investreport/34-81207.pdf ("2017 DAO Report").

[5] The 2017 DAO report explained that "information about The DAO was 'crucial' to the DAO Token holders' investment decision." *Id.* at 16 (citing *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980)). "The DAO was 'responsible for the success or failure of the enterprise,' and accordingly was the entity about which the investors needed information material to their investment decision." *Id.* (quoting *Murphy*, 626 F.2d at 643–44).

[6] *Id.* at 17.

*Contract" Analysis of Digital Assets* (the "Howey Framework Report").[7] The report reiterated that whether a particular digital asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the digital asset's creation and issuance.

59.     Following this guidance, the SEC has engaged in enforcement actions on the basis that several different tokens are in fact securities. On September 30, 2019, Block.one, the issuer of the EOS digital asset (one of the Tokens in this action), agreed to pay $24 million to settle charges that it had raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token.[8] Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP (another of the Tokens in this action).[9] The case is ongoing.

60.     On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off of securities and resemble derivatives, stating:

> Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities. These platforms—whether in the decentralized or centralized finance

---

[7] *Framework for "Investment Contract" Analysis of Digital Assets,* SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019), https://archive.ph/4wS5f ("Howey Framework Report").

[8] *See SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2019), https://web.archive.org/web/20220311134238/https://www.sec.gov/news/press-release/2019-202.

[9] *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220307145723/https://www.sec.gov/news/press-release/2020-338.

space—are implicated by the securities laws and must work within our securities regime."[10]

61.     On August 3, 2021, SEC Chairman Gensler commented on the state of the digital asset market:

> [R]ight now, we just don't have enough investor protection in crypto … [f]rankly, at this time, it's more like the Wild West … I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight … [t]his leaves prices open to manipulation. This leaves investors vulnerable …. ***While each token's legal status depends on its own facts and circumstances, the probability is quite remote that, with 50 or 100 tokens, any given platform has zero securities***.[11]

62.     As digital asset popularity exploded, Coinbase listed digital assets, including the Tokens, that qualify as investment contracts, and thus securities, in order to earn fees from user transactions in these assets. Coinbase listed these Tokens despite knowledge of their status as securities.

63.     Coinbase's CEO, Brian Armstrong, has directly commented on the possibility that Coinbase may be selling securities. In September 2021, in response to an SEC enforcement action regarding a Coinbase lending program, Armstrong tweeted that the SEC was engaging in "sketchy behavior." He criticized the SEC for objecting to Coinbase's crypto-backed lending program, and noted that he had attempted to meet with the SEC to discuss the issue. Coinbase nonetheless

---

[10] Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities,* NASDAQ (July 21, 2021), https://web.archive.org/web/20220311134752/https://www.nasdaq.com/articles/sec-chair-hints-some-stablecoins-are-securities-2021-07-21.

[11] Will Gottsegen, *SEC's Gensler: Crypto Market Filled With Unregistered Securities, Prices 'Open to Manipulation'*, DECRYPT (Aug. 3, 2021), https://web.archive.org/web/20220311134929/https://decrypt.co/77574/gary-gensler-crypto-market-securities-aspen-institute  (emphasis added).

cancelled the SEC-challenged program. But Armstrong did not register Coinbase as a securities exchange or a broker-dealer under state or federal law.

**D.     Coinbase's Failure to Register as a Securities Exchange or Broker-Dealer**

64.     Despite selling tokens that are crypto-securities, Coinbase has not registered as a securities exchange or broker-dealer. Indeed, on September 14, 2021, SEC Chairman Gary Gensler spoke at a Senate Banking Committee hearing and noted that the Coinbase Exchanges have not registered as national securities exchanges "even though they have dozens of tokens that might be securities."[12]

65.     Each of the Coinbase Exchanges is a securities exchange as the term is defined in the Exchange Act. Section 3(a)(1) of the Exchange Act defines the term "exchange" as:

> any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange. 15 U.S.C. § 78c.

66.     According to the Exchange Act, any organization, association, or group operating as an Exchange must register as a "national securities exchange" with the SEC and must make periodic disclosures to the SEC, unless the SEC determines an exemption is warranted.

67.     Section 5 of the of the Exchange Act makes failing to comply with the Exchange Act's registration and reporting requirements illegal:

---

[12] Jeff John Roberts, *SEC Chair: Coinbase Lists 'Dozens of Tokens that Might Be* Securities', DECRYPT (Sept. 14, 2021), https://web.archive.org/web/20220311192025/https://decrypt.co/80924/gensler-coinbase-sec-securities.

It shall be unlawful for any broker, dealer, *or exchange*, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction, unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration upon application by the exchange because, in the opinion of the Commission, by reason of the limited volume of transactions effected on such exchange, it is not practicable and not necessary or appropriate in the public interest or for the protection of investors to require such registration. 15 U.S. Code § 78e - Transactions on unregistered exchanges (emphasis added).

68.    Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1) of the Exchange Act. Exchange Act Rule 3b-16(a) provides that an organization, association, or group of persons shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by an exchange" as those terms are used in Section 3(a)(1) of the Exchange Act if such an organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, nondiscretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[13]

---

[13] *See* 17 CFR § 240.3b-16(a). The purpose of Rule 3b-16(b) is to explicitly exclude certain systems that the SEC believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems, hereinafter "Regulation ATS Adopting Release"), at 70852.

69.     A system that meets the criteria of Exchange Act Rule 3b-16(a), and that is not excluded under Exchange Act Rule 3b-16(b), must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act[14] or operate pursuant to an appropriate exemption. One of the available exemptions is for Alternative Trading Systems, or "ATS."[15] Exchange Act Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an organization, association, or group of persons that complies with Regulation ATS.[16]

70.     Regulation ATS requires an ATS to, among other things, register as a broker-dealer, file a Form ATS with the Commission to notice its operations, and establish written safeguards and procedures to protect subscribers' confidential trading information. An ATS that complies with Regulation ATS and operates pursuant to the Rule 3a1-1(a)(2) exemption is not required by Section 5 to register as a national securities exchange.

71.     The Coinbase Exchanges are exchanges under these regulations. They perform the functions of a traditional exchange by bringing together buy orders and sell orders and use established and nondiscretionary methods to set the prices at which these orders are executed.

_____

[14] See 15 U.S.C. §§ 78e-78f. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act.

[15] Rule 300(a) of Regulation ATS provides that an ATS is "any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading."

[16] See 17 CFR 240.3a1-1(a)(2). Rule 3a1-1 also provides exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. See 17 CFR 240.3a1-1(a)(1) and (3).

72.     Coinbase is also obligated to register as a broker-dealer. Section 15 of the Exchange Act requires that any person operating as a broker in U.S. securities markets must register with the SEC and obtain membership with, and be regulated by, the Financial Industry Regulatory Authority, or "FINRA," or operate subject to an exemption from registration.[17]

73.     The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."[18] Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of [securities] distribution."[19]

74.     Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market—frequently in exchange for transaction-based compensation.[20]

75.     The Exchange Act defines "dealer" to include an entity that is "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business."[21]

76.     Coinbase effects transactions in the Tokens for the accounts of its customers; it is thus obligated to register with the SEC as a broker-dealer but has failed to do so.

---

[17] 15 U.S.C. § 78o(a)(1), (a)(8).

[18] 15 U.S.C. § 78c(a)(4).

[19] *See, e.g.*, *Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Sup. 411, 415 (D. Mass.) *aff'd*. 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

[20] *See, e.g.*, *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Margolin*, No. 92 CIV. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).

[21] 15 U.S.C. § 78c(a)(5).

II.     **COINBASE LISTS AND SELLS SECURITIES BUT IS NOT REGISTERED AS A SECURITIES EXCHANGE**

A.      **DIGITAL ASSETS LISTED ON COINBASE ARE SECURITIES**

Coinbase has listed the Tokens on its Digital Asset Platforms. Analysis of the facts and circumstances surrounding the Tokens shows that they are investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and are therefore securities.

1.      **1INCH**

77.     1Inch ("1INCH") is a token created by the 1Inch Foundation. The first *bona fide* public offering of 1Inch occurred on or about December 24, 2020.

78.     Investors in 1INCH reasonably expected to receive profits from their investment in 1INCH. They expected these profits to derive from the efforts of the 1Inch Foundation and the developers of the 1Inch Network.

79.     The 1Inch Network operates as a decentralized exchange for crypto-assets. It was created by a core team of developers, including its founder Anton Bukov. The core development team continues to lead the day-to-day maintenance and improvement of the network.

80.     The 1Inch Foundation is a nonprofit entity that issued 1INCH. The 1Inch Foundation states on its website that it aims "to foster growth and expansion of the 1inch Network and incentivize contributions through grants and other capital deployment vehicles."

81.     The 1Inch Foundation promised that holders of 1INCHT would be able to participate in the governance of a protocol that enables trade optimization across multiple decentralized exchanges. This governance right, which resembles the voting rights of many traditional securities, allowed 1INCH purchasers to participate in a common enterprise with each other.

24

82.     The governance right granted by 1INCH would be valuable only if the team behind the 1Inch Network, including the 1Inch Foundation and the core team of technology developers, committed the managerial efforts needed to develop, maintain, and promote the 1Inch Network and its underlying algorithms.

83.     There are few, if any, goods or services that can be directly purchased using 1Inch. To the extent that 1Inch can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of 1INCH. Accordingly, all or nearly all 1INCH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

84.     Based on the foregoing facts, among others, 1INCH qualifies as an investment contract and therefore a security. However, 1INCH has never been registered as a security.

85.     During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in 1INCH on and with Coinbase. Certain members of the class currently own 1INCH tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought 1INCH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in 1INCH.

## 2.     AAVE

86.     Aave ("AAVE") is a token created by Aave. The first *bona fide* public offering of AAVE occurred on or about October 2, 2020.

87.     Investors in AAVE reasonably expected to receive profits from their investment in AAVE. They expected these profits to derive from the efforts of Aave. AAVE was marketed as

deriving value from its link to a decentralized finance protocol that allows people to lend and borrow crypto-assets with a variable interest rate, which depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained that protocol.

88.     There are few, if any, goods or services that can be directly purchased using AAVE. To the extent that AAVE can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of AAVE. Accordingly, all or nearly all AAVE traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

89.     Based on the foregoing facts, among others, AAVE qualifies as an investment contract and therefore a security. However, AAVE has never been registered as a security.

90.     During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have had one or more losing transactions in AAVE on and with Coinbase. Certain members of the class currently own AAVE tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez, Underwood, and Oberlander, bought AAVE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in AAVE.

### 3.     ACH

91.     Alchemy Pay ("ACH") is a token created by Alchemy Pay. The first *bona fide* public offering of ACH occurred on or about September 7, 2020.

92.     Investors in ACH reasonably expected to receive profits from their investment in ACH. They expected these profits to derive from the efforts of Alchemy Pay. ACH was marketed

as deriving value from its ability to power Alchemy Pay, which was a platform that enables payments using a wide variety of fiat and cryptocurrencies. The value of the ACH token thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained Alchemy Pay itself.

93.     There are few, if any, goods or services that can be directly purchased using ACH. To the extent that ACH can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ACH. Accordingly, all or nearly all ACH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

94.     Based on the foregoing facts, among others, ACH qualifies as an investment contract and therefore a security. However, ACH has never been registered as a security.

95.     During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have had one or more losing transactions in ACH on and with Coinbase. Certain members of the class currently own ACH that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez, Underwood, and Oberlander, bought ACH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in ACH.

### 4.     ADA

96.     Cardano ("ADA") is a token that was first *bona fide* offered to the public in or about September 2017.

97.     Coinbase describes ADA as follows:

27

> Cardano (ADA) is a blockchain platform built on a proof-of-stake consensus protocol (called Ouroboros) that validates transactions without high energy costs. Development on Cardano uses the Haskell programming language, which is described as enabling Cardano "to pursue evidence-based development for unparalleled security and stability." The blockchain's native token, ADA, is named after the 19th century mathematician, Ada Lovelace.

98.     ADA became available for trading on the Coinbase Pro Platform on or about March 18, 2021. ADA became available for trading on the Coinbase Platform on or about March 19, 2021. Since becoming available on the Coinbase Platform, ADA has been continuously traded on the Coinbase Exchanges.

99.     After ADA was listed on the Coinbase Platform, its price rose by approximately 150.0 percent and peaked at $3.10 on September 2, 2021. ADA has been on a steady decline since peaking in September 2021.



100.    As of 10:00 a.m. Eastern time on March 10, 2022, ADA was trading at $0.80—a decline of 74.1 percent from its September 2, 2021 peak.

101.    Cardano is a blockchain platform that was founded in 2015 by Ethereum co-founder Charles Hoskinson.

102.    Hoskinson left Ethereum in 2014 over a disagreement about how to structure the project. Vitalik Buterin, one of Ethereum's other co-founders, wanted to keep Ethereum a nonprofit organization with decentralized governance; Hoskinson wanted to accept venture capital and create a for-profit entity with a more formal governing structure.

103.    Hoskinson went on to form a new project called IOHK, a blockchain research and engineering company. IOHK's key project is Cardano, and ADA is a digital token that runs on the Cardano blockchain.

104.    The Cardano Foundation is a Swiss-based nonprofit organization that oversees and supervises the advancement of Cardano.

105.    Emurgo is a global blockchain company that serves as the official commercial arm of the Cardano blockchain.

106.    From September 2015 to January 2017, a "pre-launch sales event" was held in which approximately 20 percent of the total supply of ADA was distributed to IOHK, Emurgo, and the Cardano Foundation.

107.    ADA launched for public trading via an ICO in or around September 2017. Approximately 94.45 percent of the remaining ADA was sold to Japanese citizens.

108.    As one commentator has noted, there is a "question whether this narrow geographic distribution and the current overall coin distribution impose a problem for the decentralization of Cardano."

109.     During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in ADA tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ADA tokens and paid Coinbase a fee for executing the transaction.

110.     Investors in ADA—including Plaintiffs Oberlander, Rodriguez, and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ADA's creators, developers, managers, and promoters. The team behind ADA has actively cultivated this expectation through public communications, including on Cardano's official website.

111.     Cardano's website, for example—despite emphasizing its "decentralized" nature—also emphasizes that its "team works across three independent entities to ensure that Cardano stays true to its purpose as we advance and evolve." Those three entities are the Cardano Foundation, IOHK, and Emurgo.



112.     The Cardano Foundation's website likewise emphasizes that it "work[s] with IOHK and Emurgo to ensure that Cardano is being developed and promoted as a secure, transparent, and accountable solution for positive global change." It further states that "[t]he Cardano Foundation

sets the direction for decentralized economic empowerment, working with regulators in different jurisdictions to shape blockchain legislation and commercial standards."

113.   Although Cardano did not release an official whitepaper, it issued an analogous 2017 essay "outlining the background, philosophy, and inspiration behind the Cardano blockchain."

114.   Cardano's website also claims that "[e]very ada holder holds a stake in the Cardano network." A reasonable investor would interpret this language to mean that, by purchasing ADA tokens, the purchaser was investing in a common enterprise.

115.   Cardano's website further informs users that "[y]ou can buy or sell ada for fiat or other cryptocurrencies using cryptocurrency exchanges," and links to a site listing the "exchanges that support ada."

116.   Cardano also raised funds for ADA through its ICO in 2017. As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security." Current SEC chairman Gary Gensler has affirmed this view.

117.   In August 2020, IOHK published a blog post acknowledging that Cardano had not yet been decentralized. The article explained that Cardano's goal was full decentralization, but that "[t]his week marks the first step in the road to full decentralization"—thus conceding that Cardano was not decentralized.

118.   Individuals have also pointed out that, despite Cardano's claims of decentralization, Cardano is in fact centralized:



← **Tweet**

**Nick Szabo**
@NickSzabo4                                    ...

Replying to @RaoulGMI

Cardano's philosophy, and especially its auto-update
feature, is centralized and destroys trust minimization.
Trust minimization is the most important feature that
gives a blockchain value.  Cardano people do not
understand it and fundamentally violate it.

8:45 PM · Feb 27, 2021 · Twitter Web App

**154** Retweets   **43** Quote Tweets   **1,289** Likes

119.    On March 31, 2021, IOHK tweeted that Cardano had purportedly achieved "100%
decentralized block production":



120.     Nonetheless, Cardano's websites continue to emphasize the role of IOHK,

Emurgo, and the Cardano Foundation in overseeing the Cardano blockchain and the ADA token.

121.     In addition, ADA offers little, if any, utility apart from the ability to sell it to other

investors. Cardano's website claims that, "[i]n time, ada will also be usable for a variety of

applications and services on the Cardano platform"—but that time has not come.

122.     The primary purpose for purchasing ADA tokens was to make a profit, rather than

to use ADA tokens for a separate task. As the SEC has recognized, this lack of intrinsic utility is

33

evidence that investors buy ADA primarily because they expect profits, not because they intend to "use [ADA] for its intended functionality on the network."[22]

123.    To the extent that ADA can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ADA and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[23]

124.    Cardano's website, moreover, impliedly acknowledges that ADA is an investment with the following warning:

> You are fully and solely responsible for evaluating your investments, for determining whether you will exchange blockchain assets based on your own judgement, and for all your decisions as to whether to exchange blockchain assets with Cardano. In many cases, blockchain assets you exchange on the basis of your research may not increase in value, and may decrease in value. Similarly, blockchain assets you exchange on the basis of your research may fall or rise in value after your exchange.

125.    Yet in contrast to what would typically be included in an SEC registration statement, Cardano's website does not contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

126.    Recognizing these issues, on November 23, 2021, eToro—one of the world's largest exchanges for retail traders—announced that, starting on December 26, 2021, it would

---

[22] Howey Framework Report.

[23] *Id*.

delist Tron and ADA in the United States. eToro cited the "evolving regulatory environment" as the reason for doing so.

127.    In a video posted to Twitter, Hoskinson railed against the decision, blaming it on the lack of a "global regulatory standard" and attempting to assuage fears that the delisting would affect ADA's price.

128.    Based on the facts alleged above, among others, ADA qualifies as an investment contract and thus a security.

129.    The Coinbase Exchanges provide users with hyperlinks to Cardano's official website. Coinbase thus participates in the attempt to persuade investors that by buying ADA, they will profit from the efforts of others.

130.    During the Class Period, numerous members of the Class have made losing transactions in ADA on and with Coinbase. In addition, certain members of the class, including Plaintiff Oberlander, currently own ADA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.

**5.    AGLD**

131.    Adventure Gold ("AGLD") is a token created by Loot. The first *bona fide* public offering of Adventure Gold occurred on or about September 2, 2021.

132.    Investors in AGLD reasonably expected to receive profits from their investment in AGLD. They expected these profits to derive from the efforts of Loot. AGLD was marketed as deriving value from its ability to enable the Loot community to participate in governance of the Loot NFT project. This governance right, which resembles the voting rights of many traditional securities, means that AGLD purchasers participated in a common enterprise with each other and

depended on the managerial effort of the issuer in creating and maintaining the NFT project which AGLD holders could govern.

133.     There are few, if any, goods or services that can be directly purchased using AGLD. To the extent that AGLD can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of AGLD. Accordingly, all or nearly all AGLD traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

134.     Based on the foregoing facts, among others, AGLD qualifies as an investment contract and therefore a security. However, AGLD has never been registered as a security.

135.     During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in AGLD on and with Coinbase. Certain members of the class currently own AGLD tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought AGLD tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in AGLD.

### 6.     ALGO

136.     Algorand ("ALGO") is a token created, developed, issued, and distributed by Algorand, Inc. and the Algorand Foundation (together the "Algorand Entities").

137.     ALGO was first *bona fide* offered to the public in the United States in or about June 2019.

138.     Coinbase describes ALGO as follows:

> Algorand is a cryptocurrency and blockchain protocol that aims to be simultaneously scalable, secure, and decentralized. It uses a consensus algorithm called pure proof-of-stake.

139.     ALGO became available for trading on the Coinbase Pro Platform on or about August 14, 2019. ALGO became available for trading on the Coinbase Platform on or about July 16, 2020. Since becoming available on the Coinbase Platform, ALGO has continuously been traded on the Coinbase Exchanges.

140.     After ALGO was listed on the Coinbase Platform, its price rose by approximately 883.0 percent and peaked at $2.83 on November 18, 2021. Since its peak, the price of ALGO has persistently declined.



141.     As of 10:00 a.m. Eastern time on March 10, 2022, ALGO was trading at $0.73—a decline of 74.0 percent from its November 18, 2021 peak.

142.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in ALGO tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ALGO tokens and paid Coinbase a fee for executing the transaction.

143.    Purchasers of ALGO on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each ALGO token is fungible with all others, and the fortunes of all ALGO investors are "linked to each other [and] to the success of [the Algorand Entities'] efforts."[24]

144.    ALGO investors reasonably expected to earn profits through the appreciation in value of their ALGO tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Algorand Entities.

145.    Each Algorand Entity is an active participant in the sponsorship, promotion, or distribution of ALGO.

146.    Algorand, Inc. markets itself as the developer of the technology behind the Algorand blockchain. ALGO is the native token of the Algorand blockchain.

147.    Algorand, Inc. claims that its "technology enables a set of high performing Layer-1 blockchains that provide security, scalability, complete transaction finality, built in privacy, Co-Chains, and advanced smart contracts that are essential in a FutureFi world."

148.    Algorand, Inc. performs, and is expected to perform, "essential tasks [and] responsibilities" regarding the Algorand blockchain.[25] According to its website, Algorand, Inc.

---

[24] *Id.*

[25] *Id.*

employs a "team" of "internationally recognized researchers, mathematicians, cryptographers, and economists along with proven business leaders from global technology companies," including its founder Silvio Micali, a professor at the Massachusetts Institute of Technology. These employees are responsible for the research and development efforts needed to improve the functionality of the Algorand blockchain, as well as marketing, legal compliance, and financial management, among other functions. Algorand, Inc. is regularly rewarded in ALGO tokens for its research and development efforts. ALGO investors thus rely on Algorand, Inc. for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which ALGO operates.[26]

149.    Algorand, Inc. uses ALGO to finance its efforts to develop and promote the Algorand blockchain. Algorand, Inc. acknowledges on its website that it "anticipate[s] selling some Algos from time to time through third party run, structured selling plans to fund development initiatives." Algorand, Inc. also benefits financially from appreciation of the ALGO tokens it holds, allowing it to invest further in research and development.

150.    The Algorand Foundation is a nonprofit affiliate of Algorand, Inc. that is "dedicated to helping fulfill the global promise of the Algorand blockchain by taking responsibility for its sound monetary supply economics, decentralized governance, and healthy and prosperous open-source ecosystem," according to its website. The Algorand Foundation has chief responsibility for the distribution of ALGO, among other functions.

151.    Buyers of ALGO are motivated primarily by the belief that the Algorand Entities will succeed in their efforts, leading to growth in the value of ALGO.

---

[26] *Id.*

152.    Apart from its speculative value as an investment, ALGO offers little utility to buyers. The Algorand Foundation claims that "[a]s the vision of a Borderless Economy becomes a reality, the Algo will be one of the most critical crypto-currencies in use." Currently, however, there are few goods or services that investors can directly purchase using ALGO.

153.    To the extent that ALGO can be directly exchanged for goods or services, there is little or no apparent correlation between the price of ALGO and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in ALGO are motivated by the expectation of profits.[27]

154.    Many ALGO investors hold amounts of ALGO with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with ALGO.

155.    ALGO is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for ALGO] or those who have a need for the functionality of the network," further demonstrating that ALGO investors are motivated by the expectation of profits.[28]

156.    The Algorand Entities have promoted widespread trading of ALGO—including among investors with no personal need for the functionality of ALGO's network and no expectation of directly purchasing goods or services with ALGO—by working to make ALGO available for retail trading on exchange platforms including the Coinbase Exchanges. The August 2019 listing of ALGO on Coinbase Pro made ALGO "one of the fastest tokens to be listed on Coinbase," which Algorand, Inc. touts as one of the key accomplishments in its history.

---

[27] *Id*.

[28] *Id*.

157.    In addition to facilitating listings of ALGO on exchange platforms, the Algorand Entities have taken other steps to "support[] a market for, [and] the price of," ALGO.[29] For example, the Algorand Foundation has burned, or permanently removed from circulation, certain ALGO tokens in what it described as an effort "to strengthen the long-term viability and fairness within the Algo market." The Algorand Foundation has also offered "participation rewards" to incentivize investors to buy and hold ALGO. As the SEC recognizes, such actions support the conclusion that investors in ALGO reasonably expect to earn profits in reliance on the efforts of others.

158.    Of the 10 billion ALGO in existence, 2 billion were initially allocated to Algorand, Inc. and 500 million were allocated to the Algorand Foundation. Both Algorand Entities continue to hold large amounts of ALGO, and Algorand, Inc. has expressed an intent to "hold [its] tokens long term." The Algorand Entities' holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in ALGO have a reasonable expectation of profit.[30]

159.    Based on the facts alleged above, among others, ALGO qualifies as an investment contract and thus a security.

160.    In contrast to the robust disclosures required under federal and state securities laws, the Algorand Entities provide investors with minimal disclosures. Starting in November 2019, the Algorand Foundation has published five Transparency Reports, each of which is brief and far less

---

[29] *Id.*

[30] *Id.*

detailed than the disclosures required for securities issuers. The most recent Transparency Report was published in September 2021.

161.    The Algorand Entities have sought to conceal ALGO's status as a security through misleading public communications that emphasize the purportedly "decentralized" nature of the Algorand blockchain, thus diverting attention from the essential managerial efforts of the Algorand Entities. For example, the "About Us" page of Algorand, Inc.'s website provides almost no information about Algorand, Inc.'s day-to-day work but states that the first element of its "mission" is "[g]lobal trust through decentralization." Moreover, materials on Algorand, Inc.'s website—including, among others, the 2017 whitepaper for the Algorand blockchain—encourage readers to think of ALGO as a direct competitor and counterpart to Bitcoin and Ethereum, which are widely known as commodities. After reviewing the Algorand Entities' websites and other official publications, a reasonable layperson would likely have the impression that ALGO is not a security.

162.    The Coinbase Exchanges provide users with a hyperlink to the official Algorand, Inc. website and the Algorand whitepaper. Coinbase thus participates in the attempt to conceal ALGO's status as a security.

163.    During the Class Period, numerous members of the Class, including Plaintiffs Underwood and Oberlander, have had one or more losing transactions in ALGO on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own ALGO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Underwood and Oberlander, bought ALGO tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

7.    **AMP**

164.    Amp ("AMP") is a token that was first *bona fide* offered to investors on or about September 8, 2020. AMP became available for trading on the Coinbase Exchanges on or about June 10, 2021. Since then, AMP has continuously been traded on the Coinbase Exchanges.

165.    Coinbase describes AMP as follows:

> Amp is an Ethereum token that aims to "collateralize payments on the Flexa Network, making them instant and secure." If a BTC or ETH payment fails due to unconfirmed or long transaction times "the Amp collateral can instead be liquidated to cover losses" while the vendor receives payment in fiat, potentially providing greater assurances to both parties.

166.    After AMP was listed on the Coinbase Platform, its price rose by approximately 105.2 percent and peaked at $0.12 on June 16, 2021. Since its peak, the price of AMP has declined.



167.    As of 10:00 a.m. Eastern time on March 10, 2022, AMP was trading at $0.03—a decline of 79.4 percent from its June 16, 2021 peak.

168.     During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in AMP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for AMP tokens and paid Coinbase a fee for executing the transaction.

169.     Investors in AMP—including Plaintiffs Oberlander, Rodriguez, and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of AMP's creators, developers, managers, and promoters. The team behind AMP has actively cultivated this expectation through public communications including, but not limited to, a whitepaper hosted on AMP's official website.

170.     AMP was built by ConsenSys, a blockchain software company, and Flexa Network Inc., a digital payments platform. According to the current version of the whitepaper, dated November 24, 2020, "Amp is a digital token designed to universally decentralize risk in a financial transaction." Moreover, "AMP is the exclusive collateral token of the Flexa network," the existing merchant payment network built by Flexa Network Inc. The purported function and financial success of AMP depends on the efforts of the AMP development team to continue its maintenance of and increase the acceptance of the Flexa network.

171.     The close interdependence between the Flexa network and AMP is further documented in numerous public communications including posts on Flexa's Twitter feed. For

example, Flexa has used its Twitter account to announce network upgrades developed by its core team.



172.    In contrast to the robust disclosures required under federal and state securities laws, the development team behind AMP provides investors with little insight into financial details of the Flexa network or the business model supporting its continued growth.

173.    Despite the lack of legally mandated disclosures, AMP's development team immediately listed AMP on the Gemini cryptocurrency exchange less than a week after its official launch. The development team has since continued to encourage public investment and speculation in AMP by listing it broadly on cryptocurrency exchanges and engaging in a series of promotional activities such as giveaways, including in partnership with Coinbase.





174.    AMP offers little utility apart from the ability to sell it to other investors. Most investors purchase AMP with an expectation to make profits by reselling it later on, rather than using it as a payment collateral. AMP's development team has in the past acted to increase supply of AMP tokens in response to increases in demand, which were driven by speculation among investors rather than the purported real-world use case.



175.    As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy AMP primarily because they expect profits, not because they intend to "use [AMP] for its intended functionality on the network."[31]

176.    To the extent that AMP can be exchanged for specific goods and services, there is little or no apparent correlation between the price of AMP and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[32] Instead of responding to the price of other goods or services, the price of AMP has changed based on events that affect speculation about its future performance. For

---

[31] *Id.*

[32] *Id.*

example, the listing of AMP on platforms including the Coinbase Exchanges had an enormous positive effect on its value in 2021 even though it had no effect on AMP's nominal utility.

177.    Based on the facts alleged above, among others, AMP qualifies as an investment contract and thus a security.

178.    The Coinbase Exchanges provide users with hyperlinks to AMP's official website and whitepaper. Coinbase thus participates in the attempt to persuade investors that by buying AMP, they will profit from the efforts of others.

179.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in AMP on and with Coinbase. Certain members of the class currently own AMP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought AMP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 8.    ANKR

180.    Ankr ("ANKR") is a token created by Ankr. The first *bona fide* public offering of ANKR occurred on or about August 31, 2018.

181.    Investors in ANKR reasonably expected to receive profits from their investment in ANKR. They expected these profits to derive from the efforts of Ankr.  ANKR was marketed as deriving value from its ability to power Ankr, pay for services on the Ankr platform, and act as insurance for network participants. Buyers of ANKR were thus depending on Ankr to create and maintain the Ankr platform.

182.    There are few, if any, goods or services that can be directly purchased using ANKR. To the extent that ANKR can be directly exchanged for any goods or services, there is little or no

apparent correlation between the market price of those goods or services and the price of ANKR. Accordingly, all or nearly all ANKR traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

183.    Based on the foregoing facts, among others, ANKR qualifies as an investment contract and therefore a security. However, ANKR has never been registered as a security.

184.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in ANKR on and with Coinbase. Certain members of the class currently own ANKR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought ANKR tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in ANKR.

### 9.    ARPA

185.    ARPA Chain ("ARPA") is a token created by Arpachain. The first *bona fide* public offering of ARPA occurred on or about April 25, 2019.

186.    Investors in ARPA reasonably expected to receive profits from their investment in ARPA. They expected these profits to derive from the efforts of Arpachain. ARPA was marketed as deriving value from its ability to power ARPA Chain, a privacy-preserving computation network. The value of ARPA thus depended on the managerial effort of the issuer to create and maintain this network.

187.    There are few, if any, goods or services that can be directly purchased using ARPA. To the extent that ARPA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ARPA.

Accordingly, all or nearly all ARPA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

188.    Based on the foregoing facts, among others, ARPA qualifies as an investment contract and therefore a security. However, ARPA has never been registered as a security.

189.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in ARPA on and with Coinbase. Certain members of the class currently own ARPA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought ARPA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in ARPA.

### 10.    ATOM

190.    Cosmos ("ATOM") is a token created, issued, and distributed by the developers of the Cosmos network. The first *bona fide* public offering of ATOM occurred in or about April 2017.

191.    In 2014, developers Jae Kwon and Ethan Buchman co-founded the Cosmos network. They initially created Tendermint, the consensus algorithm that would go on to power Cosmos.

192.    The Interchain Foundation (ICF), a Swiss nonprofit organization that funds open-source blockchain projects, helped develop and launch Cosmos. The ICF held a two-week ICO of the ATOM token in 2017, raising $17 million.

193.    Tendermint Inc. raised $9 million to continue development of the project through a Series A funding round in 2019.

194.    ATOM became available for trading on the Coinbase Pro Platform on or about February 14, 2020. ATOM became available for trading on the Coinbase Platform on or about January 16, 2020. Since becoming available on Coinbase, ATOM has continuously been traded on the Coinbase Exchanges.

195.    After ATOM was listed on the Coinbase Platform, its price rose by approximately 878.1 percent and peaked at $44.70 on September 20, 2021. Since then, its price has been volatile and has declined overall.



196.    As of 10:00 a.m. Eastern time on March 10, 2022, ATOM was trading at $28.12—a decline of 37.1 percent from its September 20, 2021 peak.

197.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in ATOM tokens on the Coinbase Exchanges by giving money or digital

assets to Coinbase in exchange for ATOM tokens and paid Coinbase a fee for executing the transaction.

198.    Investors in ATOM—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ATOM's creators, developers, managers, and promoters. The team behind ATOM has actively cultivated this expectation through public communications, including but not limited to a whitepaper hosted on its official website.

199.    As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security." Current SEC chairman Gary Gensler has affirmed this view.

200.    In addition, ATOM offers little, if any, utility apart from the ability to sell it to other investors.

201.    Unlike Bitcoin and Ethereum, which have a hard limit on supply (and are commodities), there is no limit on the supply of new ATOM that can be created. Rather, the developers of Cosmos adjust the number of tokens created based on the number of ATOM tokens being staked. The value of ATOM depends on Cosmos developers' adjustment of the supply of ATOM. The Cosmos developers also solicit application developers to use Cosmos, which in turn increases the value of ATOM.

202.    ATOM offers purchasers little direct utility apart from its speculative value as an investment. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy ATOM primarily because they expect profits, not because they intend to "use [ATOM] for its intended functionality on the network."[33]

---

[33] *Id.*

203.    To the extent that ATOM can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ATOM and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[34]

204.    In contrast to what would typically be included in an SEC registration statement, ATOM's whitepaper does not contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

205.    Coinbase itself has admitted that ATOM may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given ATOM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of ATOM, the Crypto Rating Council noted ATOM's 2017 ICO and further noted that "Tendermint is engaged in ongoing development of the Interblockchain Communication (IBC)mechanism for Cosmos, and submits proposed modules that are accepted or rejected by the Cosmos decentralized community."

206.    Based on the facts alleged above, among others, ATOM qualifies as an investment contract and thus a security.

---

[34] *Id.*

54

207.     The Coinbase Exchanges provide users with hyperlinks to ATOM's whitepaper and official website. Coinbase thus participates in the attempt to persuade investors that by buying ATOM, they will profit from the efforts of others.

208.     During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in ATOM on and with Coinbase. Certain members of the class currently own ATOM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought ATOM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

## 11.     AUCTION

209.     Bounce Token ("AUCTION") is a token created by Bounce. The first *bona fide* public offering of AUCTION occurred on or about January 14, 2021.

210.     Investors in AUCTION reasonably expected to receive profits from their investment in AUCTION. They expected these profits to derive from the efforts of Bounce. AUCTION was marketed as deriving value from its ability to power Bounce, a decentralized auction protocol for token and NFT sales. This means that AUCTION's value depended on the managerial effort of the issuer to create and maintain this protocol and market it to those seeking to auction digital assets.

211.     There are few, if any, goods or services that can be directly purchased using AUCTION. To the extent that AUCTION can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of AUCTION. Accordingly, all or nearly all AUCTION traded on the Coinbase

Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

212.    Based on the foregoing facts, among others, AUCTION qualifies as an investment contract and therefore a security. However, AUCTION has never been registered as a security.

213.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in AUCTION on and with Coinbase. Certain members of the class currently own AUCTION tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought AUCTION tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in AUCTION.

### 12.    AXS

214.    Axie Infinity Shards ("AXS") is a token created, issued, and distributed by Sky Mavis.

215.    Coinbase describes AXS as follows: "AXS is an Ethereum token that powers Axie Infinity, a blockchain-based game where players can battle, collect, and build a digital kingdom for their pets. AXS holders can claim rewards for staking their tokens, playing the game, and participating in key governance votes."

216.    AXS was first *bona fide* offered to the public on or about November 4, 2020.

217.    AXS became available for trading on the Coinbase Pro Platform on or about August 11, 2021. AXS became available for trading on the Coinbase Platform on or about August 13, 2021. Since becoming available on Coinbase, AXS has continuously been traded on the Coinbase Exchanges.

218.    After AXS was listed on the Coinbase Platform, its price rose by approximately

150.1 percent and peaked at $165.37 on November 6, 2021. Since then, it has declined consistently.



219.    As of 10:00 a.m. Eastern time on March 10, 2022, AXS was trading at $46.07—a

decline of 72.1 percent from its November 6, 2021 peak.

220.    During the Class Period, members of the Class, including Plaintiff Oberlander,

invested in AXS tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase

in exchange for AXS tokens and paid Coinbase a fee for executing the transaction.

221.    Purchasers of AXS on the Coinbase Exchanges understood that they were investing

money in a common enterprise. Each AXS token is fungible with all others, and the fortunes of all

AXS investors are "linked to each other [and] to the success of [the] efforts" of AXS's developers, promoters, and distributors.[35]

222.    AXS investors reasonably expected to earn profits through the appreciation in value of their AXS tokens. They expected such profits to result predominantly, if not solely, from the efforts of Sky Mavis

223.    AXS is a token that is supposed to derive its value from a video game. As Coinbase explains, "Axie Infinity is a crypto-meets-Pokémon game in which players raise, battle, and trade cute NFT pets called Axies. It features two native cryptocurrencies: Axie Infinity Shards (AXS), which can be bought and sold on exchanges like Coinbase, and Small Love Potion (SLP), which is awarded to players for spending time in the game." Because of this structure, AXS only has value through the managerial efforts of AXS in creating and maintaining the game to which it is tied, as well as through promotion of the AXS token. Much as a traditional security allows holders to vote regarding the management of a company, holding an AXS token imparts governance rights regarding the game to which it is linked.

224.    Purchasers of AXS are motivated primarily by the expectation of profit. Many AXS investors hold AXS with no intention of ever interacting with the game with which it is associated, and hold amounts of AXS that far exceeds the value of any goods or services the investors could ever expect to purchase with AXS or use within the game to which it is linked. Indeed, tokens held on Coinbase cannot be used in the game without being transferred off Coinbase.

225.    Despite its direct utility being largely or exclusively limited to a narrow class of users, AXS is "offered broadly to potential purchasers as compared to being targeted to expected

---

[35] *Id.*

users of the goods or services [available in exchange for AXS] or those who have a need for the functionality of the network," further demonstrating that AXS investors are motivated by the expectation of profits.[36]

226.    Based on the above facts, among others, AXS qualifies as an investment contract and therefore a security.

227.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in AXS on and with Coinbase. Certain members of the class currently own AXS tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought AXS tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 13.    BAL

228.    Balancer ("BAL") is a token created by Balancer Labs. The first *bona fide* public offering of BAL occurred on or about June 1, 2020.

229.    Investors in BAL reasonably expected to receive profits from their investment in BAL. They expected these profits to derive from the efforts of Balancer Labs. BAL was marketed as deriving value from its ability to power the Balancer protocol, an automated market maker that creates liquidity in pools of different crypto-assets. The value of BAL thus depended on the managerial effort of the issuer to create and maintain the Balancer protocol.

230.    There are few, if any, goods or services that can be directly purchased using BAL. To the extent that BAL can be directly exchanged for any goods or services, there is little or no

---

[36] *Id.*

apparent correlation between the market price of those goods or services and the price of BAL. Accordingly, all or nearly all BAL traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

231.    Based on the foregoing facts, among others, BAL qualifies as an investment contract and therefore a security. However, BAL has never been registered as a security.

232.    During the Class Period, numerous members of the Class have had one or more losing transactions in BAL on and with Coinbase. Certain members of the class currently own BAL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought BAL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in BAL.

### 14.    BAND

233.    Band Protocol ("BAND") is a token created by the developer of the Band Protocol. The first *bona fide* public offering of BAND occurred on or about September 17, 2019.

234.    Investors in BAND reasonably expected to receive profits from their investment in BAND. They expected these profits to derive from the efforts of Band Protocol developer. BAND was marketed as deriving value from its ability to serve as collateral for nodes that verify real-world data that was then uploaded to the Band Protocol network, a decentralized cross-chain data oracle platform. The value of BAND thus depended on the managerial effort of the issuer to create and maintain the Band Protocol network and attract validators to that platform.

235.    There are few, if any, goods or services that can be directly purchased using BAND. To the extent that BAND can be directly exchanged for any goods or services, there is little or no

apparent correlation between the market price of those goods or services and the price of BAND. Accordingly, all or nearly all BAND traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

236. Based on the foregoing facts, among others, BAND qualifies as an investment contract and therefore a security. However, BAND has never been registered as a security.

237. During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in BAND on and with Coinbase. Certain members of the class currently own BAND tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought BAND tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BAND.

### 15.    BAT

238. Basic Attention Token ("BAT") is a token created by Brave Software. The first *bona fide* public offering of BAT occurred on or about May 31, 2017.

239. Investors in BAT reasonably expected to receive profits from their investment in BAT. They expected these profits to derive from the efforts of Brave Software. BAT was marketed as deriving value from its ability to power Brave Software's blockchain-based digital advertising platform. This means that BAT's value depended on the managerial effort of the issuer to create this advertising platform and drive its adoption.

240. There are few, if any, goods or services that can be directly purchased using BAT. To the extent that BAT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BAT.

Accordingly, all or nearly all BAT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

241.    Based on the foregoing facts, among others, BAT qualifies as an investment contract and therefore a security. However, BAT has never been registered as a security.

242.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in BAT on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own BAT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought BAT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in BAT.

### 16.    BNT

243.    Bancor Network Token ("BNT") is a token created by Bancor. The first *bona fide* public offering of BNT occurred on or about June 11, 2017.

244.    Investors in BNT reasonably expected to receive profits from their investment in BNT. They expected these profits to derive from the efforts of Bancor. BNT was marketed as deriving value from its ability to power the Bancor protocol, which creates liquidity on other blockchains through the use of smart contracts.

245.    Bancor publicly stated that it would use the funds raised through the ICO to enhance the Bancor software and support the growth of its platform, telling investors that "a portion of the funds" raised would "be used to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol implementations, and support related technologies and applications[.]"

246.     Bancor told investors that "BNT establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefitting all other smart tokens holding it in reserve." A reasonable investor would have understood that BNT would appreciate in value as BNT became more widely adopted.

247.     Investors' profits were to be derived from the managerial efforts of others—Bancor, its co-founders, and the Bancor development team. Bancor held itself out as having "[t]he A-Team of visionaries and advisors," including two co-founders who "have each founded and exited a startup." Bancor further touted outside advisors including "venture capitalist Tim Draper, Founders Fund partner Brian Singerman, governance visionary John Clippinger, founder of Asana Justin Rosenstein and more." This means that the value of BNT depended on the managerial effort of Bancor itself.

248.     There are few, if any, goods or services that can be directly purchased using BNT. To the extent that BNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BNT. Accordingly, all or nearly all BNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

249.     Based on the foregoing facts, among others, BNT qualifies as an investment contract and therefore a security. However, BNT has never been registered as a security.

250.     During the Class Period, numerous members of the Class have had one or more losing transactions in BNT on and with Coinbase. Certain members of the class currently own BNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought BNT tokens on the Coinbase Exchanges that

they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BNT.

### 17.    BOND

251.    BarnBridge ("BOND") is a token created by BarnBridge. The first *bona fide* public offering of BOND occurred on or about October 26, 2020.

252.    Investors in BOND reasonably expected to receive profits from their investment in BOND. They expected these profits to derive from the efforts of BarnBridge. BOND was marketed as deriving value from its ability to govern BarnBridge, a tokenized risk protocol.  This governance right, which resembles the voting rights of many traditional securities, means that BOND purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the risk protocol which BOND holders could govern.

253.    There are few, if any, goods or services that can be directly purchased using BOND. To the extent that BOND can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BOND. Accordingly, all or nearly all BOND traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

254.    Based on the foregoing facts, among others, BOND qualifies as an investment contract and therefore a security. However, BOND has never been registered as a security.

255.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in BOND on and with Coinbase. Certain members of the class currently own BOND tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including

Plaintiff Oberlander, bought BOND tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in BOND.

### 18.   BTRST

256.   Braintrust ("BTRST") is a token created by Braintrust. The first *bona fide* public offering of BTRST occurred on or about September 15, 2021.

257.   Investors in BTRST reasonably expected to receive profits from their investment in BTRST. They expected these profits to derive from the efforts of Braintrust. BTRST was marketed as deriving value from its ability to govern the Braintrust network. This governance right means that BTRST owners were participating in a common enterprise, which depended on the managerial effort of the issuer to in fact maintain a decentralized network connecting freelancers with organizations. Braintrust promoted and maintained its network in part by distributing BTRST as an incentive to refer new users to that network.

258.   There are few, if any, goods or services that can be directly purchased using BTRST. To the extent that BTRST can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BTRST. Accordingly, all or nearly all BTRST traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

259.   Based on the foregoing facts, among others, BTRST qualifies as an investment contract and therefore a security. However, BTRST has never been registered as a security.

260.   During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in BTRST on and with Coinbase. Certain members of the class currently own BTRST tokens that have depreciated since those tokens were

purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought BTRST tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BTRST.

### 19.   CGLD

261.    Celo ("CGLD") is a token created by Celo. The first *bona fide* public offering of CGLD occurred on or about May 11, 2020.

262.    Investors in CGLD reasonably expected to receive profits from their investment in CGLD. They expected these profits to derive from the efforts of Celo. CGLD was marketed as deriving value from its ability to power the Celo platform, a blockchain ecosystem that is accessible for anyone with a mobile phone. CGLD's value thus depended on the managerial effort of the issuer to develop this blockchain ecosystem and make it accessible and functional on mobile phones.

263.    There are few, if any, goods or services that can be directly purchased using CGLD. To the extent that CGLD can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CGLD. Accordingly, all or nearly all CGLD traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

264.    Based on the foregoing facts, among others, CGLD qualifies as an investment contract and therefore a security. However, CGLD has never been registered as a security.

265.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in CGLD on and with Coinbase. Certain members of the class currently own CGLD tokens that have depreciated since those tokens were

purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought CGLD tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in CGLD.

**20.   CLV**

266.   Clover Finance ("CLV") is a token created by Clover Inc. The first *bona fide* public offering of CLV occurred on or about April 20, 2021.

267.   Investors in CLV reasonably expected to receive profits from their investment in CLV. They expected these profits to derive from the efforts of Clover Inc. CLV was marketed as deriving value from its ability to pay for Clover transactions and to vote for network upgrades to Clover, a blockchain infrastructure platform. This governance right resembles the voting rights of many traditional securities. CLV purchasers invested in a common enterprise with each other and depended on the managerial effort of Clover Inc. to create and maintain the algorithms supporting Clover, thus making CLV's governance rights and its ability to pay for Clover transactions valuable.

268.   There are few, if any, goods or services that can be directly purchased using CLV. To the extent that CLV can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CLV. Accordingly, all or nearly all CLV traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

269.   Based on the foregoing facts, among others, CLV qualifies as an investment contract and therefore a security. However, CLV has never been registered as a security.

270.     During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in CLV on and with Coinbase. Certain members of the class currently own CLV tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought CLV tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in CLV.

### 21.     COMP

271.     Compound ("COMP") is a token created, issued, and distributed by Compound Labs.

272.     Coinbase describes COMP as follows: "Compound (COMP) is an Ethereum token that enables community governance of the Compound protocol. The protocol is a series of decentralized interest rate markets that allow users to supply and borrow Ethereum tokens at variable interest rates. COMP token holders and their delegates can also debate, propose, and vote on changes to the protocol."

273.     COMP was first *bona fide* offered to the public on or about June 15, 2020.

274.     COMP became available for trading on the Coinbase Pro Platform on or about June 23, 2020. COMP became available for trading on the Coinbase Platform on or about June 25, 2020. Since becoming available on the Coinbase Platform, COMP has continuously been traded on the Coinbase Exchanges.

275.     After COMP was listed on the Coinbase Platform, its price rose by approximately 338.6 percent and peaked at $911.20 on May 12, 2021. Since then, it has declined dramatically.



276.     As of 10:00 a.m. Eastern time on March 10, 2022, COMP was trading at $101.73— a decline of 88.8 percent from its May 12, 2021 peak.

277.     During the Class Period, members of the Class, including Plaintiff Oberlander, invested in COMP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for COMP tokens and paid Coinbase a fee for executing the transaction.

278.     Purchasers of COMP on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each COMP token is fungible with all others, and the fortunes of all COMP investors are "linked to each other [and] to the success of [the] efforts" of COMP's developers, promoters, and distributors.[37]

---

[37] *Id.*

279.    COMP investors reasonably expected to earn profits through the appreciation in value of their COMP tokens. They expected such profits to result predominantly, if not solely, from the efforts of Compound Labs and its founders, Robert Leshner and Geoffrey Hayes.

280.    Similar to a traditional security, the value of COMP derives from its providing voting rights in the management of an enterprise. COMP allows its holders to delegate voting rights regarding the governance of the Compound protocol, which in turn facilitates lending of crypto-assets. Thus, the entirety of COMP's value depends on the creation and maintenance of the Compound protocol, and the holders are part of a common enterprise of governing that protocol.

281.    The supply of COMP is highly centralized, with new COMP tokens being created out of nothing by Compound Labs.

282.    Apart from its speculative value as an investment and its impartation of voting rights, COMP does not offer direct utility. There are few, if any, goods or services that investors can directly purchase using COMP. To the extent that COMP can be directly exchanged for goods or services, there is little or no apparent correlation between the price of COMP and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in COMP are motivated by the expectation of profits.[38]

283.    Even though its only function is to participate in the governance of the Compound protocol, COMP is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for COMP] or those who have a

---

[38] *Id.*

need for the functionality of the network," further demonstrating that COMP investors are motivated by the expectation of profits.[39]

284.    Based on the above facts, among others, COMP qualifies as an investment contract and therefore a security.

285.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in COMP on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own COMP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought COMP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 22.    CRO

286.    Crypto.com Coin ("CRO") is a token created, developed, issued, and distributed by CRO Protocol Labs, also known as Crypto.com ("Crypto.com").

287.    Coinbase describes CRO as follows:

> Crypto.com Chain is an Ethereum token that powers Crypto.com Pay, a service that aims to allow users to pay for goods and services with cryptocurrency while receiving cashback rewards.

288.    CRO was first *bona fide* offered to the public in or around November 2018.

289.    CRO became available for trading on the Coinbase Pro Platform on or about November 2, 2021. CRO became available for trading on the Coinbase Platform on or about

---

[39] *Id.*

November 3, 2021. Since becoming available on the Coinbase Platform, CRO has continuously been traded on the Coinbase Exchanges.

290.    After CRO was listed on the Coinbase Platform, its price rose by approximately 281.4 percent and peaked at $0.97 on November 24, 2021. Since its peak, the price of CRO has persistently declined.



291.    As of 10:00 a.m. Eastern time on March 10, 2022, CRO was trading at $0.39—a decline of 60.0 percent from its November 24, 2021 peak.

292.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in CRO tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for CRO tokens and paid Coinbase a fee for executing the transaction.

293.    Purchasers of CRO on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each CRO token is fungible with all others, and the fortunes of all CRO investors are "linked to each other [and] to the success of [Crypto.com's] efforts."[40]

294.    CRO investors reasonably expected to earn profits through the appreciation in value of their CRO tokens. They expected such profits to result predominantly, if not solely, from the efforts of Crypto.com and its affiliates.

295.    Crypto.com is the developer of a suite of products and services, including but not limited to (1) the Crypto.com trading platform, which competes with Coinbase and allows users to trade digital assets; (2) Crypto.com Pay, a service that facilitates payment with digital assets; and (3) Crypto.com Visa debit cards, which offer cardholders rewards in the form of digital assets. According to its website, Crypto.com has approximately 3,000 employees and aims to be a "world-changing company."

296.    Buyers of CRO can use it for certain functions within Crypto.com's suite of products and services. For example, users who hold CRO in the Crypto.com trading app can gain access to Crypto.com Visa cards and discounts on transaction fees within the Crypto.com trading platform.

297.    In addition to the Ethereum-based token CRO, Crypto.com has issued another token called Cronos, which runs on a separate blockchain and is not listed on the Coinbase Exchanges. However, according to Crypto.com, both tokens have "the same token name, symbol and fiat value" and are interchangeable for most purposes.

---

[40] *Id.*

298.    Crypto.com performs, and is expected to perform, "essential tasks [and] responsibilities" regarding CRO and the network surrounding CRO.[41] For example, Crypto.com operates the Crypto.com trading platform and fulfills trade orders in exchange for transaction fees, with discounts for certain holders of CRO. Crypto.com also advertises that it actively protects security and data privacy and employs "a dedicated team to monitor all transactions" on its trading platform. In addition, Crypto.com has pursued an aggressive marketing strategy, including purchasing the naming rights to a professional sports arena and hiring celebrity endorsers such as Matt Damon and Carmelo Anthony. CRO investors thus rely on Crypto.com for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which CRO operates.[42]

299.    Buyers of CRO are motivated primarily by the belief that Crypto.com will succeed in its efforts, leading to growth in the value of CRO.

300.    Apart from its speculative value as an investment, CRO offers only limited utility, which is restricted to active users of Crypto.com's products and services.

301.    There are few goods or services that investors can directly purchase using CRO. To the extent that CRO can be directly exchanged for goods or services, there is little or no apparent correlation between the price of CRO and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in CRO are motivated by the expectation of profits.[43]

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

302.    Many CRO investors hold amounts of CRO with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with CRO.

303.    Despite its direct utility being largely or exclusively limited to buyers who are active users of Crypto.com's products and services, CRO is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for CRO] or those who have a need for the functionality of the network," further demonstrating that CRO investors are motivated by the expectation of profits.[44]

304.    Crypto.com has promoted widespread trading of CRO—including among investors with no personal need for the functionality of CRO's network and no expectation of directly purchasing goods or services with CRO—by working to make CRO available for retail trading on exchange platforms including the Coinbase Exchanges. Of all potential investors in digital assets, users of the Coinbase Exchanges are among the least likely to benefit from the direct utility features of CRO because in choosing Coinbase, they have presumably chosen *not* to use Crypto.com's trading platform. Thus, by having CRO listed on the Coinbase Exchanges, Crypto.com specifically targeted a class of investors with little or no reason to buy CRO except to make a profit.

305.    Crypto.com has taken other steps to support the market for CRO, including an announcement in February 2021 that it would "burn," or permanently remove from circulation, the majority of then-existing CRO (70 billion tokens). Crypto.com described this step as "[t]he largest token burn in history."

306.    Similarly, Crypto.com has designed its products and services in ways that are specifically calculated to support the price of CRO. To gain rewards from Crypto.com—including

---

[44] *Id.*

discounted transaction fees and access to Crypto.com Visa cards—investors do not trade in their CRO tokens like arcade tokens. Instead, they are required to *hold* CRO over time in the Crypto.com app. By incentivizing investors to hold their CRO, Crypto.com protects the market for CRO against potential selloffs and helps to ensure liquidity.

307.    As the SEC recognizes, Crypto.com's actions to "support[] a market for, [and] the price of," CRO[45] are evidence that investors in CRO reasonably expect to earn profits in reliance on the efforts of others.

308.    Crypto.com continues to hold a large amount of CRO. After the token burn announced in February 2021, Crypto.com retained 5 billion CRO in a digital wallet set aside for "Network Long-Term Incentives." Crypto.com's holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in CRO have a reasonable expectation of profit.[46]

309.    Crypto.com owns or holds licenses to the intellectual property underlying its trading app, according to its Terms and Conditions. This fact further suggests that investors in CRO have a reasonable expectation of profit derived from the efforts of Crypto.com.[47]

310.    Based on the facts alleged above, among others, CRO qualifies as an investment contract and thus a security.

311.    In contrast to the robust disclosures required under federal and state securities laws, Crypto.com provides investors with minimal disclosures. Crypto.com provides only high-level information and updates about CRO on its website, blog, and social media channels.

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

312. Crypto.com has sought to conceal CRO's status as a security through misleading public communications that emphasize the purportedly "decentralized" nature of CRO, thus diverting attention from the essential managerial efforts of Crypto.com. For example, Crypto.com claimed that the token burn announced in February 2021 would make CRO "100% decentralized." The most recent version of Crypto.com's whitepaper, dated February 2022, also states that CRO is "100% decentralized." In fact, CRO does not operate in a decentralized network; the value of CRO depends heavily on Crypto.com's efforts to develop and promote its products and services. Nevertheless, after reviewing Crypto.com's public communications, a reasonable layperson would likely have the impression that CRO is a decentralized asset and not a security.

313. The Coinbase Exchanges provide users with a hyperlink to the Crypto.com website and whitepaper. Coinbase thus participates in the attempt to conceal CRO's status as a security.

314. During the Class Period, numerous members of the Class have had one or more losing transactions in CRO on and with Coinbase. Certain members of the class currently own CRO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought CRO tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 23.   CRV

315. Curve DAO Token ("CRV") is a token created by Curve. The first *bona fide* public offering of CRV occurred on or about August 15, 2020.

316. Investors in CRV reasonably expected to receive profits from their investment in CRV. They expected these profits to derive from the efforts of Curve. CRV was marketed as deriving value from its ability to power the Curve exchange, a decentralized exchange for

stablecoins. The value of CRV thus depends on the managerial effort of the issuer to create and maintain the Curve exchange.

317.    There are few, if any, goods or services that can be directly purchased using CRV. To the extent that CRV can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CRV. Accordingly, all or nearly all CRV traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

318.    Based on the foregoing facts, among others, CRV qualifies as an investment contract and therefore a security. However, CRV has never been registered as a security.

319.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in CRV on and with Coinbase. Certain members of the class currently own CRV tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought CRV tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in CRV.

### 24.    CTSI

320.    Cartesi ("CTSI") is a token created by Cartesi. The first *bona fide* public offering of CTSI occurred on or about April 21, 2020.

321.    Investors in CTSI reasonably expected to receive profits from their investment in CTSI. They expected these profits to derive from the efforts of Cartesi. CTSI was marketed as deriving value from its ability to power the Cartesi network, a platform for the development and

deployment of scalable decentralized applications. The value of CTSI thus depended on the managerial effort of the issuer to create and develop the Cartesi network itself.

322.    There are few, if any, goods or services that can be directly purchased using CTSI. To the extent that CTSI can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CTSI. Accordingly, all or nearly all CTSI traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

323.    Based on the foregoing facts, among others, CTSI qualifies as an investment contract and therefore a security. However, CTSI has never been registered as a security.

324.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in CTSI on and with Coinbase. Certain members of the class currently own CTSI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought CTSI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in CTSI.

### 25.    CVC

325.    Civic ("CVC") is a token created by Civic Technologies, Inc. ("Civic Technologies"). The first *bona fide* public offering of CVC occurred on or about June 20, 2017.

326.    Investors in CVC reasonably expected to receive profits from their investment in CVC. They expected these profits to derive from the efforts of Civic Technologies. CVC was marketed as deriving value from its ability to power the Civic ecosystem, which features an identity verification protocol.

327.    In June 2017, Civic Technologies published the first version of the "Civic whitepaper." In its whitepaper, Civic Technologies stated that it was "building an ecosystem that is designed to facilitate on-demand, secure and low-cost access to identity verification ('IDV') services via the blockchain, such that background and personal information verification checks will no longer need to be undertaken from the ground up every time." It also introduced, for the first time, the CVC token "that participants in the ecosystem will use to transact in IDV-related services."

328.    The Civic whitepaper represented that CVC tokens would be part of a larger "consensus" system. As part of this system, investors would accumulate CVC by signing up for a service or referring a consumer to the Civic platform. The point of this service was to enable "[t]he CVC that the [investors] received for participation [to] be reusable within the Civic ecosystem." Investors in CVC thus depended on the managerial effort of the issuer to create and maintain the data verification services to which CVC was linked.

329.    Civic Technologies also promoted its core team, including its CEO, its Chief Technology Officer, and prominent technical advisors. Civic Technologies CEO Vinny Lingham authored a blog post in 2017 where he told investors to expect profits, stating, "As the size of the network and transaction volumes within it grows, this will create demand for the tokens."

330.    There are few, if any, goods or services that can be directly purchased using CVC. To the extent that CVC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CVC. Accordingly, all or nearly all CVC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

331.     Based on the foregoing facts, among others, CVC qualifies as an investment contract and therefore a security. However, CVC has never been registered as a security.

332.     During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in CVC on and with Coinbase. Certain members of the class currently own CVC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought CVC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in CVC.

### 26.     DNT

333.     district0x ("DNT") is a token created by district0x. The first *bona fide* public offering of DNT occurred on or about August 1, 2017.

334.     Investors in DNT reasonably expected to receive profits from their investment in DNT. They expected these profits to derive from the efforts of district0x. DNT was marketed as deriving value from its ability to vote on proposals made within the district0x Network, a set of decentralized marketplaces and communities. This governance right, which resembles the voting rights of many traditional securities, means that DNT purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the district0x Network.

335.     There are few, if any, goods or services that can be directly purchased using DNT. To the extent that DNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of DNT.

Accordingly, all or nearly all DNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

336.   Based on the foregoing facts, among others, DNT qualifies as an investment contract and therefore a security. However, DNT has never been registered as a security.

337.   During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in DNT on and with Coinbase. Certain members of the class currently own DNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought DNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in DNT.

## 27.   DOGE

338.   Dogecoin ("DOGE") is a token that was first *bona fide* offered to the public in or about December 2013.

339.   DOGE was initially created as a joke by software engineers Billy Markus and Jackson Palmer in 2013. DOGE was meant to poke fun at the hype surrounding Bitcoin and other cryptocurrencies, but quickly changed tact to brand itself as "the fun and friendly internet currency."

340.   In 2015, Palmer left Dogecoin, citing the "toxic" environment and describing the crypto industry as a "hotbed for scams." In an interview, he stated that "the cryptocurrency space increasingly feels like a bunch of white libertarian bros sitting around hoping to get rich and

coming up with half-baked, buzzword-filled business ideas which often fail in an effort to try and do so."

341.    DOGE became available for trading on the Coinbase Exchanges on or about June 3, 2021. Since then, DOGE has been continuously traded on the Coinbase Exchanges.

342.    Coinbase describes DOGE as follows:

> Dogecoin (DOGE) was created in 2013 as a lighthearted alternative to traditional cryptocurrencies like Bitcoin. The Dogecoin name and Shiba Inu logo are based on a meme. Unlike Bitcoin, which is designed to be scarce, Dogecoin is intentionally abundant – 10,000 new coins are mined every minute and there is no maximum supply.

343.    After DOGE was listed on the Coinbase Platform, its price rose by approximately 4.0 percent and peaked at $0.44 on June 3, 2021. Since its peak, DOGE has persistently declined in price.



344.    As of 10:00 a.m. Eastern time on March 10, 2022, DOGE was trading at $0.12—a decline of 73.4 percent from its June 3, 2021 peak.

83

345.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in DOGE tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for DOGE tokens and paid Coinbase a fee for executing the transaction.

346.    Investors in DOGE—including Plaintiff Oberlander, Plaintiff Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of DOGE's creators, developers, managers, and promoters. The team behind DOGE has actively cultivated this expectation through public communications, including on Dogecoin's official website.

347.    The team behind DOGE, for example, presents DOGE as "the fun and friendly internet currency," but provides virtually no information about the coin, the team behind it, or the risks involved in its purchase.

348.    The team behind DOGE also claims that it is wholly decentralized, but individuals have pointed out that 65 percent of Dogecoins are distributed among only 98 wallets, and the single largest wallet holds 28 percent of all Dogecoins in circulation.



349.    DOGE's former co-founder has made similar observations. On July 14, 2021, for example, Palmer tweeted that "the cryptocurrency industry is controlled by a powerful cartel of wealthy figures who, with time, have evolved to incorporate many of the same institutions tied to the existing centralized financial system they supposedly set out to replace."

350.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in DOGE on and with Coinbase. Certain members of the class, including Plaintiff Underwood, currently own DOGE tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Underwood and Oberlander, bought DOGE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

28.     **DOT**

351.     Polkadot ("DOT") is a token created by Gavin Wood (a co-founder of Ethereum) alongside co-founders Robert Habermeier and Peter Czaban in 2016. Compared to a standalone blockchain, the DOT network was designed to allow for the creation of three types of blockchains, including a main blockchain ("the relay chain") where transactions are finalized, custom blockchains ("parachains") that use the main blockchain's computing resources to confirm that transactions are accurate, and bridges that allow the DOT network to interact with other blockchains. DOT was thus mainly conceived as a project that allows independent blockchains to communicate and share data with one another.

352.     DOT's main blockchain, the relay chain, became live on or about May 26, 2020. The first *bona fide* public offering of DOT occurred on or about July 27, 2020. DOT became available for trading on the Coinbase Exchanges on or about June 16, 2021. Since then, DOT has continuously been traded on the Coinbase Exchanges.

353.     Coinbase describes DOT as follows:

> Polkadot is a protocol that enables cross-blockchain transfers of any type of data or asset. By uniting multiple blockchains, Polkadot aims to achieve high degrees of security and scalability. DOT serves as the protocol's governance token and can be used for staking to secure the network or to connect ("bond") new chains.

354.     Coinbase further states:

> The Polkadot *token* (DOT) serves two main functions within the Polkadot network: it's a governance token, which allows holders to have a say in the future of the protocol, and it's used for staking, which is the way the Polkadot network verifies transactions and issues new DOT. DOT can be bought and sold on exchanges like Coinbase as part of your investment strategy.

355.    After DOT was listed on the Coinbase Platform, its price rose by approximately 129.5 percent and peaked at $55.00 on November 4, 2021. Since then, the price of DOT has persistently declined.



356.    As of 10:00 a.m. Eastern time on March 10, 2022, DOT was trading at $16.91—a decline of 69.3 percent from its November 4, 2021 peak.

357.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in DOT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for DOT tokens and paid Coinbase a fee for executing the transaction.

358.    Investors in DOT—including Plaintiff Oberlander and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of DOT's creators, developers, managers, and promoters. The team behind DOT has actively cultivated this expectation through public communications including, but not limited to, a whitepaper and a "Lightpaper" hosted on DOT's official website.

359.     The current version of the "Lightpaper," dated April 2020, describes Polkadot as "a next-generation blockchain protocol that unites an entire network of purpose-built blockchains, allowing them to operate seamlessly together at scale." It further states that "[b]y bringing together the best features from multiple specialized blockchains, Polkadot paves the way for new decentralized marketplaces to emerge, offering fairer ways to access services through a variety of apps and providers."

360.     The current version of the whitepaper, which is undated and still titled "Draft 1," misleadingly analogizes DOT to Bitcoin and Ethereum: "Like Bitcoin and Ethereum, Polkadot refers at once to a network protocol and the (hitherto presupposed) primary public network that runs this protocol." The whitepaper further promises interoperability with both Ethereum and Bitcoin.

361.     Neither of those promises, however, has yet materialized. To date, the development team behind DOT has yet to create bridges to allow interoperability with Ethereum and Bitcoin, which has caused DOT's market value to suffer. As one cryptocurrency observer put it:

> Despite the fact that Polkadot was specifically designed to offer multi-chain support as a "layer-zero" meta protocol, there was no major release of a bridge that connected Polkadot with Ethereum in 2021 and this left the protocol unloved by crypto traders looking to engage with DeFi and NFTs.

362.     In addition, according to the whitepaper, a purported distinguishing factor of Polkadot is its ability to host parachains on the relay chain, which "is designed to provide no inherent application functionality *at all*" and only becomes useful by virtue of the parachains. Yet, the first auction for parachain slots on the relay chain did not begin until November 2021, nearly a year and a half after the relay chain first became live. The parachain auctions were only made possible through the efforts of Polkadot's development team, which emphasized that it took almost

five years for the protocol's architecture to run Polkadot parachain auctions by itself. While Polkadot envisions being able to host about 100 parachain slots eventually, it currently offers less than a dozen slots.

**Polkadot parachain slot auction**



363.    DOT offers little, if any, utility apart from the ability to sell it to other investors. DOT's official website, the "Lightpaper", and the whitepaper do not identify any specific goods or services that can be acquired in exchange for DOT. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy DOT primarily because they expect profits, not because they intend to "use [DOT] for its intended functionality on the network."[48] Indeed, many holders of DOT are confused about what the token is used for and what benefits it provides for token holders.

---

[48] *Id.*

364.     To the extent that DOT can be exchanged for specific goods and services, there is little or no apparent correlation between the price of DOT and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[49] Instead of responding to the price of other goods or services, the price of DOT has changed based on events that affect speculation about its future performance. For example, the listing of DOT on platforms including the Coinbase Exchanges had a positive effect on its value in 2021.

365.     Based on the facts alleged above, among others, DOT qualifies as an investment contract and thus a security. The development team behind DOT has actively concealed DOT's status as a security by misleadingly comparing it to Bitcoin and Ethereum.

366.     The Coinbase Exchanges provide users with hyperlinks to DOT's official website and the whitepaper. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying DOT, they will profit from the efforts of others and (2) conceal DOT's status as a security.

367.     During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in DOT on and with Coinbase. Certain members of the class currently own DOT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought DOT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

---

[49] *Id.*

29.    **ENJ**

368.    Enjin Coin ("ENJ") is a token created by Enjin. The first *bona fide* public offering of ENJ occurred on or about November 1, 2017.

369.    Investors in ENJ reasonably expected to receive profits from their investment in ENJ. They expected these profits to derive from the efforts of Enjin. ENJ was marketed as deriving value from its ability to be exchanged for NFTs managed through Enjin and used in video games to represent add-ons and other in-game purchases. Buyers of ENJ thus depended on the managerial effort of the issuer, because ENJ is only valuable if the issuer created and maintained a platform to give users access to the true ownership of their digital collectibles and allow easy trading.

370.    There are few, if any, goods or services that can be directly purchased using ENJ. To the extent that ENJ can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ENJ. Accordingly, all or nearly all Enjin Coin traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

371.    Based on the foregoing facts, among others, Enjin Coin qualifies as an investment contract and therefore a security. However, Enjin Coin has never been registered as a security.

372.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in ENJ on and with Coinbase. Certain members of the class currently own ENJ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought ENJ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in ENJ.

30.  **EOS**

373.  EOS coin ("EOS") is a token created, issued, and distributed by Block.one.

374.  Coinbase describes EOS as follows:

> EOS is a cryptocurrency designed to support large-scale
> applications. There are no fees to send or receive EOS. Instead, the
> protocol rewards the entities that run the network periodically with
> new EOS, effectively substituting inflation for transaction fees.

375.  EOS was first *bona fide* offered to investors in or around June 2017.

376.  EOS became available for trading on the Coinbase Pro Platform on or about April 8, 2019. EOS became available for trading on the Coinbase Platform on or about May 30, 2019. Since becoming available on the Coinbase Platform, EOS has continuously been traded on the Coinbase Exchanges.

377.  After EOS was listed on the Coinbase Platform, its price rose by approximately 86.7 percent and peaked at $14.88 on May 12, 2021. Since then, its price has declined.



378.    As of 10:00 a.m. Eastern time on March 10, 2022, EOS was trading at $1.97—a decline of 86.8 percent from its May 12, 2021 peak.

379.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in EOS tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for EOS tokens and paid Coinbase a fee for executing the transaction.

380.    Purchasers of EOS on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each EOS token is fungible with all others, and the fortunes of all EOS investors are "linked to each other [and] to the success of [the] efforts" of Block.one.[50]  In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one,

_____

[50] *Id.*

93

publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

381.    EOS investors reasonably expected to earn profits through the appreciation in value of their EOS tokens. They expected such profits to result predominantly, if not solely, from the efforts of Block.one.

382.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains. The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer." But this description was misleading because, unlike Bitcoin or Ethereum, all EOS tokens were issued by Block.One at creation at very little economic cost—and enormous potential upside—to the Block.One founders. Any value of the EOS token would need to derive from the promised creation of an EOS.IO software that would be tied to the EOS tokens.

383.    Investors' profits were to be derived from the managerial efforts of others—Block.one, its co-founders, and the Block.one development team. Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software and the EOS.IO platform to which it was tied.

384.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch. Only through such efforts would the EOS.IO platform be created, on which platform EOS's value entirely depended.

385.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds. Investors had little choice but to rely on their expertise. The EOS protocol and governance structure were predetermined before the ICO was launched.

386.    On September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors. Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC. The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

387.    The SEC's September 30, 2019, settlement with Block.one reflected the SEC's view that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register those tokens.

388.    Coinbase itself has admitted that EOS may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given EOS a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of EOS, the Crypto Rating Council noted the SEC settlement and further noted that "Block.one conducted the initial sale of ERC-20 EOS and continues to develop the EOSIO software."

389.    Based on the above facts, among others, EOS qualifies as an investment contract and therefore a security.

390.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in EOS on and with Coinbase. Certain members of the class currently own EOS tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought EOS tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 31.    FARM

391.    Harvest Finance ("FARM") is a token created by Harvest Finance. The first *bona fide* public offering of FARM occurred on or about September 1, 2020.

392.    Investors in FARM reasonably expected to receive profits from their investment in FARM. They expected these profits to derive from the efforts of Harvest Finance. FARM was marketed as deriving value from its ability to power Harvest Finance. FARM's value thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer

created and maintained Harvest Finance, a yield optimizer to automatically farm the highest yields available from DeFi protocols.

393.    There are few, if any, goods or services that can be directly purchased using FARM. To the extent that FARM can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FARM. Accordingly, all or nearly all FARM traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

394.    Based on the foregoing facts, among others, FARM qualifies as an investment contract and therefore a security. However, FARM has never been registered as a security.

395.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in FARM on and with Coinbase. Certain members of the class currently own FARM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought FARM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in FARM.

### 32.    FET

396.    Fetch.ai ("FET") is a token created by Fetch.ai. The first *bona fide* public offering of FET occurred on or about February 25, 2019.

397.    Investors in FET reasonably expected to receive profits from their investment in FET. They expected these profits to derive from the efforts of Fetch.ai. FET was marketed as deriving value from its ability to power Fetch.ai, a decentralized machine learning platform. FET

thus only had value if the issuer in fact created the decentralized machine learning platform and successfully marketed it to others.

398.    There are few, if any, goods or services that can be directly purchased using FET. To the extent that FET can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FET. Accordingly, all or nearly all FET traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

399.    Based on the foregoing facts, among others, FET qualifies as an investment contract and therefore a security. However, FET has never been registered as a security.

400.    During the Class Period, numerous members of the Class have had one or more losing transactions in FET on and with Coinbase. Certain members of the class currently own FET tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought FET tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in FET.

### 33.    FIL

401.    Filecoin ("FIL") is a token created by Protocol Labs. The project was launched in August 2017.

402.    Coinbase describes FIL as follows:

> Filecoin (FIL) is a cryptocurrency that powers the Filecoin network, a decentralized peer-to-peer file storage network that aims to let anyone store, retrieve, and host digital information. FIL tokens are used as payment for these services and as an economic incentive to ensure files are stored reliably over time.

403.    FIL was first *bona fide* offered to the public on or about September 7, 2017.

404.    FIL became available for trading on the Coinbase Pro Platform on or about July 12,

2020. FIL became available for trading on the Coinbase Platform on or about December 10, 2020.

Since becoming available on the Coinbase Platform, FIL has continuously been traded on the

Coinbase Exchanges.

405.    After FIL was listed on the Coinbase Platform, its price rose by approximately

677.6 percent and peaked at $237.24 on April 1, 2021. Since then, FIL has been on a steady

decline.



406.    As of 10:00 a.m. Eastern time on March 10, 2022, FIL was trading at $17.82—a

decline of 92.5 percent since its April 1, 2021 peak.

407.    During the Class Period, members of the Class, including Plaintiffs Oberlander and

Underwood, invested in FIL tokens on the Coinbase Exchanges by giving money or digital assets

to Coinbase in exchange for FIL tokens and paid Coinbase a fee for executing the transaction.

99

408.     Purchasers of FIL on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each FIL token is fungible with all others, and the fortunes of all FIL investors are "linked to each other [and] to the success of [the] efforts" of FIL's developers, promoters, and distributors.[51]

409.     Investors in FIL—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of FIL's creators, developers, managers, and promoters. The team behind FIL has actively cultivated this expectation through public communications, including but not limited to a whitepaper hosted on its official website.

410.     To raise funds for the Filecoin network, Protocol Labs conducted an ICO in 2017. The ICO raised over $200 million.

411.     As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security." Current SEC chairman Gary Gensler has affirmed this view.

412.     Filecoin did not sell tokens directly, but rather sold a "promise to deliver" tokens to the investors once the blockchain was fully developed. This type of agreement is called a "Simple Agreement for Future Tokens," or "SAFT." This means that investors in the ICO were relying entirely on the promise that Protocol Labs would in fact develop a blockchain that could render Filecoin valuable.

---

[51] *Id.*

413.    Filecoin's SAFT model is the same as that of Telegram, against whom the SEC filed suit on the basis that it conducted unregistered digital token offerings.[52] The Telegram case ultimately settled, with Telegram agreeing to return $1.2 billion to investors and pay an $18.5 million penalty.[53]

414.    FIL offers little utility apart from the ability to sell it to other investors. It is nominally usable as payment for the Filecoin storage network, but many holders of the token never intended to use it to store files. Indeed, many investors held amounts of FIL that are hugely disproportionate to any file storage needs.

415.    The primary purpose for purchasing FIL tokens was to make a profit, rather than to use FIL tokens for a separate task. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy FIL primarily because they expect profits, not because they intend to "use [FIL] for its intended functionality on the network."[54]

416.    There is little or no apparent correlation between the price of FIL and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[55] FIL's price has not decreased when other storage options become available, or increased when file storage becomes scarce.

---

[52] *SEC Halts Alleged $1.7 Billion Unregistered Digital Token Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Oct. 11, 2019), https://web.archive.org/web/2/https://www.sec.gov/news/press-release/2019-212.

[53] *Telegram to Return $1.2 Billion to Investors and Pay $18.5 Million Penalty to Settle SEC Charges*, U.S. SECURITIES AND EXCHANGE COMMISSION (Jun. 26, 2020). https://web.archive.org/web/20220311135308/https://www.sec.gov/news/press-release/2020-146.

[54] Howey Framework Report.

[55] *Id.*

417.    In contrast to what would typically be included in an SEC registration statement, Filecoin's whitepaper does <u>not</u> contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

418.    Based on the facts alleged above, among others, FIL qualifies as an investment contract and thus a security.

419.    The Coinbase Exchanges provide users with hyperlinks to Filecoin's whitepaper and official website. Coinbase thus participates in the attempt to persuade investors that by buying FIL, they will profit from the efforts of others.

420.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in FIL on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own FIL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought FIL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 34.    FORTH

421.    Ampleforth ("FORTH") is a token created by Ampleforth. The first *bona fide* public offering of FORTH occurred on or about April 13, 2019.

422.    Investors in FORTH reasonably expected to receive profits from their investment in FORTH. They expected these profits to derive from the efforts of Ampleforth. FORTH was marketed as deriving value from its ability to act as a governance token of Ampleforth, which created AMPL, an algorithmic stablecoin with fluctuating supply. This governance right, which

resembles the voting rights of many traditional securities, means that FORTH purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting AMPL, as the governance is only valuable if Ampleforth is maintained.

423.    There are few, if any, goods or services that can be directly purchased using FORTH. To the extent that FORTH can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FORTH. Accordingly, all or nearly all FORTH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

424.    Based on the foregoing facts, among others, FORTH qualifies as an investment contract and therefore a security. However, FORTH has never been registered as a security.

425.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in FORTH on and with Coinbase. Certain members of the class currently own FORTH tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought FORTH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in FORTH.

## 35.    GNT

426.    Golem ("GNT") is a token created by Golem Network. The first *bona fide* public offering of GNT occurred on or about November 11, 2016.

427.    Investors in GNT reasonably expected to receive profits from their investment in GNT. They expected these profits to derive from the efforts of Golem. GNT was marketed as

deriving value from its ability to govern the Golem protocol, which allows users to loan processing power to others. This governance right, which resembles the voting rights of many traditional securities, means that GNT purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the loan system which GNT holders could govern.

428.    There are few, if any, goods or services that can be directly purchased using GNT. To the extent that GNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of GNT. Accordingly, all or nearly all GNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

429.    Based on the foregoing facts, among others, GNT qualifies as an investment contract and therefore a security. However, GNT has never been registered as a security.

430.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in GNT on and with Coinbase. Certain members of the class currently own GNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought GNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in GNT.

### 36.    GRT

431.    The Graph ("GRT") is a token created, issued, and distributed by the Graph Foundation.

432.     Coinbase describes GRT as follows: "GRT is an Ethereum token that powers The Graph, a decentralized protocol for indexing and querying data from blockchains. Just as Google indexes the web, The Graph indexes blockchain data from networks like Ethereum and Filecoin. This data is grouped into open APIs called subgraphs that anyone can query."

433.     GRT was first *bona fide* offered to the public on or about October 23, 2020.

434.     GRT became available for trading on the Coinbase Exchanges on or about December 17, 2020. Since becoming available on the Coinbase Exchanges, GRT has continuously been traded on the Coinbase Exchanges.

435.     After GRT was listed on the Coinbase Platform, its price rose by approximately 2290.0 percent and peaked at $2.88 on February 12, 2021. Since its peak, the price of GRT has persistently declined.



436.    As of 10:00 a.m. Eastern time on March 10, 2022, GRT was trading at $0.32—a decline of 88.8 percent from its February 12, 2021 peak.

437.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in GRT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for GRT tokens and paid Coinbase a fee for executing the transaction.

438.    Purchasers of GRT on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each GRT token is fungible with all others, and the fortunes of all GRT investors are "linked to each other [and] to the success of [the] efforts" of GRT's developers, promoters, and distributors.[56]

439.    GRT investors reasonably expected to earn profits through the appreciation in value of their GRT tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Graph Foundation.

440.    GRT is the token linked to The Graph Protocol, which enables greater efficiency for programs that access data on the Ethereum blockchain. The value of GRT thus entirely depends on the Graph Foundation's creation and maintenance of the Graph Protocol. The Graph Foundation distributes grants and funding to projects related to the Graph Protocol and attempts to cause developers to use the Graph Protocol, all in an effort to create value for GRT.

441.    Apart from its speculative value as an investment, GRT offers little direct utility. Only developers who wish to create an application on a blockchain for which the Graph Protocol

---

[56] *Id.*

106

applies have any use for GRT. Individual buyers of GRT do not generally intend to use it for anything, and instead seek to profit through eventual resale of GRT.

442.     There are few, if any, goods or services that investors can directly purchase using GRT. To the extent that GRT can be directly exchanged for goods or services, there is little or no apparent correlation between the price of GRT and the market price of those goods or services— a factor recognized by the SEC as evidence that investors in GRT are motivated by the expectation of profits.[57]

443.     Despite its direct utility being largely or exclusively limited to a narrow class of users, GRT is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for GRT] or those who have a need for the functionality of the network," further demonstrating that GRT investors are motivated by the expectation of profits.[58]

444.     The Graph Foundation has promoted widespread trading of GRT—including among investors with no personal need to create an application on the Ethereum blockchain that uses GRT—by working to make GRT available for retail trading on exchange platforms such as the Coinbase Exchanges.

445.     Based on the above facts, among others, GRT qualifies as an investment contract and therefore a security.

446.     During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in GRT on and with

_____

[57] *Id.*

[58] *Id.*

Coinbase. Certain members of the class currently own GRT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought GRT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 37.   GTC

447.   Gitcoin ("GTC") is a token created by Gitcoin.co. The first *bona fide* public offering of GTC occurred on or about May 1, 2021.

448.   Investors in GTC reasonably expected to receive profits from their investment in GTC. They expected these profits to derive from the efforts of Gitcoin.co. GTC was marketed as deriving value from its ability to enable community governance of the Gitcoin platform, a platform designed to fund and coordinate open-source development. This governance right, which resembles the voting rights of many traditional securities, means that GTC purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting GTC, as the governance is only valuable if the Gitcoin platform is maintained.

449.   There are few, if any, goods or services that can be directly purchased using GTC. To the extent that GTC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of GTC. Accordingly, all or nearly all GTC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

450.   Based on the foregoing facts, among others, GTC qualifies as an investment contract and therefore a security. However, GTC has never been registered as a security.

108

451.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in GTC on and with Coinbase. Certain members of the class currently own GTC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought GTC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in GTC.

### 38.    ICP

452.    Internet Computer ("ICP") is a token created, developed, issued, and distributed by Dfinity Foundation ("Dfinity"), a Swiss nonprofit organization. ICP was first *bona fide* offered to investors on or about May 10, 2021.

453.    Coinbase describes ICP as follows:

> Internet Computer (ICP) is a utility token that allows users to participate in and govern the Internet Computer blockchain network. The network aims to help developers create websites, enterprise IT systems, internet services, and DeFi applications by "installing their code directly on the public Internet." ICP can also be staked or "converted into cycles" that can be used to power computation for dApps and traditional applications.

454.    Coinbase further states:

> The ICP token is used for governance (holders can vote on the future of the network), to reward network participants for good behavior, and is used to pay fees for making transactions …. [ICP] is much more than a form of digital money.

455.    ICP became available for trading on the Coinbase Exchanges on or about May 10, 2021. Since then, ICP has continuously been traded on the Coinbase Exchanges.

456.    After ICP was listed on the Coinbase Platform, its price rose by approximately 287.6 percent and peaked at $750.73 on May 10, 2021.  By the end of June 2021, however, it had

lost the vast majority of its value.



457.    As of 10:00 a.m. Eastern time on March 10, 2022, ICP was trading at $16.53—a decline of 97.8 percent from its May 10, 2021 peak.

458.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Rodriguez, invested in ICP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ICP tokens and paid Coinbase a fee for executing the transaction.

459.    Dominic Williams founded Dfinity in October 2016. Dfinity subsequently created a project called "Internet Computer," a public blockchain network designed to host smart contracts.

460.    The Internet Computer project purports to be a decentralized version of the internet itself, meaning that it has independent data centers that provide an alternative to corporate cloud services, such as Apple's iCloud. ICP is a token issued for the Internet Computer Project.

461.    In early 2017, Dfinity conducted a seed fundraising round, where supporters could contribute a small amount in exchange for the promise of ICP when the token eventually launched. The seed fundraising round raised approximately $40 million in fiat cash and digital assets.

462.    This fundraising round was supposed to be followed by a "main round" that would be modeled after other ICOs, but the main round never happened. Williams later admitted that the "regulatory environment" made doing so "impractical" because "ICO fundraising generally still chart[s] grey legal territory." Williams further acknowledged that a "securities regulator might well argue that [ICOs] are in fact investment contracts that investors are buying because they expect them to have value once the network has launched (and they more clearly become network utility tokens)."

463.    In early 2018, Dfinity held a "strategic round," in which Andreesen Horowitz and Polychain Capital (a prominent venture capital firm and cryptocurrency investment firm, respectively) contributed approximately $61 million. In exchange for their investment, each of these investors would receive a significant portion of ICP tokens when the token ultimately launched.

464.    ICP launched for public trading—referred to as its "Genesis" listing event—on May 10, 2021. ICP launched on the Coinbase Exchanges on that date, as well as on other major exchanges.

465.    Investors in ICP—including Plaintiffs Oberlander and Rodriguez, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ICP's creators, developers, managers, and promoters. The team behind ICP has actively cultivated this expectation through public

communications including a whitepaper and a "one-pager," both hosted on ICP's official website, as well as numerous other public statements.

466.    Dfinity and Williams relentlessly marketed ICP in the lead up to the Genesis launch. On July 9, 2020, for example, Dfinity published an article titled "Investing in the Open Web: A New Thesis." The article stated that "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist." It further stated that "venture capitalists with billions in assets under management are eyeing decentralized infrastructure that will make it easier for developers to innovate and scale-out their internet services to billions of users" and that "VCs are eager to deploy billions in capital to foster the decentralized web."

467.    On February 18, 2021, Dfinity held a virtual event in conjunction with Forbes called "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model."

468.    In the lead up to the Genesis launch, Williams also went on a press tour to solicit investment in the ICP tokens, giving numerous interviews extolling ICP. Dfinity also held the so-called Genesis Event on May 7, 2021, a road-show-type presentation extolling ICP.

469.    The team behind ICP actively concealed, and continues to conceal, that ICP is a security.

470.    In a statement published by Coinbase on May 4, 2021, Williams misleadingly compared ICP to Bitcoin and Ethereum, which are commodities rather than securities): "The Internet Computer represents the third major innovation in blockchain after Bitcoin and Ethereum[.]"

471.    Unlike Bitcoin and Ethereum, however, Dfinity created all 469,213,710 ICP tokens in existence in May 2021 as part of the Genesis launch. A significant amount of the total ICP supply was given to Dfinity and other insiders. Upon information and belief, Andreesen Horowitz and Polychain Capital were entitled to a significant portion of the 24.72 percent "Seed" contributor allotment.

**M E S S A R I**
**Genesis Token Allocation**
Total token distribution on May 10, 2021

| | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINTY Foundation | 111,938,888 | 23.86% | 1 |
| **Total** | **469,213,709** | **100.0%** | |

Data as of: May 10, 2021
Source: Dfinity, Messari

472.    Nonetheless, the Dfinity one-pager positions the Internet Computer blockchain—and its "primary token," ICP—in contrast to other exchanges and tokens that "are not truly decentralized [and thus raise] regulatory considerations," and states that Internet Computer has "maximum decentralization." The whitepaper likewise emphasizes that its network is "completely decentralized." A reasonable reader of this language would take away the impression that ICP is an investment in the lay sense, but not a "security" or "investment contract" in the legal sense.

473.    In the lead up to the Genesis launch, moreover, Dfinity repeatedly asserted that ICP tokens were "utility tokens," rather than "security tokens," which was intended to mislead users to believe that ICP tokens were not securities. A May 6, 2021 Dfinity blog post titled "Understanding

113

the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens," for example, repeatedly refers to ICP tokens as "native utility tokens."

474.    Two separate Dfinity blog posts four days later both repeated the statement that "ICP is a native utility token" and that "ICP are utility tokens."

475.    These statements were and are misleading. Investors who purchased ICP invested money or other valuable consideration (such as other digital currencies) in a common enterprise: Dfinity. Investors had a reasonable expectation of profit based on the efforts of Dfinity and its team.

476.    Williams, for example, bragged about his "superstar[]," "stellar team" that was integral to the success of the Internet Computer project. He further asserted that ICP is "backed by a large team of full time engineers and cryptographers who are currently distributed across four dedicated international research centers, as well as remote teams." Williams has similarly stated that "[t]he Internet Computer … represents the product of an unprecedent multi-year R&D effort, orchestrated by the DFINITY Foundation from research and development centers in Zurich, Palo Alto, San Francisco, and Tokyo, and with additional remote teams in places such as Germany and the UK."

477.    ICP's listing on multiple cryptocurrency exchanges all at once was also highly unusual for a cryptocurrency, and—as *Coin Telegraph* reported—"reflected a carefully structured strategy by Dfinity … that landed ICP tokens right into the conscience of everyday traders." In order to be listed on any given exchange, Dfinity would have had to take affirmative steps, including by applying to be listed, paying listing fees, and paying transaction fees incurred selling ICP on those exchanges.

478.     In addition, ICP offers little, if any, utility apart from the ability to sell it to other investors. The ICP tokens were sold to investors prior to a usable network (*i.e.*, the promised "Internet Computer" project) being fully developed. The primary purpose for purchasing ICP tokens was to make a profit, rather than to use the ICP tokens for a separate task. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy ICP primarily because they expect profits, not because they intend to "use [ICP] for its intended functionality on the network."[59]

479.     To the extent that ICP can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ICP and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[60]

480.     Indeed, ICP's precipitous decline in the month after its public listing prompted an independent analysis by Miguel Morel, the founder of Arkham Intelligence (a crypto analysis firm), into what went wrong ("Arkham Report"). The Arkham Report concluded that "possible insiders connected to Dfinity have been dumping billions of dollars of ICP on exchanges at the expense of small early supporters and retail investors."

481.     The Arkham Report found that the Dfinity Treasury and project insiders deposited billions of dollars' worth of ICP to cryptocurrency exchanges and 34 suspected insider addresses during the Genesis listing and intermittently in the weeks that followed.

---

[59] *Id.*

[60] *Id.*

482.    The Arkham Report also found that Dfinity did not follow industry practices meant to demonstrate good faith and assure investors that project insiders would not trigger a price collapse as a result of massive selling. It further found that Dfinity failed to provide critical information regarding the breakdown of token allocation and unlocking schedules.

483.    As a result, the Arkham Report concluded: "Dfinity insiders made billions of dollars dumping ICP on the market while making it difficult for their biggest potential rival sellers to dump theirs …. And it appears that their activity drove a massive crash in the price of ICP."

484.    Just as Dfinity failed to provide critical information regarding the breakdown of token allocation and unlocking schedules, the ICP whitepaper—in contrast to what would typically be included in an SEC registration statement—does <u>not</u> contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

485.    Based on the facts alleged above, among others, ICP qualifies as an investment contract and thus a security, but Dfinity actively concealed that status.

486.    The Coinbase Exchanges provide users with hyperlinks to ICP's official website and the whitepaper, as well as misleading statements by Williams. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying ICP, they will profit from the efforts of others and (2) conceal ICP's status as a security.

487.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in ICP on and with Coinbase. Certain members of the class, including Plaintiff Rodriguez, currently own ICP tokens that have

depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought ICP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 39.    IOTX

488.    IoTeX ("IOTX") is a token created by IoTeX. The first *bona fide* public offering of IOTX occurred on or about May 23, 2018.

489.    Investors in IOTX reasonably expected to receive profits from their investment in IOTX. They expected these profits to derive from the efforts of IoTeX. IOTX was marketed as deriving value from its ability to be used to pay for transactions, for staking and governance, and to register new devices on the IoTeX network. IOTX purchasers thus participated in a common enterprise with each other, and the value of their investment depended on the managerial effort of the issuer in creating and maintaining the IoTeX network, which was intended to be a platform to connect Internet of Things devices and decentralized applications.

490.    There are few, if any, goods or services that can be directly purchased using IOTX. To the extent that IOTX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of IOTX. Accordingly, all or nearly all IOTX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

491.    Based on the foregoing facts, among others, IOTX qualifies as an investment contract and therefore a security. However, IOTX has never been registered as a security.

492.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in IOTX on and with Coinbase. Certain members of the class currently own IOTX tokens that have depreciated since those tokens were

purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought IOTX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in IOTX.

> ### 40. KEEP

493. Keep Network ("KEEP") is a token created by Keep SEZC. The first *bona fide* public offering of KEEP occurred on or about April 27, 2020.

494. Investors in KEEP reasonably expected to receive profits from their investment in KEEP. They expected these profits to derive from the efforts of Keep SEZC. KEEP was marketed as deriving value from its ability to power the Keep Network, an incentivized network for storing and encrypting private data on the public blockchain. Thus, the value of KEEP depended on the managerial effort of the issuer to create, maintain, and market that encryption service.

495. There are few, if any, goods or services that can be directly purchased using KEEP. To the extent that KEEP can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of KEEP. Accordingly, all or nearly all KEEP traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

496. Based on the foregoing facts, among others, KEEP qualifies as an investment contract and therefore a security. However, KEEP has never been registered as a security.

497. During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in KEEP on and with Coinbase. Certain members of the class currently own KEEP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including

Plaintiff Oberlander, bought KEEP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in KEEP.

### 41.   KNC

498.   Kyber Network ("KNC") is a token created by the developers of the Kyber Network. The first *bona fide* public offering of KNC occurred on or about September 15, 2017.

499.   Investors in KNC reasonably expected to receive profits from their investment in KNC. They expected these profits to derive from the efforts of Kyber Network. KNC was marketed as deriving value from its ability to connect multiple participants in the Kyber Network ecosystem.

500.   Kyber Network, publicly stated that KNC would "be the FIRST deflationary token with a staking mechanism" and that an upgrade to the Kyber Network protocol would result in "ultimately enhancing liquidity for the ecosystem, Kyber Network growth, and KNC value creation." Investors in KNC thus relied on the developers of the Kyber Network to drive the value of KNC through network upgrades.

501.   KNC tokens have a centralized supply controlled by the issuer.

502.   In the KNC whitepaper, the issuer of KNC tokens represented: "The collected KNC tokens from the fees, after paying for the operation expenses and to the supporting partners, will be *burned*, i.e. taken out of circulation. The burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces." The issuer thus promised to take steps to support the market for KNC.

503.   There are few, if any, goods or services that can be directly purchased using KNC. To the extent that KNC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of KNC.

Accordingly, all or nearly all KNC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

504.    Based on the foregoing facts, among others, KNC qualifies as an investment contract and therefore a security. However, KNC has never been registered as a security.

505.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in KNC on and with Coinbase. Certain members of the class currently own KNC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought KNC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in KNC.

### 42.    LINK

506.    Chainlink ("LINK") is a token created, developed, issued, and distributed by Chainlink Labs.

507.    Coinbase describes LINK as follows:

> Chainlink (LINK) is an Ethereum token that powers the Chainlink
> decentralized oracle network. This network allows smart contracts
> on Ethereum to securely connect to external data sources, APIs,
> and payment systems.

508.    LINK was first *bona fide* offered to the public in or about September 2017.

509.    LINK became available for trading on the Coinbase Pro Platform on or about June 26, 2019. LINK became available for trading on the Coinbase Platform on or about June 28, 2019. Since becoming available on the Coinbase Platform, LINK has been continuously traded on the Coinbase Exchanges.

510.    After LINK was listed on the Coinbase Platform, its price rose by approximately 2229.5 percent and peaked at $52.88 on May 10, 2021. Since its peak, the price of LINK has declined.



511.    As of 10:00 a.m. Eastern time on March 10, 2022, LINK was trading at $13.23—a decline of 75.0 percent from its May 10, 2021 peak.

512.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in LINK tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for LINK tokens and paid Coinbase a fee for executing the transaction.

513.    Purchasers of LINK on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each LINK token is fungible with all others, and the

fortunes of all LINK investors are "linked to each other [and] to the success of [Chainlink Labs's] efforts."[61]

514.    LINK investors reasonably expected to earn profits through the appreciation in value of their LINK tokens. They expected such profits to result predominantly, if not solely, from the efforts of Chainlink Labs.

515.    Chainlink Labs describes itself as "a world-class team of results-oriented developers, academics, seasoned executives, and startup operators who are building next-generation data infrastructure for smart contracts." Chainlink Labs has numerous full-time employees, including engineers, and has recently advertised that it is seeking to hire for multiple positions.

516.    Chainlink Labs is the developer of the Chainlink network, which aims to "allow[] blockchains to securely interact with external data feeds, events, and payment methods, providing the critical off-chain information needed by complex smart contracts to become the dominant form of digital agreement," according to the Chainlink website. For example, if a smart contract "require[s] market data from a trusted source like the NYSE to trigger a transaction," Chainlink Labs's technology can help provide the needed NYSE data. To perform its data-providing function, the Chainlink network relies on third-party "node operators."

517.    Within the Chainlink network, node operators are required to hold LINK tokens and are rewarded with LINK for their contributions. Users of the network pay fees in LINK.

---

[61] *Id.*

518.    Chainlink Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding LINK and the Chainlink network.[62] Since launching LINK, Chainlink Labs has continued its efforts to develop and improve its technology. For example, Chainlink Labs has stated that it engaged in "over a year of development and numerous security audits" to build "Chainlink Off-Chain Reporting," which it claimed would "significantly improve[] the efficiency of how data is computed" on the Chainlink network and provide an "immediate … 10x increase in the amount of real-world data that can be made available to smart contract applications." LINK investors thus rely on Chainlink Labs for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which link operates.[63]

519.    Chainlink Labs uses LINK to finance its efforts to develop and promote the Chainlink network. Since the initial coin offering of LINK, Chainlink Labs has raised millions of dollars by periodically selling some of the LINK it had received in the initial allocation. Chainlink Labs also continues to hold a large quantity of LINK and benefits financially from the appreciation of those tokens, allowing it to invest further in research and development. Chainlink Labs's holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in link have a reasonable expectation of profit.[64]

520.    Buyers of LINK are motivated primarily by the belief that Chainlink Labs will succeed in its business efforts, leading to growth in the value of LINK.

521.    One of the early buyers of LINK tokens, Framework Ventures, explained the profit-motivated rationale for purchasing LINK is a December 2017 blog post:

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

> Given ChainLink's focus on enterprise relationships and solutions, we see the opportunity set of outcomes being bi-modal. The need for decentralized oracle tools is apparent now and we believe there is a $1 per token base-case, even if strong partnerships do not materialize. If successful in implementing [a] partnership [with the interbank messaging network SWIFT], launching the live network and partnering with other high-quality enterprise service providers, we have a price target of $10–20 per token. Both of these outcomes have multi-year timelines, require more ChainLink core team members to be hired and expect that the cryptoasset markets continue to grow.

522.    Apart from its speculative value as an investment, LINK offers little or no utility to most buyers. The primary utility of LINK is that it can be used to pay fees for data services on the Chainlink network or to become a Chainlink node operator. These use cases are targeted to a narrow class of users who—unlike most buyers of LINK—develop applications using Chainlink-powered smart contracts or act as Chainlink node operators.

523.    There are few, if any, goods or services that investors can directly purchase using LINK. To the extent that LINK can be directly exchanged for goods or services, there is little or no apparent correlation between the price of LINK and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in link are motivated by the expectation of profits.[65] Demand for LINK is instead driven by speculation about the future growth in popularity of Chainlink Labs's technology.

524.    Many, if not all, LINK investors hold amounts of LINK with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with LINK.

---

[65] *Id.*

525.    LINK is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for LINK] or those who have a need for the functionality of the network," further demonstrating that link investors are motivated by the expectation of profits.[66] Chainlink Labs has promoted widespread trading of LINK—including among investors with no personal need for the functionality of the Chainlink network and no expectation of directly purchasing goods or services with LINK—by working to make LINK available for retail trading on exchange platforms including the Coinbase Exchanges.

526.    Chainlink Labs "controls the creation and issuance of" LINK and thus "supports a market for, [and] the price of," LINK. [67]

527.    Based on the facts alleged above, among others, LINK qualifies as an investment contract and thus a security.

528.    In contrast to the robust disclosures required under federal and state securities laws, Chainlink Labs provides investors with minimal disclosures. Chainlink Labs communicates with users and investors primarily through occasional blog entries and social media posts, which do not provide the information required of a securities issuer. Neither Coinbase nor Chainlink disclosed to investors that LINK was a security.

529.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Oberlander, have had one or more losing transactions in LINK on and with Coinbase. Certain members of the class currently own LINK tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the

---

[66] *Id.*

[67] *Id.*

class, including Plaintiffs Rodriguez and Oberlander, bought LINK tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 43.    LOOM

530.    Loom ("LOOM") is a token created by Loom Network. The first *bona fide* public offering of LOOM occurred on or about January 10, 2018.

531.    Investors in LOOM reasonably expected to receive profits from their investment in LOOM. They expected these profits to derive from the efforts of Loom Network. LOOM was marketed as deriving value from its ability to secure Loom Network's mainnet, a delegated proof-of-stake network. The value of LOOM thus depended on the managerial effort of the issuer to create and maintain that mainnet.

532.    There are few, if any, goods or services that can be directly purchased using LOOM. To the extent that LOOM can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LOOM. Accordingly, all or nearly all LOOM traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

533.    Coinbase itself has admitted that LOOM may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given LOOM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of LOOM, the Crypto Rating Council noted that a "private token sale took place in January 2018" and that "Loom Network plays an ongoing role in the development and adoption of Loom."

534.    Based on the foregoing facts, among others, LOOM qualifies as an investment contract and therefore a security. However, LOOM has never been registered as a security.

535.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in LOOM on and with Coinbase. Certain members of the class currently own LOOM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought LOOM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in LOOM.

## 44.    LRC

536.    Loopring ("LRC") is a token created by Loopring. The first *bona fide* public offering of LRC occurred on or about August 1, 2017.

537.    Investors in LRC reasonably expected to receive profits from their investment in LRC. They expected these profits to derive from the efforts of Loopring. LRC was marketed as deriving value from the promise that it would enable its holders to receive a share of the fees collected by the Loopring's protocol's use in the building of decentralized crypto exchanges. This theory of value depended on the managerial effort of the issuer, because fees would be generated only if the issuer developed and maintained the Loopring protocol.

538.    There are few, if any, goods or services that can be directly purchased using LRC. To the extent that LRC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LRC. Accordingly, all or nearly all LRC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

127

539.    Based on the foregoing facts, among others, LRC qualifies as an investment contract and therefore a security. However, LRC has never been registered as a security.

540.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in LRC on and with Coinbase. Certain members of the class currently own LRC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought LRC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in LRC.

### 45.    MANA

541.    Decentraland ("MANA") is a token created, issued, and distributed by the Decentraland Foundation.

542.    MANA was first *bona fide* offered to the public in or about August 2017.

543.    MANA became available for trading on the Coinbase Pro Platform on or about December 10, 2018. MANA became available for trading on the Coinbase Platform on or about November 5, 2020. Since becoming available on the Coinbase Platform, MANA has continuously been traded on the Coinbase Exchanges.

544.    After MANA was listed on the Coinbase Platform, its price rose by approximately 9192.8 percent and peaked at $5.90 on November 25, 2021. Since then, the price has declined substantially.



545.    As of 10:00 a.m. Eastern time on March 10, 2022, MANA was trading at $2.38—a decline of 59.7 percent from its November 25, 2021 peak.

546.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in MANA tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for MANA tokens and paid Coinbase a fee for executing the transaction.

547.    Purchasers of MANA on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each MANA token is fungible with all others, and the

fortunes of all MANA investors are "linked to each other [and] to the success of [the] efforts" of MANA's developers, promoters, and distributors.[68]

548.    MANA investors reasonably expected to earn profits through the appreciation in value of their MANA tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Decentraland Foundation.

549.    MANA is tied to a virtual reality video game, Decentraland. In that game, MANA serves as a currency. Thus, MANA has value only insofar as the Decentraland Foundation creates and maintains the virtual reality game to which it is tied. However, the game was not available even in "beta" form until 2019. Purchasers of MANA at its ICO were purchasing an asset whose only value was based on speculation about the future development of the game to which it would be tied.

550.    Many MANA investors hold amounts of MANA with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with MANA. Even users who need some MANA in connection with the video game to which it is linked typically expect to use only a fraction of their MANA for that purpose.

551.    Despite its direct utility being largely or exclusively limited to a narrow class of users, MANA is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for MANA] or those who have a need for the functionality of the network," further demonstrating that MANA investors are motivated by the expectation of profits.[69]

---

[68] *Id.*

[69] *Id.*

552.    The Decentraland Foundation has promoted widespread trading of MANA—including among investors with no links to the game itself—by working to make MANA available for retail trading on exchange platforms such as the Coinbase Exchanges. The distribution of the MANA token generated the funds used to create the video game to which it is linked.

553.    Coinbase itself has admitted that MANA may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given MANA a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of MANA, the Crypto Rating Council noted MANA's August 2017 ICO and further noted that "Decentraland, a private company based in Beijing, is involved in ongoing development of the Decentraland network."

554.    Based on the above facts, among others, MANA qualifies as an investment contract and therefore a security.

555.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in MANA on and with Coinbase. Certain members of the class currently own MANA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought MANA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

46.     **MATIC**

556.    Polygon ("MATIC") is a token that was first *bona fide* offered to investors as the native token of the MATIC network in or about October 2017. MATIC was rebranded as Polygon on February 9, 2021.

557.    MATIC became available for trading on the Coinbase Exchanges on or about March 11, 2021. Since then, MATIC has continuously been traded on the Coinbase Exchanges.

558.    Coinbase describes MATIC as follows:

> Polygon was formerly called Matic Network. Polygon (MATIC) is an Ethereum token that powers the Polygon Network, a scaling solution for Ethereum. Polygon aims to provide faster and cheaper transactions on Ethereum using Layer 2 sidechains, which are blockchains that run alongside the Ethereum main chain. Users can deposit Ethereum tokens to a Polygon smart contract, interact with them within Polygon, and then later withdraw them back to the Ethereum main chain. The MATIC token is used to pay transaction fees and participate in proof-of-stake consensus.

559.    After MATIC was listed on the Coinbase Platform, its price rose by approximately 917 percent and peaked at $2.92 on December 27, 2021. Since then, the price of MATIC has fluctuated; after a sustained period of decline, MATIC reached a new peak on December 26, 2021 before declining again.



560.   As of 10:00 a.m. Eastern time on March 10, 2022, MATIC was trading at $1.43—a decline of 51.2 percent from its December 27, 2021 peak.

561.   During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in MATIC tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for MATIC tokens and paid Coinbase a fee for executing the transaction.

562.   Investors in MATIC—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of MATIC's creators, developers, managers, and promoters. The team behind MATIC has actively cultivated this expectation through public communications including, but not limited to, a whitepaper and a "lightpaper" hosted on MATIC's official website.

133

563.    Built by a development team based in India, MATIC is presented in the whitepaper as "a utility token which functions as the unit of payment and settlement between participants who interact within the ecosystem on the Matic Network." The whitepaper makes clear that the value of MATIC is dependent on the development team's continued maintenance and development of the MATIC Network. For example, the whitepaper lists various topics of research that the MATIC development team expected to conduct:

1. Generalized state scaling and fraud proofs/cryptographic mechanisms for the same.
2. Evaluate the approach to expand Staker base in the checkpointing layer with the future Threshold based signatures implementations on Ethereum, if any.
3. Robust structure and design pattern for upgradeable smart contracts.
4. Context specific Ether less accounts and Gas Relay Abstractions on Identity
5. Privacy-enabled transactions
6. Blockchain interoperability
7. State channels on top of the sidechain

564.    The development team further disclosed a failure to develop the MATIC Network as a potential risk factor negatively influencing the price of MATIC:

Failure to develop: There is the risk that the development of the Matic Network will not be executed or implemented as planned, for a variety of reasons, including without limitation the event of a decline in the prices of any digital asset, virtual currency or Matic Token, unforeseen technical difficulties, and shortage of development funds for activities.

565.    While the whitepaper ostensibly provides a list of risk factors that can negatively impact the price of MATIC, the disclosures made fall far short of the robust disclosures mandated by federal and state securities laws. For example, the whitepaper does not provide any financial information underlying the MATIC network. Nor does it provide details on the MATIC network's further development plans.

134

566.    MATIC offers little, if any, utility apart from the ability to sell it to other investors. MATIC's official website, the whitepaper, and the lightpaper do not identify any specific goods or services that can be acquired in exchange for MATIC. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy MATIC primarily because they expect profits, not because they intend to "use [MATIC] for its intended functionality on the network."[70]

567.    To the extent that MATIC can be exchanged for specific goods and services, there is little or no apparent correlation between the price of MATIC and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits. Instead of responding to the price of other goods or services, the price of MATIC has changed based on events that affect speculation about its future performance. For example, the announcement that MATIC would be listed on the Coinbase Exchanges caused its price to skyrocket by over 40 percent.

568.    Based on the facts alleged above, among others, MATIC qualifies as an investment contract and thus a security.

569.    The team behind MATIC actively conceals that MATIC is a security. For example, the whitepaper purports to inform investors by purchasing MATIC, they agree that MATIC tokens "are not intended to constitute securities in Singapore or any relevant jurisdiction."

570.    The Coinbase Exchanges provide users with hyperlinks to MATIC's official website and the lightpaper. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying MATIC, they will profit from the efforts of others and (2) conceal MATIC's status as a security.

---

[70] *Id.*

571. During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in MATIC on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own MATIC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought MATIC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 47. MKR

572. Maker ("MKR") is a token created by MakerDAO. The first *bona fide* public offering of MKR occurred on or about January 30, 2017.

573. Investors in MKR reasonably expected to receive profits from their investment in MKR. They expected these profits to derive from the efforts of MakerDAO. MKR was marketed as deriving value from its ability to give holders voting rights over the development of the Maker Protocol, a technology for lending and borrowing cryptocurrency. This theory of value depends on the managerial effort of the issuer, because voting rights over the protocol are only valuable if the issuer develops and maintains the protocol.

574. There are few, if any, goods or services that can be directly purchased using MKR. To the extent that MKR can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of Maker. Accordingly, all or nearly all Maker traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

575. Based on the foregoing facts, among others, Maker qualifies as an investment contract and therefore a security. However, Maker has never been registered as a security.

136

576.     During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in MKR on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own MKR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought MKR tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in MKR.

### 48.     MLN

577.     Enzyme ("MLN") is a token created by Enzyme. The first *bona fide* public offering of MLN occurred on or about February 15, 2017.

578.     Investors in MLN reasonably expected to receive profits from their investment in MLN. They expected these profits to derive from the efforts of Enzyme. MLN was marketed as deriving value from its ability to power Enzyme, a protocol to facilitate on-chain asset management. The value of MLN thus depended on the managerial effort of the issuer to create and maintain Enzyme.

579.     There are few, if any, goods or services that can be directly purchased using MLN. To the extent that MLN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of MLN. Accordingly, all or nearly all MLN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

580.     Based on the foregoing facts, among others, MLN qualifies as an investment contract and therefore a security. However, MLN has never been registered as a security.

581.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in MLN on and with Coinbase. Certain members of the class currently own MLN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought MLN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in MLN.

### 49.    NKN

582.    NKN coin ("NKN") is a token created by New Kind of Network. The first *bona fide* public offering of NKN occurred on or about April 19, 2018.

583.    Investors in NKN reasonably expected to receive profits from their investment in NKN. They expected these profits to derive from the efforts of New Kind of Network. NKN was marketed as deriving value from its ability to be used in the NKN network, which in turn would use economic incentives to motivate Internet users to share network connections and utilize unused bandwidth. The value thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer developed and maintained the NKN network.

584.    There are few, if any, goods or services that can be directly purchased using NKN. To the extent that NKN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of NKN. Accordingly, all or nearly all NKN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

585.    Based on the foregoing facts, among others, NKN qualifies as an investment contract and therefore a security. However, NKN has never been registered as a security.

586.     During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in NKN on and with Coinbase. Certain members of the class currently own NKN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought NKN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in NKN.

### 50.     NMR

587.     Numeraire ("NMR") is a token created by Numerai. The first *bona fide* public offering of Numeraire occurred on or about June 20, 2017.

588.     Investors in Numeraire reasonably expected to receive profits from their investment in Numeraire. They expected these profits to derive from the efforts of Numerai. Numeraire was marketed as deriving value from its ability to power Numerai, an Ethereum-based platform that crowdsources artificial intelligence to bring decentralization to the data science field. The value of NMR thus depended on the managerial effort of the issuer to create and maintain Numerai and attract data scientists to use the platform.

589.     There are few, if any, goods or services that can be directly purchased using Numeraire. To the extent that Numeraire can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of Numeraire. Accordingly, all or nearly all Numeraire traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

590.     Based on the foregoing facts, among others, Numeraire qualifies as an investment contract and therefore a security. However, Numeraire has never been registered as a security.

591.     During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in NMR on and with Coinbase. Certain members of the class currently own NMR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought NMR tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in NMR.

### 51.     NU

592.     NuCypher ("NU") is a token created by NuCypher. The first *bona fide* public offering of NU occurred on or about September 30, 2020.

593.     Investors in NU reasonably expected to receive profits from their investment in NU. They expected these profits to derive from the efforts of NuCypher. NU was marketed as deriving value from its ability to be staked to run a node on the NuCypher network, an encryption service for public blockchains. The value of NU thus depended on the managerial effort of the issuer to create, promote, and maintain the encryption service to which NU was tied.

594.     There are few, if any, goods or services that can be directly purchased using NU. To the extent that NU can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of NU. Accordingly, all or nearly all NU traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

595.    Based on the foregoing facts, among others, NU qualifies as an investment contract and therefore a security. However, NU has never been registered as a security.

596.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in NU on and with Coinbase. Certain members of the class currently own NU tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought NU tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in NU.

## 52.    OGN

597.    Origin ("OGN") is a token created by the developers of the Origin Protocol. The first *bona fide* public offering of OGN occurred on or about January 8, 2020.

598.    Investors in OGN reasonably expected to receive profits from their investment in OGN. They expected these profits to derive from the efforts of the Origin Protocol developers. OGN was marketed as deriving value from its ability to power Origin, a platform for building peer-to-peer marketplaces and e-commerce applications. The value of OGN thus depended on the managerial effort of the issuer, because the token is only valuable if the issuer developed and maintained the Origin platform.

599.    There are few, if any, goods or services that can be directly purchased using OGN. To the extent that OGN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OGN.

Accordingly, all or nearly all OGN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

600.    Based on the foregoing facts, among others, OGN qualifies as an investment contract and therefore a security. However, OGN has never been registered as a security.

601.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in OGN on and with Coinbase. Certain members of the class currently own OGN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought OGN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in OGN.

### 53.    OMG

602.    OMG Network ("OMG") is a token created by the OMG Foundation. The first *bona fide* public offering of OMG occurred on or about June 23, 2017.

603.    Investors in OMG reasonably expected to receive profits from their investment in OMG. They expected these profits to derive from the efforts of the OMG Foundation. OMG was marketed as deriving value from the promise that the token would impart the right to validate transactions on the blockchain supporting the OMG Network.

604.    The creation of OMG tokens occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. The value of OMG depended entirely on the managerial effort of the issuer, both to manage that supply and to develop the OMG network itself.

605.    There are few, if any, goods or services that can be directly purchased using OMG. To the extent that OMG can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OMG. Accordingly, all or nearly all OMG traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

606.    Based on the foregoing facts, among others, OMG qualifies as an investment contract and therefore a security. However, OMG has never been registered as a security.

607.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in OMG on and with Coinbase. Certain members of the class currently own OMG tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought OMG tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in OMG.

### 54.    ORN

608.    Orion Protocol ("ORN") is a token created by Orion Protocol Ltd. The first *bona fide* public offering of ORN occurred on or about July 14, 2020.

609.    Investors in ORN reasonably expected to receive profits from their investment in ORN. They expected these profits to derive from the efforts of Orion Protocol Ltd. ORN was marketed as deriving value from its ability to power the Orion platform, a decentralized platform that aggregates the liquidity of multiple crypto exchanges. This means that ORN's value depended on the managerial effort of the issuer to create, maintain, and promote the Orion platform itself.

610. There are few, if any, goods or services that can be directly purchased using ORN. To the extent that ORN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ORN. Accordingly, all or nearly all ORN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

611. Based on the foregoing facts, among others, ORN qualifies as an investment contract and therefore a security. However, ORN has never been registered as a security.

612. During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in ORN on and with Coinbase. Certain members of the class currently own ORN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought ORN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in ORN.

**55.  OXT**

613. Orchid ("OXT") is a token created by Orchid. The first *bona fide* public offering of OXT occurred on or about May 7, 2019.

614. Investors in OXT reasonably expected to receive profits from their investment in OXT. They expected these profits to derive from the efforts of Orchid. OXT was marketed as deriving value from its ability to serve as a secure means of paying for the use of Orchid's service, a cryptocurrency-powered virtual private network. Investors in OXT thus depended on the managerial effort of the issuer to create, maintain and market Orchid.

615.    There are few, if any, goods or services that can be directly purchased using OXT. To the extent that OXT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OXT. Only a small fraction of OXT is ever used to pay for the use of Orchid's virtual private network. Accordingly, all or nearly all OXT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

616.    Based on the foregoing facts, among others, OXT qualifies as an investment contract and therefore a security. However, OXT has never been registered as a security.

617.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in OXT on and with Coinbase. Certain members of the class currently own OXT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought OXT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in OXT.

### 56.    PLA

618.    PlayDapp ("PLA") is a token created by PlayDapp. The first *bona fide* public offering of PLA occurred on or about October 19, 2020.

619.    Investors in PLA reasonably expected to receive profits from their investment in PLA. They expected these profits to derive from the efforts of PlayDapp. PLA was marketed as deriving value from its ability to power PlayDapp, a blockchain gaming platform and NFT

marketplace. The value of PLA thus depended on the managerial effort of the issuer to create, maintain, and market PlayDapp.

620.    There are few, if any, goods or services that can be directly purchased using PLA. To the extent that PLA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of PLA. Accordingly, all or nearly all PLA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

621.    Based on the foregoing facts, among others, PLA qualifies as an investment contract and therefore a security. However, PLA has never been registered as a security.

622.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in PLA on and with Coinbase. Certain members of the class currently own PLA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought PLA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in PLA.

## 57.    POLY

623.    Polymath ("POLY") is a token created by Polymath. The first *bona fide* public offering of POLY occurred on or about January 12, 2018.

624.    Investors in POLY reasonably expected to receive profits from their investment in POLY. They expected these profits to derive from the efforts of Polymath. POLY was marketed as deriving value from its ability to facilitate digital securities trading on the Polymath platform. This means that POLY investors depended on the managerial effort of the issuer to create and

maintain the Polymath platform through the development of technology to create, issue, and manage security tokens on the blockchain.

625.    There are few, if any, goods or services that can be directly purchased using POLY. To the extent that POLY can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of POLY. Accordingly, all or nearly all POLY traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

626.    Based on the foregoing facts, among others, POLY qualifies as an investment contract and therefore a security. However, POLY has never been registered as a security.

627.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in POLY on and with Coinbase. Certain members of the class currently own POLY tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought POLY tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in POLY.

### 58.    QNT

628.    Quant ("QNT") is a token created, issued, and distributed by the Quant Network.

629.    Coinbase describes QNT as follows:

> QNT is an Ethereum token that is used to power Quant Network's Overledger brand of enterprise software solutions, which aim to connect public blockchains and private networks. Quant Network allows the creation of so-called mDapps that enable decentralized applications to operate on multiple blockchains at once.

630.    QNT was first *bona fide* offered to the public in or about May 11, 2018.

631.    QNT became available for trading on the Coinbase Exchanges on or about June 24, 2021. Since then, QNT has continuously been traded on the Coinbase Exchanges.

632.    After QNT was listed on the Coinbase Platform, its price rose by approximately 473.4 percent and peaked at $428.38 on September 11, 2021. Since its peak, the price of QNT has persistently declined.



633.    As of 10:00 a.m. Eastern time on March 10, 2022, QNT was trading at $116.66—a decline of 72.8 percent from its September 11, 2021 peak.

634.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in QNT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for QNT tokens and paid Coinbase a fee for executing the transaction.

635.    Purchasers of QNT on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each QNT token is fungible with all others, and the fortunes of all

148

QNT investors are "linked to each other [and] to the success of [the] efforts" of the Quant Network.[71]

636.    QNT investors reasonably expected to earn profits through the appreciation in value of their QNT tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Quant Network.

637.    QNT is the native token of the Quant Overledger, which is designed to allow apps to operate on multiple blockchains simultaneously. QNT depends on the Quant Network's development and maintenance of the Quant Overledger for all of its value.

638.    The Quant Network was founded by its CEO, Gilber Verdian. The Quant Network, in addition to developing and managing the Quant Overledger, has extensively marketed QNT, including through partnerships with entities such as SIA, Oracle, and Amazon Web Services. QNT has been distributed through "airdrops" that provide free tokens as a way of creating interest and increasing the trading volume of QNT.

639.    Investors thus rely on the Quant Network to perform "essential tasks [and] responsibilities," including "the development, improvement (or enhancement), operation, [and] promotion of the network" in which QNT operates.[72]

640.    Apart from its speculative value as an investment, QNT offers little direct utility. Although QNT is used for certain functions on the Quant Overledger, this utility is meaningful only to purchasers who are active users of the Quant Overledger—a class consisting largely of application developers.

---

[71] *Id.*

[72] *Id.*

641.    There are few, if any, goods or services that investors can directly purchase using QNT. To the extent that QNT can be directly exchanged for goods or services, there is little or no apparent correlation between the price of QNT and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in QNT are motivated by the expectation of profits.[73]

642.    Many QNT investors hold amounts of QNT with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with QNT.

643.    Based on the above facts, among others, QNT qualifies as an investment contract and therefore a security.

644.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in QNT on and with Coinbase. Certain members of the class currently own QNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought QNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 59.    QUICK

645.    QuickSwap ("QUICK") is a token created by QuickSwap. The first *bona fide* public offering of QUICK occurred on or about February 23, 2021.

646.    Investors in QUICK reasonably expected to receive profits from their investment in QUICK. They expected these profits to derive from the efforts of QuickSwap. QUICK was marketed as deriving value from its ability to power QuickSwap, a decentralized exchange that

---

[73] *Id.*

runs on the Polygon Network. The value of QUICK thus depended on the managerial effort of the issuer to create and maintain QuickSwap and to attract users to that platform.

647.    There are few, if any, goods or services that can be directly purchased using QUICK. To the extent that QUICK can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of QUICK. Accordingly, all or nearly all QUICK traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

648.    Based on the foregoing facts, among others, QUICK qualifies as an investment contract and therefore a security. However, QUICK has never been registered as a security.

649.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in QUICK on and with Coinbase. Certain members of the class currently own QUICK tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought QUICK tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in QUICK.

### 60.    RARI

650.    Rarible ("RARI") is a token created, issued, and distributed by Rarible Inc.

651.    RARI was first *bona fide* offered to the public on or about July 15, 2020. RARI became available for trading on the Coinbase Exchanges on or about October 14, 2021. Since then, RARI has continuously been traded on the Coinbase Exchanges.

652.    Coinbase describes RARI as follows:

> RARI is an Ethereum token that powers Rarible, a community-owned marketplace for creating, selling, or collecting NFTs. RARI

can be earned by using the platform and can be used to curate content and vote on platform upgrades.

653.   After RARI was listed on the Coinbase Platform, its price rose by approximately 153.7 percent and peaked at $63.53 on November 16, 2021. Since then, the price of RARI has been trending downward.



654.   As of 10:00 a.m. Eastern time on March 10, 2022, RARI was trading at $7.17—a decline of 88.7 percent from the price reached on November 16, 2021.

655.   During the Class Period, members of the Class, including Plaintiff Underwood, invested in RARI tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for RARI tokens and paid Coinbase a fee for executing the transaction.

656.   Investors in RARI—including Plaintiff Underwood and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result

primarily or exclusively from the efforts of Rarible Inc. The team behind RARI has actively cultivated this expectation through public communications.

657.     Rarible Inc. is a company with at least nine employees, including its CEO and co-founder Alexei Falin. These employees work on improving and promoting Rarible's technology. Rarible Inc. advertises that it is "backed by" several investors including Coinbase.

658.     According to a July 2020 blog post introducing the RARI token, RARI is the governance token of Rarible and "enables the most active creators and collectors on Rarible to vote for any platform upgrades and participate in curation and moderation."

659.     The blog post further stated that "[o]ver half of RARI's total supply [was] reserved for sellers and buyers on Rarible marketplace, who w[ould] receive RARI through weekly distribution according to weekly purchases and sales volumes." Rarible stopped providing these weekly distributions of RARI in January 2022.

660.     The amount of information provided by RARI's development team is paltry even by crypto-asset standards. RARI does not have a whitepaper usually published by cryptocurrency developers. The July 2020 blog post purporting to explain RARI is less than 1,000 words long and does not provide any information regarding the Rarible NFT marketplace that RARI is supposed to support.

661.     RARI offers little, if any, utility apart from the ability to sell it to other investors. Rarible's official website does not identify any specific goods or services that can be acquired in exchange for RARI. As the SEC has recognized, this lack of intrinsic utility is evidence that

investors buy RARI primarily because they expect profits, not because they intend to "use [RARI] for its intended functionality on the network."[74]

662.    To the extent that RARI can be exchanged for specific goods and services, there is little or no apparent correlation between the price of RARI and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[75] Instead of responding to the price of other goods or services, the price of RARI has changed based on events that affect speculation about its future performance. For example, the listing of RARI on platforms including the Coinbase Exchanges had a positive effect on its value in 2021.

663.    Based on the facts alleged above, among others, RARI qualifies as an investment contract and thus a security.

664.    The Coinbase Exchanges provide users with hyperlinks to RARI's official website. Coinbase thus participates in the attempt to persuade investors that by buying RARI, they will profit from the efforts of others.

665.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in RARI on and with Coinbase. Certain members of the class currently own RARI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought RARI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

---

[74] *Id.*

[75] *Id.*

154

61.     REN

666.    Ren ("REN") is a token created by Ren. The first *bona fide* public offering of REN occurred on or about February 3, 2018.

667.    Investors in REN reasonably expected to receive profits from their investment in REN. They expected these profits to derive from the efforts of Ren. REN was marketed as deriving value from its ability to power Ren's open protocol for transferring cryptocurrencies between blockchains. The value of REN thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained a protocol that in fact provided interoperability and liquidity between different blockchain platforms.

668.    There are few, if any, goods or services that can be directly purchased using REN. To the extent that REN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of REN. Accordingly, all or nearly all REN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

669.    Based on the foregoing facts, among others, REN qualifies as an investment contract and therefore a security. However, REN has never been registered as a security.

670.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in REN on and with Coinbase. Certain members of the class currently own REN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought REN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of

the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in REN.

**62.    REP**

671.    Augur ("REP") is a token created by the Forecast Foundation. The first *bona fide* public offering of REP occurred on or about August 14, 2015.

672.    Investors in REP reasonably expected to receive profits from their investment in REP. They expected these profits to derive from the efforts of the Forecast Foundation. REP was marketed as deriving value from its ability to be used to report and dispute the outcomes of events within Augur, a decentralized protocol for prediction markets. The value of REP depended on the managerial efforts of the Forecast Foundation to develop, maintain, and promote Augur.

673.    There are few, if any, goods or services that can be directly purchased using REP. To the extent that REP can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of REP. Accordingly, all or nearly all REP traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

674.    Coinbase itself has admitted that REP may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given REP a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of REP, the Crypto Rating Council noted that "[t]he Forecast Foundation helps to develop Augur" and "conducted a token sale in 2015 which reportedly raised $5.1 million."

675.    Based on the foregoing facts, among others, REP qualifies as an investment contract and therefore a security. However, REP has never been registered as a security.

676.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in REP on and with Coinbase. Certain members of the class currently own REP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought REP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in REP.

### 63.    RLC

677.    iExec RLC ("RLC") is a token created by iExec. The first *bona fide* public offering of RLC occurred on or about April 19, 2017.

678.    Investors in RLC reasonably expected to receive profits from their investment in RLC. They expected these profits to derive from the efforts of iExec. RLC was marketed as deriving value from it link to the iExec cloud platform, which enables users to monetize and rent computing power and data. The token's value thus depends on the managerial effort of the issuer, because RLC's connection to the iExec cloud platform is only valuable if the issuer created and maintained a decentralized marketplace for cloud resources.

679.    There are few, if any, goods or services that can be directly purchased using RLC. To the extent that RLC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of RLC. Accordingly, all or nearly all RLC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

680.    Based on the foregoing facts, among others, RLC qualifies as an investment contract and therefore a security. However, RLC has never been registered as a security.

681.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in RLC on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own RLC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought RLC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in RLC.

### 64.    SHIB

682.    Shiba Inu ("SHIB") is a token that was first *bona fide* offered to investors on or about August 1, 2020. SHIB became available for trading on the Coinbase Pro Platform on or about September 9, 2021. SHIB became available for trading on the Coinbase Platform on or about September 16, 2021. Since becoming available on the Coinbase Platform, SHIB has continuously been traded on the Coinbase Exchanges.

683.    Coinbase describes SHIB as follows:

> Shiba Inu (SHIB) is a token that aspires to be an Ethereum-based alternative to Dogecoin (DOGE), the popular memecoin. Unlike Bitcoin, which is designed to be scarce, SHIB is intentionally abundant — with a total supply of one quadrillion. The Shiba Inu Token ecosystem supports projects such as an NFT art incubator and the development of a decentralized exchange called Shibaswap.

684.    After SHIB was listed on the Coinbase Platform, its price rose by approximately 1206.1 percent and peaked at $0.00009 on October 28, 2021. Since its peak, the price of SHIB has persistently declined.



685.    As of 10:00 a.m. Eastern time on March 10, 2022, SHIB was trading at $0.000023—a decline of 74.4 percent from its October 28, 2021 peak.

686.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in SHIB tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for SHIB tokens and paid Coinbase a fee for executing the transaction.

687.    Investors in SHIB—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of SHIB's creators, developers, managers, and promoters. The team behind SHIB has actively cultivated this expectation through public communications including, but not limited to, a whitepaper hosted on SHIB's official website.

688.    SHIB's development team, led by its pseudonymous founder "Ryoshi," launched SHIB in 2020. Half of the total supply of SHIB—500,000,000,000 tokens—was immediately sent to a digital wallet owned by Vitalik Buterin, a co-founder of Ethereum. On information and belief,

this gift to Buterin was a stunt designed to cause reasonable investors to believe that Buterin was involved in developing SHIB and would devote his efforts to increasing the value of SHIB, leading to profits for investors. This rumor, despite being denied by Buterin, has circulated widely, with some investors even speculating that Buterin might be the true identity of Ryoshi.

689.    According to the current version of the whitepaper (which the issuer refers to as the "Woof Paper"), dated June 25, 2021, SHIB is now part of the "Shiba Inu Ecosystem," which also includes at least two other tokens: LEASH and BONE.

690.    The Woof Paper portrays SHIB as an investment that is sure to increase in value due to the efforts of its creators, developers, managers, and promoters. The Woof Paper boasts that "the value of SHIB is primed and ready to overtake the value of Dogecoin. Even if SHIB never hits $0.01, between our publicity and our utility, SHIB will be worth proportionately more than the popular, canine memecoin."

691.    In contrast to the robust disclosures required under federal and state securities laws, the team behind SHIB provides investors with little insight into the business model supporting its promise of financial growth. The Woof Paper states that "[o]ur roadmap will remain top secret to ensure our continued advantage in this highly competitive space[.]"

692.    Despite the lack of federally mandated disclosures, the Woof Paper clearly communicates that a core team will provide essential managerial efforts to advance the value of SHIB and other digital assets in the Shiba Inu Ecosystem.

693.    According to the Woof Paper, Ryoshi will personally contribute to the future growth of SHIB's value by "stay[ing] around and mak[ing] it [his] mission to 'defend the brand' and protect the community from leeches and scammers."

694.     The Woof Paper also explains that part of the plan to "assure the longevity of …
the Shiba Inu Ecosystem" is to establish two funds that will pay for the essential efforts of the
Ecosystem's core team. *First*, the "Core Developers & OG Admins Fund" will be used to pay
salaries to "talented individuals" on SHIB's "Dev team." This "trusted group of admins" will be
"deployed across multiple channels, to secure a safe space where Shiba fans build community
without being bothered by FUD [i.e., fear, uncertainty, and doubt], scams, and other issues."
*Second*, the "Shiba Inu Ecosystem Development & Marketing Fund" will "allow the team to
deploy international marketing strategies, such as commercials, that will make the freshest
mainstream cryptocurrency name, sharing the ranks with Bitcoin and Ethereum" and "allow us to
quickly expand on concepts from the top secret 2021 RuffMap with a real budget." According to
the Woof Paper, the Ecosystem Development & Marketing Fund will provide "the rocket fuel"
needed "to send this puppy to the moon and beyond."

695.     The Woof Paper adds that "the Shib Team will always be here to oversee and
support." While the Woof Paper suggests that some decisions will be made by a "decentralized
majority" of holders of the ecosystem's "governance token," it acknowledges that "there will still
be times where it falls on the shoulders of the Shib Team to make responsible decisions in the best
interest of the ShibArmy."

696.     The core team behind SHIB has created and supports a trading market for SHIB. In
addition to permitting SHIB to trade on centralized exchanges such as the Coinbase Exchanges,
the core team has built and actively promotes ShibaSwap, a dedicated platform for trading SHIB
and other tokens in the Shiba Inu Ecosystem. Investors rely on the core team to maintain
ShibaSwap and reasonably expect this work to increase the value of SHIB by ensuring an efficient,
liquid market for SHIB.

697.    SHIB offers little, if any, utility apart from the ability to sell it to other investors. SHIB's official website and Woof Paper do not identify any specific goods or services that can be acquired in exchange for SHIB. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy SHIB primarily because they expect profits, not because they intend to "use [SHIB] for its intended functionality on the network."[76]

698.    To the extent that SHIB can be exchanged for specific goods and services, there is little or no apparent correlation between the price of SHIB and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[77] Instead of responding to the price of other goods or services, the price of SHIB has changed based on events that affect speculation about its future performance. For example, the listing of SHIB on platforms including the Coinbase Exchanges had a positive effect on its value in 2021. By contrast, the news in May 2021 that Buterin was reducing his SHIB position by donating 50 trillion coins to charity caused the price of SHIB to crash.

699.    SHIB is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network," further supporting the inference that investors buy SHIB primarily for profit.[78] SHIB

---

[76] *Id.*

[77] *Id*.

[78] *Id*.

reached one million holders in November 2021—a milestone that SHIB's official Twitter account promoted as a "great moment in SHIB's history."



700.    Moreover, SHIB is offered and purchased in quantities indicative of an intent to treat SHIB primarily as an investment rather than a utility token. Even at its all-time high, SHIB has always been worth less than one thousandth of one cent. As SHIB's official website explains, this high-volume, low-value structure "allows investors to hold millions, billions, or even trillions, of it in their wallets." Holding these large amounts amplifies the volatility, increasing the possibility of profit. At the same time, it makes SHIB an unwieldy means to purchase or sell any good or service.

701. Regardless of how SHIB is denominated, many investors maintain holdings of SHIB with dollar-equivalent value that far exceeds the value of any goods or services the investor could ever expect to purchase with SHIB.

702. Investors' own statements show that they are motivated to buy SHIB primarily by the expectation of profit, not by any direct utility SHIB may have now or in the future. For example, on the social networking website Reddit, the community r/SHIBArmy—which can be accessed via a link on the official SHIB website—is dominated by messages about the price of SHIB and the profits investors expect to earn by holding SHIB. The following sample is typical of messages posted on r/SHIBArmy:



703. Based on the facts alleged above, among others, SHIB qualifies as an investment contract and thus a security.

704.    The team behind SHIB actively conceals that SHIB is a security. For example, the Woof Paper purports to inform investors that by purchasing SHIB, they "agree that [they] are not purchasing a security or investment."

705.    The Coinbase Exchanges provide users with hyperlinks to SHIB's official website and the Woof Paper. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying SHIB, they will profit from the efforts of others and (2) conceal SHIB's status as a security.

706.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in SHIB on and with Coinbase. Certain members of the class, including Plaintiffs Oberlander and Underwood, currently own SHIB tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought SHIB tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 65.    SKL

707.    Skale ("SKL") is a token created by SKALE Network. The first *bona fide* public offering of SKL occurred on or about September 3, 2020.

708.    Investors in SKL reasonably expected to receive profits from their investment in SKL. They expected these profits to derive from the efforts of SKALE Network. SKL was marketed as deriving value from its ability to power the SKALE Network, an elastic network that is designed to bring scalability to Ethereum. The value of SKL thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained the SKALE Network itself.

709.    There are few, if any, goods or services that can be directly purchased using SKL. To the extent that SKL can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SKL. Accordingly, all or nearly all SKL traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

710.    Based on the foregoing facts, among others, SKL qualifies as an investment contract and therefore a security. However, SKL has never been registered as a security.

711.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in SKL on and with Coinbase. Certain members of the class currently own SKL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought SKL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in SKL.

**66.    SNX**

712.    Synthetix ("SNX") is a token created by Synthetix. The first *bona fide* public offering of SNX occurred on or about February 28, 2018.

713.    Investors in SNX reasonably expected to receive profits from their investment in SNX. They expected these profits to derive from the efforts of Synthetix. SNX was marketed as deriving value from its ability to allow users to create crypto assets that track the price of other assets, which depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained a platform to broaden the cryptocurrency space by introducing non-blockchain assets.

166

714.    There are few, if any, goods or services that can be directly purchased using SNX. To the extent that SNX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SNX. Accordingly, all or nearly all SNX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

715.    Based on the foregoing facts, among others, SNX qualifies as an investment contract and therefore a security. However, SNX has never been registered as a security.

716.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in SNX on and with Coinbase. Certain members of the class currently own SNX tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought SNX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in SNX.

### 67.    SOL

717.    Solana ("SOL") is a token created, developed, issued, and distributed by Solana Labs, Inc. ("Solana Labs") and the Solana Foundation (together with Solana Labs, the "Solana Entities").

718.    Coinbase describes SOL as follows:

> Solana is a decentralized computing platform that uses SOL to pay for transactions. Solana aims to improve blockchain scalability by using a combination of proof of stake consensus and so-called proof of history. As a result, Solana claims to be able to support 50,000 transactions per second without sacrificing decentralization.

719.    SOL was first *bona fide* offered to the public in the United States in or about April 2020.

720.    SOL became available for trading on the Coinbase Exchanges on or about June 17, 2021. Since then, SOL has continuously been traded on the Coinbase Exchanges.

721.    After SOL was listed on the Coinbase Platform, its price rose by approximately 555.2 percent and peaked at $260.06 on November 6, 2021. Since its peak, the price of SOL has persistently declined.



722.    As of 10:00 a.m. Eastern time on March 10, 2022, SOL was trading at $82.14—a decline of 68.4 percent from its November 6, 2021 peak.

723.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in SOL tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for SOL tokens and paid Coinbase a fee for executing the transaction.

168

724.    Purchasers of SOL on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each SOL token is fungible with all others, and the fortunes of all SOL investors are "linked to each other [and] to the success of [the Solana Entities'] efforts."[79]

725.    SOL investors reasonably expected to earn profits through the appreciation in value of their SOL tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Solana Entities.

726.    Each Solana Entity is an active participant in the sponsorship, promotion, or distribution of SOL.

727.    Solana Labs markets itself as the developer of the Solana blockchain platform, which aims to process a high volume of transactions quickly and at low cost. SOL is the native token of the Solana blockchain.

728.    Solana Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding the Solana blockchain platform.[80] For example, when the Solana blockchain platform encounters system-wide technical problems, Solana Labs, by its own account, "actively work[s]" to "fix" them. Solana Labs also works on longer-term projects to improve the technical performance of the Solana blockchain platform. SOL investors thus rely on Solana Labs for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which SOL operates.[81]

729.    The Solana Foundation is a nonprofit organization that works to promote "the decentralization, growth, and security of the Solana network," according to its website.

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

730.    Anatoly Yakovenko serves as both CEO of Solana Labs and President of the Solana Foundation. Raj Gokal serves as both Chief Operating Officer of Solana Labs and a Board Member of the Solana Foundation. On information and belief, Solana Labs substantially controls the Solana Foundation.

731.    The Solana Entities have offered SOL to investors in order to fund the development, growth, and promotion of the Solana blockchain platform. In a March 18, 2020 blog post, Gokal explained: "After assessing community interest and root causes for recent market volatility, we believe this is a critical time for crypto infrastructure to be improved. With this in mind, we are going forward with plans to launch the SOL token."

732.    Solana Labs has also sold SOL in private transactions for the express purpose of raising capital for its business. In June 2021, for example, Solana Labs announced that it had raised over $314 million in a private token sale to investors including prominent venture capital firms Andreessen Horowitz and Polychain Capital. In a statement about this transaction, Yakovenko said, "The next phase is onboarding a billion users. Solana was built from the ground up to accommodate this scale. With this funding, Solana Labs is now positioned to bring in the right partners and capital to build products and tooling to get there." The Solana Entities thus use the proceeds of sales of SOL "to enhance the functionality or value of the network or digital asset," supporting a reasonable expectation of profit for SOL investors.[82]

733.    Buyers of SOL—including both institutional investors and retail investors—are motivated primarily by the belief that the Solana Entities will succeed in their efforts, leading to growth in the value of SOL. For example, in the June 2021 statement announcing the $314 million

---

[82] *Id.*

private sale of SOL, Andreessen Horowitz General Partner Ali Yahya said, "It is easy to imagine countless use cases for crypto as a technology, but building them into real products that millions of people use requires the existence of a high-performance blockchain. Solana is a next-generation blockchain that can meet that high bar." Similarly, Polychain Capital Managing Partner Olaf Carlson-Wee said, "We've been following Solana for a long time and believe it could massively scale the [decentralized finance] ecosystem."

734.    Apart from its speculative value as an investment, SOL offers only limited utility to buyers. The primary utility of SOL is as a form of payment for transaction fees on the Solana blockchain platform.

735.    There are few goods or services that investors can directly purchase using SOL. To the extent that SOL can be directly exchanged for goods or services, there is little or no apparent correlation between the price of SOL and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in SOL are motivated by the expectation of profits.[83]

736.    Many SOL investors hold amounts of SOL with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with SOL.

737.    Despite its direct utility being largely or exclusively limited to buyers who are regularly engaged in transactions on the Solana blockchain platform, SOL is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for SOL] or those who have a need for the functionality of the network,"

---

[83] *Id.*

further demonstrating that SOL investors are motivated by the expectation of profits.[84] Yakovenko acknowledged in an April 2020 blog post that Solana Labs seeks to bring SOL "to every wallet in the world," not just the wallets of Solana blockchain users or others with a need for any utility offered by SOL.

738.    The Solana Entities have promoted widespread trading of SOL—including among investors with no personal need for the functionality of SOL's network and no expectation of directly purchasing goods or services with SOL—by working to make SOL available for retail trading on exchange platforms including the Coinbase Exchanges. According to the official Solana Twitter account, the "first official listing" of SOL was on the exchange platform Binance in April 2020.

739.    In April 2020, Solana Labs transferred 167 million SOL to the Solana Foundation. Later that month, Yakovenko authored a blog post responding to "confusion" about the circulating supply of SOL. Yakovenko explained:

> [P]er standard industry practice, the Solana Foundation contracted a market maker to provide liquidity in the aftermarket and ensure that buy and sell orders always get met, regardless of macro conditions, seasonality, or daily fluctuations in trading volume. Market makers are standard for any listed token project, as well as in traditional financial markets for meeting liquidity requirements, and play an important role in our goal to reduce friction, facilitating growth for the SOL token ecosystem, and bringing Solana to every wallet in the world. As part of this agreement, the Solana Foundation agreed to lend the market maker ◎11,365,067 tokens for a 6 month period. The problem: we did not disclose this information to the public, as well as the size and nature of the loan[.]

---

[84] *Id.*

740.    In the same blog post, Yakovenko announced a plan to remove over 11.3 million SOL from the market. According to Yakovenko, the Solana Foundation would "aim to burn" those tokens, or eliminate them permanently from the circulating supply.

741.    The Solana Entities "control[] the creation and issuance of" SOL.[85] There is no predetermined maximum number of SOL tokens that may be issued.

742.    By listing SOL on multiple exchange platforms, contracting a market maker to ensure liquidity, removing millions of SOL from the market to be burned, and controlling the creation and issuance of SOL, the Solana Entities have taken steps to "support[] a market for, [and] the price of," SOL. [86] As the SEC recognizes, such actions support the conclusion that investors in SOL reasonably expect to earn profits in reliance on the efforts of others.

743.    Both Solana Entities continue to hold significant amounts of SOL. The Solana Entities' holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in SOL have a reasonable expectation of profit.[87]

744.    Solana Labs has transferred to the Solana Foundation certain intellectual property related to the Solana blockchain protocol. This fact further suggests that investors in SOL have a reasonable expectation of profit derived from the efforts of the Solana Entities.[88]

745.    Based on the facts alleged above, among others, SOL qualifies as an investment contract and thus a security.

---

[85] *Id*.

[86] *Id.*

[87] *Id.*

[88] *Id*.

746.    In contrast to the robust disclosures required under federal and state securities laws, the Solana Entities provide investors with minimal disclosures. For each month from June 2020 through December 2020, the Solana Foundation issued a Transparency Report "to shed light on the previous month's token activity, expected token activity for the current month, and other updates in relation to the SOL token." Each of these reports was less than ten pages long and provided only high-level updates. Transparency Reports have not been published since December 2020.

747.    The Solana Entities publish occasional blog posts, but these posts do not provide the disclosures required for securities issuers. They "also provide more frequent updates via Blockfolio Signal," but "only holders of $SOL can receive these special updates," according to Solana Labs. Thus, the least informed market participants are those considering whether to make an initial investment in SOL.

748.    The Solana Entities have sought to conceal SOL's status as a security through misleading public communications that emphasize the purportedly "decentralized" nature of the Solana blockchain platform, thus diverting attention from the essential managerial efforts of the Solana Entities. The official Solana website states on the home page that "Solana is a decentralized blockchain built to enable scalable, user-friendly apps for the world." Any information on the official Solana website about the managerial efforts of the Solana Entities is incomplete, vague, and difficult to locate. Similarly, the Solana Foundation's website prominently states its purported commitment to "decentralization" while providing almost no information about its day-to-day work, including its efforts to support a trading market for SOL. Moreover, the official Solana website encourages readers to think of SOL as a direct competitor and counterpart to Bitcoin and Ethereum, which are widely known as commodities. After reviewing these websites and other

174

publications of the Solana Entities, a reasonable layperson would likely have the impression that SOL is not a security.

749.    The Coinbase Exchanges provide users with a hyperlink to the official Solana website. Coinbase thus participates in the attempt to conceal SOL's status as a security.

750.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in SOL on and with Coinbase. Certain members of the class currently own SOL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought SOL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 68.    STORJ

751.    Storj ("STORJ") is a token created by Storj Labs, Inc. The first *bona fide* public offering of STORJ occurred on or about May 24, 2017.

752.    Investors in STORJ reasonably expected to receive profits from their investment in STORJ. They expected these profits to derive from the efforts of Storj Labs, Inc. STORJ was marketed as deriving value from its ability to power the Storj network, an open-source cloud storage program. The value of STORJ thus depended on the managerial effort of the issuer to create and maintain this cloud storage program.

753.    There are few, if any, goods or services that can be directly purchased using STORJ. To the extent that STORJ can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of STORJ. The price of STORJ has not correlated with the ability of digital storage, illustrating its lack of use

for its nominal utility. Accordingly, all or nearly all STORJ traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

754.   Based on the foregoing facts, among others, STORJ qualifies as an investment contract and therefore a security. However, STORJ has never been registered as a security.

755.   During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in STORJ on and with Coinbase. Certain members of the class currently own STORJ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought STORJ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in STORJ.

### 69.   SUSHI

756.   SushiSwap ("SUSHI") is a token created by Sushi. The first *bona fide* public offering of SushiSwap occurred on or about August 27, 2020.

757.   Investors in SUSHI reasonably expected to receive profits from their investment in SUSHI. They expected these profits to derive from the efforts of Sushi. SUSHI was marketed as deriving value from its ability to be used on the SushiSwap, a decentralized exchange which leveraged smart contracts in order to provide liquidity pools that allow users to directly trade crypto assets with no intermediary. Holders of SUSHI were thus depending on the managerial effort of the issuer, because the SUSHI token only has value if the issuer created and maintained the decentralized exchange linked to SUSHI.

176

758.    There are few, if any, goods or services that can be directly purchased using SushiSwap. To the extent that SushiSwap can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SushiSwap. Accordingly, all or nearly all SushiSwap traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

759.    Based on the foregoing facts, among others, SushiSwap qualifies as an investment contract and therefore a security. However, SushiSwap has never been registered as a security.

760.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in SUSHI on and with Coinbase. Certain members of the class currently own SUSHI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought SUSHI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in SUSHI.

### 70.    TRB

761.    Tellor ("TRB") is a token created by Tellor. The first *bona fide* public offering of TRB occurred on or about November 18, 2019.

762.    Investors in TRB reasonably expected to receive profits from their investment in TRB. They expected these profits to derive from the efforts of ISSUER. TRB was marketed as deriving value from its use in the governance of the Tellor network, a decentralized oracle network that allows smart contracts on Ethereum to securely connect to external data sources. This governance right, which resembles the voting rights of many traditional securities, means that TRB

purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the oracle network.

763.    There are few, if any, goods or services that can be directly purchased using TRB. To the extent that TRB can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of TRB. Accordingly, all or nearly all TRB traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

764.    Based on the foregoing facts, among others, TRB qualifies as an investment contract and therefore a security. However, TRB has never been registered as a security.

765.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in TRB on and with Coinbase. Certain members of the class currently own TRB tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought TRB tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in TRB.

### 71.    TRIBE

766.    Tribe ("TRIBE") is a token created by Fei Labs. The first *bona fide* public offering of TRIBE occurred on or about April 2, 2021.

767.    Investors in TRIBE reasonably expected to receive profits from their investment in TRIBE. They expected these profits to derive from the efforts of Fei Labs. TRIBE was marketed as deriving value from its ability to govern Fei Protocol, a liquid market for a decentralized stablecoin called FEI. This governance right, which resembles the voting rights of many traditional

securities, means that TRIBE purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the Fei Protocol.

768.    There are few, if any, goods or services that can be directly purchased using TRIBE. To the extent that TRIBE can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of TRIBE. Accordingly, all or nearly all TRIBE traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

769.    Based on the foregoing facts, among others, TRIBE qualifies as an investment contract and therefore a security. However, TRIBE has never been registered as a security.

770.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in TRIBE on and with Coinbase. Certain members of the class currently own TRIBE tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought TRIBE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in TRIBE.

### 72.    UMA

771.    UMA token ("UMA") is a token created by UMA. The first *bona fide* public offering of UMA occurred on or about April 29, 2020.

772.    Investors in UMA reasonably expected to receive profits from their investment in UMA. They expected these profits to derive from the efforts of UMA. UMA was marketed as deriving value from its ability to vote regarding the governance of the UMA protocol, which allows

users to build decentralized financial products. The value of UMA's governance right, which resembles the voting rights of a traditional security, depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained an open-source protocol to create universal market access.

773.    There are few, if any, goods or services that can be directly purchased using UMA. To the extent that UMA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of UMA. Accordingly, all or nearly all UMA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

774.    Based on the foregoing facts, among others, UMA qualifies as an investment contract and therefore a security. However, UMA has never been registered as a security.

775.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in UMA on and with Coinbase. Certain members of the class currently own UMA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought UMA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in UMA.

### 73.    UNI

776.    Uniswap ("UNI") is a token created, developed, issued, and distributed by Uniswap Labs.

777.    Coinbase describes UNI as follows:

> Uniswap (UNI) is an Ethereum token that powers Uniswap, an
> automated liquidity provider that's designed to make it easy to

exchange Ethereum (ERC-20) tokens. There is no orderbook or
central facilitator on Uniswap. Instead, tokens are exchanged
through liquidity pools that are defined by smart contracts.

778.    UNI was first *bona fide* offered to the public in the United States in or about
September 2020.

779.    UNI became available for trading on the Coinbase Exchanges on or about
September 17, 2020. Since then, UNI has continuously been traded on the Coinbase Exchanges.

780.    After UNI was listed on the Coinbase Platform, its price rose by approximately
3988.2 percent and peaked at $44.97 on May 3, 2021. Since its peak, the price of UNI has
persistently declined.



781.    As of 10:00 a.m. Eastern time on March 10, 2022, UNI was trading at $8.70—a
decline of 80.6 percent from its May 3, 2021 peak.

782.    During the Class Period, members of the Class, including Plaintiffs Underwood
and Oberlander, invested in UNI tokens on the Coinbase Exchanges by giving money or digital

Case 1:21-cv-08353-PAE   Document 43   Filed 03/11/22   Page 188 of 261

assets to Coinbase in exchange for UNI tokens and paid Coinbase a fee for executing the transaction.

783.    Purchasers of UNI on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each UNI token is fungible with all others, and the fortunes of all UNI investors are "linked to each other [and] to the success of [Uniswap Labs's] efforts."[89]

784.    UNI investors reasonably expected to earn profits through the appreciation in value of their UNI tokens. They expected such profits to result predominantly, if not solely, from the efforts of Uniswap Labs.

785.    Uniswap Labs describes itself as the developer of (1) the Uniswap Protocol, which is a "suite of persistent, non-upgradable smart contracts that together create an automated market maker, a protocol that facilitates peer-to-peer market making and swapping of ERC-20 tokens on the Ethereum blockchain," and (2) the Uniswap Interface, which is a "web interface that allows for easy interaction with the Uniswap protocol." Uniswap Labs has numerous full-time employees, including engineers, and has recently advertised that it is seeking to hire for multiple positions.

786.    Uniswap Labs describes UNI as "the Uniswap Protocol token" whose purpose is to "officially enshrine[] Uniswap as publicly-owned and self-sustainable infrastructure while continuing to carefully protect its indestructible and autonomous qualities." Ownership of UNI allows investors to participate in certain Uniswap governance decisions.

787.    Uniswap Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding UNI, the Uniswap Protocol, and the Uniswap Interface.[90] For example,

---

[89] *Id*.

[90] *Id*.

Uniswap Labs developed Uniswap v3, which it launched in May 2021 and promoted as "the most powerful version of the protocol yet." Uniswap Labs also engages with users of its technology and works on "product developments that improve the overall user experience," including new features for the Uniswap app. UNI investors thus rely on Uniswap Labs for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which UNI operates.[91]

788.    Uniswap Labs uses UNI to finance its efforts to develop and promote the Uniswap Protocol and the Uniswap Interface. Of the one billion UNI initially minted, 21.266 percent were allocated to Uniswap "team members" and 18.044 percent were allocated to Uniswap "investors." Uniswap Labs benefits financially from appreciation of these UNI tokens, allowing it to invest further in research and development. Uniswap Labs's holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in UNI have a reasonable expectation of profit.[92]

789.    Similarly, Uniswap Labs uses proceeds from sales of UNI to finance its business operations. For example, the Decentralized Finance Education Fund—a lobbying entity established and substantially controlled by Uniswap Labs—raised approximately $10 million in July 2021 by selling UNI tokens that had been allocated to it.

790.    Buyers of UNI are motivated primarily by the belief that Uniswap Labs will succeed in its business efforts, leading to growth in the value of UNI.

791.    Apart from its speculative value as an investment, UNI offers little utility to buyers. The primary utility of UNI is that it allows holders to participate in certain Uniswap governance

---

[91] *Id.*

[92] *Id.*

decisions—much as traditional equity securities often confer voting rights on their owners. Generally, however, only high-volume purchasers of UNI have the practical ability to influence governance decisions or interest in doing so.

792.    There are few, if any, goods or services that investors can directly purchase using UNI. To the extent that UNI can be directly exchanged for goods or services, there is little or no apparent correlation between the price of UNI and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in UNI are motivated by the expectation of profits.[93] Demand for UNI is instead driven by speculation about the future growth in popularity of Uniswap Labs's technology.

793.    Many, if not all, UNI investors hold amounts of UNI with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with UNI.

794.    UNI is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for UNI] or those who have a need for the functionality of the network," further demonstrating that UNI investors are motivated by the expectation of profits.[94]

795.    Uniswap Labs has promoted widespread trading of UNI—including among investors with no personal need for the functionality of the Uniswap network and no expectation of directly purchasing goods or services with UNI—by working to make UNI available for retail trading on exchange platforms including the Coinbase Exchanges. Uniswap Labs succeeded in having UNI listed on the Coinbase Exchanges almost immediately after UNI was launched.

---

[93] *Id.*

[94] *Id.*

796.    In addition to facilitating listings of UNI on exchange platforms, Uniswap Labs has taken other steps to "support[] a market for, [and] the price of," UNI. [95] For example, Uniswap Labs continues to "control[] the creation and issuance of the digital asset"[96] and plans to issue more UNI tokens on a predetermined schedule, causing gradual and predictable inflation on which investors can rely.

797.    Uniswap Labs owns "all intellectual property and other rights in the [Uniswap] Interface and its contents" and sets the terms on which this intellectual property is licensed, according to its Terms of Service. This fact further supports the conclusion that investors in UNI have a reasonable expectation of profits derived from the efforts of Uniswap Labs.[97]

798.    Based on the facts alleged above, among others, UNI qualifies as an investment contract and thus a security.

799.    In contrast to the robust disclosures required under federal and state securities laws, Uniswap Labs provides investors with minimal disclosures. Uniswap Labs communicates with users and investors primarily through occasional blog entries and social media posts, which do not provide the information required of a securities issuer.

800.    Uniswap Labs has sought to conceal UNI's status as a security through misleading public communications that create the false impression that Uniswap Labs does not contribute significant managerial efforts to Uniswap. For example, in a September 2020 blog post announcing the launch of UNI, Uniswap Labs claimed that "Uniswap's success to date" had been "achieved without involvement of the core development team since deployment." In reality, however, the

---

[95] *Id*.

[96] *Id*.

[97] *Id*.

"core development team" at Uniswap Labs has performed essential tasks throughout Uniswap's history, both before and after the launch of UNI. After reviewing Uniswap Labs's public communications, a reasonable layperson would likely have the impression that UNI is not a security.

801.    The Coinbase Exchanges provide users with a hyperlink to the official Uniswap Labs website. Coinbase thus participates in the attempt to conceal UNI's status as a security.

802.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in UNI on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own UNI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought UNI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 74.    XLM

803.    Stellar Lumen ("XLM") is a token created, issued, and distributed by the Stellar Development Foundation ("SDF").

804.    Coinbase describes XLM as follows: "Stellar's cryptocurrency, the Stellar Lumen (XLM), powers the Stellar payment network. Stellar aims to connect the world's financial system, enabling businesses and developers to take advantage of the network's fast speeds, low transaction costs, and interoperability."

805.    XLM was first *bona fide* offered to the public in or about July 2014.

806.    XLM became available for trading on the Coinbase Pro Platform on or about March 13, 2019. XLM became available for trading on the Coinbase Platform on or about March 18,

2019. Since become available on the Coinbase Platform, XLM has continuously been traded on the Coinbase Exchanges.

807.    After XLM was listed on the Coinbase Platform, its price rose by approximately 627.4 percent and peaked at $0.80 on May 16, 2021. Since its peak, the price of XLM has persistently declined.



808.    As of 10:00 a.m. Eastern time on March 10, 2022, XLM was trading at $0.18—a decline of 77.8 percent from its May 16, 2021 peak.

809.    During the Class Period, members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, invested in XLM tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for XLM tokens and paid Coinbase a fee for executing the transaction.

810.   Purchasers of XLM on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each XLM token is fungible with all others, and the fortunes of all XLM investors are "linked to each other [and] to the success of [the] efforts" of XLM's developers, promoters, and distributors.[98]

811.   XLM investors reasonably expected to earn profits through the appreciation in value of their XLM tokens. They expected such profits to result predominantly, if not solely, from the efforts of SDF and its affiliate Interstellar (together the "Stellar Entities").

812.   XLM is the native token of the Stellar network, which aims to "make[] it possible to create, send and trade digital representations of all forms of money," including traditional currencies and cryptocurrencies, according to the Stellar website. XLM is used to pay transaction fees within the Stellar network.

813.   The Stellar network was co-founded by Jed McCaleb. McCaleb previously co-founded Ripple Labs, which created the Token XRP and is currently the subject of an SEC enforcement action alleging that XRP is an unregistered security. The Stellar network competes directly with the network developed and promoted by Ripple Labs.

814.   Both Stellar Entities are active participants in the enterprise in which XLM purchasers invested.

815.   SDF is a nonprofit corporation that "leads the development of" the Stellar network, according to its website. SDF "helps maintain Stellar's codebase, supports the technical and business communities around Stellar, and is a speaking partner to regulators and institutions." Investors in XLM thus rely on SDF to perform "essential tasks [and] responsibilities," including

---

[98] *Id.*

"the development, improvement (or enhancement), operation, [and] promotion of the network" in which XLM operates.[99]

816.   SDF states on its website that it "will sell its lumens using public exchanges like Kraken, Coinbase, and Bitstamp and through direct sales." SDF uses the proceeds of these token sales to "pay[] for employee salaries, as well as for things like rent, overhead, travel, and server costs."

817.   Intersteller is a for-profit company that, according to its website, "builds, consults, and integrates to deliver the business value of the Stellar blockchain." McCaleb serves on the boards of both SDF and Interstellar.

818.   Apart from its speculative value as an investment, XLM offers little direct utility. Only active users of the Stellar network need XLM for its use as a utility token. The Stellar network's active users are primarily businesses such as financial institutions and payment-processing companies, not individual buyers of XLM.

819.   There are few, if any, goods or services that investors can directly purchase using XLM. To the extent that XLM can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XLM and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XLM are motivated by the expectation of profits.[100]

820.   Many XLM investors hold amounts of XLM with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XLM.

---

[99] *Id.*

[100] *Id.*

Even users who need some XLM to pay transaction fees on the Stellar network typically expect to use only a fraction of their XLM for that purpose. SDF advertises that transaction fees on the Stellar network are "very small," and the minimum balance required to use the network is just one XLM (worth approximately $0.18).

821.    Despite its direct utility being largely or exclusively limited to a narrow class of users, XLM is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XLM] or those who have a need for the functionality of the network," further demonstrating that XLM investors are motivated by the expectation of profits.[101]

822.    SDF has promoted widespread trading of XLM—including among investors with no personal need for the functionality of the Stellar network and no expectation of directly purchasing goods or services with XLM—by working to make XLM available for retail trading on exchange platforms such as the Coinbase Exchanges.

823.    In addition to having XLM listed on exchange platforms, SDF has taken other steps to "support[] a market for, [and] the price of," XLM.[102] For example, in November 2019, SDF "burned," or permanently removed from circulation, more than half of all XLM in existence. This token burn was designed to, and did, cause an increase in the price of XLM.

824.    SDF continues to hold the majority of the total supply of XLM. SDF is thus "able to benefit from its efforts as a result of holding the same class of digital assets as those being

---

[101] *Id.*

[102] *Id.*

distributed to the public," which further suggests that there is a reasonable expectation of profit for holders of XLM.[103]

825.    Coinbase itself has admitted that XLM may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given XLM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of XLM, the Crypto Rating Council noted that SDF "plays an ongoing development role."

826.    Based on the above facts, among others, XLM qualifies as an investment contract and therefore a security.

827.    The Stellar Entities disclose far less information about XLM and the Stellar Entities' business than is required under federal and state securities laws. The Stellar Entities communicate with investors primarily through their websites and social media posts, which do not contain the information required for a securities offering.

828.    The Stellar Entities know that XLM is a security. In August 2017, SDF posted a blog entry by an in-house attorney for Interstellar (then known as Lightyear.io), which explained that "Misconception #1" about the application of securities laws to crypto-assets was that a "utility token" cannot be a security.

> The fact that a utility exists is not determinative in determining whether the token is a security. If it were, we'd get an absurd result: any offering could escape securities law jurisdiction simply by building in a trivial utility to the token. Imagine a tokenized share of stock, except the token also enables you to redeem it for a cat GIF.

---

[103] *Id.*

829.    More recently, however, SDF has sought to conceal XLM's status as a security by exploiting the same "[m]isconception" it debunked in 2017. In a 2019 interview with Forbes, SDF CEO Denelle Dixon stated that while SDF was "not concerned" about the regulatory implications of SDF's management of XLM: "We don't actually focus on XLM for any other purpose other than to effectuate the network, and to bring good to the network and good to the world."

830.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in XLM on and with Coinbase. Certain members of the class, including Plaintiffs Oberlander and Underwood, currently own XLM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought XLM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

## 75.    XRP

831.    Ripple ("XRP") is a token created, issued, and distributed by Ripple Labs Inc. ("Ripple"). Coinbase describes XRP as follows: "XRP is the cryptocurrency used by the Ripple payment network. Built for enterprise use, XRP aims to be a fast, cost-efficient cryptocurrency for cross-border payments."

832.    XRP was first *bona fide* offered to investors in 2013. It became available for trading on the Coinbase Exchanges on or about February 28, 2019.

833.    On December 22, 2020, the SEC brought an enforcement action against Ripple and two of its senior executives alleging that XRP is a security, and that the distribution of XRP from

2013 up to December 22, 2020 constituted one large, ongoing unregistered securities offering.[104] Coinbase suspended trading of XRP on January 19, 2021. Trading of XRP on the Coinbase Exchanges currently remains suspended. Between February 28, 2019, and December 22, 2020, the price of XRP fluctuated between approximately $0.15 and approximately $0.68.



834.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in XRP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for XRP tokens and paid Coinbase a fee for executing the transaction.

---

[104] *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220311134606/https://www.sec.gov/news/press-release/2020-338.

835.    Purchasers of XRP on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each XRP token is fungible with all others, and the fortunes of all XRP investors are "linked to each other [and] to the success of [Ripple's] efforts."[105]

836.    XRP investors reasonably expected to earn profits through the appreciation in value of their XRP tokens. They expected such profits to result predominantly, if not solely, from the efforts of Ripple, the creator, developer, and issuer of XRP. XRP investors rely completely on Ripple for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which XRP operates.[106]

837.    Ripple has consistently sought to persuade investors that by purchasing XRP, they can expect to receive profits derived from the efforts of Ripple's employees. Ripple's core message to XRP investors is simple and can be broken down into two ideas. *First*, Ripple will invest its time, energy, and other resources in developing its XRP-compatible payment technology and encouraging widespread adoption of that technology by clients, particularly banks and payment providers that deal with cross-border payments. *Second*, as more clients adopt Ripple's payment technology (and potentially other use cases for XRP, which are in earlier stages of development), demand for XRP will grow, causing XRP's value to increase.

838.    In a September 2017 post on the social networking website Reddit, David Schwartz—then Ripple's Chief Cryptographer, now its Chief Technology Officer—summarized Ripple's plan to increase the value of XRP, thus generating profit for XRP investors derived from Ripple's efforts:

---

[105] Howey Framework Report.

[106] *Id.*

> Ripple is building open payment systems with technologies like
> interledger. … The more Ripple's payment technology is adopted,
> the more payments there will be that have no technical obstacle to
> being settled with XRP. … It is clearly in our economic interest to
> do things that will increase the value of XRP over the long term.
> We've explained clearly why we believe that our payment network
> will create a tremendous need for a new intermediary asset, why that
> asset is likely to be a digital asset, why XRP is well-positioned to be
> that asset, how Ripple will work to get XRP adopted for this
> purpose, and why that would be expected to create demand for XRP.

839.    In another 2017 Reddit post, Schwartz responded to another poster's question about "what could cause [XRP] to severely drop in price in the coming months/years." Schwartz identified the "biggest risks" to the value of XRP and reassured XRP owners that each of these risks was "mitigated" or unlikely to occur, thus encouraging the belief that XRP was an investment carrying a reasonable expectation of profit. Schwartz also made clear that XRP's future performance was intimately tied to the efforts of Ripple, such that potential setbacks to Ripple were among the "biggest risks" to XRP investors. For example, if "[s]omeone else does almost exactly the same thing Ripple does, but does it better," or if "[s]ome horrible personal or business

195

scandal" makes Ripple "toxic" to financial institutions, the price of XRP could crash.



sjoelkatz · 4 yr. ago
Ripple · David Schwartz

I'll tell you what I think the biggest risks are:

1. Someone else does almost exactly the same thing Ripple does, but does it better. This is mitigated by the fact that Ripple has such talented people and has a lead. But you never know.

2. Unfavorable regulatory changes make Ripple's business model impractical. Perhaps some regulators deem XRP to be a security and therefore only salable to sophisticated investors or something like that. This is mitigated by the fact that Ripple can target friendlier jurisdictions, but losing big ones would be damaging.

3. Some serious technical problem is found in the XRP ledger system and neither Ripple or anyone else is able to fix it. This seems unlikely to me, but again, you never know.

4. Some horrible personal or business scandal affects key Ripple people such as Chris Larsen or Brad Garlinghouse or the company itself and the company becomes too toxic for FIs to do business with. Again, I don't think this is likely, but you never know.

5. Someone comes up with a better way to bridge international payments than using a digital asset and Ripple is unable to position XRP for another use case and abandons XRP. I don't know of any better way, but as with the others, you never know.

⬆ 8 ⬇  💬 Reply  Share  Report  Save  Follow

840.   More recently—including during the period when XRP traded on the Coinbase Exchanges—Ripple has continued to promote the narrative that its efforts will lead to future growth in the utility of and demand for XRP, thus supporting a reasonable expectation of profit for XRP investors. For example, in response to a question about the "investment case" for XRP during a February 2020 interview with CNN, Ripple CEO Brad Garlinghouse stated that "[o]ver the coming years ... we, Ripple, are focused on driving utility from this asset, and if we're successful at that we think that's good for the liquidity of the whole ecosystem." Garlinghouse noted that Ripple was focused on pursuing "commercial banks" and "payment providers" as its target customers.

841.   Even though Ripple has represented XRP as having actual or potential real-world utility for settling financial transactions, XRP currently has little or no direct utility for users outside a narrow class of enterprise customers, consisting primarily of certain financial institutions

and payment providers. There are few, if any, goods or services that investors can directly purchase using XRP.

842.    To the extent that XRP can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XRP and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XRP are motivated by the expectation of profits.[107]

843.    Many XRP investors hold amounts of XRP with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XRP.

844.    Despite its direct utility being largely or exclusively limited to a narrow class of users, XRP is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XRP] or those who have a need for the functionality of the network," further demonstrating that XRP investors are motivated by the expectation of profits.[108] Offering XRP broadly is central to Ripple's publicly stated plan to "increase[e] XRP liquidity" and thus make XRP more attractive for use by enterprise customers.

845.    Ripple has promoted widespread trading of XRP—including among investors with no personal need for the functionality of XRP's network and no expectation of directly purchasing goods or services with XRP—by working to make XRP available for retail trading on exchange platforms such as the Coinbase Exchanges. For example, in 2018, Ripple offered to lend Coinbase over $100 million worth of XRP in exchange for the listing of XRP on the Coinbase Exchanges. Ripple also offered another exchange platform provider, Gemini, a $1 million cash payment for

---

[107] *Id.*

[108] *Id.*

listing XRP. On information and belief, Ripple ultimately did pay Coinbase and other exchange platform providers some form of consideration to list XRP.

846.    In addition to having XRP listed on exchange platforms, Ripple has taken other steps to "support[] a market for, [and] the price of," XRP.[109] For example, Ripple has stated that in December 2017, it placed "the lion's share of XRP"—55 billion tokens—in an escrow account that automatically releases 1 billion XRP to Ripple per month. Ripple stated that it took this step to "create certainty of XRP supply at any given time" and to give the market assurance that Ripple will not suddenly "flood the market" with XRP. Ripple's decision to place 55 billion XRP in escrow was designed to, and did, cause an increase in the price of XRP.

847.    In a further effort to prop up the price of XRP, Ripple has purchased XRP in the secondary market.

848.    Ripple itself remains the largest holder of XRP. As of January 2, 2022, more than half of the total supply of XRP was either held by Ripple directly or secured in its escrow account. Ripple is thus "able to benefit from its efforts as a result of holding the same class of digital assets



[109] *Id.*

as those being distributed to the public," which further suggests that there is a reasonable expectation of profit for holders of XRP.[110]



849.    Ripple has gradually sold portions of its XRP holdings, knowing and intending that many of the tokens it sold would be traded on platforms including the Coinbase Exchanges. Ripple receives the proceeds from its sales of XRP and controls how those proceeds are spent. Investors understand that by buying XRP—whether directly from Ripple or from other investors—they are helping to finance Ripple's efforts to advance its business plan and thus increase the value of XRP.

850.    Coinbase itself has admitted that XRP may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council, has given XRP a rating of 4 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is the highest rating the Crypto Rating Council has ever issued. In explaining its rating of XRP, the Crypto Rating Council

---

[110] *Id.*

noted that "Ripple Labs is involved in the ongoing development of applications for XRP" and that "Tokens were reportedly sold privately to venture and crypto-affiliated investors."

851.    Based on the above facts, among others, XRP qualifies as an investment contract and therefore a security.

852.    Ripple discloses far less information about XRP and Ripple's business than is required under federal and state securities laws. Ripple releases an "XRP Markets Report" on a quarterly basis, but these reports are brief and lack most of the details securities issuers are required to disclose.

853.    While successfully promoting the belief that XRP owners can expect to profit from Ripple's efforts, Ripple has actively concealed that XRP is a security. For example, in a December 2020 blog post responding to the SEC's enforcement action, Garlinghouse claimed that "XRP is not a security" and sought to persuade investors that there was not even a *risk* of XRP being deemed a security: "What I DON'T want is for you to worry. We will get through this, and we will prove our case in court."

854.    Coinbase provides users with a hyperlink to Ripple's official website, which contains blog posts, quarterly reports, and other communications that (1) promote XRP as an investment that carries a reasonable expectation of profits derived from Ripple's efforts and (2) deny that XRP is a security. On information and belief, Coinbase provided this hyperlink throughout the period when XRP was traded on the Coinbase Exchanges.

855.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in XRP on and with Coinbase. Certain members of the class currently own XRP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the

class, including Plaintiffs Rodriguez and Underwood, bought XRP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

### 76.    XTZ

856.    Tezos ("XTZ") is a token created, issued, and distributed by the Tezos Foundation.

857.    Coinbase describes XTZ as follows:

> Tezos is a cryptocurrency and decentralized computing platform.
> Its features include proof of stake consensus, formal verification
> (which lets developers verify the correctness of their code), and the
> ability to let stakeholders vote on changes to the protocol. Tezos's
> block creation process is called "baking" — Tezos holders who
> stake their tokens can receive Tezos tokens as a reward for creating
> and verifying blocks.

858.    XTZ was first *bona fide* offered to the public in or about July 2017.

859.    XTZ became available for trading on the Coinbase Pro Platform on or about August 5, 2019. XTZ became available for trading on the Coinbase Platform on or about August 8, 2019. Since becoming available on the Coinbase Platform, XTZ has continuously been traded on the Coinbase Exchanges.

860.    After XTZ was listed on the Coinbase Platform, its price rose by approximately 580.0 percent and peaked at $9.18 on October 4, 2021. Since its peak, the price of XTZ has persistently declined.



861.    As of 10:00 a.m. Eastern time on March 10, 2022, XTZ was trading at $3.00—a decline of 67.3 percent from its October 4, 2021 peak.

862.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in XTZ tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for XTZ tokens and paid Coinbase a fee for executing the transaction.

863.    Purchasers of XTZ on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each XTZ token is fungible with all others, and the fortunes of all

XTZ investors are "linked to each other [and] to the success of [the] efforts" of the Tezos Foundation.[111]

864.    XTZ investors reasonably expected to earn profits through the appreciation in value of their XTZ tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Tezos Foundation.

865.    XTZ is the native token of Tezos, which the Tezos Foundation describes as "an open-source, self-upgradable, energy-efficient and built to last Proof of Stake blockchain protocol for assets and applications backed by a global community of validators, researchers, and builders." XTZ is used to pay fees for transactions on the Tezos blockchain. Holding at least 8,000 XTZ also allows users to participate in "baking," the process of validating transactions for addition to the Tezos blockchain.

866.    Tezos was initially developed by Arthur Breitman and Kathleen Breitman (together the "Breitmans"), the co-founders of Dynamic Ledger Solutions, Inc. ("DLS"), a for-profit company. Even before XTZ existed, DLS promoted the narrative that the token would be a profitable investment. For example, in February 2017, Arthur Breitman announced in a blog post that the investment firm Polychain Capital had "preorder[ed] Tezos tokens." Commenting on the rationale for the transaction, Mr. Breitman stated: "Cryptocurrencies comprise a $17B market. Bitcoin commands most of that market cap. But as new blockchain technologies emerge, many feel that the overall value of the market will grow astronomically." Similarly, Kathleen Breitman stated in an interview with *Bitcoin Magazine* about the Polychain Capital transaction: "We created

---

[111] *Id.*

a product that was purchased by VC investors without the traditional equity investment model because of the anticipated appreciation of our token."

867.    In July 2017, DLS and the Tezos Foundation together conducted one of the largest ICOs to date, raising approximately $232 million worth of Bitcoin and Ethereum in exchange for future XTZ tokens, which the Tezos Foundation would issue. The Tezos Foundation used proceeds of the ICO to fund its operations, including efforts to maintain and develop Tezos' technology and to promote its adoption.

868.    Investors in the Tezos ICO relied on the Tezos Foundation and the Breitmans to contribute the managerial efforts needed to make Tezos operational and create value in XTZ tokens. In an October 2017 blog post, the Breitmans wrote that they planned to play active "roles going forward" and predicted that the Tezos Foundation would "increase … the pace of the remaining work to be done to bring the Tezos technology to the point where it is sufficiently secure and scalable to be launched."

869.    The Tezos Foundation remains an active participant in the development and promotion of Tezos. It employs a "day-to-day team" of "nearly 20 staff members split between finance, IT and security, operations, and legal," according to its website.

870.    The Tezos Foundation describes itself as "sustainably deploy[ing] the resources that are under control to support the long-term success of Tezos," including by making grants to developers of Tezos-based projects.

871.    The Tezos Foundation's role in developing and promoting Tezos is not limited to its grantmaking function. According to a September 2021 article in *Decrypt* based on interviews with the Breitmans, Arthur Breitman recently joined the board of the Tezos Foundation and has "taken on a more active role in shepherding" Tezos. Kathleen Breitman has recently engaged in

public advocacy supporting Tezos; on information and belief, this work is coordinated with the Tezos Foundation. *Decrypt* reported that "[t]he Breitmans' renewed attention has been a welcome development for the project's beleaguered token holders."

872. Investors thus rely on the Tezos Foundation to perform "essential tasks [and] responsibilities," including "the development, improvement (or enhancement), operation, [and] promotion of the network" in which XTZ operates.[112]

873. Apart from its speculative value as an investment, XTZ offers little direct utility. Although XTZ is used for certain functions on the Tezos blockchain, this utility is meaningful only to purchasers who are active users of that blockchain.

874. There are few, if any, goods or services that investors can directly purchase using XTZ. To the extent that XTZ can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XTZ and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XTZ are motivated by the expectation of profits.[113]

875. Many XTZ investors hold amounts of XTZ with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XTZ.

876. XTZ investors' own words confirm that their investments are motivated by the expectation of profit. For example, Kevin Zhou, a co-founder of the cryptocurrency trading fund Galois Capital, was quoted by *Reuters* as saying that he, like "a lot of people," purchased XTZ as

---

[112] *Id.*

[113] *Id.*

205

"an investment" and was "looking for a return," and that that he did not "really care about" using Tezos.

877.    XTZ is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XTZ] or those who have a need for the functionality of the network," further demonstrating that XTZ investors are motivated by the expectation of profits.[114] The Tezos Foundation has promoted widespread trading of XTZ—including among investors with no personal need for the functionality of the Stellar network and no expectation of directly purchasing goods or services with XTZ—by working to make XTZ available for retail trading on exchange platforms such as the Coinbase Exchanges.

878.    The Tezos Foundation remains, in its own words, "a large holder" of XTZ. The Tezos Foundation is thus "able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public," which suggests that there is a reasonable expectation of profit for holders of XTZ.[115]

879.    Coinbase itself has admitted that XTZ may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council, has given XTZ a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued. In explaining its rating of XTZ, the Crypto Rating Council noted XTZ's 2017 ICO and further noted that "[t]he Tezos Foundation plays an ongoing role in the development and adoption of Tezos."

---

[114] *Id.*

[115] *Id.*

880.    Based on the above facts, among others, XTZ qualifies as an investment contract and therefore a security.

881.    The Tezos Foundation discloses far less information about XTZ and Tezos than is required under federal and state securities laws. The Tezos Foundation releases two reports per year, but these reports are brief and do not contain the information required for a securities offering. Moreover, the Tezos Foundation explicitly refuses to publish audited financial information, claiming that non-disclosure agreements prevent it from doing so.

882.    The Tezos Foundation has explicitly denied that XTZ is a security.[116] The Tezos Foundation has also sought to persuade investors that XTZ is not a security through misleading communications that downplay its essential managerial efforts. For example, the Tezos Foundation's website prominently states that it is only "one among many other entities in the Tezos ecosystem," while providing little information about its day-to-day work.

883.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in XTZ on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own XTZ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought XTZ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

---

[116] *See* Tezos Stiftung's Answer at 18, *In re Tezos Sec. Litig.*, No. 3:17-cv-06779-RS, ECF No. 169 (N.D. Cal. Sept. 14, 2018).

207

77.    **XYO**

884.    XYO coin ("XYO") is a token created by XYO Network. The first *bona fide* public offering of XYO occurred on or about May 21, 2018.

885.    Investors in XYO reasonably expected to receive profits from their investment in XYO. They expected these profits to derive from the efforts of XYO Network. XYO was marketed as deriving value from its ability to power the XYO Network, a decentralized network of devices that anonymously collect and validate geospatial data, and to be exchanged for tokens corresponding to this data. The value of XYO thus depends on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained the network of devices and created tokens for which XYO could in turn be exchanged.

886.    There are few, if any, goods or services that can be directly purchased using XYO. To the extent that XYO can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of XYO. Accordingly, all or nearly all XYO traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

887.    Based on the foregoing facts, among others, XYO qualifies as an investment contract and therefore a security. However, XYO has never been registered as a security.

888.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in XYO on and with Coinbase. Certain members of the class currently own XYO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the Class, including Plaintiff Underwood, bought XYO tokens on the Coinbase Exchanges that they subsequently sold

on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in XYO.

### 78.    YFI

889.    yearn.finance ("YFI") is a token created, issued, and distributed by Yearn Finance.

890.    YFI was first *bona fide* offered to the public on or about December 30, 2020.

891.    YFI became available for trading on the Coinbase Pro Platform on or about September 15, 2020. YFI became available for trading on the Coinbase Platform on or about September 17, 2020. Since becoming available on the Coinbase Platform, YFI has continuously been traded on the Coinbase Exchanges.

892.    After YFI was listed on the Coinbase Platform, its price rose by approximately 168.1 percent and peaked at $93,435.53 on May 12, 2021. Since then, the price has declined substantially.



893.    As of 10:00 a.m. Eastern time on March 10, 2022, YFI was trading at $19,002.42—

a decline of 79.7 percent from its May 12, 2021 peak.

894.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Rodriguez, invested in YFI tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for YFI tokens and paid Coinbase a fee for executing the transaction.

895.    Purchasers of YFI on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each YFI token is fungible with all others, and the fortunes of all YFI investors are "linked to each other [and] to the success of [the] efforts" of YFI's developers, promoters, and distributors.[117]

896.    YFI investors reasonably expected to earn profits through the appreciation in value of their YFI tokens. They expected such profits to result predominantly, if not solely, from the efforts of Yearn Finance. The YFI token is tied to the yearn.finance protocol, which is designed to help with the optimization of yield farming of other crypto-assets. YFI thus only has any application if the yearn.finance protocol is developed, promoted, and maintained by Yearn Finance.

897.    YFI's supply is entirely centralized, in contrast with cryptocommodities like Bitcoin. Purchasers of YFI thus depend on Yearn Finance to keep supply controlled. Issuances of additional YFI are approved by six of the nine members of the Yearn multisig, which acts like a board of directors for a traditional security. On February 2, 2022, Yearn Finance issued an additional 6,666 YFI, representing a 20 percent increase in the amount available.

898.    Additionally, like a traditional security, YFI provides voting rights that allow holders to participate in the governance of the yearn.finance protocol. This right means that holders

---

[117] Howey Framework Report.

of YFI are participating in a common enterprise. Moreover, the value of this voting right depends on the development and maintenance of the yearn.finance protocol.

899.    Many YFI investors hold amounts of YFI with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with YFI.

900.    Despite its direct utility being largely or exclusively limited to a narrow class of users, YFI is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for YFI] or those who have a need for the functionality of the network," further demonstrating that YFI investors are motivated by the expectation of profits.[118]

901.    Yearn Finance has promoted widespread trading of YFI—including among investors with need for the functionality of its network—by working to make YFI available for retail trading on exchange platforms such as the Coinbase Exchanges.

902.    Based on the above facts, among others, YFI qualifies as an investment contract and therefore a security.

903.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in YFI on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own YFI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought YFI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

_____

[118] *Id.*

### 79.    ZRX

904.    0x ("ZRX") is a token created by 0x. The first *bona fide* public offering of ZRX occurred on or about August 15, 2017.

905.    Investors in ZRX reasonably expected to receive profits from their investment in ZRX. They expected these profits to derive from the efforts of 0x. ZRX was marketed as deriving value from its ability to be used to vote on updates to the 0x protocol, which is designed to allow Ethereum tokens to be traded at a low cost directly from a user's wallet. This voting right, which resembles the voting rights of many traditional securities, means that ZRX purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer to create and maintain an open protocol for decentralized peer-to-peer exchange of Ethereum tokens regarding which ZRX holders could vote.

906.    There are few, if any, goods or services that can be directly purchased using ZRX. To the extent that ZRX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ZRX. Accordingly, all or nearly all ZRX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

907.    Based on the foregoing facts, among others, ZRX qualifies as an investment contract and therefore a security. However, ZRX has never been registered as a security.

908.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in ZRX on and with Coinbase. Certain members of the Class, including Plaintiff Oberlander, currently own ZRX tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the Class, including Plaintiffs Oberlander and Underwood,

bought ZRX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in ZRX.

### B. COINBASE OFFERS AND SELLS UNREGISTERED SECURITIES

909. Because the Tokens are unregistered securities and because Coinbase offers the Tokens for sale on the Coinbase Exchanges, Coinbase has sold unregistered securities to Plaintiffs and members of the Class.

910. The structure of Coinbase means that it is the counterparty in every transaction in a Token on the Coinbase Exchanges. Customers only exchange funds and crypto-assets with Coinbase itself, and never with other users. All transactions in the Tokens made on Coinbase are reflected only in Coinbase's internal records, and Coinbase itself receives all funds and provides all Tokens purchased. Coinbase is thus in privity with each Coinbase customer in each of their transactions, and is the seller whenever a customer buys a token on Coinbase.

911. Moreover, Coinbase solicits the Tokens for sale in order to earn trading fees. Coinbase promotes the sale of Tokens by providing users with descriptions of each Token and its purported value proposition. Coinbase also participated in direct promotions, including "airdrops" of free Tokens designed to increase trading volume. Coinbase also writes news updates on price movements of the Tokens, and links to stories about the Tokens published across the internet. These solicitations profit Coinbase by increasing the number of transactions on the Coinbase Exchanges and thus the fees paid to Coinbase; these solicitations are thus motivated at least in part by a desire to serve their own financial interests.

C. **THE COINBASE EXCHANGES ARE RULE 3b-16(a) SYSTEMS AND THEREFORE ARE UNREGISTERED "EXCHANGES" UNDER THE EXCHANGE ACT**

912.     The Coinbase Exchanges satisfy the criteria of Exchange Act Rule 3b-16(a) and are not exempted under Rule 3b-16(b). As described above, the Coinbase Platform and the Coinbase Pro Platform each bring together orders of multiple buyers and sellers. The Coinbase Platform and the Coinbase Pro Platform each receive and store digital asset buy and sell orders for Tokens from their users. The Coinbase Platform and the Coinbase Pro Platform each provided the means for these orders to interact and execute through the combined use of the Coinbase and Coinbase Pro websites, mobile apps, order books, and pre-programmed trading rules protocols defined in the Coinbase and Coinbase Pro trading engine. These established non-discretionary methods allowed Coinbase and Coinbase Pro users to agree upon the terms of their trades in Tokens on Coinbase and Coinbase Pro during the Class Period.

913.     Coinbase is thus an "organization ... which ... maintains [and] provides a marketplace or facilities for bringing together purchasers and sellers" of digital assets. *See* 15 U.S.C. § 78c. As discussed in further detail below, because many of the digital assets listed on the Coinbase Exchanges are securities, the Coinbase Platform and the Coinbase Pro Platform each meet the statutory definition of an exchange under the Exchange Act. *Id.*

D. **COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER ON THE COINBASE EXCHANGES**

914.     Coinbase's activities further meet the definition of both a "broker-dealer" under the Exchange Act. The Exchange Act defines "broker" in part as an entity that is "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

915.    For example, during the Class Period, Coinbase operated as a broker by effecting transactions in Tokens for users of the Coinbase Exchanges by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker-dealer by facilitating the sale of Tokens as part of ICOs. For example, on February 28, 2019 Coinbase announced that the Token XRP was available for trading on the Coinbase Platform. As discussed above, the SEC has charged Ripple Labs Inc., the founder, developer, and issuer of XRP with operating one long continuous ICO from 2013 to the present, which includes the period of time during which Coinbase facilitated the sale of XRP by listing it for trading and facilitating transactions for XRP.

916.    Coinbase's activities also meet the Exchange Act's definition of "dealer", which includes entities that are "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." 15 U.S.C. § 78c(a)(5)A). During the Class Period, Coinbase operated as a dealer as defined by the Exchange Act by, *inter alia,* (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Tokens; (2) maintaining custody over Coinbase Exchange customers' Tokens; (3) by providing customers services such as allowing purchase of Tokens on credit; (4) by having a regular turnover inventory of Tokens; (5) by purchasing Tokens for accounts in Coinbase's name (often at a discount to the ICO price); and (6) selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

## CLASS ACTION ALLEGATIONS

917.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

918.   Plaintiffs seek class certification on behalf of a class defined as follows:

**NATIONWIDE CLASS:** all persons or entities who transacted in the Tokens on the Coinbase Platform and/or the Coinbase Pro Platform during the Class Period.

919.   Plaintiffs seek certification of the following subclasses as follows:

**CALIFORNIA SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of California.

**FLORIDA SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of Florida.

**NEW JERSEY SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of New Jersey.

920.   Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

921.   Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

922.   **Ascertainability**. The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they

216

are part of a Class or Subclass. Further, the Class and Subclasses can be readily identified through records maintained by Defendant.

923.    **Numerosity (Rule 23(a)(1))**. The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclasses, as herein identified and described, is not known, upon information and belief there are thousands of purchasers, if not more, who transacted on the Coinbase Exchanges.

924.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

- whether Coinbase offered certain digital assets for sale;

- whether Coinbase offered digital assets for sale that constitute securities under the federal securities laws;

- whether Coinbase knew or should have known that certain digital assets it listed for trading were securities;

- whether Coinbase operated as a securities exchange as defined by the federal securities laws;

- whether Coinbase operated as a broker-dealer as defined by the federal securities laws;

- whether Coinbase violated the federal securities laws;

- whether Plaintiffs and the members of the Class and Subclasses are entitled to damages and the amount and measure thereof; and

- whether Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

925.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses. Plaintiffs and members of the Class and Subclasses (as applicable) suffered injuries as a result of Coinbase's wrongful conduct that is uniform across the Class and Subclasses.

217

926.   **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

927.   **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclasses is impracticable. The prosecution of separate actions by individual members of the Class and Subclasses would impose heavy burdens upon the courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

928.   Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual

members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

929.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Coinbase acted or refused to act on grounds generally applicable to the Class and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

930.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Offer and Sale of Unregistered Securities
Sections 5 and 12(a)(1) of the Securities Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

931.    Plaintiffs reallege the allegations above.

932.    Plaintiffs bring this Cause of Action as to each Token that was first *bona fide* offered to the public within three years of the October 8, 2021 filing of the Complaint (each a "12(a)(1) Token"). The 12(a)(1) Tokens are: 1INCH, AAVE, ACH, AGLD, ALGO, AMP, ARPA, AUCTION, AXS, BAL, BAND, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, DOT, FARM, FET, FORTH, GRT, GTC, ICP, KEEP, NU, OGN, ORN, OXT, PLA, QUICK, RARI, SHIB, SKL, SOL, SUSHI, TRB, TRIBE, UMA, UNI, and YFI.

933.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails

219

to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

934.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

935.    All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1). No registration statements have been filed with the SEC or have been in effect with respect to any of the Tokens listed on the Coinbase Exchanges.

936.    Throughout the Class Period, Coinbase Global and Coinbase, Inc. promoted, solicited, offered, and sold 12(a)(1) Tokens to Plaintiffs and members of the Class. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a 12(a)(1) Token, including those by Plaintiffs and Class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

937.    In addition, by offering 12(a)(1) Tokens to Plaintiffs and members of the Class, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of

12(a)(1) Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of 12(a)(1) Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of 12(a)(1) Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for 12(a)(1) Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

938.    Coinbase Global and Coinbase, Inc. thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

939.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

940.    Accordingly, Defendants Coinbase Global and Coinbase, Inc. have violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1).

941.    Plaintiffs and Class members who purchased 12(a)(1) Tokens on the Coinbase Exchanges and subsequently sold those 12(a)(1) Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any 12(a)(1) Tokens purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

## SECOND CAUSE OF ACTION

**Control Person Liability for Violations of the Securities Act**
**Section 15 of the Securities Act**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of All Plaintiffs and Class Members)**

942.    Plaintiffs reallege the allegations above.

943.    This Count is asserted against Coinbase Global and Brian Armstrong for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

944.    Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.* § 77o(a).

945.    At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

946.    Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Securities Act as described herein, including by promoting, soliciting, offering, and selling unregistered securities to Plaintiffs and members of the Class in violation of sections

222

5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1). Coinbase, Inc. is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

947.　At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Coinbase Global purposefully decided not to do so.

948.　Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Securities Act alleged herein. Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under section 12(a)(1) of the Securities Act.

949.　Accordingly, Coinbase Global is jointly and severally liable for the violations of the Securities Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the Class for damages as to each transaction in which any 12(a)(1) Token purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

950.　With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under the First Cause of Action.

951.　As CEO and founder of both Coinbase Global and Coinbase Inc., Brian Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

952.　Armstrong purposefully exercised its power and influence to cause Coinbase to violate the Securities Act as described herein, including by directing Coinbase not to register as an

exchange or broker-dealer prior to offering and selling securities to Plaintiffs and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1). Coinbase is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

953.     At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Armstrong purposefully decided not to do so.

954.     Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Securities Act alleged herein. Armstrong had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase's liability under Section 12(a)(1) of the Securities Act.

955.     Accordingly, Armstrong is jointly and severally liable for the violations of the Securities Act by Coinbase complained of herein and is liable to Plaintiffs and the Class for damages, inclusive of transaction fees, as to each transaction in which any 12(a)(1) Token purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

### THIRD CAUSE OF ACTION

**Illegal Contracts to Pay Transaction Fees to an Unregistered Exchange**
**Sections 5 and 29(b) of the Exchange Act**
**(Against Coinbase Global and Coinbase, Inc.)**
**(On Behalf of All Plaintiffs and Class Members)**

956.     Plaintiffs reallege the allegations above.

957.     In relevant part, section 5 of the Exchange Act makes it unlawful "for any … exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered

as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

958.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens. Coinbase has operated the Coinbase Exchanges throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

959.    The Coinbase Exchanges are exchanges because they provide a market place and facilities for bringing together purchasers and sellers of Tokens. *Id.* All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

960.    Coinbase and the Coinbase Exchanges have never been registered as national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration. *See id.* § 78e.

961.    Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

962.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member. Pursuant to these contracts, Plaintiffs and Class members paid Coinbase transaction fees to fulfill purchase orders for Tokens.

963.    The foregoing contracts were made in violation of section 5 of the Exchange Act. The performance of these contracts necessarily involves the violation of section 5 because,

pursuant to each such contract, Coinbase was required to continue its practice of operating unregistered exchanges that bring together purchasers and sellers of Tokens.

964.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

965.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

### FOURTH CAUSE OF ACTION

**Illegal Contracts to Pay Transaction Fees to an Unregistered Broker or Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Against Coinbase Global and Coinbase, Inc.)**
**(On Behalf of All Plaintiffs and Class Members)**

966.    Plaintiffs reallege the allegations above.

967.    Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

968.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A).

969.    Coinbase has operated as a broker during the Class Period by facilitating the

226

sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1).

970.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." *Id.* § 78c(a)(5).

971.    Coinbase has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

972.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

973.    Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

974.    Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

975.     In the course of operating as an unregistered broker-dealer, Coinbase has entered into contracts with Plaintiffs and Class members pursuant to which Plaintiffs and Class members paid Coinbase transaction fees to fulfill purchase orders for Tokens.

976.     The foregoing contracts were made in violation of section 15(a)(1) of the Exchange Act. The performance of these contracts necessarily involves the violation of section 15(a)(1) because, pursuant to each such contract, Coinbase was required to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer.

977.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

978.     Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

## FIFTH CAUSE OF ACTION

**Illegal Contracts to Purchase Securities from an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

979.     Plaintiffs reallege the allegations above.

980.     In relevant part, section 5 of the Exchange Act makes it unlawful "for any … exchange, directly or indirectly, to make use of … any means or instrumentality of interstate

commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

981.   Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens. Coinbase has operated the Coinbase Exchanges throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

982.   The Coinbase Exchanges are exchanges because they provide a market place and facilities for bringing together purchasers and sellers of Tokens. *Id.* All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

983.   Coinbase and the Coinbase Exchanges have never been registered as a national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration. *See id.* § 78e.

984.   Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

985.   Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member. Coinbase induced Plaintiffs and Class members to enter these contracts for the purchase of Tokens during the Class Period. Coinbase did

so by promoting, soliciting, offering, and selling Tokens to Plaintiffs and members of the Class. In seeking to induce Plaintiffs and members of the Class to purchase Tokens, Coinbase Global and Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

986.   The contracts that Coinbase induced Plaintiffs and Class members to enter for the purchase of Tokens were made in violation of section 5 of the Exchange Act, 15 U.S.C. § 78e. The performance of these contracts necessarily involves the violation of section 5 because each such contract could not be performed unless Coinbase continued its practice of operating an unregistered exchange that brings together purchasers and sellers of Tokens.

987.   Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." *Id.* § 78cc(b).

988.   Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased, on any Coinbase Exchange, any Token that they later sold at a loss. Plaintiffs hereby offer to tender to Coinbase, Inc., the

Tokens or substantial equivalent realized upon sale of all Tokens they purchased on any Coinbase Exchange and later sold at a loss. In exchange for such tender, Plaintiffs and the Class are entitled to recover the amount of consideration they paid to purchase the tendered Tokens.

## SIXTH CAUSE OF ACTION

**Illegal Contracts To Purchase Securities From an Unregistered Broker or Dealer
Sections 15(a)(1) and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

989.    Plaintiffs reallege the allegations above.

990.    Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

991.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78c(a)(4)(A).

992.    Coinbase has operated as a broker during the Class Period by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id*. § 77b(a)(1).

993.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." *Id*. § 78c(a)(5).

994.     Coinbase has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

995.     Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

996.     Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

997.     Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

998.     Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member. Coinbase induced Plaintiffs and Class members to enter contracts for the purchase Tokens during the Class Period. Coinbase did so by promoting, soliciting, offering, and selling Tokens to Plaintiffs and members of the Class. In seeking to induce Plaintiffs and members of the Class to purchase Tokens, Coinbase Global and Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further

benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

999.   The contracts that Coinbase induced Plaintiffs and Class members to enter for the purchase of Tokens were made in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). The performance of these contracts necessarily involves the violation of section 15(a)(1) because each such contract could not be performed unless Coinbase continued its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer. Furthermore, Coinbase violated section 15(a)(1) by inducing Plaintiffs and Class members to enter these contracts—and thus engaging in the business of effecting transactions in securities for the account of others, the business of buying and selling securities for Coinbase's own account, or both—without being registered as a broker or dealer.

1000.   Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

1001.   Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased, on any Coinbase Exchange, any Token that they later sold at a loss. Plaintiffs hereby offer to tender to Coinbase, Inc, the Tokens or substantial equivalent realized upon sale of all Tokens they purchased on any Coinbase

Exchange and later sold at a loss. In exchange for such tender, Plaintiffs and the Class are entitled to recover the amount of consideration they paid to purchase the tendered Tokens.

## SEVENTH CAUSE OF ACTION

**Control Person Liability for Violations of the Exchange Act**
**Section 20 of the Exchange Act**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of All Plaintiffs and Class Members)**

1002.   Plaintiffs reallege the allegations above.

1003.   This Count is asserted against Coinbase Global and Brian Armstrong for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

1004.   Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

1005.   At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

1006.   Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell

Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of sections 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

1007.   At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer. Coinbase Global purposefully decided not to do so.

1008.   Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Exchange Act alleged herein.

1009.   Accordingly, Coinbase Global is jointly and severally liable for the violations of the Exchange Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

1010.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under any of the Third through Sixth Causes of Action.

1011.   At the time of the wrongs alleged herein, because Armstrong is the founder and CEO of both Coinbase Global and Coinbase, Inc., Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

235

1012.   Armstrong purposefully exercised his power and influence to cause Coinbase to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

1013.   At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer. Armstrong purposefully decided not to do so.

1014.   Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Exchange Act alleged herein.

1015.   Accordingly, Armstrong is jointly and severally liable for the violations of the Exchange Act by Coinbase complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

## EIGHTH CAUSE OF ACTION

### Offer or Sale of Unqualified Securities
### Cal. Corp. Code §§ 25110, 25130, and 25503
### (Against All Coinbase Global and Coinbase, Inc.)
### (On Behalf of the California Subclass)

1016.   Plaintiffs reallege the allegations above.

1017.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

236

1018.   The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of section 25110 or 25130 is "liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

1019.   A security includes, *inter alia*, an "investment contract." *Id.* § 25019.

1020.   The Tokens are, and at all relevant times have been, securities within the meaning of the California Securities Act. *Id.* § 25019. The Tokens were neither qualified under the California Securities Act nor exempt from qualification. *Id.* §§ 25110, 25130.

1021.   During the Class Period, Coinbase Global and Coinbase, Inc. offered or sold the Tokens to at least one Plaintiff in California and numerous Class members in California. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a Token, including those by Plaintiffs and Class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

1022.   Moreover, in offering Tokens to Plaintiffs and members of the Class in California, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at

least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1023.   Throughout the Class Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

1024.   Accordingly, Coinbase Global and Coinbase, Inc. have violated the California Securities Act through their sale of unqualified securities.

1025.   Members of the California Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## NINTH CAUSE OF ACTION

**Sale of Securities by an Unregistered Broker-Dealer**
**Cal. Corp. Code §§ 25210 and 25501.5(a)**
**(Against Coinbase Global and Coinbase, Inc.)**
**(On Behalf of the California Subclass)**

1026.   Plaintiffs reallege the allegations above.

1027.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

1028.  The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. Cal. Corp. Code § 25210.

1029.  A "broker-dealer" includes "any person engaged in the business of effecting transactions in securities in [California] for the account of others or for that person's own account" and any "person engaged in the regular business of issuing or guaranteeing options with regard to securities not of that person's own issue." *Id.* § 25044. A security includes, *inter alia*, an "investment contract." *Id.* § 25019.

1030.  Coinbase Global and Coinbase, Inc. have operated as broker-dealers in California during the Class Period. Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for their own account by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in their own name (often at a discount to the ICO price), and by selling Tokens from their inventory to investors for profit. All Tokens are, and at all relevant times have been, securities as defined by California law.

1031.   Throughout the Class Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

1032.   Coinbase Global and Coinbase, Inc. have never registered or applied for registration as a broker-dealer under California law. Coinbase Global and Coinbase, Inc. do not qualify for any exemption from registration of broker-dealers under California law.

1033.   Coinbase Global and Coinbase, Inc. have thus operated as unregistered broker-dealers in violation of Cal. Corp. Code § 25210.

1034.   In the course of operating as unregistered broker-dealers, Coinbase Global and Coinbase, Inc. have sold Tokens to members of the California Subclass. Coinbase Global and Coinbase, Inc. solicited members of the California Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1035.   Under California law, any person who offers or sells a security in violation of Cal. Corp. Code § 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of

the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 25501.5(a)(4).

1036.    Accordingly, Coinbase Global and Coinbase, Inc. have violated Cal. Corp. Code §§ 25210 and 25501.5(a).

1037.   Members of the California Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## TENTH CAUSE OF ACTION

**Control Person Liability for Violations of the California Securities Act**
**Cal. Corp. Code § 25504**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of the California Subclass)**

1038.   Plaintiffs reallege the allegations above.

1039.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

1040.   Every person who directly or indirectly controls a person liable under the California Securities Act for unlawfully selling unqualified securities is "liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." Cal. Corp. Code § 25504.

1041.   At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. By virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, Coinbase Global had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct

complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

1042.    Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the California Securities Act as described herein, including by selling unqualified securities in violation of Cal. Corp. Code §§ 25110 and 25130. Coinbase, Inc. is liable under Cal. Corp. Code § 25503 for its sales of unqualified securities.

1043.    At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from selling unqualified securities in violation of the California Securities Act. Coinbase Global purposefully decided not to do so.

1044.    Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the California Securities Act alleged herein. Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under Cal. Corp. Code § 25503.

1045.    Accordingly, Coinbase Global is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the California Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

1046.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under either the Eighth or Ninth Causes of Action.

1047.   At the time of the wrongs alleged herein, Armstrong controlled both Coinbase Global and Coinbase, Inc. As CEO and founder of both entities, Armstrong was a principal executive officer of both entities.

1048.   Armstrong knew of Coinbase's violations of Cal. Corp. Code §§ 25110 and 25130 because he was aware both of Coinbase's lack of appropriate registration and the fact that Coinbase was selling the Tokens.

1049.   Accordingly, as a "principal executive officer" of a liable corporation who had knowledge of the facts by which liability is alleged to exist, Armstrong is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the California Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

### ELEVENTH CAUSE OF ACTION

**Offer or Sale of Unregistered Securities**
**Fla. Stat. §§ 517.07 and 517.211**
**(Against 618.  Coinbase Global and Coinbase, Inc)**
**(On Behalf of the Florida Subclass)**

1050.   Plaintiffs reallege the allegations above.

1051.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in Florida.

1052.   The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities. Fla. Stat. § 517.07(1). Any person who offers or sells a security in violation of section 517.07(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as

243

reasonable attorneys' fees. *Id.* § 517.211.

1053.   A security includes, *inter alia*, an "investment contract." *Id.* § 517.021(22)(q).

1054.   The Tokens are, and at all relevant times have been, securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22)(q). The Tokens were neither registered under the Florida Securities and Investor Protection Act nor exempt from registration. *Id.* §§ 517.051, 517.061.

1055.   During the Class Period, Coinbase Global and Coinbase, Inc offered or sold the Tokens to at least one Plaintiff in Florida and numerous Class members in Florida. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc are in privity in every sale of a Token, including those by Plaintiffs and class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

1056.   Moreover, in offering Tokens to Plaintiffs and members of the Class in Florida, Coinbase Global and Coinbase, Inc solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1057.   Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to Florida, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in Florida and received by users in Florida.

1058.   Accordingly, Coinbase Global and Coinbase, Inc have violated the Florida Securities and Investor Protection Act through their sale of unregistered securities.

1059.   Members of the Florida Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in Florida during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## TWELFTH CAUSE OF ACTION

### Sale of Securities by an Unregistered Dealer
### Fla. Stat. §§ 517.12(1) and 517.211
### (Against Coinbase Global and Coinbase, Inc)
### (On Behalf of the Florida Subclass)

1060.   Plaintiffs reallege the allegations above.

1061.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Florida Subclass members who bought and sold Tokens on the Coinbase Exchanges in Florida during the Class Period.

1062.   The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. Fla. Stat. § 517.12(1).

1063.   A "dealer" includes a person who "engages … directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." *Id.* § 517.021(6)(a)(1). A security includes, *inter alia*, an "investment contract." *Id.* § 517.021(22)(q).

1064.   Coinbase Global and Coinbase, Inc have operated as dealers in Florida during the Class Period. Coinbase Global and Coinbase, Inc have engaged in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by others. They have done so by

facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment; by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets; by having regular customers; by maintaining custody over customers' Tokens; by providing customers with access to services allowing purchase of Tokens on credit; by having a regular turnover inventory of securities; by purchasing Tokens for accounts in their own name (often at a discount to the ICO price); and by selling Tokens from their inventory to investors for profit. All Tokens are, and at all relevant times have been, securities as defined by Florida law.

1065.   Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to Florida, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in Florida and received by users in Florida.

1066.   Coinbase Global and Coinbase, Inc have never registered or applied for registration as a dealer under Florida law. Coinbase Global and Coinbase, Inc do not qualify for any exemption from registration of broker-dealers under Florida law.

1067.   Coinbase Global and Coinbase, Inc have thus operated as unregistered dealers in violation of Fla. Stat. § 517.12(1).

1068.   In the course of operating as unregistered dealers, Coinbase Global and Coinbase, Inc have sold Tokens to members of the Florida Subclass. Coinbase Global and Coinbase, Inc solicited members of the Florida Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc

received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1069.   Under Florida law, any person who sells a security in violation of Fla. Stat. § 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorney fees. *Id*. § 517.211.

1070.   Accordingly, Coinbase Global and Coinbase, Inc have violated Fla. Stat. §§ 517.12(1) and 517.211.

1071.   Members of the Florida Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## THIRTEENTH CAUSE OF ACTION

### Offer or Sale of Unregistered Securities
### N.J. Stat. §§ 49:3-60 and 49:3-71
### (Against Coinbase Global and Coinbase, Inc)
### (On Behalf of the New Jersey Subclass)

1072.   Plaintiffs reallege the allegations above.

1073.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

1074.   The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities. N.J. Stat. § 49:3-60(e). Any person who offers or sells a security in violation of section

49:3-60 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 49:3-71. A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 49:3-71(c).

1075.   A security includes, *inter alia*, an "investment contract." *Id.* § 49:3-49(m).

1076.   The Tokens are, and at all relevant times have been, securities within the meaning of the New Jersey Uniform Securities Act. *Id.* The Tokens were neither registered under the New Jersey Uniform Securities Act nor exempt from registration. *Id.* § 49:3-50.

1077.   During the Class Period, Coinbase Global and Coinbase, Inc offered are sold Tokens to at least one Plaintiff in New Jersey and numerous Class members in New Jersey. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc are in privity in every sale of a Token, including those by Plaintiffs and class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

1078.   Moreover, in offering Tokens to Plaintiffs and members of the Class in New Jersey, Coinbase Global and Coinbase, Inc solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1079.   Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to New Jersey, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in New Jersey and received by users in New Jersey.

1080.   Accordingly, Coinbase Global and Coinbase, Inc have violated the New Jersey Uniform Securities Act through their sale of unregistered securities.

1081.   Members of the New Jersey Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## FOURTEENTH CAUSE OF ACTION

**Sale of Securities by an Unregistered Broker-Dealer**
**N.J. Stat. §§ 49:3-56(a) and 49:3-71**
**(Against Coinbase Global and Coinbase, Inc)**
**(On Behalf of the New Jersey Subclass)**

1082.   Plaintiffs reallege the allegations above.

1083.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

1084.   Under New Jersey law, it is unlawful for any person to act as a broker-dealer unless that person is registered or exempt from registration. N.J. Stat. § 49:3-56(a).

1085.   A "broker-dealer" includes "any person engaged in the business of effecting or attempting to effect transactions in securities for the accounts of others or for his own account." *Id.* § 49:3-49(c). A security includes, *inter alia*, an "investment contract." *Id.* § 49:3-49(m).

1086.   Coinbase Global and Coinbase, Inc have operated as broker-dealers in New Jersey during the Class Period. Coinbase Global and Coinbase, Inc have engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of Tokens in

exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. Coinbase Global and Coinbase, Inc have engaged in the business of effecting transactions in securities for their own account by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in their own name (often at a discount to the ICO price), and by selling Tokens from their inventory to investors for profit. All Tokens are, and at all relevant times have been, securities as defined by New Jersey law.

1087.   Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to New Jersey, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in New Jersey and received by users in New Jersey.

1088.   Coinbase Global and Coinbase, Inc have never registered or applied for registration as a broker-dealer under New Jersey law. Coinbase Global and Coinbase, Inc do not qualify for any exemption from registration of broker-dealers under New Jersey law.

1089.   Coinbase Global and Coinbase, Inc have thus operated as unregistered broker-dealers in violation of N.J. Stat. § 49:3-56(a).

1090.   In the course of operating as unregistered broker-dealers, Coinbase Global and Coinbase, Inc have sold Tokens to members of the New Jersey Subclass. Coinbase Global and Coinbase, Inc solicited members of the New Jersey Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the

financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

1091.   Under New Jersey law, any person who offers or sells a security in violation of N.J. Stat. § 49:3-56(a) is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 49:3-71. A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 49:3-71(c).

1092.   Accordingly, Coinbase Global and Coinbase, Inc have violated N.J. Stat. §§ 49:3-56(a) and 49:3-71.

1093.   Members of the New Jersey Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## FIFTEENTH CAUSE OF ACTION

**Control Person Liability for Violations of the New Jersey Uniform Securities Act**
**N.J. Stat. § 49:3-71(d)**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of the New Jersey Subclass)**

1094.   Plaintiffs reallege the allegations above.

1095.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

1096.   Every person who directly or indirectly controls a person liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or selling securities as an unregistered broker-dealer is "liable jointly and severally with and to the same extent as the seller … unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts … which give rise to liability." N.J. Stat. § 49:3-71(d).

1097.   At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. By virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, Coinbase Global had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

1098.   Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the New Jersey Uniform Securities Act as described herein, including by (1) selling unregistered securities in violation of N.J. Stat. § 49:3-60(e); and (2) selling securities as an unregistered broker-dealer in violation of N.J. Stat. § 49:3-56(a). Coinbase, Inc. is liable under N.J. Stat. § 49:3-71(a)(1) for its sales of unqualified securities.

1099.   At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from violating the New Jersey Uniform Securities Act. Coinbase Global purposefully decided not to do so.

1100.   Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the New Jersey Uniform Securities Act alleged herein. Coinbase Global knew, or in the exercise of reasonable care could have known, the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under the New Jersey Uniform Securities Act.

1101.   Accordingly, Coinbase Global is jointly and severally liable for the violations of the New Jersey Uniform Securities Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the New Jersey Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss. *See* N.J. Stat. § 49:3-71.

1102.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under either the Thirteenth or Fourteenth Causes of Action.

1103.   Every person who is an officer of a person liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or selling securities as an unregistered broker-dealer is "liable jointly and severally with and to the same extent as the seller … unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts … which give rise to liability." N.J. Stat. § 49:3-71(d).

1104.   Armstrong, as CEO of Coinbase Global and Coinbase, Inc., is an officer of these entities.

1105.   Armstrong knew the existence of the facts that give rise to liability here because he knew that Coinbase was not registered as a securities exchange or as a broker-dealer and that it sold the Tokens, which were unregistered securities. To the extent that he did not know this

information, he could easily have learned that information through the exercise of reasonable care, as that information was publicly available.

1106.   Accordingly, Armstrong is jointly and severally liable for the violations of the New Jersey Uniform Securities Act by Coinbase complained of herein and is liable to Plaintiffs and the New Jersey Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss. *See* N.J. Stat. § 49:3-71.

## PRAYER FOR RELIEF

1107.   WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as to each and every count, including:

- An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representatives of the Class and Subclasses, and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;

- An order declaring that Defendants' actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendants are liable to Plaintiffs, the Class, and the Subclasses, as described herein, for damages arising therefrom;

- An injunction enjoining Coinbase from offering the Tokens for purchase or sale on the Coinbase Exchanges without having registered the Coinbase Exchanges as national securities exchanges or broker-dealers as required by the federal securities laws.

- An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Coinbase from continuing the unlawful practices alleged herein, and injunctive relief to remedy Coinbase's past conduct;

- A judgment awarding Plaintiffs, the Class, and the Subclasses all appropriate damages, in an amount to be determined at trial;

- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement.

- A judgment awarding Plaintiffs, the Class, and the Subclasses prejudgment and post-judgment interest, as permitted by law;

- A judgment awarding Plaintiffs, the Class, and the Subclasses costs and fees, including attorneys' fees, as permitted by law; and

- Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

1108. Plaintiffs demand a trial by jury for all issues so triable.


Dated: March 11, 2022                              Respectfully submitted,
      New York, New York

      By: */s/ Steven L. Bloch*                    By: */s/ Jordan A. Goldstein*
      Steven L. Bloch                              Jordan A. Goldstein
      Ian W. Sloss                                 Mitchell Nobel
      SILVER GOLUB & TEITELL LLP                   SELENDY GAY ELSBERG PLLC
      184 Atlantic Street                          1290 Avenue of the Americas
      Stamford, CT 06901                           New York, NY 10104
      Tel: 203-325-4491                            Tel: 212-390-9000
      sbloch@sgtlaw.com                            jgoldstein@selendygay.com
      isloss@sgtlaw.com                            mnobel@selendygay.com

      *Attorneys for Louis Oberlander, Henry Rodriguez, and Christopher Underwood*

255