UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTOPHER UNDERWOOD, LOUIS
OBERLANDER, and HENRY RODRIGUEZ
on behalf of themselves and all others
similarly situated,

Case No. 1:21-cv-08353-PAE

          Plaintiffs,

**<u>ORAL ARGUMENT REQUESTED</u>**

      v.

COINBASE GLOBAL, INC., COINBASE,
INC., and BRIAN ARMSTRONG,

          Defendant.

**LOUIS OBERLANDER, HENRY RODRIGUEZ, AND CHRISTOPHER
UNDERWOOD'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Steven L. Bloch
Ian W. Sloss
SILVER GOLUB & TEITELL LLP
184 Atlantic Street
Stamford, CT 06901
Tel: 203-325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com

Jordan A. Goldstein
Mitchell Nobel
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
jgoldstein@selendygay.com
mnobel@selendygay.com

*Attorneys for Louis Oberlander, Henry
Rodriguez, and Christopher Underwood*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................2

LEGAL STANDARD .................................................................................................................5

ARGUMENT .............................................................................................................................5

I.     Plaintiffs Plausibly Allege That Coinbase Sold And Solicited The Sale Of
Unregistered Securities In Violation Of Section 12(a)(1) Of The Securities Act ..............5

     A.     Coinbase Is The Seller In Each Transaction ...........................................................5

         1.     Plaintiffs Have Properly Alleged That Coinbase Is The Direct
Seller Of The Tokens ................................................................................6

         2.     Coinbase's Holding Of Customer Assets In Shared Accounts
Means It Is The Direct Seller ....................................................................8

         3.     Coinbase's Attempts To Evade Plaintiffs' Allegations Fail .......................9

     B.     Coinbase's User Agreements Cannot Defeat Plaintiffs' Well-Pleaded
Allegations Regarding Coinbase's Role As A Seller ............................................12

     C.     Coinbase Admits That Plaintiffs' Securities Act Claims Are Properly
Pleaded in All Other Respects .............................................................................16

     D.     Plaintiffs Properly Allege Coinbase Solicited Sales Of The Tokens....................17

II.     Plaintiffs Adequately Plead Claims Under The Exchange Act ........................................17

     A.     Section 29(b) Of The Exchange Act Provides A Private Cause Of Action
To Rescind Contracts That Violate The Act's Registration Requirements
For Securities Exchanges And Broker/Dealers......................................................17

     B.     Plaintiffs Properly Allege That Coinbase Entered Contracts To Sell Them
Securities In Violation Of The Exchange Act's Registration Requirements.........20

     C.     Plaintiffs' Exchange Act Claims Are Timely ......................................................22

III.     The Amended Complaint Provides Adequate Notice To Each Defendant.......................24

IV.     Plaintiffs Properly Plead Federal Control Person Claims...............................................27

V.     The Amended Complaint Properly Pleads Claims Under State Law ...............................29

i

A.  The State Claims Survive For The Same Reason As The Federal Claims ............29

B.  The State Law Claims Are Timely ........................................................................30

C.  The State Law Control Person Claims Survive ....................................................30

CONCLUSION.................................................................................................................................30

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Binance*, 2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ....................................... 11, 23

*Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................ 26

*Badie v. Bank of Am.*, 67 Cal. App. 4th 779 (1998) .................................................................... 14

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) ................................................................... 18

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ........................ 23

*Cohen v. Citibank, N.A.*, 954 F. Supp. 621 (S.D.N.Y. 1996) ...................................................... 19

*CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) ............................................ 28

*Corley v. United States*, 11 F.4th 79 (2d Cir. 2021) ..................................................................... 5

*Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220 (D. Conn. 2000) ........................................................................................................................................ 18

*Demaria v. Gisbex Clearing Corp., S.A.*, 2010 WL 11553316 (S.D. Fla. Nov. 23, 2010) ........... 19

*Direction Assocs., Inc. v. Programming & Sys., Inc.*, 412 F. Supp. 714 (S.D.N.Y. 1976) .......... 24

*Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971) ............................................................. 24

*EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*, 6 F.4th 50 (1st Cir. 2021) ............ 18

*EMA Fin., LLC v. Vystar Corp., Inc*, 2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) .................. 19

*EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 5998411 (S.D.N.Y. Dec. 20, 2021) ................. 19

*Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004) ...................................... 29

*Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) ................................................................... 20

*Giant Food, Inc. v. Washington Coca-Cola Bottling Co., Inc.*, 273 Md. 592 (1975) .................. 21

*GLK, L.P. v. Four Seasons Hotel Ltd.*, 22 So. 3d 635 (Fla. Dist. Ct. App. 2009) ....................... 30

*Goodman v. Shearson Lehman Bros.*, 698 F. Supp. 1078 (S.D.N.Y. 1988) ................................ 19

*Hao Zhe Wang v. Verizon Commc'ns Inc.*, 2020 WL 5982882 (S.D.N.Y. Oct. 8, 2020) ............ 27

*Hom v. Vale, S.A.*, 2016 WL 880201 (S.D.N.Y. Mar. 7, 2016) ................................................... 11

*In re Global Crossing Ltd. Secs. Litig.*, 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ................ 28

*In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392 (S.D.N.Y. 2006) ................................................ 11

*In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ............................................ 28

*In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005). ......................................... 25

*In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) .................................. 11

*In re Refco Sec. Litig.*, 759 F. Supp. 2d 301 (S.D.N.Y. 2010) ....................................................... 8

*In re Tronox, Inc.*, 769 F. Supp. 2d 202 (S.D.N.Y. 2011) ............................................................ 29

*In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ......................................... 28

*Independent Investor Protective League v. N.Y. Stock Exchange*, 367 F. Supp. 1376
    (S.D.N.Y. 1973), ................................................................................................................... 7

*Jackson v. Fischer*, 2015 WL 1143582 (N.D. Cal. Mar. 13, 2015) ............................................ 30

*Jamie S. v. Milwaukee Pub. Schools*, 668 F.3d 481 (7th Cir. 2012) ........................................... 11

*Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020) ................................................................... 5, 6

*McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044 (2d Cir. 1995) ............................. 15, 16

*NovaFund Advisors, LLC v. Capitala Group, LLC*, 2020 WL 230089 (D. Conn. Jan. 14,
    2020) .................................................................................................................................. 18

*Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286 (D. Conn. 1979) ........... 22

Patrico v. Voya Fin., Inc. 2017 WL 2684065 (S.D.N.Y. June 20, 2017) ..................................... 27

*People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358 (S.D.N.Y. 2019). ......................................... 26

*Pinter v. Dahl*, 486 U.S. 622 (1988) ......................................................................... 7, 9, 17, 23

*Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan Acceptance
    Corp.*, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ........................................................... 27

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265
    (S.D.N.Y. 1992) ............................................................................................................. 18, 20

*Regional Props., Inc. v. Fin. & Real Est. Consulting Co.*, 752 F.2d 178 (5th Cir. 1985) ........... 18

*Rodman v. Safeway, Inc.*, 694 F. App'x 612 (9th Cir. 2017) ...................................................... 14

*Rogen v. Ilikon Corp.*, 361 F.2d 260 (1st Cir. 1966) ................................................................. 16

*Roling v. E\*Trade Secs., LLC*, 756 F. Supp. 2d 1179 (N.D. Cal. 2010) ...................................... 14

*Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573 (S.D.N.Y. 2011)................................. 18

*Seafarers Pension Plan ex rel. Boeing Co. v. Bradway*, 23 F.4th 714, 720 (7th Cir. 2022) ........ 16

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ..................................... 28

*See Rhoades v. Powell*, 644 F. Supp. 645 (E.D. Cal. 1986) ......................................... 20

*Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676 (S.D.N.Y. 1984). ............................. 18, 21, 22

*Smith v. Campbell*, 782 F.3d 93 (2d Cir. 2015) ..................................... 23

*Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*, 2021 WL 1199430 (S.D.N.Y. Mar. 30, 2021)........................................................................ 17

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ............................... 17

*U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85 (2d Cir. 2021) ..................................... 12

*Vantone Grp. LLC v. Yangpu NGT Indus. Co., Ltd.*, 2015 WL 4040882 (S.D.N.Y. Jul. 2, 2015) ........................................................................ 25

*Western Fed. Corp. v. Erickson*, 739 F.2d 1439 (9th Cir. 1984).................................. 18

*Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979)................................................. 24

## Statutes

15 U.S.C. § 77n ..................................................................................... 15

15 U.S.C. § 78c ..................................................................................... 21

15 U.S.C. § 78cc .............................................................................. 15, 22, 29

Cal. Corp. Code § 25501........................................................................ 29

Cal. Corp. Code § 25504........................................................................ 30

Fla. Stat. § 517.211 ............................................................................. 29

Fla. Stat. § 95.031 .............................................................................. 30

N.J. Stat. § 49:3-71 .......................................................................... 29, 30

## Treatises

23 Williston on Contracts § 62:22 (4th ed.).................................................. 21

Plaintiffs Louis Oberlander, Henry Rodriguez, and Christopher Underwood, individually and on behalf of all others similarly situated, respectfully submit this memorandum of law in opposition to the Motion to Dismiss ("Motion" or "MTD") filed by Defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc., and Brian Armstrong (together, "Defendants").

## PRELIMINARY STATEMENT

Defendants Coinbase Global and Coinbase, Inc. (together, "Coinbase"), which both act at the direction of Defendant Armstrong, operate crypto-exchanges that offer and sell unregistered securities to investors, in flagrant violation of federal and state securities laws. Plaintiffs are investors who purchased unregistered securities on the Coinbase Exchanges and suffered losses as a result. Plaintiffs are entitled to recover those losses, including the trading fees they incurred.

*First*, Section 12(a)(1) of the Securities Act of 1933 ("Securities Act") imposes strict liability on an entity that sells or solicits the sale of an unregistered security. Coinbase did both. As elaborated in the Amended Complaint, users who trade on Coinbase are in direct privity with Coinbase, and each sale of a digital security occurs between Coinbase and the user, making Coinbase the direct seller of each security. In addition, Coinbase has *solicited* each security for sale by providing a description of the security, making available real-time pricing information, and describing each security's value proposition, all in order to induce its purchase by investors. Defendants have not disputed that the digital assets at issue are unregistered securities, that Plaintiffs purchased them on Coinbase within a year prior to suit, and that Plaintiffs suffered losses as a result. Plaintiffs have therefore pleaded cognizable violations of Section 12(a)(1).

*Second*, Section 29(b) of the Securities Exchange Act of 1934 ("Exchange Act") authorizes a court to void contracts that violate the Exchange Act. The purchases and sales at issue in this action constitute individual contracts that are voidable because they are entirely premised on the illegal purchase or sale of an unregistered security by an unregistered broker/dealer on an

unregistered exchange, in violation of Sections 5 and 15 of the Exchange Act. Because the contracts at issue are facially unlawful (since each is entirely predicated on violations of federal and state law), they are voidable at Plaintiffs' election under Section 29(b). In addition, each claim under Section 29(b) arises from purchases within one year of suit, making the claims timely.

*Third*, Plaintiffs easily meet Rule 8(a)'s notice pleading standard. Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, and the two—as Defendants concede—operate as a single company and common enterprise, all under Defendant Armstrong's singular control. It is proper for Plaintiffs to refer to Coinbase, Inc. and Coinbase Global collectively as "Coinbase" where Plaintiffs' allegations apply to both defendant entities.

*Fourth*, Plaintiffs have adequately pleaded control person claims against Armstrong and Coinbase Global. Armstrong is clearly alleged to control both Coinbase, Inc. and Coinbase Global, and Defendants do not dispute that he controls both companies. Likewise, Coinbase Global is clearly alleged to control Coinbase, Inc.—its wholly owned subsidiary. Contrary to Defendants' claim, Plaintiffs *are* permitted to plead control person claims against Coinbase Global as an alternative to Plaintiffs' primary theory of liability against Coinbase Global.

*Finally*, Plaintiffs' state law claims are properly pleaded for the above reasons, and because the state statutes at issue are either co-extensive with or *broader* than their federal analogues.

## BACKGROUND

The 79 crypto-assets at issue (the "Tokens") are digital assets that use cryptographic principles to secure transactions. AC ¶ 19. Each crypto-asset is based around a blockchain, which serves as a public ledger of every transaction in a given crypto-asset. *Id.* ¶¶ 21, 23. Unlike trades on traditional stock exchanges, these crypto-assets can be transferred directly from one person or entity to another on a blockchain, and such transfers are publicly recorded. *Id.* ¶¶ 26–27.

Crypto-assets can trade on either centralized or decentralized exchanges. *Id.* ¶ 29. On a centralized exchange, such as Coinbase, assets are first transferred to the exchange by a user. *Id.* ¶ 32. For example, if Angela intends to trade Bitcoin for Dogecoin (which is one of the 79 Tokens) on Coinbase, she would first transfer Bitcoin on the blockchain to Coinbase. This results in a movement of assets on the blockchain indicating that the Bitcoin that was formerly held in Angela's cryptographic "wallet" is now held in a wallet owned by Coinbase. *Id.* ¶¶ 23–27, 32–34. The Coinbase wallet that now holds what was formerly Angela's Bitcoin also holds and comingles Bitcoin that Coinbase's other users have likewise transferred to Coinbase. *Id.* ¶¶ 32–34.

Once Angela decides to trade the Bitcoin she previously transferred to Coinbase for a new crypto-asset (here, Dogecoin), that transaction would occur only between Coinbase and Angela. *Id.* ¶ 33. Coinbase would make a notation in Angela's account balance noting that a certain amount of Dogecoin should be attributed to her account instead of a certain amount of Bitcoin. *Id.* At no point would Angela ever interact with a user holding Dogecoin. *Id.* Instead, each step of Angela's transaction, as confirmed by the public blockchain record, would occur only between Angela and Coinbase. *Id.* That is because Coinbase users are not in privity with each other, and face Coinbase directly on every transaction. *Id.*

The assets traded by Coinbase include a number of digital assets that are securities. Unlike commodities such as Bitcoin, which are generated at a fixed rate through a decentralized process known as "mining," the 79 Tokens are created at the discretion of each Token's issuer. *Id.* ¶ 51. These Tokens are often distributed in an Initial Coin Offering, or "ICO," and derive value from a use case that is created by the issuer's promise to create an "ecosystem" in which those Tokens have value. *Id.* ¶¶ 52–54. The Tokens are investment contracts and securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits

3

to be derived from the efforts of others—specifically, the issuer's efforts to build and maintain the promised ecosystem. *Id.* None of the Tokens is registered with the U.S. Securities and Exchange Commission ("SEC") as a security. *Id.* ¶ 4. For purposes of its Motion, Coinbase does not dispute that each Token is an unregistered security. *See* MTD 13.

Plaintiffs Underwood and Oberlander were among the plaintiffs who brought the initial Complaint in this matter on October 8, 2021, along with Zeneyda Patin. ECF No. 1. Plaintiff Rodriguez joined Plaintiffs Underwood and Oberlander in moving to be appointed as lead plaintiffs on December 13, 2021. ECF No. 15. (Initial plaintiff Patin did not move to be a lead plaintiff.) The Court granted Plaintiffs Oberlander, Rodriguez, and Underwood's lead plaintiff motion on January 11, 2022. ECF No. 21. On January 28, 2022, Plaintiffs moved for a temporary restraining order and preliminary injunction to prevent Coinbase from requiring its users to consent to a new user agreement that included provisions that could have adversely affected this litigation. ECF No. 25. Following a hearing on Plaintiffs' motion for injunctive relief, the parties stipulated that the new user agreement Defendants had proposed would not apply to this action. ECF No. 39.

On March 11, 2022, Plaintiffs filed the Amended Complaint. ECF No. 43. In their Amended Complaint, Plaintiffs brought three sets of claims against Coinbase: (i) Section 12(a)(1) claims under the Securities Act for damages arising from Coinbase's sale or solicitation of unregistered securities (AC ¶¶ 931–41); (ii) Section 29(b) claims under the Exchange Act arising from illegal contracts Coinbase entered into with its users to purchase and sell securities in violation of the Exchange Act's registration requirements (*id.* ¶¶ 956–88); and (iii) state law claims arising from Coinbase's sale of unregistered securities and failure to register as a broker/dealer (*id.* ¶¶ 1016–1106). Plaintiffs also bring control person claims against Coinbase Global and its CEO

Armstrong, who orchestrated Coinbase's strategy to profit by violating the securities laws. *Id.* ¶¶ 942–55, 1002–15, 1038–49, 1094–1106.

## LEGAL STANDARD

Coinbase seeks dismissal under Federal Rules of Civil Procedure 8(a) and 12(b)(6). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule "embodies a policy of 'notice pleading' that eschews the need to plead specific types of documentary evidence to establish a plausible claim." *Corley v. United States*, 11 F.4th 79, 89 (2d Cir. 2021).

On a motion to dismiss under Rule 12(b)(6), the Court must "accept all well-pleaded factual allegations in the complaint as true" and "determine whether they plausibly give rise to an entitlement to relief." *Lynch v. City of N.Y.*, 952 F.3d 67, 74–75 (2d Cir. 2020) (internal quotation marks omitted). "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]" *Id.* at 75.

## ARGUMENT

### I.   Plaintiffs Plausibly Allege That Coinbase Sold And Solicited The Sale Of Unregistered Securities In Violation Of Section 12(a)(1) Of The Securities Act

#### A.   Coinbase Is The Seller In Each Transaction

Defendants improperly dedicate large swaths of their Motion to Dismiss to disputing Plaintiffs' well-pleaded factual allegation in the Amended Complaint (*see, e.g.*, AC ¶¶ 28–34) that Coinbase is the direct seller to Plaintiffs of the Tokens they purchased. MTD 2–3, 6–7, 8–10. But as the Amended Complaint details, Coinbase—by virtue of its organization as a centralized exchange, its use of the blockchain to effect transactions, and its decision to hold customer assets in centralized (rather than segregated) accounts—is the direct seller of the Tokens to Plaintiffs. Rather than acknowledge that these allegations must be accepted as true on a motion to dismiss,

*see Lynch*, 952 F.3d at 74–75, Coinbase inappropriately urges the Court to consider material outside the pleadings. Such evidence is both inadmissible at this stage, and in any event, does not support Coinbase's contention.

### 1.   Plaintiffs Have Properly Alleged That Coinbase Is The Direct Seller Of The Tokens

Coinbase sold each Token in every transaction to each Plaintiff. The Amended Complaint contains detailed factual support for this assertion. While Coinbase may dispute these facts, consideration of its arguments is inappropriate at the pleading stage, where Plaintiffs' non-conclusory allegations must be credited. *Lynch*, 952 F.3d at 74–75.

As the Amended Complaint sets forth in detail, the technical structure of a centralized crypto-asset exchange such as Coinbase means that it is the only party with whom customers like Plaintiffs ever transact. The only blockchain address with which a customer ever interacts is the wallet deposit address provided by Coinbase itself and that Coinbase owns. AC ¶ 32. The transactions made on the Coinbase Exchanges are not reflected anywhere on the blockchain because they are with Coinbase itself. *Id.* ¶ 33. No Token ever flows from one Coinbase user to another. *Id.* If Angela deposits Bitcoin in her Coinbase account, exchanges that Bitcoin for a Token sold on Coinbase, and then withdraws the Token from Coinbase's wallet, the blockchain will show two parties: Angela and Coinbase. *Id.* The fact that Coinbase may have set the listing price for that Token based on a different transaction made by another user is irrelevant to Angela—Angela never interacts with that other user, sends no asset to the other user, receives no asset from the other user, and has no blockchain-recorded interaction with the other user. Angela's only counterparty on the blockchain, and the only entity with which Angela could possibly be in privity, is Coinbase. *Id.*

This is not, as Defendants suggest, inherent in all exchanges, or even in all crypto-exchanges. A transaction on the New York Stock Exchange ("NYSE"), for example, moves

interests in a security from one individual to another, without the NYSE ever holding any assets itself. Coinbase, on the other hand, *does* hold the assets that transact on it.[1] And, as Plaintiffs expressly allege, there do exist *decentralized* crypto-exchanges that operate similarly to the NYSE, serving as a place where customers pass title to each other, rather than to the exchange itself. AC ¶¶ 30–31. If Angela sells a Bitcoin for a Token on one of these other *decentralized* crypto-exchanges, there will be a counterparty on the other end of that transaction. The transaction between the two users will be visible on the blockchain itself. Coinbase could have chosen to operate as a decentralized exchange, *but it did not*. Instead, it chose to operate and substantially profit as a *centralized* exchange, in direct privity with each of its users on each purchase or sale of a Token. *Id.* ¶¶ 32–33.

Indeed, while Plaintiffs' allegations in the Amended Complaint are all that the Court need or should consider for purposes of this motion to dismiss, Coinbase's most recent SEC Form 10–Q, which was signed by Defendant Armstrong on May 10, 2022 (after the Amended Complaint was filed), confirms this point. Goldstein Decl. Ex. A. In that federal securities filing, Coinbase confirms that *it* is the holder of crypto-assets traded on its platform, rather than Plaintiffs. For example, Coinbase states that assets Plaintiffs trade with Coinbase "may be considered to be the property of [Coinbase's] bankruptcy estate, in the event of [Coinbase's] bankruptcy." *Id.* at 83. Coinbase makes a similar concession on its website: "When a Coinbase user sends cryptocurrency from their wallet, **the address it comes 'from' is one of Coinbase's many hot wallet addresses**.

---

[1] This is one reason why Defendants' reliance on *Independent Investor Protective League v. N.Y. Stock Exchange*, 367 F. Supp. 1376, 1377 (S.D.N.Y. 1973), is misplaced, along with the fact that the claims in that case (which preceded and therefore did not rely on *Pinter v. Dahl*, 486 U.S. 622 (1988)) were dismissed based on lack of scienter, rather than lack of privity.

Any crypto sent back to that address would be sent to Coinbase, not your own wallet." Goldstein

Decl. Ex. B, at 1 (emphasis added).[2]

### 2.    Coinbase's Holding Of Customer Assets In Shared Accounts Means It Is The Direct Seller

Courts have long recognized that where, as here, an entity holds customers' financial assets

in shared rather than segregated accounts, the receiving entity has title over the assets in question.

When customers deposit funds or financial instruments with an institution, the customers retain

title "only where the funds are *both* specifically identifiable and segregated"—otherwise, the entity

holding the assets possesses title. *See, e.g.*, *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 330

(S.D.N.Y. 2010) ("Absent a sufficient allegation that the FX Customers' funds were kept in

segregated accounts, it must be assumed that the FX Customers relinquished title to the assets

when they deposited them with RCM.").

Here, Plaintiffs' allegations and Coinbase's admissions align on this crucial point:

Coinbase holds its customers' crypto-assets in combined accounts, rather than in segregated or

specifically identifiable accounts, and therefore Coinbase (and not its customers) holds title over

those assets. Plaintiffs expressly allege that the Coinbase Exchanges "place all deposited assets

into a centralized wallet." AC ¶ 34. And the User Agreement Defendants inappropriately seek to

introduce concedes that Coinbase uses "shared blockchain addresses, controlled by Coinbase, to

hold Digital Currencies held on behalf of customers" and has "no obligation to segregate by

blockchain address Digital Currencies owned by you from Digital Currencies owned by other

customers or by Coinbase." ECF No. 60–2 at 3; *see also* Goldstein Decl. Ex. A, at 83 (Coinbase

---

[2] Plaintiffs cite Coinbase's description of its platform merely to demonstrate that Defendants' made-for-litigation position that it is not the seller is unsupported even by its own admissions. For purposes of deciding the Motion, the Court should rely solely on the Amended Complaint.

admitting that assets deposited by customers are "custodially held"). Because Coinbase had title to the assets the customers purchased, it was necessarily the "seller" under Section 12(a)(1), as "it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value." *Pinter*, 486 U.S. at 642 (citing predecessor to Section 12(a)(1)).

### 3.      Coinbase's Attempts To Evade Plaintiffs' Allegations Fail

Coinbase, unwilling to accept the pled allegations, as is required for this Motion to Dismiss, argues that the Court should look to a variety of sources *outside* the Amended Complaint. But none of Coinbase's arguments disrupts the points discussed above: that Plaintiffs have alleged privity, and that the centralized manner in which Coinbase holds customer assets, and its failure to segregate holdings on the blockchain by customer, confirms that Coinbase is the direct seller here because it transferred title to the Tokens.

Notably, Coinbase never explains who besides it would be in privity with a customer during an individual transaction. It is hard to see who else could qualify. It cannot be any other Coinbase user, as users never exchange assets with each other and have no way of identifying each other. Coinbase seems to suggest that its users are in privity with no one when they transact on Coinbase. But there must have been some privity between a customer and someone else, or else no transfer of assets could occur. Regardless, while Defendants appear to disagree with Plaintiffs' factual allegations, they cannot base their Motion on such a factual dispute.

Instead, Coinbase spuriously asserts that the allegations of the Amended Complaint— which carefully details Coinbase's operations and why it is in privity with its customers on every Token trade—should be disregarded because they purportedly conflict with other allegations. MTD 10. Coinbase's tortured readings cannot create conflict where none exists. There is no conflict between Coinbase's matching buy and sell orders and its role as a direct seller; rather, as Plaintiffs specifically allege, Coinbase sets prices *and* is the seller. AC ¶ 33 ("[W]hile Coinbase

may use other traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Coinbase and (b) the seller and Coinbase.") Nor is there anything contradictory about this claim and the allegation that Coinbase "earn[s] fees from user transactions in [digital] assets"—there is nothing contradictory about a seller charging fees for transactions. *Id.* ¶ 62. Similarly, Plaintiffs' allegations that they traded "on the Coinbase Exchanges," *e.g.*, *id.* ¶ 83, do not imply that they were not in privity with Coinbase on those exchanges—there is nothing contradictory about Coinbase engaging in sales on its own exchanges. Similarly, when Plaintiffs allege that Coinbase allows "users to agree upon the terms of *their trades* in Tokens," Plaintiffs do not imply that users are on both sides of these trades; the phrase "their trades" clearly refers to trades between the users *and Coinbase*. *Id.* ¶ 912 (emphasis added).

Defendants also fail in their attempt to gin up further supposed conflicts by referencing the prior, superseded complaint in this action. There is *no conflict* between the Amended Complaint and the initial Complaint. The initial Complaint never asserted that Coinbase was not in privity with its users, nor did it allege contrary facts regarding the technical operation of Coinbase. Rather, the Amended Complaint expanded upon the initial Complaint and provided more detailed allegations on these positions, which is precisely the point of an amended pleading.

Even if the Amended Complaint did contradict the initial Complaint (it does not), Defendants' attempt to use the initial Complaint against Plaintiffs would be meritless. As Defendants conspicuously omit, the prior complaint was filed by a *different set of Plaintiffs*. Specifically, lead plaintiff Henry Rodriguez had no involvement in that complaint and cannot

possibly be bound by it.[3] Defendants' approach of binding lead plaintiffs appointed pursuant to the Private Securities Litigation Reform Act ("PSLRA") to earlier complaints filed (as here) by different plaintiffs would lead to a race to the courthouse—the antithesis of the PSLRA's purpose. *See Hom v. Vale, S.A.*, 2016 WL 880201, at *5 (S.D.N.Y. Mar. 7, 2016) ("In enacting the PSLRA, Congress sought to curb abuses such as 'the race to the courthouse to be the first to file the complaint.'" (quoting S. REP. 104–98, at 10 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 689)). Courts in securities litigation therefore decline to bind plaintiffs to earlier complaints, even those filed by the same plaintiffs.  *See, e.g.*, *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 525 (S.D.N.Y. 2009), *aff'd*, 357 F. App'x 393 (2d Cir. 2009) (binding plaintiff to his previous complaint "runs contrary to the Federal Rules' pronouncements that leave to file amended pleadings shall be freely given and that a party may state as many separate claims or defenses as it has, regardless of consistency (cleaned up)); *In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392, 400 (S.D.N.Y. 2006).[4]

Out of other options, Defendants rely on *Anderson v. Binance*, in which Judge Carter stated, in *dicta*, that the different plaintiffs before him had not adequately pleaded that crypto-exchange Binance was an actual seller. 2022 WL 976824, at *3 n.2 (S.D.N.Y. Mar. 31, 2022). But the allegations that Judge Carter found insufficient in *Binance* are entirely different from, and less detailed than, those here. *Id.* at *3 n.2; *compare* AC ¶¶ 32–34, *with* 1:20-cv-2803, ECF No. 55 ¶ 58. At no point did Judge Carter suggest as a matter of law that Binance, or any other crypto-

---

[3] "Basic principles of due process prevent individual named plaintiffs from binding—through litigation or court-approved settlement—absent class members the plaintiffs do not legally represent." *Jamie S. v. Milwaukee Pub. Schools*, 668 F.3d 481, 502 (7th Cir. 2012) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999)).

[4] Notably, none of the authorities cited by Defendants on this point (MTD 6 n.8) involves class actions, let alone class actions governed by the PSLRA.

exchange, could not be a seller of securities. Nor did Judge Carter make any factual finding that Binance was not a seller (nor could Judge Carter have made such a finding, given his ruling was on a motion to dismiss). Unlike in *Binance*, Plaintiffs here have made detailed factual allegations on the precise issue of whether Coinbase was the direct seller of the Tokens, AC ¶¶ 28–34, which this Court must accept for purposes of the Motion. For the above reasons, Plaintiffs have adequately pleaded that Coinbase sold them the Tokens.

## B.  Coinbase's User Agreements Cannot Defeat Plaintiffs' Well-Pleaded Allegations Regarding Coinbase's Role As A Seller

Defendants next argue that language in the Coinbase User Agreement denying that Coinbase sells digital assets—language that Coinbase added unilaterally *after* each Plaintiff signed up—somehow precludes Plaintiffs' allegations that Coinbase acts as a seller. On its face, this argument has alarming implications; using similar logic, a restaurant could shield itself from past and future tort liability by instituting a new requirement for guests to sign a statement that it "does not serve poisonous food." Nor is this the first time Coinbase has inappropriately sought to weaponize its terms of use against its customers. As the Court is aware, Coinbase recently tried to amend its User Agreement to impede this litigation, only to back away after Plaintiffs demonstrated that Coinbase's action was legally indefensible. ECF Nos. 24, 48. Coinbase's latest gambit, too, is meritless for several independent reasons.

*First*, reliance on any version of the Coinbase User Agreement is improper at the pleading stage. The Court may consider materials outside the pleadings only if they are "incorporated by reference" into the Amended Complaint or "integral to" Plaintiffs' allegations. *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106–09 (2d Cir. 2021). However, as Coinbase concedes, Plaintiffs' claims do *not* arise from the User Agreement. *See* MTD 7 ("Plaintiffs go to great lengths in the AC to avoid any reference to the User Agreement."). Although Coinbase argues that the

User Agreement is "the only operative agreement between Plaintiffs and any of the Defendants," MTD 7, it does not cite any authority for the proposition that Plaintiffs need to show a presently "operative agreement" between them and Coinbase to prevail on their Securities Act claims. Similarly, Coinbase's assertion that the User Agreement is "the only agreement Plaintiffs could ultimately seek to rescind under Section 29(b) of the *Exchange Act*," *id.* (emphasis added), is both incorrect, *see infra* Part II.B, and plainly irrelevant to Plaintiffs' *Securities Act* claims, which are not premised on voiding a contract. Because Plaintiffs have not incorporated or relied upon the User Agreement in the Amended Complaint, Coinbase may not rely on it for its Motion.

*Second,* two of the three Plaintiffs (Oberlander and Underwood) never agreed to *any* of the contractual language Defendants seek to weaponize against them. As Defendants acknowledge, MTD 5, Plaintiffs Oberlander and Underwood signed up for Coinbase in December 2017. But Coinbase did not add the provision it cites—that "[w]hen you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase," ECF No. 60–2 (Dec. 2020 User Agreement) § 3.2—or any language to that effect, until approximately September 23, *2020* (nearly three years later). *Compare* ECF Nos. 35–26 & 35–27. Similarly, the statement that "[t]itle to Digital Currency shall at all times remain with you and shall not transfer to Coinbase," ECF No. 60–2 § 2.6.1, did not appear until approximately January 31, *2019*. *Compare* ECF Nos. 35–12 & 35–13. In each case, the cited language post-dates Oberlander and Underwood joining the platform.

Coinbase's belated addition of this language to its terms of service has no effect on the rights of preexisting customers. Under California law, which governs all versions of the User Agreement, Coinbase's unilateral attempts to "update" its contracts fail on both procedural and substantive grounds. Procedurally, a party to an adhesive consumer contract cannot unilaterally

13

"update" the contract without notice to the consumer, even if the contract purports to reserve the right to do so. *See Rodman v. Safeway, Inc.*, 694 F. App'x 612, 613 (9th Cir. 2017) ("The district court correctly determined that the modification clause" purporting to allow Safeway to update its terms unilaterally "did not allow Safeway to unilaterally amend the Special Terms without notice."); *Roling v. E\*Trade Secs., LLC*, 756 F. Supp. 2d 1179, 1190–91 (N.D. Cal. 2010) (Under California and New York law, "a contractual provision that allows a party to unilaterally change the terms of the contract without notice is unenforceable."). Defendants cite no evidence (and Plaintiffs are aware of none) that they provided any notice to existing users of the updates containing the language they now invoke.

Even if Coinbase had provided notice, these unilateral updates to contracts with existing users would be invalid. A party that reserves the unilateral right to change a contract must exercise that right in an "objectively reasonable" manner, which means it may not "attempt[] to 'recapture' a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998) (declining to enforce arbitration clause unilaterally added to terms of use) (citation omitted). Coinbase's attempt to turn itself into a non-seller by pure *ipse dixit* would be a change "not within the reasonable contemplation of the parties when the contract was entered into," *id.*, and therefore not a condition Coinbase could unilaterally impose on its users. Indeed, it is hard to think of a more abusive unilateral change than one that adds inaccurate "facts" to a User Agreement so that a corporation can rely on those purported facts in litigation with those users.

*Third*, the December 2019 version of the User Agreement, which was offered to Plaintiff Rodriguez when he signed up for Coinbase in March 2020, explicitly stated that a sale of digital

assets on Coinbase *is* a purchase from Coinbase: "When you purchase (buy) Digital Currency ***from Coinbase*** (or from a third-party using Coinbase Pro) this transaction is ***intended to effect a sale*** of Digital Currency." December 2019 User Agreement § 3.2 (ECF No. 35–24) (emphases added). The December 2019 User Agreement, even if it were admissible at this stage, thus provides strong support *for* Plaintiffs' allegations that Coinbase is the direct seller of the Tokens.

*Finally*, even if Plaintiffs had agreed to each contractual provision Coinbase cites (and they have not), federal law prohibits these provisions from operating as a waiver of Plaintiffs' right to allege the factual predicate of their Securities Act claim—*i.e.*, that Coinbase sold them securities. The Securities Act expressly provides that "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the [SEC] *shall be void*." 15 U.S.C. § 77n (emphasis added); *see also* 15 U.S.C. § 78cc(a) (same limitation under the Exchange Act); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995) ("The statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision.").

These anti-waiver provisions of federal law invalidate not only express waivers of statutory rights, but also contracts that would have the *effect* of prospectively insulating conduct from challenge under the securities laws. For example, in *McMahan*, the Second Circuit held that under the anti-waiver provisions of the Securities Act and the Exchange Act, a contractual provision purporting to establish "a procedure that must be followed before an action may be brought" could not be enforced to bar investors' federal securities claims. 65 F.3d at 1050–51. Despite lacking an express waiver, the pre-suit procedure provision could "operate to bar a minority plaintiff class from exercising its substantive rights under federal securities law" because it required the plaintiffs

to win a vote among investors and to "indemnify the Trustee," which they might be unable to do. *Id.* at 1051; *accord Seafarers Pension Plan ex rel. Boeing Co. v. Bradway*, 23 F.4th 714, 720, 727 (7th Cir. 2022) (declining to enforce "forum-selection clause that had the effect of waiving federal securities rights" by forcing plaintiffs to litigate in a court that would lack jurisdiction); *Rogen v. Ilikon Corp.*, 361 F.2d 260, 268 (1st Cir. 1966) ("[W]e see no fundamental difference between saying, for example, 'I waive any rights I might have because of your representations or obligations to make full disclosure' and 'I am not relying on your representations or obligations to make full disclosure,'" as enforcing either contractual stipulation would "go[] far toward eviscerating Section 29(a)" of the Exchange Act.). Coinbase's argument—that it is free to add a contractual provision to its User Agreement that it is not a seller—would potentially waive users' right to sue Coinbase for selling unregistered securities. That is the precise result Congress foreclosed through the securities laws' anti-waiver clauses. For all the above reasons, Defendants cannot deploy the User Agreement to avoid answering the Amended Complaint.

### C. Coinbase Admits That Plaintiffs' Securities Act Claims Are Properly Pleaded in All Other Respects

There is no dispute that Plaintiffs also sufficiently allege the remaining elements of their Section 12 claims. Plaintiffs properly plead that all the Tokens are securities. AC ¶¶ 42–908. Defendants correctly recognize that this is a factual matter that cannot be resolved on a motion to dismiss, and they do not seek dismissal on that basis. MTD 13. Nor is there any dispute that the Tokens were not registered as securities. AC ¶ 4. Defendants also do not dispute that Plaintiffs have adequately alleged damages suffered by themselves and the Class, both through trading fees and through market losses. *See, e.g., id.* ¶¶ 85, 90, 95, 109, 130. Nor do Defendants dispute that Plaintiffs' Section 12(a)(1) claims are timely, and they have therefore waived any arguments to the contrary. *See Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*, 2021 WL 1199430, at

16

*10 n.6 (S.D.N.Y. Mar. 30, 2021) (Engelmayer, J.). Plaintiffs have therefore pleaded cognizable claims under the Securities Act.

### D.   Plaintiffs Properly Allege Coinbase Solicited Sales Of The Tokens

As a second and independent basis for liability under Section 12(a)(1), Plaintiffs properly allege that Coinbase "successfully solicit[ed] the purchase [of the Tokens], motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. For example, users of Coinbase's website who purchase Tokens first receive descriptions of each Token, the value proposition offered by each Token, and updates on price movements, all of which induce users to trade with Coinbase. AC ¶ 911. "These solicitations profit Coinbase by increasing the number of transactions on the Coinbase Exchanges and thus the fees paid to Coinbase; these solicitations are thus motivated at least in part by a desire to serve their own financial interests." *Id.* Plaintiffs have therefore properly alleged Section 12(a)(1) liability based upon Coinbase's successful solicitations of Plaintiffs' purchases of the Tokens.

## II.   Plaintiffs Adequately Plead Claims Under The Exchange Act

Plaintiffs bring claims under Section 29(b) of the Exchange Act to rescind contracts with Coinbase that violate the Exchange Act's registration requirements for securities exchanges, brokers, and dealers. AC ¶¶ 956–1001. These claims are properly pled.

### A.   Section 29(b) Of The Exchange Act Provides A Private Cause Of Action To Rescind Contracts That Violate The Act's Registration Requirements For Securities Exchanges And Broker/Dealers

Defendants do not dispute that Section 29(b) provides a private cause of action, nor could they. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18–19 (1979) (noting that Section 29(b) "confers a 'right to rescind' a contract void under the criteria of the statute," and "[a] person with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid"). Indeed, the very cases Coinbase cites

17

demonstrate that Section 29(b) provides a private right of action. *See, e.g.*, *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 583 (S.D.N.Y. 2011); *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984).

A violation of Section 15(a)(1) of the Exchange Act (which requires a broker/dealer who sells securities to register with the SEC) can form the predicate for a rescission action under Section 29(b). Every appellate court to reach this question has agreed. *See EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*, 6 F.4th 50, 59 (1st Cir. 2021) (contract was "voidable under Section 29(b)" because it "involved a practice in violation of the Exchange Act, specifically inducing, or attempting to induce the purchase or sale of any security as an unregistered broker" (cleaned up)); *Regional Props., Inc. v. Fin. & Real Est. Consulting Co.*, 752 F.2d 178, 182 (5th Cir. 1985); *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1443 n.5 (9th Cir. 1984).[5] Numerous District Courts in the Second Circuit have held likewise. *See, e.g.*, *NovaFund Advisors, LLC v. Capitala Group, LLC*, 2020 WL 230089, at *13 (D. Conn. Jan. 14, 2020) (counterclaimant "adequately allege[d] a Section 29(b) claim for rescission" based on failure to register as a broker under Section 15); *Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220, 231–32 (D. Conn. 2000) (contract that was "inextricably intertwined with" violation of registration requirement for broker/dealers was "void and unenforceable" under Section 29(b)).[6]

---

[5] The Second Circuit has acknowledged this line of authority but has not reached the question. *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n.6 (2d Cir. 1998).

[6] Numerous district courts in other circuits are likewise in accord. *See, e.g.*, *Cornhusker Energy Lexington LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *7 (D. Neb. Sept. 12, 2006); *Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1284–89 (D. Colo. 2013).

The sole case Defendants cite that declined to recognize a cause of action under Section 29(b) predicated on a violation of Section 15(a)(1) is *EMA Financial, LLC v. Vystar Corp., Inc*, 2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021). Defendants' reliance on that case is misplaced. In *EMA*, Judge Carter dismissed a Section 29(b) claim predicated on a failure to register as a broker/dealer, primarily because the contracts sought to be rescinded were not themselves illegal. The court then stated, in *dicta*, that "Rule 15(a)(1) … provides no private right of action." *Id.* at *3. On a motion for reconsideration, the court articulated no substantive reasoning to support this alternative basis. Instead, the court merely found that it was not clearly erroneous because there was no "controlling authority in this Circuit" on whether a Section 15(a)(1) violation could be a Section 29(b) predicate. *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 5998411, at *3 (S.D.N.Y. Dec. 20, 2021).[7] In the absence of "controlling authority," *id.*, this Court should follow the ample and well-reasoned persuasive authority (including the unanimous authority of all circuit courts to consider this issue) recognizing a private cause of action under Section 29(b) to rescind contracts that violate the registration mandate for broker/dealers.

Violations of the exchange registration requirements under Section 5 of the Exchange Act are similarly remediable under Section 29(b). Section 29(b) allows rescission of a contract that violates "*any* provision" of the Exchange Act. 15 U.S.C. § 78cc(b) (emphasis added). "Any" means

---

[7] Judge Carter also cited *Goodman v. Shearson Lehman Bros.*, 698 F. Supp. 1078, 1083 (S.D.N.Y. 1988), which rejected a private cause of action under Section 15(a)(1) alone. *Goodman* said nothing about whether *Section 29(b)* provides a private right of action, which courts have recognized is a separate question. *See Demaria v. Gisbex Clearing Corp., S.A.*, 2010 WL 11553316, at *5–6 (S.D. Fla. Nov. 23, 2010) (agreeing with *Goodman* that Section 15(a)(1) itself provides no private cause of action, but then concluding that "Plaintiffs are correct that a party may seek to rescind an agreement under Section 29(b) in light of broker's registration violations under Section 15(a)(1)"); *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 626 n.3 (S.D.N.Y. 1996) (Section 7 of the Exchange Act "may serve as the predicate for a private cause of action seeking equitable relief pursuant to Section 29(b)" although there is no private cause of action "under Section 7" itself).

"any," including Section 5. *See Rhoades v. Powell*, 644 F. Supp. 645, 663 (E.D. Cal. 1986) ("The language of section 29(b) certainly does not" limit rescission to contracts that violate sections of the Exchange Act that independently create private causes of action, "for it declares void any contract made in violation of *any* provision of the 1934 Act."), *abrogated in part on other grounds by Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136 (9th Cir. 1991).

### B. Plaintiffs Properly Allege That Coinbase Entered Contracts To Sell Them Securities In Violation Of The Exchange Act's Registration Requirements

To void a contract under Section 29(b), a plaintiff must "show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the [Exchange] Act was designed to protect." *Pompano-Windy City Partners, Ltd.*, 794 F. Supp. at 1288 (internal quotation marks omitted). Plaintiffs satisfy these requirements.

Defendants do not dispute that Plaintiffs—retail investors in securities—are among the "persons the [Exchange] Act was designed to protect." *Id.* And Plaintiffs were in direct privity with Coinbase when they purchased the Tokens. *See supra* Part I.A., The only remaining issue is whether Plaintiffs and Coinbase entered contracts that "involved a prohibited transaction." *Id.*

Each of Plaintiffs' transactions on Coinbase is a separate contract between the user and Coinbase to effect a trade at a given price. Those purchase and sale contracts are distinct from the User Agreement Defendants argue applies to Plaintiffs. Defendants' attempt to avoid rescission of the Token sales by conflating those separate contracts with the User Agreement thus fails.

Caselaw (and common sense) confirms that each individual purchase or sale is a separate contract. By way of analogy, it is well established that whenever a consumer buys a product in a retail store, a contract is formed. *See Garrett v. Tandy Corp.*, 295 F.3d 94, 100 & n.3 (1st Cir. 2002) ("[S]hopping in a retail store may involve multiple contracts. Each time a customer takes an item off the shelf, a new contract looms[.]"); *Giant Food, Inc. v. Washington Coca-Cola Bottling*

*Co., Inc.*, 273 Md. 592, 606 (1975) (collecting cases for proposition "that in the context of a self-service supermarket, a contract for sale may arise before payment is actually made for the goods"). It does not matter whether the store is a Costco (which requires shoppers to enter a membership contract before shopping there) or a Gristedes (which does not); either way, each in-store purchase is a separate contract. The same hornbook law principle applies on Coinbase: each trade gives rise to a new contract setting a price for the sale of the security at issue. *See* 23 Williston on Contracts § 62:22 (4th ed.) ("[T]he broker having acted in accordance with the customer's instructions, a binding contract is created …."); *cf.* 15 U.S.C. § 78c(a)(13) (defining "buy" and "purchase" to "include any contract to buy, purchase, or otherwise acquire").

The fact that Coinbase has also imposed a User Agreement that addresses both prohibited and non-prohibited transactions has no bearing on whether each subsequent trade gives rise to a new contract that may be voided if it violates the Exchange Act. Because each of these subsequent contracts for the Tokens is illegal—since each compels an illegal trade in an unregistered security on an unregistered exchange by an unregistered broker/dealer—each such contract is voidable under Section 29(b). *See Slomiak*, 597 F. Supp. at 681–82 (recognizing that Section 29(b) applies where violation of the Exchange Act is "inseparable from the performance of the contract plaintiff [is] seeking to rescind").

Moreover, even if Coinbase could rely on the User Agreement on a motion to dismiss—which it cannot, *see supra* Part I.B—it would be improper to conclude that Coinbase can shield its illegal transactions from Section 29(b) simply by requiring customers to enter an overarching User Agreement before Coinbase begins selling them securities. The cases Defendants cite are inapposite because they concern situations where the *sole* contract between the plaintiff and defendant was facially lawful and the plaintiff sought to rescind contracts with *third parties*. In

21

*Slomiak*, for example, the plaintiff's only contracts with defendant Bear Stearns were "customer agreements establishing his margin and repurchase accounts," which he did not allege "were themselves unlawful." 597 F. Supp. at 681. The plaintiff complained only that Bear Stearns had failed to provide mandatory disclosures *outside* those contracts, and on that basis, he sought rescission of government bond purchases made in his Bear Stearns margin account. *Id.* The court denied rescission because—unlike here—there was no "contract *between the parties*" that inherently violated the Exchange Act. *Id.* at 682 (emphasis added); *see also Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291–92 (D. Conn. 1979) (plaintiffs could not rescind stock purchases from *third parties* executed on their behalf by defendant broker, who violated margin regulation but operated under lawful customer agreement with plaintiffs). These cases stand for the sensible rule that a defendant cannot be targeted for rescission when it has no prohibited contractual relationship with the plaintiff. They do not condone a shell game in which a violator enters prohibited contracts with impunity by framing them as mere "transactions" under a lawful contract. Because each trade in the Tokens between Plaintiffs and Coinbase gave rise to an illegal contract, each such contract is voidable at Plaintiffs' election.

## C.  Plaintiffs' Exchange Act Claims Are Timely

Defendants assert that Section 29(b) provides a one-year statute of limitation from the discovery of a violation. MTD 21. Even assuming that is correct,[8] Plaintiffs' Section 29(b) claims are timely because they were brought within one year of their Token purchases, and within the corresponding three-year statute of repose. Defendants' contrary argument rests on the

---

[8] Defendants' argument for a one-year statute of limitations lacks a textual basis. Section 29(b) expressly provides a one-year limitations period and a three-year repose period only for actions based on *fraud* violations under Section 15(c)(1) and 15(c)(2) of the Exchange Act, which are not at issue in this case. 15 U.S.C. § 78cc(b)(B). Even if Defendants were correct that a one-year limitation/three-year repose period applies, Plaintiffs' claims are timely.

unsupportable theory that the limitations period ran **before** Plaintiffs made their purchases, such that no timely claim was ever possible, even if brought within Section 29(b)'s repose period.

This remarkable position—that Plaintiffs' claims (brought within the repose period) were void *ab initio*—would upset one of the most fundamental principles of timeliness analysis: that a limitations period does not begin to run until the last element of a claim occurs, so that there is a window in which a claim can be brought. *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) ("[I]t is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.") As the U.S. Supreme Court has recognized in analyzing the securities laws, "limitations periods begin to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (internal quotation marks omitted). This timing is what distinguishes a limitations period from a statute of repose, which "begin[s] to run on the date of the last culpable act or omission of the defendant." *Id.* (internal quotation marks omitted). Because Section 29(b)'s one-year period is a statute of limitations, rather than a statute of repose, it runs from when Plaintiffs could first file suit—which date logically cannot have preceded the sales they seek to rescind. Defendants' approach—which measures the limitations period from the date of their first solicitation (even though a solicitation cannot be said to be "successful[]," *Pinter*, 486 U.S. at 647, until a sale occurs)—would transform the statute of limitations into a one-year statute of repose, thus rendering superfluous the three-year statute of repose that Congress actually provided.[9]

---

[9] Besides incorrectly treating Section 29(b)'s limitations period as a repose period, the decision in *Anderson v. Binance*, 2022 WL 976824, at *3 (S.D.N.Y. Mar. 31, 2022), incorrectly turns the discovery element of the limitations period—which should *lengthen* the period in which a plaintiff can assert a claim—into a knowledge defense that contracts it. Although Sections 11 and 12(a)(2)

The Second Circuit has already rejected Defendants' position in the context of Section 12(a)(1) of the Securities Act, whose limitation period Defendants appear to assume applies. In *Diskin v. Lomasney & Co*., Judge Friendly wrote that where liability under Section 12(a)(1) was predicated on an illegal offer, and commenced more than a year after the offer but within one year of the sale, "it would be unreasonable to read [the statute of limitations] as starting the short period for an action [under Section 12(a)(1)] at a date before the action could have been brought—a construction which might lead in some extreme cases to a running of the statute of limitations before the claim had ever arisen." 452 F.2d 871, 875–76 (2d Cir. 1971). That "extreme case" is precisely what Defendants seek to impose here, and they provide no reason to believe that Section 29(b) is unlike Section 12(a)(1), or that its limitations period can expire before a claim arises. *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 n.5 (2d Cir. 1979) (citing *Diskin* for the proposition that "the limitations period here begins to run only after the sale, because it would be unreasonable to have the limitations period begin to run before the claim accrued, I. e. [sic], before the sale occurred."); *Direction Assocs., Inc. v. Programming & Sys., Inc.*, 412 F. Supp. 714, 717 (S.D.N.Y. 1976) (*Diskin* "held that the one-year provision in section 77m does not commence to run on an illegal offer until the plaintiff acquires the shares; otherwise, the statute of limitations could run before the claims had even arisen."). Because the Complaint was filed within one year of the Token purchases at issue, Plaintiffs' Section 29(b) claims are timely.

## III.   The Amended Complaint Provides Adequate Notice To Each Defendant

Defendants' argument for dismissal under Federal Rule of Civil Procedure 8 also fails. The Amended Complaint's use of the shorthand "Coinbase" for two interrelated Coinbase entities—

---

of the Securities Act *do* contain knowledge defenses, *see* 15 U.S.C. §§ 77k(a), 77*l*(a)(2), neither Section 12(a)(1) nor Section 29(b) does.

which hold themselves out to the public as a single company and offer no transparency about their respective roles—provides each Defendant with appropriate notice of the allegations against it.

Plaintiffs clearly allege that *both* Coinbase entities—Coinbase Global and Coinbase, Inc.—violated securities laws by soliciting and selling unregistered securities,[10] failing to register the Coinbase Exchanges with the SEC, and failing to register as a broker/dealer. Plaintiffs also allege that both entities "are operated as one corporation," that they share an office, and that their own SEC filings "refer[] to the two entities jointly as the 'Company.'" AC ¶ 11. Plaintiffs further allege *how* the two Coinbase entities act as one: Coinbase, Inc. "is a wholly-owned subsidiary of Coinbase Global, Inc.," *id.*, which operates under the "consistent and daily management" of Coinbase Global's CEO, Defendant Armstrong. *Id.* ¶ 12. By controlling Coinbase Global, Armstrong necessarily controls its wholly-owned subsidiary. *See infra* Part IV. To the extent Defendants dispute these allegations, they raise a factual issue that cannot be resolved at this stage.

Courts routinely hold that Rule 8 is satisfied in similar circumstances. "Rule 8 does not require Plaintiffs to identify each of the … Defendants by name each time the Complaint makes an allegation that applies equally to all." *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005). Thus, "[t]he fact that most of Plaintiffs' claims apply to all Defendants and that the factual allegations refer to them collectively does not render the Complaint violative of Rule 8." *Id.*; *see also Vantone Grp. LLC v. Yangpu NGT Indus. Co., Ltd.*, 2015 WL 4040882, at *4 (S.D.N.Y. Jul. 2, 2015) ("Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."

---

[10] Although Defendants concede that whether the Tokens are securities cannot be resolved on a motion to dismiss, *see* MTD 1 n.2, they disparage Plaintiffs' allegations on this issue as "conclusory," *id.* at 1. That pejorative is easily rejected. The Amended Complaint analyzes each Token and alleges specific facts to show that each is a security under federal and state law. AC ¶¶ 77–908. Rule 8 does not require a more detailed recitation of facts.

(cleaned up)). For example, in *Anwar v. Fairfield Greenwich Ltd.*, the complaint included allegations against a group of entities collectively referred to as "Citco." 728 F. Supp. 2d 372, 422 (S.D.N.Y. 2010). The Citco Defendants—like Defendants here—argued that "grouping all of the Citco Defendants together as 'Citco' in the [complaint] without articulating what alleged acts are attributable to each defendant" violated Rule 8(a). *Id.* Judge Marrero rejected this argument because the plaintiffs "assert[ed] a factual basis" for making "allegations against the Citco Defendants as a whole," "clearly define[d] Citco in the [complaint] to include each of the Citco Defendants," and alleged facts about "the relationship among the Citco Defendants." *Id.* at 422–23. This reasoning applies equally here.

Moreover, even if the Amended Complaint did not make clear that Plaintiffs accuse each Coinbase entity of the same conduct, it would still satisfy Rule 8 through the "common enterprise" theory, under which "each of the interrelated companies may be held liable for the actions of the other." *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 365 (S.D.N.Y. 2019). At the pleading stage, the plaintiff "need only allege facts plausibly supporting the existence of a common enterprise, not prove that such an enterprise in fact exists." *Id.* at 366. Here, Plaintiffs allege that the two defendant Coinbase entities share an office, describe themselves in SEC filings as a single company, and "are operated as one corporation" under common control by Armstrong. AC ¶¶ 11–12. Plaintiffs further allege that Armstrong has taken steps to "promote Coinbase," as a single company. *Id.* ¶ 16. These allegations make it more than plausible that the two Coinbase entities operate as a common enterprise. *See People*, 387 F. Supp. 3d at 366 (Rule 8(a) satisfied where complaint contained "sufficient factual allegations … to plead common enterprise liability"). Defendants' reliance on *Wang v. Verizon Communication Inc.*, where the complaint "alleged *no*

*facts* to support a finding" of a common enterprise, 2020 WL 5982882, at *2 (S.D.N.Y. Oct. 8, 2020) (emphasis added), is thus misplaced.

The Court should also reject Defendants' alternative suggestion to dismiss only Coinbase Global under Rule 8 because it is not a party to the Coinbase User Agreement. Defendants cite *Patrico v. Voya Financial, Inc.*, where the court dismissed a defendant that was not "a party to the [contract] underlying [the] dispute." 2017 WL 2684065, at *5 (S.D.N.Y. Jun. 20, 2017). But as already explained, *see supra* Part I.B., the User Agreement does not "underl[ie]" Plaintiffs' claims, which are exclusively statutory; on the contrary, as Defendants freely acknowledge, the Amended Complaint *nowhere* references the User Agreement. MTD 7. Defendants' further assertion that Coinbase Global does not "provide any of the services at issue in this action," MTD 23, is a contested factual matter that cannot be resolved on the pleadings. Moreover, even if Coinbase Global's status as a non-party to the User Agreement somehow absolved it of *primary* liability, Plaintiffs have asserted viable control person claims against it. *See infra* Part IV.

## IV.    Plaintiffs Properly Plead Federal Control Person Claims

Plaintiffs have adequately pleaded control person claims against Armstrong,[11] and against Coinbase Global as an alternative to primary liability. At the pleading stage, a plaintiff bringing control person claims under the Securities Act or the Exchange Act "must plead: (1) a primary violation; and (2) control over the primary violator." *Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012) (applying Section 15 of the Securities Act); *In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278, 307

---

[11] Since the filing of the Amended Complaint, Defendants' counsel have represented to Plaintiffs that Armstrong is not the CEO of Coinbase, Inc., though they do not dispute that he *is* the CEO of Coinbase Global. Based upon that representation, Plaintiffs, without prejudice, withdraw the allegation that Armstrong is the CEO of Coinbase, Inc. (which allegation was based on public reporting by Bloomberg and S&P). This does not limit any of Plaintiffs' claims.

(S.D.N.Y. 2005) ("*Parmalat I*") (Section 20(a) of Exchange Act). No further culpable conduct by the control person need be shown where the underlying primary violation is one of strict liability. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187–88 (S.D.N.Y. 2003) (collecting cases).

The Amended Complaint makes the requisite showing for control person liability against Armstrong and Coinbase Global. As an initial matter, Plaintiffs plausibly allege primary violations of the Securities Act and the Exchange Act by Coinbase Global and Coinbase, Inc. *See supra* Parts I & II. Plaintiffs also allege particularized facts showing Armstrong controls both entities and that Coinbase Global in turn controls Coinbase, Inc. The test for control is a functional one and does not depend on any specific legal relationship. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."). Here, the Amended Complaint alleges, and Defendants do not meaningfully dispute, that Coinbase Global exercises total control over Coinbase, Inc. Coinbase Global wholly owns Coinbase, Inc. and has the power to direct or cause the direction of the management and policies of Coinbase, Inc. *Id.* ¶¶ 11, 1005–09. The Amended Complaint also states that both Coinbase entities are "operated as one corporation"—referred to in Defendants' own SEC filings as the "Company"—with a shared office. *Id.* ¶ 11. *See In re Global Crossing Ltd.*, 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (denying motion to dismiss where plaintiffs alleged more than the "mere existence of a parent/subsidiary relationship" and had not yet had an opportunity for discovery); *Parmalat I*, 375 F. Supp. 2d at 310. This case thus differs from Defendants' cited cases (MTD 24–25) where the allegations of control were conclusory.

As for Armstrong, the Amended Complaint alleges that he has daily management responsibilities over both Coinbase entities' operations—including "the decision not to register as

a securities exchange or a broker-dealer and the decision to list unregistered securities." AC ¶¶ 12, 1011–14. Plaintiffs thus offer a particularized basis for Armstrong's liability that goes well beyond his undisputed status as an officer and director of Coinbase Global.[12]

Finally, it is appropriate for Plaintiffs to plead both primary claims and alternative control person claims against Coinbase Global. "While a defendant ultimately may not be held liable as both a primary violator and a controlling person, a plaintiff may plead alternative theories of liability in the complaint." *Mendali v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 n.4 (S.D.N.Y. 2016) (internal quotation marks omitted).

## V.   The Amended Complaint Properly Pleads Claims Under State Law

### A.   The State Claims Survive For The Same Reason As The Federal Claims

Plaintiffs' state law claims survive because Plaintiffs have plausibly alleged that Coinbase solicited or sold each Token. *See supra* Part I. In addition, one of Coinbase's arguments for dismissing Plaintiffs' claims under Section 29(b)—that the purchases of Tokens do not constitute "contracts," MTD 19—has no application under state law, as all three state statutes refer to "purchases" and "sales" rather than contracts. *Compare* 15 U.S.C. § 78cc(b), *with* Cal. Corp. Code § 25501.5; Fla. Stat. § 517.211; N.J. Stat. § 49:3-71. Thus, even if Plaintiffs' purchases of Tokens were not "contracts" (and they are), that would not impair Plaintiffs' state broker/dealer claims.

---

[12] Defendants suggest that because Armstrong is formally one layer removed from Coinbase, Inc., a claim based on his control of Coinbase, Inc. sounds improperly in "tertiary liability." MTD 25 (quoting *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004)). But Defendants' reliance on a footnote in *Fezzani* is misplaced. The court there "had already dismissed plaintiffs' control claims against Bear Stearns as time-barred." *In re Tronox, Inc.*, 769 F. Supp. 2d 202, 220 (S.D.N.Y. 2011) (distinguishing *Fezzani*). Otherwise, the *Fezzani* court "may well have found that plaintiffs stated a claim against Bear Stearns, and seriously considered whether the senior officer, too, could be found to control Baron vis-a-vis his position at Bear Stearns." *In re Tronox*, 769 F. Supp. 2d at 220–21.

### B.     The State Law Claims Are Timely

Defendants do not challenge the timeliness of (i) Plaintiffs' claims under New Jersey law, nor (ii) Plaintiffs' unregistered securities claims under California and Florida law. With respect to their arguments as to the timeliness of the California and Florida unregistered broker/dealer claims, Defendants advance the same incorrect argument as they do as to Section 29(b), and fail to acknowledge that Plaintiffs claims could not accrue under California or Florida law until they purchased the Tokens (which occurred within one year of suit). *See supra* Part II.C; *see also Jackson v. Fischer*, 2015 WL 1143582, at *22 (N.D. Cal. Mar. 13, 2015) (under California law, "a cause of action accrues at the time when the cause of action is complete with all of its elements"); *GLK, L.P. v. Four Seasons Hotel Ltd.*, 22 So. 3d 635, 637 (Fla. Dist. Ct. App. 2009) (claim accrued at "time of the July 23, 2004, transaction"); Fla. Stat. § 95.031 (under Florida law, a "cause of action accrues when the last element constituting the cause of action occurs").

### C.     The State Law Control Person Claims Survive

Coinbase addresses Plaintiffs' state law control person claims only in a footnote, suggesting that these claims fail because Plaintiffs fail to allege substantive violations. MTD 24 n.24. But California and New Jersey law impose near *per se* control person liability on directors and principal executive officers for breaches of securities laws. Because Plaintiffs have properly pleaded primary violations under both statutes and met the showing for control person liability under federal law, *see supra* Part IV, as well as the more lenient standards under state law, the state law control person claims survive. *See* Cal. Corp. Code § 25504; N.J. Stat. § 49:3-71(d).

### <u>CONCLUSION</u>

For the above reasons, Plaintiffs respectfully request that the Court deny the Motion. In the alternative, if the Court grants the Motion in full or in part, Plaintiffs request that the dismissal be without prejudice and that permission to replead be granted.

Dated:   New York, New York                    Respectfully submitted,
         July 11, 2022

By: */s/ Steven L. Bloch*                       By: */s/ Jordan A. Goldstein*
Steven L. Bloch                                 Jordan A. Goldstein
Ian W. Sloss                                    Mitchell Nobel
SILVER GOLUB & TEITELL LLP                      SELENDY GAY ELSBERG PLLC
184 Atlantic Street                             1290 Avenue of the Americas
Stamford, CT 06901                              New York, NY 10104
Tel: 203-325-4491                               Tel: 212-390-9000
sbloch@sgtlaw.com                               jgoldstein@selendygay.com
isloss@sgtlaw.com                               mnobel@selendygay.com

*Attorneys for Plaintiffs Louis Oberlander, Henry Rodriguez, Christopher Underwood, and the Putative Class*