UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD et al., *Individually and on Behalf of All Others Similarly Situated*,

                                    Plaintiffs,

                    -v-

COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG,

                                    Defendants.

---

21 Civ. 8353 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a putative class action brought under the federal securities laws against defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong ("Armstrong") (collectively with Coinbase Global, Inc., and Coinbase, Inc., "Coinbase" or "defendants").

Coinbase operates two online digital trading platforms on which users can transact in the cryptoeconomy. The Amended Complaint ("AC"), Dkt. 43, alleges that among the assets that Coinbase enables customers to buy and sell on these platforms are ones qualifying as securities. It alleges that these include 79 digital assets known as the "Tokens." It alleges that, notwithstanding Coinbase's practice of transacting in these securities with plaintiffs and other users, Coinbase is not registered with the U.S. Securities and Exchange Commission ("SEC") as an exchange or broker-dealer.

On this basis, lead plaintiffs here—each of whom transacted in the Tokens on the Coinbase platform—bring three sets of claims: (1) under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), for damages arising from Coinbase's sale or solicitation of

unregistered securities, AC ¶¶ 931–41; (2) under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), arising from illegal contracts Coinbase entered into with its users to purchase and sell securities in violation of the Exchange Act's registration requirements, *id.* ¶¶ 956–88; and (3) under state law, based on Coinbase's sale of unregistered securities and failure to register as a broker-dealer, *id.* ¶¶ 1016–1106. They also bring control-person claims against Coinbase Global and its Chief Executive Officer, Armstrong, who allegedly orchestrated Coinbase's strategy to profit by violating the securities laws, *id.* ¶¶ 942–55, 1002–15, 1038–49, 1094–1106. These claims are brought on behalf of a nationwide class consisting of all persons or entities who transacted in the Tokens on the Coinbase trading platforms between October 8, 2019 and the AC's filing on March 11, 2022 (the "class period"), and of subclasses keyed to citizens of three states who so traded during that period.

Pending now is defendants' motion to dismiss the AC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 8(a). Dkt. 69. For the reasons that follow, the Court grants in full the motion to dismiss. The Court dismisses the federal claims with prejudice and the state claims without prejudice.

## I. Background

### A. Factual Background[1]

#### 1. Crypto-Assets and Blockchains

This case involves the modern financial concoctions known as crypto-assets. Also sometimes called "cryptocurrencies," "tokens," or "crypto-securities," these are digital assets created and traded in the digital world. AC ¶ 19. Crypto-assets often rely on a technology

---

[1] The summary is drawn from the AC. Dkt. 43. For the purposes of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

known as "blockchain" to "secure transactions, control the creation of additional units, and verify their transfer." *See id.* Blockchain is a digital ledger system that tracks the ownership and transfer of different kinds of crypto-assets. *See id.* ¶¶ 20–21.

Users on the blockchain have a "public key" and a "private key." *See id.* ¶¶ 24–26. A user can publicly identify herself to other users with her "public key," which is akin to a conventional bank account number an individual might share with another who wishes to send the individual funds. *See id.* ¶¶ 24–25. A user also retains a "private key," which is akin to a pin code associated with the "bank account" public key. *See id.* The blockchain makes use of the public keys and unique addresses associated therewith to document transactions. *See id.* ¶¶ 20–21. For example, with the well-known crypto-asset known as "Bitcoin," "[a] transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred." *Id.* ¶ 27. By tracking who owns any given unit of a crypto-asset at any given time, the blockchain allows for the secure exchange of crypto-assets, enabling users to verify each transaction involving that particular unit. *Id.* ¶ 22. This system, by documenting ownership, aims to prevent counterfeiting. *Id.*

### 2. Crypto-Exchanges

The crypto-asset ecosystem depends on digital exchanges known as "crypto-exchanges." "Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities." *Id.* ¶ 28. Crypto-exchanges come in two primary forms: decentralized and centralized. *Id.* ¶ 29.

Decentralized exchanges use different approaches. "[W]hat they have in common is that the crypto-assets are transferred between individual accounts." *Id.* ¶ 30. Such exchanges may be analogized to Craigslist.com, the website that allows users to match directly with other users to

enable individualized transactions. *See id.* ¶ 31. Decentralized exchanges, "like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (for example, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee." *Id.*

Centralized exchanges play a more substantial role in transactions between individuals. First, a customer must "create an account" on the centralized exchange. *Id.* ¶ 32. "The exchange will then provide that customer with a deposit address that the exchange controls." *Id.* Then "[w]hen the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset." *Id.* "The exchange will typically then transfer the crypto-assets into one of its other addresses for storage." *Id.* When that customer wants to make a transaction—say, to transfer one Bitcoin to the address of someone else—the centralized exchange "then debits the [customer's] account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address" of the user with whom he or she wishes to transact. *Id.* ¶ 42.

### 3.    The Coinbase Exchanges

Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform"). *Id.* ¶ 5. The Coinbase Platform is "marketed towards newer users," *id.* ¶ 35, and "allows users to place only market orders"—transactions of digital assets "at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order," *id.* The Coinbase Pro Platform, in contrast, "is designed for use by advanced and active digital asset traders," *id.* ¶ 37. It "allows three types of orders: a market order, . . . a limit order to buy or sell a digital asset at a specific price or better,

or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price." *Id.*

The AC alleges that the Coinbase platforms operate as centralized exchanges. *Id.* ¶¶ 32, 34. Trades "do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller." *Id.* ¶ 33. If two users wish to transact, each does so by transacting with Coinbase directly—not with each other. *Id.* "Thus, if [a customer] wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit [that customer's] account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain." *Id.* Customers are charged fees on both Coinbase platforms. *See id.* ¶¶ 34–40.

### 4. Coinbase's Alleged Failure to Register as a Securities Exchange or Broker-Dealer

The AC's central premise is that Coinbase lists and sells securities but is not registered as a securities exchange or as a broker-dealer. Plaintiffs purchased and sold the Tokens[2] on the Coinbase platforms during the Class Period,[3] *id.* ¶¶ 1, 918–19, during which neither Coinbase Platform was registered with the SEC as a securities exchange, *id.* ¶ 64; *see* 15 U.S.C. § 78c (registration requirements of "exchange" under Exchange Act), or broker-dealer, AC ¶ 64; *see* 15 U.S.C. § 78o(a)(1) (registration requirements for "brokers" and "dealers" under Exchange Act),

---

[2] Specifically, this action concerns the 79 digital assets traded under the following symbols: 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, and ZRX (collectively, the "Tokens").

[3] For each Token, the AC alleges that at least one plaintiff has purchased or sold it during the Class Period. *See* AC ¶¶ 77–908.

nor "subject to exemptions from such registrations," AC ¶ 5. "Because Coinbase brings together buy and sell orders for the Tokens[,] and the Tokens are securities," *id.*, the AC alleges, Coinbase "stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform," *id.* ¶ 6.

### 5.    The Class Allegations

Plaintiffs bring this action as a putative class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3). *Id.* ¶ 917. Plaintiffs seek certification of a nationwide class defined as "all persons or entities who transacted in the Tokens on the Coinbase Platform and/or the Coinbase Pro Platform during the Class Period." *Id.* ¶ 918. Plaintiffs also seek certification of three subclasses: (1) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of California"; (2) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of Florida"; and (3) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of New Jersey." *Id.* ¶ 919.

### B.    Procedural History

On October 8, 2021, three plaintiffs—Christopher Underwood ("Underwood") of Florida, Louis Oberlander ("Oberlander") of California, and Zeneyda Patin of New York (collectively, the "original plaintiffs")—initiated this case by filing the Complaint, *see* Dkt. 1. On October 12, 2021, counsel for the original plaintiffs published the requisite Private Securities Litigation Reform Act notice of this action through PR Newswire. *See* Dkt. 18.

On December 13, 2021, two original plaintiffs—Underwood and Oberlander—along with a new plaintiff, Henry Rodriguez ("Rodriguez"), moved to be appointed lead plaintiffs. Dkt. 15. On January 11, 2022, the Court granted an unopposed motion to name Underwood, Oberlander, and Rodriguez as lead plaintiffs and appoint Silver Golub & Teitell LLP and Selendy & Gay as

co-lead counsel. Dkt. 21. On January 28, 2022, plaintiffs moved for a temporary restraining order regarding amendments to Coinbase's user agreement that the original plaintiffs represented were to take place on January 31, 2022, and stood to affect the pending litigation. *See* Dkts. 24– 26. On January 30, 2022, Coinbase opposed the motion, *see* Dkts. 28–30, to which the original plaintiffs replied that same day, *see* Dkts. 31–32.

On February 4, 2022, the Court held a hearing on the motion for injunctive relief. There, defendants agreed to drop any reliance on the new January 2022 dispute resolution provisions altogether for the purposes of this litigation, that is, as these provisions might apply to any named plaintiff or putative class member extant as of February 4, 2022. Such mooted plaintiffs' bid for emergency relief. *See* Dkt. 41 at 28–32 (hearing transcript). At the hearing, plaintiffs' counsel stated that plaintiffs intended to file an amended complaint with additional federal claims under the Securities Act. *See id.* at 34.

On February 7, 2022, the parties filed a proposed stipulation, Dkt. 38-1, that defendants would not seek to enforce alternative dispute resolution provisions of the user agreement against plaintiffs in this or any related action, *see id.* at 2, and the Court entered the stipulation, Dkt. 39.

On March 11, 2022, Underwood, Oberlander, and Rodriguez filed the AC. Dkt. 43. It changed plaintiffs' claims in nature and scope by, *inter alia*, (1) adding Coinbase, Inc. as a defendant; (2) adding to the digital assets within the scope of the lawsuit, in connection with the addition of Rodriguez as a named plaintiff; and (3) adding federal claims, including those relating to control-person liability, and state claims. *Compare* Dkt. 1, *with* AC.

On May 10, 2022, defendants moved to dismiss the AC in its entirety. *See* Dkts. 58–60. On July 11, 2022, plaintiffs filed an opposition. *See* Dkts. 62–63. On August 5, 2022, defendants replied. *See* Dkts. 67–68.

## II.     Legal Standards Governing the Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

The Court first considers the AC's claims under the Securities Act, then those under the Exchange Act, and then its state-law claims.  Relevant to all is a single premise—that the Tokens are securities.  The AC alleges that each of the 79 Tokens is a security pursuant to the Securities Act, the Exchange Act, and the test articulated for "investment contracts" in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  In support, the AC, for each Token, alleges that this digital asset has characteristics indicative of a security.  To this end, the AC alleges how the Token was introduced to the public; whether investors expected to receive profits from it; whether any marketing has been performed for it, and if so, by whom; which entities, if any, centrally manage it; and, during the Class Period, which plaintiffs engaged in "losing transactions" involving it. *See, e.g.*, AC ¶¶ 86–90 (for Token AAVE), 338–50 (for Token DOGE), 452–87 (for Token ICP).

Were this case to reach summary judgment, this contention would emerge as a central battleground.  Defendants maintain that "[t]he Tokens are not 'securities,'" for reasons that, they state, "will become evident if this case proceeds."  Dkt. 59 ("Defs. Mem.") at 1 n.2.  However, defendants state, in light of other dispositive arguments—and presumably because whether the Tokens are securities presents a question of fact more suitably litigated at summary judgment— "the Court need not address this issue for purposes of this motion."  *Id.*  In the analysis that follows, the Court accordingly assumes *arguendo*, as do the parties in their briefing, that the Tokens are *bona fide* securities.

## A.    Claims Under the Securities Act

The AC brings two claims under the Securities Act: in Count One, for the offer and sale of unregistered securities against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5 and 12(a) of the Securities Act, *see* AC ¶¶ 931–42; *see also* 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1); and, in Count Two, for control-person liability by Coinbase Global, Inc. and Brian Armstrong, under Section 15 of the Securities Act, based on the violations in Count One, *see* AC ¶¶ 942–55; *see also* 15 U.S.C. § 77o(a).  Because Count Two is derivative of Count One, the Court addresses Count One first.

### 1.    Allegations Relating to the Offer and Sale of Unregistered Securities

#### *a.    Applicable Legal Standards*

Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration.  15 U.S.C. § 77e(a), (c).  To prove a violation of Section 5, the plaintiff must show that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used

in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).

If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an

exception applies. *Id.* Section 5 is a strict liability statute that does not require a showing of

scienter or negligence. *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for the purchaser

against the seller in any transaction that violates Sections 5(a) or (c). 15 U.S.C. § 77l(a)(1). It

includes the right to sue for damages or rescission. *See, e.g.*, *Fed. Hous. Fin. Agency for Fed.*

*Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who

retains ownership over the security may sue under Section 12 for equitable rescission, which

limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77l(a))).

"[T]he list of potential defendants in a section 12(a)[(1)][4] case is governed by a judicial

interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley*

*Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

Under the Supreme Court's decision in *Pinter v. Dahl*, an individual is a "statutory seller"

under either of two scenarios. 486 U.S. 622, 642, 647 (1988). First, liability attaches if the

defendant "passed title, or other interest in the security, to the buyer for value"; such "imposes

liability on only the buyer's immediate seller; remote purchasers are precluded from bringing

actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id.* at

642, 644 n.21. Second, liability attaches if the defendant "successfully solicit[ed] the purchase

[of a security], motivated at least in part by a desire to serve [its] own financial interests or those

---

[4] The Second Circuit has held that the identical language in Section 12(a)(2) has the same
meaning, and therefore applies *Pinter* to Section 12(a)(1) and 12(a)(2) claims alike. *See Cortec*
*Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Capri v. Murphy*, 856 F.2d 473,
478 (2d Cir. 1988); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001
WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

of the securities' owner." *Id.* at 647; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

In sum, plaintiffs may recover from defendants under Section 12(a)(1) only if: (1) defendants were the direct sellers of the Tokens to plaintiffs; or (2) defendants actively solicited the sale of the Tokens to plaintiffs and did so for financial gain.  Defendants challenge the adequacy of the AC's pleadings under each theory.

> b.    Pinter*'s First Prong: Whether Coinbase Passed Title to the Tokens*

Plaintiffs argue that the AC adequately alleges that Coinbase is a statutory seller under *Pinter*'s first prong—that is, that Coinbase "passed title, or other interest" in the Tokens as the "immediate seller." *Pinter*, 486 U.S. at 642, 644 n.21.  This theory pivots on the factual premise that Coinbase, as opposed to some other "selling" party, held title to the Tokens at the time of these transactions.

Relevant to this point, the AC alleges that Coinbase "place[s] all deposited assets into a centralized wallet," AC ¶ 34, thereby controlling the title to all the digital assets.  As a result, it alleges, in every transaction involving these digital assets, "[t]he only blockchain address with which a customer ever interacts is the wallet deposit address provided by Coinbase itself and that Coinbase owns." Dkt. 62 ("Pl. Opp") at 6; *see* AC at 32.  The AC thus posits that, in these transactions, Coinbase transacts with the user—as opposed to two users transacting with each other.  "The buyer and seller are not in privity with one another," the AC alleges, AC ¶ 910; each instead is in privity with Coinbase.  It alleges that a Coinbase user who wishes to make a transaction "never interacts with . . . [an]other user, sends no asset to the other user, receives no asset from the other user, and has no blockchain-recorded interaction with the other user." Pl.

11

Opp. at 6. Based on the premise that "[c]ustomers on Coinbase transact *solely with Coinbase itself*," it alleges, "Coinbase is thus a seller of the Tokens." AC ¶ 936 (emphasis added).

These allegations would ordinarily assist plaintiffs in pleading this theory. But plaintiffs' bid is complicated because the AC's above allegations effectively repudiate diametrically contrary allegations in plaintiffs' original Complaint, in an apparent attempt to evade dismissal.

Ordinarily, an amended complaint "supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks omitted). However, "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading." *Wheeler v. Slanovec*, No. 16 Civ. 9065 (KMK), 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) (cleaned up); *see also Poindexter v. EMI Rec. Grp. Inc.*, No. 11 Civ. 559 (LTS) (JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits."); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.*, No. 08 Civ. 588 (KMK), 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) ("[A] court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings."). As the Second Circuit has put the point: "A party . . . cannot advance one version of the facts in its pleadings, conclude that [his] interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984); *cf. Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (district court's failure to permit jurors to examine original complaint, where amended complaint was in contradiction, was substantial abuse of discretion).

Such is the case here.  Although the AC casts Coinbase as the *only* counterparty to each transaction, *see* AC ¶¶ 6, 32–33, 910, 936, and as title holder to the Tokens, *see id.* ¶ 34, the Complaint painted a very different portrait of Coinbase, with factual allegations that undermine the AC's thesis that Coinbase was a statutory seller.  That is so in two respects.

*Privity*:  The Complaint's factual allegations directly contradict the AC's claim that privity existed only between Coinbase and users, and not between users for the purposes of any individual transaction.  It alleged that "[o]nce money or digital assets had been sent to the Coinbase Platform and credited to the wallet of a Coinbase Platform user, a Coinbase Platform [user] *can enter into trade agreements with other Coinbase Platform users for purchases and sales of digital assets*."  Compl. ¶ 27 (emphasis added); *see also id.* ¶ 32 (same allegation for Coinbase Pro platform).  This allegation is flatly opposite to the Amended Complaint's allegation that "[t]he buyer and seller are *not* in privity with one another," AC ¶ 33, and that "[c]ustomers on Coinbase transact *solely with Coinbase itself*," AC ¶ 936 (emphasis added).

*Title*:  The Complaint's factual allegations about *who* holds title to the Tokens also conflict with those in the AC.  The Complaint makes these allegations by referencing and incorporating the December 2020 version of the user agreement between Coinbase users and defendants, *see* Dkt. 26-3 (December 2020 version) (the "User Agreement").

That agreement is cognizable here for two reasons.[5]  First, the Complaint states that "Coinbase entered into contracts [with plaintiffs] via the Coinbase User Agreement . . . pursuant

---

[5] In briefing on the motion to dismiss, the parties dispute whether the User Agreement binds the three lead plaintiffs, inasmuch as the plaintiffs created accounts at different times in the years before this litigation, and defendants periodically updated and revised the user agreement.  *See* Pl. Opp. at 12–16; Dkt. 67 at 2–5.  In resolving the motion, the Court's charge is not to make a plaintiff-specific inquiry as to the operative agreement.  *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).  The Court is instead to accept *plaintiffs'* well-pled allegations as true.  Here, the Complaint expressly references the User Agreement as covering the class period:

to which [p]laintiffs purchased Digital Asset Securities," Compl. ¶ 273, and asserts claims based

on this contractual relationship between plaintiffs and Coinbase, *see id.* ¶¶ 262–68.  The User

Agreement is thus "incorporated by reference," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,

111 (2d Cir. 2010).  Insofar as plaintiffs sought contractual recission of the transactions, the

contractual obligations between Coinbase and plaintiffs—as set out in the User Agreement—are

central to plaintiffs' claims in the Complaint, which "rel[ies] on the terms and effect of" the User

Agreement "in drafting the Complaint," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d

Cir. 2002).  Second, the Court "may consider any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and *documents possessed by or known to the plaintiff*

*and upon which it relied in bringing the suit.*"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (emphasis added); *see Sun Micro Med. Techs. Corp. v. Passport*

*Health Commc'ns, Inc.*, No. 06 Civ. 2083 (RWS), 2007 WL 2230082, at *3 (S.D.N.Y. Aug. 2,

---

> *During the Class Period, Coinbase entered into contracts* with issuers of Digital
> Asset Securities Coinbase and made available for sale the issuer's Digital Asset
> Securities on Coinbase's unregistered exchanges, in violation of Section 5 of the
> Exchange Act.  Additionally, *Coinbase entered into contracts via the Coinbase*
> *User Agreement*, with Plaintiffs and the members of the Class and Subclasses,
> pursuant to which Plaintiffs purchased Digital Asset Securities through Coinbase
> and paid Coinbase fees for the use of its securities exchanges despite their lack of
> registration with the SEC in violation of section 5 of the Exchange Act.

Compl. ¶¶ 272–73 (emphases added).  The AC again eludes these issues, by eliminating all
references to the User Agreement.  And insofar as plaintiffs argue that considering the Complaint
and User Agreement would unfairly injure Rodriguez, the new plaintiff the AC added to succeed
an earlier plaintiff, that is wrong, as plaintiffs do not—and cannot—dispute that the plaintiff
added by the AC "ha[d] his interests adequately represented by someone with the same interests
who [was] a party." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999).  The Court therefore
considers the December 2020 User Agreement in effect during the Class Period, as cited in the
Complaint.  The predecessor versions contain substantially similar relevant language. *See, e.g.*,
Dkt. 35-16 (January 2019 user agreement version).

2007) ("When ruling on a motion to dismiss, the Court may take judicial notice of . . . items in the record of the case."). The User Agreement was put on the case record *by plaintiffs*, soon after they filed the Complaint, in seeking emergency relief. *See* Dkt. 26; *see also Avila v. Comm'r of Soc. Sec.*, No. 15 Civ. 2456 (JGK), 2016 WL 1562944, at *1 (S.D.N.Y. Apr. 18, 2016). They sought to enjoin defendants from enforcing an updated user agreement against plaintiffs with respect to its dispute resolution provisions, which directed disputes of this nature to mandatory arbitration. *See* Dkt. 38-1. In so doing, plaintiffs asserted the primacy of the pre-January 31, 2022 user agreement (that is, the agreement from December 20, 2020). Plaintiffs thus both "possessed," *ATSI Commc'ns, Inc.*, 493 F.3d at 98, that agreement, *see* Dkt. 26-3, and "relied [on it] in bringing the suit" in this Court, *ATSI Commc'ns, Inc.*, 493 F.3d at 98. They "cannot plead around it by refusing to make reference to it" in the AC. *Van Houtven v. Adams*, No. 13 Civ. 1964 (CM), 2014 WL 1338066, at *2 (S.D.N.Y. Apr. 3, 2014), *aff'd*, 605 F. App'x 37 (2d Cir. 2015).

The User Agreement's terms flatly contradict the AC's allegations that Coinbase holds title to the digital assets. The User Agreement—in language directed to the user—states that "[t]itle to Digital Currency shall at all times remain with you and shall not transfer to Coinbase." User Agreement § 2.6.1. It adds: "You control the Digital Currencies held in your Digital Currency Wallet." *Id.* § 2.6.2.

The User Agreement also reinforces the Complaint's pleading that, by using Coinbase, the user does not transact directly with, or pass title to or from, a Coinbase entity when they purchase a Token. It states: "When you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase.

Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase [Inc.] customers." *Id.* § 3.2.

For these reasons, the Court need not, and does not, accept the AC's contrary allegations, which unavoidably emerge as strategically added to elude the facts pled in the Complaint and contained in the User Agreement that checkmate plaintiffs from adequately pleading the first prong of *Pinter*'s statutory seller inquiry.  "While the Court must accept the facts as alleged in the complaint, when any allegations contradict the evidence contained in the document[] relied upon by . . . plaintiff[s], the document[] control[s], and the Court need not accept the allegations contained within the complaint as true." *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) (internal quotations omitted).  And "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading." *Wheeler*, 2019 WL 2994193, at *6 (cleaned up).  The Court therefore declines to credit the AC's allegations as to privity and title.

Without these allegations, the AC fails to plead the first prong of *Pinter*'s statutory seller inquiry.  The Court cannot credit the AC's allegations that privity was solely between defendants and plaintiffs for each of the transactions at issue, nor can it credit the AC's allegations to the effect that defendants, as opposed to the sellers, held title to the assets that were the subjects of these transactions.  Such is clear, in fact, from a recent on-point decision from this District, resolving a motion to dismiss a complaint against a cryptocurrency digital exchange alleged to be a Section 12 statutory seller.  That decision, by Judge Carter, resolved a motion to dismiss on a similar theory, litigated during the period spanning the filing of the AC here.  *See Anderson v. Binance*, No. 20 Civ. 2803 (ALC), 2022 WL 976824, at *3 n.2 (S.D.N.Y. Mar. 31, 2022).  In the pertinent part of the analysis in *Binance*, Judge Carter rejected the theory that a digital exchange

was a "statutory seller[] because [it] passed title to Plaintiffs," noting that the complaint's factual allegations did not support this assertion.  The same is so here.

The Court accordingly—holding plaintiffs to the allegations in their Complaint and to the provisions of the User Agreement that the Complaint incorporates—holds that plaintiffs have not pled that Coinbase either qualified as the user's "immediate seller," *Pinter*, 486 U.S. at 642, or "passed title, or other interest in the security, to the buyer for value," *id.* at 644 n.21.  Because "remote purchasers are precluded from bringing actions against remote sellers" and "a buyer cannot recover against his seller's seller," *id.*, the AC fails *Pinter*'s first requirement.

      *c.*     Pinter*'s Second Prong: Whether Coinbase Solicited the Transactions*

Plaintiffs argue that the AC adequately alleges that Coinbase solicited plaintiffs' purchases of the Tokens. *See* Pl. Opp. at. 17.  In *Pinter*, the Supreme Court narrowly construed "solicitation" under the Securities Act, mindful that "Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer." *Pinter*, 486 U.S. at 647.  The Court reasoned:  "When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.'" *Id.*

To hold a defendant liable under Section 12 as a seller, a purchaser such as plaintiffs must, therefore, demonstrate its direct and active participation in the solicitation of the immediate sale. *See, e.g., Capri*, 856 F.2d at 478–79 (plaintiffs must show that the particular defendant actually solicited their investment); *Holsworth v. BProtocol Found.*, No. 20 Civ. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 12 claim where plaintiff failed to allege that he "was directly contacted by Defendants or that he purchased

securities as a result of any active solicitations by Defendants"); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 Civ. 9270 (DLC), 2020 WL 3318029, at \*4 (S.D.N.Y. June 18, 2020) ("[P]laintiffs must show that [defendant] actually solicited their investment."); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at \*2 (S.D.N.Y. June 29, 2001) ("[Plaintiff] must allege not only that [defendant] actively solicited investors with respect to this transaction but that he purchased securities as a result of [the] solicitation.").

Measured against that standard, the AC's allegations regarding Coinbase's "solicitation" of the transactions involving the Tokens fail, because they do not describe conduct beyond the "collateral" participation that *Pinter* and its progeny exclude from Section 12 liability. *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("[C]ollateral participants who do not solicit sales cannot be liable under Section 12(1) . . . ."). The AC alleges that Coinbase was an exchange that "promote[d] the sale of Tokens by providing users with descriptions of each Token and its purported value proposition," AC ¶ 911; "participated in direct promotions, including 'airdrops' of free Tokens designed to increase trading volume," *id.*; "wr[ote] news updates on price movements of the Tokens," *id.*; and "link[ed] to stories about the Tokens published across the internet," *id.* These activities of an exchange are of a piece with the marketing efforts, "materials," and "services" that courts, applying *Pinter*'s second prong, have held insufficient to establish active solicitation by a defendant. *See Youngers v. Virtus Investment Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016); *see also In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1220 (D.N.M. 2010), *on reconsideration in part*, 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Tezos Secs. Litig.*, No. 17 Civ. 6779 (RS), 2018 WL 4293341, at \*3 (N.D. Cal. Aug. 7, 2018);

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 Civ. 0302 (MRP), 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011).

And even had the AC pled direct solicitation by Coinbase, it does not plead that plaintiffs purchased and sold the Tokens as a result of such solicitation, as also required. *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing claim where plaintiff "failed to allege that plaintiff in fact purchased the [securities] as a result of [defendant's solicitation").

Because the AC's allegations fall short of the standard set by *Pinter,* the Court dismisses Count One for failure to state a claim.

### 2.    Control-Person Liability Under Section 15

It follows from this dismissal that dismissal of the AC's "control person" claims under Section 15 of the Securities Act against Coinbase Global and Brian Armstrong is also required. *See* 15 U.S.C. § 77o.  Such claims require a plaintiff to allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005).  The primary violation that is the basis for the Section 15 claims is the Section 12(a) claim against Coinbase in Count One, which the Court has dismissed.  The Court accordingly dismisses the derivative Count Two for failure to state a claim.

### B.    Claims Under the Exchange Act

The AC brings several sets of related claims under the Exchange Act.  First, it brings claims to rescind illegal contracts to pay transaction fees to an unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5, 15(a)(1) and 29(b) of the Act, *see* AC ¶¶ 956–65 (Count Three); *id.* ¶¶ 966–78 (Count Four); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b).  Second, it brings claims to rescind illegal contracts to purchase securities from an

unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5,

15(a)(1) and 29(b) of the Exchange Act, *see* AC ¶¶ 979–88 (Count Five); *id.* ¶¶ 989–1001

(Count Six); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b).  Third, it brings a claim under

Section 20 for control-person liability against Coinbase Global, Inc. and Armstrong; this claim is

based upon the violations alleged in Counts Three through Six, *see* AC ¶¶ 1002–15 (Count

Seven); *see also* 15 U.S.C. § 78t(a).  The Court addresses first the claims of direct violations of

the Act (Counts Three through Six) and then addresses the control-person claim (Count Seven).

> ### 1.   Allegations Relating to the Illegal Contracts

The AC's substantive claims under the Exchange Act seek rescission of the transactions

involving the Tokens under Section 29(b).  Section 29(b) provides in part:

> Every contract made in violation of any provision of this chapter or of any rule or
> regulation thereunder, and every contract . . . the performance of which involves
> the violation of, or the continuance of any relationship or practice in violation of,
> any provision of this chapter or any rule, or regulation thereunder, shall be
> void . . . as regards the rights of any person who, in violation of any such provision,
> rule, or regulation, shall have made or engaged in the performance of any such
> contract.

15 U.S.C. § 78cc(b).  To establish a violation of Section 29(b), a plaintiff must show that "(1) the

contract involved a prohibited transaction, (2) he is in contractual privity with the defendant[s],

and (3) he is in the class of persons the [Exchange] Act was designed to protect."  *EMA Fin.,*

*LLC v. Vystar Corp., Inc.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (S.D.N.Y.

Mar. 29, 2021).

The AC keys its allegations on the first element—a contract involving a prohibited

transaction—to the theory that the Tokens were "prohibited," in violation of two other sections

of the Exchange Act.  As plaintiffs articulate this theory in their memorandum of law:

> The purchases and sales at issue in this action constitute individual contracts that
> are voidable because they are entirely premised on the illegal purchase or sale of
> an unregistered security by an unregistered broker/dealer on an unregistered

exchange, in violation of Sections 5 and 15 of the Exchange Act. Because the contracts at issue are facially unlawful (since each is entirely predicated on violations of federal and state law), they are voidable at [p]laintiffs' election under Section 29(b).

Pl. Opp. at 1–2.

The parties dispute whether Section 29(b) provides a private cause of action to sue for a violation of Sections 5 and 15(a) (or any provision) of the Exchange Act. Defendants argue not. *Compare* Defs. Mem. at 13–17, *with* Pl. Opp. at 17–23.

Regardless, these claims fail, because the AC's allegations as to the first element—that "the contract involved a prohibited transaction," *EMA Fin., LLC*, 2021 WL 1177801, at *2—are deficient. Under Section 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F.2d 901 (2d Cir. 1981). "This test manifests the common-law principle that a contract to perform an illegal act is void, *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020), whereas rescission is not available when "the violation complained of is collateral or tangential to the contract between the parties," *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984). A contract can be voided only where "there could be no performance under the contract without violating the [Exchange] Act," *id.* (citing *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)).

The parties disagree as to the "contract" implicated by plaintiffs' claims. Defendants contend that the "contract" that must have "'on its face,' require[d] the performance of an illegal act," *Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18 Civ. 4201 (LGS), 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019), could only be the user agreement. Plaintiffs, however, take a transaction-specific view. They argue that "[e]ach of [p]laintiffs' transactions on Coinbase is a separate contract between the user and Coinbase to effect a trade at a given

price. Those purchase and sale contracts are distinct from the User Agreement [d]efendants argue applies to [p]laintiffs." Pl. Opp. at 20.

Plaintiffs' notion that each transaction involving any one of the Tokens is the "contract" implicated by their Section 29(b) claims lacks factual support—the AC does not, for example, identify any transaction-specific contract. And plaintiffs' notion that, without more, each individual purchase or sale qualifies as a contract within the meaning of Section 29(a) is without support in the case law. This Court, in fact, confronted substantially the same issue in the context of a similar factual pattern, in which securities investors made purchases or sales against the backdrop of a foundational agreement between them and their investment firm that predated (and governed) the individual transactions. *See In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570, 589, 591 n.11 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020) (citing *Zerman*, 510 F. Supp. at 135) (rejecting recission of transactions where there was "no suggestion that the basic customer agreement plaintiff signed is not lawful"); *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291 (D. Conn. 1979) (rejecting that "Section 29(b) should not only apply to the basic contract between the parties but also to each transaction that occurs thereunder").

The Court follows suit here. As pled, the only contract capable of rescission here under Section 29(b) is the User Agreement. Plaintiffs' initial Complaint is again telling on this point, on its own terms and insofar as it incorporates by reference the User Agreement, as reviewed above. The Complaint expressly alleges that "Coinbase entered into contracts via the Coinbase User Agreement, with Plaintiffs and the members of the Class and Subclasses, *pursuant to which* Plaintiffs purchased Digital Asset Securities through Coinbase and paid Coinbase fees for the use of its securities exchanges." Compl. ¶ 273 (emphasis added). This allegation destroys the AC's

22

Exchange Act claims, insofar as it tracks, virtually verbatim, the statutory standard. It is again no escape for plaintiffs to have filed an Amended Complaint that excises all references to the User Agreement, for the reasons above. By stripping away all references to the User Agreement, the AC is able to add Exchange Act claims permitting rescission. But once plaintiffs' earlier allegations in the Complaint as to the same transactions regarding the Tokens are treated as cognizable, the AC's bid to pursue claims for rescission based on a course of dealings not involving the User Agreement becomes unsustainable.

Critical to the analysis under Section 29(b), performance of the User Agreement did not necessitate illegal acts. Indeed, as defendants note, plaintiffs admit continuing to use the Coinbase platforms since filing the original lawsuit, and "that the Coinbase 'platform has other uses beyond the trading of securities, including the trading of crypto-commodities (such as Bitcoin or Ethereum), which are not the subject of this suit.'" Defs. Mem. at 18 (quoting Dkt. 31 at 6 n.3). Indeed, as defendants note, because users are free to transact in other assets—including Bitcoin or Ethereum, or not at all—the User Agreement cannot be said to require any party to transact in the Tokens that the AC depicts as unregistered securities. *Id.*; *see* AC ¶ 49. Thus, viewed facially, "the customer agreement at issue here is a lawful one." *In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. at 591.

The Court accordingly dismisses the AC's Counts Three through Six under the Exchange Act. These claims do not identify a contract between plaintiffs and Coinbase that would support rescission. And the agreement that plaintiffs' predecessor pleading identified as covering such transactions, the User Agreement, definitely would not.

### 2.    Control-Person Liability Under Section 20

As with its Securities Act claims, the AC brings "control person" claims against Coinbase Global and Armstrong, this time under Section 20 of the Exchange Act. To state a claim under

Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 98); *see Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999); *see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14 Civ. 5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016). The control-person claims here are premised on the AC's substantive Exchange Act claims, which the Court has dismissed. It follows that the control-person claims must also be dismissed for want of a well-pled primary violation.

### C.    State Claims

The Court must next determine whether to exercise supplemental jurisdiction over the AC's state-law claims, brought under California, Florida, and New Jersey laws, *see* AC ¶¶ 1016–49 (California), 1050–71 (Florida), 1072–1106 (New Jersey).

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173 (1997), and a court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).

A district court should, in deciding whether to exercise its supplemental jurisdiction, balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988); *see also Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he discretion implicit in the word 'may' in subdivision (c) of

§ 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."). However, both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966)); *see also United Mine Workers of Am.*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).

Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over plaintiffs' state-law claims. The Court has not invested the resources necessary to resolve these non-federal claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. The Court accordingly declines to exercise supplemental jurisdiction over these claims. These claims are dismissed without prejudice.

### D. Dismissals With and Without Prejudice

For the foregoing reasons, the Court dismisses the AC.

As to plaintiffs' federal-law claims, the Court's assessment is that granting leave to amend would be futile. Plaintiffs have already had an opportunity to amend their complaint, *see* Dkts. 1, 43, and as reviewed above, they did so by adding numerous allegations that directly contradicted their initial Complaint. And plaintiffs have made only a perfunctory request for leave to amend anew in the event of the AC's dismissal. In their opposition to the motion to

dismiss, they ask that "permission to replead be granted" should the Court dismiss the claims. Pl. Opp. at 30. But plaintiffs have not identified any concrete amendments or additions, let alone ones that might cure the deficiencies afflicting their Securities Act and Exchange Act claims. This supports denial of leave to amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"); *F5 Capital*, 856 F.3d at 89 (affirming denial of leave to amend on futility grounds where plaintiff provided "no clue as to how the complaint's defects would be cured through an amendment" (internal quotation marks omitted)). And given the analysis above, it is difficult to see how any revised such claims could overcome plaintiffs' factual averments in the Complaint and the terms of the User Agreement. "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."); *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015).

The Court therefore dismisses plaintiffs' federal claims with prejudice. The dismissal is, however, without prejudice as to plaintiffs' state-law claims, which have been dismissed based on a decision not to exercise supplemental jurisdiction.

## CONCLUSION

For the reasons above, the Court dismisses all claims in the AC. The federal claims are dismissed with prejudice. The state-law claims are dismissed without prejudice.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 58, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 1, 2023
       New York, New York