UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD, *et al.*,

                                        Plaintiffs,

                    -v-

COINBASE GLOBAL, INC., *et al.*,

                                        Defendants.

---

21 Civ. 8353 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs bring this putative class action under the securities laws against defendants
Coinbase Global, Inc., Coinbase, Inc. (collectively with Coinbase Global, "Coinbase"), and
Brian Armstrong ("Armstrong").  The Amended Complaint alleges claims under (1) the
Securities Act of 1933 (the "Securities Act); (2) the Securities Exchange Act of 1934 (the
"Exchange Act"); and (3) state law.  *See* Dkt. 43 (the "AC").  Its gravamen is that Coinbase lists
and sells digital assets qualifying as "securities" without registering with the U.S. Securities and
Exchange Commission ("SEC") as a securities exchange or broker-dealer.

On February 1, 2023, the Court granted Coinbase's motion to dismiss the AC in its
entirety for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).
*Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 230 (S.D.N.Y. 2023) ("*Coinbase I*").
On appeal, the Second Circuit affirmed the dismissal of the Exchange Act claims but reinstated
plaintiffs' Securities Act and state law claims.  *See Oberlander v. Coinbase Glob. Inc.*, No. 23-
184-cv, 2024 WL 1478773 (2d Cir. Apr. 5, 2024).  After remand, Coinbase filed an Answer.
Based in part on documents annexed to its Answer, Coinbase now moves for judgment on the
pleadings pursuant to Rule 12(c).

The Court, substantially constrained by the Second Circuit's decision at the pleadings stage, denies Coinbase's motion. However, the Court appreciates that discovery pertinent to whether Coinbase qualifies as a "statutory seller" amenable to suit under Section 12(a)(1) of the Securities Act (and as relevant, under state law) is a discrete issue that is segregable from the merits of plaintiffs' claims and that has the capacity to resolve this case. The Court therefore, as explained below, instructs the parties to develop a case management plan entailing bifurcated discovery that is aimed at front-loading resolution of that issue via early summary judgment motion(s).

## I.    Background

### A.    Factual Background[1]

The Court assumes familiarity with the factual background relevant to this controversy, including as to digital assets, which is set out in detail in *Coinbase I. See* Dkt. 71.

To summarize briefly:  Coinbase operates two online platforms on which users can buy and sell digital assets, Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform").  AC ¶ 5.  As alleged, the Coinbase Platform is "marketed towards newer users." *Id.* ¶ 35.  It allows users to place market orders only, that is, to transact in digital assets "at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order." *Id.*  In contrast, the Coinbase Pro Platform "is designed for use by advanced and active digital asset traders." *Id.* ¶ 37.  It "allow[s] individuals to place three types of orders: a market order," *id.*, "a limit order to buy or sell a digital asset at a specific price or better, or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price," *id.*

---

[1] The summary is drawn from the AC.  For the purposes of resolving the motion for judgment on the pleadings, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024).

The AC alleges that the Coinbase platforms operate as "centralized exchanges." *Id.* ¶¶ 32, 34. Trades "do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller." *Id.* ¶ 33. If two users wish to transact, Coinbase intermediates, such that each user transacts with Coinbase, rather than with the other user. *Id.* "Thus, if [a customer] wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit [that customer's] account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain." *Id.* Customers are charged fees on both platforms. *See id.* ¶¶ 34–40.

Among the digital assets transacted on the Coinbase platforms are 79 digital assets known as the "Tokens,"[2] which qualify as "securities," the AC alleges. AC ¶ 1. The putative class consists of all persons or entities who transacted in the Tokens on the Coinbase platforms between October 8, 2019 and the AC's filing on March 11, 2022 (the "class period"). *Id.* ¶¶ 1, 918–19.

During the class period, the AC alleges, neither Coinbase Platform was registered with the SEC as a securities exchange, *id.* ¶ 64; *see* 15 U.S.C. § 78c, or broker-dealer, AC ¶ 64; *see* 15 U.S.C. § 78o(a)(1). "Because Coinbase brings together buy and sell orders for the Tokens[,] and the Tokens are securities," *id.* ¶ 5, the AC alleges, Coinbase "stands between the buyer and seller

---

[2] Specifically, this action concerns the 79 digital assets traded under the following symbols; 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, and ZRX. (collectively, the "Tokens"). AC ¶ 1.

in each trade on its platform, meaning that [it] is the actual seller of the unregistered securities that transact each day on its platform," *id.* ¶ 6.

### B. Procedural History

#### 1. *Coinbase I*

On October 8, 2021, three plaintiffs—Christopher Underwood of Florida, Louis Oberlander of California, and Zeneyda Patin of New York (collectively, the "original plaintiffs")—filed the Complaint. *See* Dkt. 1. On October 12, 2021, counsel for the original plaintiffs published the requisite Private Securities Litigation Reform Act notice of this action through PR Newswire. *See* Dkt. 18, Ex. A.

On December 13, 2021, two original plaintiffs—Underwood and Oberlander—along with a new plaintiff, Henry Rodriguez, moved to be appointed lead plaintiffs. Dkt. 15. On January 11, 2022, the Court granted an unopposed motion to name the three as lead plaintiffs and to appoint Silver Golub & Teitell LLP and Selendy & Gay as co-lead counsel. Dkt. 21.

On March 11, 2022, Underwood, Oberlander, Rodriguez filed the AC. Dkt. 43. It changed plaintiffs' claims in nature and scope by, *inter alia*, (1) adding Coinbase, Inc. as a defendant; (2) adding to the digital assets within the scope of the lawsuit; and (3) adding federal claims, including as to control-person liability, and state law claims. *Compare* Dkt. 1, *with* AC. As filed, the AC brought three sets of claims: (a) under Section 12(a)(l) of the Securities Act, alleging the sale or solicitation of unregistered securities by Coinbase, AC ¶¶ 931–41; *see* 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1); (2) under Section 29(b) of the Exchange Act, alleging that Coinbase entered into illegal contracts with its users to purchase and sell securities in violation of the Exchange Act's registration requirements, AC ¶¶ 956–88; *see* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b); and (3) under the securities laws of California, Florida, and New Jersey, alleging that Coinbase sold unregistered securities and failed to register as a broker-dealer, AC ¶¶ 1016–1106;

*see* Cal. Corp. Code §§ 25110, 25130, 25210, 25503, 25501.5(a), 25504; Fla. Stat. §§ 517.07, 517.12(1), 517.211; N.J. Stat. §§ 49:3-56(a), 49:3-60, 49:3-71.  It also brought control-person claims against Coinbase Global and its Chief Executive Officer, Armstrong, who allegedly orchestrated Coinbase's strategy to profit in violation of the securities laws, AC ¶¶ 942–55, 1002–15, 1038–49, 1094–1106; *see* 15 U.S.C. § 77o(a), 78t(a).  Its federal claims were brought on behalf of a nationwide class consisting of all persons or entities who transacted in the Tokens on the Coinbase trading platforms during the class period.  AC ¶ 918.  Its state law claims were brought on behalf of subclasses of citizens of California, Florida, and New Jersey who so traded during the class period.  *Id.* ¶ 919.

On May 10, 2022, defendants moved to dismiss the AC in its entirety pursuant to Rule 12(b)(6).  *See* Dkts. 58–60.  On July 11, 2022, plaintiffs filed an opposition.  *See* Dkts. 62–63.  On August 5, 2022, defendants replied.  *See* Dkts. 67–68.

On February 1, 2023, the Court granted Coinbase's motion to dismiss the AC.  *Coinbase I*.  The Court considered in turn each of plaintiffs' claims under the Securities Act, Exchange Act, and state law:

***Securities Act claims***.  The viability of plaintiffs' claim under Section 12(a) of the Securities Act, the Court explained, turned on the premise that Coinbase was a "statutory seller" under the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622 (1988).  *See Coinbase I*, 654 F. Supp. 3d at 234–35.  *Pinter* holds that a defendant can be held liable as a "statutory seller" if it either (1) "passed title, or other interest in the security, to the buyer for value" or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities['] owner."  486 U.S. at 642, 644 n.21, 647.

As to the first prong of *Pinter*, the Court found that the AC did not plausibly allege that Coinbase was a statutory seller—to wit, that Coinbase was the user's immediate seller or passed title, or other interest in the security, to the buyer for value. *Coinbase I*, 654 F. Supp. 3d at 238. In reaching this conclusion, the Court put aside the AC's allegations that were directly contradicted by factual allegations in the Complaint, noting that such "unavoidably emerge[d] as strategically added to elude" the facts pled in the original Complaint and the December 2021 version of the Coinbase's User Agreement (*i.e.*, between Coinbase users and Coinbase). *Id.* at 235–38 (citing Dkt. 26-3). Those facts, the Court explained, "checkmate plaintiffs from adequately pleading the first prong of *Pinter*'s statutory seller inquiry." *Id.* at 237.[3]

Second, the Court found, plaintiffs did not adequately allege that Coinbase solicited plaintiffs' purchases of the Tokens because they did not describe conduct beyond the "collateral" participation that *Pinter* and its progeny exclude from Section 12 liability. *Id.* at 239 (quoting *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989)). Because the AC did not adequately plead either prong of *Pinter*, the Court held, it was required to dismiss the Section 12(a) claims. *Id.* The Court dismissed the control-person claim under Section 15, too, because it was derivative of the Section 12(a) claim. *Id.*

***Exchange Act claims.*** The Court found that the AC's allegations did not identify any transaction-specific contract between plaintiffs and Coinbase capable of rescission under Section 29(b). *Id.* at 241; *see Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981) (under Section 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts."), *aff'd*, 672 F.2d 901 (2d Cir. 1981). This deficiency was also fatal to

---

[3] The Court found that the December 2021 version of the User Agreement was cognizable because, *inter alia*, it was "incorporated by reference" into the original Complaint. 654 F. Supp. 3d at 236–37 (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

plaintiffs' control-person claim under Section 20 because such was premised on a primary

violation of Section 29(b). *Coinbase I*, 654 F. Supp. 3d at 242; *see, e.g.*, *Ark. Pub. Emps. Ret.*

*Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022) ("To state a claim under

Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation . . . .").

    ***State law claims***.  Having dismissed the federal claims, the Court declined to exercise

supplemental jurisdiction over plaintiffs' state law claims. *Coinbase I*, 654 F. Supp. 3d at 243.

Consequently, the Court dismissed these without prejudice. *Id.* at 243–44.

    On February 9, 2023, plaintiffs appealed.  Dkt. 73.

    **2.**    **The Second Circuit's Decision**

    On April 5, 2024, the Second Circuit affirmed in part and reversed in part this Court's

dismissal of the AC. *Oberlander*, 2024 WL 1478773, at *5.  The Circuit held that the Exchange

Act claims were properly dismissed with prejudice.  The AC's "repetitive, conclusory

allegations" that plaintiffs "had one or more losing transactions" involving the Tokens, the

Circuit explained, did not plausibly allege a contract capable of rescission under Section 29. *Id.*

at *4 & n.8.

    The Circuit, however, reinstated the Securities Act and state law claims.  The Circuit held

that the AC "plausibly allege[s] claims under Section 12(a)(1) that survive a motion to dismiss

under prong one of *Pinter*." *Id.* at *4.  Insofar as that prong asks whether the defendant "passed

title, or other interest in the security, to the buyer for value," *Pinter*, 486 U.S. at 642, 647, the

Circuit held that this Court, at the pleadings stage, was required to credit the AC's allegations

that "that privity was solely between Coinbase and Plaintiffs, and that Coinbase held title to the

Tokens that were the subject of the transactions at issue," notwithstanding the inconsistency of

that pleading with the initial Complaint's factual allegations and the December 2021 User

Agreement's terms. *Oberlander*, 2024 WL 1478773, at *2–4.  That was so for two reasons.

First, any inconsistency between the facts alleged in the Complaint and those in the AC was to be disregarded because "an allegation in a superseded pleading ceases to be a conclusive judicial admission, even as it may remain competent evidence for submission to the factfinder." *Id.* at *3 (citation omitted). Second, assuming without deciding that any version of the User Agreement was integral to AC, the Circuit found that "the differing language in the various user agreements that plausibly apply to Plaintiffs' claims precludes resolution of the title and privity issues on a motion to dismiss." *Id.* at *4. As for the state law claims, the Circuit remanded them for this Court to consider in the first instance, even if the federal claims did not proceed, noting that the Court independently had diversity jurisdiction over these pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). *See id.* at *5.

### 3.    Proceedings on Remand

On May 1, 2024, the Court directed the parties to meet and confer and provide a status update as to the two surviving sets of claims: the Securities Act claims and state law claims. Dkt. 77. On May 8, 2024, the parties filed a joint letter proposing a schedule for briefing Coinbase's anticipated motion for judgment on the pleadings and noting that discovery would remain stayed pending the Court's resolution of the motion. Dkt. 78. On May 9, 2024, the Court endorsed the briefing schedule proposed by the parties. Dkt. 79.

On June 27, 2024, Coinbase filed its Answer, Dkt. 81, annexing 34 versions of the User Agreement, Dkt. 81, Exs. 1–34. Coinbase averred that it had annexed all versions of the User Agreement "published and in effect" during the class period. Answer at 3.

On July 29, 2025, Coinbase moved for judgment on the pleadings pursuant to Rule 12(c), Dkt. 82, and filed a memorandum of law in support, Dkt. 83 ("Coinbase Br."). On September 27, 2024, plaintiffs opposed. Dkt. 84 ("Pls. Br."). On October 28, 2024, Coinbase replied. Dkt. 89 ("Coinbase Reply Br.").

## II.    Legal Standards Governing this Motion for Judgment on the Pleadings

### A.    Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides:  "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is governed by "the same standard" as a motion to dismiss under Rule 12(b)(6).  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam)); *accord L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  Thus, the court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A grant of a motion pursuant to Rule 12(c) is proper 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'"  *Dargahi v. Honda Lease Tr.*, 370 F. App'x. 172, 174 (2d Cir. 2010) (summary order) (quoting *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam)).

### B.    The Mandate Rule

The "mandate rule" requires a trial court to follow an appellate court's previous ruling on an issue in the same case.  *See Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948) (citing *Himely v. Rose*, 9 U.S. (5 Cranch) 313, 314 (1809)).  The appellate court's mandate "is controlling as to matters within its compass."  *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939); *see also United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000) ("When an appellate court has once decided an issue, the trial court, at a later stage of the litigation, is under a duty to follow the

9

appellate court's ruling on that issue" (quoting *United States v. Cirami*, 563 F.2d 26, 33 n.6 (2d Cir. 1977))); *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977) ("The decision of a federal appellate court establishes the law binding further action in the litigation by another body subject to its authority. The latter is without power to do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of (the) court deciding the case . . . ." (citation omitted)). Thus, the rule "ordinarily forecloses relitigation of all issues previously waived by the defendant or decided by the appellate court." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).

## III.    Discussion

Coinbase mounts two main challenges to the AC.

First, it argues that the AC does not plausibly plead the surviving claims, which are under the Securities Act and state law. The Securities Act claims comprise: (a) a claim under Section 12(a)(1) against Coinbase for the sale or solicitation of unregistered securities (Count 1); and (b) related control-person claims against Coinbase Global and Armstrong (Count 2). The state law claims comprise: (a) parallel claims against Coinbase, under California, Florida, and New Jersey law, for the offer or sale of unregistered securities (Counts 8, 11, 13); (b) parallel claims against Coinbase under the same state laws for the sale of securities by an unregistered broker-dealer (Counts 9, 12, 14); and (c) related control-person claims against Coinbase Global and Armstrong under California and New Jersey law (Counts 10, 15).

Second, it argues that the AC should be dismissed as impermissible "group pleading," because it does not sufficiently distinguish claims brought against Coinbase Inc. and Coinbase Global. Coinbase, Inc. and Coinbase Global are distinct juridical entities, but, Coinbase argues, the AC does not give either fair notice of the claims asserted against it.

Guided by the Second Circuit's decision, the Court considers each challenge in turn.

A.    **Facial Plausibility of Claims**

1.    **Claims Under Section 12(a)(1) of the Securities Act**

a.  *Legal Framework*

Sections 5(a) and (c) of the Securities Act prohibit "any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration." 15 U.S.C. § 77e(a), (c). To make out a claim under Section 5, a complaint must allege that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). If the plaintiff meets this prima facie burden, the burden shifts to the defendant to show that an exception applies. *Id.* Section 5 is a strict liability statute that does not require a showing of scienter or negligence. *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for the purchaser against the seller in any transaction that violates Sections 5(a) or (c). 15 U.S.C. § 77l(a)(1). It includes the right to sue for rescission. *See, e.g., Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77l(a))).

b.  *Application*

Coinbase argues that the AC does not plausibly allege that Coinbase qualifies as a statutory seller amenable to suit by plaintiffs under Section 12(a)(1) of the Securities Act. Coinbase Br. 7–15; *see* 15 U.S.C. §§ 77e(a), 77e(c), 77l(a). Substantially constrained by the Second Circuit's decision, the Court holds otherwise.

"[T]he list of potential defendants in a section [12(a)(1)][4] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). In *Pinter v. Dahl, supra*, the Supreme Court held that a defendant is a "statutory seller" in either of two scenarios. First, where the defendant "passed title, or other interest in the security, to the buyer for value," the buyer may recover from her "immediate seller" (but not from her "seller's seller"). 486 U.S. at 642, 644 n.21. Second, a defendant can be held liable where it "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." *Id.* at 647; *see also In re Morgan Stanley*, 592 F.3d at 359.

Coinbase argues that the AC does not plead adequate facts to support that Coinbase qualifies as a statutory seller under either scenario. As to *Pinter* prong one, Coinbase argues, the AC's factual allegations that Coinbase held title to the Tokens are "conclusory" and insufficient to support that Coinbase was the direct seller. Coinbase Br. at 9–10. And, even if the AC's allegations as to title and privity were otherwise sufficient, Coinbase argues, they are contradicted by the terms of the User Agreement and should be put aside. *See id.* at 10. With respect to *Pinter* prong two, Coinbase contends that this Court's prior ruling that the AC does not plausibly allege solicitation—which the Second Circuit did not reach—controls as law of the case. *Id.* at 2. In short, Coinbase reprises its arguments for dismissal in *Coinbase I*, save for its contention that *every* version of the User Agreement, which it has annexed to its Answer, is

---

[4] The Second Circuit has held that the identical language in Section 12(a)(2) carries the same meaning, and thus also applies *Pinter* to Sections 12(a)(2) claims. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

"integral" to the AC and therefore properly considered by the Court in resolving Coinbase's motion for judgment on the pleadings.[5]  Coinbase Br. at 7.

The Court finds that Coinbase's argument as to *Pinter* prong one is, decisively, foreclosed by the Second Circuit's decision.  Because Coinbase is thus well-pled to be a statutory seller, the Court does not reach its argument as to prong two.

The mandate rule requires this result for two reasons.  *See, e.g., Quintieri*, 306 F.3d at 1225 (the mandate rule "ordinarily forecloses relitigation of all issues . . . decided by the appellate court").

First and foremost, the Second Circuit held that "*based on the allegations in the amended complaint*, Plaintiffs have plausibly alleged claims under Section 12(a)(1) that survive a motion to dismiss under prong one of *Pinter*."  *Oberlander*, 2024 WL 1478773, at *2, *4 (emphasis added); *see also id.* at *4 n.7 (AC "adequately pled that Coinbase was a statutory seller under prong one of *Pinter*").  The Circuit further emphasized that the AC "specifically alleges that privity was solely between Coinbase and Plaintiffs, and that Coinbase held title to the Tokens that were the subject of the transactions at issue."  *Id.* at *2; *see also* AC ¶ 33 ("The buyer and seller are not in privity with one another.").  The AC's pleading, upheld by the Circuit as plausible, is that Coinbase controls the title to all the digital assets because it "place[s] all deposited assets into a centralized wallet."  AC ¶ 34; Answer ¶ 32 (admitting that "Coinbase, Inc. may use shared blockchain addresses to hold digital assets on behalf of Users").  And, in every transaction involving these digital assets, the AC alleges, "[t]he only blockchain address with

---

[5] "[A] document may be considered 'integral' to the complaint in a narrow set of circumstances, where the plaintiff relies heavily on the document's terms and effect in pleading his claims and there is no serious dispute as to the document's authenticity."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 108, 117 (2d Cir. 2021).

which a customer ever interacts is the wallet deposit address provided by Coinbase itself and that Coinbase owns." Dkt. 62 at 6; *see* AC ¶ 32. Because "[c]ustomers on Coinbase transact *solely with Coinbase itself*," it alleges, Coinbase is "a seller of the Tokens." AC ¶ 936 (emphasis added). The Circuit's holding to this effect is decisive here. Given that the Second Circuit's decision "is controlling as to matters within its compass," *Sprague*, 307 U.S. at 168, the Court is bound to follow its holding that the AC plausibly alleges that Coinbase qualifies as a direct seller under prong one of *Pinter*.

Second, even assuming that *every* version of the User Agreement in effect during the class period were "integral" to the AC, Coinbase's attempt to avoid the Second Circuit's validation of plaintiffs' pleading by reliance on this material is unpersuasive. Coinbase's argument is as follows. It begins by contending that the Circuit held dismissal unwarranted because multiple versions of the User Agreement "plausibly were in effect during the Class Period" whereas this Court had considered just one version. Coinbase Reply Br. at 3. Coinbase notes that it has now annexed all such versions of the User Agreement—34 in total—to its Answer. *See* Answer, Exs. 1–34. And, it notes, Section 2.6.1 of every version states that "title to Digital Currency shall at all times remain with you and shall not transfer to Coinbase." *See, e.g.*, Answer, Ex. 26 § 2.6.1 ("December 20, 2021 User Agreement"). Isolating this provision, Coinbase argues that the User Agreement unambiguously refutes the AC's theory that Coinbase was the direct seller because it held title to the Tokens. Coinbase thus seeks to avoid the Circuit's ruling by arguing that the Circuit did not consider every version of the User Agreement, and that had it done so, the Circuit's rationale would have supported dismissal based on the provision common to all versions.

14

The Second Circuit's decision, however, did not pivot on the language of the User Agreement. On the contrary, the Circuit went out of its way to note that the AC "does not reference any user agreement." *Oberlander*, 2024 WL 1478773, at *2; *cf. Foreman*, 19 F.4th at 108 (extra-pleading material not integral where it was "not alluded to, and did not form the basis for, the allegations or claims in the Complaint"). As a result of its myopic focus on the User Agreement, Coinbase's argument elides the Circuit's express reliance on the AC's allegations as to privity and title as sufficient to sustain the Securities Act claims. *See Oberlander*, 2024 WL 1478773, at *4 ("[B]ased on the allegations in the amended complaint, Plaintiffs have plausibly alleged claims under Section 12(a)(1) that survive a motion to dismiss under prong one of *Pinter*."). Nor does Coinbase grapple with plaintiffs' argument that title and privity are to be determined by reference to traditional principles of property law, and not merely by the language of the User Agreement. *See* Coinbase Br. 15–17 (focusing instead on whether title is a legal question *vel non*). The Circuit reserved judgment on that point precisely *because of* "[its] conclusion that plaintiffs adequately pled that Coinbase was a statutory seller under prong one of *Pinter*." *Oberlander*, 2024 WL 1478773, at *4 n.7 (citing *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987) ("The doctrine of privity . . . is to be applied with flexibility.")); *see* Pls. Br. at 18–22; *cf.* Coinbase Br. at 15. The Circuit did not hold—as Coinbase's argument presupposes—that title is a purely legal question of contract interpretation, disconnected from the factual realities of plaintiffs' interactions with Coinbase. *Cf. DiFolco*, 622 F.3d at 111 ("[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "that there exist no material disputed issues of fact regarding the relevance of the document" (citation omitted)). It left that question open, for consideration, on a complete record. Coinbase's argument, in short,

fails for lack of adequate heed to the Circuit's assessment of the pleadings. To be sure, the factual record developed in discovery, including the parties' written agreements, will ultimately control. At summary judgment, the AC's pleading to the effect that Coinbase is a statutory seller will no longer carry the day. But, at this stage, with only a portion of the potentially relevant evidence on this point (the agreements attached by Coinbase) having been adduced, Coinbase's motion under Rule 12(c) is premature. The statutory seller question should be resolved on a full record, not the "bespoke factual record" that Coinbase proposes be used. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016).

Moreover, even had the Circuit treated the statutory seller issue as necessarily controlled by the text of the User Agreements and that only, Coinbase's argument would be problematic as basis for relief at this stage. The Circuit noted that it was not merely the existence of different versions of the User Agreement that complicated the analysis, but also "the differing language . . . that plausibly appl[ies] to Plaintiffs' claims" that "precludes resolution of the title and privity issues on a motion to dismiss." *Oberlander*, 2024 WL 1478773, at *4. The Circuit considered "material[,]" at the pleadings stage, differences in language such as between the December 2021 version of the User Agreement, and the October 2019 and December 2019 versions. *Id.* Compare December 20, 2021 User Agreement § 3.2 ("When you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase."), *with* Answer, Ex. 1 § 3.2 ("October 2019 User Agreement") ("When you purchase (buy) Digital Currency *from Coinbase* . . . this transaction is intended to effect a sale of Digital Currency.") (emphasis added), *and* Answer, Ex.

4 § 3.2 ("December 2019 User Agreement") (same).[6] That Section 2.6.1 was common to these versions of the User Agreement was not "conclusive" as to the legal adequacy of the AC on the statutory seller point. *Oberlander*, 2024 WL 1478773, at *4. *Compare* December 20, 2021 User Agreement § 2.6.1 ("Title to Digital Currency shall at all times remain with you and shall not transfer to Coinbase."), *with* October 2019 User Agreement § 2.6.1 (same), *and* December 2019 User Agreement § 2.6.1 (same). The same differences in contract language noted by the Circuit are present in the record on which Coinbase now seeks dismissal. In light of the Circuit's analysis, the Court is constrained to treat these differences as precluding judgment on the pleadings. *See Brown v. City of Syracuse*, 673 F.3d 141, 147 (2d Cir. 2012) (the "mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate" (quoting *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010))).

Finally, *Brown v. City of Syracuse*, *supra*, does not release Coinbase from the mandate rule. There, the appellant argued that the district court's entry of summary judgment against him on his § 1983 claim breached the mandate rule, because the Circuit had previously reversed a decision dismissing this claim under Rule 12(b)(6). *Brown*, 673 F.3d at 144; *see also Brown v. City of Syracuse*, 197 F. App'x 22 (2d Cir. 2006). The Circuit rejected this argument. It held that that its prior ruling did not preclude the district court from deciding "the merits" of the § 1983 claim, where the district court's later decision differed in that it was based on the record developed in discovery and on intervening changes in governing law. *Brown*, 673 F.3d at 147–

---

[6] Coinbase has argued that all pre-September 3, 2020 versions of the User Agreement are inapplicable. *See* Coinbase Br. at 12. In light of the Circuit's discussion of prior versions as potentially relevant, the Court's declines to address this issue prior to discovery.

48. The Circuit emphasized the distinction between a decision on the pleadings and one founded on the factual record developed in discovery:

> Whereas in [the prior appellate decision], we had reviewed only a motion to dismiss Brown's § 1983 claims under Federal Rule of Civil Procedure 12(b)(6), on remand the district court considered the viability of Brown's § 1983 claims on a summary judgment motion after the record had been developed in discovery. . . . There is no inconsistency between our statement of hypothetical circumstances in [the prior appellate decision] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of what Brown would in fact be able to prove given the evidence and subsequently clarified state of the law.

*Id.* The changed circumstance to which Coinbase points here—its appending versions of the User Agreement to the Answer—stops short of that in *Brown*, in which discovery on the point at issue had been completed. Insofar as the discovery record has the potential to vindicate or undermine Coinbase's argument as to title and privity, *Brown* underscores that Coinbase's argument is premature.

Accordingly, the Court, heeding the mandate rule, holds the AC's allegations sufficient to allow plaintiffs' Section 12(a)(1) claim to proceed, and denies Coinbase's Rule 12(c) motion. For avoidance of doubt, the Court would not regard a motion directed to the statutory-seller element as precluded by the mandate rule (or by *Brown*) were it made after full discovery on this element.

### 2.    Control-Person Claims Under Section 15 of the Securities Act

#### a.    Legal Framework

Section 15 of the Securities Act extends liability to persons who "control" entities alleged to have violated Section 12. Section 15 provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11 or Section 12(a)(2) ], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to

> whom such controlled person is liable, unless the controlling person had no
> knowledge of or reasonable ground to believe in the existence of the facts by reason
> of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).  To plead a claim under Section 15, a complaint must allege "(a) a primary

violation by a controlled person, and (b) control by the defendant of the primary violator." *In re*

*Glob. Crossing, Ltd. Sec. Litig.,* No. 2 Civ. 910, 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7,

2005) (Lynch, J.).  Control entails "the power to direct or cause the direction of the management

and policies . . . whether through the ownership of voting securities, by contract, or otherwise."

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472–73 (2d Cir. 1996); *see also, e.g., Lanza v.*

*Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc).

### b.  Application

Coinbase argues that it is entitled to judgment on the control-person claims against

Coinbase Global and Armstrong, which are based on a primary violation of Section 12(a) by

Coinbase, Inc.  Those claims fail, Coinbase argues, because the AC does not adequately plead

(1) a primary violation by Coinbase, Inc., and (2) control over Coinbase, Inc. by Coinbase Global

or by Armstrong.  *See* Coinbase Br. at 19–20.

Coinbase's lead argument fails because, as reviewed above, the AC adequately pleads a

Section 12(a) claim, and thus the predicate for the Section 15 claim.  Coinbase's fallback

argument also fails, because the AC alleges facts supporting a reasonable inference that Coinbase

Global controls Coinbase Inc. and that Armstrong controls both entities.

As to Coinbase Global, the AC alleges that Coinbase Global wholly owns Coinbase, Inc.

and has the power to direct Coinbase, Inc.'s management and policies.  AC ¶¶ 11, 1005–09.  It

alleges that both entities are "operated as one corporation," share an office, and are collectively

termed the "Company" in their SEC filings.  *Id.*  The AC thus alleges, in support of its control

theory, more than the "mere existence of a parent/subsidiary relationship" between Coinbase Inc. and Coinbase Global. *In re Global Crossing*, 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (citing *In re WorldCom, Inc. Sec. Litig.*, No. 2 Civ. 3288, 2004 WL 1097786 (S.D.N.Y. May 18, 2004)).

Coinbase's argument as to Armstrong is also easily set aside. The AC alleges that Armstrong exercises authority over the daily operations of both Coinbase entities, including, as relevant here, "the decision not to register as a securities exchange or a broker-dealer and the decision to list unregistered securities." AC ¶¶ 12, 1011–14. The AC thus goes beyond arguing the inference of control by dint of Armstrong's position as founder-CEO and director of Coinbase Global. It plausibly alleges that he possesses "the power to direct or cause the direction of the management and policies of" Coinbase, Inc. and Coinbase Global. *First Jersey*, 101 F.3d at 1472–73; *see, e.g., id.* at 1472 (control substantiated, *inter alia*, by person's "active role" as president or CEO of the primary violator); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (similar); *cf. Lanza*, 479 F.2d at 1299 (outside director not liable as control person).

In sum, the AC has plausibly alleged control-person claims against Coinbase Global and Armstrong.

### 3.    State Law Claims

Coinbase also argues that the AC's state law claims should be dismissed because the AC does not adequately allege that Coinbase was the direct seller of the Tokens. The AC alleges parallel claims, under the different state statutes, of (1) the offer or sale of unregistered securities, and (2) the sale of a "security" by an unregistered "broker" or "dealer." *See* AC Counts 8–15. Each such claim, Coinbase argues, requires it to have been the direct seller of the Tokens, such that the state law claims should fall along with the Section 12 claims. Coinbase Br. at 30, 32;

Coinbase Reply Br. at 10; *see* Cal. Corp. Code §§ 25110, 25130, 25210, 25501.5(a), 25503, 25504; Fla. Stat. §§ 517.07, 517.12(1), 517.211; N.J. Stat. §§ 49:3-56(a), 49:3-60, 49:3-71.

That argument fails at its premise, however, because the Court, tracking the Circuit's analysis, has sustained as plausible the Section 12 claims in the AC to the effect that Coinbase was the direct seller of the Tokens. *See supra* at 18. And Coinbase acknowledges that where "a state law is patterned after a federal law, the two are construed together." Coinbase Br. at 23 (citing *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1406 (N.D. Cal. 1992) (*Pinter*'s test for "statutory seller" is dispositive); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1260 (M.D. Fla. 2010) ("Florida courts look to [the Securities Act] when interpreting [Florida securities laws]."); *Metz v. United Cntys. Bancorp*, 61 F. Supp. 2d 364, 380 (D.N.J. 1999) ("The Court does not have reason to believe that the New Jersey statute [§ 49:3-71] is any more or less exacting than the corresponding federal statutes.")).

Coinbase raises an argument distinct to the California claims. It argues that primary liability under the California Corporations Code is "narrower" than under the Securities Act because § 25110 requires that a plaintiff have purchased his security as part of an "issuer transaction." *See* Cal. Corp. Code § 25110. An "issuer transaction," Coinbase argues, is the sale of a security "purchased from the issuing corporation in a public offering." Coinbase Br. at 23 (quoting *Mirkin v. Wasserman*, 858 P.2d 568, 581 (Cal. 1993)). Coinbase argues that Count 8 fails because the AC does not allege that Coinbase was the "issuer" of any Token for which plaintiffs paid fees to Coinbase. But that is not fatal, because the AC separately bases Count 8

on a violation of § 25130, which applies to "any nonissuer transaction," Cal. Corp. Code § 25130.[7]

Thus, plaintiffs' state law claims survive.

### B.    Group Pleading

#### 1.    Legal Framework

Rule 8 requires that a complaint give each individual defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (citing *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)); *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995). A complaint need not be "a model of clarity or exhaustively present the facts alleged," but it must "give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene*, 10 F. App'x at 34. When a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct," it fails to satisfy this minimum standard. *Abruzzo*, 49 F.3d at 86; *see also Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019).

#### 2.    Application

Coinbase argues that the AC's use of "Coinbase" to refer to both Coinbase, Inc. and Coinbase Global amounts to impermissible group pleading under Rule 8(a). It argues that Coinbase, Inc. and Coinbase Global are distinct entities and that the AC does not give either fair notice of the claims asserted against it. *See* Coinbase Br. at 25. Coinbase argues, in the alternative, that Coinbase Global should be dismissed because it is not a party to the User Agreement between users of the platform and Coinbase, Inc. and does not provide any of the services at issue. Coinbase Br. at 11.

---

[7] In any event, Coinbase's reply appears to have abandoned this argument. *See* Coinbase Reply Br. at 16.

The Court holds that the AC meets Rule 8's "lenient standard." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004). Dismissal under this Rule "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). Rule 8 does not require that the complaint separate out claims against individual defendants so long as defendants have "notice of the substance of plaintiff's claims" against them. *Lopez v. BigCommerce, Inc.*, No. 16 Civ. 8970, 2017 WL 3278932, at *2 (S.D.N.Y. Aug. 1, 2017). And courts in this District have held that a complaint may properly make "allegations against 'Defendants' collectively" where defendants are "related corporate entities" and "multiple defendants" are alleged to have engaged in "the same conduct." *Kashef v. BNP Paribas SA*, No. 16 Civ. 3228, 2021 WL 1614406, at *2 (S.D.N.Y. Apr. 26, 2021) (quoting *Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 237 (S.D.N.Y. 2014)); *see also, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 422–23 (S.D.N.Y. 2010) (sustaining pleading where it alleged a "factual basis" for making certain allegations against defendants collectively and "clearly define[d]" the relationship between the defendants); *McCardle Bracelin v. Congress Hotel, LLC*, No. 20 Civ. 861, 2022 WL 486805, at *7 (N.D.N.Y. Feb. 17, 2022) ("[A]sserting claims against a group of defendants is appropriate if those defendants allegedly acted in concert to violate a Plaintiff's rights. A complaint that pleads enough facts to make claims of such wrongdoing plausible need not then describe each defendant's particular role in detail in order to avoid dismissal on 'group pleading grounds.'"); *cf. David v. Weinstein Co. LLC*, No. 18 Civ. 5414, 2019 WL 1864073, at *5 (S.D.N.Y. Apr. 24, 2019) (similar).

Such is the case here. First, the AC alleges a lack of corporate separateness between Coinbase Global and Coinbase, Inc. It pleads that the two entities "are operated as one

corporation," that "users have no visibility into which entity they are transacting with," that "Coinbase refers to the two entities jointly as the 'Company' in its SEC filings," and that the two entities "share an office in New York City." AC ¶ 11. This supplies a colorable basis, at the pleadings stage, "to disregard these entities' corporate separateness." *See Kashef*, 2021 WL 1614406, at *2 ("It may be especially appropriate to refer to defendants collectively where the defendants are related corporate entities, as opposed to unaffiliated entities or individuals, accused of acting in concert."); *see also, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Surgalign Spine Techs., Inc.*, No. 22 Civ. 9870, 2024 WL 477031, at *5 (S.D.N.Y. Feb. 7, 2024) ("[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."); *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13 Civ. 7639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) (same).

Second, the AC alleges that Coinbase Global and Coinbase, Inc. acted in concert to promote the sale of unregistered securities, to further their joint financial interests. AC ¶ 936 ("Throughout the Class Period, Coinbase Global and Coinbase, Inc. promoted, solicited, offered, and sold 12(a)(1) Tokens to Plaintiffs and members of the Class."); *id.* ¶ 937 ("[B]y offering 12(a)(1) Tokens to Plaintiffs and members of the Class, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of 12(a)(1) Tokens for sale on the Coinbase Exchanges."). It thus pleads facts supporting the involvement of both in the allegedly unlawful conduct. To be sure, the AC does not specify the relative culpability of the two entities, but it need not do so, as "[p]rior to discovery, plaintiff need not explain the details of each defendant's role in the planning . . . and executing" of an "alleged joint scheme." *Hudak v.*

*Berkley Grp., Inc.,* No. 13 Civ. 00089, 2014 WL 354676, at \*4 (D. Conn. Jan. 23, 2014); *see also, e.g., Kashef,* 2021 WL 1614406, at \*3; *Lopez v. BigCommerce, Inc.,* No. 16 Civ. 8970, 2017 WL 3278932, at \*2 (S.D.N.Y. Aug. 1, 2017).

## CONCLUSION

For the foregoing reasons, the Court denies Coinbase's motion for judgment on the pleadings.

By separate order today, the Court will schedule an initial pretrial conference for March 5, 2025. The Court directs the parties to file, by March 3, 2025, a proposed case management plan. The Court's determination is to front-load resolution of the statutory seller issue, given the potential for the resolution of that issue to resolve the outstanding claims. Accordingly, the parties' proposed management plan should provide for a bifurcation of discovery, with full discovery on that issue proceeding first, followed by summary judgment motion(s) on that issue, and with discovery and motions on other issues deferred until motions on the statutory seller issue have been resolved.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 82 and 90.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 7, 2025
New York, New York