UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| CHRISTOPHER UNDERWOOD, LOUIS OBERLANDER, and HENRY RODRIGUEZ on behalf of themselves and all others similarly situated, | : : : : : | Case No. 1:21-cv-08353-PAE |
| Plaintiffs, | : : : | |
| v. | : : : | DEFENDANTS' AMENDED ANSWER TO THE AMENDED COMPLAINT |
| COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG, | : : : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc. ("Coinbase, Inc."), and Brian Armstrong ("Armstrong" and collectively, "Defendants") by and through their undersigned counsel, hereby respond to the numbered allegations in the Amended Complaint.[1] Unless otherwise noted, Defendants' responses are made as of the date of the filing of the Amended Complaint, March 11, 2022. All allegations not expressly admitted herein, including those contained in the structural headings or footnotes of the Amended Complaint, are denied. To the extent that the Amended Complaint refers to quotes from external documents, statutes, or other sources, Defendants may refer the Court to such materials for their accurate and complete contents; however, Defendants make no admission as to the truth or contents of such sources and reserve all rights (and waive none) to argue that such sources, or any documents, reports, or testimony

---

[1] For the sake of clarity, and unless otherwise expressly stated or defined, capitalized terms incorporate the definitions set forth in the Amended Complaint. In so doing, however, Defendants do not concede any such definitions are proper or correct. Additionally, Defendants use the following specifically defined terms throughout this Answer: Coinbase Global, Coinbase, Inc., Armstrong, Defendants, User Agreement, Users, *Howey*, and Trading Platforms.

referenced therein are objectionable as hearsay or on any other ground. Pursuant to Rule 8(b) of

the Federal Rules of Civil Procedure, allegations in the Amended Complaint to which no

responsive pleading is required are deemed denied. Defendants reserve the right to seek to amend

and/or supplement their Answer as necessary, including the right to assert and rely upon additional

defenses as they may be discovered.

## **INTRODUCTION**

1.      Coinbase is an American company that created and operates a website from which
customers can buy and sell digital assets. During the period between October 8, 2019 and the
present (the "Class Period"), Coinbase has used this platform to buy from and sell to customers 79
different digital assets at issue in this action.[2] But what Coinbase has not disclosed is that the
Tokens are in fact securities, and Coinbase is selling these securities despite the fact that there is
no registration statement in effect for these securities and despite the fact that Coinbase has refused
to register either as a securities exchange or as a broker-dealer. Because Coinbase's sale of these
tokens violates both federal and state law, Plaintiffs, individually and on behalf of all persons or
entities who transacted in the Tokens on the Coinbase Platform (as defined herein) and/or the
Coinbase Pro Platform (as defined herein) during the Class Period (the "Class"), bring claims to
recover damages, consideration paid for Tokens, and trading fees, together with interest thereon,
as well as attorneys' fees and costs, to the fullest extent permitted by law.

**Answer:**      Defendants admit that Coinbase Global, Inc. and Coinbase, Inc. are

incorporated in the United States and that, throughout the purported Class Period, Coinbase, Inc.

operated web-based platforms known as the Coinbase and Coinbase Pro Trading Platforms (the

"Trading Platforms") that allowed customers to buy and sell digital assets between and among one

another in exchange for other digital assets or for traditional government-backed ("fiat") currency,

pursuant to the terms of the Coinbase, Inc. User Agreement ("User Agreement"), to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants aver

---

[2]     Specifically, this action concerns the digital assets traded under the following symbols: 1INCH, AAVE, ACH,
ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND,
BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL,
FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN,
NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX,
SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, ZRX. These assets are referred
to collectively as the "Tokens."

that the User Agreement was periodically updated in Coinbase, Inc.'s ordinary course of business and that each version of the User Agreement published and in effect during the putative Class Period ~~is~~ was attached and incorporated into ~~this~~ Defendants' original Answer, (ECF No. 81), as Exhibits 1-33, ~~as reflected in the Index~~ thereto.  Unless specifically noted, the defined term "User Agreement" refers to the document generally, rather than a specific version.  Reserving all rights as to relevance, the version of the User Agreement that Plaintiffs previously certified was in effect when Co-Lead Plaintiffs Underwood and Oberlander created their respective Coinbase, Inc. accounts ~~is~~ was attached as Exhibit 34 to Defendants' original Answer.  (ECF No. 81~~32-34~~1.) Defendants aver that the Coinbase Trading Platform remains available to users but that the Coinbase Pro Trading Platform was discontinued as of approximately November 20, 2023. Defendants further admit that the 79 digital assets included in footnote 1 of the Amended Complaint were listed for transacting on the Coinbase, Inc. Trading Platforms within the purported Class Period (defined as October 8, 2019 through March 11, 2022) under the symbols listed (the "Tokens").  Defendants also admit that Lead Plaintiffs and members of the putative proposed class transacted in certain of the Tokens on the Trading Platforms and that as a result of these transactions with other Coinbase, Inc. users ("Users"), they purport to seek damages, inclusive of transaction fees and aver that these transaction fees are imposed and governed by the User Agreement.  Defendants also admit that Coinbase, Inc. and Coinbase Global are not registered as securities exchanges or broker-dealers but that is because Coinbase, Inc. and Coinbase Global are not required to be registered as securities exchanges or broker-dealers.  Defendants deny any remaining allegations, including that "Coinbase is selling securities," that "Coinbase has used this platform to buy from and sell to customers," or that Defendants have violated federal or state law.

2.      Coinbase sells digital assets or "crypto-assets" that exist on a blockchain, which is a decentralized digital ledger that records all transactions.  Following the creation of Bitcoin, which

was the first prominent digital asset, the number of digital assets has increased dramatically. There are many different kinds of crypto-assets; some closely resemble Bitcoin or other commodities, in that they are decentralized. For decentralized commodities, prices may rise or fall based upon supply and demand, but there is no centralized mechanism for creating more such commodities.

**Answer:** Defendants deny that Coinbase, Inc. and Coinbase Global sell digital assets to Users and aver that Users transact among one another on the Trading Platforms pursuant to the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that digital asset networks rely on decentralized technology including the blockchain, which is a decentralized digital ledger that records transactions, that bitcoin was the first widespread digital asset to utilize blockchain technology, that bitcoin and other cryptocurrencies can themselves be considered decentralized, and that there are now many different digital assets available for transacting in the crypto-economy. The remaining allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

3. By contrast, other digital assets are similar to traditional securities in that they represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Like traditional securities, investors purchase these tokens with the hope that their value will increase as the issuer that created the token uses its managerial efforts to create some use—typically described to investors in a "whitepaper"—that will give the token value. This similarity with traditional securities is enhanced by the fact that these tokens are offered to the public in an Initial Coin Offering ("ICO") that is modeled on the IPO of a traditional security.

**Answer:** This Paragraph analogizes digital assets to securities and incorporates language from the Supreme Court's decision in *S.E.C. v. Howey*, 328 U.S. 293 (1946) ("*Howey*") and, in that regard, states legal conclusions to which no response is required. To the extent a response is required, Defendants deny that the Tokens are securities and otherwise deny the remaining allegations in this Paragraph.

4.      But, despite the fact that each of the Tokens is a security, none of them is registered with the U.S. Securities and Exchange Commission ("SEC") or with state regulators. This means that purchasers do not have access to the disclosures that accompany the issuances of traditional securities. Rather, investors receive—at most—only the so-called whitepapers, which describe the token, but do not satisfy the requirements for a prospectus under federal and state securities laws. These whitepapers are often supplemented by advertisements and social media postings that promote the token, including giveaways and other promotions.

**Answer:**      Defendants admit that some crypto asset developers or affiliates will engage

in marketing activity relating to a crypto asset that they have offered and sold and have released

informational material regarding the crypto assets, sometimes referred to as a "whitepaper," but

otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations

in this Paragraph relating to investors. Defendants otherwise deny the remaining allegations in

this Paragraph, including that the Tokens are securities.

5.      Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform" and collectively with the Coinbase Platform, the "Coinbase Exchanges"). Crypto-securities, including the Tokens, have been and continue to be sold on the Coinbase Exchanges. Because Coinbase brings together buy and sell orders for the Tokens and the Tokens are securities, the Coinbase Exchanges are securities exchanges, but Coinbase has not registered as a securities exchange under federal or state law and is not subject to any exemption from such registration. Indeed, SEC chair Gary Gensler recently told the Senate Banking Committee that Coinbase had not registered with the SEC, "even though they have dozens of tokens that may be securities."

**Answer:**      Defendants admit that Coinbase, Inc. operated the Trading Platforms

through which customers can buy and sell crypto assets, including the Tokens at various times

during the alleged Class Period. Defendants further admit that Coinbase, Inc. and Coinbase Global

are not registered under federal or state law as securities exchanges, and aver that is because they

are not required to. Defendants deny that any of the assets made available for transacting between

and among Users on the Trading Platforms are securities. This Paragraph purports to characterize

an unidentified statement made by SEC Chair Gary Gensler to the Senate Banking Committee.

Defendants respectfully refer the Court to that statement to the extent it is publicly available and

deny any paraphrasing, summarizing, or characterization of that statement and any factual inferences or legal conclusions made by Plaintiffs based on that unidentified statement. Defendants otherwise deny the remaining allegations in this Paragraph.

6. In addition, Coinbase is an intermediary in every transaction it effects, in contrast to electronic "bulletin boards" such as Craigslist, which match a buyer and seller. Coinbase stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform. Coinbase's operating as an unregistered broker-dealer and exchange on which securities transact, and its offer and sale to investors of those securities, violates federal and state securities laws.

**Answer:** Defendants admit that Users use the Trading Platforms to buy and sell digital assets in exchange for other tokens or for fiat currency and aver that all such transactions were made pursuant to the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants deny that Coinbase, Inc. or Coinbase Global stand between the buyer and seller in each transaction and respectfully refer the Court to the User Agreement for a full and accurate description of Coinbase, Inc.'s relationship with its users, including with respect to the title of their digital assets. Defendants further deny that Coinbase, Inc. or Coinbase Global are the actual sellers of any Token, that any Token is a security, and that Coinbase, Inc. and Coinbase Global operate as national securities exchanges, brokers, or clearing agencies within the meaning of the federal or state securities laws. Defendants otherwise deny the remaining allegations in this Paragraph.

## PARTIES

7. Plaintiff Louis Oberlander is a citizen and resident of California. During the Class Period, Oberlander transacted in a number of the Tokens on the Coinbase Exchanges from California.

**Answer:** Defendants admit that Lead Plaintiff Oberlander purports to be a citizen and resident of California and transacted in certain Tokens during the Class Period. Defendants lack

knowledge or information sufficient to form a belief concerning the truth of the other allegations in this Paragraph and therefore deny them.

8.      Plaintiff Henry Rodriguez is a citizen and resident of New Jersey. During the Class Period, Rodriguez transacted in a number of the Tokens on the Coinbase Exchanges from New Jersey.

**Answer:**      Defendants admit that Lead Plaintiff Rodriguez purports to be a citizen and resident of New Jersey and transacted in certain Tokens during the Class Period. Defendants lack knowledge or information sufficient to form a belief concerning the truth of the other allegations in this Paragraph and therefore deny them.

9.      Plaintiff Christopher Underwood is a citizen and resident of Florida. During the Class Period, Underwood transacted in a number of the Tokens on the Coinbase Platform from Florida.

**Answer:**      Defendants admit that Lead Plaintiff Underwood purports to be a citizen and resident of Florida and transacted in certain Tokens during the Class Period. Defendants lack knowledge or information sufficient to form a belief concerning the truth of the other allegations in this Paragraph and therefore deny them.

10.      Defendant Coinbase Global, Inc. is a Delaware corporation.

**Answer:**      Defendants admit the allegation in this Paragraph.

11.      Defendant Coinbase, Inc. is a Delaware corporation that is a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase Global and Coinbase, Inc. are operated as one corporation, and users have no visibility into which entity they are transacting with. Indeed, Coinbase refers to the two entities jointly as the "Company" in its SEC filings. Coinbase, Inc. and Coinbase Global share an office in New York City.

**Answer:**      Defendants admit that Coinbase, Inc. is a Delaware corporation, has an office in New York City, and is a wholly-owned subsidiary of Coinbase Global, Inc. but deny that Coinbase, Inc. and Coinbase Global are operated as one corporation. To the extent this Paragraph purports to quote or characterize Coinbase Global's Form 10-K or other SEC filings, Defendants

respectfully refer the Court to those SEC filings and deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on those sources. Defendants further deny that Users have no visibility into which entity they are transacting with because, inter alia, to create an account and transact on the Trading Platforms, Users must agree to the User Agreement, to which Coinbase, Inc. is the only signatory. Defendants otherwise deny the remaining allegations in this Paragraph.

12. Defendant Brian Armstrong is the founder of Coinbase and the CEO of both Coinbase Global and Coinbase, Inc. Upon information and belief, he is a citizen and resident of California. He has been reported to own a 19-percent stake in Coinbase. He has consistent and daily management of Coinbase's operations, including the decision not to register as a securities exchange or a broker-dealer and the decision to list unregistered securities, including the Tokens. Armstrong has repeatedly and publicly discussed his role in Coinbase, including his disagreements with the SEC's enforcement of securities laws against Coinbase.

**Answer:** Defendants admit that Brian Armstrong is the founder and CEO of Coinbase Global, is a citizen and resident of California, and beneficially owned 19.9% of outstanding shares in Coinbase Global as of the time it was reported in Coinbase Global's December 31, 2021 Schedule 13G filing with the SEC. With respect to the allegation that Armstrong is the CEO of Coinbase, Inc., no response is needed as Plaintiffs previously withdrew their allegation that Armstrong is the CEO of Coinbase, Inc. (ECF No. 62, n. 11.) To the extent a response is required, Defendants deny that Armstrong is the CEO of Coinbase, Inc. Defendants further deny that Coinbase, Inc. and Coinbase Global are or operate as securities-exchanges or broker-dealers and that any of the Tokens are securities. Defendants therefore deny that Armstrong, Coinbase, Inc., or Coinbase Global made any decision to "not register" Coinbase, Inc. and Coinbase Global or list any unregistered securities, including the Tokens, because registration and listing were not required. With respect to the allegation that "Armstrong has repeatedly and publicly discussed his role in Coinbase, including his disagreements with the SEC's enforcement of securities laws

against Coinbase," Defendants admit that Armstrong has repeatedly and publicly discussed his role at Coinbase Global, but aver that this allegation is not plead with sufficient specificity as to identify specific statements by Armstrong that Defendants can either admit or deny, and Defendants respectfully refer the Court to any specific statements otherwise identified in the Amended Complaint for their complete and accurate contents and deny any paraphrasing, summarizing, or characterization of those statements and any factual inferences or legal conclusions made by Plaintiffs based on those statements. Defendants otherwise deny the remaining allegations in this Paragraph.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Classes are citizens of a state different from Defendant.

**Answer:** This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants do not challenge subject matter jurisdiction but lack knowledge or information sufficient to admit or deny the amount of Plaintiffs' aggregate claims or Plaintiffs' citizenship and, on that basis, deny those allegations.

14. Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Amended Complaint asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

**Answer:** This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs assert claims under Sections 5 and 12(a)(1) of the Securities Act and aver that Defendants do not challenge subject matter jurisdiction.

15. Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal

courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1) and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78cc(b).

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

16. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District. In particular, Coinbase has an office located in New York City. Armstrong has also often traveled to New York City to promote Coinbase, including attending crypto-conference Consensus 2019 in May 2019, and attending a conference dedicated to non-fungible tokens ("NFTs") in November 2021.

**Answer:** Defendants admit that venue is proper in this District and that Coinbase, Inc. and Coinbase Global conduct business in this District. Defendants admit that Armstrong attended the Consensus conference in May 2019 and the Crypto Economy Forum for TradFi Investors in November 2021 but deny that Armstrong "often traveled to New York City to promote Coinbase." Defendants otherwise deny any remaining allegations in this Paragraph.

17. The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**Answer:** This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants aver that they do not challenge personal jurisdiction, deny that they furthered any illegal scheme or conspiracy or caused any injury cognizable under federal or state securities laws to any person in the United States, including in this District, and otherwise deny the remaining allegations in this Paragraph.

18.     The Court also had personal jurisdiction over Defendants and proper venue over this action under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

**Answer:**     This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that venue is proper and do not challenge personal jurisdiction.

## SUBSTANTIVE ALLEGATIONS

## I.     DIGITAL ASSETS, COINBASE, AND CRYPTO-SECURITIES

### A.     The Blockchain and The Foundations of Digital Assets

19.     This case concerns crypto-assets.[3] Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.  The key technology allowing the creation of crypto-assets is the blockchain.

**Answer:**     Defendants admit that Plaintiffs purport to bring this case in relation to "crypto-assets," which may sometimes be referred to as "digital assets," "cryptocurrencies," or "tokens," depending on the facts and circumstances that can vary significantly, and are essentially computer code entries on blockchain-based ledgers that record the owners' decentralized transactions, certain rights to access an application, service, or computer code.  Defendants otherwise deny the remaining allegations in this Paragraph.

20.     The challenge that had previously prevented the creation of digital assets is the need to allow for secure transfers to exactly one recipient at a time.   In general, digital files are transmitted by duplication; if someone emails a photograph to a friend, both the sender and the recipient now have copies of the photograph.  While that duplication is helpful for a photograph, it would quickly make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties.  The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

---

[3]     One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies."  In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets.

**Answer:**      Defendants admit that digital files can be transmitted by duplication. Defendants otherwise deny the remaining allegations in this Paragraph.

21.     Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every Bitcoin in existence. Each Bitcoin user has a digital "address" used to receive Bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address. By looking at the blockchain, anyone can see every Bitcoin transaction in which that address has engaged.

**Answer:**      Defendants admit that bitcoin was the first prominent cryptocurrency that uses a blockchain-based network to allow users to send and receive bitcoin and that the Bitcoin blockchain lists publicly anonymous addresses and the number of bitcoin associated with those addresses.  Defendants further admit that, generally speaking, blockchains associated with cryptocurrencies include public ledgers that track decentralized transactions on a given network. Defendants otherwise deny the remaining allegations in this Paragraph.

22.     By providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin.  Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin.  There is thus no effective way to counterfeit Bitcoin.

**Answer:**      Defendants admit that, in the case of bitcoin, transactions are recorded and verified by network users running open-source software that updates the ledger, which allows for the secure exchange of bitcoin, and mitigates the risk of attempts to duplicate a bitcoin or transfer it to multiple recipients at once.  Defendants otherwise deny the remaining allegations in this Paragraph.

23.     The blockchain has become the foundational technology for crypto-assets.  While crypto-assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

**Answer:**    Defendants admit that digital asset networks generally rely on blockchain-based, decentralized technology and that digital assets can vary tremendously.  Defendants otherwise deny the remaining allegations in this Paragraph.

24.    Control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key.    This cryptographic system of transfer and exchange is generally the same across most crypto-assets.

**Answer:**    Defendants admit that an individual's control of their digital assets may involve, but does not always require, their control of cryptographic keys, including a "public key" and a "private key," associated with a blockchain network.  Defendants otherwise deny the remaining allegations in this Paragraph.

25.    To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account.  Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, like a long PIN or password for a conventional bank account.

**Answer:**    Defendants admit that public keys are used to produce Bitcoin addresses, which are destinations for transfers of bitcoin made up of strings of alphanumeric text, and that private keys can be used to access Bitcoin addresses.  Defendants otherwise deny the remaining allegations in this Paragraph.

26.    Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account.  When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

**Answer:**    Defendants admit that transferors of bitcoin are able to send bitcoin to recipients' Bitcoin addresses and can use private keys to authorize the transfers.  Defendants otherwise deny the remaining allegations in this Paragraph.

27. A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are not recorded on the blockchain and not accessible to the public.

**Answer:** Defendants admit that Bitcoin addresses of transferors and recipients and the quantities of Bitcoin transfers are publicly knowable in that they are recorded on the Bitcoin blockchain, whereas the names of the owners of Bitcoin addresses are not. Defendants otherwise deny the remaining allegations in this Paragraph.

**B.     Crypto-Exchanges and Coinbase**

28. While the blockchain allows for secure and non-duplicable transfers of digital assets, it does not do anything to connect users to each other or to automate both sides of a transfer. The desire for locations that enabled the trading of digital assets led to the creation of crypto-exchanges. Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities.

**Answer:** Defendants admit that the Trading Platforms enable Users to buy and sell digital assets with other Users pursuant to the terms of the User Agreement, but deny that digital assets listed on the Trading Platforms, including the Tokens, are "securities." To the extent these allegations relate to third party "crypto-exchanges" or other digital asset platforms, Defendants lack knowledge or information sufficient to form a belief as to the allegations in this Paragraph, and therefore deny them on this basis. Defendants otherwise deny any other remaining allegations in this Paragraph.

29. There are two primary types of crypto-exchange: decentralized exchanges and centralized exchanges.

**Answer:** Defendants admit that platforms for buying and selling digital assets may be characterized as decentralized or centralized, depending on the facts and circumstances which vary significantly, and otherwise deny the allegations in this Paragraph.

30.     Decentralized exchanges may use the blockchain itself to match and execute transactions among traders.  There is no intermediary individual or corporation that matches or clears transactions; instead, they use a blockchain technology called a "smart contract" to automatically facilitate trading.  While different decentralized exchanges use different approaches, what they have in common is that the crypto-assets are transferred between individual accounts. Thus, if Angela exchanges one Bitcoin for 10 Ethereum using a decentralized exchange, her one Bitcoin will be sent to Brian, another user on the platform, and Brian's 10 Ethereum will be sent to Angela.

**Answer:**     Defendants admit that some digital asset trading platforms are characterized as decentralized and may use blockchain technology, including smart contracts, to facilitate transactions between users.  Defendants aver that such trading platforms provide for transacting among and between their users, similarly to how the Trading Platforms allow for Users to buy and sell among and between one another.  Defendants otherwise deny the remaining allegations in this Paragraph.

31.     These decentralized exchanges resemble Craigslist in their operation.  Just like a purchase of a collectible baseball card on Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending each other the goods being transacted.  These decentralized exchanges, like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (*e.g.*, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

**Answer:**     Defendants respectfully refer the Court to their answer to Paragraph 30 and aver that digital asset trading platforms, including the Trading Platforms, facilitate transactions among and between their users.  Defendants admit that trading platforms may earn transaction fees from users and respectfully refer the Court to the User Agreement for a description of how such fees are governed and imposed by Coinbase, Inc. with respect to the Trading Platforms. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph relating to the operation and function of Craigslist, and otherwise deny the remaining allegations in this Paragraph.

32.     The other type of crypto-exchange—which includes the Coinbase Exchanges—is the centralized exchange.  When a customer wishes to trade crypto-assets on a centralized exchange, she must first create an account on that exchange.  The exchange will then provide that customer with a deposit address that the exchange controls.  When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset.  The exchange will typically then transfer the crypto-assets into one of its other addresses for storage.

**Answer:**     Defendants admit that customers wishing to transact in digital assets on the Trading Platforms must create a Coinbase, Inc. account by agreeing to the User Agreement, and Users may then choose to transfer digital assets or fiat currency in their account in accordance with the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants further admit that Coinbase, Inc. tracks Users' ownership of digital assets and fiat currency deposited in and withdrawn from their Coinbase, Inc. accounts, and that customer cash and digital asset balances are maintained through Coinbase, Inc.'s internal ledgering processes.  Defendants further admit that Coinbase, Inc. may use shared blockchain addresses to hold digital assets on behalf of Users.  Defendants deny any allegation that Coinbase, Inc. or Coinbase Global operates as a national securities exchange or broker-dealer within the meaning of the federal or state securities laws.  To the extent these allegations relate to third party "crypto-exchanges" or other digital asset platforms, Defendants lack knowledge or information sufficient to form a belief as to the allegations in this Paragraph, and therefore deny them on this basis. Defendants otherwise deny the remaining allegations in this Paragraph.

33.     The trades conducted within that exchange, however, do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users.  Instead, it is Coinbase that faces both the buyer and the seller.  Thus, if Angela wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit Angela's account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain.  Nor is there any sense in which Angela's Bitcoin is transferred to anyone other than Coinbase: while Coinbase may use other traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Coinbase and (b) the seller and Coinbase.  The buyer and seller are *not* in privity with one another.  When a user wants to withdraw crypto-assets from Coinbase or another centralized

exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of crypto-asset from the *exchange's* reserves to that address. The withdrawn assets come directly from the centralized exchange.

**Answer:**     Defendants respectfully refer the Court to their answer to Paragraph 32, and further admit that when a User wants to withdraw digital assets from her Coinbase, Inc. account, she provides the address into which she would like her digital assets transferred. Defendants otherwise deny the allegations in this Paragraph and aver that all transactions conducted between Users on the Trading Platforms are executed pursuant to the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.

34.     Both of the Coinbase Exchanges operate as centralized exchanges. They differ in the services and fees involved, but both place all deposited assets into a centralized wallet and reflect transactions only through internal updates to each customer's account.

**Answer:**     Defendants respectfully refer the Court to their answer to Paragraph 32 and further admit that Coinbase, Inc. charges transaction fees for User transactions, and aver that such fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

35.     The Coinbase Platform, which is marketed towards newer users, allows users to place only market orders. That is, Coinbase Platform users can place orders to buy, sell, or exchange digital assets at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order.

**Answer:**     Defendants admit that Users can place market orders to buy or sell the Tokens with other Users on the Trading Platforms pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

36.     The following tables show the fees charged by Coinbase on the Coinbase Platform:

**FLAT FEES**

| TOTAL TRANSACTION AMOUNT | TRANSACTION FEE |
|---|---|
| $10 or less | $0.99 |
| More than $10, less than or equal to $25 | $1.49 |
| More than $25, less than or equal to $50 | $1.99 |
| More than $50, less than or equal to $200 | $2.99 |

**VARIABLE FEES**

| PAYMENT METHOD (PURCHASE) OR PAYOUT METHOD (SALE) | EFFECTIVE RATE OF CONVERSION FEE (AFTER WAIVER) |
|---|---|
| UNITED STATES BANK ACCOUNT | 1.49% |
| COINBASE USD WALLET | 1.49% |
| DEBIT CARD BUY | 3.99% |
| INSTANT CARD WITHDRAWAL | Up to 1.5% of any transaction and a minimum fee of $0.55. |

**Answer:**      Defendants admit that Coinbase, Inc. imposes fees for transactions on the Trading Platforms and that such fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants further admit that the fees are based on total transaction amount and that variable fees may differ as a percentage of the conversion amount depending upon the payment method. Defendants otherwise deny any remaining allegations in this Paragraph.

37.      The Coinbase Pro Platform is designed for use by advanced and active digital asset traders. The Coinbase Pro Platform allows individuals to place three types of orders: a market order to buy or sell a digital asset at the best available price; a limit order to buy or sell a digital asset at a specific price or better, or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price.

18

**Answer:**    Defendants admit that Users may place market orders, limit orders, and stop orders on the Coinbase Pro Platform and otherwise deny the remaining allegations in this Paragraph.

38.    The Coinbase Pro Platform employs a volume-tiered, "maker-taker" fee schedule. Orders that provide liquidity ("maker" orders) are charged different fees than orders that take liquidity ("taker" orders). A Coinbase Pro Platform user's fee tier is based upon total dollar value trading volume over the trailing 30-day period.

**Answer:**    Admitted.

39.    A Coinbase Pro Platform user whose order is matched immediately with an order already on the order book is considered a "taker" because they have "taken" an order off the order book and removed liquidity from the market. A Coinbase Pro Platform user whose order is not matched immediately with an order on the order book is considered a "maker", because their order is placed on the order book and provides market liquidity.

**Answer:**    Defendants admit that orders that are immediately matched with that of another User are considered "taker orders" and that orders that do not match immediately between Users are considered "maker orders." Defendants otherwise deny the remaining allegations in this Paragraph.

40.    The Coinbase Pro Platform Maker-Taker fee schedule is as follows:

| PRICING TIER | TAKER FEE | MAKER FEE |
|---|---|---|
| Under $10,000 | 0.50% | 0.50% |
| $10,000 - $50,000 | 0.35% | 0.35% |
| $50,000 - $100,000 | 0.25% | 0.15% |
| $100,000 - $1 Million | 0.20% | 0.10% |
| $1 Million - $20 Million | 0.18% | 0.08% |
| $20 Million - $100 Million | 0.15% | 0.05% |
| $100 Million - $300 Million | 0.10% | 0.02% |
| $300 Million - $500 Million | 0.08% | 0.00% |
| $500 Million - $750 Million | 0.06% | 0.00% |
| $750 Million - $1 Billion | 0.05% | 0.00% |
| $1 Billion+ | 0.04% | 0.00% |

**Answer:**        Defendants admit that Coinbase, Inc. imposed fees for transactions on the Trading Platforms and that such fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants further admit that taker fees and maker fees are based on pricing tiers and that both generally decrease as a percentage of the transaction amount as that amount increases.  Defendants otherwise deny any remaining allegations in this Paragraph.

41.    Brian Armstrong, as the founder and current CEO of Coinbase, was involved in the decision to run the Coinbase Exchanges as centralized exchanges.  Both Coinbase Exchanges have been centralized from the time they were founded by Armstrong.

**Answer:**        Defendants incorporate their response to Paragraph 12 with respect to the allegations about Armstrong's role at Coinbase Global and Coinbase, Inc.  Defendants admit that

Users use the Trading Platforms to buy and sell digital assets in exchange for other assets or fiat currency.  Defendants otherwise deny the remaining allegations in this Paragraph.

## C.    Crypto-Securities and Centralization

42.    Bitcoin, in addition to pioneering the use of the blockchain, is also notable for being decentralized and having a limited supply.  These features are core to the idea of Bitcoin, but, unlike the blockchain, are not universal among crypto-assets generally.

**Answer:**    The allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required.  To the extent a response is required, Defendants admit that Bitcoin is decentralized and has a limited supply but otherwise deny the remaining allegations in this Paragraph.

43.    Bitcoin maintains its blockchain and provides for new Bitcoin to enter the economy through a consensus mechanism known as "mining."  Individuals "mine" Bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain.  Those who mine Bitcoin—"miners"—are rewarded with new Bitcoin.

**Answer:**    The allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required.  To the extent a response is required, Defendants admit that the Bitcoin blockchain uses a consensus mechanism that involves "mining," which includes verifications of past transactions.  Defendants deny the remaining allegations in this Paragraph.

44.    The mining process creates a scarcity that underlies the value of Bitcoin.  Bitcoin is designed so it gets harder and harder to mine.  The more Bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new Bitcoin.  This process ensures that the supply of Bitcoin will not rise sharply or unpredictably, thus preventing a flood of new Bitcoin that could undercut the value of the preexisting Bitcoin.  Likewise, the number of Bitcoin that miners receive as a reward is halved roughly every four years.  This will continue until all Bitcoin have been mined, at which point miners will receive fees paid solely by network users.

**Answer:**     The allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph.

45.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver.  While the supply of Bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and Bitcoin is not devalued.  This ensures market participants that their Bitcoin will not diminish in value due to sudden inflation.

**Answer:**     The allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required.  To the extent a response is required, Defendants admit that the growth rate of bitcoin's supply is logarithmic and will eventually cease entirely but otherwise deny the remaining allegations in this Paragraph.

46.     Bitcoin's architecture ensures that it is entirely decentralized.  The Bitcoin protocol was first released on October 31, 2008 through a whitepaper authored under the pseudonym Satoshi Nakamoto.  That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."  While the first 50 Bitcoin were mined into existence by Satoshi Nakamoto three months after the release of the whitepaper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

**Answer:**     The allegations in this Paragraph are general characterizations unrelated to Defendants, to which no response is required.  To the extent a response is required, Defendants admit that a white paper authored under the pseudonym Satoshi Nakamoto that details the Bitcoin protocol was released on approximately October 31, 2008 and that it was publicly reported that the first 50 bitcoin were mined into existence by Satoshi Nakamoto.  Defendants deny the remaining allegations in this Paragraph.

47.     Accordingly, there is no "Bitcoin Inc." that administers or manages Bitcoin as a whole.  If Bitcoin were run on centralized servers, the underlying value of Bitcoin would rely on the trust that individuals had in those operating the centralized servers.  If Bitcoin's creator could issue more Bitcoin at a whim, the value of Bitcoin would reflect that uncertainty.  But because

Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

**Answer:**    The allegations in this Paragraph are general characterizations unrelated to

Defendants, to which no response is required.  To the extent a response is required, Defendants

admit that no company named "Bitcoin Inc." manages the Bitcoin protocol.  Defendants deny the

remaining allegations in this Paragraph.

48.    This decentralization distinguishes Bitcoin from other assets.  The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation.  The value of government bonds is tied to the credit of the government that issues them.  The value of a fiat currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank.  None of this is true for Bitcoin.

**Answer:**    The allegations in this Paragraph are general characterizations unrelated to

Defendants, to which no response is required.  To the extent a response is required, Defendants

deny the allegations in this Paragraph.

49.    The controlled supply and decentralized nature of Bitcoin is shared with some other crypto-assets, including Ethereum, which has become the second-largest crypto-asset by maker volume.  Because of their decentralized nature, Bitcoin and Ethereum have been recognized as commodities by courts and regulators.[4]

**Answer:**    Defendants admit that bitcoin and ethereum have been recognized as

commodities by courts and regulators.  This Paragraph also purports to characterize a public

statement from Brian Quintenz on Twitter, to which Defendants respectfully refer the Court for its

complete and accurate contents and deny any paraphrasing, summarizing, or characterization of

---

[4]    *See, e.g., Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018) (recognizing that Bitcoin can be regulated as commodity).  On August 14, 2021, CFTC Commissioner Brian Quintenz stated on Twitter that Ethereum was "a non-security commodity."   Brian Quintenz (@CFTCquintenz), Twitter (Aug.  14, 2021), https://web.archive.org/web/20220311333718/https://twitter.com/CFTCquintenz/status/1426570 174036168704?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1426570174 036168704%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.ledgerinsights.com%2Fcftc-commissioner-clarifies-role-in-digital-assets-regulation%2F.

that source and any factual inferences or legal conclusions made by Plaintiffs based on that source. Defendants otherwise deny the remaining allegations in this Paragraph.

50.     Other crypto-assets, however, are centralized and do not have a controlled supply. Stablecoins, for example, are intended to mirror real-world assets, such as the U.S. dollar or the price of gold. These stablecoins can be created and managed by a single entity that has the power to create new coins on demand; the value of these coins derives from the promise that the issuing entity will maintain a reserve of the asset to which the stablecoin is pegged and only issue new coins in response to new deposits into the reserve. Coinbase created and manages one such stablecoin, known as USDC.

**Answer:**    Defendants admit that Coinbase, Inc. participated in the building of USDC but deny that it created or manages USDC. Defendants further admit that some digital assets, including certain digital assets referred to as "stablecoins," which can vary significantly, may have a controlled supply. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph, and therefore deny them on this basis.

51.     Another type of crypto-asset is the token or crypto-security. These crypto-assets are centralized and are not generated by mining or a similar decentralized process. Instead, they are generally created by a company, known as an issuer.

**Answer:**    To the extent that this Paragraph purports to characterize unidentified tokens or crypto-assets as a "security," it states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that the Tokens are securities. Defendants admit that, generally speaking, digital assets can be created by developers who may issue a token that offers different forms of utility. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore deny them on this basis.

52.     Often, a crypto-security will begin with an initial coin offering, or "ICO." This ICO will allow members of the public to buy tokens directly from the issuer. On other occasions, the issuer will distribute some tokens for free to users in an "airdrop" and then begin selling the tokens on the secondary market through one or more exchanges. Regardless, the tokens, which were generated by the issuer themselves, do not derive value through algorithmic scarcity (and are

thus unlike Bitcoin and Ethereum) and are not backed by a reserve (and are thus unlike stablecoins).

**Answer:**    Defendants admit that, in some circumstances, developers of digital assets or their affiliates have offered and sold digital assets in processes sometimes referred to as initial coin offerings.  Defendants further admit that, in some circumstances, some digital asset developers may distribute digital assets directly to users for free, in a process sometimes referred to as an "airdrop."  Defendants otherwise deny the remaining allegations in this Paragraph.

53.    Instead, the nominal value proposition of a token comes from the promise that the issuer will use the funds raised in the ICO to create an ecosystem in which the token is useful; the token would then become valuable because it could be sold to those who wish to engage with the new ecosystem.  In reality, many tokens issued during an ICO never have an actual use case because the issuer never actually creates the relevant ecosystem; even for the tokens that eventually acquire a nominal use, those tokens are overwhelmingly used to trade and possessed by individuals who will never interact with the ecosystem for which they are designed, but instead acquire the tokens to speculate on their future market value.  In this way, they are similar to traditional securities, which entitle owners to voting rights for the board of directors but are often owned by those with no intention of casting such a vote and who hope to profit from the managerial efforts of those running the issuer.

**Answer:**    Defendants admit that, in some circumstances, developers may offer digital assets that provide different forms of utility.  To the extent the final sentence of this Paragraph characterizes the Tokens as "securities," Defendants deny that allegation.  The remaining statements in this Paragraph relating to the *Howey* test are legal conclusions to which no response is required.  Nevertheless, Defendants deny those allegations.  Defendants otherwise deny the remaining allegations in this Paragraph.

54.    The tokens issued in these ICOs are therefore investment contracts and securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  Investors invest money by purchasing the tokens.  The investors are participating in a common enterprise because their collective purchases fund the creation of the ecosystem that will supposedly give value to the tokens they have purchased.  They expect profits by reselling the tokens to others at a higher price when the ecosystem is created.  And they depend on the efforts of the issuer to create that ecosystem.

**Answer:**        Defendants deny the allegations in this Paragraph.

55.    Because these tokens are securities, the SEC has repeatedly both provided guidance and engaged in enforcement actions on that basis.  The SEC first examined how digital assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO Report").[5]  In the 2017 DAO Report, the SEC examined the application of the Securities Act and the Exchange Act to the issuance and trading of digital assets.

**Answer:**        The first sentence of this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny that allegation, including that the Tokens are securities.  This Paragraph also purports to characterize the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO Report"), to which Defendants respectfully refer the Court for its accurate and complete contents and deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on that source.  Defendants otherwise deny the remaining allegations in this Paragraph.

56.    With respect to the application of the Securities Act to digital assets, the SEC concluded (1) that digital assets may qualify as securities pursuant to the Securities Act and the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that (2) issuers of digital assets that fit within the definition of security under the *Howey* test are subject to the registration and reporting requirements of the Securities Act.[6]

**Answer:**        This Paragraph purports to characterize the 2017 DAO Report, to which Defendants respectfully refer the Court for its accurate and complete contents and deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal

---

[5]    *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO*, SECURITIES AND EXCHANGE                COMMISSION            (Jul.            25,            2017), https://web.archive.org/web/20220306215515/https://www.sec.gov/litigation/investreport/34-81207.pdf ("2017 DAO Report").

[6]    The 2017 DAO report explained that "information about The DAO was 'crucial' to the DAO Token holders' investment decision."  *Id.* at 16 (citing *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980)).  "The DAO was 'responsible for the success or failure of the enterprise,' and accordingly was the entity about which the investors needed information material to their investment decision."  *Id.* (quoting *Murphy*, 626 F.2d at 643–44).

conclusions made by Plaintiffs based on that source. Defendants deny that the Tokens are securities and otherwise deny the remaining allegations in this Paragraph.

57.    Similarly, the SEC concluded that digital asset trading platforms may satisfy the meaning of "exchange" as defined by the Exchange Act if they "provide[] users with an electronic system that matched orders from multiple parties to buy and sell [digital assets] for execution based on non-discretionary methods."[7] The SEC noted that a "system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act or operate pursuant to an appropriate exemption."

**Answer:**    This Paragraph purports to characterize the 2017 DAO Report, to which Defendants respectfully refer the Court for its accurate and complete contents and deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on that source. Defendants deny that Coinbase, Inc. or Coinbase Global are required to register as a national securities exchange. To the extent the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

58.    Following an ICO boom in 2017, the SEC issued further guidance as to the application of the *Howey* test to digital assets in a 2019 report entitled *Framework for "Investment Contract" Analysis of Digital Assets* (the "Howey Framework Report").[8] The report reiterated that whether a particular digital asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the digital asset's creation and issuance.

**Answer:**    This Paragraph purports to characterize an SEC Report called *Framework for "Investment Contract" Analysis of Digital Assets* (the "Framework Report"), to which Defendants respectfully refer the Court for its accurate and complete contents and deny any

---

[7]    *Id.* at 17.

[8]    *Framework for "Investment Contract" Analysis of Digital Assets*, SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019), https://archive.ph/4wS5f ("Howey Framework Report").

paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on that source.

59.    Following this guidance, the SEC has engaged in enforcement actions on the basis that several different tokens are in fact securities.  On September 30, 2019, Block.one, the issuer of the EOS digital asset (one of the Tokens in this action), agreed to pay $24 million to settle charges that it had raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token.[9]  Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP (another of the Tokens in this action).[10]  The case is ongoing.

**Answer:**    This Paragraph purports to characterize two enforcement actions by the SEC unrelated to Coinbase, Inc or Coinbase Global.  Defendants admit such enforcement actions have been publicly reported but lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations and therefore deny them on that basis.

60.    On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off of securities and resemble derivatives, stating:

Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities.  These platforms—whether in the decentralized or centralized finance space—are implicated by the securities laws and must work within our securities regime.[11]

**Answer:**    This Paragraph purports to characterize a statement made by SEC Chair Gary Gensler.  Defendants respectfully refer the Court to that statement and deny any paraphrasing,

---

[9]    *See SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2019), https://web.archive.org/web/20220311134238/https://www.sec.gov/news/press-release/2019-202.

[10]    *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220307145723/https://www.sec.gov/news/press-release/2020-338.

[11]    Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities*, NASDAQ (July 21, 2021), https://web.archive.org/web/20220311134752/https://www.nasdaq.com/articles/sec-chair-hints-some-stablecoins-are-securities-2021-07-21.

summarizing, or characterization of that statement and any factual inferences or legal conclusions made by Plaintiffs based on that statement. Defendants otherwise deny the remaining allegations in this Paragraph.

61. On August 3, 2021, SEC Chairman Gensler commented on the state of the digital asset market:

> [R]ight now, we just don't have enough investor protection in crypto . . . [f]rankly, at this time, it's more like the Wild West . . . I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight . . . [t]his leaves prices open to manipulation. This leaves investors vulnerable . . . . ***While each token's legal status depends on its own facts and circumstances, the probability is quite remote that, with 50 or 100 tokens, any given platform has zero securities***.[12]

**Answer:** This Paragraph purports to characterize a statement made by SEC Chair Gary Gensler. Defendants respectfully refer the Court to that statement and deny any paraphrasing, summarizing, or characterization of that statement and any factual inferences or legal conclusions made by Plaintiffs based on that statement. Defendants otherwise deny the remaining allegations in this Paragraph.

62. As digital asset popularity exploded, Coinbase listed digital assets, including the Tokens, that qualify as investment contracts, and thus securities, in order to earn fees from user transactions in these assets. Coinbase listed these Tokens despite knowledge of their status as securities.

**Answer:** Defendants admit that the Trading Platform permit Users to buy and sell certain digital assets, including the Tokens, from other Users, for a transaction fee paid to Coinbase, Inc. that is imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents, but deny that the Tokens are

---

[12] Will Gottsegen, *SEC's Gensler: Crypto Market Filled With Unregistered Securities, Prices 'Open to Manipulation'*, DECRYPT (Aug. 3, 2021), https://web.archive.org/web/20220311134929/https://decrypt.co/77574/gary-gensler-crypto-market-securities-aspen-institute (emphasis added).

investment contracts or securities. Defendants otherwise deny the remaining allegations in this Paragraph.

63.     Coinbase's CEO, Brian Armstrong, has directly commented on the possibility that Coinbase may be selling securities. In September 2021, in response to an SEC enforcement action regarding a Coinbase lending program, Armstrong tweeted that the SEC was engaging in "sketchy behavior." He criticized the SEC for objecting to Coinbase's crypto-backed lending program, and noted that he had attempted to meet with the SEC to discuss the issue. Coinbase nonetheless cancelled the SEC-challenged program. But Armstrong did not register Coinbase as a securities exchange or a broker-dealer under state or federal law.

**Answer:**     Defendants admit that Coinbase, Inc. did not launch a program called Coinbase Lend designed to allow certain retail customers to engage in certain types of lending of digital asset deposits. Defendants also admit that Coinbase, Inc. and Coinbase Global are not registered as securities exchanges or broker-dealers under state or federal law and aver that that is because they are neither of those things. This Paragraph purports to characterize a public September 2021 statement by Brian Armstrong on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents and deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on that source. Nevertheless, Defendants deny that Armstrong commented on the possibility that Coinbase, Inc. or Coinbase Global may be selling securities in the statement purportedly cited in this Paragraph. Defendants otherwise deny the remaining allegations in this Paragraph.

**D.     Coinbase's Failure to Register as a Securities Exchange or Broker-Dealer**

64.     Despite selling tokens that are crypto-securities, Coinbase has not registered as a securities exchange or broker-dealer. Indeed, on September 14, 2021, SEC Chairman Gary Gensler spoke at a Senate Banking Committee hearing and noted that the Coinbase Exchanges have not registered as national securities exchanges "even though they have dozens of tokens that might be securities."[13]

---

[13]     12 Jeff John Roberts, *SEC Chair: Coinbase Lists 'Dozens of Tokens that Might Be Securities'*, DECRYPT (Sept. 14, 2021), https://web.archive.org/web/20220311192025/https://decrypt.co/80924/gensler-coinbase-sec-securities.

**Answer:** Defendants admit that Coinbase, Inc. or Coinbase Global are not registered as securities exchanges or broker-dealers under state or federal law and aver that that is because they are neither of those things and deny the remaining allegations in the first sentence of this Paragraph. The second sentence purports to characterize a statement made by SEC Chair Gary Gensler. Defendants respectfully refer the Court to that statement and deny any paraphrasing, summarizing, or characterization of that statement and any factual inferences or legal conclusions made by Plaintiffs based on that statement. Defendants otherwise deny the remaining allegations in this Paragraph.

65. Each of the Coinbase Exchanges is a securities exchange as the term is defined in the Exchange Act. Section 3(a)(1) of the Exchange Act defines the term "exchange" as:

> any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange. 15 U.S.C. § 78c.

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

66. According to the Exchange Act, any organization, association, or group operating as an Exchange must register as a "national securities exchange" with the SEC and must make periodic disclosures to the SEC, unless the SEC determines an exemption is warranted.

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

67.     Section 5 of the of the Exchange Act makes failing to comply with the Exchange Act's registration and reporting requirements illegal:

It shall be unlawful for any broker, dealer, *or exchange*, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction, unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration upon application by the exchange because, in the opinion of the Commission, by reason of the limited volume of transactions effected on such exchange, it is not practicable and not necessary or appropriate in the public interest or for the protection of investors to require such registration. 15 U.S. Code § 78e - Transactions on unregistered exchanges (emphasis added).

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

68.     Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1) of the Exchange Act.  Exchange Act Rule 3b-16(a) provides that an organization, association, or group of persons shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by an exchange" as those terms are used in Section 3(a)(1) of the Exchange Act if such an organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, nondiscretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[14]

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

---

[14]     *See* 17 CFR § 240.3b-16(a).  The purpose of Rule 3b-16(b) is to explicitly exclude certain systems that the SEC believed did not meet the exchange definition.  These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system.  *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems, hereinafter "Regulation ATS Adopting Release"), at 70852.

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

69.    A system that meets the criteria of Exchange Act Rule 3b-16(a), and that is not excluded under Exchange Act Rule 3b-16(b), must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act[15] or operate pursuant to an appropriate exemption.  One of the available exemptions is for Alternative Trading Systems, or "ATS."[16]  Exchange Act Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an organization, association, or group of persons that complies with Regulation ATS.[17]

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

70.    Regulation ATS requires an ATS to, among other things, register as a broker-dealer, file a Form ATS with the Commission to notice its operations, and establish written safeguards and procedures to protect subscribers' confidential trading information.  An ATS that complies with Regulation ATS and operates pursuant to the Rule 3a1-1(a)(2) exemption is not required by Section 5 to register as a national securities exchange.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

---

[15]    *See* 15 U.S.C. §§ 78e-78f.  A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act.

[16]    Rule 300(a) of Regulation ATS provides that an ATS is "any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading."

[17]    *See* 17 CFR 240.3a1-1(a)(2).  Rule 3a1-1 also provides exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS.  *See* 17 CFR 240.3a1-1(a)(1) and (3).

71.     The Coinbase Exchanges are exchanges under these regulations.  They perform the functions of a traditional exchange by bringing together buy orders and sell orders and use established and nondiscretionary methods to set the prices at which these orders are executed.

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

72.     Coinbase is also obligated to register as a broker-dealer.  Section 15 of the Exchange Act requires that any person operating as a broker in U.S. securities markets must register with the SEC and obtain membership with, and be regulated by, the Financial Industry Regulatory Authority, or "FINRA," or operate subject to an exemption from registration.[18]

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

73.     The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."[19]  Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of [securities] distribution."[20]

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

---

[18]    15 U.S.C. § 78o(a)(1), (a)(8).

[19]    15 U.S.C. § 78c(a)(4).

[20]    *See, e.g.*, *Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Sup. 411, 415 (D. Mass.) *aff'd.* 545 F2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

74.     Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market—frequently in exchange for transaction-based compensation.[21]

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.  This Paragraph also purports to characterize *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) and *SEC v. Margolin*, No. 92 CIV. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992), to which Defendants respectfully refer the Court for their complete and accurate contents.

75.     The Exchange Act defines "dealer" to include an entity that is "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business."[22]

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

76.     Coinbase effects transactions in the Tokens for the accounts of its customers; it is thus obligated to register with the SEC as a broker-dealer but has failed to do so.

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

---

[21]     *See, e.g.*, *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Margolin*, No. 92 CIV. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).

[22]     15 U.S.C. § 78c(a)(5).

## II.    COINBASE LISTS AND SELLS SECURITIES BUT IS NOT REGISTERED AS A SECURITIES EXCHANGE

## A.    DIGITAL ASSETS LISTED ON COINBASE ARE SECURITIES

Coinbase has listed the Tokens on its Digital Asset Platforms.  Analysis of the facts and circumstances surrounding the Tokens shows that they are investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and are therefore securities.

**Answer:**    Defendants admit that Tokens are listed for buying and selling on the Trading Platforms and deny the remaining allegations in this unnumbered Paragraph, including that the Tokens are securities.  The unnumbered Paragraph also states a legal conclusion to which no response is required and purports to characterize the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to which Defendants respectfully refer the Court for its complete and accurate contents.

### 1.    1INCH

77.    1Inch ("1INCH") is a token created by the 1Inch Foundation.  The first *bona fide* public offering of 1Inch occurred on or about December 24, 2020.

**Answer:**    Defendants admit that 1INCH is a token on the Ethereum blockchain that is used in conjunction with the 1inch Network platform and that 1INCH was launched on approximately December 24, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

78.    Investors in 1INCH reasonably expected to receive profits from their investment in 1INCH.  They expected these profits to derive from the efforts of the 1Inch Foundation and the developers of the 1Inch Network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

79.    The 1Inch Network operates as a decentralized exchange for crypto-assets. It was created by a core team of developers, including its founder Anton Bukov. The core development team continues to lead the day-to-day maintenance and improvement of the network.

**Answer:**    Defendants admit that Anton Bukov was among the founders of the 1inch Network. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

80.    The 1Inch Foundation is a nonprofit entity that issued 1INCH. The 1Inch Foundation states on its website that it aims "to foster growth and expansion of the 1inch Network and incentivize contributions through grants and other capital deployment vehicles."

**Answer:**    This Paragraph purports to characterize the 1Inch Foundation website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

81.    The 1Inch Foundation promised that holders of 1INCH would be able to participate in the governance of a protocol that enables trade optimization across multiple decentralized exchanges. This governance right, which resembles the voting rights of many traditional securities, allowed 1INCH purchasers to participate in a common enterprise with each other.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

82.    The governance right granted by 1INCH would be valuable only if the team behind the 1Inch Network, including the 1Inch Foundation and the core team of technology developers, committed the managerial efforts needed to develop, maintain, and promote the 1Inch Network and its underlying algorithms.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

83.    There are few, if any, goods or services that can be directly purchased using 1Inch. To the extent that 1Inch can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of 1INCH. Accordingly, all or nearly all 1INCH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

84.    Based on the foregoing facts, among others, 1INCH qualifies as an investment contract and therefore a security. However, 1INCH has never been registered as a security.

**Answer:**    Defendants admit that 1INCH has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

85.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in 1INCH on and with Coinbase. Certain members of the class currently own 1INCH tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought 1INCH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in 1INCH.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in 1INCH on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

2.    **AAVE**

86.     Aave ("AAVE") is a token created by Aave.  The first *bona fide* public offering of AAVE occurred on or about October 2, 2020.

**Answer:**     Defendants admit that AAVE is a token on the Ethereum blockchain that is used in conjunction with the Aave platform and that AAVE was launched on approximately October 2, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

87.     Investors in AAVE reasonably expected to receive profits from their investment in AAVE.  They expected these profits to derive from the efforts of Aave.  AAVE was marketed as deriving value from its link to a decentralized finance protocol that allows people to lend and borrow crypto-assets with a variable interest rate, which depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained that protocol.

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

88.     There are few, if any, goods or services that can be directly purchased using AAVE. To the extent that AAVE can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of AAVE. Accordingly, all or nearly all AAVE traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

89.     Based on the foregoing facts, among others, AAVE qualifies as an investment contract and therefore a security.  However, AAVE has never been registered as a security.

**Answer:**     Defendants admit that AAVE has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

90.     During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have had one or more losing transactions in AAVE on and with Coinbase.  Certain members of the class currently own AAVE tokens that have

depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez, Underwood, and Oberlander, bought AAVE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in AAVE.

**Answer:**    Defendants admit that Lead Plaintiffs Rodriguez, Underwood, and Oberlander and members of the putative proposed class transacted in AAVE on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 3.    ACH

91.    Alchemy Pay ("ACH") is a token created by Alchemy Pay. The first *bona fide* public offering of ACH occurred on or about September 7, 2020.

**Answer:**    Defendants admit that ACH is a token on the Ethereum blockchain that is used in conjunction with the Alchemy Pay platform and that ACH launched on approximately September 7, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

92.    Investors in ACH reasonably expected to receive profits from their investment in ACH. They expected these profits to derive from the efforts of Alchemy Pay. ACH was marketed as deriving value from its ability to power Alchemy Pay, which was a platform that enables payments using a wide variety of fiat and cryptocurrencies. The value of the ACH token thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained Alchemy Pay itself.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

93.    There are few, if any, goods or services that can be directly purchased using ACH. To the extent that ACH can be directly exchanged for any goods or services, there is little or no

apparent correlation between the market price of those goods or services and the price of ACH. Accordingly, all or nearly all ACH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

94.    Based on the foregoing facts, among others, ACH qualifies as an investment contract and therefore a security. However, ACH has never been registered as a security.

**Answer:**    Defendants admit that ACH has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

95.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have had one or more losing transactions in ACH on and with Coinbase. Certain members of the class currently own ACH that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez, Underwood, and Oberlander, bought ACH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in ACH.

**Answer:**    Defendants admit that Lead Plaintiffs Rodriguez, Underwood, and Oberlander and members of the putative proposed class transacted in ACH on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

**4.    ADA**

96.    Cardano ("ADA") is a token that was first *bona fide* offered to the public in or about September 2017.

**Answer:**    Defendants admit that ADA was launched in approximately September 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants,

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

97.    Coinbase describes ADA as follows:

Cardano (ADA) is a blockchain platform built on a proof-of-stake consensus protocol (called Ouroboros) that validates transactions without high energy costs. Development on Cardano uses the Haskell programming language, which is described as enabling Cardano "to pursue evidence-based development for unparalleled security and stability." The blockchain's native token, ADA, is named after the 19th century mathematician, Ada Lovelace.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

98.    ADA became available for trading on the Coinbase Pro Platform on or about March 18, 2021. ADA became available for trading on the Coinbase Platform on or about March 19, 2021. Since becoming available on the Coinbase Platform, ADA has been continuously traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that ADA became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform on approximately March 18, 2021, and on the Coinbase Trading Platform on approximately March 19, 2021, but otherwise deny the remaining allegations in this Paragraph.

99.    After ADA was listed on the Coinbase Platform, its price rose by approximately 150.0 percent and peaked at $3.10 on September 2, 2021. ADA has been on a steady decline since peaking in September 2021.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.   Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants admit that the price of ADA reached a high on or around September 2, 2021, at approximately $3.10, but otherwise deny the remaining allegations in this Paragraph.

100.    As of 10:00 a.m. Eastern time on March 10, 2022, ADA was trading at $0.80—a decline of 74.1 percent from its September 2, 2021 peak.

**Answer:**    Defendants admit that ADA was trading at approximately $0.80 on or around March 10, 2022, and that there was an approximate 74.1% decline in price from its September 2021 high, but otherwise deny any remaining allegations in this Paragraph.

101.    Cardano is a blockchain platform that was founded in 2015 by Ethereum co-founder Charles Hoskinson.

**Answer:**    Defendants admit that Cardano represents that ADA is the native token of the Cardano blockchain, which was founded by Charles Hoskinson in 2015. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

102.    Hoskinson left Ethereum in 2014 over a disagreement about how to structure the project. Vitalik Buterin, one of Ethereum's other co-founders, wanted to keep Ethereum a nonprofit organization with decentralized governance; Hoskinson wanted to accept venture capital and create a for-profit entity with a more formal governing structure.

**Answer:**    As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

103.    Hoskinson went on to form a new project called IOHK, a blockchain research and engineering company. IOHK's key project is Cardano, and ADA is a digital token that runs on the Cardano blockchain.

**Answer:**    Defendants admit that Cardano represents that IOHK is a blockchain engineering company founded by Hoskinson and Jeremy Wood and that ADA is a digital token that runs on the Cardano blockchain. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

104.    The Cardano Foundation is a Swiss-based nonprofit organization that oversees and supervises the advancement of Cardano.

**Answer:**    Defendants admit that Cardano represents that the Cardano Foundation is an independent Swiss nonprofit entity that aids in the development of Cardano. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

105.    Emurgo is a global blockchain company that serves as the official commercial arm of the Cardano blockchain.

**Answer:**    Defendants admit that Cardano represents that Emurgo serves as the commercial arm of Cardano.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

106.    From September 2015 to January 2017, a "pre-launch sales event" was held in which approximately 20 percent of the total supply of ADA was distributed to IOHK, Emurgo, and the Cardano Foundation.

**Answer:**    Defendants admit that it has been publicly reported that Cardano Foundation, IOHK, and Emurgo received approximately 5.2 billion ADA at its genesis block distribution in 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

107.    ADA launched for public trading via an ICO in or around September 2017. Approximately 94.45 percent of the remaining ADA was sold to Japanese citizens.

**Answer:**    Defendants admit that ADA was launched in approximately September 2017. To the extent Plaintiffs purport to characterize information on the Cardano website, Defendants respectfully refer the Court to it for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants aver that Charles Hoskinson stated that "[t]here was no Cardano ICO" in a public statement on Twitter on November 28, 2023, to which Defendants respectfully refer the Court for its complete and accurate contents.  As the

remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

108.    As one commentator has noted, there is a "question whether this narrow geographic distribution and the current overall coin distribution impose a problem for the decentralization of Cardano."

**Answer:**    This Paragraph purports to quote from an article by "Undersearcher" posted on medium.com on May 2, 2019, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

109.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in ADA tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ADA tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in ADA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

110.    Investors in ADA—including Plaintiffs Oberlander, Rodriguez, and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ADA's creators, developers, managers, and promoters.  The team behind ADA has actively cultivated this expectation through public communications, including on Cardano's official website.

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Defendants nevertheless deny the allegations in this Paragraph.

111.    Cardano's website, for example—despite emphasizing its "decentralized" nature—also emphasizes that its "team works across three independent entities to ensure that Cardano stays true to its purpose as we advance and evolve."  Those three entities are the Cardano Foundation, IOHK, and Emurgo.



**Answer:**     This Paragraph purports to characterize the Cardano website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that Cardano represents that these three entities with separate ownership and leadership contribute to Cardano (Cardano Foundation, IOHK, and Emurgo), but otherwise deny any remaining allegations in this Paragraph.

112.    The Cardano Foundation's website likewise emphasizes that it "work[s] with IOHK and Emurgo to ensure that Cardano is being developed and promoted as a secure, transparent, and accountable solution for positive global change."  It further states that "[t]he Cardano Foundation sets the direction for decentralized economic empowerment, working with regulators in different jurisdictions to shape blockchain legislation and commercial standards."

**Answer:**     This Paragraph purports to quote the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any

paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

113.    Although Cardano did not release an official whitepaper, it issued an analogous 2017 essay "outlining the background, philosophy, and inspiration behind the Cardano blockchain."

**Answer:**    This Paragraph purports to characterize the Cardano website and an essay posted on it, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

114.    Cardano's website also claims that "[e]very ada holder holds a stake in the Cardano network." A reasonable investor would interpret this language to mean that, by purchasing ADA tokens, the purchaser was investing in a common enterprise.

**Answer:**    This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

115.    Cardano's website further informs users that "[y]ou can buy or sell ada for fiat or other cryptocurrencies using cryptocurrency exchanges," and links to a site listing the "exchanges that support ada."

**Answer:**    This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

116.    Cardano also raised funds for ADA through its ICO in 2017.  As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security."  Current SEC chairman Gary Gensler has affirmed this view.

**Answer:**    This Paragraph purports to characterize a statement made by former SEC Chairman Jay Clayton made during a Senate hearing, to which Defendants respectfully refer the Court for its complete and accurate contents.  This Paragraph also appears to characterize a statement made by SEC Chairman Gary Gensler on August 3, 2021, during a speech at the Aspen Security Forum, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of these statements and any factual inferences or legal conclusions made by Plaintiffs based on these statements.  Defendants aver that Charles Hoskinson stated that "[t]here was no Cardano ICO" in a public statement on Twitter on November 28, 2023, to which Defendants respectfully refer the Court for its complete and accurate contents.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

117.    In August 2020, IOHK published a blog post acknowledging that Cardano had not yet been decentralized.  The article explained that Cardano's goal was full decentralization, but that "[t]his week marks the first step in the road to full decentralization"—thus conceding that Cardano was not decentralized.

**Answer:**    This Paragraph purports to characterize a blog post published on the IOHK website on August 13, 2020, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

118.    Individuals have also pointed out that, despite Cardano's claims of decentralization, Cardano is in fact centralized:



€ Tweet

Nick Szabo

@NickSzabo4

Replying to @RaoulGMI

Cardano's philosophy, and especially its auto-update feature, is centralized and destroys trust minimization. Trust minimization is the most important feature that gives a blockchain value. Cardano people do not understand it and fundamentally violate it.

8:45 PM • Feb 27. 2021 • Twitter Web App
154 Retweets 43 Quote Tweets 1,289 Likes

**Answer:**    This Paragraph purports to characterize a public statement made on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual

inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this

Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore

deny them on this basis.

119.    On March 31, 2021, IOHK tweeted that Cardano had purportedly achieved "100% decentralized block production":



**Answer:**        This Paragraph purports to characterize a public statement made on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

120.    Nonetheless, Cardano's websites continue to emphasize the role of IOHK, Emurgo, and the Cardano Foundation in overseeing the Cardano blockchain and the ADA token.

**Answer:**        This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

121.    In addition, ADA offers little, if any, utility apart from the ability to sell it to other investors. Cardano's website claims that, "[i]n time, ada will also be usable for a variety of applications and services on the Cardano platform"—but that time has not come.

**Answer:**        This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

122.    The primary purpose for purchasing ADA tokens was to make a profit, rather than to use ADA tokens for a separate task.  As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy ADA primarily because they expect profits, not because they intend to "use [ADA] for its intended functionality on the network."[23]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

123.    To the extent that ADA can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ADA and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[24]

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

124.    Cardano's website, moreover, impliedly acknowledges that ADA is an investment with the following warning:

> You are fully and solely responsible for evaluating your investments, for determining whether you will exchange blockchain assets based on your own judgement, and for all your decisions as to whether to exchange blockchain assets with Cardano.  In many cases, blockchain assets you exchange on the basis of your research may not increase in value, and may decrease in value.  Similarly,

---

[23]   Howey Framework Report.

[24]   *Id.*

blockchain assets you exchange on the basis of your research may fall or rise in value after your exchange.

**Answer:**    This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

125.    Yet in contrast to what would typically be included in an SEC registration statement, Cardano's website does <u>not</u> contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

**Answer:**    Defendants deny that ADA is a security. This Paragraph purports to characterize the Cardano website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. To the extent this Paragraph purports to compare the Cardano website to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

126.    Recognizing these issues, on November 23, 2021, eToro—one of the world's largest exchanges for retail traders—announced that, starting on December 26, 2021, it would delist Tron and ADA in the United States. eToro cited the "evolving regulatory environment" as the reason for doing so.

**Answer:**    This Paragraph purports to characterize the eToro website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph

reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny

them on this basis.

127.    In a video posted to Twitter, Hoskinson railed against the decision, blaming it on
the lack of a "global regulatory standard" and attempting to assuage fears that the delisting would
affect ADA's price.

**Answer:**    This Paragraph purports to characterize a public statement from Charles

Hoskinson on Twitter, to which Defendants respectfully refer the Court for its complete and

accurate contents and deny any paraphrasing, summarizing, or characterization of that source and

any factual inferences or legal conclusions made by Plaintiffs based on that source. As the

remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in this Paragraph and therefore deny them on this basis.

128.    Based on the facts alleged above, among others, ADA qualifies as an investment
contract and thus a security.

**Answer:**    Denied.

129.    The Coinbase Exchanges provide users with hyperlinks to Cardano's official
website. Coinbase thus participates in the attempt to persuade investors that by buying ADA, they
will profit from the efforts of others.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which

Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in

this Paragraph.

130.    During the Class Period, numerous members of the Class have made losing transactions in ADA on and with Coinbase.  In addition, certain members of the class, including Plaintiff Oberlander, currently own ADA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in ADA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have been for a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 5.    AGLD

131.    Adventure Gold ("AGLD") is a token created by Loot.  The first *bona fide* public offering of Adventure Gold occurred on or about September 2, 2021.

**Answer:**    Defendants admit that AGLD is a token on the Ethereum blockchain that is used in conjunction with the Loot platform and that AGLD was launched on approximately September 2, 2021.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

132.    Investors in AGLD reasonably expected to receive profits from their investment in AGLD.  They expected these profits to derive from the efforts of Loot.  AGLD was marketed as deriving value from its ability to enable the Loot community to participate in governance of the Loot NFT project.  This governance right, which resembles the voting rights of many traditional securities, means that AGLD purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the NFT project which AGLD holders could govern.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

133.    There are few, if any, goods or services that can be directly purchased using AGLD. To the extent that AGLD can be directly exchanged for any goods or services, there is little or no

apparent correlation between the market price of those goods or services and the price of AGLD. Accordingly, all or nearly all AGLD traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**     The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

134.     Based on the foregoing facts, among others, AGLD qualifies as an investment contract and therefore a security. However, AGLD has never been registered as a security.

**Answer:**     Defendants admit that AGLD has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

135.     During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in AGLD on and with Coinbase. Certain members of the class currently own AGLD tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought AGLD tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in AGLD.

**Answer:**     Defendants admit that Lead Plaintiff Rodriguez and members of the putative proposed class transacted in AGLD on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 6.     ALGO

136.     Algorand ("ALGO") is a token created, developed, issued, and distributed by Algorand, Inc. and the Algorand Foundation (together the "Algorand Entities").

**Answer:**     Defendants admit that ALGO is the native token of the Algorand blockchain. As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

137.   ALGO was first *bona fide* offered to the public in the United States in or about June 2019.

**Answer:**   Defendants admit that ALGO was launched in approximately June 2019. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

138.   Coinbase describes ALGO as follows:

Algorand is a cryptocurrency and blockchain protocol that aims to be simultaneously scalable, secure, and decentralized.   It uses a consensus algorithm called pure proof-of-stake.

**Answer:**   This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

139.   ALGO became available for trading on the Coinbase Pro Platform on or about August 14, 2019.  ALGO became available for trading on the Coinbase Platform on or about July 16, 2020.  Since becoming available on the Coinbase Platform, ALGO has continuously been traded on the Coinbase Exchanges.

**Answer:**   Defendants admit that ALGO became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform since approximately August 14, 2019, and on the Coinbase Trading Platform since approximately July 16, 2020, but otherwise deny the remaining allegations in this Paragraph.

140.    After ALGO was listed on the Coinbase Platform, its price rose by approximately 883.0 percent and peaked at $2.83 on November 18, 2021.  Since its peak, the price of ALGO has persistently declined.



**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of ALGO reached a high on or around November 18, 2021, at approximately $2.83, but otherwise deny the remaining allegations in this Paragraph.

141.    As of 10:00 a.m. Eastern time on March 10, 2022, ALGO was trading at $0.73—a decline of 74.0 percent from its November 18, 2021 peak.

**Answer:**    Defendants admit that ALGO was trading at approximately $0.73 on or around March 10, 2022, and that there was an approximate 74.0% decline in price from its November 2021 high, but otherwise deny any remaining allegations in this Paragraph.

142.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in ALGO tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ALGO tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in ALGO on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

143.    Purchasers of ALGO on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each ALGO token is fungible with all others, and the fortunes of all ALGO investors are "linked to each other [and] to the success of [the Algorand Entities'] efforts."[25]

**Answer:**    Defendants admit that Users bought ALGO on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

144.    ALGO investors reasonably expected to earn profits through the appreciation in value of their ALGO tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Algorand Entities.

---

[25]    *Id.*

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

145.    Each Algorand Entity is an active participant in the sponsorship, promotion, or distribution of ALGO.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

146.    Algorand, Inc. markets itself as the developer of the technology behind the Algorand blockchain.  ALGO is the native token of the Algorand blockchain.

**Answer:**    Defendants admit that ALGO is the native token of the Algorand blockchain.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

147.    Algorand, Inc. claims that its "technology enables a set of high performing Layer-1 blockchains that provide security, scalability, complete transaction finality, built in privacy, Co-Chains, and advanced smart contracts that are essential in a FutureFi world."

**Answer:**    This Paragraph appears to quote an unidentified source, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

148.    Algorand, Inc. performs, and is expected to perform, "essential tasks [and] responsibilities" regarding the Algorand blockchain.[26]  According to its website, Algorand, Inc. employs a "team" of "internationally recognized researchers, mathematicians, cryptographers, and

---

[26]    *Id.*

economists along with proven business leaders from global technology companies," including its founder Silvio Micali, a professor at the Massachusetts Institute of Technology. These employees are responsible for the research and development efforts needed to improve the functionality of the Algorand blockchain, as well as marketing, legal compliance, and financial management, among other functions. Algorand, Inc. is regularly rewarded in ALGO tokens for its research and development efforts. ALGO investors thus rely on Algorand, Inc. for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which ALGO operates.[27]

**Answer:**    This Paragraph purports to quote and characterize the Framework Report and the Algorand, Inc. website, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

149.    Algorand, Inc. uses ALGO to finance its efforts to develop and promote the Algorand blockchain. Algorand, Inc. acknowledges on its website that it "anticipate[s] selling some Algos from time to time through third party run, structured selling plans to fund development initiatives." Algorand, Inc. also benefits financially from appreciation of the ALGO tokens it holds, allowing it to invest further in research and development.

**Answer:**    This Paragraph purports to characterize the Algorand, Inc. website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

---

[27]    *Id.*

150.    The Algorand Foundation is a nonprofit affiliate of Algorand, Inc. that is "dedicated to helping fulfill the global promise of the Algorand blockchain by taking responsibility for its sound monetary supply economics, decentralized governance, and healthy and prosperous open-source ecosystem," according to its website.  The Algorand Foundation has chief responsibility for the distribution of ALGO, among other functions.

**Answer:**    This Paragraph purports to characterize the Algorand Foundation website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

151.    Buyers of ALGO are motivated primarily by the belief that the Algorand Entities will succeed in their efforts, leading to growth in the value of ALGO.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

152.    Apart from its speculative value as an investment, ALGO offers little utility to buyers.  The Algorand Foundation claims that "[a]s the vision of a Borderless Economy becomes a reality, the Algo will be one of the most critical crypto-currencies in use."  Currently, however, there are few goods or services that investors can directly purchase using ALGO.

**Answer:**    This Paragraph appears to quote an unidentified source, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

153.    To the extent that ALGO can be directly exchanged for goods or services, there is little or no apparent correlation between the price of ALGO and the market price of those goods

or services—a factor recognized by the SEC as evidence that investors in ALGO are motivated by the expectation of profits.[28]

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

154.    Many ALGO investors hold amounts of ALGO with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with ALGO.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

155.    ALGO is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for ALGO] or those who have a need for the functionality of the network," further demonstrating that ALGO investors are motivated by the expectation of profits.[29]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

156.    The Algorand Entities have promoted widespread trading of ALGO—including among investors with no personal need for the functionality of ALGO's network and no

---

[28]    *Id.*

[29]    *Id.*

expectation of directly purchasing goods or services with ALGO—by working to make ALGO available for retail trading on exchange platforms including the Coinbase Exchanges. The August 2019 listing of ALGO on Coinbase Pro made ALGO "one of the fastest tokens to be listed on Coinbase," which Algorand, Inc. touts as one of the key accomplishments in its history.

**Answer:**    This Paragraph appears to quote an unidentified source, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

157.    In addition to facilitating listings of ALGO on exchange platforms, the Algorand Entities have taken other steps to "support[] a market for, [and] the price of," ALGO.[30] For example, the Algorand Foundation has burned, or permanently removed from circulation, certain ALGO tokens in what it described as an effort "to strengthen the long-term viability and fairness within the Algo market." The Algorand Foundation has also offered "participation rewards" to incentivize investors to buy and hold ALGO. As the SEC recognizes, such actions support the conclusion that investors in ALGO reasonably expect to earn profits in reliance on the efforts of others.

**Answer:**    This Paragraph appears to characterize unidentified sources and the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

158.    Of the 10 billion ALGO in existence, 2 billion were initially allocated to Algorand, Inc. and 500 million were allocated to the Algorand Foundation. Both Algorand Entities continue to hold large amounts of ALGO, and Algorand, Inc. has expressed an intent to "hold [its] tokens long term." The Algorand Entities' holding of "the same class of digital assets as those being

---

[30]    *Id.*

distributed to the public" supports the inference that investors in ALGO have a reasonable expectation of profit.[31]

**Answer:**    Defendants admit that it has been publicly reported that of the 10 billion ALGO in existence, 2 billion were initially allocated to Algorand, Inc. and 500 million were allocated to the Algorand Foundation, but otherwise lack knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny them on this basis.    This Paragraph appears to characterize unidentified sources and the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.    Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.    The remaining allegations in this Paragraph reflect no allegations specific to Defendants.    Nevertheless, Defendants deny the allegations in this Paragraph.

159.    Based on the facts alleged above, among others, ALGO qualifies as an investment contract and thus a security.

**Answer:**    Denied.

160.    In contrast to the robust disclosures required under federal and state securities laws, the Algorand Entities provide investors with minimal disclosures.    Starting in November 2019, the Algorand Foundation has published five Transparency Reports, each of which is brief and far less detailed than the disclosures required for securities issuers.    The most recent Transparency Report was published in September 2021.

**Answer:**    Defendants deny that ALGO is a security.    This Paragraph purports to characterize Algorand Foundation Transparency Reports, to which Defendants respectfully refer the Court for their complete and accurate contents.    Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions

---

[31]    *Id.*

made by Plaintiffs based on them.  To the extent this Paragraph purports to compare the

Transparency Reports to the requirements of a registration statement filed with the SEC under the

federal securities laws, this Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny these allegations in this Paragraph.  As the

remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in this Paragraph and therefore deny them on this basis.

161.    The Algorand Entities have sought to conceal ALGO's status as a security through
misleading public communications that emphasize the purportedly "decentralized" nature of the
Algorand blockchain, thus diverting attention from the essential managerial efforts of the Algorand
Entities.  For example, the "About Us" page of Algorand, Inc.'s website provides almost no
information about Algorand, Inc.'s day-to-day work but states that the first element of its
"mission" is "[g]lobal trust through decentralization."  Moreover, materials on Algorand, Inc.'s
website—including, among others, the 2017 whitepaper for the Algorand blockchain—encourage
readers to think of ALGO as a direct competitor and counterpart to Bitcoin and Ethereum, which
are widely known as commodities.  After reviewing the Algorand Entities' websites and other
official publications, a reasonable layperson would likely have the impression that ALGO is not a
security.

**Answer:**    Defendants deny that ALGO is a security.  This Paragraph purports to

characterize and quote from the Algorand Entities' websites, to which Defendants respectfully

refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing,

summarizing, or characterization of those sources and any factual inferences or legal conclusions

made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no

allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this

basis.

162.    The Coinbase Exchanges provide users with a hyperlink to the official Algorand,
Inc. website and the Algorand whitepaper.  Coinbase thus participates in the attempt to conceal
ALGO's status as a security.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

163.    During the Class Period, numerous members of the Class, including Plaintiffs Underwood and Oberlander, have had one or more losing transactions in ALGO on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own ALGO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Underwood and Oberlander, bought ALGO tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:** Defendants admit that Lead Plaintiffs Underwood and Oberlander and members of the putative proposed class transacted in ALGO on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 7.    AMP

164.    Amp ("AMP") is a token that was first *bona fide* offered to investors on or about September 8, 2020. AMP became available for trading on the Coinbase Exchanges on or about June 10, 2021. Since then, AMP has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that AMP is a token on the Ethereum blockchain that works in conjunction with the Amp platform, that AMP was launched in approximately September 2020, and that AMP became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 10, 2021. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

165.    Coinbase describes AMP as follows:

Amp is an Ethereum token that aims to "collateralize payments on the Flexa Network, making them instant and secure." If a BTC or ETH payment fails due to unconfirmed or long transaction times "the Amp collateral can instead be liquidated to cover losses" while the vendor receives payment in fiat, potentially providing greater assurances to both parties.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

166.    After AMP was listed on the Coinbase Platform, its price rose by approximately 105.2 percent and peaked at $0.12 on June 16, 2021. Since its peak, the price of AMP has declined.



**Answer:** This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of AMP reached a high on or around June 6, 2021, at approximately $0.12, but otherwise deny the remaining allegations in this Paragraph.

167. As of 10:00 a.m. Eastern time on March 10, 2022, AMP was trading at $0.03—a decline of 79.4 percent from its June 16, 2021 peak.

**Answer:** Defendants admit that AMP was trading at approximately $0.03 on or around March 10, 2022, and that there was an approximate 79.4% decline in price from its June 2021 high, but otherwise deny the remaining allegations in this Paragraph.

168. During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in AMP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for AMP tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in AMP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

169. Investors in AMP—including Plaintiffs Oberlander, Rodriguez, and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of AMP's creators, developers, managers, and promoters. The team behind AMP has actively cultivated this expectation through public communications including, but not limited to, a whitepaper hosted on AMP's official website.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

170.    AMP was built by ConsenSys, a blockchain software company, and Flexa Network Inc., a digital payments platform.  According to the current version of the whitepaper, dated November 24, 2020, "Amp is a digital token designed to universally decentralize risk in a financial transaction."  Moreover, "AMP is the exclusive collateral token of the Flexa network," the existing merchant payment network built by Flexa Network Inc. The purported function and financial success of AMP depends on the efforts of the AMP development team to continue its maintenance of and increase the acceptance of the Flexa network.

**Answer:**    This Paragraph purports to characterize a whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that AMP was launched by Flexa, a blockchain payments company.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

171.    The close interdependence between the Flexa network and AMP is further documented in numerous public communications including posts on Flexa's Twitter feed.  For example, Flexa has used its Twitter account to announce network upgrades developed by its core team.



**Answer:**      This Paragraph purports to characterize a public statement made on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

172.    In contrast to the robust disclosures required under federal and state securities laws, the development team behind AMP provides investors with little insight into financial details of the Flexa network or the business model supporting its continued growth.

**Answer:**      Defendants deny that AMP is a security. To the extent this Paragraph purports to compare statements from the development team behind AMP to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a

legal conclusion to which no response is required.  To the extent a response is required, Defendants

deny these allegations in this Paragraph.  As the remaining allegations in this Paragraph reflect no

allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this

basis.

173.    Despite the lack of legally mandated disclosures, AMP's development team immediately listed AMP on the Gemini cryptocurrency exchange less than a week after its official launch.  The development team has since continued to encourage public investment and speculation in AMP by listing it broadly on cryptocurrency exchanges and engaging in a series of promotional activities such as giveaways, including in partnership with Coinbase.





**Answer:**     Defendants deny that AMP is a security.  To the extent this Paragraph purports to compare public statements to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  This Paragraph purports to characterize public statements made on Twitter, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny the remaining allegations in this Paragraph.

174.    AMP offers little utility apart from the ability to sell it to other investors.  Most investors purchase AMP with an expectation to make profits by reselling it later on, rather than using it as a payment collateral.  AMP's development team has in the past acted to increase supply of AMP tokens in response to increases in demand, which were driven by speculation among investors rather than the purported real-world use case.



**Answer:**    This Paragraph purports to characterize a public statement made on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

175.    As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy AMP primarily because they expect profits, not because they intend to "use [AMP] for its intended functionality on the network."[32]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

176.    To the extent that AMP can be exchanged for specific goods and services, there is little or no apparent correlation between the price of AMP and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[33] Instead of responding to the price of other goods or services, the price of AMP has changed based on events that affect speculation about its future performance. For example, the listing of AMP on platforms including the Coinbase Exchanges had an enormous positive effect on its value in 2021 even though it had no effect on AMP's nominal utility.

**Answer:**    Defendants admit that AMP became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 10, 2021. This Paragraph purports to characterize from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny those allegations.

177.    Based on the facts alleged above, among others, AMP qualifies as an investment contract and thus a security.

---

[32]    *Id.*

[33]    *Id.*

**Answer:**        Denied.

178.    The Coinbase Exchanges provide users with hyperlinks to AMP's official website and whitepaper.  Coinbase thus participates in the attempt to persuade investors that by buying AMP, they will profit from the efforts of others.

**Answer:**        This Paragraph purports to characterize the Coinbase.com website, to which

Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in

this Paragraph.

179.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in AMP on and with Coinbase.  Certain members of the class currently own AMP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought AMP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**        Defendants admit that Lead Plaintiffs Rodriguez and Underwood and

members of the putative proposed class transacted in AMP on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement,

to which Defendants respectfully refer the Court for the complete and accurate contents.

Defendants admit that certain of these transactions may have resulted in a loss but deny the

remaining allegations, including that Plaintiffs are entitled to any damages.

### 8.    ANKR

180.    Ankr ("ANKR") is a token created by Ankr.  The first *bona fide* public offering of ANKR occurred on or about August 31, 2018.

**Answer:**        Defendants admit that ANKR is a token on the Ethereum blockchain that is

used in conjunction with the Ankr platform and that ANKR was launched in approximately 2019.

As the remaining allegations in this Paragraph reflect no allegations specific to Defendants,

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

181.    Investors in ANKR reasonably expected to receive profits from their investment in ANKR.  They expected these profits to derive from the efforts of Ankr.  ANKR was marketed as deriving value from its ability to power Ankr, pay for services on the Ankr platform, and act as insurance for network participants.  Buyers of ANKR were thus depending on Ankr to create and maintain the Ankr platform.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

182.    There are few, if any, goods or services that can be directly purchased using ANKR. To the extent that ANKR can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ANKR. Accordingly, all or nearly all ANKR traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

183.    Based on the foregoing facts, among others, ANKR qualifies as an investment contract and therefore a security.  However, ANKR has never been registered as a security.

**Answer:**    Defendants admit that ANKR has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

184.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in ANKR on and with Coinbase.  Certain members of the class currently own ANKR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Underwood, bought ANKR tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in ANKR.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in ANKR on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 9.    ARPA

185.    ARPA Chain ("ARPA") is a token created by Arpachain. The first *bona fide* public offering of ARPA occurred on or about April 25, 2019.

**Answer:**    Defendants admit that ARPA is a token on the Ethereum blockchain that is used in conjunction with the ARPA Chain platform and that ARPA was launched on approximately April 25, 2019. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

186.    Investors in ARPA reasonably expected to receive profits from their investment in ARPA. They expected these profits to derive from the efforts of Arpachain. ARPA was marketed as deriving value from its ability to power ARPA Chain, a privacy-preserving computation network. The value of ARPA thus depended on the managerial effort of the issuer to create and maintain this network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

187.    There are few, if any, goods or services that can be directly purchased using ARPA. To the extent that ARPA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ARPA. Accordingly, all or nearly all ARPA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

188.    Based on the foregoing facts, among others, ARPA qualifies as an investment contract and therefore a security. However, ARPA has never been registered as a security.

**Answer:**        Defendants admit that ARPA has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

189.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in ARPA on and with Coinbase. Certain members of the class currently own ARPA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought ARPA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in ARPA.

**Answer:**        Defendants admit that Plaintiff Underwood and members of the putative proposed class transacted in ARPA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 10.    ATOM

190.    Cosmos ("ATOM") is a token created, issued, and distributed by the developers of the Cosmos network. The first *bona fide* public offering of ATOM occurred in or about April 2017.

**Answer:**        Defendants admit that ATOM is the native token of the Cosmos platform and that ATOM was launched in approximately April 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

191.    In 2014, developers Jae Kwon and Ethan Buchman co-founded the Cosmos network. They initially created Tendermint, the consensus algorithm that would go on to power Cosmos.

**Answer:** Defendants admit that Jae Kwon and Ethan Buchman were among the co-founders of Tendermint and the origins of Cosmos can be traced back to 2014 with the founding of Tendermint, a core contributor to the network. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

192. The Interchain Foundation (ICF), a Swiss nonprofit organization that funds open-source blockchain projects, helped develop and launch Cosmos. The ICF held a two-week ICO of the ATOM token in 2017, raising $17 million.

**Answer:** Defendants admit that a token sale for Cosmos was held in 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

193. Tendermint Inc. raised $9 million to continue development of the project through a Series A funding round in 2019.

**Answer:** As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

194. ATOM became available for trading on the Coinbase Pro Platform on or about February 14, 2020. ATOM became available for trading on the Coinbase Platform on or about January 16, 2020. Since becoming available on Coinbase, ATOM has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that ATOM became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform since approximately February 14, 2020, and on the Coinbase Trading Platform since approximately January 16, 2020, but otherwise deny the remaining allegations in this Paragraph.

195.    After ATOM was listed on the Coinbase Platform, its price rose by approximately 878.1 percent and peaked at $44.70 on September 20, 2021. Since then, its price has been volatile and has declined overall.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of ATOM reached a high on or around September 20, 2021, at approximately $44.70, but otherwise deny the remaining allegations in this Paragraph.

196.    As of 10:00 a.m. Eastern time on March 10, 2022, ATOM was trading at $28.12—a decline of 37.1 percent from its September 20, 2021 peak.

**Answer:**    Defendants admit that ATOM was trading at approximately $28.12 on or around March 10, 2022, and that there was an approximate 37.1% decline in price from its September 2021 high, but otherwise deny any remaining allegations in this Paragraph.

197.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in ATOM tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ATOM tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in ATOM on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

198.    Investors in ATOM—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ATOM's creators, developers, managers, and promoters.  The team behind ATOM has actively cultivated this expectation through public communications, including but not limited to a whitepaper hosted on its official website.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

199.    As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security."  Current SEC chairman Gary Gensler has affirmed this view.

**Answer:**    This Paragraph purports to characterize a statement made by former SEC Chairman Jay Clayton made during a Senate hearing, to which Defendants respectfully refer the Court for its complete and accurate contents.  This Paragraph also appears to characterize a statement made by SEC Chairman Gary Gensler on August 3, 2021, during a speech at the Aspen Security Forum, to which Defendants respectfully refer the Court for its complete and accurate

contents.  Defendants deny any paraphrasing, summarizing, or characterization of these statements and any factual inferences or legal conclusions made by Plaintiffs based on these statements.

200.    In addition, ATOM offers little, if any, utility apart from the ability to sell it to other investors.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

201.    Unlike Bitcoin and Ethereum, which have a hard limit on supply (and are commodities), there is no limit on the supply of new ATOM that can be created.  Rather, the developers of Cosmos adjust the number of tokens created based on the number of ATOM tokens being staked.  The value of ATOM depends on Cosmos developers' adjustment of the supply of ATOM.  The Cosmos developers also solicit application developers to use Cosmos, which in turn increases the value of ATOM.

**Answer:**    Defendants admit that bitcoin and ethereum have been recognized as commodities by courts and regulators.  To the extent this Paragraph purports to characterize ATOM as not a commodity, that is a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny that allegation, including that ATOM is a security.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

202.    ATOM offers purchasers little direct utility apart from its speculative value as an investment.  As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy ATOM primarily because they expect profits, not because they intend to "use [ATOM] for its intended functionality on the network."[34]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

---

[34]    *Id.*

legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

203. To the extent that ATOM can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ATOM and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[35]

**Answer:** This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

204. In contrast to what would typically be included in an SEC registration statement, ATOM's whitepaper does not contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

**Answer:** Defendants deny that ATOM is a security. Plaintiffs purport to characterize the ATOM whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. To the extent Plaintiffs purport to compare the ATOM whitepaper to the requirements of a registration statement filed with the SEC under federal securities laws, this Paragraph states a legal conclusion to which

---

[35] *Id.*

no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph.

205.    Coinbase itself has admitted that ATOM may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council has given ATOM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00).  In explaining its rating of ATOM, the Crypto Rating Council noted ATOM's 2017 ICO and further noted that "Tendermint is engaged in ongoing development of the Interblockchain Communication (IBC) mechanism for Cosmos, and submits proposed modules that are accepted or rejected by the Cosmos decentralized community."

**Answer:**    Defendants deny that ATOM is a security and that Coinbase, Inc. or Coinbase Global admitted that ATOM may constitute a security.  Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities.  The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

206.    Based on the facts alleged above, among others, ATOM qualifies as an investment contract and thus a security.

**Answer:**    Denied.

207.    The Coinbase Exchanges provide users with hyperlinks to ATOM's whitepaper and official website.  Coinbase thus participates in the attempt to persuade investors that by buying ATOM, they will profit from the efforts of others.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

208.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in ATOM on and with Coinbase. Certain members of the class currently own ATOM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought ATOM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood members of the putative proposed class transacted in ATOM on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have been for a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 11.    AUCTION

209.    Bounce Token ("AUCTION") is a token created by Bounce. The first *bona fide* public offering of AUCTION occurred on or about January 14, 2021.

**Answer:**    Defendants admit that AUCTION is a token on the Ethereum blockchain that is used in conjunction with the Bounce platform and that AUCTION was launched in approximately February 2021. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

210.    Investors in AUCTION reasonably expected to receive profits from their investment in AUCTION. They expected these profits to derive from the efforts of Bounce. AUCTION was marketed as deriving value from its ability to power Bounce, a decentralized auction protocol for token and NFT sales. This means that AUCTION's value depended on the managerial effort of the issuer to create and maintain this protocol and market it to those seeking to auction digital assets.

**Answer:**        This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

211.    There are few, if any, goods or services that can be directly purchased using AUCTION. To the extent that AUCTION can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of AUCTION. Accordingly, all or nearly all AUCTION traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**        This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

212.    Based on the foregoing facts, among others, AUCTION qualifies as an investment contract and therefore a security. However, AUCTION has never been registered as a security.

**Answer:**        Defendants admit that AUCTION has not been registered as a security and

aver that that is because it is not a security. Defendants otherwise deny the remaining allegations

in this Paragraph.

213.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in AUCTION on and with Coinbase. Certain members of the class currently own AUCTION tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought AUCTION tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in AUCTION.

**Answer:**        Defendants admit that Lead Plaintiff Rodriguez and members of the

putative proposed class transacted in AUCTION on the Trading Platforms during the putative

Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages

**12.    AXS**

214.    Axie Infinity Shards ("AXS") is a token created, issued, and distributed by Sky Mavis.

**Answer:**    Defendants admit that AXS is a token on the Ethereum blockchain that is used in conjunction with Axie Infinity game. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

215.    Coinbase describes AXS as follows: "AXS is an Ethereum token that powers Axie Infinity, a blockchain-based game where players can battle, collect, and build a digital kingdom for their pets. AXS holders can claim rewards for staking their tokens, playing the game, and participating in key governance votes."

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

216.    AXS was first *bona fide* offered to the public on or about November 4, 2020.

**Answer:**    Defendants admit that AXS was launched in approximately November 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

217.    AXS became available for trading on the Coinbase Pro Platform on or about August 11, 2021. AXS became available for trading on the Coinbase Platform on or about August 13, 2021. Since becoming available on Coinbase, AXS has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that AXS became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Trading Platform on

approximately August 13, 2021, and the Coinbase Pro Trading Platform on approximately August 11, 2021, but otherwise deny the remaining allegations in this Paragraph.

218.    After AXS was listed on the Coinbase Platform, its price rose by approximately 150.1 percent and peaked at $165.37 on November 6, 2021.  Since then, it has declined consistently.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of AXS reached a high on or around November 6, 2021, at approximately $165.37, but otherwise deny the remaining allegations in this Paragraph.

219.    As of 10:00 a.m. Eastern time on March 10, 2022, AXS was trading at $46.07—a decline of 72.1 percent from its November 6, 2021 peak.

**Answer:**    Defendants admit that AXS was trading at approximately $46.07 on or around March 10, 2022, and that there was an approximate 72.1% decline in price from its November 2021 high, but otherwise deny any remaining allegations in this Paragraph.

220.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in AXS tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for AXS tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in AXS on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

221.    Purchasers of AXS on the Coinbase Exchanges understood that they were investing money in a common enterprise.  Each AXS token is fungible with all others, and the fortunes of all AXS investors are "linked to each other [and] to the success of [the] efforts" of AXS's developers, promoters, and distributors.[36]

**Answer:**    Defendants admit that Users bought AXS on the Trading Platforms.  This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny the remaining allegations in this Paragraph.

222.    AXS investors reasonably expected to earn profits through the appreciation in value of their AXS tokens.  They expected such profits to result predominantly, if not solely, from the efforts of Sky Mavis

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

---

[36]    *Id.*

223.    AXS is a token that is supposed to derive its value from a video game. As Coinbase explains, "Axie Infinity is a crypto-meets-Pokémon game in which players raise, battle, and trade cute NFT pets called Axies. It features two native cryptocurrencies: Axie Infinity Shards (AXS), which can be bought and sold on exchanges like Coinbase, and Small Love Potion (SLP), which is awarded to players for spending time in the game." Because of this structure, AXS only has value through the managerial efforts of AXS in creating and maintaining the game to which it is tied, as well as through promotion of the AXS token. Much as a traditional security allows holders to vote regarding the management of a company, holding an AXS token imparts governance rights regarding the game to which it is linked.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that Axie represents that players of the Axie game can earn AXS for playing the Axie game and use AXS to make in-game purchases, and that AXS can be used to participate in governance votes. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

224.    Purchasers of AXS are motivated primarily by the expectation of profit. Many AXS investors hold AXS with no intention of ever interacting with the game with which it is associated, and hold amounts of AXS that far exceeds the value of any goods or services the investors could ever expect to purchase with AXS or use within the game to which it is linked. Indeed, tokens held on Coinbase cannot be used in the game without being transferred off Coinbase.

**Answer:**    Defendants admit the allegations in the third sentence of this Paragraph. The first two sentences of this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in the first two sentences of this Paragraph.

225.    Despite its direct utility being largely or exclusively limited to a narrow class of users, AXS is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for AXS] or those who have a need for the

functionality of the network," further demonstrating that AXS investors are motivated by the expectation of profits.[37]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

226.    Based on the above facts, among others, AXS qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

227.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in AXS on and with Coinbase. Certain members of the class currently own AXS tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought AXS tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in AXS on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 13.    BAL

228.    Balancer ("BAL") is a token created by Balancer Labs. The first *bona fide* public offering of BAL occurred on or about June 1, 2020.

---

[37]    *Id.*

**Answer:**    Defendants admit that BAL is a token on the Ethereum blockchain that is used in conjunction with the Balancer platform and that BAL was launched on approximately June 1, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

229.    Investors in BAL reasonably expected to receive profits from their investment in BAL. They expected these profits to derive from the efforts of Balancer Labs. BAL was marketed as deriving value from its ability to power the Balancer protocol, an automated market maker that creates liquidity in pools of different crypto-assets. The value of BAL thus depended on the managerial effort of the issuer to create and maintain the Balancer protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

230.    There are few, if any, goods or services that can be directly purchased using BAL. To the extent that BAL can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BAL. Accordingly, all or nearly all BAL traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

231.    Based on the foregoing facts, among others, BAL qualifies as an investment contract and therefore a security. However, BAL has never been registered as a security.

**Answer:**    Defendants admit that BAL has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

232.    During the Class Period, numerous members of the Class have had one or more losing transactions in BAL on and with Coinbase. Certain members of the class currently own BAL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought BAL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class,

including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in BAL.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood members of the putative proposed class transacted in BAL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 14.    BAND

233.    Band Protocol ("BAND") is a token created by the developer of the Band Protocol. The first *bona fide* public offering of BAND occurred on or about September 17, 2019.

**Answer:**    Defendants admit that BAND is the native token of the Band Protocol platform and that BAND was launched on approximately September 17, 2019. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

234.    Investors in BAND reasonably expected to receive profits from their investment in BAND. They expected these profits to derive from the efforts of Band Protocol developer. BAND was marketed as deriving value from its ability to serve as collateral for nodes that verify real-world data that was then uploaded to the Band Protocol network, a decentralized cross-chain data oracle platform. The value of BAND thus depended on the managerial effort of the issuer to create and maintain the Band Protocol network and attract validators to that platform.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

235.    There are few, if any, goods or services that can be directly purchased using BAND. To the extent that BAND can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BAND. Accordingly, all or nearly all BAND traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**  The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

236.  Based on the foregoing facts, among others, BAND qualifies as an investment contract and therefore a security.  However, BAND has never been registered as a security.

**Answer:**  Defendants admit that BAND has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

237.  During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in BAND on and with Coinbase.  Certain members of the class currently own BAND tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Underwood, bought BAND tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BAND.

**Answer:**  Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in BAND on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 15.  BAT

238.  Basic Attention Token ("BAT") is a token created by Brave Software.  The first *bona fide* public offering of BAT occurred on or about May 31, 2017.

**Answer:**  Defendants admit that BAT is a token on the Ethereum blockchain that is used in conjunction with Brave Software's digital advertising platform and that BAT was launched on approximately May 31, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

239. Investors in BAT reasonably expected to receive profits from their investment in BAT. They expected these profits to derive from the efforts of Brave Software. BAT was marketed as deriving value from its ability to power Brave Software's blockchain-based digital advertising platform. This means that BAT's value depended on the managerial effort of the issuer to create this advertising platform and drive its adoption.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

240. There are few, if any, goods or services that can be directly purchased using BAT. To the extent that BAT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BAT. Accordingly, all or nearly all BAT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

241. Based on the foregoing facts, among others, BAT qualifies as an investment contract and therefore a security. However, BAT has never been registered as a security.

**Answer:** Defendants admit that BAT has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

242. During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in BAT on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own BAT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought BAT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in BAT.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in BAT on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 16.    BNT

243.    Bancor Network Token ("BNT") is a token created by Bancor.  The first *bona fide* public offering of BNT occurred on or about June 11, 2017.

**Answer:**    Defendants admit that BNT is a token on the Ethereum blockchain that is used in conjunction with the Bancor platform and that BNT was launched on or around June 11, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

244.    Investors in BNT reasonably expected to receive profits from their investment in BNT.  They expected these profits to derive from the efforts of Bancor.  BNT was marketed as deriving value from its ability to power the Bancor protocol, which creates liquidity on other blockchains through the use of smart contracts.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

245.    Bancor publicly stated that it would use the funds raised through the ICO to enhance the Bancor software and support the growth of its platform, telling investors that "a portion of the funds" raised would "be used to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol implementations, and support related technologies and applications[.]"

**Answer:**    This Paragraph purports to characterize statements made by Bancor, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph. To the extent a further response is required, Defendants deny the allegations in this Paragraph.

246. Bancor told investors that "BNT establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefitting all other smart tokens holding it in reserve." A reasonable investor would have understood that BNT would appreciate in value as BNT became more widely adopted.

**Answer:** This Paragraph purports to characterize statements made by Bancor, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

247. Investors' profits were to be derived from the managerial efforts of others—Bancor, its co-founders, and the Bancor development team. Bancor held itself out as having "[t]he A-Team of visionaries and advisors," including two co-founders who "have each founded and exited a startup." Bancor further touted outside advisors including "venture capitalist Tim Draper, Founders Fund partner Brian Singerman, governance visionary John Clippinger, founder of Asana Justin Rosenstein and more." This means that the value of BNT depended on the managerial effort of Bancor itself.

**Answer:** This Paragraph purports to characterize statements made by Bancor, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

248. There are few, if any, goods or services that can be directly purchased using BNT. To the extent that BNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BNT.

Accordingly, all or nearly all BNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

249.    Based on the foregoing facts, among others, BNT qualifies as an investment contract and therefore a security.  However, BNT has never been registered as a security.

**Answer:**    Defendants admit that BNT has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

250.    During the Class Period, numerous members of the Class have had one or more losing transactions in BNT on and with Coinbase.  Certain members of the class currently own BNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought BNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BNT.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in BNT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 17.    BOND

251.    BarnBridge ("BOND") is a token created by BarnBridge.  The first *bona fide* public offering of BOND occurred on or about October 26, 2020.

**Answer:**    Defendants admit that BOND is a token on the Ethereum blockchain that is used in conjunction with the BarnBridge platform and that BOND was launched on approximately October 26, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

252.    Investors in BOND reasonably expected to receive profits from their investment in BOND.  They expected these profits to derive from the efforts of BarnBridge.  BOND was marketed as deriving value from its ability to govern BarnBridge, a tokenized risk protocol.  This governance right, which resembles the voting rights of many traditional securities, means that BOND purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the risk protocol which BOND holders could govern.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to

Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

253.    There are few, if any, goods or services that can be directly purchased using BOND. To the extent that BOND can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BOND. Accordingly, all or nearly all BOND traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to

Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

254.    Based on the foregoing facts, among others, BOND qualifies as an investment contract and therefore a security.  However, BOND has never been registered as a security.

**Answer:**    Defendants admit that BOND has not been registered as a security and aver

that that is because it is not a security.  Defendants otherwise deny the remaining allegations in

this Paragraph.

255.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in BOND on and with Coinbase.  Certain members of the class currently own BOND tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought BOND tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in BOND.

**Answer:** Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in BOND on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 18.    BTRST

256.    Braintrust ("BTRST") is a token created by Braintrust. The first *bona fide* public offering of BTRST occurred on or about September 15, 2021.

**Answer:** Defendants admit that BTRST is a token on the Ethereum blockchain that is used in conjunction with the Braintrust platform and that BTRST was launched on approximately September 2021. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

257.    Investors in BTRST reasonably expected to receive profits from their investment in BTRST. They expected these profits to derive from the efforts of Braintrust. BTRST was marketed as deriving value from its ability to govern the Braintrust network. This governance right means that BTRST owners were participating in a common enterprise, which depended on the managerial effort of the issuer to in fact maintain a decentralized network connecting freelancers with organizations. Braintrust promoted and maintained its network in part by distributing BTRST as an incentive to refer new users to that network.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

258.    There are few, if any, goods or services that can be directly purchased using BTRST. To the extent that BTRST can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of BTRST. Accordingly, all or nearly all BTRST traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

259.    Based on the foregoing facts, among others, BTRST qualifies as an investment contract and therefore a security. However, BTRST has never been registered as a security.

**Answer:**    Defendants admit that BTRST has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

260.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in BTRST on and with Coinbase. Certain members of the class currently own BTRST tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought BTRST tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in BTRST.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in BTRST on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 19.    CGLD

261.    Celo ("CGLD") is a token created by Celo. The first *bona fide* public offering of CGLD occurred on or about May 11, 2020.

**Answer:**    Defendants admit that CGLD is the native token of the Celo blockchain and that CGLD was launched on approximately May 11, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

262.    Investors in CGLD reasonably expected to receive profits from their investment in CGLD.  They expected these profits to derive from the efforts of Celo.  CGLD was marketed as deriving value from its ability to power the Celo platform, a blockchain ecosystem that is accessible for anyone with a mobile phone.  CGLD's value thus depended on the managerial effort of the issuer to develop this blockchain ecosystem and make it accessible and functional on mobile phones.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

263.    There are few, if any, goods or services that can be directly purchased using CGLD. To the extent that CGLD can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CGLD. Accordingly, all or nearly all CGLD traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

264.    Based on the foregoing facts, among others, CGLD qualifies as an investment contract and therefore a security.  However, CGLD has never been registered as a security.

**Answer:**    Defendants admit that CGLD has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

265.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in CGLD on and with Coinbase.  Certain members of the class currently own CGLD tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought CGLD tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in CGLD.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in CGLD on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

## 20.    CLV

266.    Clover Finance ("CLV") is a token created by Clover Inc. The first *bona fide* public offering of CLV occurred on or about April 20, 2021.

**Answer:**    Defendants admit that CLV is the native token of the Clover Finance

blockchain and that CLV was launched on approximately April 20, 2021. As the remaining

allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

this Paragraph and therefore deny them on this basis.

267.    Investors in CLV reasonably expected to receive profits from their investment in CLV. They expected these profits to derive from the efforts of Clover Inc. CLV was marketed as deriving value from its ability to pay for Clover transactions and to vote for network upgrades to Clover, a blockchain infrastructure platform. This governance right resembles the voting rights of many traditional securities. CLV purchasers invested in a common enterprise with each other and depended on the managerial effort of Clover Inc. to create and maintain the algorithms supporting Clover, thus making CLV's governance rights and its ability to pay for Clover transactions valuable.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

268.    There are few, if any, goods or services that can be directly purchased using CLV. To the extent that CLV can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CLV. Accordingly, all or nearly all CLV traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

269.    Based on the foregoing facts, among others, CLV qualifies as an investment contract and therefore a security.  However, CLV has never been registered as a security.

**Answer:**    Defendants admit that CLV has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

270.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in CLV on and with Coinbase.  Certain members of the class currently own CLV tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Rodriguez, bought CLV tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in CLV.

**Answer:**    Defendants admit that Lead Plaintiffs Rodriguez and Underwood and members of the putative proposed class transacted in CLV on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 21.    COMP

271.    Compound ("COMP") is a token created, issued, and distributed by Compound Labs.

**Answer:**    Defendants admit that COMP is a token on the Ethereum blockchain that is used in conjunction with the Compound platform.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

272.    Coinbase describes COMP as follows: "Compound (COMP) is an Ethereum token that enables community governance of the Compound protocol.  The protocol is a series of

decentralized interest rate markets that allow users to supply and borrow Ethereum tokens at variable interest rates. COMP token holders and their delegates can also debate, propose, and vote on changes to the protocol."

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

273.    COMP was first *bona fide* offered to the public on or about June 15, 2020.

**Answer:**    Defendants admit that COMP was launched on approximately June 15, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

274.    COMP became available for trading on the Coinbase Pro Platform on or about June 23, 2020. COMP became available for trading on the Coinbase Platform on or about June 25, 2020. Since becoming available on the Coinbase Platform, COMP has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that COMP became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform since approximately June 23, 2020, and on the Coinbase Trading Platform since approximately June 25, 2020, but otherwise deny the remaining allegations in this Paragraph.

275.    After COMP was listed on the Coinbase Platform, its price rose by approximately 338.6 percent and peaked at $911.20 on May 12, 2021. Since then, it has declined dramatically.





**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of COMP reached a high on or around May 12, 2021, at approximately $911.20, but otherwise deny the remaining allegations in this Paragraph.

276.    As of 10:00 a.m. Eastern time on March 10, 2022, COMP was trading at $101.73—a decline of 88.8 percent from its May 12, 2021 peak.

**Answer:**    Defendants admit that COMP was trading at approximately $101.73 on or around March 10, 2022, and that there was an approximate 88.8% decline in price from its May 2021 high, but otherwise deny any remaining allegations in this Paragraph.

277.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in COMP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for COMP tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in COMP on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents.  Defendants

otherwise deny the remaining allegations in this Paragraph.

278.    Purchasers of COMP on the Coinbase Exchanges understood that they were investing money in a common enterprise.  Each COMP token is fungible with all others, and the fortunes of all COMP investors are "linked to each other [and] to the success of [the] efforts" of COMP's developers, promoters, and distributors.[38]

**Answer:**    Defendants admit that Users bought COMP on the Trading Platforms.  This

Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer

the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing,

or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs

based on it.  Defendants otherwise deny the remaining allegations in this Paragraph.

279.    COMP investors reasonably expected to earn profits through the appreciation in value of their COMP tokens.  They expected such profits to result predominantly, if not solely, from the efforts of Compound Labs and its founders, Robert Leshner and Geoffrey Hayes.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

280.    Similar to a traditional security, the value of COMP derives from its providing voting rights in the management of an enterprise.  COMP allows its holders to delegate voting rights regarding the governance of the Compound protocol, which in turn facilitates lending of crypto-assets.  Thus, the entirety of COMP's value depends on the creation and maintenance of the Compound protocol, and the holders are part of a common enterprise of governing that protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph, including that COMP is a security.

281.    The supply of COMP is highly centralized, with new COMP tokens being created out of nothing by Compound Labs.

---

[38]    *Id.*

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

282.    Apart from its speculative value as an investment and its impartation of voting rights, COMP does not offer direct utility.  There are few, if any, goods or services that investors can directly purchase using COMP. To the extent that COMP can be directly exchanged for goods or services, there is little or no apparent correlation between the price of COMP and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in COMP are motivated by the expectation of profits.[39]

**Answer:**        This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

283.    Even though its only function is to participate in the governance of the Compound protocol, COMP is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for COMP] or those who have a need for the functionality of the network," further demonstrating that COMP investors are motivated by the expectation of profits.[40]

**Answer:**        This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

---

[39]    *Id.*

[40]    *Id.*

284.    Based on the above facts, among others, COMP qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

285.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in COMP on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own COMP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought COMP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in COMP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 22.    CRO

286.    Crypto.com Coin ("CRO") is a token created, developed, issued, and distributed by CRO Protocol Labs, also known as Crypto.com ("Crypto.com").

**Answer:**    Defendants admit that CRO is a token on the Ethereum blockchain that is used in conjunction with the Cronos Chain platform. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

287.    Coinbase describes CRO as follows:

Crypto.com Chain is an Ethereum token that powers Crypto.com Pay, a service that aims to allow users to pay for goods and services with cryptocurrency while receiving cashback rewards.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

288.    CRO was first *bona fide* offered to the public in or around November 2018.

**Answer:** Defendants admit that CRO was launched in approximately November 2018. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

289.    CRO became available for trading on the Coinbase Pro Platform on or about November 2, 2021. CRO became available for trading on the Coinbase Platform on or about November 3, 2021. Since becoming available on the Coinbase Platform, CRO has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that CRO became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Trading Platform in approximately November 3, 2021, and the Coinbase Pro Trading Platform in approximately November 2, 2021, but otherwise deny the remaining allegations in this Paragraph.

290.    After CRO was listed on the Coinbase Platform, its price rose by approximately 281.4 percent and peaked at $0.97 on November 24, 2021. Since its peak, the price of CRO has persistently declined.





**Answer:** This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of CRO reached a high on or around November 24, 2021, at approximately $0.97, but otherwise deny the remaining allegations in this Paragraph.

291. As of 10:00 a.m. Eastern time on March 10, 2022, CRO was trading at $0.39—a decline of 60.0 percent from its November 24, 2021 peak.

**Answer:** Defendants admit that the price of CRO was approximately $0.39 on or around March 10, 2022, and that there was an approximate 60.0% decline in price from its November 2021 high, but otherwise deny the remaining allegations in this Paragraph.

292. During the Class Period, members of the Class, including Plaintiff Underwood, invested in CRO tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for CRO tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in CRO on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents.  Defendants

otherwise deny the remaining allegations in this Paragraph.

293.    Purchasers of CRO on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each CRO token is fungible with all others, and the fortunes of all CRO investors are "linked to each other [and] to the success of [Crypto.com's] efforts."[41]

**Answer:**    Defendants admit that Users bought CRO on the Trading Platforms.  This

Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer

the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing,

or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs

based on it.  Defendants otherwise deny the remaining allegations in this Paragraph.

294.    CRO investors reasonably expected to earn profits through the appreciation in value of their CRO tokens.  They expected such profits to result predominantly, if not solely, from the efforts of Crypto.com and its affiliates.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

295.    Crypto.com is the developer of a suite of products and services, including but not limited to (1) the Crypto.com trading platform, which competes with Coinbase and allows users to trade digital assets; (2) Crypto.com Pay, a service that facilitates payment with digital assets; and (3) Crypto.com Visa debit cards, which offer cardholders rewards in the form of digital assets. According to its website, Crypto.com has approximately 3,000 employees and aims to be a "world-changing company."

**Answer:**    This Paragraph purports to characterize the Crypto.com website, to which

Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph

---

[41]    *Id.*

reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

296.     Buyers of CRO can use it for certain functions within Crypto.com's suite of products and services.  For example, users who hold CRO in the Crypto.com trading app can gain access to Crypto.com Visa cards and discounts on transaction fees within the Crypto.com trading platform.

**Answer:**     This Paragraph purports to characterize the Crypto.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

297.     In addition to the Ethereum-based token CRO, Crypto.com has issued another token called Cronos, which runs on a separate blockchain and is not listed on the Coinbase Exchanges.  However, according to Crypto.com, both tokens have "the same token name, symbol and fiat value" and are interchangeable for most purposes.

**Answer:**     Defendants admit that CRO, also referred to as Crypto.com coin, became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Trading Platform on approximately November 3, 2021, and the Coinbase Pro Trading Platform on approximately November 2, 2021, and that that CRO is a token on the Ethereum blockchain that is used in conjunction with the Cronos Chain blockchain.  Defendants further admit that no other digital asset using the symbol CRO, including one referred to as Cronos, is available for buying and selling on the Trading Platforms.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

298.    Crypto.com performs, and is expected to perform, "essential tasks [and] responsibilities" regarding CRO and the network surrounding CRO.[42] For example, Crypto.com operates the Crypto.com trading platform and fulfills trade orders in exchange for transaction fees, with discounts for certain holders of CRO.   Crypto.com also advertises that it actively protects security and data privacy and employs "a dedicated team to monitor all transactions" on its trading platform.   In addition, Crypto.com has pursued an aggressive marketing strategy, including purchasing the naming rights to a professional sports arena and hiring celebrity endorsers such as Matt Damon and Carmelo Anthony. CRO investors thus rely on Crypto.com for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which CRO operates.[43]

**Answer:**    This Paragraph purports to characterize the Crypto.com website and the Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents.   Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.    The remaining allegations in this Paragraph reflect no allegations specific to Defendants.   Nevertheless, Defendants deny the remaining allegations in this Paragraph.

299.    Buyers of CRO are motivated primarily by the belief that Crypto.com will succeed in its efforts, leading to growth in the value of CRO.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.   Nevertheless, Defendants deny the allegations in this Paragraph.

300.    Apart from its speculative value as an investment, CRO offers only limited utility, which is restricted to active users of Crypto.com's products and services.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.   Nevertheless, Defendants deny the allegations in this Paragraph.

---

[42]  *Id.*

[43]  *Id.*

301.     There are few goods or services that investors can directly purchase using CRO. To the extent that CRO can be directly exchanged for goods or services, there is little or no apparent correlation between the price of CRO and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in CRO are motivated by the expectation of profits.[44]

**Answer:**     This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

302.     Many CRO investors hold amounts of CRO with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with CRO.

**Answer:**     This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

303.     Despite its direct utility being largely or exclusively limited to buyers who are active users of <u>Crypto.com</u>'s products and services, CRO is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for CRO] or those who have a need for the functionality of the network," further demonstrating that CRO investors are motivated by the expectation of profits.[45]

**Answer:**     This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[44]     *Id.*

[45]     *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

304.    Crypto.com has promoted widespread trading of CRO—including among investors with no personal need for the functionality of CRO's network and no expectation of directly purchasing goods or services with CRO—by working to make CRO available for retail trading on exchange platforms including the Coinbase Exchanges. Of all potential investors in digital assets, users of the Coinbase Exchanges are among the least likely to benefit from the direct utility features of CRO because in choosing Coinbase, they have presumably chosen *not* to use Crypto.com's trading platform. Thus, by having CRO listed on the Coinbase Exchanges, Crypto.com specifically targeted a class of investors with little or no reason to buy CRO except to make a profit.

    **Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

305.    Crypto.com has taken other steps to support the market for CRO, including an announcement in February 2021 that it would "burn," or permanently remove from circulation, the majority of then-existing CRO (70 billion tokens). Crypto.com described this step as "[t]he largest token burn in history."

    **Answer:**    This Paragraph purports to characterize statements from Crypto.com, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

306.    Similarly, Crypto.com has designed its products and services in ways that are specifically calculated to support the price of CRO. To gain rewards from Crypto.com—including discounted transaction fees and access to Crypto.com Visa cards—investors do not trade in their CRO tokens like arcade tokens. Instead, they are required to *hold* CRO over time in the Crypto.com app. By incentivizing investors to hold their CRO, Crypto.com protects the market for CRO against potential selloffs and helps to ensure liquidity.

    **Answer:**    This Paragraph purports to characterize the Crypto.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

307.    As the SEC recognizes, Crypto.com's actions to "support[] a market for, [and] the price of," CRO[46] are evidence that investors in CRO reasonably expect to earn profits in reliance on the efforts of others.

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

308.    Crypto.com continues to hold a large amount of CRO. After the token bum announced in February 2021, Crypto.com retained 5 billion CRO in a digital wallet set aside for "Network Long-Term Incentives." Crypto.com's holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in CRO have a reasonable expectation of profit.[47]

**Answer:**    This Paragraph purports to quote the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

---

[46]    *Id.*

[47]    *Id.*

309.    Crypto.com owns or holds licenses to the intellectual property underlying its trading app, according to its Terms and Conditions.  This fact further suggests that investors in CRO have a reasonable expectation of profit derived from the efforts of Crypto.com.[48]

**Answer:**    This Paragraph purports to characterize Crypto.com's Terms and Conditions and the Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

310.    Based on the facts alleged above, among others, CRO qualifies as an investment contract and thus a security.

**Answer:**    Denied.

311.    In contrast to the robust disclosures required under federal and state securities laws, Crypto.com provides investors with minimal disclosures.  Crypto.com provides only high-level information and updates about CRO on its website, blog, and social media channels.

**Answer:**    Defendants deny that CRO is a security.  This Paragraph purports to characterize the Crypto.com website, blog, and social media channels, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  To the extent this Paragraph purports to compare the Crypto.com website, blog, and social media channels to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  As the remaining allegations in this Paragraph reflect no

---

[48]    *Id.*

allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

312.    Crypto.com has sought to conceal CRO's status as a security through misleading public communications that emphasize the purportedly "decentralized" nature of CRO, thus diverting attention from the essential managerial efforts of Crypto.com. For example, Crypto.com claimed that the token burn announced in February 2021 would make CRO "100% decentralized." The most recent version of Crypto.com's whitepaper, dated February 2022, also states that CRO is "100% decentralized." In fact, CRO does not operate in a decentralized network; the value of CRO depends heavily on Crypto.com's efforts to develop and promote its products and services. Nevertheless, after reviewing Crypto.com's public communications, a reasonable layperson would likely have the impression that CRO is a decentralized asset and not a security.

**Answer:**    Defendants deny that CRO is a security. This Paragraph purports to characterize and quote from Crypto.com and Crypto.com's whitepaper, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

313.    The Coinbase Exchanges provide users with a hyperlink to the Crypto.com website and whitepaper. Coinbase thus participates in the attempt to conceal CRO's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

314.     During the Class Period, numerous members of the Class have had one or more losing transactions in CRO on and with Coinbase.  Certain members of the class currently own CRO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class bought CRO tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**       Defendants admit that members of the putative proposed class transacted in CRO on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 23.    CRV

315.     Curve DAO Token ("CRV") is a token created by Curve.  The first *bona fide* public offering of CRV occurred on or about August 15, 2020.

**Answer:**       Defendants admit that CRV is a token on the Ethereum blockchain that is used in conjunction with Curve.fi and that CRV was launched on approximately August 15, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

316.     Investors in CRV reasonably expected to receive profits from their investment in CRV.  They expected these profits to derive from the efforts of Curve.  CRV was marketed as deriving value from its ability to power the Curve exchange, a decentralized exchange for stablecoins.  The value of CRV thus depends on the managerial effort of the issuer to create and maintain the Curve exchange.

**Answer:**       This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

317.     There are few, if any, goods or services that can be directly purchased using CRV.  To the extent that CRV can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CRV.

Accordingly, all or nearly all CRV traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

318.    Based on the foregoing facts, among others, CRV qualifies as an investment contract and therefore a security. However, CRV has never been registered as a security.

**Answer:**    Defendants admit that CRV has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

319.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in CRV on and with Coinbase. Certain members of the class currently own CRV tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought CRV tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in CRV.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in CRV on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 24.    CTSI

320.    Cartesi ("CTSI") is a token created by Cartesi. The first *bona fide* public offering of CTSI occurred on or about April 21, 2020.

**Answer:**    Defendants admit that CTSI is the native token on the Cartesi blockchain and that CTSI launched on approximately April 21, 2020. As the remaining allegations in this

123

Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

321.    Investors in CTSI reasonably expected to receive profits from their investment in CTSI.  They expected these profits to derive from the efforts of Cartesi.  CTSI was marketed as deriving value from its ability to power the Cartesi network, a platform for the development and deployment of scalable decentralized applications.  The value of CTSI thus depended on the managerial effort of the issuer to create and develop the Cartesi network itself.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

322.    There are few, if any, goods or services that can be directly purchased using CTSI. To the extent that CTSI can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CTSI. Accordingly, all or nearly all CTSI traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

323.    Based on the foregoing facts, among others, CTSI qualifies as an investment contract and therefore a security.  However, CTSI has never been registered as a security.

**Answer:**    Defendants admit that CTSI has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

324.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in CTSI on and with Coinbase.  Certain members of the class currently own CTSI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought CTSI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in CTSI.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in CTSI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 25.    CVC

325.    Civic ("CVC") is a token created by Civic Technologies, Inc. ("Civic Technologies"). The first *bona fide* public offering of CVC occurred on or about June 20, 2017.

**Answer:**    Defendants admit that CVC is a token on the Ethereum blockchain that is used in conjunction with the Civic platform and that CVC was launched on approximately June 20, 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

326.    Investors in CVC reasonably expected to receive profits from their investment in CVC. They expected these profits to derive from the efforts of Civic Technologies. CVC was marketed as deriving value from its ability to power the Civic ecosystem, which features an identity verification protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

327.    In June 2017, Civic Technologies published the first version of the "Civic whitepaper." In its whitepaper, Civic Technologies stated that it was "building an ecosystem that is designed to facilitate on-demand, secure and low-cost access to identity verification ('IDV') services via the blockchain, such that background and personal information verification checks will no longer need to be undertaken from the ground up every time." It also introduced, for the first time, the CVC token "that participants in the ecosystem will use to transact in IDV-related services."

**Answer:**    This Paragraph purports to characterize the Civic whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

328.    The Civic whitepaper represented that CVC tokens would be part of a larger "consensus" system. As part of this system, investors would accumulate CVC by signing up for a service or referring a consumer to the Civic platform. The point of this service was to enable "[t]he CVC that the [investors] received for participation [to] be reusable within the Civic ecosystem." Investors in CVC thus depended on the managerial effort of the issuer to create and maintain the data verification services to which CVC was linked.

**Answer:**    This Paragraph purports to characterize the Civic whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

329.    Civic Technologies also promoted its core team, including its CEO, its Chief Technology Officer, and prominent technical advisors. Civic Technologies CEO Vinny Lingham authored a blog post in 2017 where he told investors to expect profits, stating, "As the size of the network and transaction volumes within it grows, this will create demand for the tokens."

**Answer:**    This Paragraph purports to characterize a blog post authorized by Vinny Lingham in 2017, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining

allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

this Paragraph and therefore deny them on this basis.

330.    There are few, if any, goods or services that can be directly purchased using CVC. To the extent that CVC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of CVC. Accordingly, all or nearly all CVC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to

Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

331.    Based on the foregoing facts, among others, CVC qualifies as an investment contract and therefore a security.  However, CVC has never been registered as a security.

**Answer:**    Defendants admit that CVC has not been registered as a security and aver

that that is because it is not a security.  Defendants otherwise deny the remaining allegations in

this Paragraph.

332.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in CVC on and with Coinbase.  Certain members of the class currently own CVC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought CVC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in CVC.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Underwood, and

Rodriguez and members of the putative proposed class transacted in CVC on the Trading Platforms

during the putative Class Period and that they paid fees on those transactions pursuant to the User

Agreement, to which Defendants respectfully refer the Court for the complete and accurate

contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny

the remaining allegations, including that Plaintiffs are entitled to any damages.

127

## 26.    DNT

333.    district0x ("DNT") is a token created by district0x.  The first *bona fide* public offering of DNT occurred on or about August 1, 2017.

**Answer:**    Defendants admit that DNT is a token on the Ethereum blockchain that is used in conjunction with the district0x platform and that DNT launched on approximately August 1, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

334.    Investors in DNT reasonably expected to receive profits from their investment in DNT.  They expected these profits to derive from the efforts of district0x.  DNT was marketed as deriving value from its ability to vote on proposals made within the district0x Network, a set of decentralized marketplaces and communities.  This governance right, which resembles the voting rights of many traditional securities, means that DNT purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the district0x Network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

335.    There are few, if any, goods or services that can be directly purchased using DNT.  To the extent that DNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of DNT.  Accordingly, all or nearly all DNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

336.    Based on the foregoing facts, among others, DNT qualifies as an investment contract and therefore a security.  However, DNT has never been registered as a security.

**Answer:**    Defendants admit that DNT has not been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the remaining allegations in this Paragraph.

337.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in DNT on and with Coinbase. Certain members of the class currently own DNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought DNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in DNT.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in DNT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 27.    DOGE

338.    Dogecoin ("DOGE") is a token that was first *bona fide* offered to the public in or about December 2013.

**Answer:**    Defendants admit that Dogecoin was launched in approximately December 2013. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

339.    DOGE was initially created as a joke by software engineers Billy Markus and Jackson Palmer in 2013. DOGE was meant to poke fun at the hype surrounding Bitcoin and other cryptocurrencies, but quickly changed tact to brand itself as "the fun and friendly internet currency."

**Answer:**    This Paragraph appears to quote from an unidentified source, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that DOGE was created by

Billy Markus and Jackson Palmer in 2013 as a lighthearted alternative to traditional cryptocurrencies like Bitcoin. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

340.    In 2015, Palmer left Dogecoin, citing the "toxic" environment and describing the crypto industry as a "hotbed for scams." In an interview, he stated that "the cryptocurrency space increasingly feels like a bunch of white libertarian bros sitting around hoping to get rich and coming up with half-baked, buzzword-filled business ideas which often fail in an effort to try and do so."

**Answer:**    This Paragraph purports to characterize statements made by and an interview with Jackson Palmer, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

341.    DOGE became available for trading on the Coinbase Exchanges on or about June 3, 2021. Since then, DOGE has been continuously traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that DOGE became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms since approximately June 3, 2021, but otherwise deny the remaining allegations in this Paragraph.

342.    Coinbase describes DOGE as follows:

Dogecoin (DOGE) was created in 2013 as a lighthearted alternative to traditional cryptocurrencies like Bitcoin. The Dogecoin name and Shiba Inu logo are based on a meme. Unlike Bitcoin, which is designed to be scarce, Dogecoin is intentionally abundant–10,000 new coins are mined every minute and there is no maximum supply.

**Answer:**     This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

343.     After DOGE was listed on the Coinbase Platform, its price rose by approximately 4.0 percent and peaked at $0.44 on June 3, 2021. Since its peak, DOGE has persistently declined in price.



**Answer:**     This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of DOGE reached a high in or around May 2021, but otherwise deny the remaining allegations in this Paragraph.

344. As of 10:00 a.m. Eastern time on March 10, 2022, DOGE was trading at $0.12—a decline of 73.4 percent from its June 3, 2021 peak.

**Answer:** Defendants admit that DOGE was trading at approximately $0.12 on or around March 10, 2022, but otherwise deny any remaining allegations in this Paragraph.

345. During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in DOGE tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for DOGE tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in DOGE on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

346. Investors in DOGE—including Plaintiff Oberlander, Plaintiff Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of DOGE's creators, developers, managers, and promoters. The team behind DOGE has actively cultivated this expectation through public communications, including on Dogecoin's official website.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

347. The team behind DOGE, for example, presents DOGE as "the fun and friendly internet currency," but provides virtually no information about the coin, the team behind it, or the risks involved in its purchase.

**Answer:** This Paragraph appears to quote from an unidentified source, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

348.    The team behind DOGE also claims that it is wholly decentralized, but individuals have pointed out that 65 percent of Dogecoins are distributed among only 98 wallets, and the single largest wallet holds 28 percent of all Dogecoins in circulation.



**Answer:**    This Paragraph purports to characterize a public statement made on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

349.    DOGE's former co-founder has made similar observations.  On July 14, 2021, for example, Palmer tweeted that "the cryptocurrency industry is controlled by a powerful cartel of wealthy figures who, with time, have evolved to incorporate many of the same institutions tied to the existing centralized financial system they supposedly set out to replace."

**Answer:**    This Paragraph purports to characterize statements made by Jackson Palmer, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

350.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in DOGE on and with Coinbase.  Certain members of the class, including Plaintiff Underwood, currently own DOGE tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Underwood and Oberlander, bought DOGE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in DOGE on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 28.    DOT

351.    Polkadot ("DOT") is a token created by Gavin Wood (a co-founder of Ethereum) alongside co-founders Robert Habermeier and Peter Czaban in 2016.  Compared to a standalone blockchain, the DOT network was designed to allow for the creation of three types of blockchains, including a main blockchain ("the relay chain") where transactions are finalized, custom blockchains ("parachains") that use the main blockchain's computing resources to confirm that

transactions are accurate, and bridges that allow the DOT network to interact with other blockchains. DOT was thus mainly conceived as a project that allows independent blockchains to communicate and share data with one another.

**Answer:**     Defendants admit that Polkadot's founders include Gavin Wood, Robert Habermeier, and Peter Czaban and that DOT is the native token of the Polkadot platform. Defendants further admit that the Polkadot network confirms transactions and allows interactions with other blockchains using various technologies including the Relay Chain, Parachains, and Bridges. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

352.    DOT's main blockchain, the relay chain, became live on or about May 26, 2020. The first *bona fide* public offering of DOT occurred on or about July 27, 2020. DOT became available for trading on the Coinbase Exchanges on or about June 16, 2021. Since then, DOT has continuously been traded on the Coinbase Exchanges.

**Answer:**     Defendants admit that DOT launched in approximately July 2020 and that DOT became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 16, 2021. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

353.    Coinbase describes DOT as follows:

Polkadot is a protocol that enables cross-blockchain transfers of any type of data or asset. By uniting multiple blockchains, Polkadot aims to achieve high degrees of security and scalability. DOT serves as the protocol's governance token and can be used for staking to secure the network or to connect ("bond") new chains.

**Answer:**     This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

354.    Coinbase further states:

The Polkadot *token* (DOT) serves two main functions within the Polkadot network: it's a governance token, which allows holders to have a say in the future of the protocol, and it's used for staking, which is the way the Polkadot network verifies transactions and issues new DOT. DOT can be bought and sold on exchanges like Coinbase as part of your investment strategy.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

355.    After DOT was listed on the Coinbase Platform, its price rose by approximately 129.5 percent and peaked at $55.00 on November 4, 2021. Since then, the price of DOT has persistently declined.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of DOT reached a high on or around November 4, 2021, at approximately $55.00, but otherwise deny the remaining allegations in this Paragraph.

356.    As of 10:00 a.m. Eastern time on March 10, 2022, DOT was trading at $16.91—a decline of 69.3 percent from its November 4, 2021 peak.

**Answer:**    Defendants admit that DOT was trading at approximately $16.91 on or around March 10, 2022, and that there was an approximate 69.3% decline in price from its November 2021 high, but otherwise deny the remaining allegations in this Paragraph.

357.    During the Class Period, members of the Class, including Plaintiff Oberlander, invested in DOT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for DOT tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in DOT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

358.    Investors in DOT—including Plaintiff Oberlander and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of DOT's creators, developers, managers, and promoters. The team behind DOT has actively cultivated this expectation through public communications including, but not limited to, a whitepaper and a "Lightpaper" hosted on DOT's official website.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

359.    The current version of the "Lightpaper," dated April 2020, describes Polkadot as "a next-generation blockchain protocol that unites an entire network of purpose-built blockchains, allowing them to operate seamlessly together at scale." It further states that "[b]y bringing together the best features from multiple specialized blockchains, Polkadot paves the way for new decentralized marketplaces to emerge, offering fairer ways to access services through a variety of apps and providers."

**Answer:**    This Paragraph purports to characterize a Lightpaper dated April 2020, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

360.    The current version of the whitepaper, which is undated and still titled "Draft 1," misleadingly analogizes DOT to Bitcoin and Ethereum: "Like Bitcoin and Ethereum, Polkadot refers at once to a network protocol and the (hitherto presupposed) primary public network that runs this protocol." The whitepaper further promises interoperability with both Ethereum and Bitcoin.

**Answer:**    This Paragraph purports to characterize a whitepaper titled "Draft 1," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of the source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

361.    Neither of those promises, however, has yet materialized. To date, the development team behind DOT has yet to create bridges to allow interoperability with Ethereum and Bitcoin, which has caused DOT's market value to suffer. As one cryptocurrency observer put it:

> Despite the fact that Polkadot was specifically designed to offer multi-chain support as a "layer-zero" meta protocol, there was no major release of a bridge that connected Polkadot with Ethereum in 2021 and this left the protocol unloved by crypto traders looking to engage with DeFi and NFTs.

**Answer:**    This Paragraph purports to characterize a statement from a "cryptocurrency observer," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

362.    In addition, according to the whitepaper, a purported distinguishing factor of Polkadot is its ability to host parachains on the relay chain, which "is designed to provide no inherent application functionality at all" and only becomes useful by virtue of the parachains. Yet,

the first auction for parachain slots on the relay chain did not begin until November 2021, nearly a year and a half after the relay chain first became live. The parachain auctions were only made possible through the efforts of Polkadot's development team, which emphasized that it took almost five years for the protocol's architecture to run Polkadot parachain auctions by itself. While Polkadot envisions being able to host about 100 parachain slots eventually, it currently offers less than a dozen slots.



**Answer:**        This Paragraph purports to characterize a whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

363.    DOT offers little, if any, utility apart from the ability to sell it to other investors. DOT's official website, the "Lightpaper", and the whitepaper do not identify any specific goods or services that can be acquired in exchange for DOT. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy DOT primarily because they expect profits, not

because they intend to "use [DOT] for its intended functionality on the network."[49]  Indeed, many holders of DOT are confused about what the token is used for and what benefits it provides for token holders.

**Answer:**    This Paragraph purports to characterize DOT's official website, the "Lightpaper", the whitepaper, and Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

364.    To the extent that DOT can be exchanged for specific goods and services, there is little or no apparent correlation between the price of DOT and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[50]  Instead of responding to the price of other goods or services, the price of DOT has changed based on events that affect speculation about its future performance.  For example, the listing of DOT on platforms including the Coinbase Exchanges had a positive effect on its value in 2021.

**Answer:**    Defendants admit that DOT became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 16, 2021.  This Paragraph purports to characterize from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny those allegations.

365.    Based on the facts alleged above, among others, DOT qualifies as an investment contract and thus a security.  The development team behind DOT has actively concealed DOT's status as a security by misleadingly comparing it to Bitcoin and Ethereum.

---

[49]    *Id.*

[50]    *Id.*

**Answer:**    Defendants deny that DOT is a security.  This Paragraph appears to characterize unidentified statements from the development team behind DOT, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those source and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

366.    The Coinbase Exchanges provide users with hyperlinks to DOT's official website and the whitepaper.  Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying DOT, they will profit from the efforts of others and (2) conceal DOT's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

367.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in DOT on and with Coinbase.  Certain members of the class currently own DOT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought DOT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in DOT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 29.    ENJ

368.    Enjin Coin ("ENJ") is a token created by Enjin.  The first *bona fide* public offering of ENJ occurred on or about November 1, 2017.

**Answer:**    Defendants admit that ENJ is a token on the Ethereum blockchain that is used in conjunction with the Enjin platform and that ENJ was launched on approximately November 1, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

369.    Investors in ENJ reasonably expected to receive profits from their investment in ENJ.  They expected these profits to derive from the efforts of Enjin.  ENJ was marketed as deriving value from its ability to be exchanged for NFTs managed through Enjin and used in video games to represent add-ons and other in-game purchases.  Buyers of ENJ thus depended on the managerial effort of the issuer, because ENJ is only valuable if the issuer created and maintained a platform to give users access to the true ownership of their digital collectibles and allow easy trading.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

370.    There are few, if any, goods or services that can be directly purchased using ENJ.  To the extent that ENJ can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ENJ.  Accordingly, all or nearly all Enjin Coin traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

371.    Based on the foregoing facts, among others, Enjin Coin qualifies as an investment contract and therefore a security.  However, Enjin Coin has never been registered as a security.

**Answer:** Defendants admit that ENJ has not been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the remaining allegations in this Paragraph.

372. During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in ENJ on and with Coinbase. Certain members of the class currently own ENJ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought ENJ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in ENJ.

**Answer:** Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in ENJ on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 30. EOS

373. EOS coin ("EOS") is a token created, issued, and distributed by Block.one.

**Answer:** Defendants admit that the EOS is the native token of the EOS blockchain. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

374. Coinbase describes EOS as follows:

EOS is a cryptocurrency designed to support large-scale applications. There are no fees to send or receive EOS. Instead, the protocol rewards the entities that run the network periodically with new EOS, effectively substituting inflation for transaction fees.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

375. EOS was first *bona fide* offered to investors in or around June 2017.

**Answer:** Defendants admit that EOS launched in approximately June 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

376. EOS became available for trading on the Coinbase Pro Platform on or about April 8, 2019. EOS became available for trading on the Coinbase Platform on or about May 30, 2019. Since becoming available on the Coinbase Platform, EOS has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that EOS became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform since approximately April 8, 2019, and on the Coinbase Trading Platform since approximately May 30, 2019, but otherwise deny the remaining allegations in this Paragraph.

377. After EOS was listed on the Coinbase Platform, its price rose by approximately 86.7 percent and peaked at $14.88 on May 12, 2021. Since then, its price has declined.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price EOS reached a high on or around May 2021, at approximately $14.88, but otherwise deny the remaining allegations in this Paragraph.

378.    As of 10:00 a.m. Eastern time on March 10, 2022, EOS was trading at $1.97—a decline of 86.8 percent from its May 12, 2021 peak.

**Answer:**    Defendants admit that EOS was trading at approximately $1.97 on or around March 10, 2022, and that there was an approximate 86.8% decline in price from its May 2021 high, but otherwise deny any remaining allegations in this Paragraph.

379.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in EOS tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for EOS tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and

Underwood and members of the putative proposed class transacted in EOS on the Trading

Platforms during the putative Class Period and that they paid fees on those transactions pursuant

to the User Agreement, to which Defendants respectfully refer the Court for the complete and

accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

380.    Purchasers of EOS on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each EOS token is fungible with all others, and the fortunes of all EOS investors are "linked to each other [and] to the success of [the] efforts" of Block.one.[51] In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

**Answer:**    Defendants admit that Users bought EOS on the Trading Platforms. This

Paragraph purports to quote from the Framework Report and statements from Block.one, to which

Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of those sources and any factual inferences or

legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining

allegations in this Paragraph.

381.    EOS investors reasonably expected to earn profits through the appreciation in value of their EOS tokens. They expected such profits to result predominantly, if not solely, from the efforts of Block.one.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

nevertheless deny the allegations in this Paragraph.

---

[51]    *Id.*

382.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.  The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."  But this description was misleading because, unlike Bitcoin or Ethereum, all EOS tokens were issued by Block.One at creation at very little economic cost—and enormous potential upside—to the Block.One founders.  Any value of the EOS token would need to derive from the promised creation of an EOS.IO software that would be tied to the EOS tokens.

**Answer:**    This Paragraph purports to characterize an unidentified statement from issuers and a commentator, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those statements and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

383.    Investors' profits were to be derived from the managerial efforts of others—Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software and the EOS.IO platform to which it was tied.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

384.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.  Only through such efforts would the EOS.IO platform be created, on which platform EOS's value entirely depended.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

385.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

386.    On September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."
- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."
- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."
- "[EOS] Tokens were securities under the federal securities laws."
- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."
- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

**Answer:**    This Paragraph purports to characterize an SEC enforcement action and settlement, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

387.    The SEC's September 30, 2019, settlement with Block.one reflected the SEC's view that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register those tokens.

**Answer:**    This Paragraph purports to characterize an SEC enforcement action and settlement, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

388.    Coinbase itself has admitted that EOS may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council has given EOS a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00).  In explaining its rating of EOS, the Crypto Rating Council noted the SEC settlement and further noted that "Block.one conducted the initial sale of ERC-20 EOS and continues to develop the EOSIO software."

**Answer:**        Defendants deny that EOS is a security and that Coinbase, Inc. or Coinbase

Global admitted that EOS may constitute a security.  Defendants admit that a number of

businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants

respectfully refer the Court to the Crypto Rating Council's website for a description of it and its

activities.  The remaining allegations in this Paragraph purport to characterize statements made by

the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and

accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those

sources and any factual inferences or legal conclusions made by Plaintiffs based on them.

Defendants otherwise deny any remaining allegations in this Paragraph.

389.    Based on the above facts, among others, EOS qualifies as an investment contract and therefore a security.

**Answer:**        Denied.

390.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in EOS on and with Coinbase.  Certain members of the class currently own EOS tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Rodriguez, bought EOS tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**        Defendants admit that Lead Plaintiff Rodriguez and members of the

putative proposed class transacted in EOS on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

### 31.    FARM

391.    Harvest Finance ("FARM") is a token created by Harvest Finance. The first *bona fide* public offering of FARM occurred on or about September 1, 2020.

**Answer:**    Defendants admit that FARM is a token on the Ethereum blockchain that is used in conjunction with the Harvest Finance platform and that FARM was launched on approximately September 1, 2020.   As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

392.    Investors in FARM reasonably expected to receive profits from their investment in FARM. They expected these profits to derive from the efforts of Harvest Finance. FARM was marketed as deriving value from its ability to power Harvest Finance. FARM's value thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained Harvest Finance, a yield optimizer to automatically farm the highest yields available from DeFi protocols.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

393.    There are few, if any, goods or services that can be directly purchased using FARM. To the extent that FARM can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FARM. Accordingly, all or nearly all FARM traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

394.    Based on the foregoing facts, among others, FARM qualifies as an investment contract and therefore a security. However, FARM has never been registered as a security.

**Answer:** Defendants deny that FARM is a security and otherwise deny the remaining allegations in this Paragraph.

395. During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in FARM on and with Coinbase. Certain members of the class currently own FARM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought FARM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in FARM.

**Answer:** Defendants admit that Lead Plaintiffs Rodriguez and Underwood and members of the putative proposed class transacted in FARM on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 32. FET

396. Fetch.ai ("FET") is a token created by Fetch.ai. The first *bona fide* public offering of FET occurred on or about February 25, 2019.

**Answer:** Defendants admit that FET is a token on the Ethereum blockchain that is used in conjunction with the Fetch.ai platform and that FET was launched on or around February 25, 2019. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

397. Investors in FET reasonably expected to receive profits from their investment in FET. They expected these profits to derive from the efforts of Fetch.ai. FET was marketed as deriving value from its ability to power Fetch.ai, a decentralized machine learning platform. FET thus only had value if the issuer in fact created the decentralized machine learning platform and successfully marketed it to others.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

398.    There are few, if any, goods or services that can be directly purchased using FET. To the extent that FET can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FET. Accordingly, all or nearly all FET traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

399.    Based on the foregoing facts, among others, FET qualifies as an investment contract and therefore a security.  However, FET has never been registered as a security.

**Answer:**    Defendants deny that FET is a security and otherwise deny the remaining allegations in this Paragraph.

400.    During the Class Period, numerous members of the Class have had one or more losing transactions in FET on and with Coinbase.  Certain members of the class currently own FET tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought FET tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.   Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in FET.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in FET on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 33.    FIL

401.    Filecoin ("FIL") is a token created by Protocol Labs. The project was launched in August 2017.

**Answer:** Defendants admit that FIL is the native token of the Filecoin platform. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

402. Coinbase describes FIL as follows:

Filecoin (FIL) is a cryptocurrency that powers the Filecoin network, a decentralized peer-to-peer file storage network that aims to let anyone store, retrieve, and host digital information. FIL tokens are used as payment for these services and as an economic incentive to ensure files are stored reliably over time.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and deny any remaining allegations in this Paragraph.

403. FIL was first *bona fide* offered to the public on or about September 7, 2017.

**Answer:** Defendants admit FIL launched on approximately September 7, 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

404. FIL became available for trading on the Coinbase Pro Platform on or about July 12, 2020. FIL became available for trading on the Coinbase Platform on or about December 10, 2020. Since becoming available on the Coinbase Platform, FIL has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that FIL became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms in approximately December 2020 but otherwise deny the remaining allegations in this Paragraph.

154

405.    After FIL was listed on the Coinbase Platform, its price rose by approximately 677.6 percent and peaked at $237.24 on April 1, 2021. Since then, FIL has been on a steady decline.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of FIL reached a high on or around April 1, 2021, at approximately $237.24, but otherwise deny the remaining allegations in this Paragraph.

406.    As of 10:00 a.m. Eastern time on March 10, 2022, FIL was trading at $17.82—a decline of 92.5 percent since its April 1, 2021 peak.

**Answer:**        Defendants admit that FIL was trading at approximately $17.82 on or around March 10, 2022, and that there was an approximate 92.5% decline in price from its April 2021 high, but otherwise deny any remaining allegations in this Paragraph.

407.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in FIL tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for FIL tokens and paid Coinbase a fee for executing the transaction.

**Answer:**        Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in FIL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

408.    Purchasers of FIL on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each FIL token is fungible with all others, and the fortunes of all FIL investors are "linked to each other [and] to the success of [the] efforts" of FIL's developers, promoters, and distributors.[52]

**Answer:**        Defendants admit that Users bought FIL on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

409.    Investors in FIL—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of FIL's creators, developers, managers, and promoters. The team behind FIL has actively cultivated this expectation through public communications, including but not limited to a whitepaper hosted on its official website.

---

[52]    *Id.*

**Answer:**      This Paragraph reflects no allegations specific to Defendants.  Defendants nevertheless deny the allegations in this Paragraph.

410.    To raise funds for the Filecoin network, Protocol Labs conducted an ICO in 2017. The ICO raised over $200 million.

**Answer:**      Defendants admit that Protocol Labs reported that it raised more than $200 million through the sale of FIL tokens in 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

411.    As former SEC chairman Jay Clayton has stated, "I believe every ICO I've seen is a security."  Current SEC chairman Gary Gensler has affirmed this view.

**Answer:**      This Paragraph purports to characterize a statement made by former SEC Chairman Jay Clayton made during a Senate hearing, to which Defendants respectfully refer the Court for its complete and accurate contents.  This Paragraph also appears to characterize a statement made by SEC Chairman Gary Gensler on August 3, 2021, at the Aspen Security Forum, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of these statements and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

412.    Filecoin did not sell tokens directly, but rather sold a "promise to deliver" tokens to the investors once the blockchain was fully developed.  This type of agreement is called a "Simple Agreement for Future Tokens," or "SAFT."  This means that investors in the ICO were relying entirely on the promise that Protocol Labs would in fact develop a blockchain that could render Filecoin valuable.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

413.    Filecoin's SAFT model is the same as that of Telegram, against whom the SEC filed suit on the basis that it conducted unregistered digital token offerings.[53]  The Telegram case ultimately settled, with Telegram agreeing to return $1.2 billion to investors and pay an $18.5 million penalty.[54]

**Answer:**    Plaintiffs purport to characterize two press releases from the SEC, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

414.    FIL offers little utility apart from the ability to sell it to other investors.  It is nominally usable as payment for the Filecoin storage network, but many holders of the token never intended to use it to store files.  Indeed, many investors held amounts of FIL that are hugely disproportionate to any file storage needs.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

415.    The primary purpose for purchasing FIL tokens was to make a profit, rather than to use FIL tokens for a separate task.  As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy FIL primarily because they expect profits, not because they intend to "use [FIL] for its intended functionality on the network."[55]

---

[53]    *SEC Halts Alleged $1.7 Billion Unregistered Digital Token Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Oct. 11, 2019), https://web.archive.org/web/2/https://www.sec.gov/news/press-release/2019-212.

[54]    *Telegram to Return $1.2 Billion to Investors and Pay $18.5 Million Penalty to Settle SEC Charges*, U.S. SECURITIES AND EXCHANGE COMMISSION (Jun. 26, 2020). https://web.archive.org/web/20220311135308/https://www.sec.gov/news/press-release/2020-146.

[55]    Howey Framework Report.

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

416.    There is little or no apparent correlation between the price of FIL and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[56] FIL's price has not decreased when other storage options become available, or increased when file storage becomes scarce.

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

417.    In contrast to what would typically be included in an SEC registration statement, Filecoin's whitepaper does <u>not</u> contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

**Answer:**    Defendants deny that FIL is a security. Plaintiffs purport to characterize the Filecoin whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. To the extent this

---

[56]    *Id.*

Paragraph purports to compare the Filecoin whitepaper to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these and any remaining allegations in this Paragraph.

418.    Based on the facts alleged above, among others, FIL qualifies as an investment contract and thus a security.

**Answer:**    Denied.

419.    The Coinbase Exchanges provide users with hyperlinks to Filecoin's whitepaper and official website. Coinbase thus participates in the attempt to persuade investors that by buying FIL, they will profit from the efforts of others.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

420.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in FIL on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own FIL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought FIL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in FIL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

160

### 34.    FORTH

421.    Ampleforth ("FORTH") is a token created by Ampleforth.  The first *bona fide* public offering of FORTH occurred on or about April 13, 2019.

**Answer:**    Defendants admit that FORTH is a token on the Ampleforth platform and that FORTH was launched in approximately April 2021.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

422.    Investors in FORTH reasonably expected to receive profits from their investment in FORTH.  They expected these profits to derive from the efforts of Ampleforth.  FORTH was marketed as deriving value from its ability to act as a governance token of Ampleforth, which created AMPL, an algorithmic stablecoin with fluctuating supply.  This governance right, which resembles the voting rights of many traditional securities, means that FORTH purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting AMPL, as the governance is only valuable if Ampleforth is maintained.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

423.    There are few, if any, goods or services that can be directly purchased using FORTH. To the extent that FORTH can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of FORTH.  Accordingly, all or nearly all FORTH traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

424.    Based on the foregoing facts, among others, FORTH qualifies as an investment contract and therefore a security.  However, FORTH has never been registered as a security.

**Answer:**    Defendants deny that FORTH is a security and otherwise deny the remaining allegations in this Paragraph.

425.     During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in FORTH on and with Coinbase.  Certain members of the class currently own FORTH tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought FORTH tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in FORTH.

**Answer:**     Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in FORTH on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 35.     GNT

426.     Golem ("GNT") is a token created by Golem Network.  The first *bona fide* public offering of GNT occurred on or about November 11, 2016.

**Answer:**     Defendants admit that GNT is a token on the Ethereum blockchain that is used in conjunction with the Golem platform and that GNT was launched on approximately November 11, 2016.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

427.     Investors in GNT reasonably expected to receive profits from their investment in GNT.  They expected these profits to derive from the efforts of Golem.  GNT was marketed as deriving value from its ability to govern the Golem protocol, which allows users to loan processing power to others.  This governance right, which resembles the voting rights of many traditional securities, means that GNT purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the loan system which GNT holders could govern.

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

428.    There are few, if any, goods or services that can be directly purchased using GNT. To the extent that GNT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of GNT. Accordingly, all or nearly all GNT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

429.    Based on the foregoing facts, among others, GNT qualifies as an investment contract and therefore a security. However, GNT has never been registered as a security.

**Answer:**    Defendants deny that GNT is a security and otherwise deny the remaining allegations in this Paragraph.

430.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in GNT on and with Coinbase. Certain members of the class currently own GNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought GNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in GNT.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in GNT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 36.    GRT

431.    The Graph ("GRT") is a token created, issued, and distributed by the Graph Foundation.

**Answer:**    Defendants admit that GRT is a token on the Ethereum blockchain that is used in conjunction with the The Graph platform. As the remaining allegations in this Paragraph

163

reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

432. Coinbase describes GRT as follows: "GRT is an Ethereum token that powers The Graph, a decentralized protocol for indexing and querying data from blockchains. Just as Google indexes the web, The Graph indexes blockchain data from networks like Ethereum and Filecoin. This data is grouped into open APIs called subgraphs that anyone can query."

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

433. GRT was first *bona fide* offered to the public on or about October 23, 2020.

**Answer:** Defendants admit that GRT launched on or around October 23, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

434. GRT became available for trading on the Coinbase Exchanges on or about December 17, 2020. Since becoming available on the Coinbase Exchanges, GRT has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that GRT became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately December 17, 2020, but otherwise deny the remaining allegations in this Paragraph.

435. After GRT was listed on the Coinbase Platform, its price rose by approximately 2290.0 percent and peaked at $2.88 on February 12, 2021. Since its peak, the price of GRT has persistently declined.



**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of GRT reached a high on or around February 12, 2021, at approximately $2.88, but otherwise deny the remaining allegations in this Paragraph.

436.    As of 10:00 a.m. Eastern time on March 10, 2022, GRT was trading at $0.32—a decline of 88.8 percent from its February 12, 2021 peak.

**Answer:**        Defendants admit that the price of GRT was approximately $0.32 on or around March 10, 2022, and that there was an approximate 88.8% decline in price from its February 2021 high, but otherwise deny any remaining allegations in this Paragraph.

437.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in GRT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for GRT tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in GRT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

438.    Purchasers of GRT on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each GRT token is fungible with all others, and the fortunes of all GRT investors are "linked to each other [and] to the success of [the] efforts" of GRT's developers, promoters, and distributors.[57]

**Answer:**    Defendants admit that Users bought GRT on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

439.    GRT investors reasonably expected to earn profits through the appreciation in value of their GRT tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Graph Foundation.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

440.    GRT is the token linked to The Graph Protocol, which enables greater efficiency for programs that access data on the Ethereum blockchain. The value of GRT thus entirely depends on the Graph Foundation's creation and maintenance of the Graph Protocol. The Graph

---

[57]    *Id.*

166

Foundation distributes grants and funding to projects related to the Graph Protocol and attempts to cause developers to use the Graph Protocol, all in an effort to create value for GRT.

**Answer:**    Defendants admit that GRT is an Ethereum token that powers The Graph, a decentralized protocol for indexing and querying data from blockchains. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

441.    Apart from its speculative value as an investment, GRT offers little direct utility. Only developers who wish to create an application on a blockchain for which the Graph Protocol applies have any use for GRT. Individual buyers of GRT do not generally intend to use it for anything, and instead seek to profit through eventual resale of GRT.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

442.    There are few, if any, goods or services that investors can directly purchase using GRT. To the extent that GRT can be directly exchanged for goods or services, there is little or no apparent correlation between the price of GRT and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in GRT are motivated by the expectation of profits.[58]

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

443.    Despite its direct utility being largely or exclusively limited to a narrow class of users, GRT is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for GRT] or those who have a need for the

---

[58]    *Id.*

functionality of the network," further demonstrating that GRT investors are motivated by the expectation of profits.[59]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

444.    The Graph Foundation has promoted widespread trading of GRT—including among investors with no personal need to create an application on the Ethereum blockchain that uses GRT—by working to make GRT available for retail trading on exchange platforms such as the Coinbase Exchanges.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

445.    Based on the above facts, among others, GRT qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

446.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in GRT on and with Coinbase. Certain members of the class currently own GRT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought GRT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Rodriguez and members of the putative proposed class transacted in GRT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement,

---

[59]    *Id.*

to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 37.    GTC

447.    Gitcoin ("GTC") is a token created by Gitcoin.co.  The first *bona fide* public offering of GTC occurred on or about May 1, 2021.

**Answer:**    Defendants admit that GTC is a token on the Ethereum blockchain that is used in conjunction with the Gitcoin platform and that GTC was launched on approximately May 1, 2021.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

448.    Investors in GTC reasonably expected to receive profits from their investment in GTC.  They expected these profits to derive from the efforts of Gitcoin.co.  GTC was marketed as deriving value from its ability to enable community governance of the Gitcoin platform, a platform designed to fund and coordinate open-source development.  This governance right, which resembles the voting rights of many traditional securities, means that GTC purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting GTC, as the governance is only valuable if the Gitcoin platform is maintained.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

449.    There are few, if any, goods or services that can be directly purchased using GTC. To the extent that GTC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of GTC. Accordingly, all or nearly all GTC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

450.    Based on the foregoing facts, among others, GTC qualifies as an investment contract and therefore a security.  However, GTC has never been registered as a security.

**Answer:** Defendants admit that GTC has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

451. During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in GTC on and with Coinbase. Certain members of the class currently own GTC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought GTC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in GTC.

**Answer:** Defendants admit that Lead Plaintiff Rodriguez and members of the putative proposed class transacted in GTC on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 38. ICP

452. Internet Computer ("ICP") is a token created, developed, issued, and distributed by Dfinity Foundation ("Dfinity"), a Swiss nonprofit organization. ICP was first *bona fide* offered to investors on or about May 10, 2021.

**Answer:** Defendants admit that ICP is the native token of the Internet Computer blockchain and that ICP launched on approximately May 10, 2021. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

453. Coinbase describes ICP as follows:

Internet Computer (ICP) is a utility token that allows users to participate in and govern the Internet Computer blockchain network. The network aims to help developers create websites, enterprise IT systems, internet services, and DeFi applications by "installing their code directly on the public Internet." ICP can also

be staked or "converted into cycles" that can be used to power computation for dApps and traditional applications.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

454.    Coinbase further states:

The ICP token is used for governance (holders can vote on the future of the network), to reward network participants for good behavior, and is used to pay fees for making transactions .. . . [ICP] is much more than a form of digital money.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

455.    ICP became available for trading on the Coinbase Exchanges on or about May 10, 2021. Since then, ICP has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that ICP became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately May 10, 2021, but otherwise deny the remaining allegations in this Paragraph.

456.    After ICP was listed on the Coinbase Platform, its price rose by approximately 287.6 percent and peaked at $750.73 on May 10, 2021. By the end of June 2021, however, it had lost the vast majority of its value.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of ICP reached a high on or around May 10, 2021, but otherwise deny the remaining allegations in this Paragraph.

457.    As of 10:00 a.m. Eastern time on March 10, 2022, ICP was trading at $16.53—a decline of 97.8 percent from its May 10, 2021 peak.

**Answer:**    Defendants admit that ICP was trading at approximately $16.53 on or around March 10, 2022, but otherwise deny the remaining allegations in this Paragraph.

458.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Rodriguez, invested in ICP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for ICP tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Rodriguez and members of the putative proposed class transacted in ICP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents, but otherwise deny the remaining allegations in this Paragraph.

459.    Dominic Williams founded Dfinity in October 2016. Dfinity subsequently created a project called "Internet Computer," a public blockchain network designed to host smart contracts.

**Answer:**    Defendants admit that Dfinity was founded by Dominic Williams in October 2016, that it developed the Internet Computer blockchain, and that the Internet Computer works by running canister smart contracts on a network of node machines. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

460.    The Internet Computer project purports to be a decentralized version of the internet itself, meaning that it has independent data centers that provide an alternative to corporate cloud services, such as Apple's iCloud. ICP is a token issued for the Internet Computer Project.

**Answer:**    Defendants admit that ICP is a token issued that allows users to participate in the Internet Computer blockchain network. Defendants also admit that DFINITY describes the Internet Computer as a set of protocols that allow independent data centers around the world to band together and offer a decentralized alternative to the current centralized internet cloud providers and ICP as the token designed to interact with these systems, including to provide for processing power, data storage, and network bandwidth. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

461.    In early 2017, Dfinity conducted a seed fundraising round, where supporters could contribute a small amount in exchange for the promise of ICP when the token eventually launched. The seed fundraising round raised approximately $40 million in fiat cash and digital assets.

**Answer:**    Defendants admit that DFINITY has represented that, between 2017 and 2018, rights to ICP tokens reportedly were sold in three rounds for fiat currencies and cryptocurrencies cumulatively totaling over $100 million dollars.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

462.    This fundraising round was supposed to be followed by a "main round" that would be modeled after other ICOs, but the main round never happened.  Williams later admitted that the "regulatory environment" made doing so "impractical" because "ICO fundraising generally still chart[s] grey legal territory."  Williams further acknowledged that a "securities regulator might well argue that [ICOs] are in fact investment contracts that investors are buying because they expect them to have value once the network has launched (and they more clearly become network utility tokens)."

**Answer:**    This Paragraph appears to quote a blog post by Dominic Williams on medium.com on April 4, 2018, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

463.    In early 2018, Dfinity held a "strategic round," in which Andreesen Horowitz and Polychain Capital (a prominent venture capital firm and cryptocurrency investment firm, respectively) contributed approximately $61 million.  In exchange for their investment, each of these investors would receive a significant portion of ICP tokens when the token ultimately launched.

**Answer:**    Defendants respectfully refer the Court to their answer to Paragraph 461. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

464.    ICP launched for public trading—referred to as its "Genesis" listing event—on May 10, 2021. ICP launched on the Coinbase Exchanges on that date, as well as on other major exchanges.

**Answer:**    Defendants admit that ICP tokens became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately May 10, 2021, and that ICP launched on approximately May 10, 2021.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

465.    Investors in ICP—including Plaintiffs Oberlander and Rodriguez, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of ICP's creators, developers, managers, and promoters.  The team behind ICP has actively cultivated this expectation through public communications including a whitepaper and a "one-pager," both hosted on ICP's official website, as well as numerous other public statements.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

466.    Dfinity and Williams relentlessly marketed ICP in the lead up to the Genesis launch.  On July 9, 2020, for example, Dfinity published an article titled "Investing in the Open Web: A New Thesis."  The article stated that "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist." It further stated that "venture capitalists with billions in assets under management are eyeing decentralized infrastructure that will make it easier for developers to innovate and scale-out their internet services to billions of users" and that "VCs are eager to deploy billions in capital to foster the decentralized web."

**Answer:**    Defendants admit that Dfinity published an article titled "Investing in the Open Web: A New Thesis" on July 9, 2020.  This Paragraph purports to quote from "Investing in the Open Web: A New Thesis," to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

467.    On February 18, 2021, Dfinity held a virtual event in conjunction with Forbes called "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model."

**Answer:**    As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

468.    In the lead up to the Genesis launch, Williams also went on a press tour to solicit investment in the ICP tokens, giving numerous interviews extolling ICP. Dfinity also held the so-called Genesis Event on May 7, 2021, a road-show-type presentation extolling ICP.

**Answer:**    As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

469.    The team behind ICP actively concealed, and continues to conceal, that ICP is a security.

**Answer:**    Defendants deny that ICP is a security.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

470.    In a statement published by Coinbase on May 4, 2021, Williams misleadingly compared ICP to Bitcoin and Ethereum, (which are commodities rather than securities): "The Internet Computer represents the third major innovation in blockchain after Bitcoin and Ethereum[.]"

**Answer:**    Defendants admit that bitcoin and ethereum have been recognized as commodities by courts and regulators.  This Paragraph purports to quote and characterize a statement made by Dominic Williams published on the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants otherwise deny any remaining allegations in this Paragraph.

471.    Unlike Bitcoin and Ethereum, however, Dfinity created all 469,213,710 ICP tokens in existence in May 2021 as part of the Genesis launch.  A significant amount of the total ICP supply was given to Dfinity and other insiders.  Upon information and belief, Andreesen Horowitz and Polychain Capital were entitled to a significant portion of the 24.72 percent "Seed" contributor allotment.

**MESSARI**
**Genesis Token Allocation**
Total token distribution on May 10,2021

|  | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINITY Foundation | 111,938,888 | 23.86% | 1 |
| Total | 469,213,709 | 100.0% | |

Data as of May 10, 2021
Source: Dfinity, Messari

**Answer:**    This Paragraph appears to characterize an unidentified website, to which Defendants respectfully refer the Court for its complete and accurate contents.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

472.    Nonetheless, the Dfinity one-pager positions the Internet Computer blockchain—and its "primary token," ICP—in contrast to other exchanges and tokens that "are not truly decentralized [and thus raise] regulatory considerations," and states that Internet Computer has "maximum decentralization." The whitepaper likewise emphasizes that its network is "completely decentralized." A reasonable reader of this language would take away the impression that ICP is an investment in the lay sense, but not a "security" or "investment contract" in the legal sense.

**Answer:**    This Paragraph purports to quote and characterize a Dfinity "one-pager" and whitepaper, to which Defendants refer the court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

473.    In the lead up to the Genesis launch, moreover, Dfinity repeatedly asserted that ICP tokens were "utility tokens," rather than "security tokens," which was intended to mislead users to believe that ICP tokens were not securities. A May 6, 2021 Dfinity blog post titled "Understanding the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens," for example, repeatedly refers to ICP tokens as "native utility tokens."

**Answer:**    Defendants deny that ICP is a security. Plaintiffs purport to quote and characterize a blog post titled "Understanding the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens," to which Defendants refer the court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

474.    Two separate Dfinity blog posts four days later both repeated the statement that "ICP is a native utility token" and that "ICP are utility tokens."

**Answer:**    This Paragraph appears to be quoting and characterizing two blog posts on medium.com from May 10, 2021, to which Defendants refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

475.    These statements were and are misleading.  Investors who purchased ICP invested money or other valuable consideration (such as other digital currencies) in a common enterprise: Dfinity.  Investors had a reasonable expectation of profit based on the efforts of Dfinity and its team.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

476.    Williams, for example, bragged about his "superstar[]," "stellar team" that was integral to the success of the Internet Computer project.  He further asserted that ICP is "backed by a large team of full time engineers and cryptographers who are currently distributed across four dedicated international research centers, as well as remote teams."  Williams has similarly stated that "[t]he Internet Computer . . . represents the product of an unprecedent multi-year R&D effort, orchestrated by the DFINITY Foundation from research and development centers in Zurich, Palo Alto, San Francisco, and Tokyo, and with additional remote teams in places such as Germany and the UK."

**Answer:**    This Paragraph appears to quote unidentified statements by Dominic Williams, to which Defendants refer the court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

477.    ICP's listing on multiple cryptocurrency exchanges all at once was also highly unusual for a cryptocurrency, and—as *Coin Telegraph* reported—"reflected a carefully structured strategy by Dfinity . . . that landed ICP tokens right into the conscience of everyday traders." In order to be listed on any given exchange, Dfinity would have had to take affirmative steps, including by applying to be listed, paying listing fees, and paying transaction fees incurred selling ICP on those exchanges.

**Answer:**    This Paragraph purports to characterize an article on the Coin Telegraph website, to which Defendants refer the court for the complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

478.    In addition, ICP offers little, if any, utility apart from the ability to sell it to other investors. The ICP tokens were sold to investors prior to a usable network (*i.e.*, the promised "Internet Computer" project) being fully developed. The primary purpose for purchasing ICP tokens was to make a profit, rather than to use the ICP tokens for a separate task. As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy ICP primarily because they expect profits, not because they intend to "use [ICP] for its intended functionality on the network."[60]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[60]    *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

479.    To the extent that ICP can be exchanged for specific goods and services, there is little or no apparent correlation between the price of ICP and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[61]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

480.    Indeed, ICP's precipitous decline in the month after its public listing prompted an independent analysis by Miguel Morel, the founder of Arkham Intelligence (a crypto analysis firm), into what went wrong ("Arkham Report"). The Arkham Report concluded that "possible insiders connected to Dfinity have been dumping billions of dollars of ICP on exchanges at the expense of small early supporters and retail investors."

**Answer:**    This Paragraph purports to quote the "Arkham Report," to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

---

[61]    *Id.*

481.    The Arkham Report found that the Dfinity Treasury and project insiders deposited billions of dollars' worth of ICP to cryptocurrency exchanges and 34 suspected insider addresses during the Genesis listing and intermittently in the weeks that followed.

**Answer:**        This Paragraph purports to characterize the "Arkham Report," to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

482.    The Arkham Report also found that Dfinity did not follow industry practices meant to demonstrate good faith and assure investors that project insiders would not trigger a price collapse as a result of massive selling.   It further found that Dfinity failed to provide critical information regarding the breakdown of token allocation and unlocking schedules.

**Answer:**        This Paragraph purports to characterize the "Arkham Report," to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

483.    As a result, the Arkham Report concluded: "Dfinity insiders made billions of dollars dumping ICP on the market while making it difficult for their biggest potential rival sellers to dump theirs .. . . And it appears that their activity drove a massive crash in the price of ICP."

**Answer:**        This Paragraph purports to quote the "Arkham Report," to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

484. Just as Dfinity failed to provide critical information regarding the breakdown of token allocation and unlocking schedules, the ICP whitepaper—in contrast to what would typically be included in an SEC registration statement—does <u>not</u> contain a plain English description of the offering, a list of key risk factors, a description of important information and incentives concerning management, warnings about relying on forward-looking statements, an explanation of how the proceeds from the offering would be used, or a standardized format that investors could readily follow.

**Answer:** Defendants deny that ICP is a security. Plaintiffs purport to characterize the ICP whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. To the extent Plaintiffs purport to compare the ICP whitepaper to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

485. Based on the facts alleged above, among others, ICP qualifies as an investment contract and thus a security, but Dfinity actively concealed that status.

**Answer:** Denied.

486. The Coinbase Exchanges provide users with hyperlinks to ICP's official website and the whitepaper, as well as misleading statements by Williams. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying ICP, they will profit from the efforts of others and (2) conceal ICP's status as a security.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

487.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in ICP on and with Coinbase. Certain members of the class, including Plaintiff Rodriguez, currently own ICP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought ICP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Rodriguez and members of the putative proposed class transacted in ICP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 39.    IOTX

488.    IoTeX ("IOTX") is a token created by IoTeX.  The first *bona fide* public offering of IOTX occurred on or about May 23, 2018.

**Answer:**    Defendants admit that IOTX is a token on the Ethereum blockchain that is used in conjunction with the IoTeX platform and that IOTX was launched on approximately May 23, 2018.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

489.    Investors in IOTX reasonably expected to receive profits from their investment in IOTX.  They expected these profits to derive from the efforts of IoTeX.  IOTX was marketed as deriving value from its ability to be used to pay for transactions, for staking and governance, and to register new devices on the IoTeX network.  IOTX purchasers thus participated in a common enterprise with each other, and the value of their investment depended on the managerial effort of

the issuer in creating and maintaining the IoTeX network, which was intended to be a platform to connect Internet of Things devices and decentralized applications.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

490.    There are few, if any, goods or services that can be directly purchased using IOTX. To the extent that IOTX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of IOTX. Accordingly, all or nearly all IOTX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

491.    Based on the foregoing facts, among others, IOTX qualifies as an investment contract and therefore a security. However, IOTX has never been registered as a security.

**Answer:**    Defendants admit that IOTX has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

492.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in IOTX on and with Coinbase. Certain members of the class currently own IOTX tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought IOTX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in IOTX.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in IOTX on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

185

40.    **KEEP**

493.    Keep Network ("KEEP") is a token created by Keep SEZC. The first *bona fide* public offering of KEEP occurred on or about April 27, 2020.

**Answer:**    Defendants admit that KEEP is a token on the Ethereum blockchain that is used in conjunction with the Keep blockchain and that KEEP was launched on approximately April 27, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

494.    Investors in KEEP reasonably expected to receive profits from their investment in KEEP.  They expected these profits to derive from the efforts of Keep SEZC. KEEP was marketed as deriving value from its ability to power the Keep Network, an incentivized network for storing and encrypting private data on the public blockchain.  Thus, the value of KEEP depended on the managerial effort of the issuer to create, maintain, and market that encryption service.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

495.    There are few, if any, goods or services that can be directly purchased using KEEP. To the extent that KEEP can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of KEEP. Accordingly, all or nearly all KEEP traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

496.    Based on the foregoing facts, among others, KEEP qualifies as an investment contract and therefore a security.  However, KEEP has never been registered as a security.

**Answer:**    Defendants admit that KEEP has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

186

497.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in KEEP on and with Coinbase.  Certain members of the class currently own KEEP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought KEEP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in KEEP.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in KEEP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 41.    KNC

498.    Kyber Network ("KNC") is a token created by the developers of the Kyber Network.  The first *bona fide* public offering of KNC occurred on or about September 15, 2017.

**Answer:**    Defendants admit that KNC is a token on the Ethereum blockchain that is used in conjunction with the Kyber Network platform and that KNC was launched on approximately September 15, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

499.    Investors in KNC reasonably expected to receive profits from their investment in KNC.  They expected these profits to derive from the efforts of Kyber Network.  KNC was marketed as deriving value from its ability to connect multiple participants in the Kyber Network ecosystem.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

500.    Kyber Network, publicly stated that KNC would "be the FIRST deflationary token with a staking mechanism" and that an upgrade to the Kyber Network protocol would result in "ultimately enhancing liquidity for the ecosystem, Kyber Network growth, and KNC value creation." Investors in KNC thus relied on the developers of the Kyber Network to drive the value of KNC through network upgrades.

**Answer:**    This Paragraph purports to characterize an interview with Loi Luu with the Cryptonomist, published on the Cryptonomist website on March 8, 2020. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

501.    KNC tokens have a centralized supply controlled by the issuer.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

502.    In the KNC whitepaper, the issuer of KNC tokens represented: "The collected KNC tokens from the fees, after paying for the operation expenses and to the supporting partners, will be *burned*, i.e. taken out of circulation. The burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces." The issuer thus promised to take steps to support the market for KNC.

**Answer:**    This Paragraph purports to characterize the KNC whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflects no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

503.    There are few, if any, goods or services that can be directly purchased using KNC. To the extent that KNC can be directly exchanged for any goods or services, there is little or no

apparent correlation between the market price of those goods or services and the price of KNC. Accordingly, all or nearly all KNC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

504.    Based on the foregoing facts, among others, KNC qualifies as an investment contract and therefore a security. However, KNC has never been registered as a security.

**Answer:**    Defendants admit that KNC has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

505.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in KNC on and with Coinbase. Certain members of the class currently own KNC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought KNC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in KNC.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in KNC on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 42.    LINK

506.    Chainlink ("LINK") is a token created, developed, issued, and distributed by Chainlink Labs.

**Answer:**    Defendants admit that LINK is a token on the Ethereum blockchain that is used in conjunction with the Chainlink platform. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

507.    Coinbase describes LINK as follows:

Chainlink (LINK) is an Ethereum token that powers the Chainlink decentralized oracle network.  This network allows smart contracts on Ethereum to securely connect to external data sources, APIs, and payment systems.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

508.    LINK was first *bona fide* offered to the public in or about September 2017.

**Answer:**    Defendants admit that LINK was launched in approximately September 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

509.    LINK became available for trading on the Coinbase Pro Platform on or about June 26, 2019. LINK became available for trading on the Coinbase Platform on or about June 28, 2019.  Since becoming available on the Coinbase Platform, LINK has been continuously traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that LINK became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform on approximately June 26, 2019, the Coinbase Trading Platform on approximately June 28, 2019, and deny the remaining allegations in this Paragraph.

510.    After LINK was listed on the Coinbase Platform, its price rose by approximately 2229.5 percent and peaked at $52.88 on May 10, 2021.  Since its peak, the price of LINK has declined.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of LINK reached a high on or around May 10, 2021, at approximately $52.88, but otherwise deny the remaining allegations in this Paragraph.

511.    As of 10:00 a.m. Eastern time on March 10, 2022, LINK was trading at $13.23—a decline of 75.0 percent from its May 10, 2021 peak.

**Answer:**    Defendants admit that LINK was trading at approximately $13.23 on or around March 10, 2022, and that there was an approximate 75.0% decline in price from its May 2021 high, but otherwise deny the remaining allegations in this Paragraph.

512.     During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in LINK tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for LINK tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in LINK on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

513.     Purchasers of LINK on the Coinbase Exchanges understood that they were investing money in a common enterprise.  Each LINK token is fungible with all others, and the fortunes of all LINK investors are "linked to each other [and] to the success of [Chainlink Labs's] efforts."[62]

**Answer:**     Defendants admit that Users bought LINK on the Trading Platforms.  This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny the remaining allegations in this Paragraph.

514.     LINK investors reasonably expected to earn profits through the appreciation in value of their LINK tokens.  They expected such profits to result predominantly, if not solely, from the efforts of Chainlink Labs.

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Nevertheless, nevertheless deny the allegations in this Paragraph.

515.     Chainlink Labs describes itself as "a world-class team of results-oriented developers, academics, seasoned executives, and startup operators who are building next-generation data infrastructure for smart contracts."  Chainlink Labs has numerous full-time

---

[62]    *Id.*

employees, including engineers, and has recently advertised that it is seeking to hire for multiple positions.

**Answer:** This Paragraph appears to characterize an unidentified statement from Chainlink Labs, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of these statements and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

516.    Chainlink Labs is the developer of the Chainlink network, which aims to "allow[] blockchains to securely interact with external data feeds, events, and payment methods, providing the critical off-chain information needed by complex smart contracts to become the dominant form of digital agreement," according to the Chainlink website. For example, if a smart contract "require[s] market data from a trusted source like the NYSE to trigger a transaction," Chainlink Labs's technology can help provide the needed NYSE data. To perform its data-providing function, the Chainlink network relies on third-party "node operators."

**Answer:** This Paragraph purports to characterize the Chainlink website, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of these statements and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants admit that Chainlink operates by using a network of decentralized oracle nodes and that these nodes gather data from external sources, validate it, and relay it to smart contracts on the blockchain. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

517.    Within the Chainlink network, node operators are required to hold LINK tokens and are rewarded with LINK for their contributions. Users of the network pay fees in LINK.

**Answer:**        Defendants admit that the Chainlink network permits node operators to lock up their LINK tokens as collateral and that this collateral may be reduced if a node provides incorrect data, incentivizing honesty and accuracy among node operators.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

518.    Chainlink Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding LINK and the Chainlink network.[63]  Since launching LINK, Chainlink Labs has continued its efforts to develop and improve its technology.  For example, Chainlink Labs has stated that it engaged in "over a year of development and numerous security audits" to build "Chainlink Off-Chain Reporting," which it claimed would "significantly improve[] the efficiency of how data is computed" on the Chainlink network and provide an "immediate . . . 10x increase in the amount of real-world data that can be made available to smart contract applications."  LINK investors thus rely on Chainlink Labs for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which link operates.[64]

**Answer:**        This Paragraph purports to quote from the Framework Report and a blog post on the Chainlink website from February 24, 2021, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

519.    Chainlink Labs uses LINK to finance its efforts to develop and promote the Chainlink network.  Since the initial coin offering of LINK, Chainlink Labs has raised millions of dollars by periodically selling some of the LINK it had received in the initial allocation. Chainlink Labs also continues to hold a large quantity of LINK and benefits financially from the appreciation of those tokens, allowing it to invest further in research and development.  Chainlink Labs's

---

[63]    *Id.*

[64]    *Id.*

holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in link have a reasonable expectation of profit. [65]

**Answer:** This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

520.    Buyers of LINK are motivated primarily by the belief that Chainlink Labs will succeed in its business efforts, leading to growth in the value of LINK.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

521.    One of the early buyers of LINK tokens, Framework Ventures, explained the profit-motivated rationale for purchasing LINK is a December 2017 blog post:

> Given ChainLink's focus on enterprise relationships and solutions, we see the opportunity set of outcomes being bi-modal. The need for decentralized oracle tools is apparent now and we believe there is a $1 per token base-case, even if strong partnerships do not materialize. If successful in implementing [a] partnership [with the interbank messaging network SWIFT], launching the live network and partnering with other high-quality enterprise service providers, we have a price target of $10–20 per token. Both of these outcomes have multi-year timelines, require more ChainLink core team members to be hired and expect that the cryptoasset markets continue to grow.

**Answer:** This Paragraph purports to characterize a December 2017 blog post, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph

---

[65]    *Id.*

reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and deny them on this basis.

522.    Apart from its speculative value as an investment, LINK offers little or no utility to most buyers.  The primary utility of LINK is that it can be used to pay fees for data services on the Chainlink network or to become a Chainlink node operator.  These use cases are targeted to a narrow class of users who—unlike most buyers of LINK—develop applications using Chainlink-powered smart contracts or act as Chainlink node operators.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

523.    There are few, if any, goods or services that investors can directly purchase using LINK. To the extent that LINK can be directly exchanged for goods or services, there is little or no apparent correlation between the price of LINK and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in link are motivated by the expectation of profits.[66] Demand for LINK is instead driven by speculation about the future growth in popularity of Chainlink Labs's technology.

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

524.    Many, if not all, LINK investors hold amounts of LINK with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with LINK.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

---

[66]    *Id.*

525.    LINK is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for LINK] or those who have a need for the functionality of the network," further demonstrating that link investors are motivated by the expectation of profits.[67] Chainlink Labs has promoted widespread trading of LINK—including among investors with no personal need for the functionality of the Chainlink network and no expectation of directly purchasing goods or services with LINK—by working to make LINK available for retail trading on exchange platforms including the Coinbase Exchanges.

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

526.    Chainlink Labs "controls the creation and issuance of" LINK and thus "supports a market for, [and] the price of," LINK.[68]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

527.    Based on the facts alleged above, among others, LINK qualifies as an investment contract and thus a security.

**Answer:**    Denied.

---

[67]    *Id.*

[68]    *Id.*

528.    In contrast to the robust disclosures required under federal and state securities laws, Chainlink Labs provides investors with minimal disclosures. Chainlink Labs communicates with users and investors primarily through occasional blog entries and social media posts, which do not provide the information required of a securities issuer. Neither Coinbase nor Chainlink disclosed to investors that LINK was a security.

**Answer:**    Defendants deny that LINK is a security. This Paragraph purports to characterize blog entries and social media posts from Chainlink Labs, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. To the extent this Paragraph purports to compare the blog entries and social media posts from Chainlink Labs to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these allegations in this Paragraph. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

529.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Oberlander, have had one or more losing transactions in LINK on and with Coinbase. Certain members of the class currently own LINK tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Oberlander, bought LINK tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Rodriguez, and members of the putative proposed class transacted in LINK on the Coinbase Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.

Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 43.    LOOM

530.    Loom ("LOOM") is a token created by Loom Network.  The first *bona fide* public offering of LOOM occurred on or about January 10, 2018.

**Answer:**    Defendants admit that LOOM is a token on the Ethereum blockchain that is used in conjunction with the Loom Network platform and that LOOM was launched on approximately January 10, 2018.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

531.    Investors in LOOM reasonably expected to receive profits from their investment in LOOM.  They expected these profits to derive from the efforts of Loom Network.  LOOM was marketed as deriving value from its ability to secure Loom Network's mainnet, a delegated proof-of-stake network.  The value of LOOM thus depended on the managerial effort of the issuer to create and maintain that mainnet.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

532.    There are few, if any, goods or services that can be directly purchased using LOOM. To the extent that LOOM can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LOOM. Accordingly, all or nearly all LOOM traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

533.    Coinbase itself has admitted that LOOM may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council has given LOOM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00).  In explaining its rating

of LOOM, the Crypto Rating Council noted that a "private token sale took place in January 2018" and that "Loom Network plays an ongoing role in the development and adoption of Loom."

**Answer:** Defendants deny that LOOM is a security and that Coinbase, Inc. or Coinbase Global admitted that LOOM may constitute a security. Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council. Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities. The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny any remaining allegations in this Paragraph.

534. Based on the foregoing facts, among others, LOOM qualifies as an investment contract and therefore a security. However, LOOM has never been registered as a security.

**Answer:** Defendants admit that LOOM has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

535. During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in LOOM on and with Coinbase. Certain members of the class currently own LOOM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought LOOM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in LOOM.

**Answer:** Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in LOOM on the Coinbase Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 44.    LRC

536.    Loopring ("LRC") is a token created by Loopring.  The first *bona fide* public offering of LRC occurred on or about August 1, 2017.

**Answer:**    Defendants admit that LRC is a token on the Ethereum blockchain that works in conjunction with the Loopring platform and that the LRC was launched on approximately August 1, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

537.    Investors in LRC reasonably expected to receive profits from their investment in LRC.  They expected these profits to derive from the efforts of Loopring.  LRC was marketed as deriving value from the promise that it would enable its holders to receive a share of the fees collected by the Loopring's protocol's use in the building of decentralized crypto exchanges.  This theory of value depended on the managerial effort of the issuer, because fees would be generated only if the issuer developed and maintained the Loopring protocol.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

538.    There are few, if any, goods or services that can be directly purchased using LRC. To the extent that LRC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LRC. Accordingly, all or nearly all LRC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

539.    Based on the foregoing facts, among others, LRC qualifies as an investment contract and therefore a security.  However, LRC has never been registered as a security.

**Answer:**    Defendants admit that LRC has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

540.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in LRC on and with Coinbase.  Certain members of the class currently own LRC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought LRC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in LRC.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood, and members of the putative proposed class transacted in LRC on the Coinbase Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 45.    MANA

541.    Decentraland ("MANA") is a token created, issued, and distributed by the Decentraland Foundation.

**Answer:**    Defendants admit that MANA is a token on the Ethereum blockchain that is used in conjunction with the Decentraland platform.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

542.    MANA was first *bona fide* offered to the public in or about August 2017.

**Answer:**    Defendants admit that Decentraland was launched in approximately August 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

202

543.    MANA became available for trading on the Coinbase Pro Platform on or about December 10, 2018.  MANA became available for trading on the Coinbase Platform on or about November 5, 2020.  Since becoming available on the Coinbase Platform, MANA has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that MANA became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform since approximately December 10, 2018, and on the Coinbase Platform since approximately November 5, 2020, but otherwise deny the remaining allegations in this Paragraph.

544.    After MANA was listed on the Coinbase Platform, its price rose by approximately 9192.8 percent and peaked at $5.90 on November 25, 2021.  Since then, the price has declined substantially.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal

conclusions made by Plaintiffs based on it. Defendants admit that the price of MANA reached a

high on or around November, 25 2021, at approximately $5.90, but otherwise deny the remaining

allegations in this Paragraph.

545.    As of 10:00 a.m. Eastern time on March 10, 2022, MANA was trading at $2.38—
a decline of 59.7 percent from its November 25, 2021 peak.

**Answer:**    Defendants admit that MANA was trading at approximately $2.38 on or

around March 10, 2022, and that there was an approximate 59.7% decline in price from its

November 2021 high, but otherwise deny the remaining allegations in this Paragraph.

546.    During the Class Period, members of the Class, including Plaintiffs Oberlander and
Underwood, invested in MANA tokens on the Coinbase Exchanges by giving money or digital
assets to Coinbase in exchange for MANA tokens and paid Coinbase a fee for executing the
transaction.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood, and

members of the putative proposed class transacted in MANA on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement,

to which Defendants respectfully refer the Court for the complete and accurate contents.

Defendants otherwise deny the remaining allegations in this Paragraph.

547.    Purchasers of MANA on the Coinbase Exchanges understood that they were
investing money in a common enterprise. Each MANA token is fungible with all others, and the
fortunes of all MANA investors are "linked to each other [and] to the success of [the] efforts" of
MANA's developers, promoters, and distributors.[69]

**Answer:**    Defendants admit that Users bought MANA on the Trading Platforms. This

Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer

the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing,

---

[69]    *Id.*

204

or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

548.    MANA investors reasonably expected to earn profits through the appreciation in value of their MANA tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Decentraland Foundation.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

549.    MANA is tied to a virtual reality video game, Decentraland. In that game, MANA serves as a currency. Thus, MANA has value only insofar as the Decentraland Foundation creates and maintains the virtual reality game to which it is tied. However, the game was not available even in "beta" form until 2019. Purchasers of MANA at its ICO were purchasing an asset whose only value was based on speculation about the future development of the game to which it would be tied.

**Answer:**    Defendants admit that MANA tokens are used to acquire LAND tokens and can also be used to acquire a range of avatars, wearables, names, and more on the Decentraland marketplace. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

550.    Many MANA investors hold amounts of MANA with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with MANA. Even users who need some MANA in connection with the video game to which it is linked typically expect to use only a fraction of their MANA for that purpose.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

551.    Despite its direct utility being largely or exclusively limited to a narrow class of users, MANA is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for MANA] or those who have a need for the functionality of the network," further demonstrating that MANA investors are motivated by the expectation of profits.[70]

---

[70]    *Id.*

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

552.    The Decentraland Foundation has promoted widespread trading of MANA—including among investors with no links to the game itself—by working to make MANA available for retail trading on exchange platforms such as the Coinbase Exchanges. The distribution of the MANA token generated the funds used to create the video game to which it is linked.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

553.    Coinbase itself has admitted that MANA may well constitute a security. Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security. The Crypto Rating Council has given MANA a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security." This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00). In explaining its rating of MANA, the Crypto Rating Council noted MANA's August 2017 ICO and further noted that "Decentraland, a private company based in Beijing, is involved in ongoing development of the Decentraland network."

**Answer:**    Defendants deny that MANA is a security and that Coinbase, Inc. or Coinbase Global admitted that MANA may constitute a security. Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council. Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities. The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those

sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny any remaining allegations in this Paragraph.

554. Based on the above facts, among others, MANA qualifies as an investment contract and therefore a security.

**Answer:**      Denied.

555. During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in MANA on and with Coinbase. Certain members of the class currently own MANA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought MANA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**      Defendants admit that Lead Plaintiffs Oberlander and Underwood, and members of the putative proposed class transacted in MANA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 46.    MATIC

556. Polygon ("MATIC") is a token that was first *bona fide* offered to investors as the native token of the MATIC network in or about October 2017. MATIC was rebranded as Polygon on February 9, 2021.

**Answer:**      Defendants admit that MATIC is a token on the Ethereum blockchain that is used in conjunction with the Polygon platform, which was launched in approximately October 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

557. MATIC became available for trading on the Coinbase Exchanges on or about March 11, 2021. Since then, MATIC has continuously been traded on the Coinbase Exchanges.

**Answer:** Defendants admit that MATIC became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately March 11, 2021, but otherwise deny the remaining allegations in this Paragraph.

558. Coinbase describes MATIC as follows:

Polygon was formerly called Matic Network. Polygon (MATIC) is an Ethereum token that powers the Polygon Network, a scaling solution for Ethereum. Polygon aims to provide faster and cheaper transactions on Ethereum using Layer 2 sidechains, which are blockchains that run alongside the Ethereum main chain. Users can deposit Ethereum tokens to a Polygon smart contract, interact with them within Polygon, and then later withdraw them back to the Ethereum main chain. The MATIC token is used to pay transaction fees and participate in proof-of-stake consensus.

**Answer:** This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and deny any remaining allegations in this Paragraph.

559. After MATIC was listed on the Coinbase Platform, its price rose by approximately 917 percent and peaked at $2.92 on December 27, 2021. Since then, the price of MATIC has fluctuated; after a sustained period of decline, MATIC reached a new peak on December 26, 2021 before declining again.



**Answer:** This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants admit that the price of MATIC reached a high on or around December 27, 2021, at approximately $2.92, but otherwise deny the remaining allegations in this Paragraph.

560. As of 10:00 a.m. Eastern time on March 10, 2022, MATIC was trading at $1.43—a decline of 51.2 percent from its December 27, 2021 peak.

**Answer:** Defendants admit that MATIC was trading at approximately $1.43 on or around March 10, 2022, and that there was an approximate 51.2% decline in price from its December 2021 high, but otherwise deny any remaining allegations in this Paragraph.

561. During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in MATIC tokens on the Coinbase Exchanges by giving money or digital

assets to Coinbase in exchange for MATIC tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in MATIC on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

562.     Investors in MATIC—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of MATIC's creators, developers, managers, and promoters. The team behind MATIC has actively cultivated this expectation through public communications including, but not limited to, a whitepaper and a "lightpaper" hosted on MATIC's official website.

**Answer:**     This Paragraph reflects no allegations specific to Defendants. Defendants nevertheless deny the allegations in this Paragraph.

563.     Built by a development team based in India, MATIC is presented in the whitepaper as "a utility token which functions as the unit of payment and settlement between participants who interact within the ecosystem on the Matic Network." The whitepaper makes clear that the value of MATIC is dependent on the development team's continued maintenance and development of the MATIC Network. For example, the whitepaper lists various topics of research that the MATIC development team expected to conduct:

1. Generalized state scaling and fraud proofs/cryptographic mechanisms for the same.

2. Evaluate the approach to expand Staker base in the checkpointing layer with the future Threshold based signatures implementations on Ethereum, if any.

3. Robust structure and design pattern for upgradeable smart contracts.

4. Context specific Ether less accounts and Gas Relay Abstractions on Identity

5. Privacy-enabled transactions

6. Blockchain interoperability

7. State channels on top of the sidechain

**Answer:**    This Paragraph purports to characterize the MATIC whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants aver that the MATIC whitepaper states that MATIC "does not represent or confer on the token holder any right of any form with respect to the [Matic Network Pte. Ltd.], the Issuer (or any of its affiliates), or its revenues or assets, including without limitation any right to receive future dividends, revenue, shares, ownership right or stake, share or security, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property or licence [sic] rights), or other financial or legal rights or equivalent rights, or intellectual property rights or any other form of participation in or relating to the Matic Network, the [Matic Network Pte. Ltd.], the Issuer and/or their service providers."  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

564.    The development team further disclosed a failure to develop the MATIC Network as a potential risk factor negatively influencing the price of MATIC:

> Failure to develop: There is the risk that the development of the Matic Network will not be executed or implemented as planned, for a variety of reasons, including without limitation the event of a decline in the prices of any digital asset, virtual currency or Matic Token, unforeseen technical difficulties, and shortage of development funds for activities.

**Answer:**    This Paragraph purports to characterize the MATIC whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

565.    While the whitepaper ostensibly provides a list of risk factors that can negatively impact the price of MATIC, the disclosures made fall far short of the robust disclosures mandated by federal and state securities laws.  For example, the whitepaper does not provide any financial information underlying the MATIC network.  Nor does it provide details on the MATIC network's further development plans.

**Answer:**    Defendants deny that MATIC is a security.  This Paragraph purports to characterize the MATIC whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  To the extent Plaintiffs purport to compare the MATIC whitepaper to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them on this basis.

566.    MATIC offers little, if any, utility apart from the ability to sell it to other investors. MATIC's official website, the whitepaper, and the lightpaper do not identify any specific goods or services that can be acquired in exchange for MATIC.  As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy MATIC primarily because they expect profits, not because they intend to "use [MATIC] for its intended functionality on the network."[71]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny

---

[71]    *Id.*

any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

567. To the extent that MATIC can be exchanged for specific goods and services, there is little or no apparent correlation between the price of MATIC and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits. Instead of responding to the price of other goods or services, the price of MATIC has changed based on events that affect speculation about its future performance. For example, the announcement that MATIC would be listed on the Coinbase Exchanges caused its price to skyrocket by over 40 percent.

**Answer:** Defendants admit that MATIC became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately March 11, 2021. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny those allegations.

568. Based on the facts alleged above, among others, MATIC qualifies as an investment contract and thus a security.

**Answer:** Denied.

569. The team behind MATIC actively conceals that MATIC is a security. For example, the whitepaper purports to inform investors by purchasing MATIC, they agree that MATIC tokens "are not intended to constitute securities in Singapore or any relevant jurisdiction."

**Answer:** Defendants deny that MATIC is a security. This Paragraph purports to characterize the MATIC whitepaper, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

570.    The Coinbase Exchanges provide users with hyperlinks to MATIC's official website and the lightpaper. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying MATIC, they will profit from the efforts of others and (2) conceal MATIC's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

571.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in MATIC on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own MATIC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought MATIC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in MATIC on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 47.    MKR

572.    Maker ("MKR") is a token created by MakerDAO. The first *bona fide* public offering of MKR occurred on or about January 30, 2017.

**Answer:**    Defendants admit that MKR is a token on the Ethereum blockchain that is used in conjunction with the Maker platform and that MKR was launched in approximately January 2017. As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

573.    Investors in MKR reasonably expected to receive profits from their investment in MKR. They expected these profits to derive from the efforts of MakerDAO. MKR was marketed as deriving value from its ability to give holders voting rights over the development of the Maker Protocol, a technology for lending and borrowing cryptocurrency. This theory of value depends on the managerial effort of the issuer, because voting rights over the protocol are only valuable if the issuer develops and maintains the protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

574.    There are few, if any, goods or services that can be directly purchased using MKR. To the extent that MKR can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of Maker. Accordingly, all or nearly all Maker traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

575.    Based on the foregoing facts, among others, Maker qualifies as an investment contract and therefore a security. However, Maker has never been registered as a security.

**Answer:**    Defendants admit that MKR has never been registered as a security and aver

that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

576.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in MKR on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own MKR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought MKR tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in MKR.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and

members of the putative proposed class transacted in MKR on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement,

to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 48.  MLN

577.    Enzyme ("MLN") is a token created by Enzyme.  The first *bona fide* public offering of MLN occurred on or about February 15, 2017.

**Answer:**       Defendants admit MLN is a token on the Ethereum blockchain that is used in conjunction with the Enzyme platform and that MLN was launched in approximately February 15, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

578.    Investors in MLN reasonably expected to receive profits from their investment in MLN.  They expected these profits to derive from the efforts of Enzyme.  MLN was marketed as deriving value from its ability to power Enzyme, a protocol to facilitate on-chain asset management.  The value of MLN thus depended on the managerial effort of the issuer to create and maintain Enzyme.

**Answer:**       This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

579.    There are few, if any, goods or services that can be directly purchased using MLN. To the extent that MLN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of MLN. Accordingly, all or nearly all MLN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**       This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

580.    Based on the foregoing facts, among others, MLN qualifies as an investment contract and therefore a security.  However, MLN has never been registered as a security.

**Answer:**        Defendants admit that MLN has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

581.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in MLN on and with Coinbase.  Certain members of the class currently own MLN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought MLN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in MLN.

**Answer:**        Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in MLN on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 49.    NKN

582.    NKN coin ("NKN") is a token created by New Kind of Network.  The first *bona fide* public offering of NKN occurred on or about April 19, 2018.

**Answer:**        Defendants admit that NKN is the native token of the New Kind of Network blockchain and that NKN was launched on approximately April 19, 2018.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

583.    Investors in NKN reasonably expected to receive profits from their investment in NKN.  They expected these profits to derive from the efforts of New Kind of Network.  NKN was marketed as deriving value from its ability to be used in the NKN network, which in turn would use economic incentives to motivate Internet users to share network connections and utilize unused bandwidth.  The value thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer developed and maintained the NKN network.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

584.    There are few, if any, goods or services that can be directly purchased using NKN. To the extent that NKN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of NKN. Accordingly, all or nearly all NKN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

585.    Based on the foregoing facts, among others, NKN qualifies as an investment contract and therefore a security.  However, NKN has never been registered as a security.

**Answer:**        Defendants admit that NKN has never been registered as a security and aver

that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

586.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in NKN on and with Coinbase.  Certain members of the class currently own NKN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought NKN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in NKN.

**Answer:**        Defendants admit that Lead Plaintiffs Oberlander and Underwood and

members of the putative proposed class transacted in NKN on the Trading Platforms during the

putative Class Period and that they paid fees on those transactions pursuant to the User Agreement,

to which Defendants respectfully refer the Court for the complete and accurate contents.

Defendants admit that certain of these transactions may have resulted in a loss but deny the

remaining allegations, including that Plaintiffs are entitled to any damages.

### 50.    NMR

587.    Numeraire ("NMR") is a token created by Numerai.  The first *bona fide* public offering of Numeraire occurred on or about June 20, 2017.

**Answer:** Defendants admit that NMR is a token on the Ethereum blockchain that is used in conjunction with the Numerai platform and that NMR launched on approximately June 20, 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

588. Investors in Numeraire reasonably expected to receive profits from their investment in Numeraire. They expected these profits to derive from the efforts of Numerai. Numeraire was marketed as deriving value from its ability to power Numerai, an Ethereum-based platform that crowdsources artificial intelligence to bring decentralization to the data science field. The value of NMR thus depended on the managerial effort of the issuer to create and maintain Numerai and attract data scientists to use the platform.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

589. There are few, if any, goods or services that can be directly purchased using Numeraire. To the extent that Numeraire can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of Numeraire. Accordingly, all or nearly all Numeraire traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

590. Based on the foregoing facts, among others, Numeraire qualifies as an investment contract and therefore a security. However, Numeraire has never been registered as a security.

**Answer:** Defendants admit that NMR has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

591. During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in NMR on and with Coinbase. Certain members of the class currently own NMR tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought NMR tokens on the Coinbase Exchanges that they subsequently sold

on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in NMR.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in NMR on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 51.    NU

592.    NuCypher ("NU") is a token created by NuCypher. The first *bona fide* public offering of NU occurred on or about September 30, 2020.

**Answer:**    Defendants admit that NU is a token on the Ethereum blockchain that is used in conjunction with the NuCypher platform and that NU launched in approximately October 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

593.    Investors in NU reasonably expected to receive profits from their investment in NU. They expected these profits to derive from the efforts of NuCypher. NU was marketed as deriving value from its ability to be staked to run a node on the NuCypher network, an encryption service for public blockchains. The value of NU thus depended on the managerial effort of the issuer to create, promote, and maintain the encryption service to which NU was tied.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

594.    There are few, if any, goods or services that can be directly purchased using NU. To the extent that NU can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of NU. Accordingly, all or nearly all NU traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

220

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

595. Based on the foregoing facts, among others, NU qualifies as an investment contract and therefore a security. However, NU has never been registered as a security.

**Answer:** Defendants admit that NU has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

596. During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in NU on and with Coinbase. Certain members of the class currently own NU tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought NU tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have paid fees to Coinbase as part of their transactions in NU.

**Answer:** Defendants admit that Lead Plaintiffs Rodriguez and Underwood and members of the putative proposed class transacted in NU on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 52.    OGN

597. Origin ("OGN") is a token created by the developers of the Origin Protocol. The first *bona fide* public offering of OGN occurred on or about January 8, 2020.

**Answer:** Defendants admit that OGN is a token on the Ethereum blockchain that is used in conjunction with the Origin platform and that OGN was launched on approximately January 8, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

598.    Investors in OGN reasonably expected to receive profits from their investment in OGN. They expected these profits to derive from the efforts of the Origin Protocol developers. OGN was marketed as deriving value from its ability to power Origin, a platform for building peer-to-peer marketplaces and e-commerce applications. The value of OGN thus depended on the managerial effort of the issuer, because the token is only valuable if the issuer developed and maintained the Origin platform.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

599.    There are few, if any, goods or services that can be directly purchased using OGN. To the extent that OGN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OGN. Accordingly, all or nearly all OGN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

600.    Based on the foregoing facts, among others, OGN qualifies as an investment contract and therefore a security. However, OGN has never been registered as a security.

**Answer:**    Defendants admit that OGN has never been registered as a security and aver

that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

601.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in OGN on and with Coinbase. Certain members of the class currently own OGN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought OGN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in OGN.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the

putative proposed class transacted in OGN on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 53. OMG

602.    OMG Network ("OMG") is a token created by the OMG Foundation.  The first *bona fide* public offering of OMG occurred on or about June 23, 2017.

**Answer:**    Defendants admit that OMG is the native token of the OMG Network blockchain and that OMG launched on approximately June 23, 2017.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

603.    Investors in OMG reasonably expected to receive profits from their investment in OMG.  They expected these profits to derive from the efforts of the OMG Foundation.  OMG was marketed as deriving value from the promise that the token would impart the right to validate transactions on the blockchain supporting the OMG Network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

604.    The creation of OMG tokens occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  The value of OMG depended entirely on the managerial effort of the issuer, both to manage that supply and to develop the OMG network itself.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

605.    There are few, if any, goods or services that can be directly purchased using OMG. To the extent that OMG can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OMG. Accordingly, all or nearly all OMG traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

606.    Based on the foregoing facts, among others, OMG qualifies as an investment contract and therefore a security.  However, OMG has never been registered as a security.

**Answer:**    Defendants admit that OMG has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

607.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in OMG on and with Coinbase.  Certain members of the class currently own OMG tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Rodriguez, bought OMG tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in OMG.

**Answer:**    Defendants admit that Lead Plaintiffs Rodriguez, Underwood, and Oberlander and members of the putative proposed class transacted in OMG on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 54.    ORN

608.    Orion Protocol ("ORN") is a token created by Orion Protocol Ltd. The first *bona fide* public offering of ORN occurred on or about July 14, 2020.

**Answer:**    Defendants admit that ORN is a token on the Ethereum blockchain that is used in conjunction with the Orion platform and that the ORN was launched on approximately July 14, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

609.    Investors in ORN reasonably expected to receive profits from their investment in ORN.  They expected these profits to derive from the efforts of Orion Protocol Ltd. ORN was marketed as deriving value from its ability to power the Orion platform, a decentralized platform

that aggregates the liquidity of multiple crypto exchanges. This means that ORN's value depended on the managerial effort of the issuer to create, maintain, and promote the Orion platform itself.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

610.    There are few, if any, goods or services that can be directly purchased using ORN. To the extent that ORN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ORN. Accordingly, all or nearly all ORN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

611.    Based on the foregoing facts, among others, ORN qualifies as an investment contract and therefore a security. However, ORN has never been registered as a security.

**Answer:**    Defendants admit that ORN has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

612.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in ORN on and with Coinbase. Certain members of the class currently own ORN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought ORN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in ORN.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in ORN on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

**55.    OXT**

613.    Orchid ("OXT") is a token created by Orchid.  The first *bona fide* public offering of OXT occurred on or about May 7, 2019.

**Answer:**    Defendants admit that OXT is a token on the Ethereum blockchain that is used in conjunction with the Orchid platform and that OXT was launched in approximately December 2019.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

614.    Investors in OXT reasonably expected to receive profits from their investment in OXT.  They expected these profits to derive from the efforts of Orchid.  OXT was marketed as deriving value from its ability to serve as a secure means of paying for the use of Orchid's service, a cryptocurrency-powered virtual private network.  Investors in OXT thus depended on the managerial effort of the issuer to create, maintain and market Orchid.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

615.    There are few, if any, goods or services that can be directly purchased using OXT. To the extent that OXT can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of OXT. Only a small fraction of OXT is ever used to pay for the use of Orchid's virtual private network. Accordingly, all or nearly all OXT traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

616.    Based on the foregoing facts, among others, OXT qualifies as an investment contract and therefore a security.  However, OXT has never been registered as a security.

**Answer:**    Defendants admit that OXT has never been registered as a security and aver that that is because it is not a security.  Defendants otherwise deny the allegations in this Paragraph.

617.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in OXT on and with Coinbase.  Certain members of the class currently own OXT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the

class, including Plaintiffs Rodriguez and Underwood, bought OXT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, have paid fees to Coinbase as part of their transactions in OXT.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander, Rodriguez and Underwood and members of the putative proposed class transacted in OXT on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 56.    PLA

618.    PlayDapp ("PLA") is a token created by PlayDapp. The first *bona fide* public offering of PLA occurred on or about October 19, 2020.

**Answer:** Defendants admit that PLA is a token on the Ethereum blockchain that is used in conjunction with the PlayDapp platform and that PLA was launched on approximately October 19, 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

619.    Investors in PLA reasonably expected to receive profits from their investment in PLA. They expected these profits to derive from the efforts of PlayDapp. PLA was marketed as deriving value from its ability to power PlayDapp, a blockchain gaming platform and NFT marketplace. The value of PLA thus depended on the managerial effort of the issuer to create, maintain, and market PlayDapp.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

620.    There are few, if any, goods or services that can be directly purchased using PLA. To the extent that PLA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of PLA.

Accordingly, all or nearly all PLA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

621.    Based on the foregoing facts, among others, PLA qualifies as an investment contract and therefore a security. However, PLA has never been registered as a security.

**Answer:**    Defendants admit that PLA has never been registered as a security and aver that that is because it is not a security. Defendants otherwise deny the allegations in this Paragraph.

622.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in PLA on and with Coinbase. Certain members of the class currently own PLA tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought PLA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in PLA.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in PLA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 57.    POLY

623.    Polymath ("POLY") is a token created by Polymath. The first *bona fide* public offering of POLY occurred on or about January 12, 2018.

**Answer:**    Defendants admit that POLY is a token on the Ethereum blockchain that works in conjunction with the Polymath platform and that POLY was launched on approximately January 12, 2018. As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph, and therefore deny them on this basis.

624.    Investors in POLY reasonably expected to receive profits from their investment in POLY. They expected these profits to derive from the efforts of Polymath. POLY was marketed as deriving value from its ability to facilitate digital securities trading on the Polymath platform. This means that POLY investors depended on the managerial effort of the issuer to create and maintain the Polymath platform through the development of technology to create, issue, and manage security tokens on the blockchain.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

625.    There are few, if any, goods or services that can be directly purchased using POLY. To the extent that POLY can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of POLY. Accordingly, all or nearly all POLY traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

626.    Based on the foregoing facts, among others, POLY qualifies as an investment contract and therefore a security. However, POLY has never been registered as a security.

**Answer:**    Defendants admit that POLY has never been registered as a security and

aver that that is because it is not a security. Defendants otherwise deny the allegations in this

Paragraph.

627.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in POLY on and with Coinbase. Certain members of the class currently own POLY tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought POLY tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in POLY.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the

putative proposed class transacted in POLY on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

### 58.    QNT

628.    Quant ("QNT") is a token created, issued, and distributed by the Quant Network.

**Answer:**    Defendants admit that QNT is a token on the Ethereum blockchain that is

used in conjunction with the Quant Overledger Network platform and that QNT was launched in

approximately June 2018. As the remaining allegations in this Paragraph reflect no allegations

specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

629.    Coinbase describes QNT as follows:

QNT is an Ethereum token that is used to power Quant Network's Overledger brand
of enterprise software solutions, which aim to connect public blockchains and
private networks. Quant Network allows the creation of so-called mDapps that
enable decentralized applications to operate on multiple blockchains at once.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which

Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in

this Paragraph.

630.    QNT was first *bona fide* offered to the public in or about May 11, 2018.

**Answer:**    Defendants admit that QNT was launched in approximately 2018. As the

remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

631.    QNT became available for trading on the Coinbase Exchanges on or about June 24, 2021.  Since then, QNT has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that QNT became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 24, 2021, but otherwise deny the remaining allegations in this Paragraph.

632.    After QNT was listed on the Coinbase Platform, its price rose by approximately 473.4 percent and peaked at $428.38 on September 11, 2021.  Since its peak, the price of QNT has persistently declined.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal

conclusions made by Plaintiffs based on it. Defendants admit that the price of QNT reached a high

on or around September 11, 2021, at approximately $428.38, but otherwise deny the remaining

allegations in this Paragraph.

633.     As of 10:00 a.m. Eastern time on March 10, 2022, QNT was trading at $116.66—
a decline of 72.8 percent from its September 11, 2021 peak.

**Answer:**     Defendants admit that QNT was trading at approximately $116.66 on or

around March 10, 2022, and that there was an approximate 72.8% in price decline from its

September 2021 high, but otherwise deny any remaining allegations in this Paragraph.

634.     During the Class Period, members of the Class, including Plaintiff Oberlander,
invested in QNT tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase
in exchange for QNT tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiff Oberlander and members of the

putative proposed class transacted in QNT on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants

otherwise deny the remaining allegations in this Paragraph.

635.     Purchasers of QNT on the Coinbase Exchanges understood that they were investing
money in a common enterprise. Each QNT token is fungible with all others, and the fortunes of
all QNT investors are "linked to each other [and] to the success of [the] efforts" of the Quant
Network.[72]

**Answer:**     Defendants admit that Users bought QNT on the Trading Platforms. This

Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer

the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing,

---

[72]     *Id.*

or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

636.    QNT investors reasonably expected to earn profits through the appreciation in value of their QNT tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Quant Network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

637.    QNT is the native token of the Quant Overledger, which is designed to allow apps to operate on multiple blockchains simultaneously. QNT depends on the Quant Network's development and maintenance of the Quant Overledger for all of its value.

**Answer:**    Defendants admit that QNT is a token on the Ethereum blockchain that is used in conjunction with the Quant Overledger Network platform, which allows decentralized applications to operate on multiple blockchains at once. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

638.    The Quant Network was founded by its CEO, Gilber Verdian. The Quant Network, in addition to developing and managing the Quant Overledger, has extensively marketed QNT, including through partnerships with entities such as SIA, Oracle, and Amazon Web Services. QNT has been distributed through "airdrops" that provide free tokens as a way of creating interest and increasing the trading volume of QNT.

**Answer:**    Defendants admit that the Quant Network was conceived by Gilbert Verdian. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

639.    Investors thus rely on the Quant Network to perform "essential tasks [and] responsibilities," including "the development, improvement (or enhancement), operation, [and] promotion of the network" in which QNT operates.[73]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

640.    Apart from its speculative value as an investment, QNT offers little direct utility. Although QNT is used for certain functions on the Quant Overledger, this utility is meaningful only to purchasers who are active users of the Quant Overledger—a class consisting largely of application developers.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

641.    There are few, if any, goods or services that investors can directly purchase using QNT. To the extent that QNT can be directly exchanged for goods or services, there is little or no apparent correlation between the price of QNT and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in QNT are motivated by the expectation of profits.[74]

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[73]    *Id.*

[74]    *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this

Paragraph.

642.    Many QNT investors hold amounts of QNT with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with QNT.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

643.    Based on the above facts, among others, QNT qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

644.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in QNT on and with Coinbase. Certain members of the class currently own QNT tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought QNT tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the

putative proposed class transacted in QNT on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

### 59.    QUICK

645.    QuickSwap ("QUICK") is a token created by QuickSwap. The first *bona fide* public offering of QUICK occurred on or about February 23, 2021.

**Answer:**    Defendants admit that QUICK is a token on the Ethereum blockchain that

is used in conjunction with the QuickSwap platform and that QUICK was launched in

approximately 2021. As the remaining allegations in this Paragraph reflect no allegations specific

to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

646.    Investors in QUICK reasonably expected to receive profits from their investment in QUICK.  They expected these profits to derive from the efforts of QuickSwap.  QUICK was marketed as deriving value from its ability to power QuickSwap, a decentralized exchange that runs on the Polygon Network.  The value of QUICK thus depended on the managerial effort of the issuer to create and maintain QuickSwap and to attract users to that platform.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

647.    There are few, if any, goods or services that can be directly purchased using QUICK. To the extent that QUICK can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of QUICK.  Accordingly, all or nearly all QUICK traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

648.    Based on the foregoing facts, among others, QUICK qualifies as an investment contract and therefore a security.  However, QUICK has never been registered as a security.

**Answer:**        Defendants admit that QUICK has never been registered as a security and

aver that that is because it is not a security.  Defendants otherwise deny the allegations in this

Paragraph.

649.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in QUICK on and with Coinbase.  Certain members of the class currently own QUICK tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Underwood, bought QUICK tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in QUICK.

**Answer:**        Defendants admit that Lead Plaintiff Underwood and members of the

putative proposed class transacted in QUICK on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

### 60.    RARI

650.    Rarible ("RARI") is a token created, issued, and distributed by Rarible Inc.

**Answer:**        Defendants admit RARI is a token on the Ethereum blockchain that is used

in conjunction with the Rarible platform. As the remaining allegations in this Paragraph reflect no

allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this

basis.

651.    RARI was first *bona fide* offered to the public on or about July 15, 2020. RARI
became available for trading on the Coinbase Exchanges on or about October 14, 2021. Since
then, RARI has continuously been traded on the Coinbase Exchanges.

**Answer:**        Defendants admit that RARI was launched on approximately July 15, 2020.

Defendants further admit that RARI became available for buying and selling among and between

Users pursuant to the User Agreement on the Trading Platforms on approximately October 14,

2021, but otherwise deny the remaining allegations in this Paragraph.

652.    Coinbase describes RARI as follows:

RARI is an Ethereum token that powers Rarible, a community-owned marketplace
for creating, selling, or collecting NFTs. RARI can be earned by using the platform
and can be used to curate content and vote on platform upgrades.

**Answer:**        This Paragraph purports to characterize the Coinbase.com website, to which

Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

653.    After RARI was listed on the Coinbase Platform, its price rose by approximately 153.7 percent and peaked at $63.53 on November 16, 2021.  Since then, the price of RARI has been trending downward.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of RARI reached a high in approximately 2021.  Defendants otherwise deny the remaining allegations in this Paragraph.

654.    As of 10:00 a.m. Eastern time on March 10, 2022, RARI was trading at $7.17—a decline of 88.7 percent from the price reached on November 16, 2021.

**Answer:**    Defendants admit that the price of RARI was approximately $7.17 on or around March 10, 2022, and that there was a decline from the price in November 2021 but otherwise deny any remaining allegations in this Paragraph.

655.    During the Class Period, members of the Class, including Plaintiff Underwood, invested in RARI tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for RARI tokens and paid Coinbase a fee for executing the transaction.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in RARI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

656.    Investors in RARI—including Plaintiff Underwood and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of Rarible Inc. The team behind RARI has actively cultivated this expectation through public communications.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

657.    Rarible Inc. is a company with at least nine employees, including its CEO and co-founder Alexei Falin.  These employees work on improving and promoting Rarible's technology. Rarible Inc. advertises that it is "backed by" several investors including Coinbase.

**Answer:**    Defendants admit that Alexei Falin is a co-founder and CEO of Rarible and aver that Rarible has raised funding from a number of investors, including Coinbase Global.  This Paragraph appears to characterize an unidentified statement by Rarible, Inc., to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal

conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

658.    According to a July 2020 blog post introducing the RARI token, RARI is the governance token of Rarible and "enables the most active creators and collectors on Rarible to vote for any platform upgrades and participate in curation and moderation."

**Answer:**    This Paragraph purports to characterize a July 2020 blog post, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

659.    The blog post further stated that "[o]ver half of RARI's total supply [was] reserved for sellers and buyers on Rarible marketplace, who w[ould] receive RARI through weekly distribution according to weekly purchases and sales volumes."  Rarible stopped providing these weekly distributions of RARI in January 2022.

**Answer:**    This Paragraph purports to characterize a July 2020 blog post, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

660.    The amount of information provided by RARI's development team is paltry even by crypto-asset standards.  RARI does not have a whitepaper usually published by cryptocurrency developers.  The July 2020 blog post purporting to explain RARI is less than 1,000 words long and does not provide any information regarding the Rarible NFT marketplace that RARI is supposed to support.

**Answer:**        This Paragraph purports to characterize a July 2020 blog post and other information provided by RARI's development team, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

661.    RARI offers little, if any, utility apart from the ability to sell it to other investors. Rarible's official website does not identify any specific goods or services that can be acquired in exchange for RARI.  As the SEC has recognized, this lack of intrinsic utility is evidence that investors buy RARI primarily because they expect profits, not because they intend to "use [RARI] for its intended functionality on the network."[75]

**Answer:**        This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

662.    To the extent that RARI can be exchanged for specific goods and services, there is little or no apparent correlation between the price of RARI and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[76]  Instead of responding to the price of other goods or services, the price of RARI has changed based on events that affect speculation about its future performance.  For example, the listing of RARI on platforms including the Coinbase Exchanges had a positive effect on its value in 2021.

---

[75]    *Id.*

[76]    *Id.*

**Answer:**    Defendants admit that RARI became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately October 14, 2021. This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

663.    Based on the facts alleged above, among others, RARI qualifies as an investment contract and thus a security.

**Answer:**    Denied.

664.    The Coinbase Exchanges provide users with hyperlinks to RARI's official website. Coinbase thus participates in the attempt to persuade investors that by buying RARI, they will profit from the efforts of others.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

665.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in RARI on and with Coinbase. Certain members of the class currently own RARI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought RARI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in RARI on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit

that certain of these transactions may have been for a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

### 61.    REN

666.    Ren ("REN") is a token created by Ren.  The first *bona fide* public offering of REN occurred on or about February 3, 2018.

**Answer:**    Defendants admit that REN is a token on the Ethereum blockchain that is

used in conjunction with the Ren platform and that REN was launched on approximately

February 3, 2018.  As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

667.    Investors in REN reasonably expected to receive profits from their investment in REN.  They expected these profits to derive from the efforts of Ren.  REN was marketed as deriving value from its ability to power Ren's open protocol for transferring cryptocurrencies between blockchains.  The value of REN thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained a protocol that in fact provided interoperability and liquidity between different blockchain platforms.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

668.    There are few, if any, goods or services that can be directly purchased using REN. To the extent that REN can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of REN. Accordingly, all or nearly all REN traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

669.    Based on the foregoing facts, among others, REN qualifies as an investment contract and therefore a security.  However, REN has never been registered as a security.

**Answer:**    Defendants deny that REN is a security and otherwise deny the remaining allegations in this Paragraph.

670.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in REN on and with Coinbase. Certain members of the class currently own REN tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought REN tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in REN.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in REN on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 62.    REP

671.    Augur ("REP") is a token created by the Forecast Foundation. The first *bona fide* public offering of REP occurred on or about August 14, 2015.

**Answer:**    Defendants admit that REP is a token on the Ethereum blockchain that is used in conjunction with the Augur platform and that REP was launched in approximately July 2018. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

672.    Investors in REP reasonably expected to receive profits from their investment in REP. They expected these profits to derive from the efforts of the Forecast Foundation. REP was marketed as deriving value from its ability to be used to report and dispute the outcomes of events within Augur, a decentralized protocol for prediction markets. The value of REP depended on the managerial efforts of the Forecast Foundation to develop, maintain, and promote Augur.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

673.    There are few, if any, goods or services that can be directly purchased using REP. To the extent that REP can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of REP. Accordingly, all or nearly all REP traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

674.    Coinbase itself has admitted that REP may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council has given REP a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00).  In explaining its rating of REP, the Crypto Rating Council noted that "[t]he Forecast Foundation helps to develop Augur" and "conducted a token sale in 2015 which reportedly raised $5.1 million."

**Answer:**    Defendants deny that REP is a security and that Coinbase, Inc. or Coinbase Global admitted that REP may constitute a security.  Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities.  The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

675.    Based on the foregoing facts, among others, REP qualifies as an investment contract and therefore a security.  However, REP has never been registered as a security.

**Answer:**    Defendants deny that REP is a security and otherwise deny the allegations in this Paragraph.

676.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in REP on and with Coinbase. Certain members of the class currently own REP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought REP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in REP.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in REP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 63.    RLC

677.    iExec RLC ("RLC") is a token created by iExec. The first *bona fide* public offering of RLC occurred on or about April 19, 2017.

**Answer:**    Defendants admit that RLC is a token on the Ethereum blockchain that is used in conjunction with the iExec cloud platform and that RLC was launched on approximately April 19, 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

678.    Investors in RLC reasonably expected to receive profits from their investment in RLC. They expected these profits to derive from the efforts of iExec. RLC was marketed as deriving value from it link to the iExec cloud platform, which enables users to monetize and rent computing power and data. The token's value thus depends on the managerial effort of the issuer, because RLC's connection to the iExec cloud platform is only valuable if the issuer created and maintained a decentralized marketplace for cloud resources.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

679.    There are few, if any, goods or services that can be directly purchased using RLC. To the extent that RLC can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of RLC. Accordingly, all or nearly all RLC traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

680.    Based on the foregoing facts, among others, RLC qualifies as an investment contract and therefore a security. However, RLC has never been registered as a security.

**Answer:**    Defendants deny that RLC is a security and otherwise deny the remaining allegations in this Paragraph.

681.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in RLC on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own RLC tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class bought RLC tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in RLC.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in RLC on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 64.    SHIB

682.    Shiba Inu ("SHIB") is a token that was first *bona fide* offered to investors on or about August 1, 2020. SHIB became available for trading on the Coinbase Pro Platform on or about September 9, 2021. SHIB became available for trading on the Coinbase Platform on or about September 16, 2021. Since becoming available on the Coinbase Platform, SHIB has continuously been traded on the Coinbase Exchanges.

**Answer:**        Defendants admit that SHIB was launched on approximately August 1, 2020.  Defendants further admit that SHIB became available for buying and selling on the Coinbase Pro Trading Platform on approximately September 9, 2021, and on the Coinbase Trading Platform on approximately September 16, 2021, but otherwise deny the remaining allegations in this Paragraph.

683.    Coinbase describes SHIB as follows:

Shiba Inu (SHIB) is a token that aspires to be an Ethereum-based alternative to Dogecoin (DOGE), the popular memecoin.  Unlike Bitcoin, which is designed to be scarce, SHIB is intentionally abundant—with a total supply of one quadrillion. The Shiba Inu Token ecosystem supports projects such as an NFT art incubator and the development of a decentralized exchange called Shibaswap.

**Answer:**        This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

684.    After SHIB was listed on the Coinbase Platform, its price rose by approximately 1206.1 percent and peaked at $0.00009 on October 28, 2021.  Since its peak, the price of SHIB has persistently declined.



**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.   Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants admit that the price of SHIB reached a high of approximately $0.00009 in 2021, but otherwise deny the remaining allegations in this Paragraph.

685.    As of 10:00 a.m. Eastern time on March 10, 2022, SHIB was trading at $0.000023—a decline of 74.4 percent from its October 28, 2021 peak.

**Answer:**        Defendants admit that the price of SHIB was approximately $0.000023 on or around March 10, 2022, and that there was an approximate 74.4% decline from its high, but otherwise deny the remaining allegations in this Paragraph.

686.    During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in SHIB tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for SHIB tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in SHIB on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

687. Investors in SHIB—including Plaintiffs Oberlander and Underwood, and other members of the Class—invested with the purpose and reasonable expectation to make profits that would result primarily or exclusively from the efforts of SHIB's creators, developers, managers, and promoters. The team behind SHIB has actively cultivated this expectation through public communications including, but not limited to, a whitepaper hosted on SHIB's official website.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

688. SHIB's development team, led by its pseudonymous founder "Ryoshi," launched SHIB in 2020. Half of the total supply of SHIB—500,000,000,000 tokens—was immediately sent to a digital wallet owned by Vitalik Buterin, a co-founder of Ethereum. On information and belief, this gift to Buterin was a stunt designed to cause reasonable investors to believe that Buterin was involved in developing SHIB and would devote his efforts to increasing the value of SHIB, leading to profits for investors. This rumor, despite being denied by Buterin, has circulated widely, with some investors even speculating that Buterin might be the true identity of Ryoshi.

**Answer:** Defendants admit that Shiba Inu was created in 2020 by an individual or group of individuals under the pseudonym "Ryoshi." As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

689. According to the current version of the whitepaper (which the issuer refers to as the "Woof Paper"), dated June 25, 2021, SHIB is now part of the "Shiba Inu Ecosystem," which also includes at least two other tokens: LEASH and BONE.

**Answer:** This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

690.    The Woof Paper portrays SHIB as an investment that is sure to increase in value due to the efforts of its creators, developers, managers, and promoters. The Woof Paper boasts that "the value of SHIB is primed and ready to overtake the value of Dogecoin. Even if SHIB never hits $0.01, between our publicity and our utility, SHIB will be worth proportionately more than the popular, canine memecoin."

**Answer:**    This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.

691.    In contrast to the robust disclosures required under federal and state securities laws, the team behind SHIB provides investors with little insight into the business model supporting its promise of financial growth. The Woof Paper states that "[o]ur roadmap will remain top secret to ensure our continued advantage in this highly competitive space[.]"

**Answer:**    Defendants deny that SHIB is a security. To the extent this Paragraph purports to compare "the Woof Paper" to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these allegations in this Paragraph. This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

692.    Despite the lack of federally mandated disclosures, the Woof Paper clearly communicates that a core team will provide essential managerial efforts to advance the value of SHIB and other digital assets in the Shiba Inu Ecosystem.

**Answer:**    Defendants deny that SHIB is a security.  To the extent this Paragraph purports to compare "the Woof Paper" to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants otherwise deny the remaining allegations in this Paragraph.

693.    According to the Woof Paper, Ryoshi will personally contribute to the future growth of SHIB's value by "stay[ing] around and mak[ing] it [his] mission to 'defend the brand' and protect the community from leeches and scammers."

**Answer:**    This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants otherwise deny the remaining allegations in this Paragraph.

694.    The Woof Paper also explains that part of the plan to "assure the longevity of . . . the Shiba Inu Ecosystem" is to establish two funds that will pay for the essential efforts of the Ecosystem's core team.  *First*, the "Core Developers & OG Admins Fund" will be used to pay salaries to "talented individuals" on SHIB's "Dev team."  This "trusted group of admins" will be "deployed across multiple channels, to secure a safe space where Shiba fans build community without being bothered by FUD [i.e., fear, uncertainty, and doubt], scams, and other issues." *Second*, the "Shiba Inu Ecosystem Development & Marketing Fund" will "allow the team to deploy international marketing strategies, such as commercials, that will make the freshest mainstream cryptocurrency name, sharing the ranks with Bitcoin and Ethereum" and "allow us to quickly expand on concepts from the top secret 2021 RuffMap with a real budget."  According to

252

the Woof Paper, the Ecosystem Development & Marketing Fund will provide "the rocket fuel" needed "to send this puppy to the moon and beyond."

**Answer:** This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

695. The Woof Paper adds that "the Shib Team will always be here to oversee and support." While the Woof Paper suggests that some decisions will be made by a "decentralized majority" of holders of the ecosystem's "governance token," it acknowledges that "there will still be times where it falls on the shoulders of the Shib Team to make responsible decisions in the best interest of the ShibArmy."

**Answer:** This Paragraph purports to characterize the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

696. The core team behind SHIB has created and supports a trading market for SHIB. In addition to permitting SHIB to trade on centralized exchanges such as the Coinbase Exchanges, the core team has built and actively promotes ShibaSwap, a dedicated platform for trading SHIB and other tokens in the Shiba Inu Ecosystem. Investors rely on the core team to maintain ShibaSwap and reasonably expect this work to increase the value of SHIB by ensuring an efficient, liquid market for SHIB.

**Answer:** The allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

697. SHIB offers little, if any, utility apart from the ability to sell it to other investors. SHIB's official website and Woof Paper do not identify any specific goods or services that can be acquired in exchange for SHIB. As the SEC has recognized, this lack of intrinsic utility is evidence

that investors buy SHIB primarily because they expect profits, not because they intend to "use [SHIB] for its intended functionality on the network."[77]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

698.    To the extent that SHIB can be exchanged for specific goods and services, there is little or no apparent correlation between the price of SHIB and the market price of those goods or services—another factor recognized by the SEC as evidence that investors are motivated by the expectation of profits.[78] Instead of responding to the price of other goods or services, the price of SHIB has changed based on events that affect speculation about its future performance. For example, the listing of SHIB on platforms including the Coinbase Exchanges had a positive effect on its value in 2021. By contrast, the news in May 2021 that Buterin was reducing his SHIB position by donating 50 trillion coins to charity caused the price of SHIB to crash.

**Answer:**    Defendants admit that SHIB became available for buying and selling on the Coinbase Pro Trading Platform on approximately September 9, 2021, and on the Coinbase Trading Platform on approximately September 16, 2021. This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

699.    SHIB is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the

---

[77]    *Id.*

[78]    *Id.*

network," further supporting the inference that investors buy SHIB primarily for profit.[79]  SHIB reached one million holders in November 2021—a milestone that SHIB's official Twitter account promoted as a "great moment in SHIB's history."



  **Answer:**  This Paragraph purports to characterize the Framework Report and a public statement from SHIB on Twitter from November 25, 2021, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

  700. Moreover, SHIB is offered and purchased in quantities indicative of an intent to treat SHIB primarily as an investment rather than a utility token.  Even at its all-time high, SHIB has always been worth less than one thousandth of one cent.  As SHIB's official website explains, this high-volume, low-value structure "allows investors to hold millions, billions, or even trillions,

---

[79]  *Id.*

of it in their wallets." Holding these large amounts amplifies the volatility, increasing the possibility of profit. At the same time, it makes SHIB an unwieldy means to purchase or sell any good or service.

**Answer:** This Paragraph purports to characterize SHIB's official website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

701. Regardless of how SHIB is denominated, many investors maintain holdings of SHIB with dollar-equivalent value that far exceeds the value of any goods or services the investor could ever expect to purchase with SHIB.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

702. Investors' own statements show that they are motivated to buy SHIB primarily by the expectation of profit, not by any direct utility SHIB may have now or in the future. For example, on the social networking website Reddit, the community r/SHIBArmy—which can be accessed via a link on the official SHIB website—is dominated by messages about the price of SHIB and the profits investors expect to earn by holding SHIB. The following sample is typical of messages posted on r/SHIBArmy:



**Answer:**    This Paragraph purports to characterize unidentified statements by unidentified purported investors and a Reddit post, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

703.    Based on the facts alleged above, among others, SHIB qualifies as an investment contract and thus a security.

**Answer:**    Denied.

704.    The team behind SHIB actively conceals that SHIB is a security.  For example, the Woof Paper purports to inform investors that by purchasing SHIB, they "agree that [they] are not purchasing a security or investment."

**Answer:**    This Paragraph purports to characterize and quote from the "Woof Paper," to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

705.    The Coinbase Exchanges provide users with hyperlinks to SHIB's official website and the Woof Paper.  Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying SHIB, they will profit from the efforts of others and (2) conceal SHIB's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

706.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in SHIB on and with Coinbase.  Certain members of the class, including Plaintiffs Oberlander and Underwood, currently own SHIB tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought SHIB tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in SHIB on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and

accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 65.    SKL

707.    Skale ("SKL") is a token created by SKALE Network.  The first *bona fide* public offering of SKL occurred on or about September 3, 2020.

**Answer:**    Defendants admit that SKL is a token on the Ethereum blockchain that is used in conjunction with the SKALE Network platform and that SKL was launched on approximately September 3, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

708.    Investors in SKL reasonably expected to receive profits from their investment in SKL.  They expected these profits to derive from the efforts of SKALE Network.  SKL was marketed as deriving value from its ability to power the SKALE Network, an elastic network that is designed to bring scalability to Ethereum.  The value of SKL thus depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained the SKALE Network itself.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

709.    There are few, if any, goods or services that can be directly purchased using SKL.  To the extent that SKL can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SKL.  Accordingly, all or nearly all SKL traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

710.    Based on the foregoing facts, among others, SKL qualifies as an investment contract and therefore a security.  However, SKL has never been registered as a security.

**Answer:**    Defendants deny that SKL is a security and otherwise deny the remaining allegations in this Paragraph.

711.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in SKL on and with Coinbase. Certain members of the class currently own SKL tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Underwood, bought SKL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in SKL.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in SKL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 66.    SNX

712.    Synthetix ("SNX") is a token created by Synthetix. The first *bona fide* public offering of SNX occurred on or about February 28, 2018.

**Answer:**    Defendants admit that SNX is a token on the Ethereum blockchain that is used in conjunction with the Synthetix platform and that SNX was launched on approximately February 28, 2018. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

713.    Investors in SNX reasonably expected to receive profits from their investment in SNX. They expected these profits to derive from the efforts of Synthetix. SNX was marketed as deriving value from its ability to allow users to create crypto assets that track the price of other assets, which depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained a platform to broaden the cryptocurrency space by introducing non-blockchain assets.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

714.    There are few, if any, goods or services that can be directly purchased using SNX. To the extent that SNX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SNX. Accordingly, all or nearly all SNX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

715.    Based on the foregoing facts, among others, SNX qualifies as an investment contract and therefore a security.  However, SNX has never been registered as a security.

**Answer:**        Defendants deny that SNX is a security and otherwise deny the remaining allegations in this Paragraph.

716.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in SNX on and with Coinbase.  Certain members of the class currently own SNX tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought SNX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have paid fees to Coinbase as part of their transactions in SNX.

**Answer:**        Defendants admit that Lead Plaintiffs Oberlander, Underwood, and Rodriguez and members of the putative proposed class transacted in SNX on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

**67.    SOL**

717.    Solana ("SOL") is a token created, developed, issued, and distributed by Solana Labs, Inc. ("Solana Labs") and the Solana Foundation (together with Solana Labs, the "Solana Entities").

**Answer:**    Defendants admit that SOL is the native token of the Solana blockchain. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

718.    Coinbase describes SOL as follows:

Solana is a decentralized computing platform that uses SOL to pay for transactions. Solana aims to improve blockchain scalability by using a combination of proof of stake consensus and so-called proof of history. As a result, Solana claims to be able to support 50,000 transactions per second without sacrificing decentralization.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

719.    SOL was first *bona fide* offered to the public in the United States in or about April 2020.

**Answer:**    Defendants admit that SOL was launched in approximately April 2020. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

720.    SOL became available for trading on the Coinbase Exchanges on or about June 17, 2021. Since then, SOL has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that SOL became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately June 17, 2021, but otherwise deny the remaining allegations in this Paragraph.

721.    After SOL was listed on the Coinbase Platform, its price rose by approximately 555.2 percent and peaked at $260.06 on November 6, 2021.  Since its peak, the price of SOL has persistently declined.



**Answer:**    This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of SOL reached a high on or around November 6, 2021, at approximately $260.06.  Defendants otherwise deny the remaining allegations in this Paragraph.

722.    As of 10:00 a.m. Eastern time on March 10, 2022, SOL was trading at $82.14—a decline of 68.4 percent from its November 6, 2021 peak.

**Answer:** Defendants admit that SOL was trading at approximately $82.14 on or around March 10, 2022, and that there was an approximate 68.4% decline in price from its high, but otherwise deny the remaining allegations in this Paragraph.

723. During the Class Period, members of the Class, including Plaintiff Oberlander, invested in SOL tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for SOL tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in SOL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

724. Purchasers of SOL on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each SOL token is fungible with all others, and the fortunes of all SOL investors are "linked to each other [and] to the success of [the Solana Entities'] efforts."[80]

**Answer:** Defendants admit that Users bought SOL on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

725. SOL investors reasonably expected to earn profits through the appreciation in value of their SOL tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Solana Entities.

---

[80] *Id.*

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

726.    Each Solana Entity is an active participant in the sponsorship, promotion, or distribution of SOL.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

727.    Solana Labs markets itself as the developer of the Solana blockchain platform, which aims to process a high volume of transactions quickly and at low cost.  SOL is the native token of the Solana blockchain.

**Answer:**        Defendants admit that SOL is the native token of the Solana blockchain.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

728.    Solana Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding the Solana blockchain platform.[81]  For example, when the Solana blockchain platform encounters system-wide technical problems, Solana Labs, by its own account, "actively work[s]" to "fix" them.  Solana Labs also works on longer-term projects to improve the technical performance of the Solana blockchain platform.  SOL investors thus rely on Solana Labs for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which SOL operates.[82]

**Answer:**        This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph

---

[81]    *Id.*

[82]    *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

729.    The Solana Foundation is a nonprofit organization that works to promote "the decentralization, growth, and security of the Solana network," according to its website.

**Answer:**    This Paragraph purports to quote from the Solana Foundation website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

730.    Anatoly Yakovenko serves as both CEO of Solana Labs and President of the Solana Foundation. Raj Gokal serves as both Chief Operating Officer of Solana Labs and a Board Member of the Solana Foundation. On information and belief, Solana Labs substantially controls the Solana Foundation.

**Answer:**    Defendants admit that Mr. Gokal serves as the CEO and COO of Solana Labs and is a member of the Solana Foundation Council. Defendants also admit that Mr. Yakovenko was a member of the Solana Foundation Council but deny that he is the current President or CEO of Solana Labs. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the final sentence of this Paragraph and deny them on this basis.

731.    The Solana Entities have offered SOL to investors in order to fund the development, growth, and promotion of the Solana blockchain platform. In a March 18, 2020 blog post, Gokal explained: "After assessing community interest and root causes for recent market volatility, we believe this is a critical time for crypto infrastructure to be improved. With this in mind, we are going forward with plans to launch the SOL token."

**Answer:** This Paragraph purports to quote from a blog post by Mr. Gokal, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

732. Solana Labs has also sold SOL in private transactions for the express purpose of raising capital for its business. In June 2021, for example, Solana Labs announced that it had raised over $314 million in a private token sale to investors including prominent venture capital firms Andreessen Horowitz and Polychain Capital. In a statement about this transaction, Yakovenko said, "The next phase is onboarding a billion users. Solana was built from the ground up to accommodate this scale. With this funding, Solana Labs is now positioned to bring in the right partners and capital to build products and tooling to get there." The Solana Entities thus use the proceeds of sales of SOL "to enhance the functionality or value of the network or digital asset," supporting a reasonable expectation of profit for SOL investors. [83]

**Answer:** This Paragraph purports to quote from an unidentified statement by Mr. Yakovenko and the Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

733. Buyers of SOL—including both institutional investors and retail investors—are motivated primarily by the belief that the Solana Entities will succeed in their efforts, leading to growth in the value of SOL. For example, in the June 2021 statement announcing the $314 million private sale of SOL, Andreessen Horowitz General Partner Ali Yahya said, "It is easy to imagine countless use cases for crypto as a technology, but building them into real products that millions of people use requires the existence of a high-performance blockchain. Solana is a next-generation blockchain that can meet that high bar." Similarly, Polychain Capital Managing Partner Olaf

---

[83]    *Id.*

Carlson-Wee said, "We've been following Solana for a long time and believe it could massively scale the [decentralized finance] ecosystem."

**Answer:**    This Paragraph purports to quote from statements by Ms. Yahya and Mr. Carlson-Wee, to which Defendants respectly refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

734.    Apart from its speculative value as an investment, SOL offers only limited utility to buyers.  The primary utility of SOL is as a form of payment for transaction fees on the Solana blockchain platform.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

735.    There are few goods or services that investors can directly purchase using SOL.  To the extent that SOL can be directly exchanged for goods or services, there is little or no apparent correlation between the price of SOL and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in SOL are motivated by the expectation of profits.[84]

**Answer:**    This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

---

[84]    *Id.*

736.    Many SOL investors hold amounts of SOL with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with SOL.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

737.    Despite its direct utility being largely or exclusively limited to buyers who are regularly engaged in transactions on the Solana blockchain platform, SOL is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for SOL] or those who have a need for the functionality of the network," further demonstrating that SOL investors are motivated by the expectation of profits.[85] Yakovenko acknowledged in an April 2020 blog post that Solana Labs seeks to bring SOL "to every wallet in the world," not just the wallets of Solana blockchain users or others with a need for any utility offered by SOL.

**Answer:**    This Paragraph purports to quote from an unidentified statement by Mr. Yakovenko and the Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

738.    The Solana Entities have promoted widespread trading of SOL—including among investors with no personal need for the functionality of SOL's network and no expectation of directly purchasing goods or services with SOL—by working to make SOL available for retail trading on exchange platforms including the Coinbase Exchanges. According to the official Solana Twitter account, the "first official listing" of SOL was on the exchange platform Binance in April 2020.

**Answer:**    This Paragraph purports to quote from a public statement from Solana on Twitter, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this

---

[85]    *Id.*

Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

739. In April 2020, Solana Labs transferred 167 million SOL to the Solana Foundation. Later that month, Yakovenko authored a blog post responding to "confusion" about the circulating supply of SOL. Yakovenko explained:

> [P]er standard industry practice, the Solana Foundation contracted a market maker to provide liquidity in the aftermarket and ensure that buy and sell orders always get met, regardless of macro conditions, seasonality, or daily fluctuations in trading volume. Market makers are standard for any listed token project, as well as in traditional financial markets for meeting liquidity requirements, and play an important role in our goal to reduce friction, facilitating growth for the SOL token ecosystem, and bringing Solana to every wallet in the world. As part of this agreement, the Solana Foundation agreed to lend the market maker 11,365,067 tokens for a 6 month period. The problem: we did not disclose this information to the public, as well as the size and nature of the loan[.]

**Answer:** Defendants admit that it has been publicly reported that 125 million of the 500 million SOL initially minted were allocated to Solana Labs' team and the Solana Foundation. This Paragraph purports to quote from a blog post purportedly authored by Mr. Yakovenko, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the final sentence of this Paragraph and deny them on this basis.

740. In the same blog post, Yakovenko announced a plan to remove over 11.3 million SOL from the market. According to Yakovenko, the Solana Foundation would "aim to burn" those tokens, or eliminate them permanently from the circulating supply.

**Answer:** This Paragraph purports to quote from a blog post purportedly authored by Mr. Yakovenko, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and

any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and deny them on this basis.

741.    The Solana Entities "control[] the creation and issuance of" SOL.[86] There is no predetermined maximum number of SOL tokens that may be issued.

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

742.    By listing SOL on multiple exchange platforms, contracting a market maker to ensure liquidity, removing millions of SOL from the market to be burned, and controlling the creation and issuance of SOL, the Solana Entities have taken steps to "support[] a market for, [and] the price of," SOL.[87] As the SEC recognizes, such actions support the conclusion that investors in SOL reasonably expect to earn profits in reliance on the efforts of others.

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

---

[86]    *Id.*

[87]    *Id.*

743.    Both Solana Entities continue to hold significant amounts of SOL.   The Solana Entities' holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in SOL have a reasonable expectation of profit. [88]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

744.    Solana Labs has transferred to the Solana Foundation certain intellectual property related to the Solana blockchain protocol.  This fact further suggests that investors in SOL have a reasonable expectation of profit derived from the efforts of the Solana Entities. [89]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

745.    Based on the facts alleged above, among others, SOL qualifies as an investment contract and thus a security.

**Answer:**    Denied.

746.    In contrast to the robust disclosures required under federal and state securities laws, the Solana Entities provide investors with minimal disclosures.  For each month from June 2020 through December 2020, the Solana Foundation issued a Transparency Report "to shed light on the previous month's token activity, expected token activity for the current month, and other

---

[88]   *Id.*

[89]   *Id.*

updates in relation to the SOL token." Each of these reports was less than ten pages long and provided only high-level updates. Transparency Reports have not been published since December 2020.

**Answer:**      Defendants deny that SOL is a security. This Paragraph purports to quote from a Solana Foundation Transparency Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. To the extent this Paragraph purports to compare the Solana Foundation Transparency Report to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these allegations in this Paragraph. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

747.    The Solana Entities publish occasional blog posts, but these posts do not provide the disclosures required for securities issuers. They "also provide more frequent updates via Blockfolio Signal," but "only holders of $SOL can receive these special updates," according to Solana Labs. Thus, the least informed market participants are those considering whether to make an initial investment in SOL.

**Answer:**      This Paragraph purports to quote from Solana blog posts, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

748.    The Solana Entities have sought to conceal SOL's status as a security through misleading public communications that emphasize the purportedly "decentralized" nature of the Solana blockchain platform, thus diverting attention from the essential managerial efforts of the Solana Entities.  The official Solana website states on the home page that "Solana is a decentralized blockchain built to enable scalable, user-friendly apps for the world."  Any information on the official Solana website about the managerial efforts of the Solana Entities is incomplete, vague, and difficult to locate.  Similarly, the Solana Foundation's website prominently states its purported commitment to "decentralization" while providing almost no information about its day-to-day work, including its efforts to support a trading market for SOL.  Moreover, the official Solana website encourages readers to think of SOL as a direct competitor and counterpart to Bitcoin and Ethereum, which are widely known as commodities.  After reviewing these websites and other publications of the Solana Entities, a reasonable layperson would likely have the impression that SOL is not a security.

**Answer:**    Defendants deny that SOL is a security.  This Paragraph purports to characterize and quote from the official Solana website and the Solana Foundation website, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

749.    The Coinbase Exchanges provide users with a hyperlink to the official Solana website.  Coinbase thus participates in the attempt to conceal SOL's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

750.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in SOL on and with Coinbase.  Certain members of the class currently own SOL tokens that have depreciated since those tokens were

purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Oberlander, bought SOL tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**     Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in SOL on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 68.    STORJ

751.    Storj ("STORJ") is a token created by Storj Labs, Inc. The first *bona fide* public offering of STORJ occurred on or about May 24, 2017.

**Answer:**     Defendants admit that STORJ is a token on the Ethereum blockchain that is used in conjunction with the Storj platform and that STORJ launched on or about May 24, 2017. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

752.    Investors in STORJ reasonably expected to receive profits from their investment in STORJ. They expected these profits to derive from the efforts of Storj Labs, Inc. STORJ was marketed as deriving value from its ability to power the Storj network, an open-source cloud storage program. The value of STORJ thus depended on the managerial effort of the issuer to create and maintain this cloud storage program.

**Answer:**     This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

753.    There are few, if any, goods or services that can be directly purchased using STORJ. To the extent that STORJ can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of STORJ. The price of STORJ has not correlated with the ability of digital storage, illustrating its lack of use

for its nominal utility.  Accordingly, all or nearly all STORJ traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

754.    Based on the foregoing facts, among others, STORJ qualifies as an investment contract and therefore a security.  However, STORJ has never been registered as a security.

**Answer:**        Defendants deny that STORJ is a security and otherwise deny the remaining allegations in this Paragraph.

755.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in STORJ on and with Coinbase.  Certain members of the class currently own STORJ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought STORJ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in STORJ.

**Answer:**        Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in STORJ on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 69.    SUSHI

756.    SushiSwap ("SUSHI") is a token created by Sushi.  The first *bona fide* public offering of SushiSwap occurred on or about August 27, 2020.

**Answer:**        Defendants admit SUSHI is a token on the Ethereum blockchain that is used in conjunction with the SushiSwap platform and that SUSHI was launched in approximately September 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

757.    Investors in SUSHI reasonably expected to receive profits from their investment in SUSHI.  They expected these profits to derive from the efforts of Sushi.  SUSHI was marketed as deriving value from its ability to be used on the SushiSwap, a decentralized exchange which leveraged smart contracts in order to provide liquidity pools that allow users to directly trade crypto assets with no intermediary.  Holders of SUSHI were thus depending on the managerial effort of the issuer, because the SUSHI token only has value if the issuer created and maintained the decentralized exchange linked to SUSHI.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

758.    There are few, if any, goods or services that can be directly purchased using SushiSwap.  To the extent that SushiSwap can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of SushiSwap.  Accordingly, all or nearly all SushiSwap traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless,

Defendants deny the allegations in this Paragraph.

759.    Based on the foregoing facts, among others, SushiSwap qualifies as an investment contract and therefore a security.  However, SushiSwap has never been registered as a security.

**Answer:**    Defendants deny that SushiSwap is a security and otherwise deny the

remaining allegations in this Paragraph.

760.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in SUSHI on and with Coinbase.  Certain members of the class currently own SUSHI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought SUSHI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in SUSHI.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the

putative proposed class transacted in SUSHI on the Trading Platforms during the putative Class

Period and that they paid fees on those transactions pursuant to the User Agreement, to which

Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations,

including that Plaintiffs are entitled to any damages.

### 70.    TRB

761.    Tellor ("TRB") is a token created by Tellor. The first *bona fide* public offering of TRB occurred on or about November 18, 2019.

**Answer:**    Defendants admit that TRB is a token on the Ethereum blockchain that is

used in conjunction with the Tellor platform and that TRB was launched on approximately

November 18, 2019. As the remaining allegations in this Paragraph reflect no allegations specific

to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in this Paragraph and therefore deny them on this basis.

762.    Investors in TRB reasonably expected to receive profits from their investment in TRB. They expected these profits to derive from the efforts of ISSUER [sic]. TRB was marketed as deriving value from its use in the governance of the Tellor network, a decentralized oracle network that allows smart contracts on Ethereum to securely connect to external data sources. This governance right, which resembles the voting rights of many traditional securities, means that TRB purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the oracle network.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

763.    There are few, if any, goods or services that can be directly purchased using TRB. To the extent that TRB can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of TRB. Accordingly, all or nearly all TRB traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

764.    Based on the foregoing facts, among others, TRB qualifies as an investment contract and therefore a security.  However, TRB has never been registered as a security.

**Answer:**    Defendants deny that TRB is a security and otherwise deny the remaining allegations in this Paragraph.

765.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in TRB on and with Coinbase.  Certain members of the class currently own TRB tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought TRB tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Oberlander, have paid fees to Coinbase as part of their transactions in TRB.

**Answer:**    Defendants admit that Lead Plaintiff Oberlander and members of the putative proposed class transacted in TRB on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 71.    TRIBE

766.    Tribe ("TRIBE") is a token created by Fei Labs. The first *bona fide* public offering of TRIBE occurred on or about April 2, 2021.

**Answer:**    Defendants admit that TRIBE is a token on the Ethereum blockchain that is used in conjunction with the Fei platform and that TRIBE was launched in approximately March 2021.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

767.    Investors in TRIBE reasonably expected to receive profits from their investment in TRIBE.  They expected these profits to derive from the efforts of Fei Labs. TRIBE was marketed as deriving value from its ability to govern Fei Protocol, a liquid market for a decentralized stablecoin called FEI. This governance right, which resembles the voting rights of many traditional

securities, means that TRIBE purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting the Fei Protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

768.    There are few, if any, goods or services that can be directly purchased using TRIBE. To the extent that TRIBE can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of TRIBE. Accordingly, all or nearly all TRIBE traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

769.    Based on the foregoing facts, among others, TRIBE qualifies as an investment contract and therefore a security. However, TRIBE has never been registered as a security.

**Answer:**    Defendants deny that TRIBE is a security and otherwise deny the remaining allegations in this Paragraph.

770.    During the Class Period, numerous members of the Class, including Plaintiff Rodriguez, have had one or more losing transactions in TRIBE on and with Coinbase. Certain members of the class currently own TRIBE tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiff Rodriguez, bought TRIBE tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiff Rodriguez, have paid fees to Coinbase as part of their transactions in TRIBE.

**Answer:**    Defendants admit that Lead Plaintiff Rodriguez and members of the putative proposed class transacted in TRIBE on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

**72.    UMA**

771.    UMA token ("UMA") is a token created by UMA.  The first *bona fide* public offering of UMA occurred on or about April 29, 2020.

**Answer:**    Defendants admit that UMA is a token on the Ethereum blockchain that is used in conjunction with the UMA platform and that UMA was launched on approximately April 29, 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

772.    Investors in UMA reasonably expected to receive profits from their investment in UMA.  They expected these profits to derive from the efforts of UMA.  UMA was marketed as deriving value from its ability to vote regarding the governance of the UMA protocol, which allows users to build decentralized financial products.  The value of UMA's governance right, which resembles the voting rights of a traditional security, depended on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained an open-source protocol to create universal market access.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

773.    There are few, if any, goods or services that can be directly purchased using UMA. To the extent that UMA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of UMA. Accordingly, all or nearly all UMA traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

774.    Based on the foregoing facts, among others, UMA qualifies as an investment contract and therefore a security.  However, UMA has never been registered as a security.

**Answer:**    Defendants deny that UMA is a security and otherwise deny the remaining allegations in this Paragraph.

775.    During the Class Period, numerous members of the Class, including Plaintiff Oberlander, have had one or more losing transactions in UMA on and with Coinbase.  Certain members of the class currently own UMA tokens that have depreciated since those tokens were

281

purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiff Oberlander, bought UMA tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiffs Underwood and Oberlander, have paid fees to Coinbase as part of their transactions in UMA.

**Answer:**        Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in UMA on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 73.    UNI

776.    Uniswap ("UNI") is a token created, developed, issued, and distributed by Uniswap Labs.

**Answer:**        Defendants admit that UNI is a token on the Ethereum blockchain that is used in conjunction with the Uniswap platform.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

777.    Coinbase describes UNI as follows:

Uniswap (UNI) is an Ethereum token that powers Uniswap, an automated liquidity provider that's designed to make it easy to exchange Ethereum (ERC-20) tokens. There is no orderbook or central facilitator on Uniswap.  Instead, tokens are exchanged through liquidity pools that are defined by smart contracts.

**Answer:**        This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

778.    UNI was first *bona fide* offered to the public in the United States in or about September 2020.

**Answer:**    Defendants admit that UNI was launched in approximately September 2020.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

779.    UNI became available for trading on the Coinbase Exchanges on or about September 17, 2020.  Since then, UNI has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that UNI became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms in approximately September 17, 2020, but otherwise deny the remaining allegations in this Paragraph.

780.    After UNI was listed on the Coinbase Platform, its price rose by approximately 3988.2 percent and peaked at $44.97 on May 3, 2021.  Since its peak, the price of UNI has persistently declined.





**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of UNI reached a high on or around May 3, 2021, at approximately $44.97, but otherwise deny the remaining allegations in this Paragraph.

781.    As of 10:00 a.m. Eastern time on March 10, 2022, UNI was trading at $8.70—a decline of 80.6 percent from its May 3, 2021 peak.

**Answer:**        Defendants admit that the price of UNI was approximately $8.70 on or around March 10, 2022, and that there was an approximate 80.6% decline in price from its May 2021 high, but otherwise deny any remaining allegations in this Paragraph.

782.    During the Class Period, members of the Class, including Plaintiffs Underwood and Oberlander, invested in UNI tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for UNI tokens and paid Coinbase a fee for executing the transaction.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in UNI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

783. Purchasers of UNI on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each UNI token is fungible with all others, and the fortunes of all UNI investors are "linked to each other [and] to the success of [Uniswap Labs's] efforts."[90]

**Answer:** Defendants admit that Users bought UNI on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

784. UNI investors reasonably expected to earn profits through the appreciation in value of their UNI tokens. They expected such profits to result predominantly, if not solely, from the efforts of Uniswap Labs.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

785. Uniswap Labs describes itself as the developer of (1) the Uniswap Protocol, which is a "suite of persistent, non-upgradable smart contracts that together create an automated market maker, a protocol that facilitates peer-to-peer market making and swapping of ERC-20 tokens on the Ethereum blockchain," and (2) the Uniswap Interface, which is a "web interface that allows for easy interaction with the Uniswap protocol." Uniswap Labs has numerous full-time employees, including engineers, and has recently advertised that it is seeking to hire for multiple positions.

---

[90] *Id.*

**Answer:** This Paragraph purports to characterize statements from Uniswap Labs, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

786. Uniswap Labs describes UNI as "the Uniswap Protocol token" whose purpose is to "officially enshrine[] Uniswap as publicly-owned and self-sustainable infrastructure while continuing to carefully protect its indestructible and autonomous qualities." Ownership of UNI allows investors to participate in certain Uniswap governance decisions.

**Answer:** Defendants admit that UNI is the governance token of the Uniswap network. This Paragraph purports to characterize statements from Uniswap Labs, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

787. Uniswap Labs performs, and is expected to perform, "essential tasks [and] responsibilities" regarding UNI, the Uniswap Protocol, and the Uniswap Interface.[91] For example, Uniswap Labs developed Uniswap v3, which it launched in May 2021 and promoted as "the most powerful version of the protocol yet." Uniswap Labs also engages with users of its technology and works on "product developments that improve the overall user experience," including new features for the Uniswap app. UNI investors thus rely on Uniswap Labs for "the development,

---

[91]    *Id.*

improvement (or enhancement), operation, [and] promotion of the network" in which UNI operates.[92]

**Answer:**    Defendants admit that Uniswap v3 was launched on the Ethereum network on May 5, 2021.  This Paragraph purports to quote and characterize the Framework Report and statements from Uniswap Labs, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

788.    Uniswap Labs uses UNI to finance its efforts to develop and promote the Uniswap Protocol and the Uniswap Interface.  Of the one billion UNI initially minted, 21.266 percent were allocated to Uniswap "team members" and 18.044 percent were allocated to Uniswap "investors." Uniswap Labs benefits financially from appreciation of these UNI tokens, allowing it to invest further in research and development.  Uniswap Labs's holding of "the same class of digital assets as those being distributed to the public" supports the inference that investors in UNI have a reasonable expectation of profit.[93]

**Answer:**    This Paragraph purports to quote from and characterize the Framework Report and unidentified sources, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

789.    Similarly, Uniswap Labs uses proceeds from sales of UNI to finance its business operations.  For example, the Decentralized Finance Education Fund—a lobbying entity established and substantially controlled by Uniswap Labs—raised approximately $10 million in July 2021 by selling UNI tokens that had been allocated to it.

---

[92]    *Id.*

[93]    *Id.*

**Answer:**    The allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

790.    Buyers of UNI are motivated primarily by the belief that Uniswap Labs will succeed in its business efforts, leading to growth in the value of UNI.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

791.    Apart from its speculative value as an investment, UNI offers little utility to buyers. The primary utility of UNI is that it allows holders to participate in certain Uniswap governance decisions—much as traditional equity securities often confer voting rights on their owners. Generally, however, only high-volume purchasers of UNI have the practical ability to influence governance decisions or interest in doing so.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

792.    There are few, if any, goods or services that investors can directly purchase using UNI. To the extent that UNI can be directly exchanged for goods or services, there is little or no apparent correlation between the price of UNI and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in UNI are motivated by the expectation of profits.[94] Demand for UNI is instead driven by speculation about the future growth in popularity of Uniswap Labs's technology.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

793.    Many, if not all, UNI investors hold amounts of UNI with dollar-equivalent value that far exceeds the value of any goods or services the investors expect to purchase with UNI.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

794.    UNI is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for UNI] or those who have a need

---

[94]    *Id.*

for the functionality of the network," further demonstrating that UNI investors are motivated by the expectation of profits.[95]

      **Answer:**      This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

      795.    Uniswap Labs has promoted widespread trading of UNI—including among investors with no personal need for the functionality of the Uniswap network and no expectation of directly purchasing goods or services with UNI—by working to make UNI available for retail trading on exchange platforms including the Coinbase Exchanges. Uniswap Labs succeeded in having UNI listed on the Coinbase Exchanges almost immediately after UNI was launched.

      **Answer:**      This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

      796.    In addition to facilitating listings of UNI on exchange platforms, Uniswap Labs has taken other steps to "support[] a market for, [and] the price of," UNI.[96] For example, Uniswap Labs continues to "control[] the creation and issuance of the digital asset"[97] and plans to issue more UNI tokens on a predetermined schedule, causing gradual and predictable inflation on which investors can rely.

      **Answer:**      This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[95]   *Id.*

[96]   *Id.*

[97]   *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

797.    Uniswap Labs owns "all intellectual property and other rights in the [Uniswap] Interface and its contents" and sets the terms on which this intellectual property is licensed, according to its Terms of Service. This fact further supports the conclusion that investors in UNI have a reasonable expectation of profits derived from the efforts of Uniswap Labs.[98]

**Answer:**    This Paragraph purports to characterize unidentified sources and the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

798.    Based on the facts alleged above, among others, UNI qualifies as an investment contract and thus a security.

**Answer:**    Denied.

799.    In contrast to the robust disclosures required under federal and state securities laws, Uniswap Labs provides investors with minimal disclosures. Uniswap Labs communicates with users and investors primarily through occasional blog entries and social media posts, which do not provide the information required of a securities issuer.

**Answer:**    Defendants deny that UNI is a security. This Paragraph purports to characterize statements from Uniswap Labs, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. To the extent this Paragraph purports to compare these statements to the requirements of a registration statement filed with the SEC under the federal securities laws, this

---

[98]    *Id.*

Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

800.    Uniswap Labs has sought to conceal UNI's status as a security through misleading public communications that create the false impression that Uniswap Labs does not contribute significant managerial efforts to Uniswap.  For example, in a September 2020 blog post announcing the launch of UNI, Uniswap Labs claimed that "Uniswap's success to date" had been "achieved without involvement of the core development team since deployment."  In reality, however, the "core development team" at Uniswap Labs has performed essential tasks throughout Uniswap's history, both before and after the launch of UNI.  After reviewing Uniswap Labs's public communications, a reasonable layperson would likely have the impression that UNI is not a security.

**Answer:**    Defendants deny that UNI is a security.  This Paragraph purports to characterize and quote from a September 2020 blog post and other public communications from Uniswap Labs, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

801.    The Coinbase Exchanges provide users with a hyperlink to the official Uniswap Labs website.  Coinbase thus participates in the attempt to conceal UNI's status as a security.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

802.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in UNI on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own UNI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Underwood, bought UNI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Underwood and Oberlander and members of the putative proposed class transacted in UNI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## 74.    XLM

803.    Stellar Lumen ("XLM") is a token created, issued, and distributed by the Stellar Development Foundation ("SDF").

**Answer:**    Defendants admit that XLM is the native token of the Stellar network. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

804.    Coinbase describes XLM as follows: "Stellar's cryptocurrency, the Stellar Lumen (XLM), powers the Stellar payment network. Stellar aims to connect the world's financial system, enabling businesses and developers to take advantage of the network's fast speeds, low transaction costs, and interoperability."

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

805.    XLM was first *bona fide* offered to the public in or about July 2014.

**Answer:**        Defendants admit that XLM was launched in approximately July 2014. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

806.    XLM became available for trading on the Coinbase Pro Platform on or about March 13, 2019.  XLM became available for trading on the Coinbase Platform on or about March 18, 2019.  Since become available on the Coinbase Platform, XLM has continuously been traded on the Coinbase Exchanges.

**Answer:**        Defendants admit that XLM became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro platform in approximately March 2019 and on the Coinbase Trading Platform in approximately March 2019, but otherwise deny the remaining allegations in this Paragraph.

807.    After XLM was listed on the Coinbase Platform, its price rose by approximately 627.4 percent and peaked at $0.80 on May 16, 2021.  Since its peak, the price of XLM has persistently declined.

 



**Answer:**     This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.   Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants admit that the price of XLM reached a high on or around May 16, 2021, at approximately $0.80, but otherwise deny the remaining allegations in this Paragraph.

808.     As of 10:00 a.m. Eastern time on March 10, 2022, XLM was trading at $0.18—a decline of 77.8 percent from its May 16, 2021 peak.

**Answer:**     Defendants admit that the price of XLM was approximately $0.18 on or around March 10, 2022, and admit there was an approximate 77.8% decline in price from its May 2021 high, but otherwise deny any remaining allegations in this Paragraph.

809.     During the Class Period, members of the Class, including Plaintiffs Rodriguez, Underwood, and Oberlander, invested in XLM tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for XLM tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiffs Rodriguez, Oberlander and Underwood and members of the putative proposed class transacted in XLM on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

810.    Purchasers of XLM on the Coinbase Exchanges understood that they were investing money in a common enterprise.  Each XLM token is fungible with all others, and the fortunes of all XLM investors are "linked to each other [and] to the success of [the] efforts" of XLM's developers, promoters, and distributors.[99]

**Answer:**     Defendants admit that Users bought XLM on the Trading Platforms.  This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for the complete and accurate contents.   Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   Defendants otherwise deny the remaining allegations in this Paragraph.

811.    XLM investors reasonably expected to earn profits through the appreciation in value of their XLM tokens.  They expected such profits to result predominantly, if not solely, from the efforts of SDF and its affiliate Interstellar (together the "Stellar Entities").

**Answer:**     This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

812.    XLM is the native token of the Stellar network, which aims to "make[] it possible to create, send and trade digital representations of all forms of money," including traditional currencies and cryptocurrencies, according to the Stellar website.  XLM is used to pay transaction fees within the Stellar network.

---

[99]    *Id.*

**Answer:**    Defendants admit that XLM is the native digital currency of the Stellar network and that XLM can be used to pay transaction fees within that network.  This Paragraph purports to characterize the Stellar website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

813.    The Stellar network was co-founded by Jed McCaleb.  McCaleb previously co-founded Ripple Labs, which created the Token XRP and is currently the subject of an SEC enforcement action alleging that XRP is an unregistered security.  The Stellar network competes directly with the network developed and promoted by Ripple Labs.

**Answer:**    Defendants admit that Jed McCaleb was among the co-founders of Stellar and Ripple.  This Paragraph purports to characterize an SEC enforcement action, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants also respectfully refer the Court to Judge Torres's opinion in *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) for its conclusions as to the SEC enforcement action referenced in this Paragraph.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

814.    Both Stellar Entities are active participants in the enterprise in which XLM purchasers invested.

**Answer:** This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

815. SDF is a nonprofit corporation that "leads the development of" the Stellar network, according to its website. SDF "helps maintain Stellar's codebase, supports the technical and business communities around Stellar, and is a speaking partner to regulators and institutions." Investors in XLM thus rely on SDF to perform "essential tasks [and] responsibilities," including "the development, improvement (or enhancement), operation, [and] promotion of the network" in which XLM operates.[100]

**Answer:** This Paragraph purports to characterize unidentified sources, the SDF website, and the Framework Report, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

816. SDF states on its website that it "will sell its lumens using public exchanges like Kraken, Coinbase, and Bitstamp and through direct sales." SDF uses the proceeds of these token sales to "pay[] for employee salaries, as well as for things like rent, overhead, travel, and server costs."

**Answer:** This Paragraph purports to characterize the SDF website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

817. Interstellar is a for-profit company that, according to its website, "builds, consults, and integrates to deliver the business value of the Stellar blockchain." McCaleb serves on the boards of both SDF and Interstellar.

---

[100] *Id.*

**Answer:**        This Paragraph purports to characterize the Intersteller website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

818.    Apart from its speculative value as an investment, XLM offers little direct utility. Only active users of the Stellar network need XLM for its use as a utility token. The Stellar network's active users are primarily businesses such as financial institutions and payment-processing companies, not individual buyers of XLM.

**Answer:**        This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

819.    There are few, if any, goods or services that investors can directly purchase using XLM. To the extent that XLM can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XLM and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XLM are motivated by the expectation of profits.[101]

**Answer:**        This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

820.    Many XLM investors hold amounts of XLM with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XLM.

---

[101]    *Id.*

Even users who need some XLM to pay transaction fees on the Stellar network typically expect to use only a fraction of their XLM for that purpose.  SDF advertises that transaction fees on the Stellar network are "very small," and the minimum balance required to use the network is just one XLM (worth approximately $0.18).

**Answer:**     This Paragraph purports to characterize statements from SDF, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

821.     Despite its direct utility being largely or exclusively limited to a narrow class of users, XLM is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XLM] or those who have a need for the functionality of the network," further demonstrating that XLM investors are motivated by the expectation of profits.[102]

**Answer:**     This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

822.     SDF has promoted widespread trading of XLM—including among investors with no personal need for the functionality of the Stellar network and no expectation of directly purchasing goods or services with XLM—by working to make XLM available for retail trading on exchange platforms such as the Coinbase Exchanges.

---

[102]    *Id.*

**Answer:**        This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

823.    In addition to having XLM listed on exchange platforms, SDF has taken other steps to "support[] a market for, [and] the price of," XLM.[103]  For example, in November 2019, SDF "burned," or permanently removed from circulation, more than half of all XLM in existence.  This token burn was designed to, and did, cause an increase in the price of XLM.

**Answer:**        This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.   The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

824.    SDF continues to hold the majority of the total supply of XLM.  SDF is thus "able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public," which further suggests that there is a reasonable expectation of profit for holders of XLM.[104]

**Answer:**        This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  As the first sentence in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this Paragraph and therefore deny them on this basis.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

---

[103]    *Id.*

[104]    *Id.*

825.    Coinbase itself has admitted that XLM may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council has given XLM a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued, after XRP (4.00).  In explaining its rating of XLM, the Crypto Rating Council noted that SDF "plays an ongoing development role."

**Answer:**    Defendants deny that XLM is a security and that Coinbase, Inc. or Coinbase Global admitted that XLM may constitute a security.  Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities.  The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

826.    Based on the above facts, among others, XLM qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

827.    The Stellar Entities disclose far less information about XLM and the Stellar Entities' business than is required under federal and state securities laws.  The Stellar Entities communicate with investors primarily through their websites and social media posts, which do not contain the information required for a securities offering.

**Answer:**    Defendants deny that XLM is a security.  This Paragraph purports to characterize statements made by the Stellar Entities, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  To the extent this Paragraph purports to compare the statements made by the Stellar Entities to the requirements of a registration statement filed with the SEC under the

301

federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these allegations in this Paragraph. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

828.    The Stellar Entities know that XLM is a security. In August 2017, SDF posted a blog entry by an in-house attorney for Interstellar (then known as Lightyear.io), which explained that "Misconception #1" about the application of securities laws to crypto-assets was that a "utility token" cannot be a security.

> The fact that a utility exists is not determinative in determining whether the token is a security. If it were, we'd get an absurd result: any offering could escape securities law jurisdiction simply by building in a trivial utility to the token. Imagine a tokenized share of stock, except the token also enables you to redeem it for a cat GIF.

**Answer:**    Defendants deny that XLM is a security. This Paragraph purports to characterize a blog post by an in-house attorney for Interstellar from August 2017, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of this source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

829.    More recently, however, SDF has sought to conceal XLM's status as a security by exploiting the same "[m]isconception" it debunked in 2017. In a 2019 interview with Forbes, SDF CEO Denelle Dixon stated that while SDF was "not concerned" about the regulatory implications of SDF's management of XLM: "We don't actually focus on XLM for any other purpose other than to effectuate the network, and to bring good to the network and good to the world."

**Answer:**    Defendants deny that XLM is a security. This Paragraph purports to characterize and quote from a 2019 interview with Forbes from Denelle Dixon, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny

any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this

Paragraph.

830.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in XLM on and with Coinbase. Certain members of the class, including Plaintiffs Oberlander and Underwood, currently own XLM tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander, Rodriguez, and Underwood, bought XLM tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and

Underwood and members of the putative proposed class transacted in XLM on the Trading

Platforms during the putative Class Period and that they paid fees on those transactions pursuant

to the User Agreement, to which Defendants respectfully refer the Court for the complete and

accurate contents. Defendants admit that certain of these transactions may have resulted in a loss

but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 75.    XRP

831.    Ripple ("XRP") is a token created, issued, and distributed by Ripple Labs Inc. ("Ripple"). Coinbase describes XRP as follows: "XRP is the cryptocurrency used by the Ripple payment network. Built for enterprise use, XRP aims to be a fast, cost-efficient cryptocurrency for cross-border payments."

**Answer:**    Defendants admit that XRP is the native token of the XRP blockchain. This

Paragraph purports to characterize the Coinbase.com, to which Defendants respectfully refer the

Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or

characterization of that source and any factual inferences or legal conclusions made by Plaintiffs

based on it. As the remaining allegations in this Paragraph reflect no allegations specific to

Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

832.    XRP was first *bona fide* offered to investors in 2013. It became available for trading on the Coinbase Exchanges on or about February 28, 2019.

**Answer:**    Defendants admit that XRP first became available for buying and selling among and between Users pursuant to the User Agreement on the Trading Platforms on approximately February 28, 2019, but aver that XRP has not been continuously available for buying and selling on the Trading Platforms and that is was not available on the date of the filing of the Amended Complaint.    Defendants otherwise deny the remaining allegations in this Paragraph.

833.    On December 22, 2020, the SEC brought an enforcement action against Ripple and two of its senior executives alleging that XRP is a security, and that the distribution of XRP from 2013 up to December 22, 2020 constituted one large, ongoing unregistered securities offering. [105] Coinbase suspended trading of XRP on January 19, 2021.    Trading of XRP on the Coinbase Exchanges currently remains suspended.    Between February 28, 2019, and December 22, 2020, the price of XRP fluctuated between approximately $0.15 and approximately $0.68.

---

[105]    *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220311134606/https://www.sec.gov/news/press-release/2020-338.



**Answer:**        Defendants admit that XRP was suspended on the Trading Platforms as of approximately January 19, 2021, but aver that as of July 2023, it has been relisted for transactions on the Coinbase Trading Platform.  This Paragraph purports to characterize an SEC enforcement action and a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants also respectfully refer the Court to Judge Torres's opinion in *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) for its conclusions as to the SEC enforcement action referenced in this Paragraph.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

834.     During the Class Period, members of the Class, including Plaintiffs Oberlander and Underwood, invested in XRP tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for XRP tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in XRP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

835.     Purchasers of XRP on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each XRP token is fungible with all others, and the fortunes of all XRP investors are "linked to each other [and] to the success of [Ripple's] efforts."[106]

**Answer:**     Defendants admit that Users bought XRP on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. Defendants otherwise deny the remaining allegations in this Paragraph.

836.     XRP investors reasonably expected to earn profits through the appreciation in value of their XRP tokens. They expected such profits to result predominantly, if not solely, from the efforts of Ripple, the creator, developer, and issuer of XRP. XRP investors rely completely on Ripple for "the development, improvement (or enhancement), operation, [and] promotion of the network" in which XRP operates.[107]

**Answer:**     This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[106]   Howey Framework Report.

[107]   *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

837.    Ripple has consistently sought to persuade investors that by purchasing XRP, they can expect to receive profits derived from the efforts of Ripple's employees. Ripple's core message to XRP investors is simple and can be broken down into two ideas. *First*, Ripple will invest its time, energy, and other resources in developing its XRP-compatible payment technology and encouraging widespread adoption of that technology by clients, particularly banks and payment providers that deal with cross-border payments. *Second*, as more clients adopt Ripple's payment technology (and potentially other use cases for XRP, which are in earlier stages of development), demand for XRP will grow, causing XRP's value to increase.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

838.    In a September 2017 post on the social networking website Reddit, David Schwartz—then Ripple's Chief Cryptographer, now its Chief Technology Officer—summarized Ripple's plan to increase the value of XRP, thus generating profit for XRP investors derived from Ripple's efforts:

> Ripple is building open payment systems with technologies like interledger. . . . The more Ripple's payment technology is adopted, the more payments there will be that have no technical obstacle to being settled with XRP. . . . It is clearly in our economic interest to do things that will increase the value of XRP over the long term. We've explained clearly why we believe that our payment network will create a tremendous need for a new intermediary asset, why that asset is likely to be a digital asset, why XRP is well-positioned to be that asset, how Ripple will work to get XRP adopted for this purpose, and why that would be expected to create demand for XRP.

**Answer:**    This Paragraph purports to characterize a September 2017 post on Reddit from David Schwartz, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

839. In another 2017 Reddit post, Schwartz responded to another poster's question about "what could cause [XRP] to severely drop in price in the coming months/years." Schwartz identified the "biggest risks" to the value of XRP and reassured XRP owners that each of these risks was "mitigated" or unlikely to occur, thus encouraging the belief that XRP was an investment carrying a reasonable expectation of profit. Schwartz also made clear that XRP's future performance was intimately tied to the efforts of Ripple, such that potential setbacks to Ripple were among the "biggest risks" to XRP investors. For example, if "[s]omeone else does almost exactly the same thing Ripple does, but does it better," or if "[s]ome horrible personal or business scandal" makes Ripple "toxic" to financial institutions, the price of XRP could crash.



**Answer:** This Paragraph purports to characterize a 2017 post on Reddit from David Schwartz, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

840. More recently—including during the period when XRP traded on the Coinbase Exchanges—Ripple has continued to promote the narrative that its efforts will lead to future growth in the utility of and demand for XRP, thus supporting a reasonable expectation of profit for XRP investors. For example, in response to a question about the "investment case" for XRP during a February 2020 interview with CNN, Ripple CEO Brad Garlinghouse stated that "[o]ver

the coming years . . . we, Ripple, are focused on driving utility from this asset, and if we're successful at that we think that's good for the liquidity of the whole ecosystem." Garlinghouse noted that Ripple was focused on pursuing "commercial banks" and "payment providers" as its target customers.

**Answer:**     This Paragraph purports to characterize a February 2020 interview with CNN and Brad Garlinghouse, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

841.     Even though Ripple has represented XRP as having actual or potential real-world utility for settling financial transactions, XRP currently has little or no direct utility for users outside a narrow class of enterprise customers, consisting primarily of certain financial institutions and payment providers. There are few, if any, goods or services that investors can directly purchase using XRP.

**Answer:**     This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

842.     To the extent that XRP can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XRP and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XRP are motivated by the expectation of profits.[108]

**Answer:**     This Paragraph purports to characterize the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

---

[108]     *Id.*

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

843.    Many XRP investors hold amounts of XRP with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XRP.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

844.    Despite its direct utility being largely or exclusively limited to a narrow class of users, XRP is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XRP] or those who have a need for the functionality of the network," further demonstrating that XRP investors are motivated by the expectation of profits.[109]  Offering XRP broadly is central to Ripple's publicly stated plan to "increase[e] XRP liquidity" and thus make XRP more attractive for use by enterprise customers.

**Answer:**    This Paragraph purports to characterize the Framework Report and public statements from Ripple, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

845.    Ripple has promoted widespread trading of XRP—including among investors with no personal need for the functionality of XRP's network and no expectation of directly purchasing goods or services with XRP—by working to make XRP available for retail trading on exchange platforms such as the Coinbase Exchanges.  For example, in 2018, Ripple offered to lend Coinbase over $100 million worth of XRP in exchange for the listing of XRP on the Coinbase Exchanges. Ripple also offered another exchange platform provider, Gemini, a $1 million cash payment for listing XRP. On information and belief, Ripple ultimately did pay Coinbase and other exchange platform providers some form of consideration to list XRP.

**Answer:**    With respect to the alleged 2018 offer from Ripple to lend Coinbase over $100 million worth of XRP in exchange for the listing of XRP on the Coinbase Exchanges,

---

[109]    *Id.*

Defendants lack knowledge or information sufficient to form a belief as to the truth of this allegation and therefore deny it on this basis and aver that Defendants do not accept payment or other consideration for the listing of any token. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

846.    In addition to having XRP listed on exchange platforms, Ripple has taken other steps to "support[] a market for, [and] the price of," XRP.[110] For example, Ripple has stated that in December 2017, it placed "the lion's share of XRP"—55 billion tokens—in an escrow account that automatically releases 1 billion XRP to Ripple per month. Ripple stated that it took this step to "create certainty of XRP supply at any given time" and to give the market assurance that Ripple will not suddenly "flood the market" with XRP. Ripple's decision to place 55 billion XRP in escrow was designed to, and did, cause an increase in the price of XRP.

**Answer:**    This Paragraph purports to characterize the Framework Report and statements from Ripple, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

847.    In a further effort to prop up the price of XRP, Ripple has purchased XRP in the secondary market.

**Answer:**    As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

848.    Ripple itself remains the largest holder of XRP. As of January 2, 2022, more than half of the total supply of XRP was either held by Ripple directly or secured in its escrow account. Ripple is thus "able to benefit from its efforts as a result of holding the same class of digital assets

---

[110]    *Id.*

as those being distributed to the public," which further suggests that there is a reasonable expectation of profit for holders of XRP.[111]



**Answer:**    This Paragraph purports to characterize the Framework Report and an unidentified 2022 screenshot, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

849.    Ripple has gradually sold portions of its XRP holdings, knowing and intending that many of the tokens it sold would be traded on platforms including the Coinbase Exchanges.  Ripple receives the proceeds from its sales of XRP and controls how those proceeds are spent.  Investors understand that by buying XRP—whether directly from Ripple or from other investors—they are helping to finance Ripple's efforts to advance its business plan and thus increase the value of XRP.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

---

[111]    *Id.*

850.    Coinbase itself has admitted that XRP may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council, has given XRP a rating of 4 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is the highest rating the Crypto Rating Council has ever issued.  In explaining its rating of XRP, the Crypto Rating Council noted that "Ripple Labs is involved in the ongoing development of applications for XRP" and that "Tokens were reportedly sold privately to venture and crypto-affiliated investors."

**Answer:**    Defendants deny that XRP is a security and that Coinbase, Inc. or Coinbase Global admitted that XRP may constitute a security.  Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities.  The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

851.    Based on the above facts, among others, XRP qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

852.    Ripple discloses far less information about XRP and Ripple's business than is required under federal and state securities laws.  Ripple releases an "XRP Markets Report" on a quarterly basis, but these reports are brief and lack most of the details securities issuers are required to disclose.

**Answer:**    This Paragraph purports to characterize XRP Market Reports, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  To the extent this Paragraph purports to compare XRP Market Reports to the requirements of a registration statement filed with the SEC

under the federal securities laws, this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny these allegations in this Paragraph. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

853.    While successfully promoting the belief that XRP owners can expect to profit from Ripple's efforts, Ripple has actively concealed that XRP is a security. For example, in a December 2020 blog post responding to the SEC's enforcement action, Garlinghouse claimed that "XRP is not a security" and sought to persuade investors that there was not even a *risk* of XRP being deemed a security: "What I DON'T want is for you to worry. We will get through this, and we will prove our case in court."

**Answer:**    Defendants deny that XRP is a security. This Paragraph purports to characterize a 2020 blog post by Garlinghouse, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

854.    Coinbase provides users with a hyperlink to Ripple's official website, which contains blog posts, quarterly reports, and other communications that (1) promote XRP as an investment that carries a reasonable expectation of profits derived from Ripple's efforts and (2) deny that XRP is a security. On information and belief, Coinbase provided this hyperlink throughout the period when XRP was traded on the Coinbase Exchanges.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

855.    During the Class Period, numerous members of the Class, including Plaintiffs Rodriguez and Underwood, have had one or more losing transactions in XRP on and with Coinbase.  Certain members of the class currently own XRP tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought XRP tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Underwood and Rodriguez and members of the putative proposed class transacted in XRP on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 76.    XTZ

856.    Tezos ("XTZ") is a token created, issued, and distributed by the Tezos Foundation.

**Answer:**    Defendants admit that XTZ is the native token of the Tezos blockchain.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

857.    Coinbase describes XTZ as follows:

Tezos is a cryptocurrency and decentralized computing platform.  Its features include proof of stake consensus, formal verification (which lets developers verify the correctness of their code), and the ability to let stakeholders vote on changes to the protocol.  Tezos's block creation process is called "baking"—Tezos holders who stake their tokens can receive Tezos tokens as a reward for creating and verifying blocks.

**Answer:**    This Paragraph purports to characterize the Coinbase.com website, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

858.    XTZ was first *bona fide* offered to the public in or about July 2017.

**Answer:**    Defendants admit that XTZ was launched in approximately July 2017.    As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

859.    XTZ became available for trading on the Coinbase Pro Platform on or about August 5, 2019.    XTZ became available for trading on the Coinbase Platform on or about August 8, 2019.    Since becoming available on the Coinbase Platform, XTZ has continuously been traded on the Coinbase Exchanges.

**Answer:**    Defendants admit that XTZ became available for buying and selling among and between Users pursuant to the User Agreement on the Coinbase Pro Trading Platform on approximately August 5, 2019, and on the Coinbase Trading Platform on approximately August 8, 2019, but otherwise deny the remaining allegations in this Paragraph.

860.    After XTZ was listed on the Coinbase Platform, its price rose by approximately 580.0 percent and peaked at $9.18 on October 4, 2021.    Since its peak, the price of XTZ has persistently declined.



**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of XTZ reached a high on or around October 4, 2021, at approximately $9.18, but otherwise deny the remaining allegations in this Paragraph.

861.    As of 10:00 a.m. Eastern time on March 10, 2022, XTZ was trading at $3.00—a decline of 67.3 percent from its October 4, 2021 peak.

**Answer:**        Defendants admit that the price of XTZ was approximately $3.00 on or around March 10, 2022, and that there was an approximate 67.3% decline from the October 2021 high, but otherwise deny any remaining allegations in this Paragraph.

862.    During the Class Period, members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, invested in XTZ tokens on the Coinbase Exchanges by giving money

or digital assets to Coinbase in exchange for XTZ tokens and paid Coinbase a fee for executing the transaction.

**Answer:**      Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in XTZ on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

863.    Purchasers of XTZ on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each XTZ token is fungible with all others, and the fortunes of all XTZ investors are "linked to each other [and] to the success of [the] efforts" of the Tezos Foundation.[112]

**Answer:**      Defendants admit that Users bought XTZ on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

864.    XTZ investors reasonably expected to earn profits through the appreciation in value of their XTZ tokens. They expected such profits to result predominantly, if not solely, from the efforts of the Tezos Foundation.

**Answer:**      This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

865.    XTZ is the native token of Tezos, which the Tezos Foundation describes as "an open-source, self-upgradable, energy-efficient and built to last Proof of Stake blockchain protocol for assets and applications backed by a global community of validators, researchers, and builders." XTZ is used to pay fees for transactions on the Tezos blockchain. Holding at least 8,000 XTZ also allows users to participate in "baking," the process of validating transactions for addition to the Tezos blockchain.

---

[112]    *Id.*

**Answer:**    Defendants admit that Tezos operates on a process known as "baking," and that participants, or "bakers" stake 8,000 XTZ to get involved with the network's governance. This Paragraph purports to characterize a statement from the Tezos Foundation, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and therefore deny them on this basis.

866.    Tezos was initially developed by Arthur Breitman and Kathleen Breitman (together the "Breitmans"), the co-founders of Dynamic Ledger Solutions, Inc. ("DLS"), a for-profit company. Even before XTZ existed, DLS promoted the narrative that the token would be a profitable investment. For example, in February 2017, Arthur Breitman announced in a blog post that the investment firm Polychain Capital had "preorder[ed] Tezos tokens." Commenting on the rationale for the transaction, Mr. Breitman stated: "Cryptocurrencies comprise a $17B market. Bitcoin commands most of that market cap. But as new blockchain technologies emerge, many feel that the overall value of the market will grow astronomically." Similarly, Kathleen Breitman stated in an interview with *Bitcoin Magazine* about the Polychain Capital transaction: "We created a product that was purchased by VC investors without the traditional equity investment model because of the anticipated appreciation of our token."

**Answer:**    Defendants admit that Arthur Breitman and Kathleen Breitman participated in the founding of a startup called Dynamic Ledger Solutions, which developed the Tezos protocol. This Paragraph purports to characterize a 2017 blog post by Arthur Breitman and an interview with Kathleen Breitman in *Bitcoin Magazine*, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

319

867. In July 2017, DLS and the Tezos Foundation together conducted one of the largest ICOs to date, raising approximately $232 million worth of Bitcoin and Ethereum in exchange for future XTZ tokens, which the Tezos Foundation would issue. The Tezos Foundation used proceeds of the ICO to fund its operations, including efforts to maintain and develop Tezos' technology and to promote its adoption.

**Answer:** Defendants admit that a token sale for Tezos was held in July 2017, raising a total of 65,681 BTC and 361,122 ETH, which was worth $232 million at the time. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

868. Investors in the Tezos ICO relied on the Tezos Foundation and the Breitmans to contribute the managerial efforts needed to make Tezos operational and create value in XTZ tokens. In an October 2017 blog post, the Breitmans wrote that they planned to play active "roles going forward" and predicted that the Tezos Foundation would "increase . . . the pace of the remaining work to be done to bring the Tezos technology to the point where it is sufficiently secure and scalable to be launched."

**Answer:** This Paragraph purports to characterize a 2017 blog post by the Breitmans, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

869. The Tezos Foundation remains an active participant in the development and promotion of Tezos. It employs a "day-to-day team" of "nearly 20 staff members split between finance, IT and security, operations, and legal," according to its website.

**Answer:** This Paragraph purports to characterize the Tezos Foundation website, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph

reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

870.    The Tezos Foundation describes itself as "sustainably deploy[ing] the resources that are under control to support the long-term success of Tezos," including by making grants to developers of Tezos-based projects.

**Answer:**    This Paragraph purports to characterize a statement from the Tezos Foundation, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it and otherwise deny any remaining allegations in this Paragraph.

871.    The Tezos Foundation's role in developing and promoting Tezos is not limited to its grantmaking function. According to a September 2021 article in *Decrypt* based on interviews with the Breitmans, Arthur Breitman recently joined the board of the Tezos Foundation and has "taken on a more active role in shepherding" Tezos. Kathleen Breitman has recently engaged in public advocacy supporting Tezos; on information and belief, this work is coordinated with the Tezos Foundation. *Decrypt* reported that "[t]he Breitmans' renewed attention has been a welcome development for the project's beleaguered token holders."

**Answer:**    This Paragraph purports to characterize a September 2021 article in *Decrypt*, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

872.    Investors thus rely on the Tezos Foundation to perform "essential tasks [and] responsibilities," including "the development, improvement (or enhancement), operation, [and] promotion of the network" in which XTZ operates.[113]

---

[113]    *Id.*

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

873.    Apart from its speculative value as an investment, XTZ offers little direct utility. Although XTZ is used for certain functions on the Tezos blockchain, this utility is meaningful only to purchasers who are active users of that blockchain.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

874.    There are few, if any, goods or services that investors can directly purchase using XTZ. To the extent that XTZ can be directly exchanged for goods or services, there is little or no apparent correlation between the price of XTZ and the market price of those goods or services—a factor recognized by the SEC as evidence that investors in XTZ are motivated by the expectation of profits.[114]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

875.    Many XTZ investors hold amounts of XTZ with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with XTZ.

---

[114]    *Id.*

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

876.    XTZ investors' own words confirm that their investments are motivated by the expectation of profit.  For example, Kevin Zhou, a co-founder of the cryptocurrency trading fund Galois Capital, was quoted by *Reuters* as saying that he, like "a lot of people," purchased XTZ as "an investment" and was "looking for a return," and that that he did not "really care about" using Tezos.

**Answer:**    This Paragraph purports to characterize a statement made by Kevin Zhou, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

877.    XTZ is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for XTZ] or those who have a need for the functionality of the network," further demonstrating that XTZ investors are motivated by the expectation of profits.[115]  The Tezos Foundation has promoted widespread trading of XTZ— including among investors with no personal need for the functionality of the Stellar network and no expectation of directly purchasing goods or services with XTZ—by working to make XTZ available for retail trading on exchange platforms such as the Coinbase Exchanges.

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

---

[115]    *Id.*

878.    The Tezos Foundation remains, in its own words, "a large holder" of XTZ.  The Tezos Foundation is thus "able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public," which suggests that there is a reasonable expectation of profit for holders of XTZ.[116]

**Answer:**    This Paragraph purports to quote from the Framework Report and a statement from the Tezos Foundation, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  The remaining allegations in this Paragraph reflect no allegations specific to Defendants.  Nevertheless, Defendants deny the remaining allegations in this Paragraph.

879.    Coinbase itself has admitted that XTZ may well constitute a security.  Coinbase founded and participates in the Crypto Rating Council, which assesses the likelihood that a token is a security.  The Crypto Rating Council, has given XTZ a rating of 3.75 on a scale from 1 to 5, with 5 being the most "strongly consistent with treatment as a security."  This is tied for the second-highest rating the Crypto Rating Council has ever issued.  In explaining its rating of XTZ, the Crypto Rating Council noted XTZ's 2017 ICO and further noted that "[t]he Tezos Foundation plays an ongoing role in the development and adoption of Tezos."

**Answer:**    Defendants deny that XTZ is a security and that Coinbase, Inc. or Coinbase Global admitted that XTZ may constitute a security.  Defendants admit that a number of businesses, including Coinbase, are members of the Crypto Rating Council.  Defendants respectfully refer the Court to the Crypto Rating Council's website for a description of it and its activities.  The remaining allegations in this Paragraph purport to characterize statements made by the Crypto Rating Council, to which Defendants respectfully refer the Court for their complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  Defendants otherwise deny any remaining allegations in this Paragraph.

---

[116]    *Id.*

880.    Based on the above facts, among others, XTZ qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

881.    The Tezos Foundation discloses far less information about XTZ and Tezos than is required under federal and state securities laws.  The Tezos Foundation releases two reports per year, but these reports are brief and do not contain the information required for a securities offering. Moreover, the Tezos Foundation explicitly refuses to publish audited financial information, claiming that non-disclosure agreements prevent it from doing so.

**Answer:**    This Paragraph purports to characterize reports from the Tezos Foundation, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them.  To the extent this Paragraph purports to compare reports from the Tezos Foundation to the requirements of a registration statement filed with the SEC under the federal securities laws, this Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny these allegations in this Paragraph.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

882.    The Tezos Foundation has explicitly denied that XTZ is a security.[117]  The Tezos Foundation has also sought to persuade investors that XTZ is not a security through misleading communications that downplay its essential managerial efforts.  For example, the Tezos Foundation's website prominently states that it is only "one among many other entities in the Tezos ecosystem," while providing little information about its day-to-day work.

**Answer:**    Defendants deny that XTZ is a security.  This Paragraph purports to characterize Tezos Stiftung's Answer in *In re Tezos Sec. Litig.*, No. 3:17-cv-06779-RS, ECF

---

[117]    *See* Tezos Stiftung's Answer at 18, *In re Tezos Sec. Litig.*, No. 3:17-cv-06779-RS, ECF No. 169 (N.D. Cal. Sept. 14, 2018).

No. 169 (N.D. Cal. Sept. 14, 2018) and the Tezos Foundation website, to which Defendants respectfully refer the Court for their complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of those sources and any factual inferences or legal conclusions made by Plaintiffs based on them. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

883. During the Class Period, numerous members of the Class, including Plaintiffs Oberlander, Rodriguez, and Underwood, have had one or more losing transactions in XTZ on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own XTZ tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Rodriguez and Underwood, bought XTZ tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:** Defendants admit that Lead Plaintiffs Oberlander, Rodriguez, and Underwood and members of the putative proposed class transacted in XTZ on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 77.    XYO

884. XYO coin ("XYO") is a token created by XYO Network. The first *bona fide* public offering of XYO occurred on or about May 21, 2018.

**Answer:** Defendants admit that XYO is a token on the Ethereum blockchain that is used in conjunction with the XYO platform. As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

885.    Investors in XYO reasonably expected to receive profits from their investment in XYO.  They expected these profits to derive from the efforts of XYO Network.  XYO was marketed as deriving value from its ability to power the XYO Network, a decentralized network of devices that anonymously collect and validate geospatial data, and to be exchanged for tokens corresponding to this data.  The value of XYO thus depends on the managerial effort of the issuer, because that ability is only valuable if the issuer created and maintained the network of devices and created tokens for which XYO could in turn be exchanged.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

886.    There are few, if any, goods or services that can be directly purchased using XYO. To the extent that XYO can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of XYO. Accordingly, all or nearly all XYO traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

887.    Based on the foregoing facts, among others, XYO qualifies as an investment contract and therefore a security.  However, XYO has never been registered as a security.

**Answer:**    Defendants deny that XYO is a security and otherwise deny the remaining allegations in this Paragraph.

888.    During the Class Period, numerous members of the Class, including Plaintiff Underwood, have had one or more losing transactions in XYO on and with Coinbase.  Certain members of the class currently own XYO tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges.  Additionally, certain members of the Class, including Plaintiff Underwood, bought XYO tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.  Numerous members of the Class, including Plaintiff Underwood, have paid fees to Coinbase as part of their transactions in XYO.

**Answer:**    Defendants admit that Lead Plaintiff Underwood and members of the putative proposed class transacted in XYO on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants admit

that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 78.    YFI

889.    yearn.finance ("YFI") is a token created, issued, and distributed by Yearn Finance.

**Answer:**        Defendants admit that YFI is a token on the Ethereum blockchain that is used in conjunction with the Yearn.finance platform.   As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

890.    YFI was first *bona fide* offered to the public on or about December 30, 2020.

**Answer:**        Defendants admit that YFI was launched in approximately 2020.  As the allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on this basis.

891.    YFI became available for trading on the Coinbase Pro Platform on or about September 15, 2020.  YFI became available for trading on the Coinbase Platform on or about September 17, 2020.  Since becoming available on the Coinbase Platform, YFI has continuously been traded on the Coinbase Exchanges.

**Answer:**        Defendants admit that YFI became available for buying and selling on the Coinbase Pro Trading Platform among and between Users pursuant to the User Agreement on approximately September 15, 2020, and on the Coinbase Trading Platform on approximately September 17, 2020, but otherwise deny the remaining allegations in this Paragraph.

892.    After YFI was listed on the Coinbase Platform, its price rose by approximately 168.1 percent and peaked at $93,435.53 on May 12, 2021.  Since then, the price has declined substantially.



**Answer:**        This Paragraph purports to characterize a graph apparently taken from the Coinbase.com website at the time of the filing of the Amended Complaint, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it.  Defendants admit that the price of YFI reached a high on or around May 12, 2021, between approximately $90,000 and $95,000, but otherwise deny the remaining allegations in this Paragraph.

893.    As of 10:00 a.m. Eastern time on March 10, 2022, YFI was trading at $19,002.42—a decline of 79.7 percent from its May 12, 2021 peak.

**Answer:**        Defendants admit that the price of YFI was approximately $19,002.42 on or around March 10, 2022, and that there was an approximate 79.7% decline in price from the May 2021 high, but otherwise deny any remaining allegations in this Paragraph.

894.     During the Class Period, members of the Class, including Plaintiffs Oberlander and Rodriguez, invested in YFI tokens on the Coinbase Exchanges by giving money or digital assets to Coinbase in exchange for YFI tokens and paid Coinbase a fee for executing the transaction.

**Answer:**     Defendants admit that Lead Plaintiffs Oberlander and Rodriguez and members of the putative proposed class transacted in YFI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

895.     Purchasers of YFI on the Coinbase Exchanges understood that they were investing money in a common enterprise. Each YFI token is fungible with all others, and the fortunes of all YFI investors are "linked to each other [and] to the success of [the] efforts" of YFI's developers, promoters, and distributors.[118]

**Answer:**     Defendants admit that Users bought YFI on the Trading Platforms. This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents. Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or legal conclusions made by Plaintiffs based on it. Defendants otherwise deny the remaining allegations in this Paragraph.

896.     YFI investors reasonably expected to earn profits through the appreciation in value of their YFI tokens. They expected such profits to result predominantly, if not solely, from the efforts of Yearn Finance. The YFI token is tied to the yearn.finance protocol, which is designed to help with the optimization of yield farming of other crypto-assets. YFI thus only has any application if the yearn.finance protocol is developed, promoted, and maintained by Yearn Finance.

**Answer:**     This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

897.     YFI's supply is entirely centralized, in contrast with cryptocommodities like Bitcoin. Purchasers of YFI thus depend on Yearn Finance to keep supply controlled. Issuances of additional YFI are approved by six of the nine members of the Yearn multisig, which acts like

---

[118]   Howey Framework Report.

a board of directors for a traditional security.  On February 2, 2022, Yearn Finance issued an additional 6,666 YFI, representing a 20 percent increase in the amount available.

**Answer:**    Defendants admit that Bitcoin is a commodity.  To the extent this Paragraph purports to characterize YFI as a security and not a commodity, that is a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny that allegation, including that YFI is a security.  As the remaining allegations in this Paragraph reflect no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them on this basis.

898.    Additionally, like a traditional security, YFI provides voting rights that allow holders to participate in the governance of the yearn.finance protocol.  This right means that holders of YFI are participating in a common enterprise.  Moreover, the value of this voting right depends on the development and maintenance of the yearn.finance protocol.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph, including that YFI is a security.

899.    Many YFI investors hold amounts of YFI with dollar-equivalent value that far exceeds the value of any goods or services the investors could ever expect to purchase with YFI.

**Answer:**    This Paragraph reflects no allegations specific to Defendants.  Nevertheless, Defendants deny the allegations in this Paragraph.

900.    Despite its direct utility being largely or exclusively limited to a narrow class of users, YFI is "offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services [available in exchange for YFI] or those who have a need for the functionality of the network," further demonstrating that YFI investors are motivated by the expectation of profits.[119]

**Answer:**    This Paragraph purports to quote from the Framework Report, to which Defendants respectfully refer the Court for its complete and accurate contents.  Defendants deny any paraphrasing, summarizing, or characterization of that source and any factual inferences or

---

[119]    Id.

legal conclusions made by Plaintiffs based on it. The remaining allegations in this Paragraph reflect no allegations specific to Defendants. Nevertheless, Defendants deny the remaining allegations in this Paragraph.

901.    Yearn Finance has promoted widespread trading of YFI—including among investors with need for the functionality of its network—by working to make YFI available for retail trading on exchange platforms such as the Coinbase Exchanges.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless, Defendants deny the allegations in this Paragraph.

902.    Based on the above facts, among others, YFI qualifies as an investment contract and therefore a security.

**Answer:**    Denied.

903.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Rodriguez, have had one or more losing transactions in YFI on and with Coinbase. Certain members of the class, including Plaintiff Oberlander, currently own YFI tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the class, including Plaintiffs Oberlander and Rodriguez, bought YFI tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Rodriguez and members of the putative proposed class transacted in YFI on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

### 79.    ZRX

904.    0x ("ZRX") is a token created by 0x. The first *bona fide* public offering of ZRX occurred on or about August 15, 2017.

**Answer:**    Defendants admit that ZRX is a token on the Ethereum blockchain that is used in conjunction with the 0x platform. As the remaining allegations in this Paragraph reflect

no allegations specific to Defendants, Defendants lack knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in this Paragraph and therefore deny them on

this basis.

905.    Investors in ZRX reasonably expected to receive profits from their investment in ZRX. They expected these profits to derive from the efforts of 0x. ZRX was marketed as deriving value from its ability to be used to vote on updates to the 0x protocol, which is designed to allow Ethereum tokens to be traded at a low cost directly from a user's wallet. This voting right, which resembles the voting rights of many traditional securities, means that ZRX purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer to create and maintain an open protocol for decentralized peer-to-peer exchange of Ethereum tokens regarding which ZRX holders could vote.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

906.    There are few, if any, goods or services that can be directly purchased using ZRX. To the extent that ZRX can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of ZRX. Accordingly, all or nearly all ZRX traded on the Coinbase Exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

**Answer:**    This Paragraph reflects no allegations specific to Defendants. Nevertheless,

Defendants deny the allegations in this Paragraph.

907.    Based on the foregoing facts, among others, ZRX qualifies as an investment contract and therefore a security. However, ZRX has never been registered as a security.

**Answer:**    Defendants deny that ZRX is a security and otherwise deny the remaining

allegations in this Paragraph.

908.    During the Class Period, numerous members of the Class, including Plaintiffs Oberlander and Underwood, have had one or more losing transactions in ZRX on and with Coinbase. Certain members of the Class, including Plaintiff Oberlander, currently own ZRX tokens that have depreciated since those tokens were purchased on the Coinbase Exchanges. Additionally, certain members of the Class, including Plaintiffs Oberlander and Underwood, bought ZRX tokens on the Coinbase Exchanges that they subsequently sold on one or more occasions at a loss. Numerous members of the Class, including Plaintiffs Oberlander and Underwood, have paid fees to Coinbase as part of their transactions in ZRX.

**Answer:**    Defendants admit that Lead Plaintiffs Oberlander and Underwood and members of the putative proposed class transacted in ZRX on the Trading Platforms during the putative Class Period and that they paid fees on those transactions pursuant to the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants admit that certain of these transactions may have resulted in a loss but deny the remaining allegations, including that Plaintiffs are entitled to any damages.

## B.    COINBASE OFFERS AND SELLS UNREGISTERED SECURITIES

909.    Because the Tokens are unregistered securities and because Coinbase offers the Tokens for sale on the Coinbase Exchanges, Coinbase has sold unregistered securities to Plaintiffs and members of the Class.

**Answer:**    Defendants admit that during the alleged Class Period, Users were able to buy and sell the Tokens on the Trading Platforms between and among other Users pursuant to the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  Defendants otherwise deny the remaining allegations in this Paragraph.

910.    The structure of Coinbase means that it is the counterparty in every transaction in a Token on the Coinbase Exchanges.  Customers only exchange funds and crypto-assets with Coinbase itself, and never with other users.  All transactions in the Tokens made on Coinbase are reflected only in Coinbase's internal records, and Coinbase itself receives all funds and provides all Tokens purchased.  Coinbase is thus in privity with each Coinbase customer in each of their transactions, and is the seller whenever a customer buys a token on Coinbase.

**Answer:**    Defendants admit that digital asset transactions executed on the Trading Platforms are tracked in Coinbase, Inc.'s internal ledgering system, but deny that Coinbase, Inc. or Coinbase Global are the counterparties to transactions on the Trading Platforms, are in privity with each User in any of their transactions, or are the sellers whenever a User purchases a Token on the Trading Platforms. Defendants admit that during the alleged Class Period, Users were able to buy or sell the Tokens on the Trading Platforms between and among other Users pursuant to the

terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

911. Moreover, Coinbase solicits the Tokens for sale in order to earn trading fees. Coinbase promotes the sale of Tokens by providing users with descriptions of each Token and its purported value proposition. Coinbase also participated in direct promotions, including "airdrops" of free Tokens designed to increase trading volume. Coinbase also writes news updates on price movements of the Tokens, and links to stories about the Tokens published across the internet. These solicitations profit Coinbase by increasing the number of transactions on the Coinbase Exchanges and thus the fees paid to Coinbase; these solicitations are thus motivated at least in part by a desire to serve their own financial interests.

**Answer:** To the extent this Paragraph alleges that Coinbase, Inc. or Coinbase Global engages in "solicitation" or "promotion," that is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny those allegations. Defendants admit that Coinbase, Inc. charges fees for transactions between Users executed on the Trading Platforms and aver that such transaction fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants also admit that information about the price of digital assets and that certain news updates and information regarding digital assets is made publicly available on Coinbase.com. Defendants otherwise deny any remaining allegations in this Paragraph.

## C. THE COINBASE EXCHANGES ARE RULE 3b-16(a) SYSTEMS AND THEREFORE ARE UNREGISTERED "EXCHANGES" UNDER THE EXCHANGE ACT

912. The Coinbase Exchanges satisfy the criteria of Exchange Act Rule 3b-16(a) and are not exempted under Rule 3b-16(b). As described above, the Coinbase Platform and the Coinbase Pro Platform each bring together orders of multiple buyers and sellers. The Coinbase Platform and the Coinbase Pro Platform each receive and store digital asset buy and sell orders for Tokens from their users. The Coinbase Platform and the Coinbase Pro Platform each provided the means for these orders to interact and execute through the combined use of the Coinbase and Coinbase Pro websites, mobile apps, order books, and pre-programmed trading rules protocols defined in the Coinbase and Coinbase Pro trading engine. These established non-discretionary methods allowed Coinbase and Coinbase Pro users to agree upon the terms of their trades in Tokens on Coinbase and Coinbase Pro during the Class Period.

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

913.    Coinbase is thus an "organization . . . which . . . maintains [and] provides a marketplace or facilities for bringing together purchasers and sellers" of digital assets. *See* 15 U.S.C. § 78c. As discussed in further detail below, because many of the digital assets listed on the Coinbase Exchanges are securities, the Coinbase Platform and the Coinbase Pro Platform each meet the statutory definition of an exchange under the Exchange Act. *Id.*

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## D.    COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER ON THE COINBASE EXCHANGES

914.    Coinbase's activities further meet the definition of both a "broker-dealer" under the Exchange Act. The Exchange Act defines "broker" in part as an entity that is "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

915.    For example, during the Class Period, Coinbase operated as a broker by effecting transactions in Tokens for users of the Coinbase Exchanges by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker-dealer by facilitating the sale of Tokens as part of ICOs. For example, on February 28, 2019 Coinbase announced that the Token XRP was available for trading on the Coinbase Platform. As discussed above, the SEC has charged Ripple Labs Inc., the founder, developer, and issuer of XRP with operating one long continuous ICO from 2013 to the present, which includes the period of time

during which Coinbase facilitated the sale of XRP by listing it for trading and facilitating transactions for XRP.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

916.    Coinbase's activities also meet the Exchange Act's definition of "dealer", which includes entities that are "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business." 15 U.S.C. § 78c(a)(5)A).  During the Class Period, Coinbase operated as a dealer as defined by the Exchange Act by, *inter alia*, (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Tokens; (2) maintaining custody over Coinbase Exchange customers' Tokens; (3) by providing customers services such as allowing purchase of Tokens on credit; (4) by having a regular turnover inventory of Tokens; (5) by purchasing Tokens for accounts in Coinbase's name (often at a discount to the ICO price); and (6) selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## CLASS ACTION ALLEGATIONS

917.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

**Answer:**    Defendants deny the allegations contained in this Paragraph, except admit that Plaintiffs purport to bring this action as a class action for a putative class.

918.    Plaintiffs seek class certification on behalf of a class defined as follows:

**NATIONWIDE CLASS:** all persons or entities who transacted in the Tokens on the Coinbase Platform and/or the Coinbase Pro Platform during the Class Period.

**Answer:**    Defendants deny the allegations contained in this Paragraph, except admit that Lead Plaintiffs seek class certification on behalf of an alleged class.

919.    Plaintiffs seek certification of the following subclasses as follows:

**CALIFORNIA SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of California.

**FLORIDA SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of Florida.

**NEW JERSEY SUBCLASS**: all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of New Jersey.

**Answer:**    Defendants deny the allegations contained in this Paragraph, except admit that Lead Plaintiffs seek class certification on behalf of three alleged subclasses.

920.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

**Answer:**    Defendants reserve the right to respond or object to any of the alleged definitions Plaintiffs propose in the future.

921.    Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

**Answer:**    Defendants deny the allegations contained in this Paragraph, except admit that Plaintiffs purport to bring this action as a putative class action that excludes the persons mentioned in this Paragraph.

922.    **Ascertainability**.  The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they

are part of a Class or Subclass.  Further, the Class and Subclasses can be readily identified through records maintained by Defendant.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

923.    **Numerosity (Rule 23(a)(1))**.  The Class and Subclasses are so numerous that joinder of individual members herein is impracticable.  The exact number of members of the Class and Subclasses, as herein identified and described, is not known, upon information and belief there are thousands of purchasers, if not more, who transacted on the Coinbase Exchanges.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

924.    **Commonality (Rule 23(a)(2))**.  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

- whether Coinbase offered certain digital assets for sale;
- whether Coinbase offered digital assets for sale that constitute securities under the federal securities laws;
- whether Coinbase knew or should have known that certain digital assets it listed for trading were securities;
- whether Coinbase operated as a securities exchange as defined by the federal securities laws;
- whether Coinbase operated as a broker-dealer as defined by the federal securities laws;
- whether Coinbase violated the federal securities laws;
- whether Plaintiffs and the members of the Class and Subclasses are entitled to damages and the amount and measure thereof; and
- whether Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

925.    **Typicality (Rule 23(a)(3))**.  Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses.  Plaintiffs and members of the Class and Subclasses (as applicable) suffered injuries as a result of Coinbase's wrongful conduct that is uniform across the Class and Subclasses.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

926.    **Adequacy (Rule 23(a)(4))**.  Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and Subclasses.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses, and they have the resources to do so.  Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

927.    **Substantial Benefits**.  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclasses is impracticable.  The prosecution of separate actions by individual members of the Class and Subclasses would impose heavy burdens upon the courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

928.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

929.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Coinbase acted or refused to act on grounds generally applicable to the Class and Subclasses, so

that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

930.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**Answer:**        Defendants reserve the right to respond or object to any of the allegations

or alleged definitions Plaintiffs raise in the future.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Offer and Sale of Unregistered Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Against Coinbase Global and Coinbase, Inc.)**
**(On Behalf of All Plaintiffs and Class Members)**

931.    Plaintiffs reallege the allegations above.

**Answer:**        Defendants incorporate their responses to those allegations.

932.    Plaintiffs bring this Cause of Action as to each Token that was first *bona fide* offered to the public within three years of the October 8, 2021 filing of the Complaint (each a "12(a)(1) Token"). The 12(a)(1) Tokens are: 1INCH, AAVE, ACH, AGLD, ALGO, AMP, ARPA, AUCTION, AXS, BAL, BAND, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, DOT, FARM, FET, FORTH, GRT, GTC, ICP, KEEP, NU, OGN, ORN, OXT, PLA, QUICK, RARI, SHIB, SKL, SOL, SUSHI, TRB, TRIBE, UMA, UNI, and YFI.

**Answer:**        This Paragraph reflects Plaintiffs' characterization of their claim for relief

to which no response is required.  To the extent a response is required, Defendants admit that

Plaintiffs purport to pursue claims under Section 12(a)(1) of the Securities Act with respect to the

Tokens listed in this Paragraph and that those Tokens were made available for transacting by and

among Users pursuant to the terms of the User Agreement within three years of the October 8,

2021 filing of the Complaint.  Defendants deny any characterization of liability with respect to

341

these Tokens implied by the use of the defined term "12(a)(1) Token" and otherwise deny the

remaining allegations in this Paragraph.

933.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

**Answer:**    This Paragraph purports to characterize 15 U.S.C § 77(e)(a), to which

Defendants respectfully refer the Court for its complete and accurate contents.

934.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

**Answer:**    This Paragraph purports to characterize 15 U.S.C § 77e(c), to which

Defendants respectfully refer the Court for its complete and accurate contents.

935.    All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1).  No registration statements have been filed with the SEC or have been in effect with respect to any of the Tokens listed on the Coinbase Exchanges.

**Answer:**    The first sentence of this Paragraph states a legal conclusion to which no

response is required but Defendants deny that the Tokens are securities and otherwise deny the

remaining allegations in this Paragraph.

936.    Throughout the Class Period, Coinbase Global and Coinbase, Inc. promoted, solicited, offered, and sold 12(a)(1) Tokens to Plaintiffs and members of the Class.  Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a 12(a)(1) Token, including those by Plaintiffs and Class members.  Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

**Answer:**    Defendants deny the allegations in this Paragraph.

937.    In addition, by offering 12(a)(1) Tokens to Plaintiffs and members of the Class, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of 12(a)(1) Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of 12(a)(1) Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of 12(a)(1) Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for 12(a)(1) Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**    Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transaction fees in connection with the purchase and sale of Tokens by Users in accordance with the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

938.    Coinbase Global and Coinbase, Inc. thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Coinbase, Inc. made use of means or instruments of transportation or communication in interstate commerce or of the mails in connection with its business, but deny that any part of its business ran or runs afoul of federal or state securities laws and otherwise deny the remaining allegations in this Paragraph.

939.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

**Answer:**        This Paragraph purports to characterize 15 U.S.C § 77*l*(a)(1), to which

Defendants respectfully refer the Court for its complete and accurate contents.

940.    Accordingly, Defendants Coinbase Global and Coinbase, Inc. have violated
Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1).

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

941.    Plaintiffs and Class members who purchased 12(a)(1) Tokens on the Coinbase
Exchanges and subsequently sold those 12(a)(1) Tokens at a loss seek damages, inclusive of
transaction fees, as to each transaction in which any 12(a)(1) Tokens purchased in the Class Period
was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

**Answer:**        This Paragraph reflects Plaintiffs' characterization of their claim for relief

to which no response is required.  To the extent a response is required, Defendants admit that Lead

Plaintiffs and members of the putative class purport to seek damages inclusive of transaction fees

and aver that those fees are imposed and governed by the User Agreement, to which Defendants

respectfully refer the Court for the complete and accurate contents.  The remainder of the

allegations in this Paragraph state legal conclusions to which no response is required.  To the extent

a response is required, Defendants otherwise deny the remaining allegations in this Paragraph.

### SECOND CAUSE OF ACTION

**Control Person Liability for Violations of the Securities Act**
**Section 15 of the Securities Act**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of All Plaintiffs and Class Members)**

942.    Plaintiffs reallege the allegations above.

**Answer:**        Defendants incorporate their responses to those allegations.

943.    This Count is asserted against Coinbase Global and Brian Armstrong for violations
of Section 15 of the Securities Act, 15 U.S.C. § 77o.

344

**Answer:**        This Paragraph reflects Plaintiffs' characterization of their claim to relief to which no response is required.  To the extent a response is required, Defendants deny the allegations except admit that Plaintiffs purport to pursue this claim against Coinbase Global and Brian Armstrong pursuant to 15 U.S.C. § 77o.

944.    Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."  *Id.* § 77o(a).

**Answer:**        This Paragraph purports to characterize 15 U.S.C §§ 77k, 77l, and 77o(a), to which Defendants respectfully refer the Court for their complete and accurate contents.

945.    At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein.  Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

**Answer:**        Defendants deny that Coinbase Global controlled Coinbase, Inc., had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, or had the power to direct or cause the direction of the management and policies of Coinbase, Inc. The remaining allegations in this Paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants otherwise deny the remaining allegations in this Paragraph.

946.    Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Securities Act as described herein, including by promoting, soliciting, offering, and selling unregistered securities to Plaintiffs and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1).  Coinbase,

Inc. is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

**Answer:** This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the remaining allegations in this Paragraph,

including that Coinbase, Inc. violated the Securities Act.

947. At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Coinbase Global purposefully decided not to do so.

**Answer:** This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the remaining allegations in this Paragraph,

including that Coinbase, Inc. violated the Securities Act.

948. Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Securities Act alleged herein. Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under section 12(a)(1) of the Securities Act.

**Answer:** This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the remaining allegations in this Paragraph,

including that Coinbase, Inc. violated the Securities Act.

949. Accordingly, Coinbase Global is jointly and severally liable for the violations of the Securities Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the Class for damages as to each transaction in which any 12(a)(1) Token purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

**Answer:** Defendants admit that Plaintiffs purport to seek damages inclusive of

transactions fees and aver that those fees are imposed and governed by the User Agreement, which

Defendants respectfully refer the Court to for its complete and accurate contents. The remaining

allegations in this Paragraph state legal conclusions to which no response is required. To the extent

a response is required, Defendants otherwise deny the remaining allegations in this Paragraph.

950.    With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under the First Cause of Action.

**Answer:**        This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

951.    As CEO and founder of both Coinbase Global and Coinbase Inc., Brian Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

**Answer:**        Defendants incorporate their response to Paragraph 12 with respect to the

allegations about Armstrong's role at Coinbase Global and Coinbase, Inc. The remaining

allegations in this Paragraph are legal conclusions to which no response is required. To the extent

a response is required, Defendants deny the remaining allegations in this Paragraph.

952.    Armstrong purposefully exercised its [sic] power and influence to cause Coinbase to violate the Securities Act as described herein, including by directing Coinbase not to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiffs and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1). Coinbase is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

**Answer:**        Defendants deny that either Coinbase, Inc. or Coinbase Global violated the

Securities Act. The remaining allegations in this Paragraph are legal conclusions to which no

response is required. To the extent a response is required, Defendants otherwise deny the

remaining allegations in this Paragraph.

953.    At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Armstrong purposefully decided not to do so.

**Answer:**        Defendants deny that either Coinbase, Inc. or Coinbase Global violated the

Securities Act. The remaining allegations in this Paragraph are legal conclusions to which no

response is required. To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

954. Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Securities Act alleged herein. Armstrong had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase's liability under Section 12(a)(1) of the Securities Act.

**Answer:** Defendants deny that either Coinbase, Inc. or Coinbase Global violated the Securities Act. The remaining allegations in this Paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

955. Accordingly, Armstrong is jointly and severally liable for the violations of the Securities Act by Coinbase complained of herein and is liable to Plaintiffs and the Class for damages, inclusive of transaction fees, as to each transaction in which any 12(a)(1) Token purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

**Answer:** Defendants admit that Plaintiffs purport to seek damages inclusive of transaction fees and aver that those fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

### THIRD CAUSE OF ACTION

**Illegal Contracts to Pay Transaction Fees to an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

956. Plaintiffs reallege the allegations above.

**Answer:** Defendants incorporate their responses to those allegations.

957. In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such

registration."  15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

958.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens.  Coinbase has operated the Coinbase Exchanges throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

959.    The Coinbase Exchanges are exchanges because they provide a market place and facilities for bringing together purchasers and sellers of Tokens.  *Id.*  All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

960.    Coinbase and the Coinbase Exchanges have never been registered as national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration.  *See id.* § 78e.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

961.    Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

962.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member.  Pursuant to these contracts, Plaintiffs and Class members paid Coinbase transaction fees to fulfill purchase orders for Tokens.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

963.    The foregoing contracts were made in violation of section 5 of the Exchange Act. The performance of these contracts necessarily involves the violation of section 5 because, pursuant to each such contract, Coinbase was required to continue its practice of operating unregistered exchanges that bring together purchasers and sellers of Tokens.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

964.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . .

350

shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief

brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations,

Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

965.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief

brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations,

Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## FOURTH CAUSE OF ACTION

**Illegal Contracts to Pay Transaction Fees to an Unregistered Broker or Dealer
Sections 15(a)(1) and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

966.    Plaintiffs reallege the allegations above.

**Answer:**    Defendants incorporate their responses to those allegations.

967.    Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief

brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

968.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id.* § 78c(a)(4)(A).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

969.    Coinbase has operated as a broker during the Class Period by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment.  All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act.  *Id.* § 77b(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

970.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business."  *Id.* § 78c(a)(5).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

971.    Coinbase has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers'

Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

972.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

973.    Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

974.    Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

975. In the course of operating as an unregistered broker-dealer, Coinbase has entered into contracts with Plaintiffs and Class members pursuant to which Plaintiffs and Class members paid Coinbase transaction fees to fulfill purchase orders for Tokens.

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

976. The foregoing contracts were made in violation of section 15(a)(1) of the Exchange Act. The performance of these contracts necessarily involves the violation of section 15(a)(1) because, pursuant to each such contract, Coinbase was required to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer.

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

977. Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

**Answer:** Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

978. Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

**Answer:**      Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## FIFTH CAUSE OF ACTION

**Illegal Contracts to Purchase Securities from an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

979.    Plaintiffs reallege the allegations above.

**Answer:**      Defendants incorporate their responses to those allegations.

980.    In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a market place or facilities for bringing together purchasers and sellers of securities.'" 17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

**Answer:**      Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

981.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens. Coinbase has operated the Coinbase Exchanges throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

**Answer:**      Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

982.    The Coinbase Exchanges are exchanges because they provide a market place and facilities for bringing together purchasers and sellers of Tokens.  *Id.*  All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

983.    Coinbase and the Coinbase Exchanges have never been registered as a national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration.  *See id.* § 78e.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

984.    Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Class Period.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

985.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member.  Coinbase induced Plaintiffs and Class members to enter these contracts for the purchase of Tokens during the Class Period.  Coinbase did so by promoting, soliciting, offering, and selling Tokens to Plaintiffs and members of the Class. In seeking to induce Plaintiffs and members of the Class to purchase Tokens, Coinbase Global and

Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

986.    The contracts that Coinbase induced Plaintiffs and Class members to enter for the purchase of Tokens were made in violation of section 5 of the Exchange Act, 15 U.S.C. § 78e. The performance of these contracts necessarily involves the violation of section 5 because each such contract could not be performed unless Coinbase continued its practice of operating an unregistered exchange that brings together purchasers and sellers of Tokens.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

987.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." *Id.* § 78cc(b).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

988.     Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased, on any Coinbase Exchange, any Token that they later sold at a loss.  Plaintiffs hereby offer to tender to Coinbase, Inc., the Tokens or substantial equivalent realized upon sale of all Tokens they purchased on any Coinbase Exchange and later sold at a loss.  In exchange for such tender, Plaintiffs and the Class are entitled to recover the amount of consideration they paid to purchase the tendered Tokens.

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## SIXTH CAUSE OF ACTION

**Illegal Contracts To Purchase Securities From an Unregistered Broker or Dealer
Sections 15(a)(1) and 29(b) of the Exchange Act
(Against Coinbase Global and Coinbase, Inc.)
(On Behalf of All Plaintiffs and Class Members)**

989.     Plaintiffs reallege the allegations above.

**Answer:**     Defendants incorporate their responses to those allegations.

990.     Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

991.     A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id*. § 78c(a)(4)(A).

**Answer:**     Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

992.    Coinbase has operated as a broker during the Class Period by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id*. § 77b(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

993.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business." *Id*. § 78c(a)(5).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

994.    Coinbase has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

995.    Throughout the Class Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

996.    Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

997.    Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

998.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member.  Coinbase induced Plaintiffs and Class members to enter contracts for the purchase Tokens during the Class Period.  Coinbase did so by promoting, soliciting, offering, and selling Tokens to Plaintiffs and members of the Class.  In seeking to induce Plaintiffs and members of the Class to purchase Tokens, Coinbase Global and Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges.  Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges.  Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

360

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

999.    The contracts that Coinbase induced Plaintiffs and Class members to enter for the purchase of Tokens were made in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).    The performance of these contracts necessarily involves the violation of section 15(a)(1) because each such contract could not be performed unless Coinbase continued its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer. Furthermore, Coinbase violated section 15(a)(1) by inducing Plaintiffs and Class members to enter these contracts—and thus engaging in the business of effecting transactions in securities for the account of others, the business of buying and selling securities for Coinbase's own account, or both—without being registered as a broker or dealer.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1000.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." 15 U.S.C. § 78cc.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1001.   Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void and rescind each contract pursuant to which they purchased, on any Coinbase Exchange, any Token that they later sold at a loss.  Plaintiffs hereby offer to tender to Coinbase, Inc, the Tokens or substantial equivalent realized upon sale of all Tokens they purchased on any Coinbase

Exchange and later sold at a loss.  In exchange for such tender, Plaintiffs and the Class are entitled to recover the amount of consideration they paid to purchase the tendered Tokens.

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## SEVENTH CAUSE OF ACTION

**Control Person Liability for Violations of the Exchange Act**
**Section 20 of the Exchange Act**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of All Plaintiffs and Class Members)**

1002.  Plaintiffs reallege the allegations above.

**Answer:**        Defendants incorporate their responses to those allegations.

1003.  This Count is asserted against Coinbase Global and Brian Armstrong for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1004.  Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

**Answer:**        Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1005.  At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein.  Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1006.  Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of sections 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1007.  At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer.  Coinbase Global purposefully decided not to do so.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1008.  Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Exchange Act alleged herein.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1009.  Accordingly, Coinbase Global is jointly and severally liable for the violations of the Exchange Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1010.  With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under any of the Third through Sixth Causes of Action.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1011.  At the time of the wrongs alleged herein, because Armstrong is the founder and CEO of both Coinbase Global and Coinbase, Inc., Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein.  Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1012.  Armstrong purposefully exercised his power and influence to cause Coinbase to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1013.  At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer. Armstrong purposefully decided not to do so.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required.  To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1014.  Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Exchange Act alleged herein.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no

response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

1015. Accordingly, Armstrong is jointly and severally liable for the violations of the Exchange Act by Coinbase complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

**Answer:**    Because the allegations of this Paragraph relate to the claims for relief brought under the Securities Exchange Act of 1934, which have been dismissed with prejudice, no response is required. To the extent a response is required to any underlying factual allegations, Defendants refer to their answers to the remaining paragraphs of the Amended Complaint.

## EIGHTH CAUSE OF ACTION

**Offer or Sale of Unqualified Securities**
**Cal. Corp. Code §§ 25110, 25130, and 25503**
**(Against All Coinbase Global and Coinbase, Inc.)**
**(On Behalf of the California Subclass)**

1016. Plaintiffs reallege the allegations above.

**Answer:**    Defendants incorporate their responses to those allegations.

1017. This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

**Answer:**    This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to bring this cause of action on behalf of themselves, a Class, and a Subclass but otherwise deny the remaining allegations in this Paragraph.

1018. The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of section 25110 or 25130 is "liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is

366

not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

**Answer:**    This Paragraph purports to characterize Cal. Corp. Code §§ 25110, 25130, and 25503, to which Defendants respectfully refer the Court for their complete and accurate contents.

1019.   A security includes, *inter alia*, an "investment contract." *Id.* § 25019.

**Answer:**    This Paragraph purports to characterize Cal. Corp. Code § 25019, to which Defendants respectfully refer the Court for its complete and accurate contents.

1020.   The Tokens are, and at all relevant times have been, securities within the meaning of the California Securities Act. *Id.* § 25019. The Tokens were neither qualified under the California Securities Act nor exempt from qualification. *Id.* §§ 25110, 25130.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that the Tokens are securities within the meaning of the California Securities Act and otherwise deny the remaining allegations in this Paragraph.

1021.   During the Class Period, Coinbase Global and Coinbase, Inc. offered or sold the Tokens to at least one Plaintiff in California and numerous Class members in California. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a Token, including those by Plaintiffs and Class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

**Answer:**    Defendants deny the allegations in this Paragraph.

1022.   Moreover, in offering Tokens to Plaintiffs and members of the Class in California, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the

Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**    Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transactions fees in connection with the purchase and sale of Tokens by Users in accordance with the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. The first sentence of this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that allegation. Defendants otherwise deny the remaining allegations in this Paragraph.

1023.  Throughout the Class Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

**Answer:**    Defendants deny that Coinbase Global and Coinbase, Inc. directed the foregoing actions to California and otherwise deny the remaining allegations in this Paragraph.

1024.  Accordingly, Coinbase Global and Coinbase, Inc. have violated the California Securities Act through their sale of unqualified securities.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1025.  Members of the California Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**    Defendants admit that Plaintiffs purport to seek damages inclusive of transaction fees and aver that those fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. The remainder of the allegations in this Paragraph state legal conclusions to which no response is required. To the extent a response is required, Defendants otherwise deny the allegations in this Paragraph.

## NINTH CAUSE OF ACTION

**Sale of Securities by an Unregistered Broker-Dealer**
**Cal. Corp. Code §§ 25210 and 25501.5(a)**
**(Against Coinbase Global and Coinbase, Inc.)**
**(On Behalf of the California Subclass)**

1026.   Plaintiffs reallege the allegations above.

**Answer:**      Defendants incorporate their responses to those allegations.

1027.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

**Answer:**      This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.   To the extent a response is required, Defendants admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass, but deny the remaining allegations in this Paragraph.

1028.   The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law.   Cal. Corp. Code § 25210.

**Answer:**      This Paragraph purports to characterize Cal. Corp. Code § 25210, to which Defendants respectfully refer the Court for its complete and accurate contents.

1029.   A "broker-dealer" includes "any person engaged in the business of effecting transactions in securities in [California] for the account of others or for that person's own account" and any "person engaged in the regular business of issuing or guaranteeing options with regard to securities not of that person's own issue."   *Id.* § 25044. A security includes, *inter alia*, an "investment contract."   *Id.* § 25019.

**Answer:**      This Paragraph purports to characterize Cal. Corp. Code §§ 25044 and 25019, to which Defendants respectfully refer the Court for their complete and accurate contents.

1030.   Coinbase Global and Coinbase, Inc. have operated as broker-dealers in California during the Class Period.   Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors

369

after payment.  Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for their own account by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in their own name (often at a discount to the ICO price), and by selling Tokens from their inventory to investors for profit.  All Tokens are, and at all relevant times have been, securities as defined by California law.

**Answer:**    This Paragraph states legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Coinbase, Inc. earned transaction fees as imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents but otherwise deny the remaining allegations in this Paragraph.

1031.  Throughout the Class Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

**Answer:**    Defendants deny that Coinbase Global and Coinbase, Inc. directed the foregoing actions to California and otherwise deny the remaining allegations in this Paragraph.

1032.  Coinbase Global and Coinbase, Inc. have never registered or applied for registration as a broker-dealer under California law.  Coinbase Global and Coinbase, Inc. do not qualify for any exemption from registration of broker-dealers under California law.

**Answer:**    Defendants admit that Coinbase Global and Coinbase, Inc. have never registered or applied for registration as a broker-dealer under California state securities law but aver that is because they are not required to.  Defendants otherwise deny the remaining allegations in this Paragraph.

1033.  Coinbase Global and Coinbase, Inc. have thus operated as unregistered broker-dealers in violation of Cal. Corp. Code § 25210.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1034.    In the course of operating as unregistered broker-dealers, Coinbase Global and Coinbase, Inc. have sold Tokens to members of the California Subclass. Coinbase Global and Coinbase, Inc. solicited members of the California Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**    Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transactions fees in connection with the purchase and sale of Tokens by Users in accordance with the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. The remainder of the allegations in this Paragraph state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

1035.    Under California law, any person who offers or sells a security in violation of Cal. Corp. Code § 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 25501.5(a)(4).

**Answer:**    This Paragraph purports to characterize Cal. Corp. Code §§ 25210, 25501.5(a)(1), and 25501.5(a)(4), to which Defendants respectfully refer the Court for their complete and accurate contents.

1036.    Accordingly, Coinbase Global and Coinbase, Inc. have violated Cal. Corp. Code §§ 25210 and 25501.5(a).

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1037.    Members of the California Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction

fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**       Defendants admit that Plaintiffs purport to seek damages inclusive of transaction fees and aver that those fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  The remainder of the allegations in this Paragraph state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

## TENTH CAUSE OF ACTION

**Control Person Liability for Violations of the California Securities Act**
**Cal. Corp. Code § 25504**
**(Against Coinbase Global and Brian Armstrong)**
**(On Behalf of the California Subclass)**

1038.  Plaintiffs reallege the allegations above.

**Answer:**       Defendants incorporate their responses to those allegations.

1039.  This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in California.

**Answer:**       This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.  To the extent a response is required, Defendants admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass, but deny the remaining allegations in this Paragraph.

1040.  Every person who directly or indirectly controls a person liable under the California Securities Act for unlawfully selling unqualified securities is "liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Cal. Corp. Code § 25504.

**Answer:**       This Paragraph purports to characterize Cal. Corp. Code § 25504, to which Defendants respectfully refer the Court for its complete and accurate contents.

1041.  At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. By virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, Coinbase Global had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein.  Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

**Answer:**    Defendants deny that Coinbase Global controlled Coinbase, Inc., had the power and authority to direct the management and activities of Coinbase, Inc., or had the power to direct or cause the direction of the management and policies of Coinbase, Inc.  Defendants also deny that Coinbase, Inc. engaged in wrongful conduct.  The remaining allegations in this Paragraph are legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

1042.  Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the California Securities Act as described herein, including by selling unqualified securities in violation of Cal. Corp. Code §§ 25110 and Coinbase, Inc. is liable under Cal. Corp. Code § 25503 for its sales of unqualified securities.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph, including that Coinbase Global or Coinbase, Inc. violated the California Securities Act.

1043.  At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from selling unqualified securities in violation of the California Securities Act.  Coinbase Global purposefully decided not to do so.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph, including that Coinbase, Inc. sold unqualified securities or violated the California Securities Act.

1044.  Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the California Securities Act alleged herein.  Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under Cal. Corp. Code § 25503.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph, including

that Coinbase, Inc. violated the California Securities Act.

1045.   Accordingly, Coinbase Global is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the California Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

1046.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under either the Eighth or Ninth Causes of Action.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

1047.   At the time of the wrongs alleged herein, Armstrong controlled both Coinbase Global and Coinbase, Inc. As CEO and founder of both entities, Armstrong was a principal executive officer of both entities.

**Answer:**    Defendants incorporate their response to Paragraph 12 with respect to the

allegations about Armstrong's role at Coinbase Global and Coinbase, Inc.   The remaining

allegations in this Paragraph are legal conclusions to which no response is required. To the extent

a response is required, Defendants deny the remaining allegations in this Paragraph.

1048.   Armstrong knew of Coinbase's violations of Cal. Corp. Code §§ 25110 and 25130 because he was aware both of Coinbase's lack of appropriate registration and the fact that Coinbase was selling the Tokens.

**Answer:**    Defendants admit that the Tokens are made available on the Trading

Platforms and that Coinbase, Inc. and Coinbase Global are not registered as securities exchanges

or broker-dealers under state or federal law but deny that Coinbase, Inc. and Coinbase Global were

required to register as securities-exchanges or broker-dealers and deny that the Tokens are securities. Defendants further deny that Coinbase, Inc. and Coinbase Global violated Cal. Corp. Code §§ 25110 or 25130 and the remaining allegations in this Paragraph.

1049.    Accordingly, as a "principal executive officer" of a liable corporation who had knowledge of the facts by which liability is alleged to exist, Armstrong is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the California Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Class Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants incorporate their response to Paragraph 12 with respect to the allegations about Armstrong's role at Coinbase Global and Coinbase, Inc. and otherwise deny the remaining allegations in this Paragraph.

## ELEVENTH CAUSE OF ACTION

**Offer or Sale of Unregistered Securities**
**Fla. Stat. §§ 517.07 and 517.211**
**(Against 618. Coinbase Global and Coinbase, Inc)**
**(On Behalf of the Florida Subclass)**

1050.    Plaintiffs reallege the allegations above.

**Answer:**    Defendants incorporate their responses to those allegations.

1051.    This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in Florida.

**Answer:**    This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph of the Complaint, except admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass.

1052.    The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities. Fla. Stat. § 517.07(1). Any person who offers or sells a security in violation of section 517.07(1) is liable to the purchaser for "the consideration paid for the security

or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

**Answer:**    This Paragraph purports to characterize Fla. Stat. §§ 517.07(1) and 517.211, to which Defendants respectfully refer the Court for their complete and accurate contents.

1053.    A security includes, *inter alia*, an "investment contract." *Id.* § 517.021(22)(q).

**Answer:**    This Paragraph purports to characterize Fla. Stat. § 517.021(22)(q), to which Defendants respectfully refer the Court for its complete and accurate contents.

1054.    The Tokens are, and at all relevant times have been, securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22)(q). The Tokens were neither registered under the Florida Securities and Investor Protection Act nor exempt from registration. *Id.* §§ 517.051, 517.061.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations, including that the Tokens are securities under the meaning of the Florida Securities and Investor Protection Act.

1055.    During the Class Period, Coinbase Global and Coinbase, Inc offered or sold the Tokens to at least one Plaintiff in Florida and numerous Class members in Florida. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc are in privity in every sale of a Token, including those by Plaintiffs and class members. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

**Answer:**    Defendants deny the allegations in this Paragraph.

1056.    Moreover, in offering Tokens to Plaintiffs and members of the Class in Florida, Coinbase Global and Coinbase, Inc solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**    Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transactions fees in connection with the purchase and sale of digital assets by Users

in accordance with the terms of the User Agreement, which Defendants respectfully refer the Court

to for its complete and accurate contents.  The first sentence of this Paragraph states a legal

conclusion to which no response is required.  To the extent a response is required, Defendants

deny that allegation.  Defendants otherwise deny the remaining allegations in this Paragraph.

1057.  Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to Florida, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in Florida and received by users in Florida.

**Answer:**      Defendants deny the allegations in this Paragraph.

1058.  Accordingly, Coinbase Global and Coinbase, Inc have violated the Florida Securities and Investor Protection Act through their sale of unregistered securities.

**Answer:**      This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

1059.  Members of the Florida Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in Florida during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**      Defendants admit that Plaintiffs purport to seek damages inclusive of

transaction fees and aver that those fees are imposed and governed by the User Agreement, which

Defendants respectfully refer the Court to for its complete and accurate contents.  The remainder

of the allegations in this Paragraph state legal conclusions to which no response is required.  To

the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

## TWELFTH CAUSE OF ACTION

**Sale of Securities by an Unregistered Dealer Fla. Stat. §§ 517.12(1) and 517.211 (Against Coinbase Global and Coinbase, Inc) (On Behalf of the Florida Subclass)**

1060.  Plaintiffs reallege the allegations above.

**Answer:**      Defendants incorporate their responses to those allegations.

1061.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Florida Subclass members who bought and sold Tokens on the Coinbase Exchanges in Florida during the Class Period.

**Answer:**         This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph, except admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass.

1062.   The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law.  Fla. Stat. § 517.12(1).

**Answer:**         This Paragraph purports to characterize Fla. Stat. § 517.12(1), to which Defendants respectfully refer the Court for its complete and accurate contents.

1063.   A "dealer" includes a person who "engages . . . directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."  *Id.* § 517.021(6)(a)(1).  A security includes, *inter alia*, an "investment contract."  *Id.* § 517.021(22)(q).

**Answer:**         This Paragraph purports to characterize Fla. Stat. §§ 517.021(6)(a)(1) and 517.021(22)(q), to which Defendants respectfully refer the Court for their complete and accurate contents.

1064.   Coinbase Global and Coinbase, Inc have operated as dealers in Florida during the Class Period.  Coinbase Global and Coinbase, Inc have engaged in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by others.  They have done so by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment; by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets; by having regular customers; by maintaining custody over customers' Tokens; by providing customers with access to services allowing purchase of Tokens on credit; by having a regular turnover inventory of securities; by purchasing Tokens for accounts in their own name (often at a discount to the ICO price); and by selling Tokens from their inventory to investors for profit.  All Tokens are, and at all relevant times have been, securities as defined by Florida law.

**Answer:**       The first and last sentences of this Paragraph state legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that Coinbase, Inc. earned transaction fees imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents, but otherwise deny the remaining allegations in the first and last sentences of this Paragraph.  Defendants deny the remaining allegations in this Paragraph.

1065.  Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to Florida, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in Florida and received by users in Florida.

**Answer:**       Defendants deny the allegations in this Paragraph.

1066.  Coinbase Global and Coinbase, Inc have never registered or applied for registration as a dealer under Florida law.  Coinbase Global and Coinbase, Inc do not qualify for any exemption from registration of broker-dealers under Florida law.

**Answer:**       Defendants admit that Coinbase Global and Coinbase, Inc. have never registered as dealers under Florida law but deny that they are required to do so and otherwise deny the remaining allegations in this Paragraph.

1067.  Coinbase Global and Coinbase, Inc have thus operated as unregistered dealers in violation of Fla. Stat. § 517.12(1).

**Answer:**       This Paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph.

1068.  In the course of operating as unregistered dealers, Coinbase Global and Coinbase, Inc have sold Tokens to members of the Florida Subclass.  Coinbase Global and Coinbase, Inc solicited members of the Florida Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges.  Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges.  Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**        Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transactions fees in connection with the purchase and sale of Tokens by Users in accordance with the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. The first sentence of this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that allegation. Defendants otherwise deny the remaining allegations in this Paragraph.

1069. Under Florida law, any person who sells a security in violation of Fla. Stat. § 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorney fees. *Id*. § 517.211.

**Answer:**        This Paragraph purports to characterize Fla. Stat. §§ 517.12(1) and 517.211, to which Defendants respectfully refer the Court for their complete and accurate contents.

1070. Accordingly, Coinbase Global and Coinbase, Inc have violated Fla. Stat. §§ 517.12(1) and 517.211.

**Answer:**        This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1071. Members of the Florida Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**        This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs seek damages inclusive of transaction fees imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents and otherwise deny the remaining allegations in this Paragraph.

### THIRTEENTH CAUSE OF ACTION

**Offer or Sale of Unregistered Securities**
**N.J. Stat. §§ 49:3-60 and 49:3-71**
**(Against Coinbase Global and Coinbase, Inc)**
**(On Behalf of the New Jersey Subclass)**

1072.  Plaintiffs reallege the allegations above.

**Answer:**    Defendants incorporate their responses to those allegations.

1073.  This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

**Answer:**    This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.  To the extent a response is required, Defendants deny the allegations in this Paragraph, except admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass.

1074.  The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities.  N.J. Stat. § 49:3-60(e).  Any person who offers or sells a security in violation of section 49:3-60 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages.  *Id.* § 49:3-71. A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser.  *Id.* § 49:3-71(c).

**Answer:**    This Paragraph purports to characterize N.J. Stat. §§ 49:3-60 and 49:3-71, to which Defendants respectfully refer the Court for their complete and accurate contents.

1075.  A security includes, *inter alia*, an "investment contract."  *Id.* § 49:3-49(m).

**Answer:**    This Paragraph purports to characterize N.J. Stat. § 49:3-49(m), to which Defendants respectfully refer the Court for its complete and accurate contents.

1076.  The Tokens are, and at all relevant times have been, securities within the meaning of the New Jersey Uniform Securities Act.  *Id.*  The Tokens were neither registered under the New Jersey Uniform Securities Act nor exempt from registration.  *Id.* § 49:3-50.

**Answer:**      This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations, including that the Tokens

are securities within meaning of the New Jersey Uniform Securities Act.

1077.   During the Class Period, Coinbase Global and Coinbase, Inc offered are sold Tokens to at least one Plaintiff in New Jersey and numerous Class members in New Jersey. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc are in privity in every sale of a Token, including those by Plaintiffs and class members.   Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

**Answer:**      Defendants deny the allegations in this Paragraph.

1078.   Moreover, in offering Tokens to Plaintiffs and members of the Class in New Jersey, Coinbase Global and Coinbase, Inc solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges.   Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges.   Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:**      Defendants admit that a portion of Coinbase, Inc.'s total revenue is

generated from transactions fees in connection with the purchase, sale, and trading of digital assets

by Coinbase, Inc.'s Users in accordance with the terms of the User Agreement, which Defendants

respectfully refer the Court to for its complete and accurate contents.   The first sentence of this

Paragraph states a legal conclusion to which no response is required.   To the extent a response is

required, Defendants deny that allegation.   Defendants otherwise deny the remaining allegations

in this Paragraph.

1079.   Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to New Jersey, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in New Jersey and received by users in New Jersey.

**Answer:**      Defendants deny the allegations in this Paragraph.

1080.   Accordingly, Coinbase Global and Coinbase, Inc have violated the New Jersey Uniform Securities Act through their sale of unregistered securities.

**Answer:**       This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1081.   Members of the New Jersey Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**       Defendants admit that Plaintiffs purport to seek damages inclusive of transaction fees and aver that those fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.   The remainder of the allegations in this Paragraph state legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

## FOURTEENTH CAUSE OF ACTION

### Sale of Securities by an Unregistered Broker-Dealer
### N.J. Stat. §§ 49:3-56(a) and 49:3-71
### (Against Coinbase Global and Coinbase, Inc)
### (On Behalf of the New Jersey Subclass)

1082.   Plaintiffs reallege the allegations above.

**Answer:**       Defendants incorporate their responses to those allegations.

1083.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

**Answer:**       This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.   To the extent a response is required, Defendants deny the allegations in this Paragraph, except admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass.

1084.   Under New Jersey law, it is unlawful for any person to act as a broker-dealer unless that person is registered or exempt from registration.   N.J. Stat. § 49:3-56(a).

383

**Answer:**        This Paragraph purports to characterize N.J. Stat. § 49:3-56(a), to which Defendants respectfully refer the Court for its complete and accurate contents.

1085.  A "broker-dealer" includes "any person engaged in the business of effecting or attempting to effect transactions in securities for the accounts of others or for his own account." *Id.* § 49:3-49(c).  A security includes, *inter alia*, an "investment contract." *Id.* § 49:3-49(m).

**Answer:**        This Paragraph purports to characterize N.J. Stat. § 49:3-49(c) and (m), to which Defendants respectfully refer the Court for its complete and accurate contents.

1086.  Coinbase Global and Coinbase, Inc have operated as broker-dealers in New Jersey during the Class Period.  Coinbase Global and Coinbase, Inc have engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment.  Coinbase Global and Coinbase, Inc have engaged in the business of effecting transactions in securities for their own account by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in their own name (often at a discount to the ICO price), and by selling Tokens from their inventory to investors for profit.  All Tokens are, and at all relevant times have been, securities as defined by New Jersey law.

**Answer:**        Defendants admit that Coinbase, Inc. earns transaction fees imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents, but otherwise deny the remaining allegations in this Paragraph.

1087.  Throughout the Class Period, Coinbase Global and Coinbase, Inc directed the foregoing actions to New Jersey, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc to users in New Jersey and received by users in New Jersey.

**Answer:**        Defendants deny the allegations in this Paragraph.

1088.  Coinbase Global and Coinbase, Inc have never registered or applied for registration as a broker-dealer under New Jersey law.  Coinbase Global and Coinbase, Inc do not qualify for any exemption from registration of broker-dealers under New Jersey law.

**Answer:** Defendants admit that Coinbase Global and Coinbase, Inc. are not registered as broker-dealers under New Jersey law but deny that they are required to do so and otherwise deny the remaining allegations in this Paragraph.

1089. Coinbase Global and Coinbase, Inc have thus operated as unregistered broker-dealers in violation of N.J. Stat. § 49:3-56(a).

**Answer:** This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1090. In the course of operating as unregistered broker-dealers, Coinbase Global and Coinbase, Inc have sold Tokens to members of the New Jersey Subclass. Coinbase Global and Coinbase, Inc solicited members of the New Jersey Subclass to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

**Answer:** Defendants admit that a portion of Coinbase, Inc.'s total revenue is generated from transactions fees in connection with the purchase and sale of Tokens by Users in accordance with the terms of the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. The first sentence of this Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that allegation. Defendants otherwise deny the remaining allegations in this Paragraph.

1091. Under New Jersey law, any person who offers or sells a security in violation of N.J. Stat. § 49:3-56(a) is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 49:3-71. A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 49:3-71(c).

**Answer:**        This Paragraph purports to characterize N.J. Stat. §§ 49:3-56(a) and 49:3-71, to which Defendants respectfully refer the Court for their complete and accurate contents.

1092.   Accordingly, Coinbase Global and Coinbase, Inc have violated N.J. Stat. §§ 49:3-56(a) and 49:3-71.

**Answer:**        This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

1093.   Members of the New Jersey Subclass who purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Class Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**Answer:**        Defendants admit that Plaintiffs purport to seek damages inclusive of transaction fees and aver that those fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents.  The remainder of the allegations in this Paragraph state legal conclusions to which no response is required.  To the extent a response is required, Defendants otherwise deny the remaining allegations in this Paragraph.

## FIFTEENTH CAUSE OF ACTION

**Control Person Liability for Violations of the New Jersey Uniform Securities Act
N.J. Stat. § 49:3-71(d)
(Against Coinbase Global and Brian Armstrong)
(On Behalf of the New Jersey Subclass)**

1094.   Plaintiffs reallege the allegations above.

**Answer:**        Defendants incorporate their responses to those allegations.

1095.   This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Tokens on the Coinbase Exchanges in New Jersey.

**Answer:**        This Paragraph reflects Plaintiffs' characterization of their claim for relief to which no response is required.  To the extent a response is required, Defendants deny the

allegations contained in this Paragraph, except admit that Plaintiffs purport to pursue this claim on behalf of themselves, a putative class, and a putative subclass.

1096.  Every person who directly or indirectly controls a person liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or selling securities as an unregistered broker-dealer is "liable jointly and severally with and to the same extent as the seller . . . unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts . . . which give rise to liability."  N.J. Stat. § 49:3-71(d).

**Answer:**    This Paragraph purports to characterize N.J. Stat. § 49:3-71(d), to which Defendants respectfully refer the Court for its complete and accurate contents.

1097.  At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. By virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, Coinbase Global had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein.  Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

**Answer:**    Defendants deny that Coinbase Global controlled Coinbase, Inc., had the power and authority to direct the management and activities of Coinbase, Inc., or had the power to direct or cause the direction of the management and policies of Coinbase, Inc.  Defendants also deny that Coinbase, Inc. engaged in wrongful conduct.  The remaining allegations in this Paragraph are legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations in this Paragraph.

1098.  Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the New Jersey Uniform Securities Act as described herein, including by (1) selling unregistered securities in violation of N.J. Stat. § 49:3-60(e); and (2) selling securities as an unregistered broker-dealer in violation of N.J. Stat. § 49:3-56(a).  Coinbase, Inc. is liable under N.J. Stat. § 49:3-71(a)(1) for its sales of unqualified securities.

**Answer:**    This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in this Paragraph, including that Coinbase Global or Coinbase, Inc. violated the New Jersey Uniform Securities Act.

1099.   At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from violating the New Jersey Uniform Securities Act.  Coinbase Global purposefully decided not to do so.

**Answer:**     This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph, including

that Coinbase, Inc. violated the New Jersey Uniform Securities Act.

1100.   Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the New Jersey Uniform Securities Act alleged herein.  Coinbase Global knew, or in the exercise of reasonable care could have known, the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under the New Jersey Uniform Securities Act.

**Answer:**     This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph, including

that Coinbase Global or Coinbase, Inc. violated the New Jersey Uniform Securities Act.

1101.   Accordingly, Coinbase Global is jointly and severally liable for the violations of the New Jersey Uniform Securities Act by Coinbase, Inc. complained of herein and is liable to Plaintiffs and the New Jersey Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss.  *See* N.J. Stat. § 49:3-71.

**Answer:**     This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants admit that Plaintiffs seek damages inclusive of

transaction fees imposed and governed by the User Agreement, respectfully refer the Court to the

User Agreement for the complete and accurate contents, and otherwise deny the remaining

allegations in this Paragraph, including that Coinbase, Inc. violated the New Jersey Uniform

Securities Act.

1102.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under either the Thirteenth or Fourteenth Causes of Action.

**Answer:**     This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants deny the allegations in this Paragraph.

1103.  Every person who is an officer of a person liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or selling securities as an unregistered broker-dealer is "liable jointly and severally with and to the same extent as the seller . . . unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts . . . which give rise to liability."  N.J. Stat. § 49:3-71(d).

**Answer:**    This Paragraph purports to characterize N.J. Stat. § 49:3-71(d), to which

Defendants respectfully refer the Court for its complete and accurate contents.

1104.  Armstrong, as CEO of Coinbase Global and Coinbase, Inc., is an officer of these entities.

**Answer:**    Defendants incorporate their response to Paragraph 12 with respect to the

allegations about Armstrong's role at Coinbase Global and Coinbase, Inc.

1105.  Armstrong knew the existence of the facts that give rise to liability here because he knew that Coinbase was not registered as a securities exchange or as a broker-dealer and that it sold the Tokens, which were unregistered securities.  To the extent that he did not know this information, he could easily have learned that information through the exercise of reasonable care, as that information was publicly available.

**Answer:**    This Paragraph states a legal conclusion to which no response is required.

To the extent a response is required, Defendants admit that Coinbase, Inc. and Coinbase Global

are not registered as securities exchanges or broker-dealers under state or federal law but deny that

they are required to do so.  Defendants admit that Armstrong was aware that Coinbase, Inc. and

Coinbase Global, Inc. were not registered as securities exchanges or broker-dealers but deny that

either of those facts give rise to liability here.  Defendants deny that the Tokens are securities and

otherwise deny the remaining allegations in this Paragraph.

1106.  Accordingly, Armstrong is jointly and severally liable for the violations of the New Jersey Uniform Securities Act by Coinbase complained of herein and is liable to Plaintiffs and the New Jersey Subclass for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in New Jersey during the Class Period was subsequently sold at a loss.  *See* N.J. Stat. § 49:3-71.

**Answer:**       This Paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants incorporate their response to Paragraph 12 with respect to the allegations about Armstrong's role at Coinbase Global and Coinbase, Inc. and admit that Plaintiffs purport to seek damages inclusive of transaction fees relating to the Tokens purchased and sold to other customers at a loss by members of the purported New Jersey Subclass and aver that those transaction fees are imposed and governed by the User Agreement, to which Defendants respectfully refer the Court for the complete and accurate contents. Defendants otherwise deny the remaining allegations in this Paragraph.

## **PRAYER FOR RELIEF**

1107.   WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as to each and every count, including:

- An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representatives of the Class and Subclasses, and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;
- An order declaring that Defendants' actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendants are liable to Plaintiffs, the Class, and the Subclasses, as described herein, for damages arising therefrom;
- An injunction enjoining Coinbase from offering the Tokens for purchase or sale on the Coinbase Exchanges without having registered the Coinbase Exchanges as national securities exchanges or broker-dealers as required by the federal securities laws.
- An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Coinbase from continuing the unlawful practices alleged herein, and injunctive relief to remedy Coinbase's past conduct;
- A judgment awarding Plaintiffs, the Class, and the Subclasses all appropriate damages, in an amount to be determined at trial;
- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement.
- A judgment awarding Plaintiffs, the Class, and the Subclasses prejudgment and post-judgment interest, as permitted by law;
- A judgment awarding Plaintiffs, the Class, and the Subclasses costs and fees, including attorneys' fees, as permitted by law; and

- Grant such other legal, equitable or further relief as the Court may deem just and proper.

**Answer:** Plaintiffs' Prayer for Relief contains no factual assertions to which a response is required. To the extent this Prayer may be deemed to require a response, Defendants deny that Plaintiffs are entitled to any relief.

## DEMAND FOR JURY TRIAL

1108. Plaintiffs demand a trial by jury for all issues so triable.

**Answer:** Defendants admit that Plaintiffs purport to demand a jury trial.

## AFFIRMATIVE DEFENSES

Defendants assert the following defenses without assuming the burden of proof, burden of persuasion, burden of production, or any other burden that would otherwise be on Lead Plaintiffs and members of the putative class:

### FIRST DEFENSE: FAILURE TO STATE A CLAIM

The Amended Complaint fails to state a claim upon which relief can be granted for any of the remaining causes of action.

### SECOND DEFENSE: PLAINTIFFS LACK STANDING

This action is barred, in whole or in part, to the extent Lead Plaintiffs and members of the putative class lack standing.

### THIRD DEFENSE: DEFENDANTS ARE NOT STATUTORY SELLERS

This action is barred, in whole or in part, because Defendants are not statutory sellers of alleged securities under either prong of *Pinter v. Dahl*, 486 U.S. 622 (1988). Defendants did not promote, offer, or sell alleged securities within the meaning of the Securities Act or California, Florida, or New Jersey securities laws.

**FOURTH DEFENSE: PLAINTIFFS DID NOT PURCHASE DIRECTLY FROM A DEFENDANT**

This action is barred, in whole or in part, because Lead Plaintiffs and members of the putative class did not buy or sell alleged securities from or to any Defendant and are not in privity with any Defendant with respect to the purchase or sale of any alleged security. Rather, Lead Plaintiffs and members of the putative class transacted with other Users on the Trading Platforms pursuant to the terms of the Coinbase, Inc. User Agreement.

**FIFTH DEFENSE: THE TOKENS ARE NOT SECURITIES**

This action is barred, in whole or in part, because none of the Tokens are a "security" as that term is defined under the Securities Act or California, Florida, or New Jersey securities laws and thus none of the alleged transactions involving the Tokens falls under those laws.

**SIXTH DEFENSE: STATUTES OF LIMITATIONS AND REPOSE**

The action is barred, in whole or in part, by the applicable statutes of limitations and repose, including but not limited to 15 U.S.C. § 77m, Cal. Corp. Code §§ 25506-07, Fla. Stat. Ann. §§ 95.11(4)(e) and 95.11(5)(f), and N.J. Rev. Stat. § 49:3-71(g).

**SEVENTH DEFENSE: EQUITABLE ESTOPPEL**

This action is barred, in whole or in part, by the doctrine of equitable estoppel.

**EIGHTH DEFENSE: RATIFICATION**

This action is barred, in whole or in part, by the doctrine of ratification.

**NINTH DEFENSE UNCLEAN HANDS**

This action is barred, in whole or in part, by the doctrine of unclean hands to the extent Lead Plaintiffs or members of the putative class were responsible for promotion, offer or sale of any alleged unregistered securities.

**TENTH DEFENSE: IN PARI DELICTO**

This action is barred, in whole or in part, by the doctrine of *in pari delicto* to the extent Lead Plaintiffs or members of the putative class were responsible for promotion, offer or sale of any allegedly unregistered securities.

### ELEVENTH DEFENSE: LACHES

This action is barred, in whole or in part, by the doctrine of laches.

### TWELFTH DEFENSE: WAIVER

This action is barred, in whole or in part, to the extent that Lead Plaintiffs and members of the putative class waived their claims through unreasonable delay in bringing this action following their purported transactions in the Tokens.

### THIRTEENTH DEFENSE: NO CONTROL PERSON LIABILITY

This action is barred, in whole or in part, because Lead Plaintiffs and members of the putative class cannot prove the primary liability necessary to establish a claim for control person liability or otherwise establish control person liability.

### FOURTEENTH DEFENSE: NO CERTIFIABLE CLASS

This action is barred, in whole or in part, because it is not maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

### FIFTEENTH DEFENSE: NO COMPENSABLE INJURY

This action is barred, in whole or in part, because Lead Plaintiffs and the members of the putative class have no compensable injury.

### SIXTEENTH DEFENSE: NO APPROPRIATE REMEDY

This action is barred, in whole or in part, because Lead Plaintiffs and the members of the putative class are entitled to neither rescission nor rescissory damages under 15 U.S.C.§§ 77*l* or applicable California, Florida and New Jersey statutes, including but not limited to under and/or

the transactions at issue are exempt from registration under 15 U.S.C. §§ 77*d-e* and applicable California, Florida and New Jersey statutes*l*.

## SEVENTEENTH DEFENSE: SPECULATIVE DAMAGES

This action is barred, in whole or in part, because the damages sought by Lead Plaintiffs and members of the putative class are speculative and, thus, not recoverable.

## EIGHTEENTH DEFENSE: OVERBROAD DAMAGES

This action is barred, in whole or in part, to the extent Lead Plaintiffs or members of the putative class seek damages that exceed those permitted under the Securities Act, California, Florida, or New Jersey securities laws, or any other applicable laws.

## NINETEENTH DEFENSE: FAILURE TO MITIGATE DAMAGES

This action is barred, in whole or in part, to the extent Lead Plaintiffs or members of the putative class failed to mitigate any purported damages.

## RESERVATION OF DEFENSES

Additional facts may be revealed through discovery that support additional defenses presently available to, but unknown to, Defendants. Defendants therefore reserve the right to assert additional defenses, cross-claims, and third-party claims, not asserted herein of which they may become aware through discovery or other investigation as may be appropriate.

## PRAYER FOR RELIEF

Based on the foregoing, Defendants respectfully request that (1) judgment be entered in their favor; (2) the Amended Complaint be dismissed with prejudice; (3) this Court award Defendants' costs of suit, including attorneys' fees incurred in defense of this action; and (4) the Court grant such other and further relief as it deems just and appropriate.

Dated: ~~June 27, 2024~~ June 17, 2025
New York, New York

/s/ *Lara A. Flath*
Jay B. Kasner
Lara A. Flath
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
lara.flath@skadden.com
alexander.drylewski@skadden.com

*Attorneys for Defendants*

Index of Exhibits 1-33
Coinbase, Inc. User Agreements

| Exhibit # | Publication Date |
|-----------|------------------|
| 1 | October 2, 2019 |
| 2 | November 5, 2019 |
| 3 | November 6, 2019 |
| 4 | December 3, 2019 |
| 5 | May 18, 2020 |
| 6 | May 21, 2020 |
| 7 | September 3, 2020 |
| 8 | September 29, 2020 |
| 9 | December 9, 2020 |
| 10 | December 18, 2020 |
| 11 | January 25, 2021 |
| 12 | May 21, 2021 |
| 13 | May 27, 2021 |
| 14 | June 29, 2021 |
| 15 | July 2, 2021 |
| 16 | August 12, 2021 |
| 17 | August 20, 2021 |
| 18 | August 30, 2021 |
| 19 | August 31, 2021 |
| 20 | September 2, 2021 |
| 21 | September 17, 2021 |

| Exhibit # | Publication Date |
|-----------|------------------|
| 22 | September 30, 2021 |
| 23 | November 3, 2021 |
| 24 | November 22, 2021 |
| 25 | December 7, 2021 |
| 26 | December 20, 2021 |
| 27 | January 13, 2022 |
| 28 | January 25, 2022 |
| 29 | January 31, 2022*<br>*This version was applicable only to existing Users as of the date of the update. |
| 30 | February 3, 2022*<br>*This version was applicable only to new Users. |
| 31 | February 5, 2022*<br>*This version was applicable only to new Users. |
| 32 | February 8, 2022 |
| 33 | February 26, 2022 |

397