July 11, 2025

Hon. Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

**Re: *Underwood, et al. v. Coinbase Global, Inc., et al.*, No. 1:21-cv-08353-PAE (S.D.N.Y.)**

Dear Judge Engelmayer:

Pursuant to Rule 2(C) of Your Honor's Individual Rules of Practice and Local Civil Rule 37.2, the parties respectfully submit this joint letter to request a pre-motion conference regarding certain discovery disputes.[1] The parties met and conferred telephonically on May 5, 7, 19, and 30, and June 5 and 9, 2025, and subsequently through email. While they came to agreement on many of the propounded discovery requests, they are at impasse with respect to the items described below. Each request in dispute is set forth in Exhibit A.[2]

## I. Plaintiffs' RFP 16

> RFP 16: All Documents and Communications relating to how and why Coinbase Users' Crypto-Assets may be subject to the claims, rights, or interests of Coinbase's creditors.

**Plaintiffs' Position**: Defendants have agreed to produce non-custodial documents sufficient to show Coinbase's written policies, in effect between October 8, 2019 and March 11, 2022, concerning how Coinbase users' crypto-assets may or may not be subject to claims by Coinbase's creditors in the event of its default or bankruptcy. But Defendants refuse to produce responsive external custodial documents or other communications with regulators, auditors, shareholders, and users.

Defendants do not dispute the relevance of the requested materials and fail to carry their burden to "to show why discovery should not be had." *MG Freesites Ltd. v. Scorpcast, LLC*, 2023 WL 2822272, at *3 (S.D.N.Y. Apr. 7, 2023) (Engelmayer, J.) (citation omitted). Determining whether crypto-assets held by Coinbase on behalf of users may be subject to claims by Coinbase's creditors goes directly to whether Coinbase has ownership interests in such crypto-assets and thus whether Coinbase is a statutory seller because it "passe[s] title, or other interest in the [crypto-assets], to [users] for value." *Pinter v. Dahl*, 486 U.S. 622, 642 (1988). Indeed, Coinbase's own SEC disclosures acknowledge that "crypto assets

---

[1] For the Court's convenience, the parties have combined their respective letters into this consolidated filing to permit them to raise their arguments concerning each disputed issue. The parties will not file any responsive letters.

[2] Unless otherwise noted, defined terms shall adopt the meanings set forth in the discovery requests propounded by the party seeking compulsion. However, neither party adopts the terms used by the other for any other purpose and does not waive their right to challenge the accuracy thereof.

we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."[3] On information and belief, Coinbase holds all crypto-assets pursuant to the same user agreements that apply to the Tokens at issue in this case. Communications between Coinbase and external parties concerning whether such Coinbase-held assets are subject to claims of Coinbase's creditors thus directly implicate key issues in this matter, including whether Coinbase holds "title, or other interest in" such assets. *Pinter*, 486 U.S. at 642; *cf.* ECF No. 94, at 15–16 (discussing "plaintiffs' argument that title and privity are to be determined by reference to traditional principles of property law, and not merely by the language of the User Agreement"). Yet Defendants' proposal to limit their responsive productions to Coinbase's "written policies" would not even capture public SEC disclosures of the type described above,[4] let alone responsive *non*-public communications with regulators. Such communications will show how Coinbase interprets and applies (or perhaps even contravenes) its written policies, and how its actual conduct was viewed by regulators. Given the undisputed relevance of the requested materials, as well as Defendants' own public statements about creditor claims in their SEC disclosures, Defendants' purported concerns about speculation and fishing expeditions fall flat.[5] Defendants claim there is no basis to infer that they applied their policies inconsistently, but the Second Circuit expressly found inconsistencies in Coinbase's own written user agreements, and this Court has left open the question of whether Coinbase's actual treatment of Tokens contravenes the statements made in some of its user agreements. *See* ECF No. 94, at 15–17 (citing *Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773, at *4 (2d Cir. Apr. 5, 2024)).

Defendants are also wrong in describing RFP 16 as "duplicative" of RFP 5.[6] The former concerns whether Coinbase's creditors may reach crypto-assets it holds for users, and it seeks all documents and communications concerning potential claims by Coinbase's creditors over users' crypto-assets. The latter seeks only documents sufficient to show how

---

[3] *E.g.*, Coinbase Global, Inc., Form 10-K, at 44 (Feb. 13, 2025). That "Defendants reject Plaintiffs' characterization of the risk disclosure in Coinbase Global's Form 10-K," as they state in footnote 7 below, further highlights the need for discovery of external communications on this issue.

[4] Defendants state below that their offer to produce non-custodial "written policies" responsive to RFP 16 "extends to the risk disclosure in Coinbase Global's Form 10-K that Plaintiffs highlight," but no reasonable interpretation of "written policies" covers SEC disclosures. To the extent Defendants are suggesting they will produce the 2024 Form 10-K as a one-off exception to their offer to produce only written policies, that is insufficient. To the extent they are proposing to modify the scope of their offer, they should say so plainly.

[5] Defendants' suggestion below that communications responsive to RFP 16 may not "even exist" undermines any burden argument they hint at. Regardless, Defendants' "general and conclusory objections as to … burden are insufficient to exclude discovery of requested information." *MG Freesites Ltd.*, 2023 WL 2822272, at *3 (citation omitted).

[6] RFP 5 requests "Documents, including but not limited to Documents provided to any regulator(s) and/or government entity or entities, sufficient to show how Coinbase (a) has held Crypto-Assets transacted on, with, or through the Coinbase Exchanges, (b) has accounted for such Crypto-Assets, including any draft, unaudited, and audited accounting statements and working papers, including but not limited to ledgers and financial statements, concerning such Crypto-Assets, and (c) periodically reconciled the aggregate holdings of Crypto-Assets recorded in User accounts with the amounts of Crypto-Assets received by Coinbase from Users and held in any digital 'wallets' or other repositories in which Coinbase has held any Crypto-Assets."

Coinbase held and accounted for crypto-assets transacted on its platform. Defendants' focus on the difference between "all" and "sufficient," but they ignore the material difference between the subject matter of the two requests. Accordingly, RFP 16 is not duplicative of RFP 5.

In response to Coinbase's articulated concerns that the discovery sought would implicate privileged communications, Plaintiffs have already agreed to narrow the scope of requested custodial communications solely to *external* communications with regulators, auditors, shareholders, and users concerning this topic. By forgoing Defendants' internal communications on this topic, Plaintiffs' proposal more than adequately addresses Defendants' purported privilege and burden concerns. Unlike Plaintiffs' objections to producing tax-related information, *infra* Part II.B, Defendants do not articulate any confidentiality concerns as to custodial records that cannot be addressed with the Protective Order (ECF No. 110). Defendants therefore have no valid objection to the limited custodial documents and external communications Plaintiffs seek in response to RFP 16.

**Defendants' Position**: This request is overly broad, unduly burdensome, and should be rejected. Section 2.7.1 of Coinbase's User Agreement establishes that interests in digital assets are held for customers, are not property of Coinbase, and are not subject to claims of Coinbase's creditors. In addition, Defendants have already agreed in their written Responses and Objections to produce documents "sufficient to show Coinbase Inc.'s written policies . . . concerning how Users' Tokens may or may not be subject to any of Coinbase, Inc.'s creditors in the event of default or bankruptcy." Any such policies will provide Plaintiffs with information regarding Coinbase's relationships with creditors and how they may bear on the statutory seller issue. Indeed, this offer also extends to the risk disclosure in Coinbase Global's Form 10-K that Plaintiffs highlight above.[7] That disclosure, of course, is public and any policies underlying its inclusion will be produced. Plaintiffs have offered no explanation as to why this offer is inadequate, or why external custodial communications, such as those with regulators—to the extent they even exist—would add anything beyond what responsive non-custodial documents would show. *See Sahu v. Union Carbide Corp.*, 262 F.R.D. 308, 317 (S.D.N.Y. 2009) (denying discovery request with "the potential to dredge up a mountain of irrelevant documents . . ."). Rather, Plaintiffs' speculative assumption of what they might find in external communications defies logic. There is no reason to believe that Coinbase "interprets and applies (or perhaps even contravenes)" its own written policies inconsistently, let alone communicates as much externally.

Courts routinely reject such improper "fishing expeditions," which are based on mere speculation and unsupported by evidence or allegations. *MG Freesites Ltd. v. Scorpcast, LLC*, No. 22 MC. 361 (PAE), 2023 WL 2822272, at *5 (S.D.N.Y. Apr. 7, 2023)

[7] For the avoidance of doubt, Defendants reject Plaintiffs' characterization of the risk disclosure in Coinbase Global's Form 10-K, including that it is any "acknowledgement" by Coinbase. This risk factor was added in response to the SEC's March 31, 2022 Staff Accounting Bulletin (SAB") 121, recommending such a risk disclosure for every company holding crypto assets for its customers, regardless of the actual risk of bankruptcy. In any event, SAB 121 was rescinded in January 2025.

(noting that a discovery request "requires a non-speculative basis to be sustained" and ordering production on only one of nine requests where—unlike here—the requested materials were "reasonably calculated" to shed light on the scope of damages because of "gaps and inconsistencies in the financial information" already produced).[8] This Court should do the same.

This request is also duplicative of Plaintiffs' RFP 5, to which Defendants have agreed to produce documents "sufficient to show how Coinbase . . . has accounted for [] Crypto-Assets." Thus, whether Tokens may be subject to claims of creditors will be reflected in Defendants' agreed upon production. Plaintiffs' demand for a more expansive custodial document search would be both wasteful and unnecessary. *See Greenberg v. Malkin*, 39 F. App'x 633, 637 (2d Cir. 2002) (no compulsion of documents that were "duplicative of previously produced material"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-CV-05944SC, 2015 WL 13655394, at *9 (N.D. Cal. July 9, 2015) (denying "motion to compel production of [custodial] documents" that would be "significantly burdensome" but "of . . . questionable relevance"). That RFP 5 seeks "documents sufficient to show" and RFP 16 seeks "all documents" is of no moment. The productions Defendants have offered to make will provide Plaintiffs with the information they seek, *i.e.* whether customer assets are subject to creditors' claims. Any further production is cumulative and unnecessary.[9] Nor does Plaintiffs' compromise alleviate sensitivity and confidentiality considerations adding to Defendants' burden of reviewing and producing documents that are unlikely to be additive to the production already agreed to. The request for all external communications ought to be rejected as disproportional to the needs of the case.

## II. Defendants' Requests

### A. Defendants' RFPs 5 and 9

> RFP 5: All Documents and Communications concerning Your sale, transfer, or disposition of any Tokens on the Trading Platforms.
>
> RFP 9: From December 7, 2017 to the present, all Documents and Communications sufficient to identify Your use of the services of an investment advisor, broker, money manager, or financial advisor with respect to any of Your

[8] *See also, e.g., Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 436 (S.D.N.Y. 2011) ("[m]ere speculation as to the existence of additional documents is insufficient to warrant an order to compel"); *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) (discovery requests cannot be "based on pure speculation that amount[s] to nothing more than a fishing expedition"); *Lam v. State St. Corp.*, No. 24 Civ. 6098 (NRB), 2025 WL 834885, at *4 (S.D.N.Y. Mar. 17, 2025) ("Given the somewhat factually light basis for believing that the second search for documents will yield responsive and relevant documents that are meaningful to the litigation, the Court declines to compel production . . . ." (internal quotation omitted)).

> purchases, receipts, acquisitions, sales, transfers, or dispositions of any Token.

**Defendants' Position**: Plaintiffs should produce documents concerning their sales of Tokens on the Coinbase platforms because they are directly relevant to their allegations regarding the issue of title.[10] Plaintiffs do not claim any burden associated with producing these documents, and their position that their Token sales are not relevant to the statutory seller question is belied by their own allegations. Plaintiffs have alleged that "Coinbase is an intermediary in every transaction it effects . . . Coinbase stands between the buyer *and seller* in each trade on its platform . . ." (AC ¶ 6). Plaintiffs cannot argue that their sales are not relevant when they allege (without support) that Coinbase stands as the buyer in those transactions. To the extent Plaintiffs' own records and communications reflect how they viewed transactions—including whether they considered themselves to be selling Tokens to other Coinbase users rather than to Coinbase itself—they are relevant to their passing-title theory in this case.

Plaintiffs' argument with respect to relevance is off base. That Section 12(a)(1) is a strict liability statute is unrelated to the question of whether title passed to Coinbase or not.[11] That question will be determined in part—under traditional principles of property law—by looking to both parties' understandings.[12] Indeed, in opposing Defendants' motions to dismiss and for judgment on the pleadings in this case, Plaintiffs argued to this Court and to the Second Circuit six times that Coinbase cannot by "*ipse dixit*" unilaterally disclaim title in its User Agreement.[13] If Coinbase cannot unilaterally determine whether title passes, then Plaintiffs' own understanding must be relevant. Plaintiffs' argument that "Coinbase's attempt to turn itself into a non-seller by pure *ipse dixit* in a disputed user agreement would be a change 'not within the reasonable contemplation of the parties when the contract was entered into,'" *Oberlander*, Doc. 45 at 45, affirmatively puts their contemplation of the passage of title into contention in this litigation.

**Plaintiffs' Position**: Plaintiffs' sales or other dispositions of the Tokens are irrelevant to the sole issue subject to discovery at this bifurcated stage: whether *Defendants* acted as statutory sellers for purposes of Section 12(a)(1) of the Securities Act of 1933, which "creates a private right of action for the purchaser against the seller," ECF No. 94,

---

[10] Defendants' RFP 5 relates specifically to Plaintiffs' sales. RFP 9 relates to Plaintiffs' use of investment advisers, for which they have offered to produce documents relating to purchases, but not sales.

[11] Moreover, even as a strict liability statute, equitable defenses may be raised. *See Zola v. Gordon*, 685 F. Supp. 354, 362 n. 8 (S.D.N.Y. 1988) ("the law of the Second Circuit is that section 12(1) claims are subject to estoppel").

[12] *See, e.g. In re Sale Guar. Corp.*, 220 B.R. 660, 665 (B.A.P. 9th Cir. 1998), aff'd, 199 F.3d 1375 (9th Cir. 2000) ("It is ***the parties' belief*** . . . that is relevant evidence of whether they intended the Debtor to receive unrestricted title." (emphasis added)); *In re NLiquidation, Inc.*, 2018 WL 3524585, at *5 (Bankr. N.D.N.Y. July 20, 2018) ("a transfer of title [may be] deemed to have occurred" based on the terms of the parties' agreement).

[13] *See* ECF 62 at 14; ECF 84 at 1, 6, 10; *Oberlander v. Coinbase Global Inc.*, No. 23-cv-0184 (2d Cir. 2023), Doc. 45 at 45, Doc. 94 at 25.

at 11, and analogous state laws. Because "selling unregistered securities is a strict liability offense," *Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349, 356 (S.D.N.Y. 2011), Defendants' effort to discover how Plaintiffs "viewed transactions" is misguided. Indeed, any hypothetical evidence that Plaintiffs (who are not experts or lawyers) "considered themselves to be selling Tokens to other Coinbase users," as Defendants suggest, would simply reflect Plaintiffs' awareness of downstream buyers standing on the other side of Coinbase. It would have no bearing on whether Coinbase acted as an "intermediary," AC ¶ 6, and passed title, or other interest in the Tokens, to Plaintiffs. Defendants' theory of relevance—that Plaintiffs' sales will reveal "how they viewed transactions" in which they acted as sellers, which will say something about whether Coinbase held title in such transactions, which will inform whether Coinbase acted as a statutory seller when Plaintiffs acted as *purchasers*—is too attenuated to support discovery into this issue. Contrary to Defendants' contention above, Plaintiffs' prior "*ipse dixit*" argument did not put Plaintiffs' "own understanding" of their sales at issue. That argument concerned Coinbase's effort to disclaim title in the user agreements despite, as Plaintiffs allege, actually treating Tokens in the manner of a title-holder. It therefore put Defendants' *actual conduct* at issue.

Defendants are also wrong in claiming that their requested discovery into Plaintiffs' sales would not impose burdens far outweighing any marginal relevance. RFPs 5 and 9 seek *all* responsive documents and communications, requiring searches of custodial files. Holding Defendants to the limited scope of bifurcated discovery at this stage will not prejudice Defendants. To the extent Defendants believe that Plaintiffs' sales are relevant to other issues in the case, such as class certification, they may renew their RFP 5 and (as to sales) RFP 9 at the appropriate time.

**B. Defendants' RFPs 13-14**

> RFP 13: From December 7, 2017 to the present, all Documents or Communications concerning your personal accounting with respect to the Tokens including, but not limited to, brokerage account statements, communications with financial advisors, estate planning documents, and applications for credit.

> RFP 14: From December 7, 2017 to the present, all Documents or Communications concerning your personal taxes with respect to the Tokens including, but not limited to, communications with the Internal Revenue Service, annual tax filings and returns and communications with tax experts or advisors.

**Defendants' Position**: Plaintiffs should produce documents responsive to RFPs 13 and 14, as they call for information at the heart of this phase of the litigation: whether Plaintiffs treated the Tokens in their Coinbase accounts as if title resided with them, rather than with Coinbase (as they have incorrectly alleged). As discussed *supra*, both parties'

understandings of title are relevant. Whether ownership interests can be held by two parties at once by way of the separation of legal and equitable title does not change that Plaintiffs' understanding of whether either or both forms of title transferred to Coinbase for their digital assets is crucially relevant. Documents showing how Plaintiffs treated the Tokens from an accounting and tax perspective bear directly on that question. For example, applications for credit often ask the applicant to disclose their assets. If worded in terms of title and one of the Plaintiffs stated on such an application that they held title to the assets they stored on Coinbase, this would speak directly to the issue of whether Defendants can be considered statutory sellers. Plaintiffs do not claim any burden associated with these requests. And they have conceded their relevance by seeking in their own RFP 5 documents showing how Coinbase "has accounted for such Crypto-Assets." Plaintiffs cannot seek Coinbase's accounting-related documents while simultaneously shielding their own similar documents from discovery because each sides' records go to the issue of title. This clear showing of relevance distinguishes each of Plaintiffs' cited cases.

Moreover, Plaintiffs' complaint that these documents reflect sensitive personal information is easily remedied; the protective order entered in this case protects such documents from public disclosure.[14] Courts have also previously allowed for tax returns to be produced in redacted form which, depending on the nature of the redactions, Defendants may be amenable to here.[15] *See In re Forfeiture Ord. of Tim Leissner*, No. 23 MC 1505 (MKB), 2025 WL 1166981, at *11 (E.D.N.Y. Feb. 28, 2025) (collecting cases).

Plaintiffs' citation to *In re Tether & Bitfinex Crypto Asset Litig.*, 2023 WL 5116817, at *1 (S.D.N.Y. July 6, 2023), is inapposite. In *Tether*, defendants requested production of tax returns as "necessary to probe Plaintiffs' damages and confirm relevant transactions, and [because] the information is not available through other sources." *Id.* at *1. But plaintiffs in *Tether* had already provided a summary of the requested transactions, making the production of tax returns wholly unnecessary to assess the requested transactions. *Id.* at *1-*2. Here, by contrast, Plaintiffs have not offered any other means for obtaining their accounting treatment for their Tokens. Indeed, where—as here and unlike in *Tether*—no alternative information is available, there is a compelling need for production of tax returns. *See Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2021 WL 1226596, at *3 (S.D.N.Y. Mar. 31, 2021) ("tax returns are clearly relevant to [plaintiffs'] claims, and [plaintiffs] had yet to produce any financial documents . . . There was thus a compelling need for their production."). Plaintiffs' production of their Coinbase transaction logs does not demonstrate how they view the issue of title like accounting and tax documents might. The only way for Defendants to adequately probe this relevant aspect of the case, which is by no means undisputed, and be able to fairly defend against Plaintiffs' claims, is for Plaintiffs to produce documents in response to RFPs 13 and 14.

[14] To the extent Plaintiffs argue that collecting accounting documents from individuals rather than corporations is more burdensome, they offer no support for this sheer conjecture.

[15] For example, Defendants are amenable to Plaintiffs redacting on their tax returns any personally identifiable information, bank account information, and fiat-related information that is not relevant to their holdings of digital assets.

**Plaintiffs' Position**: "[T]he heart of this phase of the litigation" is not, as Defendants contend, how *Plaintiffs* "treated the Tokens in their Coinbase accounts," but rather how *Coinbase* treated them. *See* ECF No. 94, at 13 ("The AC's pleading, upheld by the Circuit as plausible, is that Coinbase controls the title to all the digital assets because it 'place[s] all deposited assets into a centralized wallet.'" (quoting AC ¶ 34)). As noted above, Plaintiffs' subjective views of their Tokens are irrelevant to the statutory-seller issue because "selling unregistered securities is a strict liability offense." *Cobalt Multifamily*, 857 F. Supp. 2d at 356. Discovery into Plaintiffs' accounting treatment is also unnecessary because Plaintiffs have expressly alleged that they purchased Tokens on the Coinbase Exchanges and thus do not dispute that they held some form of ownership interests in the Tokens they purchased. *E.g.*, AC ¶ 1, 90, 909, 941; *see Liyan He v. Cigna Life Ins. Co. of N.Y.*, 304 F.R.D. 186, 189 (S.D.N.Y. 2015) (finding "no need for discovery into" undisputed facts). Plaintiffs' ownership interest in Tokens on Coinbase is entirely consistent with their theory that Coinbase *also* held ownership interests in, and passed title to, such Tokens. *E.g.*, *Von Ritter v. Columbia Cnty. Sheriff's Dep't*, 1992 WL 175535, at *1 (N.D.N.Y. July 21, 1992) (recognizing "separation of legal and equitable title," with legal title vested in a custodian). Defendants draw a false equivalence between discovery into *Plaintiffs'* accounting and discovery into *Coinbase's* accounting. How Coinbase accounts for Tokens it holds on behalf of its users is squarely relevant to whether "Coinbase controls the title" to those Tokens, ECF No. 94, at 13. Discovery of Plaintiffs' accounting, by contrast, would not assist the Court's statutory-seller analysis.

Contrary to Defendants' argument above, obtaining accounting- and tax-related discovery from Plaintiffs is not "[t]he only way" they can "fairly defend against Plaintiffs' claims." With respect to tax records, courts have routinely "hesitated to require disclosure of the requested information and have rejected similar attempts to compel production of tax information to attack a party's credibility," based on both the private nature of the sensitive information contained therein" and "the public interest in encouraging the filing by taxpayers of complete and accurate returns." *Xiao Hong Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 660 (2d Cir. 2018) (internal quotation marks omitted) (collecting cases); *accord Shih v. Petal Card, Inc.*, 2021 WL 5279395, at *6 n.8 (S.D.N.Y. Nov. 12, 2021); *Agerbrink v. Model Serv. LLC*, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017); *Rosas v. Alice's Tea Cup, LLC*, 127 F. Supp. 3d 4, 11 (S.D.N.Y. 2015). As Defendants concede (as both of their cited cases require), a party requesting the production of tax records "bears the burden of establishing both [1] relevancy and [2] a compelling need." *In re Tether & Bitfinex Crypto Asset Litig.*, 2023 WL 5116817, at *1 (S.D.N.Y. July 6, 2023); *accord Wexler v. Allegion (UK) Ltd.*, 2021 WL 1226596, at *3 (S.D.N.Y. Mar. 31, 2021). Defendants' harassing fishing expedition easily fails both prongs.

*First*, Plaintiffs' financial records are not relevant to the statutory-seller issue for the reasons discussed above. If Defendants believe the records are relevant to later issues, they may renew their request at the appropriate time.

*Second*, Defendants demonstrate no need for Plaintiffs' financial and tax records because any potentially relevant information exists in Plaintiffs' Coinbase transaction data,

which Defendants already possess.[16] Defendants "can verify transaction records through cross-checking Plaintiffs' [forthcoming] productions against public blockchain activity," and "may explore transactions-related issues through depositions of Plaintiffs." *In re Tether*, 2023 WL 5116817, at *1. Defendants attempt to distinguish *Tether* because the plaintiffs there had "already provided a summary of the requested transactions," but Plaintiffs here have similarly committed to producing relevant transaction data, which Defendants can corroborate with their own records. In *Wexler*, the plaintiff's tax returns were "relevant to his damages claims" resulting from alleged defamation. 2021 WL 1226596, at *2. No such issues are presented in this case, let alone in this bifurcated phase of discovery. Accordingly, the Court should not compel responses to Defendants' RFPs 13 or 14, particularly on issues such as tax records that are subject to significant privacy concerns and restrictions as detailed above.

Respectfully submitted,

<u>/s/ *Jordan A. Goldstein*</u>
Jordan A. Goldstein
Oscar Shine
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
jgoldstein@selendygay.com

Steven L. Bloch
Ian W. Sloss
SILVER GOLUB & TEITELL LLP
184 Atlantic Street
Stamford, CT 06901
Telephone: (203) 325-4491
sbloch@sgtlaw.com
isloss@sgtlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

<u>/s/ *Lara A. Flath (on consent)*</u>
Jay B. Kasner
Lara A. Flath
Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
jay.kasner@skadden.com
lara.flath@skadden.com
alexander.drylewski@skadden.com

*Attorneys for Defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong*

Encl: Exhibit A

Cc: All counsel of record (via ECF)

[16] "[T]here is no reason to assume that [Defendants' own] records are less reliable than any records maintained by [Plaintiffs]." *Rosas*, 127 F. Supp. 3d at 11 (quoting *Rengifo v. Erevos Enters., Inc.*, 2007 WL 894376, at *2 (S.D.N.Y. Mar. 20, 2007)).

# Exhibit A

| Nos. | DISPUTED REQUESTS FOR PRODUCTION |
|---|---|
| Plaintiffs' RFP 16 | All Documents and Communications relating to how and why Coinbase Users' Crypto-Assets may be subject to the claims, rights, or interests of Coinbase's creditors. |
| Defendants' RFP 5 | All Documents and Communications concerning Your sale, transfer, or disposition of any Tokens on the Trading Platforms. |
| Defendants' RFP 9 | From December 7, 2017 to the present, all Documents and Communications sufficient to identify Your use of the services of an investment advisor, broker, money manager, or financial advisor with respect to any of Your purchases, receipts, acquisitions, sales, transfers, or dispositions of any Token. |
| Defendants' RFP 13 | From December 7, 2017 to the present, all Documents or Communications concerning your personal accounting with respect to the Tokens including, but not limited to, brokerage account statements, communications with financial advisors, estate planning documents, and applications for credit. |
| Defendants' RFP 14 | From December 7, 2017 to the present, all Documents or Communications concerning your personal taxes with respect to the Tokens including, but not limited to, communications with the Internal Revenue Service, annual tax filings and returns and communications with tax experts or advisors. |