January 28, 2026

**VIA ECF**
Hon. Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 2201
New York, New York 10007

      RE:    *Underwood, et al. v. Coinbase Global, Inc.*, 1:21-cv-08353-PAE

Dear Judge Engelmayer:

      Pursuant to Rule 3.H of Your Honor's Individual Rules of Practice and the Modified Case Management Plan (ECF 139), Defendants write to confirm that they intend to move for summary judgment on whether Coinbase is a statutory seller of the Tokens at issue. Discovery has confirmed that summary judgment in Defendants' favor is warranted.

**Relevant Background**

      Defendants anticipate that much of the factual record will be undisputed, and submit that the parties should be able to reach agreement on many of the material facts. That record confirms the core principle articulated in the operative User Agreements: i.e., that Coinbase users retain title and control over their digital assets at all times.[1] Discovery into the operations of the Coinbase, Inc. trading platforms has confirmed that Coinbase acts as an agent and intermediary, matching users' transactions on their behalf. Thus, when a user submits an order, Coinbase's internal matching engine searches for counterparties and executes the trade on their behalf. The transaction is then immediately recorded on Coinbase's internal ledger to reflect the simultaneous debiting and crediting of the users' custodial accounts. As with traditional financial transactions involving intermediaries, the user alone controls when and how to transfer the asset and retains all economic rights associated with that asset. Coinbase does not (and cannot) decide how such assets are used or disposed of, nor does it bear market risk of the assets.

      Although Coinbase maintains an omnibus wallet that holds users' digital assets, Coinbase individually and distinctly ledgers users' assets. Coinbase does not have any economic interest in those assets and title remains with the users at all times—a fact that is further confirmed by Coinbase's internal accounting procedures. Moreover, while Coinbase offers trading services to users (and can, for example, implement withdrawal limits or other restrictions as to those services), its role as a trading platform does not render

---

[1] "Title to Digital Currency shall at all times remain with you and shall not transfer to Coinbase." (Section 2.6.1.); "You control the Digital Currencies held in your Digital Currency Wallet." (Section 2.6.2.) Although Defendants anticipate that Plaintiffs will point to certain language in versions of the User Agreement prior to September 2020 that mentions buying tokens "from Coinbase," this language must be read in harmony with the more specific provisions that speak directly to title and control. Furthermore, the operations of the trading platforms confirm that users buy and sell from each other—not Coinbase.

Hon. Paul A. Engelmayer
January 28, 2026

it a buyer or seller of users' assets—rather, only users can authorize trades and direct trades of their assets. Finally, while Coinbase posts market pricing and news about digital assets, it makes clear that such information is for informational purposes only, and is not an endorsement of, or recommendation to buy, any particular digital asset.

Under *Pinter v. Dahl*, a defendant can be held liable as a statutory seller if it: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities['] owner." 486 U.S. 622, 642, 647 (1988). Coinbase does not meet either prong.

**The Undisputed Facts Show That Coinbase Did Not Pass Title in Transactions Between Users**

The User Agreement establishes that Coinbase users held title to their assets. Because title is a legal issue defined by the parties' agreement, the terms of the User Agreement are dispositive. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) ("[T]he effect of [contract] terms on ownership is strictly a question of law."). Indeed, courts routinely look to parties' contracts to determine whether title passed and on what terms. *Generation Next Fashions Ltd. v. JPMorgan Chase Bank, NA.*, 698 F. Supp. 3d 663, 675-76 (S.D.N.Y. 2023); *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 330 (S.D.N.Y. 2010). Tellingly, bankruptcy courts have relied on the terms of user agreements to determine ownership of digital assets. *See, e.g.*, *In re Celsius Network LLC*, 647 B.R. 631, 651-59 (Bankr. S.D.N.Y. 2023). This legal reality is confirmed by the undisputed facts regarding Coinbase's operations and accounting treatment, as summarized above.[2]

**The Undisputed Facts Show That Coinbase Did Not Successfully Solicit Plaintiffs' Purchases**

To meet *Pinter*'s second prong, Plaintiffs must demonstrate (1) Coinbase's "direct and active participation in the solicitation of the immediate sale" and (2) "that plaintiffs purchased and sold the Tokens as a result of such solicitation." (ECF 71 at 17-19.) The undisputed evidence confirms that Plaintiffs cannot do either.

The Amended Complaint alleges that Coinbase "promote[d] the sale of Tokens" by (1) listing descriptions and prices of Tokens, (2) providing news updates on pricing movements and linking to stories about Tokens, and (3) participating in "direct promotions." (ECF 43 ¶ 911; ECF 71 at 17-18.) But these activities do not establish active solicitation as a matter of law. (ECF 71 at 18.) The record also confirms that Coinbase does not solicit the purchase of any Tokens—through these methods or otherwise. For example, the prices provided on its website or through the Coinbase app are simply market-driven prices provided for informational purposes, and such data is accompanied by a disclaimer that it does not constitute a recommendation or financial advice. Similarly, while Coinbase's tweets and blog posts provide informational announcements, including about

---

[2] Because Coinbase is not a statutory seller, the Section 12(a)(1) claims against Coinbase Global, Inc., as well as the control person claims against Coinbase Global and Brian Armstrong, necessarily fail.

Hon. Paul A. Engelmayer
January 28, 2026

new assets available for trading; they do not urge or persuade particular users to purchase any particular Token. Likewise, Coinbase's rewards programs sought to draw attention to the platform at large or allow users to obtain digital assets from the issuer (not Coinbase); they did not encourage the purchase of any specific Token. Tellingly, many rewards programs did not involve the purchase of a Token at all. In sum, any promotion by Coinbase through its website, social media, or rewards programs is not "solicitation" within the meaning of *Pinter*.

Second, there is no dispute that Defendants did not "successfully" solicit Plaintiffs' purchases. Both Lead Plaintiffs testified that they relied on other social media and news sources to make investment decisions—not any news or information provided by Coinbase other than the Token prices themselves, which are not solicitations.

### The Undisputed Facts Show That Coinbase Is Not Liable For Inventory Transactions

While the Coinbase platform primarily operates by matching and executing transactions between users as discussed above, discovery shows that there was a *de minimis* amount of transactions during the purported Class Period—about 0.3–0.5%—that were filled using Coinbase's separate corporate inventory. Those rare transactions were not part of Coinbase's ordinary business and occurred only under limited circumstances, such as during exchange outages or orders below a minimum order size. The existence of these "inventory transactions" does not preclude summary judgment, particularly as to the overwhelming majority of other transactions that were facilitated between users. Moreover, these inventory transactions cannot give rise to liability under the Securities Act of 1933 because they are exempt from Section 12(a)(1) on the ground that Coinbase did not perform the sales as an issuer, underwriter, or dealer. *See* 15 U.S.C. § 77d(a)(1).[3]

### Plaintiffs' State Law Claims Fall Together With the Federal Claims

Plaintiffs' state law claims fail for the same reasons outlined above, as it is well settled that where "a state law is patterned after a federal law, the two are construed together." (ECF 94 at 21 (collecting cases).)

### Plaintiffs Lack Standing Based on Former Plaintiff Oberlander's Purchases

Finally, while Plaintiffs bring claims relating to 79 Tokens, 19 of the Tokens were purchased only by former plaintiff Oberlander, who has since withdrawn from the case (ECF 128), and not by remaining Plaintiffs Rodriguez or Underwood. Accordingly, the remaining Plaintiffs lack standing to bring any claims relating to these Tokens. *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 334 (S.D.N.Y. 2021) ("[T]he plaintiff lacks standing to bring suit regarding tokens that he did not purchase.").

Defendants look forward to discussing these issues with the Court on February 13.

---

[3] Even if Coinbase were considered a dealer for these transactions, Coinbase would still be exempt from liability pursuant to 15 U.S.C. § 77d(a)(3).

Hon. Paul A. Engelmayer
January 28, 2026

        Respectfully submitted,

        /s/ *Lara A. Flath*
        Jay B. Kasner
        Lara A. Flath
        Alexander C. Drylewski
        SKADDEN, ARPS, SLATE,
           MEAGHER & FLOM LLP
        One Manhattan West
        New York, NY 10001
        Telephone: (212) 735-3000
        jay.kasner@skadden.com
        lara.flath@skadden.com
        alexander.drylewski@skadden.com

        *Counsel for Defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong*

cc:    All counsel of record (via ECF)