**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER UNDERWOOD, et al., *Individually and on Behalf of All Others Similarly Situated*, <br><br> Plaintiffs, <br><br> v. <br><br> COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG, <br><br> Defendants. | Case No. 21 Civ. 8353 (PAE) |

**BRIEF OF AMICUS CURIAE THE DIGITAL CHAMBER**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

CAHILL GORDON & REINDEL LLP
Samson A. Enzer
Lewis Rinaudo Cohen
Miles C. Wiley, IV
Gregory Mortenson
Victoria H. Yuhas
32 Old Slip
New York, New York 10005
(212) 701-3000

*Counsel for Amicus Curiae*
*The Digital Chamber*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Holsworth* v. *BProtocol Foundation*,
    2021 WL 706549, (S.D.N.Y. Feb. 22, 2021)) ...............................................................9, 10

*In re Celsius Network LLC*,
    647 B.R. 631 (Bankr. S.D.N.Y. 2023) ................................................................................8

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002).........................................................................9

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988)..................................................................................... *passim*

*Risley* v. *Universal Navigation Inc.*,
    2025 WL 615185 (2d. Cir. Feb. 26, 2025) ........................................................................8, 9

*SEC* v. *Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) ................................................................................2n

*Wilson* v. *Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989)..............................................................................................8

**Statutes**

31 U.S.C. § 5311 *et seq.*....................................................................................................5n

Securities Act of 1933 § 12................................................................................ *passim*

**Other Authorities**

Lewis R. Cohen, Gregory Strong, Freeman Lewin & Sarah Chen,
    *The Ineluctable Modality of Securities Law* (Nov. 10, 2022),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4282385...............................................2n

Felix Eigelshoven, André Ullrich, & Douglas Parry, *Cryptocurrency Market
    Manipulation - A Systematic Literature Review* (2021),
    https://aisel.aisnet.org/icis2021/fintech/fintech/1/ ....................................................5n

Sascha Hägele, *Centralized Exchanges vs. Decentralized Exchanges in
    Cryptocurrency Markets: A Systematic Literature Review*, Electronic Mkts.
    33:34 (2024), https://doi.org/10.1007/s12525-024-00714-2 .............................................4n, 5n

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICUS CURIAE .............................................................. 1

INTRODUCTION ................................................................................................................. 2

BACKGROUND .................................................................................................................. 4

ARGUMENT ....................................................................................................................... 7

    I.    Coinbase is Not a "Statutory Seller".................................................................... 7

        A.   Coinbase Does Not Pass Title in Transactions on Its Platform. .................................... 7

        B.   Coinbase Did Not Engage in "Solicitation" by Facilitating User Transactions. ............ 9

    II.   Adopting Plaintiffs' Theory Would Ultimately Harm Consumers................................. 10

CONCLUSION.................................................................................................................... 13

**STATEMENT OF INTEREST OF AMICUS CURIAE**

The Digital Chamber ("TDC") is the oldest and largest trade association dedicated to the digital asset and blockchain industry, representing more than 250 diverse members across the ecosystem, including digital asset exchanges, leading banks and investment firms, and other market participants who build, use, and custodially support blockchain-based technologies in the United States and globally.  TDC's mission is to advocate for a clear and workable legal environment for the digital asset industry so that market participants understand their regulatory obligations and feel safe to develop and deploy digital asset and blockchain solutions across commercial, technological, and social use cases, promoting growth and responsible innovation, particularly in the United States.  Filing *amicus curiae* briefs in cases of consequence to the industry is an important part of TDC's mission, and the organization regularly appears as amicus to provide courts with industry expertise and broader policy context that bear on the proper application of the federal securities laws in the digital asset domain.

TDC has a substantial interest in this case because the resolution of whether Coinbase is a "statutory seller" under Section 12 of the Securities Act of 1933 (as amended) (the "Securities Act") will shape not only the outcome here but also the legal architecture governing digital asset exchanges and trading platforms in the United States.  A broad ruling deeming Coinbase a "statutory seller" would lead to ministerial trading functions suddenly resulting in primary-seller liability for digital asset exchanges.  Such an expansion of statutory seller liability could dissuade future market participants from entering the industry altogether, or lead to trading platforms avoiding the U.S. market or scaling back the features they offer.  These outcomes would harm consumers, and diminish U.S. competitiveness—systemic consequences TDC has consistently highlighted in other briefs when urging courts to reject legal theories that, should they prevail, would result in pushing innovation and market activity offshore.

1

# INTRODUCTION[1]

Coinbase's motion for summary judgment presents a focused legal question with substantial implications for the digital asset and blockchain industry, market participants, users of Coinbase and other digital asset trading platforms, and traditional financial markets: whether Coinbase is a "statutory seller" under Section 12 of the Securities Act for matched-user transactions executed on its centralized trading platforms.[2]  Under the Supreme Court's decision in *Pinter* v. *Dahl*, it is not.  *Pinter* confines Section 12 liability to an immediate seller that passes title of a security, or to an actor that successfully solicits a security purchase for its own or an owner's financial interest.[3]  *Pinter* does not extend statutory seller liability to parties that merely assist in the transaction.  Here, Coinbase's platforms are centralized, order-driven systems that pair counterparties through an automated matching engine and settle transactions off-chain by contemporaneously debiting and crediting user accounts on Coinbase's internal ledger.  Coinbase acts as the agent to facilitate purchases and sales between its users, and title to the digital assets remains at all times with the users.  In furtherance of this core function, Coinbase displays the

---

[1] In this submission, unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

[2] TDC addresses the "non-corporate inventory" transactions—often referred to by the parties as "matched transactions"—which constitute the vast majority of transactions at issue.  TDC takes no position with respect to the parties' arguments relating to "corporate inventory" transactions.  *See* Defendants' Pre-Motion Letter Seeking Summary Judgment, ECF No. 144 at 3 ("While the Coinbase platform primarily operates by matching and executing transactions between users as discussed above, discovery shows that there was a *de minimis* amount of transactions . . . that were filled using Coinbase's separate corporate inventory.").

[3] Nothing in this brief should be construed as an acknowledgement by TDC that the digital assets at issue in this case qualify as "securities."  Indeed, in applying the *Howey* test, courts have repeatedly recognized that digital assets themselves are not securities.  *See, e.g.*, *SEC* v. *Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023) (Torres, J.) (holding that the XRP token "[was] not in and of itself a contract, transaction or scheme").  *See also* Guidance on Application of Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, Release No. 33-11412 at 24-29 (Mar. 17, 2026), https://www.sec.gov/files/rules/interp/2026/33-11412.pdf.  Moreover, many transactions in digital assets do not and cannot qualify as securities transactions.  *See, e.g.*, *Ripple Labs*, 682 F. Supp. 3d at 328-29 (blind bid/ask sales of XRP token on digital asset exchanges were not securities transactions); Lewis R. Cohen, Gregory Strong, Freeman Lewin & Sarah Chen, *The Ineluctable Modality of Securities Law* at 58 (Nov. 10, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4282385 (concluding that "many secondary transactions involving crypto assets, particularly transactions conducted on centralized marketplaces or on DEXes or other DeFi platforms, lack the characteristics of investment contract transactions and, therefore, would not be considered a securities transaction").

2

price at which users can purchase or sell a particular token and also displays real-time valuation data, including bid-ask spreads, trading volume, and trading history, which users may reference when determining whether or not to place an order at their own discretion.  On these facts, Coinbase neither passes title in matched-user transactions nor engages in the kind of targeted, active solicitation *Pinter* requires.

To accept Plaintiffs' invitation to deem Coinbase's exchange-based functions—market-data displays, pricing information, order matching, custodial omnibus wallets, and facilitation fees—sufficient to establish statutory seller liability would expand Section 12 far beyond *Pinter*'s carefully drawn limits and mischaracterize the services that Coinbase actually provides. This expansion of liability would also likely drive market trading activity and innovation offshore or lead centralized exchanges (like Coinbase and many others) to reduce investment in features that provide significant value to users—including, for example, providing information on digital assets (*see* Joint Statement of Undisputed Facts ("JSF"), ECF No. 158 ¶¶ 52-59, 88-94).  Such predictable and far-reaching consequences would undermine American competitiveness in a key industry and harm consumers.  Increased liability risk may lead some centralized exchanges to exclude U.S. consumers entirely, straining access to the international financial system.

Moreover, the spillover risks from Plaintiffs' proposed expansion of statutory seller liability are not confined solely to digital assets.  Blurring settled distinctions between actors collateral to a transaction and actors so fundamental that they can be rightly deemed "sellers" would destabilize decades-old legal expectations for traditional securities exchanges and intermediaries that depend on the separation that *Pinter* preserves.  Entities at risk under Plaintiffs' proposed liability expansion include stock exchanges, broker-dealers, and other intermediaries in traditional financial markets.

3

TDC respectfully urges the Court to grant summary judgment in Coinbase's favor on statutory seller status for matched-user transactions and to preserve *Pinter*'s calibrated limits on liability.

## BACKGROUND

Digital asset exchanges are secondary trading platforms that enable users to buy, sell, and trade cryptocurrencies and other digital assets, rather than purchasing them directly from the initial creator or allocator of that digital asset. (*See* JSF ¶¶ 3, 22). Digital asset trading platforms bring together buyers and sellers, facilitate price discovery, and aggregate liquidity for the market. These digital asset exchanges generally fall into two categories—centralized exchanges ("CEXs") and decentralized exchanges ("DEXs")—which differ in how they custody assets, execute trades, and record transactions.[4]

Coinbase operates as a CEX. (JSF ¶ 7). Other examples of CEXs that operate in the United States include Kraken, Gemini, Crypto.com, Binance.US, and OKX. CEXs use "order books" to facilitate transactions between users, which establish the price for a particular cryptocurrency based on current buy and sell orders.[5] In essence, an "order book" is "a list of current buy orders (also known as 'bids') and sell orders (also known as 'asks') for a specific asset" that shows "the price buyer or seller is willing to pay" for a particular digital asset.[6] By aggregating these bids and asks, CEXs organize liquidity, facilitate price discovery, and simplify the trading process in a user-

---

[4] *See* Sascha Hägele, *Centralized Exchanges vs. Decentralized Exchanges in Cryptocurrency Markets: A Systematic Literature Review*, Electronic Mkts. 33:34 at 7, 12, 14 (2024), https://doi.org/10.1007/s12525-024-00714-2 ("Hägele Literature Review").

[5] *See* JSF ¶ 45; *see also What is a DEX?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-is-a-dex (last visited Apr. 27, 2026); Hägele Literature Review at 12.

[6] *See What is an order book?*, Coinbase, https://www.coinbase.com/learn/advanced-trading/what-is-an-order-book (last visited Apr. 27, 2026); *see also, e.g.*, Nic Tse, *What is a crypto order book and how do you use it?*, https://crypto.com/us/crypto/learn/what-is-a-crypto-order-book-how-to-use-it (last visited Apr. 27, 2026); *What Is an Order Book and How Does It Work?*, Binance Academy, https://www.binance.com/en/academy/articles/what-is-an-order-book-and-how-does-it-work (last updated Apr. 24, 2026). *See also* JSF ¶¶ 45-46.

friendly way.[7]  CEXs earn income by charging transaction fees on purchases and sales of digital assets by users based on trading volume.[8]

CEXs offer a variety of benefits to users, especially those who are new to digital asset trading or prefer a more streamlined experience.  Notably, CEXs like Coinbase offer customer support services (such as password recovery or assistance with executing a transaction) that may not be available on DEXs.  CEXs' focus on user-friendly features, coupled with an emphasis on regulatory and legal compliance, provide CEX users with the ability to trade digital assets with comparative confidence and peace of mind.  Moreover, CEXs also tend to have higher liquidity levels than their DEX counterparts, which can translate to faster trade execution and increased pricing stability—traits that appeal to a wide variety of customers.

To trade on a CEX, a user first sets up and funds an account.  In the United States, consistent with the Bank Secrecy Act,[9] the user onboarding process involves providing the CEX with Know Your Customer ("KYC") information, which helps the CEX prevent and halt illegal activity on the platform, such as money laundering or terrorism financing.[10]  Once the account is set up and funded, the user is ready to transact.  When a user places an order—for example to buy a particular amount of a specific digital asset—the CEX matches the buy order with a corresponding sell order,

---

[7] *See* Felix Eigelshoven, André Ullrich, & Douglas Parry, *Cryptocurrency Market Manipulation - A Systematic Literature Review* at 3 (2021), https://aisel.aisnet.org/icis2021/fintech/fintech/1/; *see also* Hägele Literature Review at 12-13.

[8] *See, e.g.*, *Fee Structure*, Binance.US, https://www.binance.us/fees (last visited Apr. 27, 2026) (trading fees determined by trading volume); *see also, e.g.*, *Fee Schedule*, Kraken, https://www.kraken.com/features/fee-schedule (last visited Apr. 27, 2026) (instant buy/sell trade fees determined by trading volume).  *See also* JSF ¶¶ 84-86.

[9] *See generally* 31 U.S.C. § 5311 et seq.

[10]    *See    Importance    of    KYC    Verification    for    Crypto    Exchanges*,    CoinMarketCap, https://coinmarketcap.com/academy/article/importance-of-kyc-verification-for-crypto-exchanges    (last    updated 2023); *see also, e.g.*, *What is Know Your Customer (KYC)?*, Coinbase, https://www.coinbase.com/learn/crypto-taxes/what-is-know-your-customer-kyc (last visited Apr. 27, 2026); *What's KYC: What to expect and why it matters?*, OKX, https://www.okx.com/en-us/help/whats-kyc-what-to-expect-and-why-it-matters (last updated Apr. 6, 2026). *See also* JSF ¶ 8.

generally through automated methods.[11]  These transactions occur "*off-chain*"—meaning that the purchases and sales that occur on CEXs are not recorded on the blockchain corresponding to the particular digital asset.[12]  Instead, CEXs typically maintain internal ledgers of users' transaction history.[13]

Importantly, even though CEXs may custody users' digital assets in exchange-controlled wallets, CEXs like Coinbase do not "actually possess the assets that are being traded – instead they function as a matchmaking service," or intermediary, "pairing interested buyers and sellers together."[14]  In other words, other than with respect to the classification of the assets that they trade, CEXs function much like traditional stock exchanges such as the New York Stock Exchange or Nasdaq:  they facilitate trading between users who place buy and sell orders into an order book without taking title to the underlying assets.  (*See, e.g.*, JSF ¶ 22 (Section 2.6.1 of the Coinbase User Agreements effective during the class period states that "[t]itle to Digital Currency shall at all times remain with you and shall not transfer to Coinbase.")).[15]

---

[11] *See, e.g.*, *Exchange Matching Engine*, Coinbase Docs, https://docs.cdp.coinbase.com/exchange/concepts/matching-engine (last visited Apr. 27, 2026); *see also, e.g.*, *How to trade on Crypto.com Exchange*, Crypto.com, https://help.crypto.com/en/articles/3514966-how-to-trade-on-crypto-com-exchange (last updated 2025). *See also* JSF ¶¶ 43-74.

[12] *See* Emily Ekshian, *On-Chain vs. Off-Chain Transactions*, Crypto Council for Innovation (Aug. 5, 2024), https://cryptoforinnovation.org/on-chain-vs-off-chain-transactions/. *See also* JSF ¶ 75.

[13] *See, e.g.*, Coinbase User Agreement Section § 2.7.4, https://www.coinbase.com/legal/user_agreement/united_states (last updated Mar. 19, 2026) ("we maintain separate ledgers for customers' accounts and accounts held by Coinbase for its own benefit"); Kraken Terms of Service § 2, https://www.kraken.com/legal/global-terms (last updated Apr. 13, 2026) ("We maintain separate ledgers for your account and our accounts."). *See also* JSF ¶¶ 75-80.

[14] *See What is an order book?*, Coinbase, https://www.coinbase.com/learn/advanced-trading/what-is-an-order-book (last visited Apr. 27, 2026); *see also, e.g.*, OKX Terms of Service § 4.6, https://www.okx.com/en-us/help/terms-of-service (last updated Apr. 21, 2026).

[15] Trading on DEXs is very different.  DEXs facilitate peer-to-peer trading through the use of smart contracts, which allow users to trade directly with one another without an intermediary. *What is a DEX?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-is-a-dex (last visited Apr. 27, 2026).  To transact on a DEX, a user must connect a self-custodial wallet, manage private cryptographic keys, and pay network transaction fees directly to the underlying blockchain to validate transactions.  Unlike with CEXs, transactions effected through DEXs are recorded on the public blockchain (*i.e.*, they occur "*on-chain*").  DEXs also generally do not require users to undergo KYC verification and lack certain features that come standard on CEXs.  "When considering between a DEX vs CEX[, both] have their distinct benefits and drawbacks.  One is not necessarily better than the other."  Blockchain Education,

**ARGUMENT**

**I.      Coinbase is Not a "Statutory Seller."**

Claims under Section 12 of the Securities Act may be asserted only against "statutory sellers," which include defendants that: (1) were "the buyer's immediate seller," who "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter* v. *Dahl*, 486 U.S. 622, 642, 644 n.21, 647 (1988). The statute "contemplates a buyer-seller relationship not unlike traditional contractual privity," and "remote purchasers are precluded from bringing actions against remote sellers." *Id.* at 642, 644 n.21. Here, the record demonstrates that, with respect to the matched transactions, Coinbase is not a statutory seller under either prong.

**A.      Coinbase Does Not Pass Title in Transactions on Its Platform.**

First, Coinbase did not "pass title" to any Plaintiff because Coinbase was not a counterparty to the Plaintiffs' transactions. (*See* Defendants' Pre-Motion Letter, ECF No. 144 at 2). Rather, as explained above (*see* Background Section, *supra*), Coinbase operates a CEX that allows users to transact directly with other users. Coinbase never holds title over the users' assets; users retain title at all times. (*See, e.g.*, JSF ¶ 22 (Coinbase User Agreement § 2.6.1)). Therefore, Coinbase is not a seller under *Pinter*'s first prong.

Moreover, Coinbase's custodial architecture—an operational necessity of a CEX—does not transfer title to Coinbase. Users deposit digital assets into Coinbase-hosted wallets, and Coinbase holds the cryptographic keys to access the wallets and aggregates user assets into omnibus wallets. (JSF ¶¶ 36-42). Coinbase individually ledgers each user's assets, maintains

---

*CEX vs. DEX: The Complete Guide to Crypto Exchanges* (Oct. 10, 2024), https://www.bitpay.com/blog/cex-vs-dex. For example, "CEXs are more accessible for beginners, while DEXs require more technical knowledge." *Id.*

separate internal balances, and does not—and contractually may not—sell, transfer, loan, hypothecate, or otherwise alienate user assets absent the user's instruction or a valid court order. (JSF ¶ 22 (Coinbase User Agreement § 2.6.1)).  These contractual terms are determinative; the users retain title to the assets, and an omnibus wallet is not a proprietary inventory.  *See, e.g.*, *In re Celsius Network LLC*, 647 B.R. 631, 637 (Bankr. S.D.N.Y. 2023) (identifying ownership of digital assets based on language of unambiguous terms of use).

The functions that Coinbase performs to facilitate transactions between users are collateral to the users' transactions and also do not supply the missing element of title passage.  As the Court in *Pinter* explained, Section 12's "failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants[] collateral to the offer or sale."  486 U.S. at 650.

The Second Circuit and courts within the Circuit have faithfully applied this principle since *Pinter* was decided more than 35 years ago, holding that even participation "essential to the transaction" does not create seller liability absent title passage or solicitation.  *Wilson* v. *Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125-26 (2d Cir. 1989) (rejecting liability for law firm performing acts "collateral" to the sale).  Indeed, last year the Second Circuit confirmed that collateral activity does not make an entity a statutory seller, even in digital asset transactions.  In *Risley* v. *Universal Navigation Inc.*, the Second Circuit held that neither the DEX at issue nor its creators were statutory sellers because "[t]he role of the smart contracts in the [platform] accords with that of base-level agreements for traders who access the stock market, whose function is ***solely to execute the trades***, and is ***collateral to the actual token sale***."  2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025).  The Circuit explained that "[e]ven assuming, *arguendo*, that title to the tokens temporarily passed from the issuer to the [platform] and then to Plaintiffs in those split-second

8

autonomous functions, it does not render Defendants sellers of the tokens" because "extending such liability to that role would be akin to holding the NASDAQ or the New York Stock Exchange liable as facilitators of any fraudulent stock purchase on their exchanges." *Id.*

Treating Coinbase's collateral actions—operating a matching engine, maintaining an internal ledger, and holding user assets in custodial omnibus wallets—as "selling" would obliterate the distinction between intermediaries and parties to a transaction—a distinction expressly provided for by the Supreme Court in *Pinter*.

**B.    Coinbase Did Not Engage in "Solicitation" by Facilitating User Transactions.**

Coinbase also did not "solicit" security transactions under *Pinter*'s second prong because it did not engage in conduct amounting to active and direct solicitation. *See In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *4 (S.D.N.Y. Feb. 20, 2002) (Stein, J.). (*See also* Defendants' Pre-Motion Letter, ECF No. 144 at 2-3). Rather, according to Plaintiffs, Coinbase provides descriptions of tokens, price information, and news updates, and occasionally distributes tokens to users free of any charge, in what is known as an "airdrop." (Amended Complaint, ECF No. 43 ¶ 911; Plaintiffs' Response to Defendants' Pre-Motion Letter, ECF No. 154 at 3; *see also* JSF ¶¶ 51-59).

These types of general, mass-communication efforts and promotions are not "solicitation" within the meaning of *Pinter*. For example, in *Holsworth* v. *BProtocol Foundation*, the plaintiff alleged that defendants "continuous[ly] and systematic[ally] market[ed]" the tokens at issue and engaged in widespread promotional activity designed to encourage investment. 2021 WL 706549, at *1 (S.D.N.Y. Feb. 22, 2021) (Pauley, J.). Nevertheless, the court found no statutory seller liability because the plaintiff failed to allege privity or "that he was directly contacted by

9

Defendants or that he purchased [the tokens] as a result of any active solicitations by Defendants."
*Id.* at *3.

## II.     <u>Adopting Plaintiffs' Theory Would Ultimately Harm Consumers.</u>

Recharacterizing core exchange trading infrastructure—central order books, automated matching engines, internal ledger settlement, custodial omnibus wallets, fee-based facilitation, and information streams—as "selling" or "offering" for Section 12 purposes would depart from *Pinter*'s carefully drawn lines between immediate sellers, offerors, and collateral participants. This would significantly expand the reach of Section 12 across digital asset trading platforms, as well as traditional securities exchanges.

Indeed, adopting Plaintiffs' theory would potentially expose all CEXs, all DEXs, many traditional financial market participants, and even data providers that provide basic information about assets to statutory seller liability. Each incorporates one or more features that Plaintiffs say make Coinbase a statutory seller. All CEXs and DEXs provide trading infrastructure, and many CEXs use the same features as Coinbase. Binance.US and Gemini, for example, place user assets into a centralized wallet. Like Coinbase, Kraken and OKX provide users with price information and news updates, at times engage in marketing efforts about tokens, and distribute free tokens to users. The front-ends used to access DEXs also provide traders with pricing info and news updates.

Key players in the traditional securities exchange market—including legacy institutions like the New York Stock Exchange and Nasdaq, as well as new entrants like Robinhood—also facilitate transactions and provide investors with pricing data and information regarding potential investments.[16]  Moreover, if applied strictly, Plaintiffs' theory could even impose Section 12

---

[16] *See, e.g.*, *NYSE Options*, NYSE, https://www.nyse.com/trade/options#products (last visited Apr. 27, 2026); *see also, e.g.*, Market Activity, Nasdaq, https://www.nasdaq.com/market-activity/stocks (last visited Apr. 27, 2026).

liability on popular news and informational platforms like Bloomberg, The Wall Street Journal, and Investopedia, which all provide real-time valuation information which inform their readers' purchases.

As set forth above in Section I, this is far beyond anything Congress intended for Section 12 liability and is barred by *Pinter*.  *See Pinter*, 486 U.S. at 650 (concluding that "Congress did not intend that the section impose liability on participants collateral to the offer or sale"). Moreover, this dramatic expansion of liability would result in significant negative consequences for the country's economy and consumers in several ways:

*First*, an expansive "statutory seller" rule could drive innovation and currently lawful market activity offshore, ceding U.S. leadership to jurisdictions that have adopted more tailored frameworks for digital asset trading platforms.[17]  This would deter investment, fragment liquidity, and push talented entrepreneurs to relocate operations abroad, undermining American competitiveness and leadership in a transformative, multi-trillion-dollar sector with global scale.[18] It could also chill cross-border participation in U.S. markets and incentivize offshore platforms to exclude U.S. users entirely.

*Second*, CEXs could exit the U.S. market or reduce the features offered to U.S. consumers, reducing options and degrading outcomes for retail consumers.  As discussed above, for certain consumers, CEXs offer significant advantages over their DEX counterparts—including user-friendly interfaces, fiat currency on-ramps (*i.e.*, a path for converting dollars into tokens), customer

---

[17] For example, other jurisdictions—including the European Union, the United Kingdom, Singapore, and the United Arab Emirates—have adopted regulatory frameworks designed to attract digital asset businesses and foster innovation. *See, e.g.*, Sarah Hammer, *Structural Themes in Global Digital Asset Regulation*, AMERICAN BAR ASSOCIATION: BUSINESS LAW TODAY (Aug. 14, 2025), https://businesslawtoday.org/2025/08/structural-themes-in-global-digital-asset-regulation.

[18] *Cryptocurrency Prices Today By Market Cap*, Forbes, https://www.forbes.com/digital-assets/crypto-prices/ (listing the global cryptocurrency market cap as $2.65 Trillion as of Apr. 27, 2026).

support, deeper liquidity, tighter pricing spreads, and robust KYC and anti-money laundering protections.  (*See* Background Section, *supra*).  If CEXs ceased U.S. operations, consumers would lose access to these benefits, and many consumers—particularly newer and less technically sophisticated participants—might not enter the digital assets markets at all.  Alternatively, CEXs might rationally limit the assets that can be traded on the platform to those that are not alleged to be securities, while also limiting tools and data displays, leaving U.S. users with narrower access and/or inferior execution quality.  This in turn may lead some U.S. retail consumers to seek out substitute products, and they may be pushed towards less-regulated or offshore alternatives.

*Third*, Plaintiffs' theory would chill speech by digital asset platforms and market intermediaries who are best positioned to provide timely, accurate market information.  Plaintiffs' approach would transform neutral disclosures, market-data displays, and educational content into Section 12 exposure, discouraging digital asset trading platforms from publishing the very data investors rely upon to make informed trading decisions.

*Fourth*, the chilling effect would extend beyond the digital asset industry and produce damaging spillovers in traditional finance by eroding settled distinctions between "collateral" transaction participants and those who engage in activity that can fairly be described as "selling." *Pinter* confines Section 12 liability to immediate title-passers and active solicitors motivated by financial gain, not entities whose roles are collateral to the sale.  Courts have consistently treated exchange-like displays and facilitation services as insufficient to establish liability for "solicitation" of a purchase of a security, absent direct, causative urging to make the purchase.  Recasting order matching, clearing, off-chain ledger settlement, and custodial services as "selling" threatens to unsettle legal expectations for stock exchanges, broker-dealers, and other

12

intermediaries in traditional financial markets, to the detriment of investors in those markets as well.

Adopting Plaintiffs' overbroad legal theory purportedly aimed at protecting investors could, in practice, harm American competitiveness and innovation and harm consumers by reducing the features and products offered to them or by driving them toward less regulated, less transparent, and potentially riskier trading environments—precisely the opposite of what the Securities Act was designed to achieve.

## CONCLUSION

For the reasons above, this Court should grant Coinbase's Motion for Summary Judgment.

Dated:  April 29, 2026
      New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

*By: /s/ Samson A. Enzer*
Samson A. Enzer
Lewis Rinaudo Cohen
Miles C. Wiley, IV
Gregory Mortenson
Victoria H. Yuhas
32 Old Slip
New York, NY 10005
(212) 701-3000
SEnzer@cahill.com
LRCohen@cahill.com
MWiley@cahill.com
GMortenson@cahill.com
VYuhas@cahill.com

*Counsel for Amicus Curiae The Digital Chamber*

## CERTIFICATION OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), counsel for Amicus Curiae The Digital Chamber has complied with the word-count limitations set forth therein. The total number of words contained in this brief—exclusive of the caption, table of contents, table of authorities, signature blocks, and this certification of compliance—is 4,084 words.

Dated:  April 29, 2026
New York, New York

CAHILL GORDON & REINDEL LLP

By: /s/ Samson A. Enzer
Samson A. Enzer
Lewis Rinaudo Cohen
Miles C. Wiley, IV
Gregory Mortenson
Victoria H. Yuhas
32 Old Slip
New York, NY 10005
(212) 701-3000
SEnzer@cahill.com
LRCohen@cahill.com
MWiley@cahill.com
GMortenson@cahill.com
VYuhas@cahill.com

*Counsel for Amicus Curiae The Digital Chamber*