# ECF 201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTOPHER UNDERWOOD, et al., on behalf of themselves and all others similarly situated, *Plaintiffs*, | : | Case No. 1:21-cv-08353 (PAE) |
| v. | : | |
| COINBASE GLOBAL, INC., et al., *Defendants*. | : | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Jay B. Kasner
Lara A. Flath
Alexander C. Drylewski
James M. Johnston
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ... ii

PRELIMINARY STATEMENT ... 1

ARGUMENT ... 3

I. COINBASE WAS NOT A STATUTORY SELLER ... 3

A. Coinbase Did Not Pass Title in Matched Transactions (Count I) ... 3

1. The Express Terms of the User Agreement Foreclose Plaintiffs' Claims ... 3

2. The Trading Platforms Facilitated Transactions Between Users ... 5

3. The Company's Submissions to the SEC's Accounting Group Reflect Its Role as an Agent—Not a Principal ... 9

B. Coinbase Did Not Solicit the Sale of Any Tokens (Count I) ... 11

1. Displaying Pricing Information Is Not Solicitation ... 11

2. Coinbase's General Marketing Efforts Still Do Not Constitute Solicitation ... 13

II. PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME REASONS ... 14

III. THE CLAIMS AGAINST COINBASE GLOBAL AND ARMSTRONG FAIL AS THERE IS NO EVIDENCE THEY ENGAGED IN ANY RELEVANT CONDUCT ... 15

A. Coinbase Global Is Not Primarily Liable as a Statutory Seller under Federal or State Law (Counts I, VIII, IX, IX, XI, XII, XIII, XIV) ... 15

B. The Control Person Claims Fail (Counts II, X, XV) ... 15

CONCLUSION ... 15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*,
971 F.2d 272 (9th Cir. 1992)....................3

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988)....................12

*In re Celsius Network LLC*,
647 B.R. 631 (Bankr. S.D.N.Y. 2023)....................4

*Holsworth v. BProtocol Foundation*,
20 Civ. 2810 (AKH), 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021)....................14

*Lowinger v. Morgan Stanley & Co. LLC*,
841 F.3d 122 (2d Cir. 2016)....................12

*In re ProShares Trust Securities Litigation*,
728 F.3d 96 (2d Cir. 2013)....................15

*Pinter v. Dahl*,
486 U.S. 622 (1988)....................1

*Risley v. Universal Navigation Inc.*,
No. 23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025)....................7, 8

*Risley v. Universal Navigation Inc.*,
690 F. Supp. 3d 195 (S.D.N.Y. 2023)....................7, 13

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*,
642 B.R. 353 (Bankr. S.D.N.Y. 2022)....................8

*Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
No. 01 Civ. 3013 (DLC), 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001)....................5

*Underwood v. Coinbase Global, Inc.*,
654 F. Supp. 3d 224 (S.D.N.Y. 2023)....................11, 13-14

**Other Authorities**

*In re TokenLot, LLC*,
Securities Act Release No. 10543, Exchange Act Release No. 84075, 2018 WL 4329662 (Sept. 11, 2018)....................13-14

## PRELIMINARY STATEMENT[1]

Unable to challenge that Coinbase matched buyers and sellers in 99.97% of the transactions at issue, Plaintiffs resort to mischaracterizing the User Agreement, the Trading Platforms' operations, Coinbase's accounting submissions to the SEC, and the case law applying *Pinter v. Dahl*, 486 U.S. 622 (1988). But these efforts cannot transform the undisputed evidence, which establishes that Coinbase was not a statutory seller under *Pinter* because it did not pass title in transactions between users or successfully solicit Plaintiffs' purchases.

First, the User Agreement forecloses Plaintiffs' claims as a matter of law. (*Infra* § I.A.1.) The terms expressly stated that title to digital assets "shall *at all times remain* with [the user] and shall *not transfer to Coinbase*." (JSF ¶22.) Plaintiffs' retort that these terms only applied to digital assets "resting in the [user's] account" defies not only this plain language but also common sense: if title "at all times" remained with users and users in matched transactions buy from each other, not Coinbase (as the User Agreement also made explicit (*id.* ¶25)), then Coinbase could not pass title in such transactions. This reality destroys Plaintiffs' passing-title theory under *Pinter*.

This conclusion is reinforced by the Trading Platforms' actual operations. (*Infra* § I.A.2.) Plaintiffs argue that the Simple Platform's automated price quotes, its now-retired batching mechanism for matching trades, and its ledgering system somehow transform Coinbase into the party that passed title. But Coinbase matched Simple orders with other users' orders on the Order Book, and users retained the economic rights associated with their Tokens, the prices of which were determined based on the real-time market activity. And as the *amici* demonstrate, many of Plaintiffs' arguments could apply to traditional stock exchanges and other trading platforms that

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in Defendants' opening Memorandum of Law (ECF 165, "MSJ"). "Opposition" or "Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' MSJ (ECF 197), and "Opp. Ex." refers to the exhibits thereto. Unless otherwise noted, all emphases and alterations are added, and all internal citations, footnotes, and quotation marks are omitted.

no one would suggest are direct sellers.

[redacted]

Plaintiffs also strain common sense with respect to *Pinter*'s second prong regarding solicitation. (*Infra* § I.B.) Plaintiffs argue that displaying the price of an asset constitutes direct solicitation, but such a result would subject any trading venue—including the New York Stock Exchange and Nasdaq—or even publications like the Wall Street Journal, to potential Section 12 liability under a "solicitation" theory. Plaintiffs also attempt to resurrect their previously rejected argument that Coinbase's general marketing and promotions constitute "solicitation" but fail to explain why the Court should come to any different conclusion now. Nor can they offer any evidence that Plaintiffs purchased Tokens as a result of Coinbase's conduct, which dooms their solicitation argument.

Finally, Plaintiffs concede that their state claims rise and fall based on their federal claim and thus cannot survive for the same reasons. (*Infra* § II.) And they fail to identify any evidence that Coinbase Global or Armstrong controlled Coinbase with respect to the User Agreement or the operations of the Trading Platforms. (*Infra* § III.)

Accordingly, summary judgment should be awarded for Defendants.

# ARGUMENT

## I. COINBASE WAS NOT A STATUTORY SELLER

### A. Coinbase Did Not Pass Title in Matched Transactions (Count I)

#### 1. The Express Terms of the User Agreement Foreclose Plaintiffs' Claims

The User Agreement is explicit that title to digital assets remained with users and did not transfer to Coinbase. (MSJ 23-27.) Because title is a legal concept determined by the parties' agreement, these express terms foreclose Plaintiffs' claims. (*Id.*)

Section 2.6.1 of the User Agreement is unequivocal that "[t]itle to Digital Currency shall at all times remain with [the user] and shall not transfer to Coinbase." (JSF ¶22.) Plaintiffs claim that this "cherry-picked" language only speaks to title of digital assets "*when those assets are resting in the [user's] account*," and "says nothing about whether assets are *transferred* through Coinbase-owned accounts." (Opp. 19-20 (emphasis in original).) But the very language they cite states that title "shall *at all times* remain with [the user] and *shall not transfer* to Coinbase." (*Id.* (quoting § 2.6.1).) Plaintiffs' reading—that title *does* transfer to Coinbase in every Simple transaction—would directly contravene this plain language and render it meaningless. (*Id.* 19-22.) "It is well settled that a contract should be interpreted so as to give meaning to each of its provisions." *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278-79 (9th Cir. 1992) (citing Restatement (Second) of Contracts §203(a) cmt. b (1979); Cal. Civ. Code § 1641). If Coinbase never takes title to users' digital assets, then by definition, it could not have passed title in matched transactions on the Platform. This destroys Plaintiffs' claim.

Other provisions reinforce this conclusion. Every version of the User Agreement from September 2020 on states that "[w]hen you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase." (JSF ¶25.) Rather, "Coinbase acts as the agent, transacting on your behalf, to facilitate that

purchase or sale between you and other Coinbase customers." (*Id.*)

Plaintiffs argue that prior versions of the User Agreement included stray language about buying digital assets "from Coinbase." (Opp. 21-22.) But they cannot dispute that even these versions state that title "shall at all times remain with [the user] and shall not transfer to Coinbase" (JSF ¶22; Opp. 19-20). Thus Plaintiffs "ignore the plain and clear language in [Section 2.6.1]" and would effectively "read [Section 2.6.1] out of the contract entirely." *In re Celsius Network LLC*, 647 B.R. 631, 657-58 (Bankr. S.D.N.Y. 2023).[2] The only reasonable interpretation that gives meaning to both provisions is that users received their digital assets through the Trading Platforms, and title remained with users and transferred directly from seller to buyer. (MSJ 25-26.) In any event, discovery confirmed that the September 2020 update to Section 3.2 was "intended to clarify existing positions" that Coinbase "act[s] as an agent." (56.1 ¶¶86-88; MSJ 26.)

Finally, Plaintiffs argue that the User Agreement cannot possibly mean that "Coinbase *never* holds or transfers title to *any* digital assets" because Coinbase at times filled transactions from its corporate inventory. (Opp. 20-21.) This is a strawman. The User Agreement does not represent that Coinbase "*never* holds or transfers title to *any* digital assets." (Exs. 15, 29, 36.) Rather, it says that title to *users'* digital assets "shall at all times remain with you [i.e., the user] and shall not transfer to Coinbase." (JSF ¶22; Opp. 19-20.) As addressed in the separate briefing regarding "inventory transactions," Coinbase separately purchased its corporate inventory of digital assets from its over-the-counter desk—not from users via the Order Book—and only filled user transactions in limited narrow circumstances. (Defs. Cross-MSJ, ECF 191.) Thus, far from

---

[2] Plaintiffs argue that *Celsius* "resolved only the question of who owned digital assets on the debtors' accounts" and not "who transferred Tokens to Plaintiffs." (Opp. 21 n.9.) But in *Celsius*, the court analyzed whether the user agreement's specific language on "*Transfer of Title*" controlled over more general language elsewhere in the user agreement—the precise question posed here. *Celsius*, 647 B.R. at 657-59.

"creat[ing] a direct conflict" (Opp. 20), these transactions are consistent with Section 2.6.1.[3]

2. The Trading Platforms Facilitated Transactions Between Users

The Trading Platforms' operations further demonstrate that Coinbase acted as an agent that facilitated user transactions through its automated matching engine but did not take or pass title. (MSJ 27-30.) Faced with this undisputable evidence, Plaintiffs argue that Coinbase was a direct seller in Simple Transactions because: (1) Coinbase could control two elements of the price quote; (2) Coinbase was exposed to some risk of minor price movements in seconds between price quotes; (3) until February 2021, Coinbase "batched" certain Simple orders to be matched on the Advanced Platform; and (4) Simple trades were routed through an operational clearance account for ledgering purposes. (Opp. 15-19.) None of these points make Coinbase a direct seller.

First, Coinbase did not set the price for Simple transactions. (Opp. 15-16.) Price quotes were calculated based on the *market price* from the Order Book, which was controlled by the supply and demand of Coinbase users. (Opp. 5-6; 56.1 ¶38.) From the market price, Coinbase then added a spread of approximately 0.5% and a trading fee that ranged from 1.49% to 3.99%. (56.1 ¶39.) Simply because Coinbase controlled the price of the spread and trading fee does not mean that Coinbase controlled the market price of the Token at issue. Indeed, intermediaries in traditional financial markets charge transaction fees and are not considered buyers or sellers as a result. (Ex. 37 ¶¶79, 81, 86.) Although "transaction fees . . . affect the cost of trading," they are "part of [Coinbase]'s bargain with its [users]" and do "not concern the value of [the alleged] securities, or the consideration received in return for trading [them]." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2001 WL 1182927, at *5 (S.D.N.Y. Oct. 9, 2001). Nor did Coinbase

[3] To the extent Plaintiffs argue that inventory transactions conflict with Section 3.2, which since September 2020 has stated that users do not "buy[] Digital Currency from Coinbase or sell[] Digital Currency to Coinbase" (JSF ¶25), this language clarifies that Coinbase's business was to facilitate transactions between users, which it did in 99.97% of relevant instances. (Defendants Cross-MSJ Rule 56.1 Statement, ECF 195, ¶33.)

exercise discretion in setting the spread or trading fee for particular transactions. Coinbase charged the same 0.5% spread for all Simple transactions, which was disclosed to users. (Pls. Opp. Ex. G at CB00012700.) Likewise, the trading fee amount, also disclosed to users, varied only based on the region and payment type. (*Id.* at CB00012770-73.) For example, debit card transactions were subject to a 3.99% fee while bank account transactions were subject to a 1.49% fee. (*Id.*) The market prices of the Tokens, however, were dictated by the Order Book—not Coinbase.

Second, Coinbase did not bear principal exposure to Token price movements. (Opp. 16-17.) While Coinbase was subjected to some risk of minor price movements in the seconds between updated price quotes, that risk simply was to the size of the spread it would receive on the transaction; it was not general market price risk, the risk of losing principal, or the risk of having a counterparty default, all of which was borne by users. (MSJ 28; 56.1 ¶¶66, 73-74, 114-19.) As Plaintiffs' own expert observed: "[u]sers retain[ed] an economic interest in the digital assets held on their behalf, as recognized by Coinbase's user agreement." (56.1 ¶66.)

Moreover, any risk to Coinbase's spread was minimal. The price quote provided through Coinbase Simple automatically refreshed every few seconds based on the latest market activity, and the Platform automatically rejected orders that moved more than 0.1% in either direction of the market price used to calculate the quote. (MSJ 16, 28; JSF ¶¶55, 82-83.) [redacted]

Third, Coinbase's batching of Simple orders did not make it a statutory seller who passed title. (Opp. 17.) Prior to February 2021, the Matching Engine first would attempt to match Simple

orders with other Simple orders submitted around the same time. (JSF ¶¶64-65.) If no counterparty was located, every 250 milliseconds the Matching Engine would submit a single "fill-or-kill" limit order for the net quantity of unmatched Simple orders to be matched with Advanced orders on the Order Book. (*Id.* ¶¶66-67.) If the net order was executed within six seconds, the Simple orders would be completed; otherwise, they would be rejected. (Pls. Opp. Ex. I at 16.) This process was completed automatically via an algorithm, with no manual intervention. (Ex. 26 at CB00012702.) The result of this batching process is the same as the others: Coinbase matched user orders and executed transactions as an agent to users—not "in its own name"—and Coinbase never took title to the digital assets at issue. (Opp. 17; JSF ¶¶45, 60-63, 68; 56.1 ¶¶37, 50-55.)

And even if Coinbase had somehow taken and passed title through this process (it did not), such "split-second autonomous functions" would not render Coinbase a statutory seller. *Risley v. Universal Navigation Inc.*, 2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025).[4] Rather, Coinbase would be a "participant[] only remotely related to the relevant aspects of the sales transaction[s]," *id.*, because it "facilitated—but was not party to—the contested transaction[s]." *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 219-20 (S.D.N.Y. 2023). No reasonable factfinder could conclude that Coinbase was a statutory seller based on batching Simple orders.

Fourth, Plaintiffs' assertion that Coinbase took title through the operational clearance account does not save them. (Opp. 18.) There is no dispute that Simple orders were routed to the same Matching Engine and matched with other users' orders on the same Order Book as Advanced orders. (MSJ 28; JSF ¶¶45, 60-63, 68; 56.1 ¶¶37, 50-55.) While Coinbase routed Simple orders

---

[4] Plaintiffs argue that *Risley* "has no bearing" because it involved a decentralized cryptocurrency exchange. (Opp. 18-19.) This is a distinction without a difference. The Second Circuit held that even assuming title to digital assets passed to a defendant in a "split-second autonomous function[]," that did not render the defendant a statutory seller because it would be a "participant[] only remotely related to the relevant aspects of the sales transaction[s]." *Risley*, 2025 WL 615185, at *3 (quoting *Pinter*, 486 U.S. at 651). The same reasoning is true here.

through an operational clearance account [redacted] it executed transactions only at the user's direction and the user retained all economic rights associated with the digital assets—including title. (MSJ 28-29; 56.1 ¶¶62-64, 66, 131.) As the Second Circuit held, a momentary transfer of assets to a defendant does *not* transform a defendant into a statutory seller under *Pinter*. (MSJ 28-29); *Risley*, 2025 WL 615185, at *3. Likewise, as the *amici* explain, this conclusion comports with *Pinter*'s carefully drawn limits, which were intended to confine Section 12 liability to immediate sellers of securities and actors who successfully solicit purchases. (ECF 181; ECF 189.) Indeed, the *amici* demonstrate that many of Plaintiffs' arguments could apply to other financial market participants, such as traditional stock exchanges and other digital asset platforms.

Plaintiffs argue that summary judgment is precluded due to "conflicting opinions offered by the parties' respective experts" on the operational clearance account. (Opp. 18.) Not so. There is no dispute over the function and purpose of the operational clearance account: both experts agree (and Plaintiffs do not dispute) that Simple orders were routed through the operational clearance account [redacted] (Pls. Opp. Ex. C ¶35 n.53; Ex. 37 ¶49 n.68; Ex. 23 ¶3; Opp. 18.) Rather, Plaintiffs argue that the parties' experts disagree on the extent to which operational clearance accounts are used by traditional custodians. (Opp. 18.)[5] To the extent the parties' experts disagree (which is not clear), the degree to which traditional custodians use operational clearance accounts is *not* a material fact that precludes summary judgment. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 642 B.R. 353, 362 (Bankr. S.D.N.Y. 2022) ("'conflicting experts'" do not preclude summary judgment where the "opinions create no genuine issues of fact"). Rather,

---

[5] Defendants' expert, Dr. Lindsey, opined that the use of an operational clearance account is a "standard post-trade operational practice across financial institutions." (Ex. 23 ¶3.) Plaintiffs' expert, Mr. Jain, did not dispute that view. Instead, he opined that Coinbase's "integrated structure consolidates functions" in a way that gives Coinbase "a degree of operational control over user transactions that traditional custodians and depositories do not possess." (Opp. 18; Pls. Opp. Ex. C ¶¶34-35 & nn.50, 53.) But Jain's invented notion of "operational control" says nothing about the use of operational accounts in traditional markets or the issue of title.

the material, undisputed facts are that Coinbase matched Simple transactions with other users' orders on the Order Book, and the users retained the economic rights associated with their Tokens. (JSF ¶¶45, 60-63, 68; 56.1 ¶65.) Thus, Coinbase acted as an agent in transactions between users and was not a direct seller under *Pinter*'s first prong.

3. The Company's Submissions to the SEC's Accounting Group Reflect Its Role as an Agent—Not a Principal

[redacted]

[redacted]

[redacted]

### B. Coinbase Did Not Solicit the Sale of Any Tokens (Count I)

Plaintiffs also cannot establish liability under *Pinter*'s second prong, as they cannot demonstrate (1) Coinbase's "direct and active participation in the solicitation of the immediate sale," and (2) "that plaintiffs purchased and sold the Tokens as a result of such solicitation." *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 238-39 (S.D.N.Y. 2023).[7]

#### 1. Displaying Pricing Information Is Not Solicitation

Coinbase did not solicit Plaintiffs' purchases simply by providing pricing displays, price quotes, and related trading data. (Opp. 24-26.) Plaintiffs do not dispute that the price displays on

---

[6] Plaintiffs also argue that [redacted] In other words, Coinbase does not exercise control in matching buyers and sellers. (JSF ¶¶60-68.)

[7] Plaintiffs' argument that Coinbase was motivated to earn fees, even if true, does not satisfy either element. (Opp. 2, 24); *Risley*, 690 F. Supp. 3d at 223 (rejecting the same as "Plaintiffs still fail to allege the first two elements").

digital asset pages were set by the real-time market sales of other Coinbase users, and Coinbase had no discretion in setting those market prices. (*Id.* at 26; MSJ 31-32; 56.1 ¶¶94-97.) Nor do they dispute that price quotes provided on Simple were automatically calculated based on the market price of the digital asset, a 0.5% spread, and a set trading fee, and were updated every few seconds based on Order Book activity. (Opp. 26; MSJ 31-32; 56.1 ¶¶37-39; JSF ¶55.) Plaintiffs also do not dispute that the User Agreement and Coinbase website explicitly stated that information was provided "for informational purposes only" and "d[id] not constitute investment advice" nor "a recommendation by Coinbase to buy [or] sell." (Opp. 26; MSJ 31; 56.1 ¶¶92-93, 102-03.)

Rather, Plaintiffs argue that displaying the price somehow constitutes solicitation because Coinbase is a "one-stop-shop of functions traditionally handled by distinct and separate market participants," and thus unlike conventional trading platforms, the prices displayed were not always "based on *external* pricing data." (Opp. 26.) But Plaintiffs concede that, even for "internal" pricing data, just like with conventional trading platforms, the price displayed was based on real-time supply and demand—not dictated by Coinbase. (*Id.*; 56.1 ¶¶38-39; JSF ¶55.)[8]

Plaintiffs argue that "[d]isplaying prices is the *sine qua non* of solicitation, as 'investors seek[] to buy low and sell high.'" (Opp. 25 (quoting *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 131 (2d Cir. 2016)).) But *Lowinger* does not state that displaying prices "is the *sine qua non* of solicitation." It has nothing to do with solicitation. It simply mentions the well-known economic concept that "investors seek[] to buy low and sell high." *Lowinger*, 841 F.3d at 131. Merely displaying a price cannot constitute solicitation under *Pinter*, otherwise it could threaten Section 12 liability for every trading venue—including the New York Stock Exchange and

---

[8] *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988), is distinguishable. (Opp. 24-25.) There, the general partners of a coal mining venture solicited investments because they "prepared and circulated the [venture's] prospectus to plaintiffs." *Capri*, 856 F.2d at 478. Here, Coinbase did not prepare or circulate any prospectus. Rather, it is undisputed that Coinbase did not recommend any Tokens for purchase. (56.1 ¶¶92-93, 101-03.)

Nasdaq—as well as news platforms such as the Wall Street Journal. (56.1 ¶¶132-33; ECF 181 at 10.) This is obviously not the law. Indeed, this Court previously ruled that "news updates on price movements of the Tokens" do not constitute solicitation, *Underwood*, 654 F. Supp. 3d at 238-39, thus displaying current prices cannot either. Plaintiffs' strained theory should be rejected.

2. Coinbase's General Marketing Efforts Still Do Not Constitute Solicitation

Plaintiffs further argue that Coinbase solicited their purchases via "a broader marketing campaign to encourage trades on its platform" (Opp. 26), but offer no reason to depart from this Court's prior analysis that these types of "marketing efforts, 'materials,' and 'services'" do not constitute solicitation as a matter of law. *Underwood*, 654 F. Supp. 3d at 239. Plaintiffs say this marketing campaign included sweepstakes programs to win prizes of certain Tokens, educational programs to win Tokens for completing certain tasks like watching educational videos, and a staking program to earn Token rewards for locking up their digital assets to support the blockchain protocol. (Opp. 27-28.) In their pre-motion response letter, Plaintiffs did not even mention these marketing activities, let alone assert that they constitute solicitation. (ECF 149 at 2-3.) For good reason: Plaintiffs themselves acknowledge that this theory was already rejected. (Opp. 25.)

Plaintiffs do not explain why the Court should abandon its prior reasoning. Nor do they offer any counter to the *Risley* and *Ocampo* decisions—which held that "promotional activities" are not solicitation—except to note that they did not discuss price displays. (Opp. 25 ("[T]hose cases . . . concerned general promotional activities by non-brokers, not price displays . . .").) Thus by Plaintiffs' own concession, Coinbase's promotional activities are not solicitation under *Pinter*.[9]

[9] *In re TokenLot, LLC*, Securities Act Release No. 10543, Exchange Act Release No. 84075, 2018 WL 4329662, at *2-3 (Sept. 11, 2018), is inapposite. (Opp. 28-29.) There, the SEC concluded that TokenLot "broadly solicited" investors and took thousands of purchase orders for digital tokens connected with initial coin offerings. *TokenLot*, 2018 WL 4329662 at *2-3. The SEC held that TokenLot violated Section 15(a) of the Securities Exchange Act of 1934, barring sales of securities by unregistered broker-dealers. *Id.* at *4. The SEC did *not* analyze *Pinter* or its solicitation prong, but to the extent *TokenLot* has any bearing, there the respondents promoted TokenLot's *(cont'd)*

Finally, even if Coinbase's promotional activities were somehow solicitations, Plaintiffs do not offer any facts to show that they purchased Tokens as a result. (Opp. 26 n.11; MSJ 32.) Neither Plaintiff testified that they relied on any information provided by Coinbase other than pricing information (which, as discussed above, is not solicitation). (*Id.*; 56.1 ¶¶104-09.) As a result, they offer no evidence that Plaintiffs "purchased and sold the Tokens as a result of [any] such solicitation," as required by *Pinter*. *Underwood*, 654 F. Supp. 3d at 239. While Plaintiffs argue that reliance is not an element of a Section 12(a)(1) claim (Opp. 26 n.11), that misses the point. As this Court correctly held, *Pinter*'s second prong requires that plaintiffs purchased securities "as a result" of the alleged solicitation. Otherwise, it strains logic to say that Plaintiffs were "'successfully solicited,'" which *Pinter* requires. *Underwood*, 654 F. Supp. 3d at 234, 239 (citing *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001)); *see also Holsworth v. BProtocol Found.*, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021). Because Plaintiffs were not successfully solicited, their theory should be rejected.

## II. PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME REASONS

Plaintiffs concede that "the Section 12(a)(1) claims and their state-law analogs rise or fall together." (Opp. 29-30.) Thus, for the above reasons, Plaintiffs' claims under California, Florida, and New Jersey law for the alleged offer or sale of unregistered securities necessarily fail. (MSJ 32-33.) Moreover, because Coinbase was not the direct seller of any Token (*supra* § I), Plaintiffs' claims alleging violations of the state statutes prohibiting sales of securities by unregistered "brokers" or "dealers" likewise fail. (MSJ 33-34.)

---

*direct sale of purported securities* in connection with ICOs. *Id.* at *3-4. Here, at most, Coinbase promoted the use of its Trading Platforms to buy and sell with *other users*. (Opp. 26-29; JSF ¶¶97-99; 56.1 ¶102.)

## III. THE CLAIMS AGAINST COINBASE GLOBAL AND ARMSTRONG FAIL AS THERE IS NO EVIDENCE THEY ENGAGED IN ANY RELEVANT CONDUCT

### A. Coinbase Global Is Not Primarily Liable as a Statutory Seller under Federal or State Law (Counts I, VIII, IX, IX, XI, XII, XIII, XIV)

Because Coinbase is not liable under federal or state law (*supra* §§ I, II), the claims against Coinbase Global fail too. Even so, there is no evidence of any conduct *by Coinbase Global* that would support primary liability. (MSJ 34.) Plaintiffs' sole counterargument is that Coinbase Global is the subject of the SEC Accounting Letters. (Opp. 30-31.) But as they acknowledge, the letters explicitly state that trading services are provided "*through its wholly-owned subsidiary Coinbase, Inc.*" (Opp. 31; Pls. Opp. Ex. F at CB00012957; Pls. Opp. Ex. G at CB00012699.)

### B. The Control Person Claims Fail (Counts II, X, XV)

Because Plaintiffs have not established a primary violation, the control person claims fail as a matter of law. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 109 (2d Cir. 2013). But even if a primary claim could survive as to Coinbase (none can), there is no evidence of any specific actions taken by Coinbase Global or Armstrong or any decisions they made to control Coinbase as to the User Agreement or the operations of the Trading Platforms. (MSJ 34-35.) Plaintiffs again point to the SEC Accounting Letters, but they explicitly state that trading services were provided through Coinbase. (*Supra* § III.A.) Plaintiffs also cite to a handful of statements that merely reflect Armstrong's role as CEO of Coinbase Global and his ownership of its stock. (Opp. 31-32.) But none demonstrate that Armstrong directly controlled the Trading Platforms, which were operated by Coinbase, Inc., not Coinbase Global. (*Supra* § III.A; *see also* JSF ¶¶1, 19-20; 56.1 ¶2.) Accordingly, Plaintiffs' control person claims fail as a matter of law.

## CONCLUSION

For these reasons and those set forth in Defendants' opening memorandum, the Court should grant Defendants' motion for summary judgment on matched transactions.

Dated: New York, New York
June 17, 2026

Respectfully submitted,

*/s/ Lara A. Flath*

Jay B. Kasner
Lara A. Flath
Alexander C. Drylewski
James M. Johnston
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
lara.flath@skadden.com
alexander.drylewski@skadden.com
james.johnston@skadden.com

*Attorneys for Defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong*