UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD *et al.*, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

-v-

COINBASE GLOBAL, INC. *et al.*,

Defendants.

21 Civ. 8353 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

The Court hereby dockets the slide deck used by defense counsel at yesterday's oral argument on the pending cross-motions for summary judgment, with the limited redactions proposed by the defense. *See* Court Exhibit 1. The Court grants the defense's oral motion to seal those redacted portions, which contain sensitive commercial information. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–120 (2d Cir. 2006).

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 16, 2026
        New York, New York

# Court Exhibit 1

# DEFENDANTS'
# MOTION FOR SUMMARY JUDGMENT

## MATCHED TRANSACTIONS

*UNDERWOOD ET AL. V. COINBASE GLOBAL, INC. ET AL.*

JULY 15, 2026 ORAL ARGUMENT

# PINTER PRONG 1: THE EXPRESS TERMS OF THE USER AGREEMENT FORECLOSE PLAINTIFFS' CLAIMS

**Users retained title over their Tokens at all times.**

ENTIRE RELEVANT TIME PERIOD

COINBASE USER AGREEMENT                                                          JSF ¶22

**2.6.1 Ownership.** Title to Digital Currency shall <mark>at all times</mark> remain with you and <mark>shall not transfer to Coinbase</mark>.

Other provisions also make express that users—not Coinbase—control their Tokens.

- Plaintiffs argue that Section 2.6.1 speaks only to *"assets [that] are resting in the account"* and *"says nothing about whether assets are transferred through Coinbase-owned accounts."* Opp. 20

  - This renders <mark>"at all times"</mark> and <mark>"shall not transfer to Coinbase"</mark> meaningless.

## *PINTER* PRONG 1: THE EXPRESS TERMS OF THE USER AGREEMENT FORECLOSE PLAINTIFFS' CLAIMS

- **Other provisions reinforce that Coinbase acted to facilitate peer-to-peer transactions.**

**AS OF SEPTEMBER 3, 2020:**

| COINBASE USER AGREEMENT | JSF ¶25 |
|---|---|

**3.2. Transactions on the Coinbase Site.** When you buy or sell Supported Digital Assets on the Coinbase Site (which, for clarity, does not include transactions with Third Party Services (as defined below)), you are not buying Supported Digital Assets from Coinbase or selling Supported Digital Assets to Coinbase. Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase customers.

- Prior language about buying digital assets "from Coinbase" must be read in harmony with Section 2.6.1. Opp. 21-22

*In re* **Celsius Network LLC** *647 B.R. 631, 657-58 (Bankr. S.D.N.Y. 2023)*

"To read the Terms of Use such that 'loan' overrides the unequivocal language transferring title and ownership of assets deposited into Earn Accounts to Celsius would be to read the Transfer of Title Clause out of the contract entirely."

- Record is undisputed that the clarification to Section 3.2 did not reflect a change in Trading Platform operations. Plaintiffs' Ex. G at CB00012703-04, CB00012716-17; Ex. 5 (Paget Dep. Tr.) at 157:9-23

# *PINTER* PRONG 1: THE TRADING PLATFORM OPERATIONS ARE UNDISPUTED

- **Coinbase facilitated user-to-user transactions through its automated Matching Engine.**

### COINBASE ADVANCED

- Users submitted orders, including quantity and price, directly to the Order Book. JSF ¶62

- Once a user placed an order, an automated Matching Engine searched for a counterparty on the Order Book. JSF ¶¶50, 60-61

- Transactions were ledgered directly between users. 56.1 ¶61

**PLAINTIFFS CONCEDE COINBASE WAS NOT A "DIRECT SELLER"**

### COINBASE SIMPLE

- Users would choose a quantity and see a price quote reflecting the current market price in the Order Book. JSF ¶¶52-56

- Once a user clicked "buy," the same Matching Engine searched for a counterparty on the same Order Book. JSF ¶68

- Transactions were ledgered through an operational clearance account—a bookkeeping mechanism. 56.1 ¶¶62-64

**LIKE COINBASE ADVANCED, COINBASE WAS NOT THE "DIRECT SELLER" ON COINBASE SIMPLE**

## *PINTER* PRONG 1: THE TRADING PLATFORM OPERATIONS ARE UNDISPUTED

**Matching is matching—regardless of whether placed through Advanced or Simple.**

When the Trading Service is able to match Consumer trades on the Exchange, the process happens virtually instantly. An example of a Consumer buy of LTC being matched with an Exchange user sell of LTC is shown below:

| CLEARING_GROUP_ID | PROCESS_ID | EXCHANGE_ORDER_ID | TS | DIRECTION | CURRENCY | AMOUNT |
|---|---|---|---|---|---|---|
| 5d1dfc5437c2cf569e99ccfa | Exchange Match LTC-USD 40238628 | efd7bb3f-3adc-4730-b510-9089f88ef478 | 7/4/2019 13:17:19 | 1 | LTC | 0.14893992 |
| 5d1dfc5437c2cf569e99ccfa | Customer Buy 5d1dfc5437c2cf569e99ccfa | NULL | 7/4/2019 13:17:20 | -1 | LTC | 0.14893992 |

As noted in the time stamp (TS), both the Consumer Buy and Exchange match occur within 1 second of each other.

Ex. 31 at 16

**The operational clearing account is a ledgering system to support accurate books and records reflecting customer ownership.**

- The operational clearance account functioned as "an in and an out to track the flows of . . . transactions." Ex. 5 (Paget Dep. Tr.) at 137:24–138:6

- "[S]plit-second autonomous functions" do not make a defendant a statutory seller. *Risley v. Universal Navigation Inc.*, 2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025)

## PINTER PRONG 1: PLAINTIFFS IGNORE THAT COINBASE CONSISTENTLY REPRESENTED IT ACTED AS AN AGENT

**The Company's submissions to the SEC Accounting Staff make clear that Coinbase provided matchmaking services to facilitate user-directed transactions:**

- "Coinbase **acts as an agent** that facilitates the purchase and sale of Digital Assets by executing buy and sell orders on the Trading Platform to fulfill purchases and sales in exchange for a commission." Plaintiffs' Opp. Ex. F at CB00012961

- "Consumer Platform Users initiate transactions by placing buy or sell orders **through** the Coinbase website or the mobile application. The Consumer Platform then **sends the orders** to the Trading Platform **on behalf of the Consumer User**." Id. at CB00012963

- Coinbase "holds Users' fiat currency in separate accounts, which are for **the exclusive benefit of its Users**." Id. at CB00012961

- Coinbase "maintains custody of the Digital Assets of its Users utilizing an **internal ledger of beneficial ownership** records to account for User holdings." Id.

# *PINTER* PRONG 1: PLAINTIFFS' REMAINING ARGUMENTS DO NOT MAKE COINBASE A DIRECT SELLER

- Plaintiffs also rely upon a graphic depicting how Coinbase recorded Simple transactions on its internal ledger. Opp. 11-13; MSJ 18-20

- Taylor's digital assets were shown "as going out from [his] account and into Casey's account," but "technologically they're held in omnibus wallets" and would not move. Ex. 5 (Paget Dep. Tr.) at 90:25–91:8

## *PINTER* PRONG 1: PLAINTIFFS' REMAINING ARGUMENTS DO NOT MAKE COINBASE A DIRECT SELLER

- **Batching Orders**: Before February 2021, the Matching Engine first attempted to match Simple orders with other Simple orders; remaining orders were then "batched" and sent to the Order Book.

  - Batching does not change the result: Simple orders were matched with other users' orders-whether Advanced or Simple. JSF ¶¶64-68

- **Price / Inventory Risk**: Plaintiffs argue Coinbase set the price and bore inventory risk.
  - The Simple price quote reflected the market price from the Order Book plus a 0.5% spread and a fee. The quote updated every few seconds to reflect the moving market; any risk during those seconds was incremental. JSF ¶55; 56.1 ¶39; Plaintiffs' Ex. G at CB00012714
  - Coinbase had protections to minimize any incremental, short-lived risk. JSF ¶83; 56.1 ¶¶54-55
  - Inventory risk (including the risk of losing one's principal or having a counterparty default on a transaction) remained with the user. Ex. 31 at 27; Ex. 5 (Paget Dep. Tr.) at 116:19–117:5, 169:2-18

## *PINTER* PRONG 2: COINBASE DID <u>NOT</u> SOLICIT THE SALE OF ANY TOKENS

**To establish liability under Pinter's second prong, Plaintiffs must demonstrate:**

1. Coinbase's direct and active participation in the solicitation of the immediate sale.

2. That plaintiffs purchased and sold the Tokens as a result of such solicitation.

**Plaintiffs argue that Coinbase solicited their purchases through:**

- Displaying and making available pricing information. Opp. 24-26

- A "broader marketing campaign to encourage trades on its platforms." Opp. 26-29

**NEITHER CONSTITUTE SOLICITATION**

## *PINTER* PRONG 2: COINBASE DID NOT SOLICIT THE SALE OF ANY TOKENS

**Displaying price information is <u>not</u> direct and successful solicitation.**

- Digital asset pages displayed market price set by supply and demand. 56.1 ¶¶94-96

- Digital asset pages and User Agreement stated that information was provided for "informational purposes only" and did not constitute investment advice. 56.1 ¶¶92-93, 102-03

- Plaintiffs' purchases were motivated by social media, third parties, and other information—not price alone. 56.1 ¶¶104-09



56.1 ¶ 91

# *PINTER* PRONG 2: COINBASE DID NOT SOLICIT THE SALE OF ANY TOKENS

**Promotional activities are <u>not</u> solicitation:**

- Plaintiffs ignore the Second Circuit's holding in *Risley*:

> *Risley v. Universal Navigation Inc.*  2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025)
>
> **"Defendants' promotion of their platform on social media or use of the platform to sell their own issued token . . . does not render them statutory sellers."**

**Any purported solicitation was <u>not</u> direct and successful:**

- The **only** information upon which Plaintiffs relied that came from Coinbase, rather than social media or other third parties, was price-related.

56.1 ¶¶104-09; Ex. 16 (Rodriguez Dep. Tr.) at 190:20–191:2; Ex. 14 (Underwood Dep. Tr.) at 188:24–192:10

# DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT & OPPOSITION TO PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT

## INVENTORY TRANSACTIONS

# INVENTORY TRANSACTIONS OCCURRED ONLY IN TWO NARROW CIRCUMSTANCES—AS THE EXCEPTION TO THE MATCHMAKING SERVICE

- **99.97%** of Token transactions matched between users. **0.03%** filled from "operational" inventory. Opp. 56.1 ¶33

- Coinbase primarily held operational inventory to **pay gas fees** (blockchain network fees) when users moved digital assets on or off the Trading Platforms. Ex. 46 (Night Dep. Tr.) at 101:11–102:20; Night Declaration ¶10

- Coinbase used its operational inventory to fill user orders in **two limited circumstances:**

  1. Unanticipated system disruptions when the Advanced Platform suffered an outage or latency delay ("downtime")
  2. Orders below the Advanced Platform's minimum trade size for that Token
     Plaintiffs' Ex. G at CB00012702-03; Plaintiffs' Ex. A at CB00012958-59

- Use of operational inventory was based on predetermined criteria and implemented through an automated process. Coinbase did not fill transactions based upon whether it would realize a profit or loss. Opp. 56.1 ¶20

# INVENTORY TRANSACTIONS ARE EXEMPT UNDER SECTION 4(a)(1)

**Coinbase is exempt from liability because it was not an issuer, underwriter, or dealer.** 15 U.S.C. § 77d(a)(1)

- Plaintiffs concede that **Coinbase was <u>not an issuer.</u>** Plaintiffs' Reply at 2 n.2; 56.1 ¶101

- **Coinbase was <u>not an underwriter</u>** because it did not:
  - Purchase Tokens from, or sell Tokens for, an issuer
  - Purchase Tokens with a view to distribution

- **Coinbase was <u>not a dealer</u>** because it was not "in the business" of buying or selling securities:
  - Coinbase only filled ~3 out of 10,000 transactions with inventory and this proportion declined over the Relevant Time Period
  - Coinbase did so to accommodate users—not to profit
  - Coinbase did not provide or advertise "dealer" services

# COINBASE WAS <u>NOT</u> AN UNDERWRITER

**Coinbase did not purchase Tokens from, or sell Tokens for, an issuer:**

- Coinbase acquired its inventory via its over-the-counter desk—not from issuers.
  Night Declaration ¶13; *see also* Plaintiffs' Ex. D at 266:9-16

- Coinbase only sold to users in two circumstances: downtime and below-minimum orders. Neither was "for an issuer." Plaintiffs' Ex. G at CB00012702-03

- Coinbase did not charge a fee for listing Tokens—and had no agreement to sell any Tokens for issuers. Ex. 49 at CB00008809; Ex. 50 at CB00008468

  - Plaintiffs point to the provision of educational services.
    Reply at 13; Ex. 49, Plaintiffs' Ex. Q, Plaintiffs' Ex. R at §3.1

  - Not only has nothing to do with inventory transactions but transferring free Tokens from issuer to users for completing educational tasks is <u>not</u> 'selling for' an issuer. Indeed, the issuer "will retain all rights, title and interest in [the digital assets] until transferred to Eligible Recipients." Ex. 49, Plaintiffs' Ex. Q, Plaintiffs' Ex. R at §3.3

# COINBASE WAS <u>NOT</u> AN UNDERWRITER

**Coinbase did not purchase Tokens with a view to distribution:**

- Plaintiffs abandon their theory that Coinbase sold Tokens "to stoke demand" and *"to support new launches."* <small>Opp. 5-6, 9-10; Reply 12-13</small>

- Coinbase sold Tokens in two limited instances. Neither scenario was "with a view to distribution." <small>Plaintiffs' Ex. G at CB00012702-03</small>

- Coinbase's goal was always to match transactions between users. <small>*Id.* at CB00012717-19</small>



> ### *In re Lehman Bros. Mortgage-Backed Securities Litigation*
> #### *650 F.3d 167, 177-78 (2d Cir. 2011)*
>
> Only those "playing roles essential in the actual distribution of securities qualify as underwriters." The definition does not include "those who participate only in **non-distributional activities** that may facilitate securities' offering by others."

# COINBASE WAS NOT A DEALER

**SEC v. Big Apple Consulting USA, Inc.**
*783 F.3d 786, 809 (11th Cir. 2015)*

**"…the centerpiece to this definition is the word 'business'"**

| Securities Act of 1933 | Securities Exchange Act of 1934 |
| --- | --- |
| "The term 'dealer' means any person who engages either for all *or part of his time*, directly or indirectly, as agent, *broker*, or *principal*, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." 15 U.S.C. § 77b(a)(12) (emphasis added). | "The term 'dealer' means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A) (emphasis added). |
| *[No exception for person not engaged in the "regular business" of dealing]* | "Exception for person not engaged in the business of dealing.— The term *'dealer' does not include* a person that buys or sells securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but *not as a part of a regular business*." *Id.* § 78c(a)(5)(B) |

- As the Eleventh Circuit explained, the two definitions **"are very similar."** Plaintiffs point to the district court decision (Reply 4 n.3) but ignore that the Eleventh Circuit held that any Exchange Act argument would **"fail[] as a matter of law for the same reasons"** as under the Securities Act.
*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 806, 809 n.11 (11th Cir. 2015)

# Coinbase Was Not a Dealer

**Coinbase was not "in the business" of buying or selling securities.**

- Evidence of "dealer behavior" requires performing transactions "**at such a volume and with such regularity as to render [the defendant] in the business of buying and selling securities.**" *SEC v. Auctus Fund Mgmt.,* LLC, 2024 WL 3498593, at *4 (D. Mass. July 22, 2024)

  - Coinbase's business was to provide a matchmaking service between users and it did so for 99.97% of transactions. Opp. 56.1 ¶¶30-33; Paget Declaration, Ex. A; Plaintiffs' Ex. G at CB00012703, CB00012717-19

- "Business" means a "commercial enterprise carried on **for profit**, a particular occupation or employment habitually engaged in **for livelihood or gain**." *SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 809 (11th Cir. 2015)

  - Coinbase's business was to "provide a Crypto Asset matching service" to facilitate transactions between users. Plaintiffs' Ex. G at CB00012719

  - Coinbase filled transactions in two limited circumstances outside of its control and did so regardless of whether Coinbase would realize a profit or loss. Plaintiffs' Ex. G at CB00012702-03; Night Declaration ¶5; Opp. 56.1 ¶20

# COINBASE WAS <u>NOT</u> A DEALER

**Coinbase was not "in the business" of buying or selling securities because it did not provide or advertise dealer services.** In addition to qualitative and quantitative factors, courts look at whether a defendant:

- Advertises that it is in the business of buying and selling securities
- Solicits investor clients
- Makes a market by quoting both its purchase and sale prices for one or more securities
- Provides other services to investors such as handling money and securities, extending credit, circulating subscription agreements, or giving investment advice

> **COINBASE <u>NEVER</u> ENGAGED IN NOR ADVERTISED THESE TYPES OF ACTIVITIES**
>
> 56.1 ¶¶92-93, 102-03; JSF ¶¶ 97-99

*EMA Fin., LLC v. AppTech Corp.*, 2022 WL 4237144, at *5 (S.D.N.Y. Sept. 13, 2022); *Chapel Invs., Inc. v. Cherubim Ints., Inc.,* 177 F. Supp. 3d 981, 990-91 (N.D. Tex. 2016)