UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD *et al.*, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

-v-

COINBASE GLOBAL, INC. *et al.*,

Defendants.

21 Civ. 8353 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves cross-motions for summary judgment in this putative class action

bringing claims under the securities laws against a centralized digital assets exchange. Plaintiffs

sue defendants Coinbase, Inc. ("Coinbase"), Coinbase Global, Inc. ("Coinbase Global"), and

chief executive officer Brian Armstrong under the Securities Act of 1933 (the "Securities Act")

and state "blue sky" laws.[1] Plaintiffs claim that Coinbase lists and sells digital assets qualifying

as "securities," without registering with the U.S. Securities and Exchange Commission ("SEC")

as a securities exchange or broker-dealer.

Pending now are cross-motions for summary judgment on a threshold issue: whether

Coinbase qualifies as a statutory seller under the Securities Act and state blue sky laws. The

Court earlier limited discovery to that issue, deferring litigation on other questions presented by

plaintiffs' claims, including whether the digital assets (or "tokens") at issue constitute securities,

and whether any transaction involving Coinbase violated federal or state securities laws.

---

[1] The Court earlier dismissed plaintiffs' claims under the Securities Exchange Act of 1934 (the "Exchange Act"). *See Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 242 (S.D.N.Y. 2023), *rev'd in part and remanded on other grounds sub nom. Oberlander v. Coinbase Glob. Inc.*, No. 23 Civ. 184, 2024 WL 1478773 (2d Cir. Apr. 5, 2024).

The pending statutory-seller motions—as the parties agree—implicate two distinct categories of transactions on Coinbase: (1) those in which Coinbase matched users' buy and sell orders ("matched" transactions); and (2) those in which Coinbase filled orders from a corporate inventory of tokens it owned ("inventory" transactions). Matched transactions represent the vast majority (approximately 99.97%) of Coinbase's overall trading volume in the tokens at issue. Inventory transactions represent the remaining 0.03% of Coinbase trades in those tokens, although these equate to at least $178 million in token sales.

As to the matched transactions, defendants move for summary judgment on the statutory-seller element. Plaintiffs oppose that motion, but do not cross-move for summary judgment. As to the inventory transactions, both parties cross-move for summary judgment on the statutory-seller element.

For the following reasons, the Court finds that Coinbase was not a statutory seller with respect to matched transactions, and accordingly grants defendants' motion for summary judgment on all claims, federal and state, to the extent that these claims are based on matched transactions.

The Court finds, as to the inventory transactions, that Coinbase was a statutory seller. The Court thus grants plaintiffs' motion for summary judgment as to that element, and denies defendants' cross-motion for summary judgment. Litigation of all federal and state claims—to the extent these claims are based on inventory transactions—will move forward.

## I.  Background

### A.  Factual Background[2]

---

[2] This decision draws the underlying facts from the parties' submissions in support of and opposition to these motions, including: the parties' joint statement of undisputed facts, Dkt. 158 ("JSF"); Coinbase's declarations, Rule 56.1 statement, and exhibits supporting its opening motion for summary judgment as to the matched transactions, Dkts. 166–67; plaintiffs'

### 1.    The Parties

Coinbase is a wholly owned subsidiary of Coinbase Global.  Dkt. 158 ("JSF") ¶ 1.

Armstrong is chief executive officer of Coinbase Global.  *Id.* ¶ 2.

Plaintiff Christopher Underwood is a citizen and resident of Florida.  *Id.* ¶ 101.  Plaintiff

Henry Rodriguez is a citizen and resident of New Jersey.  *Id.* ¶ 100.  Both plaintiffs used

Coinbase to transact in digital assets while located in their states of citizenship.  *Id.* ¶¶ 100–01.

### 2.    Overview of Coinbase's Trading Platforms

Coinbase operates trading platforms that allow its customers to buy, sell, and use digital

assets.  *Id.* ¶ 3.  Digital assets are "computer code entries on blockchain-based ledgers that record

the owners' transactions," and confer "certain rights to access an application, service, or

---

declaration, Rule 56.1 statement, and exhibits supporting its opening motion for partial summary judgment as to the inventory transactions, Dkts. 170–71; Coinbase's declarations, exhibits, and Rule 56.1 response and counterstatement in opposition to plaintiffs' motion on the inventory transactions, Dkts. 192–95; plaintiffs' declaration, exhibits, and Rule 56.1 response and counterstatement supporting their opposition to Coinbase's motion on the matched transactions, Dkts. 198–99; Coinbase's Rule 56.1 counterstatement in reply as to the matched transactions, Dkt. 202; and plaintiffs' declaration and Rule 56.1 response and counterstatement in reply as to Coinbase's motion as to the inventory transactions, Dkts. 205–06.

Citations to the JSF or a party's Rule 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's Rule 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

computer code." *Id.* ¶ 4. The digital assets available on these platforms include the 60 tokens that plaintiffs allege are unregistered securities.[3]

In general, parties can trade tokens in two ways: "on-chain" and "off-chain." Coinbase Ex. 37 ("Lindsey Rep.") ¶ 45.[4] In an on-chain transaction, a party authorizes the transfer of his digital asset to another party, after which the transaction is broadcast to the token's blockchain network for validation and recording on the public blockchain. *Id.* An off-chain transaction is not recorded on the blockchain. *Id.* These transactions may occur on "centralized" trading exchanges such as Coinbase. *Id.* Centralized exchanges are platforms where users can trade, buy, and sell tokens through a centralized intermediary. Coinbase Ex. 22 ("Jain Rep.") ¶ 31. The exchange typically holds custody of users' assets to ensure efficient and secure trading. *See id.* As described below, trading occurs within the exchange, rather than directly on the blockchain. *See id.* ¶ 32.[5]

---

[3] These tokens are traded under the following symbols: AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, BAL, BAND, BAT, BNT, BTRST, CGLD, CLV, COMP, CRO, CRV, CVC, DNT, DOGE, EOS, FARM, FET, FIL, FORTH, GRT, GTC, ICP, IOTX, KNC, LINK, LRC, MANA, MATIC, MKR, NKN, NMR, NU, OMG, OXT, QUICK, RARI, REN, REP, SHIB, SKL, SNX, STORJ, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, and ZRX. Dkt. 156 ("Token Stip.") at 2.

[4] The Court refers to Coinbase's sequentially numbered exhibits at dockets 166, 192, 213, and 214 as "Coinbase Ex. 1," *etc.* It refers to plaintiffs' exhibits at dockets 171 and 206 (supporting its motion as to the inventory transactions) as "Pls. Inv. Ex. A," *etc.*, and to plaintiffs' exhibits at docket 199 (supporting its opposition to Coinbase's motion as to the matched transactions) as "Pls. Matched Ex. A," *etc.*

[5] A decentralized exchange, by contrast, is a peer-to-peer marketplace that allows users to trade digital assets directly with one another, without any intermediary. Jain Rep. ¶ 33. Such transactions may be recorded directly on public blockchains (or "on-chain"). *Id.*

Between October 8, 2019 and September 30, 2024,[6] Coinbase offered two trading platforms: Coinbase Simple and Coinbase Advanced. *Id.* ¶ 5 & n.2. Any Coinbase customer could use either platform. *Id.* ¶ 6. Each was a "centralized trading platform for digital assets" that offered "trade and settlement services," plus "additional compliance measures." *Id.* ¶¶ 7–8. Each allowed Coinbase users to "deposit or withdraw fiat currency," "buy and sell digital assets," and "track, manage, and store digital assets." *Id.* ¶ 9.

Coinbase Simple is a streamlined product that lets users "buy, sell, hold, and convert" digital assets. *Id.* ¶ 10.[7] Coinbase Advanced "enable[d] more complex trading parameters" than the Simple platform. These included the ability to place "different order types" and view each digital asset's "order book," *i.e.*, a central reference that tracked current buy and sell orders for a given digital asset, including prices and quantities. *Id.* ¶¶ 13, 45–46.[8] On or around November 20, 2023, Coinbase Advanced was discontinued. *Id.* ¶ 15.

Individual Coinbase customers, such as plaintiffs and members of the putative class, are sometimes referred to as "retail" users. *Id.* ¶ 16. Coinbase also offers institutional services. *Id.* ¶ 17. Although these services are not at issue in this litigation, institutional investors may also transact on Coinbase Simple and Advanced. *Id.*

---

[6] The operative complaint, dated March 11, 2022, defined the class period to extend until "the present." Dkt. 43 ("AC") ¶ 1. For purposes of the instant motions, the parties have stipulated to the facts at issue through September 30, 2024 (the end of fact discovery). JSF ¶ 5 n.2.

[7] Coinbase Simple was also called "Coinbase Retail," "Coinbase Consumer," "simple retail," and "simple trade." JSF ¶ 11.

[8] Coinbase Advanced was initially called "Coinbase Pro," and became Coinbase Advanced in 2022. JSF ¶ 15.

### 3.    Trading Operations on Coinbase's Platforms

*Account creation and funding*:  A customer who wishes to buy, sell, convert, or store digital assets on Coinbase's platforms must register for a free Coinbase account.  *Id.* ¶¶ 32–33. He may then deposit funds in his individual Coinbase account for trading purposes.  *Id.* ¶ 34. The customer may fund that account by (1) depositing fiat currency via debit card, credit card, PayPal, Apple Pay, Google Pay, or ACH payment; (2) transferring or receiving digital assets from another trading platform; and/or (3) transferring or receiving digital assets from another digital asset wallet (*i.e.*, a tool holding cryptographic keys to access and control certain digital assets).  *Id.* ¶ 35; *see id.* ¶ 36.

*Hosted wallets and custody*:  Coinbase offers its users "hosted wallets" to store digital assets.  *Id.* ¶ 36.  A hosted wallet is one for which a third party—here, Coinbase—holds the cryptographic keys to access the wallet.  *Id.* ¶ 37.  All digital assets in these Coinbase wallets are held and registered on the blockchain under Coinbase's name, with users' ownership in them recorded on Coinbase's internal ledger.  *Id.* ¶ 38.  Coinbase acts as the "custodian" for hosted wallets on its platforms.  *Id.* ¶ 40.

A customer's Coinbase account shows the digital assets he may transfer or withdraw from his Coinbase-hosted wallet.  *Id.* ¶ 39.  Coinbase keeps custody of its users' digital assets in "omnibus wallets," separated by type of digital asset.  *Id.* ¶ 41.  These omnibus wallets contain digital assets belonging to multiple users.  *Id.* ¶ 42.

*Orders*:  To place an order, a customer's available balance in his Coinbase account generally must be sufficient to cover the total value of the order plus any fees.  *Id.* ¶ 44. Coinbase maintains a central order book for each digital asset traded on Coinbase, which tracks

6

current buy and sell orders for that digital asset (including the price a buyer/seller is willing to pay/receive, and the quantity he seeks to buy/sell at each price). *Id.* ¶¶ 45–46.

On Coinbase Advanced—before its November 2023 discontinuation—customers could place a "variety of order types," including "limit orders" and "market orders." *Id.* ¶¶ 15, 47. A limit order specified the price at which the user was willing to buy or sell a specific quantity of digital asset. *Id.* ¶ 48. A market order was an order to buy or sell a specific quantity of digital asset, at the best available price of all existing orders on that digital asset's order book. *Id.* ¶ 49. To submit an order on Coinbase Advanced, users specified not only the digital asset and quantity, but also certain other parameters, such as order type. *Id.* ¶ 50. Coinbase Advanced displayed real-time data on bid and ask prices, trading volume, and trade history. *Id.* ¶ 51.

Coinbase Simple, by contrast, provided (and continues to provide) a simplified trading interface. *Id.* ¶ 52. To submit an order on that platform, a user only selects the digital asset to be bought or sold, and the quantity of that asset. *Id.* ¶ 53. Coinbase Simple displays a price quote to the user, based on the user's requested quantity of a particular digital asset. *Id.* ¶ 54. The platform refreshes that quote "every few seconds" based on updated user activity on the order book for that asset. *Id.* ¶ 55. If the user clicks "buy," the quoted price is locked in. *See id.* ¶¶ 56–57. If not, the quote continues to update every few seconds until the user clicks "buy" or leaves the interface. *See id.* Once an order has been submitted, a "brief electronic hold" is placed on the user's account to prevent the pledged digital assets from being used for another purpose or doubly pledged. *Id.* ¶ 59. Orders on the Simple platform must be "executed in their entirety"—otherwise, they are cancelled. *Id.* ¶ 58.

***Coinbase's spread and transaction fees on user orders***:  As to the Simple platform, the price quoted to users there consisted of three components: (1) the market price of the digital

7

asset; (2) a spread of approximately 0.5% on the market price; and (3) a transaction fee between 1.49% and 3.99% of the total value of the order.  Matched 56.1 ¶ 38; *see also* JSF ¶¶ 84–85.

For Advanced orders, Coinbase charged transaction fees but did not earn a spread.  *See* JSF ¶ 86.  Such fees differ between "taker orders" (those matching the price of one or more pending orders) and "maker orders" (those that did not), in accordance with a tiered fee schedule. *Id.*  Coinbase included these fees in the digital asset price displayed on the Advanced interface's "trade preview screen."  *Id.* ¶ 87.

*Matching*:  When a user on Coinbase Advanced submitted an order, Coinbase routed the order to its automated matching engine.  *Id.* ¶ 60.  The matching engine used an algorithm to find counterparties to fill orders.  *Id.* ¶ 61.  It matched new Coinbase Advanced orders with orders already submitted to a given order book that had not yet been executed.  *Id.* ¶ 62.  Advanced orders that were not immediately matched remained "at rest" on the order book until they were filled, expired, or cancelled.  *Id.* ¶ 63.

The processing of orders placed by users on Coinbase Simple changed during the relevant time period of October 8, 2019 through September 30, 2024.  Before approximately February 2021, the matching engine first attempted to match each Simple order with another Simple order (or orders) placed within the same 250-millisecond period.  *Id.* ¶ 64.  These orders offset each other.  *Id.* ¶ 65.  Any remaining net amount from Coinbase Simple orders during that period (*i.e.*, those not fully matched and offset) was then automatically placed on the Coinbase Advanced platform as a limit "fill-or-kill" order.  *Id.* ¶ 66.  This type of order had to be matched in its entirety to be executed.  *Id.*  If the order was fully matched and executed within "approximately six seconds," the net Simple orders comprising it were completed.  *Id.*  If not, the

leftover Simple orders would "generally" be rejected.  *Id.*  This process repeated approximately every 250 milliseconds.  *Id.* ¶ 67.

In approximately February 2021, the process for filling Simple orders changed.  Starting then, the matching engine submitted Simple orders directly to a given order book, to be matched with either Simple or Advanced orders.  *Id.* ¶ 68.  If a Simple order was not filled, Coinbase notified the user that the order was rejected.  *Id.* ¶ 69.  This updated process remained in place through September 30, 2024.  *Id.* ¶ 68.  Coinbase also reserved the right to cancel open orders on the order book, in its sole discretion and for any reason, including where (1) the company found that the user had abused the platform (*e.g.*, by market manipulation); (2) transactions were "clearly erroneous," *i.e.*, involved errors in price, quantity, or other parameters; (3) law or regulation required such (*e.g.*, where Coinbase was ordered to suspend or terminate a user's account or trades); and (4) as required for technical reasons.  *Id.* ¶ 70.

After a matched order, Coinbase updated its internal records to reflect that a transaction had occurred (*i.e.*, the "clearing" process).  *Id.* ¶ 72.  It also "settled" the transactions internally—for example, exchanging U.S. dollars for bitcoin.  *Id.* ¶ 73.  During payment-processing periods, Coinbase restricted customers' ability to move digital assets off of the platform, to reduce the risk of loss.  *Id.* ¶ 74.

*Ledgering*:  Transactions on Coinbase's platforms generally occurred "off-chain"—that is, they are not reflected on any public blockchain record.  *Id.* ¶ 75.  To track transactions on its platforms, Coinbase maintains an internal ledgering system.  *Id.* ¶ 76.  This ledger records all transactions and the counterparties involved.  *Id.* ¶ 77.  Once a trade settles, the Coinbase ledger updates to reflect the crediting and debiting of accounts based on the trade.  *Id.* ¶ 78.  For example, if Customer A places an order to buy one bitcoin and that order is matched with

Customer B's order to sell one bitcoin, Coinbase's internal ledger credits one bitcoin to Customer A's account and deducts one bitcoin from Customer B's account. *Id.* That transaction, however, would not be recorded on the public blockchain as to that bitcoin, and the bitcoin would have remained in Coinbase's custody throughout the process. *See id.* ¶ 75. After a trade settles and the ledger updates, each affected user's account reflects the outcome of the trade. *Id.* ¶ 79. These ledger and account updates occur near instantaneously. *Id.* ¶ 80.

With respect to Advanced orders, the ledger reflected users "transacting directly with" other users. Dkt. 202 ("Matched 56.1") ¶ 60. Simple users, however, did not place orders directly on the order book for a given token. *Id.* ¶ 61. With respect to Simple orders, Coinbase used an "operational clearing account," through which Simple orders were routed, to track such transactions for "purposes of Coinbase's ledger." *Id.* ¶¶ 61, 64. This operational clearing account was separate from user accounts and those holding Coinbase's corporate inventory. *Id.*

***Coinbase's accounting and risk exposure***: On its financial statements, Coinbase does not record the tokens in users' accounts as owned by the company, notwithstanding Coinbase's custody of such. *See* JSF ¶ 81.

As to Coinbase's potential risk exposure from Coinbase Simple orders, the price of a token can change in the few seconds between when (1) a price is quoted (*i.e.*, offered) to the user, and (2) the user clicks "buy" and the order is executed. *See id.* ¶ 82. The matching engine rejects Simple orders when a token's price has moved by more than 0.1%, in either direction, from the price used to calculate the quote offered to the user. *Id.* ¶ 83.

### 4.    Coinbase User Agreements

To trade on Coinbase's platforms, all users were required to "sign up for a Coinbase account" and agree to the terms and conditions of the user agreement in effect at that time. *Id.* ¶

10

18.  Coinbase Inc.—not Coinbase Global, Inc.—is the only Coinbase signatory to the user agreement.  *Id.* ¶¶ 19–20.  Both Coinbase Simple and Advanced are governed by the same user agreement, but some provisions apply to only one platform.  *Id.* ¶ 21.

During the relevant time period (*i.e.*, between October 8, 2019 and September 30, 2024), every version of the user agreement contained the following sections:

> **2.6 Digital Asset Custody and Title.**  All Digital Currencies held in your Digital Currency Wallet are custodial assets held by Coinbase for your benefit, as described in further detail below.
>
> **2.6.1 Ownership.**  Title to Digital Currency shall at all times remain with you and shall not transfer to Coinbase.  As the owner of Digital Currency in your Digital Wallet, you shall bear all risk of loss of such Digital Currency.  Coinbase shall have no liability for Digital Currency fluctuations.  None of the Digital Currencies in your Digital Currency Wallet are the property of, or shall or may be loaned to, Coinbase; Coinbase does not represent or treat assets in User's Digital Currency Wallets as belonging to Coinbase.  Coinbase may not grant a security interest in the Digital Currency held in your Digital Currency Wallet.  Except as required by a facially valid court order, or except as provided herein, Coinbase will not sell, transfer, loan, hypothecate, or otherwise alienate Digital Currency in your Digital Currency Wallet unless instructed by you.
>
> **2.6.2 Control.** You control the Digital Currencies held in your Digital Currency Wallet.  At any time, subject to outages, downtime, and other applicable policies, you may withdraw your Digital Currency by sending it to a different blockchain address.  As long as you continue to custody your Digital Currencies with Coinbase, Coinbase shall retain control over electronic private keys associated with blockchain addresses operated by Coinbase, including the blockchain addresses that hold your Digital Currency.

*Id.* ¶ 22.[9]  Every such version also contained an amendment clause, stating:

> We may amend or modify this Agreement at any time by posting the revised agreement on the Coinbase Site and/or providing a copy to you (a "Revised Agreement").  The Revised Agreement shall be effective as of the time it is posted but will not apply retroactively.  Your continued use of the Services after the

---

[9] On or about June 1, 2022, Coinbase renumbered these sections and renamed the "Control" section "Control and Customer Instructions."  JSF ¶ 22 n.3.  On or about January 31, 2022 and May 11, 2022, Coinbase made other changes to the user agreement that, the parties agree, are irrelevant here (*e.g.*, replacing "Digital Currency" with "Supported Digital Assets," and removing "applicable" from "all applicable fees").  *Id.*

posting of a Revised Agreement constitutes your acceptance of such Revised Agreement.

*Id.* ¶ 30. Every user agreement also stated that, by using Coinbase, customers "agree[d] to pay all applicable fees." *Id.* ¶ 31.

Between January 2019 and September 2020, section 3.2—then titled "Purchase or Sale of Digital Currency"—stated: "When you purchase (buy) Digital Currency from Coinbase (or from a third-party using Coinbase Pro) this transaction is intended to effect a sale of Digital Currency." *Id.* ¶ 23. On or about September 3, 2020, Coinbase retitled this section "Transactions on the Coinbase Site," and amended its language to read:

> When you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase. Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase customers.

*Id.* ¶¶ 24–25.

Between approximately January 2019 and January 2022, section 1.3, then titled "Registration of Coinbase Account," stated: "We may, in our sole discretion, refuse to open a Coinbase Account, or limit the number of Coinbase Accounts that you may hold or suspend or terminate any Coinbase Account or the trading of specific Digital Currency in your account." *Id.* ¶ 26. On or about January 31, 2022, Coinbase amended this section to read: "We may, in our sole discretion, refuse to open a Coinbase Account, suspend or terminate any Coinbase Account, suspend or terminate the sending of Digital Assets from your account, or suspend or terminate the trading of Digital Assets in your account." *Id.* ¶ 27.[10]

Between approximately January 2019 and January 2022, section 7.5, then titled "Prohibited Uses," stated: "We reserve the right to cancel and/or suspend your Coinbase

---

[10] Coinbase also renumbered this section "1.2." JSF ¶ 27.

Account(s) and/or block transactions or freeze funds immediately and without notice if we determine, in our sole discretion, that your Account is associated with a Prohibited Use and/or a Prohibited Business." *Id.* ¶ 28.  Appendix 1 of the user agreement stated that "Prohibited Use" included unlawful activity, abusive activity, abuse of others, fraud, gambling, and intellectual property infringement. *Id.* ¶ 29.  It stated that "Prohibited Businesses" included investment and credit services; restricted financial services; intellectual property or proprietary rights infringement; counterfeit or unauthorized goods; regulated products and services; drugs and drug paraphernalia; pseudo-pharmaceuticals; substances designed to mimic illegal drugs; adult content and services, multi-level marketing; unfair, predatory, or deceptive practices; and high-risk businesses. *Id.*

### 5.    Coinbase's Publication of Information Regarding Digital Assets

Coinbase provides descriptive information regarding hundreds of digital assets on its website and mobile application ("app"). *Id.* ¶ 88; *see also id.* ¶ 43.  It publishes pages for tokens available for trading on Coinbase's platforms, as well as for those traded elsewhere. *Id.* ¶ 88. Each digital asset page generally includes a description of the asset, pricing information, the asset's white paper (*i.e.*, a guide to the token, its underlying technology, and stated purpose) if available, and a link to the issuer's website. *Id.* ¶¶ 89, 91–92.  Coinbase does not charge a fee to create or host a digital asset page (or to list a digital asset for trading on either platform). *Id.* ¶ 90.  The Coinbase Simple interface displays a quoted price on the page of every digital asset page available for trading there. *Id.* ¶ 93.  For digital assets not available for trading on Coinbase's platforms, Coinbase displays pricing data obtained from third parties. *Id.* ¶ 94.

### 6.    Coinbase's Corporate Inventory Transactions

Coinbase maintains a corporate inventory of digital assets.  *Id.* ¶ 95.  It filled certain orders directly from that inventory during the relevant time period.  *See id.* ¶ 96.  For such orders, Coinbase owned the digital assets before transferring them to the user.  *Id.*  Coinbase did not advertise these inventory transactions as a feature of the trading platforms on its website or in marketing materials.  *Id.* ¶ 97.  Coinbase's user agreement, help page, and blog likewise did not state that Coinbase fulfills orders from its corporate inventory.  *Id.* ¶ 98.  Users do not learn the identity of the party that fulfills an order, regardless whether the order is filled through the matching engine (*i.e.*, from other users) or from Coinbase's corporate inventory.  *Id.* ¶ 99.

### 7.    Named Plaintiffs' Transactions on Coinbase

During the relevant time period, Underwood and Rodriguez transacted in multiple digital assets on the trading platforms.  *Id.* ¶¶ 100–01.  Underwood testified that he consulted information on Coinbase, including digital asset prices, descriptions, and historical pricing graphs.  *Id.* ¶ 103.  Rodriguez testified that he considered prices when deciding whether to buy or sell digital assets.  *Id.* ¶ 102.

### B.    Relevant Procedural History

On October 8, 2021, three plaintiffs—Underwood, Louis Oberlander, and Zeneyda Patin—filed the Complaint against Coinbase Global.  Dkt. 1.  On January 11, 2022, the Court granted an unopposed motion to appoint Underwood, Oberlander, and a new plaintiff, Rodriguez, as lead plaintiffs, and to appoint Selendy Gay PLLC and Silver Golub & Teitell LLP as co-lead counsel.  Dkt. 21.

On March 11, 2022, lead plaintiffs filed the Amended Complaint.  Dkt. 43 ("AC").  It added Coinbase, Inc. and Armstrong as defendants, and expanded its claims to cover more

14

digital assets. *See id.* It brought three sets of claims: (1) under Section 12(a)(1) of the Securities Act, alleging that Coinbase sold or solicited unregistered securities, AC ¶¶ 931–41; *see* 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1); (2) under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that Coinbase entered into illegal contracts with its users to purchase and sell securities in violation of the Exchange Act's registration requirements, AC ¶¶ 956–88; *see* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b); and (3) under the securities laws of California, Florida, and New Jersey, alleging that Coinbase sold unregistered securities and failed to register as a broker-dealer, AC ¶¶ 1016–1106; *see* Cal. Corp. Code §§ 25110, 25130, 25210, 25503, 25501.5(a), 25504; Fla. Stat. §§ 517.07, 517.12(1), 517.211; N.J. Stat. §§ 49:3-56(a), 49:3-60, 49:3-71. It also brought control-person claims against Coinbase Global and Armstrong. AC ¶¶ 942–55, 1002–15, 1038–49, 1094–1106; *see* 15 U.S.C. §§ 77o(a), 78t(a). The federal claims were brought on behalf of a putative nationwide class consisting of all persons or entities who transacted in the listed digital assets on Coinbase's trading platforms during the class period of October 8, 2019 through the present. AC ¶¶ 1, 918. Its state law claims were brought on behalf of putative subclasses of citizens of California, Florida, and New Jersey who so traded during the class period. *Id.* ¶ 919.

On February 1, 2023, the Court granted Coinbase's motion to dismiss the AC, under Rule 12(b)(6). *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 244 (S.D.N.Y. 2023) ("*Coinbase I*"), *aff'd in part, rev'd in part, and remanded sub nom. Oberlander v. Coinbase Glob., Inc.*, No. 23 Civ. 184, 2024 WL 1478773 (2d Cir. Apr. 5, 2024) ("*Coinbase II*").

On April 5, 2024, the Second Circuit affirmed in part and reversed in part. *Coinbase II*, 2024 WL 1478773, at *5. It held that the Exchange Act claims were properly dismissed with prejudice, but reinstated the Securities Act and state law claims. *Id.* at *2–4 & n.8. As to these,

15

the Circuit held, the AC had plausibly alleged claims, under Section 12(a)(1), to survive a motion to dismiss under the first prong of the statutory seller test of *Pinter v. Dahl*, which asks whether a defendant "passed title, or other interest in the security, to the buyer for value." 486 U.S. 622, 642, 647 (1988). The Circuit held that, at the pleading stage, the Court was required to credit the AC's allegations "that privity was solely between Coinbase and Plaintiffs, and that Coinbase held title to the Tokens that were the subject of the transactions at issue"—notwithstanding that that pleading was inconsistent with the original Complaint's allegations and the December 2021 user agreement's terms. *Coinbase II*, 2024 WL 1478773, at *2–4. That was so for two reasons. First, any inconsistency between the facts alleged in the Complaint and those in the AC was to be disregarded because "an allegation in a superseded pleading ceases to be a conclusive judicial admission, even as it may remain competent evidence for submission to the factfinder." *Id.* at *3 (citation omitted). Second, assuming that any version of the user agreement was integral to AC, the Circuit found that the "differing language in the various user agreements that plausibly apply to Plaintiffs' claims precludes resolution of the title and privity issues on a motion to dismiss." *Id.* at *4. The Circuit remanded the state law claims, because the Court independently had diversity jurisdiction over these under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). *See id.* at *5.

On July 29, 2024, Coinbase moved for judgment on the pleadings under Rule 12(c). Dkts. 82–83; *see also* Dkts. 84 (opposition), 89 (reply). It argued that the AC inadequately alleged that Coinbase was a statutory seller, precluding liability on the remaining Securities Act and state law claims. *Underwood v. Coinbase Glob., Inc.*, No. 21 Civ. 8353 (PAE), 2025 WL 438547, at *5–6 (S.D.N.Y. Feb. 7, 2025) ("*Coinbase III*"). On February 7, 2025, the Court denied the motion. *Id.* at *12. It held that the Second Circuit's decision in *Coinbase II*, under

16

the mandate rule, foreclosed Coinbase's argument. *Id.* at \*7–9.[11]  And the user agreements, which Coinbase had appended to its answer, reflected an incomplete portion of the evidence "potentially relevant" to the statutory-seller analysis. *Id.* at \*8.  The Court also bifurcated discovery. *Id.* at \*12.  It directed the parties first to take discovery and move for summary judgment on the statutory seller issue, and deferred discovery and motions on other issues until that threshold issue was resolved. *Id.*[12]

On March 5, 2025, the Court held a discovery conference, *see* Dkt. 106, and, on March 7, 2025, approved the parties' case management plan, Dkt. 105; *see also* Dkt. 139 (revised plan with extended deadlines).[13]  On July 17, October 7, and November 19, 2025, the Court resolved discovery disputes between the parties.  Dkts. 118, 136, 143.

On February 18, 2026, the Court held a pre-motion conference concerning the instant motions.  *See* Dkt. 150.  On February 24, 2026, it adopted the parties' proposed briefing schedule, which set out distinct briefing schedules for the matched and inventory transactions.

---

[11] On this point, the Court also stated:  "The Circuit did not hold—as Coinbase's argument presupposes—that title is a purely legal question of contract interpretation, disconnected from the factual realities of plaintiffs' interactions with Coinbase. . . .  It left that question open, for consideration, on a complete record." *Coinbase III*, 2025 WL 438547, at \*8.

[12] The Court also denied Coinbase's motion with respect to the AC's control-person and state law claims, and held that the AC's use of "Coinbase" to refer to both Coinbase, Inc. and Coinbase Global, Inc. did not constitute impermissible group pleading under Rule 8(a). *Coinbase III*, 2025 WL 438547, at \*9–12.

[13] On September 22, 2025, the Court granted the parties' joint request to dismiss Oberlander's claims without prejudice for failure to prosecute, based on Oberlander's unresponsiveness and the Court's earlier order to show cause. Dkt. 128.  The parties agreed that the remaining plaintiffs' claims no longer encompass the 19 tokens that Oberlander (but no other plaintiff) traded on Coinbase, leaving 60 tokens at issue. *See* Dkt. 156 ("Token Stip.") at 2.

As to the matched transactions, on April 20, 2026, Coinbase filed a motion for summary judgment, Dkt. 164, memorandum of law, Dkt. 165 ("Coinbase Mem"), declaration and exhibits, Dkt. 166, and Rule 56.1 statement, Dkt. 167.  On May 22, 2026, plaintiffs opposed, Dkt. 197 ("Pls. Opp'n"), attaching a declaration and exhibits, Dkt. 199, and response and counterstatement to Coinbase's Rule 56.1 statement, Dkt. 198.  On June 17, 2026, Coinbase replied, Dkt. 201 ("Coinbase Reply"), and filed a response to plaintiffs' counterstatement, Dkt. 202 ("Matched 56.1").

As to inventory transactions, on April 20, 2026, plaintiffs filed a motion for partial summary judgment, Dkt. 168, memorandum of law, Dkt. 169 ("Pls. Mem."), declaration and exhibits, Dkt. 171, and Rule 56.1 statement, Dkt. 170.  On May 22, 2026, Coinbase opposed and cross-moved for summary judgment on this issue, Dkt. 190, attaching a memorandum of law ("Coinbase Opp'n"), Dkt. 191, three declarations and exhibits, Dkts. 192, 193, 194, and Rule 56.1 statement and response to plaintiffs' statement, Dkt. 195 ("First Inv. 56.1").  On June 17, 2026, plaintiffs filed a reply, Dkt. 204 ("Pls. Reply"), declaration and exhibits, Dkt. 206, and response and counterstatement to Coinbase's 56.1 statement, Dkt. 205 ("Second Inv. 56.1").[14]

---

[14] On July 2, 2026, Coinbase moved to maintain various exhibits, declarations, and portions of both sides' briefs under seal (collectively, the "sealed materials"), on the grounds that they contain confidential, proprietary, and commercially sensitive information.  Dkt. 208.  The request appended an index with document-specific justifications.  For the reasons stated in the motion and accompanying index, the Court grants the motion to seal.  To the extent this decision references portions of such materials, however, the Court finds the presumption of public access to such information to outweigh the countervailing factors Coinbase has identified.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–120 (2d Cir. 2006).

On April 29 and May 20, 2026, respectively, *amici curiae* The Digital Chamber and National Cryptocurrency Association filed briefs supporting Coinbase with respect to the matched transactions.  Dkts. 181, 189.

On July 15, 2026, the Court held argument.  *See* Dkt. 221 ("Oral Arg. Tr.").

## II.   Applicable Legal Standards

### A.   Summary Judgment

To prevail on a motion for summary judgment, the movant bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party, *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), resolving "all ambiguities" in its favor, *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

### B.    Section 12(a)(1)'s Statutory Seller Requirement

Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce, unless the securities are exempt from registration. 15 U.S.C. § 77e(a), (c). To prove a Section 5 violation, a plaintiff must show that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). If a plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies. *Id.* Section 5 is a strict liability statute that does not require a showing of scienter or negligence. *Id.*

Section 12(a)(1) of the Securities Act creates a private right of action for a buyer against a seller in any transaction that violates Section 5(a) or (c). 15 U.S.C. § 77*l*(a)(1). It includes the right to sue for damages or rescission. *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017). "[T]he list of potential defendants in a section 12(a)[(1)] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592

20

F.3d 347, 359 (2d Cir. 2010) ("*Morgan Stanley*").[15]

Under *Pinter v. Dahl*, an individual is a "statutory seller" under either of two scenarios. 486 U.S. at 642, 647.

First, liability attaches if a defendant "passed title, or other interest in the security, to the buyer for value." *Id.* at 642. Such "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id.* at 644 n.21. An "immediate seller" must be the "actual owner" of an asset to pass title. *Id.* at 643. Second, liability attaches if a defendant "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the [security's] owner." *Id.* at 647; *see also Morgan Stanley*, 592 F.3d at 359. In sum, a plaintiff may recover from a defendant under Section 12(a)(1) only if the defendant (1) owned and sold a security directly to the plaintiff, or (2) successfully solicited the sale of a security to the plaintiff and did so for financial gain.

## III.    Discussion

The parties' motions separately address the two categories of transactions on the Coinbase trading platforms: (1) matched transactions and (2) inventory transactions.

As to matched transactions, these comprise the vast majority—approximately 99.97%—of transactions on Coinbase's trading platforms in the 60 tokens at issue. It is undisputed that, as to these, Coinbase kept custody of users' tokens (*i.e.*, possessed the cryptographic keys necessary to access and transfer such); matched the orders of buyers and sellers through an automated,

---

[15] The Second Circuit has held that the identical language in Sections 12(a)(1) and (2) has the same meaning, and thus applies *Pinter* to claims under both sections. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *see also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

near-instantaneous process; and recorded these transactions on an internal ledger. Coinbase moves for summary judgment on the ground that it cannot be deemed a statutory seller under either *Pinter* prong. As to the first prong, it argues that customers, not Coinbase, always owned the tokens attributed to them on Coinbase's internal ledger, and that it thus did not itself hold or pass title in the tokens to buyers. As to the second, it argues that its publication of information and pricing related to tokens does not constitute solicitation under *Pinter*, and did not cause either lead plaintiff to purchase the tokens at issue. On related grounds, Coinbase moves for summary judgment on plaintiffs' blue-sky and control-person claims. In opposing these motions, plaintiffs argue that factual disputes exist as to whether (1) under the first prong, Coinbase was a direct seller as to matched transactions on Coinbase Simple; and (2) under the second prong, Coinbase solicited token sales in matched transactions on Coinbase Simple and Advanced. For similar reasons, they oppose summary judgment on the state-law and control-person claims.

As to the inventory transactions, comprising approximately 0.03% of Coinbase's total trading volume in the 60 tokens and yielding at least $178 million in sales,[16] it is undisputed that Coinbase filled customers' Coinbase Simple orders drawing on its corporate-owned inventory. Plaintiffs move for summary judgment on the statutory seller element as to these inventory transactions, arguing that, under *Pinter*'s first prong, Coinbase qualifies as a direct seller, and that the exceptions available to statutory sellers under Section 12(a)(1) do not apply. In cross-moving, Coinbase does not dispute that it is a statutory seller under *Pinter* prong one as to

---

[16] Coinbase argues that $178 million approximates the total volume of inventory transactions in these tokens involving users located in the United States. Plaintiffs counter that inventory transactions involving non-U.S. users should be included, because Coinbase, which acts as the seller in these transactions, is located in the United States. On that view, the inventory transactions involving these tokens total some $288 million.

inventory transactions on Coinbase Simple.  It instead argues that it is exempt from

Section 12(a)(1) liability under the statute's ordinary-trading exemption (Section 4(a)(1)),

because it was not an issuer, underwriter, or dealer.  It argues that the blue-sky claims fail for the

same reason, and based on additional exemptions available under state law.  It argues that the

control-person claims fail on similar grounds.

> **A.    Whether Coinbase Was a Statutory Seller of Tokens in Matched
> Transactions on the Simple Platform**

> **1.    First *Pinter* Prong: Whether Coinbase Passed Title in the Tokens
> to Buyers**

The parties do not materially dispute how Coinbase processed trades between its users.

But they disagree on the application to these facts of *Pinter*'s first prong: specifically, whether

Coinbase exercised sufficient control over the tokens traded by its users to gain an ownership

interest in them.

This issue is readily resolved on summary judgment.  For multiple reasons, the record

adduced in discovery establishes conclusively, without any material factual dispute, that

Coinbase did not take title in tokens, or pass such title to buyers, in matched transactions on the

Simple platform.  Every iteration of Coinbase's user agreement expressly provided that all

ownership interests in users' tokens remained with the users, and did not transfer to Coinbase at

any point.  Coinbase's custody and operational control of users' tokens did not grant it title in

those assets.  On the contrary, Coinbase's role in such processes closely parallels that of

intermediaries in traditional securities markets who—despite taking custody and control of

customers' assets—do not gain ownership interests in those assets.  The company also did not

record users' assets as its own in its financial accounting.  And the spreads and fees Coinbase

earned on trades reflect compensation typical for trade-execution services—not for principals of

such transactions.  Finally, a recent Second Circuit decision applying *Pinter*'s first prong to a different token exchange supports that Coinbase is not a statutory seller under this prong.

*Coinbase Simple's operations*:  The Court begins by detailing how Coinbase Simple processed matched transactions between customers.  This process is essential to the discussion that follows—and, as explained below, accords with Coinbase's contention that, at all times, the tokens traded in these transactions were owned by the trading customers, with Coinbase serving as custodian for its customers and matchmaker of their trades.

A customer who wishes to buy, sell, convert, or store digital assets on Coinbase Simple (or Advanced) must register for a free Coinbase account.  JSF ¶¶ 32–33.  To do so, the customer must agree to the terms and conditions of the operative user agreement.  *Id.* ¶ 18.  He may then deposit funds in his Coinbase account for trading purposes.  *Id.* ¶ 34.  The customer may fund his Coinbase account by (1) depositing fiat currency via debit card, credit card, PayPal, Apple Pay, Google Pay, or ACH payment; (2) transferring or receiving digital assets from another trading platform; and/or (3) transferring or receiving digital assets from another digital asset wallet.  *Id.* ¶ 35; *see id.* ¶ 36.  Before placing an order, the customer must have an available balance in his Coinbase account sufficient to cover the total value of any orders, including fees.  *Id.* ¶ 44.

Coinbase stores users' digital assets in "hosted wallets."  *Id.* ¶¶ 36–37.  The company holds the cryptographic keys to access these wallets.  *Id.*  A customer's Coinbase account reflects the distinct digital assets he is permitted to transfer or withdraw from his Coinbase-hosted wallet.  *Id.* ¶ 39.  All digital assets held in Coinbase wallets, although registered on the blockchain under Coinbase's name, have their ownership by customers recorded in Coinbase's internal ledger.  *See id.* ¶ 38.  Coinbase thus acts as the custodian for hosted wallets on its platforms.  *Id.* ¶ 40.  It

24

custodies its users' digital assets in "omnibus wallets," separated by type of digital asset. *Id.*

¶ 41. These omnibus wallets thus contain digital assets belonging to multiple users. *Id.* ¶ 42.

The Simple platform is a "streamlined" product that allowed customers to "buy, sell,

hold[,] and convert digital assets." *Id.* ¶ 10. For each type of token, Coinbase maintained a

central order book that tracked the current buy and sell orders for that asset—including the prices

buyers or sellers were willing to pay or receive, and the quantity each sought to buy or sell at

each price. *Id.* ¶¶ 45–46. To buy or sell tokens, the user navigated to the interface pictured

below:



Coinbase Ex. 27 at 26.[17] The user selected the token he wished to buy or sell (*e.g.*, bitcoin or

"BTC"), and inputted the intended quantity. JSF ¶ 53. Coinbase then provided a price quote

based on those inputs. *Id.* ¶ 54. The displayed quote was updated "every few seconds" to reflect

real-time user activity on the order book for that token. *Id.* ¶ 55. If the user clicked "buy," he

---

[17] Unless otherwise noted, citations to exhibits refer to ECF-stamped pages.

locked in the then-displayed quote.  *Id.* ¶ 56.  If not, the quote continued to update every few seconds, until the user clicked buy or navigated away from the interface.  *See id.* ¶ 57.

When the user placed a Simple order, Coinbase placed a brief electronic hold on his account assets, to prevent them from being double-pledged or otherwise used elsewhere.  *Id.* ¶ 59.  If Coinbase could not execute the entirety of an order, it notified the user that it had cancelled the order.  *Id.* ¶ 58.  To fill Simple orders, Coinbase used an "automated matching engine."  *Id.* ¶¶ 60, 64–69.  The matching engine used a proprietary algorithm to find counterparties to an order.  *See id.* ¶ 61.

The matching engine used two different processes during the relevant time period. Before approximately February 2021, the matching engine first tried to match each Simple order with other Simple orders submitted during the same 250-millisecond period.  *Id.* ¶ 64.  Such orders offset each other.  *Id.* ¶ 65.  To the extent Simple buy or sell orders were not fully offset in this manner, Coinbase placed the remaining orders on the Advanced platform in a limit "fill-or-kill" order.  *Id.* ¶ 66.  A fill-or-kill order had to be matched entirely with offsetting orders to execute.  *See id.*  If it was filled within approximately six seconds, the previously unmatched Simple orders were completed.  *Id.*  If not, the unmatched net Simple orders constituting the fill-or-kill order were rejected.  *Id.*  This process was triggered approximately every 250 milliseconds.  *Id.* ¶ 67.

After February 2021, rather than first trying to match orders between only Simple users, the matching engine submitted all Simple orders to be matched with either Simple or Advanced orders.  *Id.* ¶ 68.  If the algorithm did not find a match for a buy order among either platform's sell orders, the buy order was rejected.  *Id.* ¶ 69.  Because Simple users did not place orders directly on the order book for a given token (unlike Advanced users, who transacted directly with

the order book), Coinbase used an "operational clearing account" for Simple transactions. Matched 56.1 ¶¶ 60–61.  This account was separate from user accounts and from accounts holding Coinbase's own tokens, including its corporate inventory.  *Id.* ¶ 64.

*The user agreement*:  The provisions in Coinbase's user agreement governing these operations—in particular, custody and title of its customers' tokens—powerfully support that the company did not take ownership of those tokens.  Sections 2.6.1 of the user agreement, titled "Ownership," stated unequivocally: "Title to Digital Currency shall at all times remain with you and shall not transfer to Coinbase."  JSF ¶ 22.  Numerous provisions in the same section drove home that its users exclusively owned their tokens:

- "As the owner of Digital Currency in your Digital Wallet, you shall bear all risk of loss of such Digital Currency.  Coinbase shall have no liability for Digital Currency fluctuations."

- "None of the Digital Currencies in your Digital Currency Wallet are the property of, or shall or may be loaned to, Coinbase; Coinbase does not represent or treat assets in User's Digital Currency Wallets as belonging to Coinbase."

- "Coinbase may not grant a security interest in the Digital Currency held in your Digital Currency Wallet."

- "Except as required by a facially valid court order, or except as provided herein, Coinbase will not sell, transfer, loan, hypothecate, or otherwise alienate Digital Currency in your Digital Currency Wallet unless instructed by you."

*Id.*  It is difficult to imagine more conclusive language to the effect that title in tokens remained with users and did not pass to Coinbase.

Lest the point be missed, neighboring provisions expressly decoupled the concepts of ownership and custody.  Section 2.6, titled "Digital Asset Custody and Title," stated: "All Digital Currencies held in your Digital Currency Wallet are custodial assets held by Coinbase for your benefit."  *Id.*  And Section 2.6.2, titled "Control," provided:

You control the Digital Currencies held in your Digital Currency Wallet.  At any time, subject to outages, downtime, and other applicable policies, you may

27

> withdraw your Digital Currency by sending it to a different blockchain address.  As long as you continue to custody your Digital Currencies with Coinbase, Coinbase shall retain control over electronic private keys associated with blockchain addresses operated by Coinbase, including the blockchain addresses that hold your Digital Currency.

*Id.*  Read in concert with the "Ownership" provision, these terms of the "Digital Asset Custody and Title" and "Control" provisions, made patent that Coinbase's custody and operational control over users' digital assets accorded with, and did not displace, the customers' exclusive ownership rights in those assets.  *See Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994) ("well-established principles of contract construction" require, where possible, "that all provisions of a contract be read together as a harmonious whole" (cleaned up)).

Under the case law, these provisions are decisive.  Where there is an "unambiguous writing" concerning ownership, the parties' "agreed upon enumeration of the applicable rights, title, and interest [] controls."  *Surrey Propco LLC v. Denihan Ownership Co.*, 614 F. Supp. 3d 62, 70 n.34 (S.D.N.Y. 2022), *aff'd*, 2023 WL 4553551 (2d Cir. July 17, 2023) (summary order); *see also New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) (where "determination of ownership turns on the interpretation of provisions of a contract," which existence and terms are undisputed and unambiguous, "the effect of those terms on ownership is strictly a question of law").  And bankruptcy courts in this District, which have had frequent occasion to resolve ownership questions as to digital assets, have similarly construed applicable user agreements in determining whether assets belonged to a platform or its users.  *Compare In re Voyager Digit. Holdings, Inc.*, No. 22-10943, 2022 WL 3146796, at *1–3 (Bankr. S.D.N.Y. Aug. 5, 2022) (digital assets belonged to users, not estate of bankrupt cryptocurrency platform, based on provision in pre-bankruptcy agreement that entity would hold digital assets on behalf of users, including in consolidated "omnibus wallets" (cleaned up)), *with In re Celsius Network LLC*, 647 B.R. 631, 659 (Bankr. S.D.N.Y. 2023) (centralized platform's

28

terms of use "unambiguously transferred all right and title" of certain digital assets to platform; holding otherwise would "ignore the plain and clear language" of such agreement); *see also* Coinbase Ex. 38 ("Casey Rep.") ¶¶ 68–79 (collecting bankruptcy cases in which courts relied on user agreements to determine token ownership).[18]  In language every bit the equal of the precedents finding ownership by users, the reinforcing provisions of the user agreement here nailed down that a user retained exclusive title in his tokens, notwithstanding Coinbase's custody of and operational control over them.

The operation of Coinbase Simple, described above, dovetailed with the premise of these user agreement provisions—that Coinbase served as matchmaker between buying and selling parties, one of whom at all times owned the digital asset at issue.  Before February 2021, when a user placed a buy or sell order for a given token on Coinbase Simple, the company's automated matching engine nearly instantaneously determined whether an equal and opposite Simple order was available.  If so, the trades matched and cancelled each other out; if not, the matching engine consolidated these straggler orders and sought to match them on the Advanced platform.  After February 2021, the matching engine, no longer privileging Simple-to-Simple matches, instead immediately sought to match Simple orders with offsetting orders on either platform.  Because Coinbase maintained custody of its users' assets, the tokens themselves remained in Coinbase's omnibus wallets, and the trades were not recorded on tokens' respective public blockchains.  But Coinbase's contemporaneous internal ledger recorded whose tokens (or portions thereof) were owned by which customers.  This ledgering procedure is explicable under—and only compatible

---

[18] As one bankruptcy court recently put the point, the task of determining ownership "begins and ends with the language of" user agreements.  Transcript of Decision on Debtors' Motion for Entry of an Order, *In re BlockFi Inc.*, No. 22-19361, Doc. 871 at 4 (Bankr. Ct. N.J. May 11, 2023) (cited in Casey Rep. ¶ 76).

with—the ownership by customers, not Coinbase, of tokens in matched transactions.  *See* Jain

Rep. ¶ 16 (plaintiffs' expert, acknowledging that Coinbase users "retain an economic interest in

the digital assets held on their behalf, as recognized by Coinbase's user agreement").

>    ***Similarities to traditional securities-market intermediaries***:  That Coinbase's custody

and operational control over the tokens transacted by its users did not give it ownership rights in

those assets is in accord with the longstanding operation of the securities industry.  The

company's role is fairly likened to intermediaries in that industry that have not been treated or

held to be buyers or sellers, notwithstanding their custodial and operational roles.

>    The trading of traditional equity securities under the system established by the Depository

Trust and Clearing Corporation (the "DTCC") is a particularly apt comparator.  It underscores

that intermediaries may custody, settle, clear, ledger, and be listed as holders of assets—all while

their actual owners retain exclusive title.  As chronicled by Coinbase's expert, Dr. Richard R.

Lindsey, in 1973, the DTCC (then called the Depository Trust Corporation or "DTC") was

founded in response to a "paper crisis" that developed in the 1960s, in which securities trading

increased exponentially and overwhelmed Wall Street exchanges that used hard copy securities

certificates.  Lindsey Rep. ¶ 20.[19]  The DTC centralized securities trading mechanisms to

facilitate more efficient, accurate, and secure trading.  *See id.* ¶¶ 15, 20–22.  It took custody of

the physical certificates by storing them in its vaults, which allowed customers to record

transactions via book-entry instead of physical trading.  *See id.* ¶¶ 20–21 (noting that DTC

eventually eliminated paper certificates).

---

[19] Dr. Lindsey, from whom Coinbase submitted opening and rebuttal reports, is a principal of Callcott Group, a firm specializing in quantitative portfolio analysis, risk management, and market structure consulting.  He earlier served as the SEC's chief economist and its director of market regulation, and as a visiting economist at the New York Stock Exchange.  Lindsey Rep. ¶¶ 1–9.

A similar separation between custody and ownership inheres in connection with exchange trading today.  The DTCC continues to function as a central securities depository.  *Id.* ¶ 21.  And almost all shares of U.S. corporations are legally registered in the name of Cede & Co., a nominee partnership controlled by the DTCC.  *Id.*  But Cede & Co. is not the beneficial owner of these shares.  *See id.* ¶ 22.  Notwithstanding the shares' registration, investors retain their economic interest in the shares as beneficial owners.  *Id.*  In general, the beneficial owner of a given security holds an account at a brokerage firm, which identifies the security as belonging to the owner—notwithstanding that the DTCC identifies the broker as holder of the security.  *Id.* ¶ 22 & n.12.  When the owner sells the security, book-entries (by brokers, other intermediaries, and/or the DTCC) record the transaction and thus change the beneficial owner of the security. *Id.* ¶¶ 23–24.  In sum, although beneficial owners' names generally do not appear on corporate shareholder registers or the DTCC's book entries, they nonetheless have exclusive title in stocks based on brokerage records.  *Id.* ¶ 25.

As Dr. Lindsey further chronicles, in U.S. stock markets, the vast majority of trades today are routed electronically through brokers' systems to a market—a trading venue or exchange, such as the New York Stock Exchange ("NYSE")—where they are matched against other orders. *Id.* ¶ 30.  In general, a "clearing broker" submits a buy or sell order to the exchange on a customer's behalf, but the exchange's rules "dictate whether a transaction occurs, and on what terms." *Id.* ¶ 29.  This process is implemented by the exchange's automated matching engine. *Id.* ¶ 29 & n.22 (citing Velu *et al.*, *Algorithmic Trading and Quantitative Strategies*, CRC Press (2020) (software component used to "determine if any buy and sell orders can be matched in an execution" is called a "matching algorithm")).  When orders are matched, the exchange sends instant execution reports to both sides (and to a general data stream for stock trade reporting).

31

*Id.* ¶ 30.  After a trade is matched in the market, a series of electronic book entries register the change in beneficial ownership of the security—the processes of clearance and settlement.  *Id.* ¶ 31.  The DTCC, in concert with the National Securities Clearing Corporation (the "NSCC") maintains a "dynamic operational ledger" that records trades "in real time throughout the trading day."  *Id.* ¶ 35.[20]  These records reflect the beneficial ownership of the shares transacted by the owners' brokers.  The brokers' book entries in turn reflect the underlying investors' beneficial ownership, notwithstanding that Cede & Co. remains the registered name of the "owner" of the vast majority of shares.  *Id.* ¶¶ 21–22, 35.

The fee structure used by intermediaries in connection with securities trading is also instructive.  These intermediaries charge fees that are passed through to retail investors.  *Id.* ¶ 38. The NSCC charges fees for clearing and settlement services, which mainly consist of (1) clearance-activity fees, based on the value of transactions cleared; (2) usage-tiered, per-item transaction fees; and (3) monthly maintenance fees based on the amount of cash deposit required to be held in the clearing fund.  *Id.* ¶ 39.  The DTCC charges custody and processing fees (tiered by activity level and share count); book-entry settlement fees (per transaction); and participant fund maintenance fees (based on the average daily cash deposit in the fund).  *Id.* ¶ 40.  The NSCC and DTCC fees are charged to brokers, which pass them on to retail investors.  *See id.* ¶¶ 38–40.  Stock exchanges typically charge transaction-based fees that scale directly with the volume of trading activity.  *Id.* ¶ 41.  These are based on a maker-taker model: taker fees are

---

[20] Once a trade is confirmed, the NSCC conducts a process called "novation."  Lindsey Rep. ¶ 34 n.33.  The NSCC becomes the buyer to every seller and the seller to every buyer, thereby extinguishing the original bilateral obligation and replacing it with two new contracts: one between the seller and the NSCC, and one between the buyer and NSCC.  *Id.*  The novation process ensures that even if an original counterparty defaults, the other party will receive the promised securities or cash, with the NSCC guaranteeing performance.  *Id.*  The NSCC receives prefunding to mitigate its risk.  *Id.*

charged to orders that remove liquidity from the exchange (*e.g.*, a limit order that executes against an offsetting limit order already in the book), and maker rebates are credited to orders that add liquidity (*e.g.*, limit orders that rest on the book instead of matching immediately). *See id.* ¶ 41 & n.47. Brokers pass these fees through to investors. *Id.* ¶ 42. They also charge transaction-based fees for clearing services, per-trade processing fees, and/or fixed yearly fees for custody (depending on account size). *Id.*

Coinbase's operations in connection with matched trades are significantly analogous to those of the above intermediaries in the traditional U.S. equity market, which act on behalf of the true, beneficial owners. Much as the DTCC custodies securities, for which Cede & Co. is the registered owner of record, in a consolidated account, Coinbase custodies its users' tokens in omnibus wallets as to which it holds the cryptographic keys and which contain tokens registered on the blockchain under Coinbase's name. JSF ¶¶ 38–42; *see also* Lindsey Rep. ¶ 69.[21] Like these intermediaries, Coinbase's books and financial statements did not record the tokens as beneficially owned by it. JSF ¶ 81; *see also id.* ¶ 22 (per user agreement, Coinbase "does not represent or treat assets in [users'] Digital Currency Wallets as belonging to Coinbase").

Coinbase's trading platform is also relevantly akin to traditional markets, such as the NYSE, in that, as to matched transactions, it provides a venue for buyers and sellers themselves

---

[21] As Dr. Lindsey notes, other modern electronic platforms separate custody and ownership. These include eBay, an e-commerce platform that typically does not take any ownership interest in the goods users buy and sell there; the London Stock Exchange Group's "LSEG FX Matching" platform, which matches institutional buy and sell orders for foreign currencies without becoming a party to such trades or benefiting directly from price changes in those currencies; traditional auction houses such as Sotheby's, which may take physical custody of fine art and collectibles, while their sellers retain legal title in those goods; and commodities exchanges such as the London Metal Exchange, which provides clearing services for all transactions in that market and acts as a depository for electronic warrants that serve as legal title to metal bullion, without taking title to these commodities. *See* Lindsey Rep. ¶¶ 80–86; *see also* Casey Rep. ¶¶ 80–87 (commodity futures brokers do not take title to customer funds).

to swap title.  Lindsey Rep. ¶ 70.  Like the NYSE, Coinbase uses an algorithm-driven, automated

matching engine to execute trades.  *Id.*  It thus acts as an agent—not as a principal—in

facilitating these transactions.  It provides the infrastructure and governance to match orders, but,

in matched transactions, it does not make markets (*i.e.*, provide liquidity by offering to buy and

sell in the market itself).  *Id.*  And, in the matched transactions, it does not bear principal

exposure to price fluctuations.  As noted, Simple trades are automatically cancelled if the price

moves more than 0.1% in either direction, between a user clicking "buy" at a quoted price and

the order's execution.  Because Coinbase took a spread of approximately 0.5% and charged

transaction fees between 1.49% and 3.99%, it would not take a loss on a matched trade, even if

the token's price moved by just under 0.1% after a user placed an order.  *See id.* ¶¶ 70–73.

Coinbase's processes for clearing and settling matched trades also resemble those in

traditional equities markets.  Not unlike the NSCC's role in nearly instantaneously verifying and

processing trades to ensure fast and accurate changes in ownership, Coinbase's internal ledger

checks user account balances to assure that these contain adequate assets to execute a proposed

trade and cover associated fees, and, within seconds, clears and settles the transaction on both

sides.  *See id.* ¶¶ 74–78.  Coinbase's operational clearing account for Simple transactions

resembles a standard tool for post-trade processing used by intermediaries in the traditional

securities industry.  *See* Coinbase Ex. 23 ("Lindsey Rebuttal Rep.") ¶ 3.  Indeed, plaintiffs'

expert likened Coinbase's ledgering process to that of a "commercial bank [that] maintains

deposit accounts for its customers" and "simply adjusts its internal ledger" to debit and credit

different accounts to reflect transactions.  Coinbase Ex. 22 ("Jain Rep.") ¶ 38; *see also*

Matched 56.1 ¶ 57.

Finally, as to fees, Coinbase's business model broadly tracks those of entities in traditional equity markets that facilitate third-party transactions, in that its primary source of revenue consists of trading fees paid by users on its platforms.  Lindsey Rep. ¶ 79.  As to the matched transactions, these fees undisputedly do not represent compensation for a sale *by Coinbase*.  Rather, like the fees paid to traditional intermediaries, they were keyed to the matching and execution process.  *Id.*; *see also* Lindsey Rebuttal Rep. ¶ 15.

**Second Circuit case law**:  Federal courts have not yet had occasion to resolve claims that a centralized digital asset exchange constituted a statutory seller of those assets.  But the closest precedent supports that Coinbase did not hold title in any matched tokens on the Simple platform.

In *Risley v. Universal Navigation Inc.*, No. 23 Civ. 1340, 2025 WL 615185, at *2–3 (2d Cir. Feb. 26, 2025) (summary order),[22] the Second Circuit held that plaintiffs had not adequately pled that a *decentralized* digital asset exchange was a statutory seller under either *Pinter* prong.[23] That platform—the "Uniswap Protocol"—used "smart contracts," which, as alleged, were "self-executing" computer programs that autonomously wrote the terms of agreements between traders of a given token into the platform's computer code.  *Id.* at *2.  The smart contracts automatically determined the market prices of tokens, set exchange rates, and facilitated direct "swaps" of tokens between traders in "liquidity pools."  *Id.*  This system obviated the need for the intermediating-agent role that "centralized" exchanges—such as those using broker-dealers,

---

[22] Summary orders by the Second Circuit lack precedential value, but courts "are, of course, permitted to consider summary orders for their persuasive value, and often draw guidance from them in later cases."  *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 450 n.5 (2d Cir. 2012).

[23] A centralized exchange (such as Coinbase) typically custodies its users' tokens and records trades "off-chain," whereas a decentralized exchange allows users to transact directly with other users and record such directly on the blockchain.  *See* Lindsey Rep. ¶ 45; Jain Rep. ¶¶ 32–33.

banks, lawyers, and accountants in traditional asset trading—played. *Id.* Traders using the platform thus had "no direct interaction" with the original token issuers or the company operating the platform. *Id.*

The Circuit held, as to the first *Pinter* prong, that plaintiffs had not adequately alleged that the platform was a direct seller of the tokens it allowed traders to swap among themselves. *Id.* That was so for two reasons. First, "[i]n a decentralized cryptocurrency exchange such as this one, the hosts of the [platform] do not hold title to the tokens placed in the liquidity pool by third party users of the platform." *Id.* at *3. Instead, "the token issuers and liquidity providers . . . retain[ed] title of their tokens." *Id.* The "role of the smart contracts" on the platform, the Circuit stated, accorded with that of "base-level agreements for traders who access the stock market," whose function is "solely to execute the trades." *Id.* The platform was thus a "collateral" participant to the offer or sale of the tokens. *Id.* (quoting *Pinter*, 486 U.S. at 650). Under *Pinter*, such participants did not qualify as statutory sellers. *Id.* Second, the Circuit held that "[e]ven assuming, *arguendo*, that title to the tokens temporarily passed from the issuer to the [platform] and then to Plaintiffs in those split-second autonomous functions," such did not render the platform a direct seller of the tokens because its participation was "only remotely related to the relevant aspects" of those transactions," akin to those whose involvement was "only the performance of their professional services." *Id.* (first quoting *Pinter*, 486 U.S. at 651, and then quoting *In re Longfin Corp. Sec. Class Action Litig.*, No. 18 Civ. 2933, 2019 WL 1569792, at *6 (S.D.N.Y. Apr. 11, 2019) ("*Longfin I*"), *reconsideration granted on other grounds*, 2019 WL 3409684 (S.D.N.Y. July 29, 2019)).

The Second Circuit's reasoning in *Risley* has force as to the matched transactions here, notwithstanding the different species of exchanges. Insofar as the Circuit noted that the hosts of

the platform there did not hold title to the tokens placed in the liquidity pool, the same is so here: as reviewed, Coinbase's user agreement expressly provided, and its operations and financial accounting reinforced, that Coinbase did not have any ownership interest in the tokens whose trading it facilitated. And insofar as the Circuit assumed *arguendo* that, under the Uniswap Protocol, title might have temporarily passed for a split second to the platform in the course of the electronic transaction, its holding that that circumstance would not make the platform a direct seller would be equally applicable here, had this Court not found that Coinbase did not take title even for a split second. Like the platform at issue in *Risley*, Coinbase's role, as to matched transactions, was "solely to execute the trades" customers requested, and it was thus a "collateral" participant in the trades of tokens, not a direct seller of them. *Id.* (quoting *Pinter*, 486 U.S. at 650).

*Plaintiffs' arguments*: Plaintiffs make a series of arguments why genuine factual disputes prevent entry of summary judgment as to whether Coinbase functioned as a direct seller with respect to matched transactions. None is persuasive.

### a.    Coinbase's SEC correspondence

Plaintiffs first argue that, in two letters to the SEC, Coinbase made representations that create a factual dispute whether it functioned as a direct seller.

First, plaintiffs argue that, in a June 2020 letter to the SEC, Coinbase characterized its role on the Simple platform as that of a direct seller. Pls. Opp'n at 11–15 (citing Pls. Matched Ex. F ("June 2020 SEC Ltr.")). In the excerpts plaintiffs extract from that letter, they quote Coinbase as telling the SEC that it had made "a promise to deliver Digital Assets" to users who

traded on the Simple platform, and that, "In a sale to a User on [Simple], Coinbase carrie[s] out a contemporaneous purchase on [that platform] in order to fulfill the sale." *Id.* at 14, 25.[24]

Plaintiffs also note that, beneath that description in Coinbase's June 2020 letter were the two diagrams below, which, respectively, depicted order-filling processes on Coinbase Simple and Advanced:



*Id.* at 25 (Coinbase Simple diagram).

---

[24] The letter refers to "Coinbase Consumer," the Simple platform's predecessor. The parties agree that Coinbase Consumer and Simple functioned the same. JSF ¶ 11.



*Id.* at 18 (Coinbase Advanced diagram). Plaintiffs characterize the first of these, involving

Coinbase Simple, as depicting Coinbase buying tokens directly from, or selling tokens directly

to, users. They note that this diagram contrasts with the second, involving Coinbase Advanced,

which depicts users transacting directly with each other via the order book.

Second, plaintiffs cite a letter Coinbase sent the SEC in October 2020. The letter, they

argue, tacitly admitted that Coinbase was a direct seller, in that it stated that Coinbase "controls

which counterparty on the [Simple platform] gets the Crypto Asset once a User decides to sell

it," and that a "customer would never be aware of which counterparty it purchased a Crypto

Asset from or sold a Crypto Asset to." *Id.* (quoting Pls. Matched Ex. G ("Oct. 2020 SEC Ltr.")

at 23–24).

Neither the June 2020 nor the October 2020 letter, with the cited excerpts read in context,

supports plaintiffs' bid.

In the June 2020 letter, Coinbase sought confirmation from the SEC that it did not object

to Coinbase's applying an accounting standard (ASC 940) to revenue from Simple transactions.

ASC 940 applied, Coinbase argued, because the company "act[ed] as an agent to facilitate the purchase and sale of Digital Assets"—*not* as a principal or direct seller of such assets. *Id.* at 6–13. The letter stated that applying an alternative standard (ASC 606) would, in fact, *improperly* treat Coinbase as a direct seller on the Simple platform, and require it to recognize "all proceeds received from the sale of Digital Assets . . . as revenue," which would be inaccurate. *Id.* at 14. Read in full, the sentence (of which plaintiffs cite a fragment) stated that Coinbase's "preliminary assessment of applying ASC 606"—the standard Coinbase argued should *not* apply—to orders on the Simple platform "would result in the Company making a promise to deliver Digital Assets to the User." *Id.* This, Coinbase warned, "would *not* . . . be an accurate representation of the Company's business." *Id.* (emphasis added). Plaintiffs' textual excerpts, and commentary on these, thus are quite misleading. In arguing that these reflected a "promise" by Coinbase "to deliver Digital Assets to the User" irrespective of whether there was a counterparty, plaintiffs omit the critical surrounding text stating that this was *not* how the Simple platform functioned.

The diagrams in that letter also do not create a genuine dispute of fact. The diagram concerning Coinbase Simple's trading operations can certainly be construed consistent with plaintiffs' theory that Coinbase itself owned digital assets, in that its lefthand images depict Coinbase as purchasing bitcoin from a trader (using fiat currency from "Coinbase Bank account," and receiving the bitcoin to a "Coinbase BTC wallet"), and then selling that bitcoin to a customer. But there is no evidence that the diagram was anything other than a simplified gloss on the ledgering process of Coinbase Simple. It cannot disturb the underlying facts reviewed above as to matched transactions, which are undisputed, and which are not consistent with Coinbase selling its own tokens to consumers.

40

And there is no evidence that the differences between the diagrams with respect to the operations of the two platforms reflects that Coinbase owned the tokens traded on Coinbase Simple. Rather, the undisputed evidence is that, with respect to Advanced orders, Coinbase's internal ledger reflected such users "transacting directly with" other users, Matched 56.1 ¶ 60, whereas, for Simple users, who did not place orders directly on the order book for a given token, Coinbase used the operational clearing account for "purposes of Coinbase's ledger," *id.* ¶ 61. The undisputed evidence is that the letter's diagram as to Coinbase Simple reflected a simplified version of this process. *See* Coinbase Ex. 5 ("Paget Tr.") at 16 (transcript of deposition of Brent Paget, Coinbase's head of technical account policy and Rule 30(b)(6) witness). An illustration of such a simplification is that the diagram depicts a bitcoin moving from a seller's wallet to Coinbase's BTC wallet. *See also* June 2020 SEC Ltr. at 25 ("In a sale to a User on [Simple], Coinbase carried out a contemporaneous purchase on [that platform] in order to fulfill the sale."). In fact, the undisputed evidence is that that bitcoin would not transfer between wallets, but was instead held in an omnibus wallet, with the "transfers" recorded on Coinbase's internal ledger. *See id.* at 15–16; JSF ¶¶ 38–42, 76–80.[25]

Coinbase's October 2020 letter to the SEC, read in full, cannot be taken as a corporate admission assisting plaintiffs as to matched transactions. To the contrary, that letter stated that Coinbase was an agent, not a direct seller. It stated:

> In order for us to be deemed the principal as it relates to the sale of a Crypto Asset, we would need to conclude that we control the Crypto Asset prior to that Crypto Asset being transferred to the customer. . . . *Having control over a Crypto Asset would be inconsistent with our business model as a Crypto Asset trading platform*

---

[25] Plaintiffs' expert, Jain, relying on the same excerpts from the June 2020 letter, opined that Coinbase "appears to supply the asset and commits to deliver it at a quoted price," making it a seller. Jain Rebuttal Rep. ¶ 23. But because the operational facts regarding Coinbase Simple are undisputed and the letter and its diagrams cannot give rise to a genuine dispute, Jain's conclusion derived from these cannot either.

*and the nature of our promise to our customers.  Our promise to our customers is strictly to purchase and sell Crypto Assets on their behalf as an agent, and we do not have the ability to control a customer's decision on when to purchase or sell a Crypto Asset.  We ultimately rejected this view* as our algorithm only matches Users when instructed by Users, so from a contractual, practical, operations, and technical perspective, we do not control the Crypto Asset.

Oct. 2020 SEC Ltr. at 23 (emphasis added).

Plaintiffs seize on snippets elsewhere in the letter as ostensibly implying that Coinbase nonetheless acted as a principal or direct seller.  They note, for example, that Coinbase stated that it "controls which counterparty on the [Simple platform] gets the Crypto Asset once a User decides to sell it," and that a "customer would never be aware of which counterparty it purchased a Crypto Asset from or sold a Crypto Asset to."  Oct. 2020 SEC Ltr. at 23–24.  But these statements do not support that *Coinbase*—as opposed to a customer's counterparty—took title to the transacted tokens.  They are consistent with the undisputed facts concerning Coinbase Simple's operations, which reflect that Coinbase's automated matching engine identified which counterparty could offset a Simple order, and the user who had placed that order was generally not notified of the offsetting counterparty's identity.

### b.    Coinbase Simple's operations

Plaintiffs next argue that the operations of the Coinbase Simple platform reflect that the company functioned as a direct seller in all such transactions.  They cite four aspects of these operations.

Plaintiffs first note Coinbase's control over certain components of token prices that were quoted to users on that platform.  As noted, that platform quoted a price to a user seeking to purchase a particular token, which updated every few seconds based on that token's order book of current buy/sell activity.  JSF ¶¶ 45–46, 52–55.  The price quote reflected three components: (1) the market price of the digital asset; (2) a spread of approximately 0.5% on the market price;

and (3) a transaction fee between 1.49% and 3.99% of the total value of the order.  Matched 56.1 ¶ 38.  It is undisputed that Coinbase did not exercise discretion over the first component, which was based on the order book for the asset.  *See id.* ¶ 37 (disputed as to other aspects).  Plaintiffs argue that there is a factual dispute as to the extent to which Coinbase had discretion to set the amount of the spread and transaction fee.  *See id.* ¶¶ 37, 150.[26]  But even assuming so, summary judgment would still be in order, as Coinbase would still be an agent of the user, not a direct seller, on the platform.  A trading platform's exercise of discretion over spreads and/or fees for transactions, without more, does not establish that the defendant operating the platform "passed title, or other interest in the security, to the buyer."  *Pinter*, 486 U.S. at 642.  And, as reviewed, Coinbase's charging of transaction-based fees was widely consistent with the practices of non-owner intermediaries in the securities industry.  Any factual dispute on this point would not alter application of the first *Pinter* prong.  *See id.*; *see also id.* at 644 n.21, 647 (defendant's financial interests relevant to second prong regarding solicitation); *Longfin*, 2019 WL 1569792, at *2, 6

---

[26] An undated Coinbase accounting memorandum stated:

> Per section 3.3 of the user agreement, we have discretion to change the spread and the Coinbase Fee.  However, we do not have discretion to change the market exchange rate.  This is determined by users who submit sell orders on the platform.  Given that we only have discretion to change a small portion of the total consideration paid by a user to buy the Digital Assets, we concluded that we do not have discretion in setting the price of the Digital Assets delivered to users.

Pls. Matched Ex. D ("ASC 606 Mem.") at 8.  Nadav Night, Coinbase's senior technical program manager for trading services and Rule 30(b)(6) witness, testified: "The company has discretion in its use of spread and Coinbase [*i.e.*, transaction] fee, on spread, but the backbone of that exchange rate is based off of market participants, submitting their bids and offers.  And that is not at all controlled by Coinbase."  Coinbase Ex. 3 ("Night Tr.") at 59 (cleaned up); *see also* Oct. 2020 SEC Ltr. at 32–35 (describing calculation of transaction fee, which was "the greater of a flat fee or a variable percentage fee determined by region, product feature, and payment type" (cleaned up)).

(defendant was not direct seller under first *Pinter* prong, despite receiving commissions based on amount of shares sold).

Second, plaintiffs assert that Coinbase bore some financial risk on orders on the Coinbase Simple platform.  Coinbase, they note, gave Simple users several seconds to decide to buy a given token at the quoted price—notwithstanding that the actual market price could move in that short window.  JSF ¶¶ 54–57, 82.  As long as the actual market price did not move more than 0.1% from the quoted price (and provided that the transaction could be filled), Coinbase would honor the buy order.  *Id.* ¶¶ 56, 58, 69, 82–83.  Thus, if the actual price increased by up to 0.1% of the quoted price before that price updated, the market movement cut into Coinbase's net profits from the spread and transaction fee.  *See id.* ¶¶ 82–85.  But, because market fluctuations greater than 0.1% were automatically cancelled, and Coinbase's spread was approximately 0.5% and its transaction fee between 1.49% and 3.99% of the order, Coinbase did not take losses even on trades where the price moved to Coinbase's detriment during those seconds.  *See id.* ¶¶ 83, 85; Matched 56.1 ¶ 39; *see also* Pls. Matched Ex. D ("ASC 606 Mem.") at 8 ("given the timing of when market exchange rates are obtained to determine the price quoted to users, we are exposed to changes in the value of the underlying Digital Asset for a brief moment (as the market price is obtained prior to the user submitting their order)").  Plaintiffs declare (without support) that Coinbase's "inventory risk is one indicator that the party bearing the risk is the principal seller in the transaction."  Pls. Opp'n at 16.  But any minimal risk that Coinbase assumed would not establish that it was the principal seller or otherwise held title in the tokens traded.  *See Pinter*, 486 U.S. at 642, 647; *Morgan Stanley*, 592 F.3d at 359.  And Coinbase's accounting assessment, cited by plaintiffs, supports that, notwithstanding such limited risk exposure, Coinbase acted "as an agent," not a principal.  ASC 606 Mem. at 9.  The

first *Pinter* prong turns on whether the defendant held title or other ownership in the securities at issue. Coinbase's financial motivation, including its risk exposure, is distinct from ownership, and bears only on the second *Pinter* prong. *See Pinter*, 486 U.S. at 644 n.21, 647. Coinbase's minimal risk exposure thus does not give rise to a material dispute of fact on the first prong.

Third, plaintiffs argue that Coinbase's ostensible "batching" process for executing orders on the Coinbase Simple platform before February 2021 caused Coinbase to take an ownership interest in the tokens. It is undisputed that, during this period, Coinbase's automated matching engine first attempted to match each order with others on that platform, placed within the same 250-millisecond period. JSF ¶ 64. These orders offset each other. *Id.* ¶ 65. To the extent an order was not fully matched, it was then placed on the Coinbase Advanced platform as a limit "fill-or-kill" order, meaning that that entire order had to be matched to be executed. *Id.* ¶ 66. If the batch order was matched and executed within "approximately six seconds," the remaining Simple orders were completed. *Id.* If not, the leftover orders "generally would be rejected." *Id.* This process was performed approximately every 250 milliseconds. *Id.* ¶ 67.

The parties appear to disagree whether, as an operational matter, Coinbase "batched" all Coinbase Simple orders within a 250-millisecond window into a single net trade. Plaintiffs quote a February 2022 internal memorandum as stating that Simple's trading platform would "bundle and aggregate all buys and sells on the same order book" per 250-millisecond window. Pls. Matched Ex. I ("Feb. 2022 Mem.") at 17. Coinbase disputes this characterization, but does not support its contention; it merely cites the JSF's description of the pre–February 2021 Simple trading process, which is not inconsistent with the February 2022 memorandum's description of the batching process. Matched 56.1 ¶ 159.[27] The Court thus takes as true, for purposes of these

---

[27] Plaintiffs' Rule 56.1 counterstatement and Coinbase's response on this point read:

motions, plaintiffs' assertion that Coinbase aggregated all Simple orders within a 250-millisecond period into a single net trade. *See* S.D.N.Y. Local Civil Rule 56.1(c)–(d) (insofar as facts in Rule 56.1 statement are denied without citation to *conflicting* admissible evidence, courts find such facts to be true); *see also Champion v. Artuz*, 76 F.3d 483, 485–86 (2d Cir. 1996) (same).

Even so, that such orders were "bundle[d] and aggregate[d]" every 250 milliseconds does not support that Coinbase owned or otherwise acted as a direct seller for those transactions. To the contrary, the same section of the February 2022 memorandum stated that Coinbase "operates the [Simple] platform where Users who wish to sell *their* Digital Assets can sell them to Users that wish to buy Digital Assets." Feb. 2022 Mem. at 16 (emphasis added). And such batching is "functionally analogous to a broker's house settlement account or a prime broker's internal allocation or bridge account, which traditional firms use to route and net trades" without thereby rendering them sellers. Lindsey Rebuttal Rep. ¶ 3. Viewed in the light most favorable to plaintiffs, the evidence shows that title in tokens passed directly between users without Coinbase

---

[Plaintiffs' counterstatement:]   Until approximately February 2021, Coinbase would "bundle and aggregate" all Coinbase Simple orders into a net trade approximately every 250 milliseconds.   (Pls.' Ex. I at p.16; Pls.' Ex. G at CB00012702.)

[Coinbase's response:]   Disputed.  Prior to February 2021, the Matching Engine first would attempt to match Simple orders with other Simple orders submitted around the same time.  (JSF ¶¶64-65.)  If no counterparty was located, every 250 milliseconds the Matching Engine would submit a single "fill-or-kill" limit order to the Order Book for the net quantity of unmatched Simple orders to be matched with Advanced user orders.  (Id. ¶¶66-67.)

Matched 56.1 ¶ 159.

having any ownership stake in the tokens, notwithstanding the technical "batching" process used for user-to-user trades before February 2021.

Fourth, plaintiffs argue that Coinbase's routing of all Simple transactions through the operational clearance account vested the company with ownership interests in the tokens.  In contrast with Advanced orders (which Coinbase's ledger recorded as users "transacting directly with" other users), Simple users did not place orders directly on the order book for a given token. Matched 56.1 ¶¶ 60–61.  Coinbase thus used its operational clearing account—separate from user accounts and from accounts holding Coinbase's own tokens, including its corporate inventory—to track Coinbase Simple transactions for "purposes of Coinbase's ledger." *Id.* ¶¶ 61, 64.  Plaintiffs' expert, Jain, opined that this process gave Coinbase "a degree of operational control over user transactions that traditional custodians and depositories do not possess."  Jain Rebuttal Rep. ¶ 34.[28]  But as reviewed above, Coinbase's use of its operational clearing account did not grant it ownership interests in the tokens that passed through that account.[29]  And Jain's expert reports state only that Coinbase possessed *more* operational control than certain traditional custodians and depositories over user transactions.  They do not conclude, let alone supply a

---

[28] Jain is chief scientist and co-founder of Unifor, an artificial intelligence lab.  He has worked as director of Stanford University's mathematical and computational finance program; co-founded a Stanford research group that worked with financial institutions and asset managers; and was a quantitative analyst and portfolio manager at several hedge funds.  Jain Rep. ¶¶ 1–8.

[29] Dr. Lindsey's opening report stated:

> Coinbase performs the functions of a financial market intermediary that facilitates trading between users without acting as a counterparty to the trades.  Its activities— matching orders, maintaining custody through book-entry systems, and updating user balances upon settlement—mirror the essential infrastructure of traditional financial markets designed to manage operational and counterparty risk.

Lindsey Rep. ¶ 16.

basis for a reasonable factfinder to conclude, that such gave Coinbase an ownership interest in the tokens being transacted.

c.    *Plaintiffs' expert*

Plaintiffs again cite their expert, Jain, whose conclusions as to the matched transactions differ from Dr. Lindsey's—but not by much. Indeed, Jain's opening and rebuttal reports largely corroborate the expert reports of Dr. Lindsey and Casey, insofar as these describe the functioning of Coinbase and traditional securities markets and the similarities between them. *See, e.g.*, Jain Rep. ¶¶ 15(a) ("Coinbase aggregates the functions of multiple market participants in traditional finance within its centralized platform," including by performing "economic functions" similar to a broker when it routes user orders to the matching engine, to an exchange "when it operates the order book" and matches trades, and to a clearing agency when it "updates its internal ledger"), 42 (Coinbase "performs economic functions associated with an exchange in traditional finance markets, such as NYSE and NASDAQ, by maintaining a centralized order book and applying trade matching rules"). To the extent Jain takes issue with Dr. Lindsey's conclusions that Coinbase did not act as a seller in Simple matched transactions, that does not give rise to a genuine dispute of material fact. Jain, for instance, applies the "Dickinson definition" of "seller" differently than Dr. Lindsey. Pls. Matched Ex. C ("Jain Rebuttal Rep.") ¶ 12. Defining such as a party "committed to deliver securities in exchange for [] sale proceeds," Jain states that, under a "plain reading" of that definition, Coinbase "could be viewed as performing the delivery obligation associated with a seller" because it "perform[s] the operational steps that effect delivery," given that "no transfer occurs unless and until Coinbase executes these internal ledger changes." *Id.* But, as Jain proximately acknowledges, definitions of seller drawn from such "financial economic literature" do not "themselves resolve who functions as the seller on a

48

platform like Coinbase" for purposes of applying *Pinter*'s first prong.  *Id.* ¶ 11.  That analysis is driven by the case law, under which, as reviewed, Coinbase's actual operations and its user agreements are determinative, and do not make the company a statutory seller.

### d.    Coinbase's user agreement

Finally, plaintiffs argue that the applicable user agreement does not support that title in tokens remained with users during transactions on the Coinbase Simple platform.  They make three arguments along these lines.

First, they argue that the title provisions only apply to a user's digital assets "when those assets are resting in the [user's] account," not when the assets are "transferred" via Coinbase.  But plaintiffs do not cite any such language, in these provisions or elsewhere in the agreements, supporting that limitation.  To the contrary, the title provisions are broadly and unambiguously drawn.  They provide that title to tokens "shall *at all times* remain with" the user and that "none" of the tokens in a user's Coinbase wallet are deemed Coinbase's property.  These terms cover users' tokens, regardless whether such are in users' accounts or in the process of being transferred.  *See Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (where contract is unambiguous, "courts must effectuate its plain language").

Second, plaintiffs argue that a provision of an earlier version of the user agreement contradicted the terms immediately above.  Between January 2019 and September 2020, a section titled "Purchase or Sale of Digital Currency" stated: "When you purchase (buy) Digital Currency *from Coinbase* (or from a third-party using Coinbase Pro) this transaction is intended to effect a sale of Digital Currency."  JSF ¶ 23 (emphasis added).[30]  Plaintiffs argue that this

---

[30] On or about September 3, 2020, Coinbase retitled this section "Transactions on the Coinbase Site" and amended it as follows:

provision shows that Coinbase had title over tokens, which it transferred to purchasing users, such that the agreement's title provisions apply to tokens only after title passed from Coinbase to users.  *See* Pls. Opp'n at 21.  That is wrong.  As reviewed, the facts of Coinbase's operations are not in dispute.  Based on these and other provisions in the user agreement, Coinbase did not take ownership in tokens in matched transactions.  In a vacuum, the phrase "when you purchase [] Digital Currency from Coinbase" could be taken to imply that Coinbase owned and sold some such assets.  But, in the context of the rest of the user agreement (which stated repeatedly and unambiguously that users always retained exclusive title in their assets) and the other record evidence, no reasonable juror could find this snippet to mean that Coinbase owned the tokens in matched transactions.

Third, plaintiffs argue that because Coinbase's user agreements ostensibly provide that Coinbase never holds or transfers title to digital assets, and because Coinbase has admitted in this litigation that it holds title to the tokens in its corporate inventory, the agreements should be put aside as asserting a falsehood.  But plaintiffs attack a strawman.  The user agreements do not state that Coinbase never holds title to *any* digital assets.  And the Court's holding above—that the digital assets users custody with Coinbase remain owned by those users—fully accords with the undisputed fact that Coinbase holds title over the tokens in its corporate inventory.

***Overall assessment***:  For the above reasons, there is no genuine material dispute that, with respect to matched transactions, Coinbase did not pass any ownership interest in tokens to

---

When you purchase (buy) or sell Digital Currency *on the Coinbase Site*, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase.  Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase customers.

JSF ¶¶ 24–25 (emphasis added).

buyers on the Simple platform. And plaintiffs have abandoned their claim on this prong of *Pinter* concerning the Advanced platform. The Court thus grants summary judgment for defendants, as to the matched transactions, on *Pinter*'s first prong.

### 2.    Second *Pinter* Prong: Whether Coinbase Solicited Token Purchases by Plaintiffs

Coinbase moves for summary judgment on the issue whether, under the second *Pinter* prong, Coinbase solicited tokens purchases by the plaintiffs. Plaintiffs oppose, arguing that the evidence would permit a reasonable juror to find that Coinbase did so, as to transactions on both Coinbase Simple and Advanced.

In *Pinter*, the Supreme Court held that Section 12's definition of "seller" encompasses not only one who passes title in a security to a buyer, but also one "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. at 647. It noted, however, that "Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer." *Id.* "When a person who urges another to make a securities purchase acts merely to assist the buyer," it stated, "not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.'" *Id.* Rather, to satisfy *Pinter*'s solicitation prong, a plaintiff must show that a defendant had "direct and active participation in the solicitation of the immediate sale." *Coinbase I*, 654 F. Supp. 3d at 238; *see, e.g.*, *Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir. 1988) (plaintiffs must show individual defendant "actually solicited" their investment); *Holsworth v. BProtocol Found.*, No. 20 Civ. 2810, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) ("*BProtocol*") (dismissing Section 12 claim where plaintiff failed to allege that he "was directly contacted by Defendants or that he purchased securities as a result of

51

any active solicitations by Defendants"); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 Civ. 9270, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) ("plaintiffs must show that [defendant] actually solicited their investment"); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) ("[plaintiff] must allege not only that [defendant] actively solicited investors with respect to this transaction but that he purchased securities as a result of [the] solicitation").

The record reflects that Coinbase—like firms operating traditional securities exchanges—operates its trading platforms, at least in part, to "serve its own financial interests." *Pinter*, 486 U.S. at 647. For its role in facilitating trades, it charges transaction fees on both the Simple and Advanced platforms. JSF ¶¶ 84–87. As Jaclyn Sales, Coinbase's director of communications, testified, Coinbase is a "for-profit business" for which "[t]rading equals revenue." Pls. Matched Ex. N ("9/19/25 Sales Dep.") at 8; *see also* Lindsey Rep. ¶ 79 (Coinbase's economics expert, stating that Coinbase's "primary source of revenue from operating the trading platforms is fees on trades, paid by users," and that its "revenues would increase when trading volume increases, because Coinbase collects fees for each order executed"). To be sure, Sales separately testified that "[p]art of [Coinbase's] mission is educating folks on crypto." 9/19/25 Sales Dep. at 12. But that ostensible goal does not undermine the undisputed—and commonsense—fact that Coinbase operated its platforms to boost fee revenue and profit. That dimension of the *Pinter* prong two test is met.

That leaves the question whether Coinbase "successfully solicited" plaintiffs' purchases of tokens on its platforms, within the meaning of *Pinter*. The Court holds that the materials on which either of the two lead plaintiffs relied in purchasing tokens on Coinbase are insufficient to make the company a seller under *Pinter*'s solicitation prong.

As a preface to reviewing materials relied upon by the lead plaintiffs, the Court describes the evidence concerning Coinbase's public-facing materials. Coinbase publishes, on its website and app, descriptive information related to hundreds of tokens. JSF ¶ 88; *see also id.* ¶ 43. These pages address the tokens available for trading on Coinbase's platforms, plus others. *Id.* ¶ 88. The page for each token generally includes a description, pricing information, white paper (if applicable), and a link to the token issuer's website. *Id.* ¶¶ 89, 91–92. Coinbase does not charge a fee to create or host such pages (or to list tokens for trading on its platform). *Id.* ¶ 90.

The Coinbase Simple interface displays a quoted price on the page of every digital asset page available for trading there. *Id.* ¶ 93. For tokens not available for trading on Coinbase's platforms, Coinbase displays pricing data obtained from third parties. *Id.* ¶ 94.

The Advanced interface displayed "real time data on bid and ask prices, trading volume, and trade history" for each token available to trade. *See id.* ¶ 51. An illustrative excerpt of the token page for bitcoin is below:



Lindsey Rebuttal Rep., App'x Fig. 2A.

Lead plaintiff Underwood described his process in deciding to buy a given token as follows.  He would "check different avenues" such as Twitter/X, YouTube, and other social media platforms, including Coinbase's Twitter/X account.  Coinbase Ex. 14 ("Underwood Dep.") at 19–21.  He would "dig a little deeper to see who's behind the [token], more information on the supply, more information on if there's a utility, if they have . . . a white paper . . . meaning [] their outline of everything about the project [and] where they wanted to see it go." *Id.* at 23–24.  He would visit "CoinMarketCap" and "CoinGecko," which "[n]ormally" published tokens' white papers and "things of that nature." *Id.* at 24.  Asked where he would turn to determine the price of a token he intended to buy, Underwood listed "CoinMarketCap, Twitter, YouTube, and then Coinbase would be on that list as well." *Id.* at 25.  "TradingView," he testified, published pricing information that Coinbase did not. *Id.*  He stated that he follows "crypto influencer[s]," such as "BitBoy." *Id.* at 26.  He stated that he appreciated BitBoy, for example, because that influencer "had employees under him" conducting research; as a result, Underwood "learn[ed] quite a bit off [BitBoy's] show because [BitBoy] had the time and resources to actually dig deeper, look at different crypto events that maybe I wouldn't have caught, different things that were happening in the market, different coins that were maybe popping up." *Id.* at 26–27.  Underwood made token purchases at BitBoy's recommendation because BitBoy "would talk about why he thought [those tokens] were going to go up, the people behind it, how reputable they were.  And then [BitBoy] would go over stuff like tokenomics, [*e.g.*,] how many coins [were] in the market cap, . . . stuff like that." *Id.* at 27.  As to Coinbase's interface specifically, Underwood testified that he would view prices, descriptions, graphs reflecting historical price changes, and supply-related metrics (*i.e.*, "tokenomics"). *Id.* at 28–29;

54

*see also* JSF ¶ 103 ("Underwood testified that he consulted information on Coinbase including digital asset prices, descriptions, and historical pricing graphs.").

Lead plaintiff Rodriguez's use of information derived from Coinbase to guide his purchase and trading decisions was more limited.  Rodriguez testified that, in deciding whether to purchase tokens, he watched YouTube videos published by "[m]any companies and many people," concerning "many [digital] currencies."  Coinbase Ex. 16 ("Rodriguez Dep.") at 3.  He did not know whether any such videos had been created by Coinbase.  *Id.* at 7.  He learned about new tokens, he testified, through the YouTube channels he followed, and based his decisions whether to purchase them on "the news that [those channels] post when they're talking about the currencies."  *Id.* at 10–11.  He testified that he also "look[ed] at the news [on] Google [and] Instagram" to decide whether to purchase tokens.  *Id.* at 11–12.  And, he testified, he based his purchase decisions on "the price" of a given token.  *Id.* at 24–25; *see also* JSF ¶ 102 ("Rodriguez testified to considering prices when deciding whether to buy or sell digital assets.").

In sum, Underwood and Rodriguez overwhelmingly relied on sources of information outside of Coinbase to decide which tokens to buy, and when to purchase them.  They both, however, considered token prices, displayed on the Coinbase trading interface.  Underwood also considered the descriptions, historical price graphs, and certain supply metrics on Coinbase's interface (plus unspecified posts on Twitter/X by Coinbase).

Coinbase is entitled to summary judgment on the application of *Pinter* prong two to matched transactions for two independent reasons.

First, the information that Coinbase provided regarding tokens did not induce plaintiffs to purchase them.  Viewed in the light most favorable to plaintiffs, Underwood and Rodriguez's testimony established that they relied on numerous sources of information that were far more in-

depth than the basic overview that Coinbase provided of each token and its price history. *See, e.g.*, Underwood Dep. at 23–27 (Underwood viewed metrics from CoinMarketCap, CoinGecko, and TradingView, including those unavailable on Coinbase, and followed trading advice by crypto influencer BitBoy, whom he viewed as having the capacity to "dig deeper" using "researchers"); Rodriguez Dep. at 3, 7, 10–12 (Rodriguez bought tokens based on YouTube videos by "[m]any companies and many people," plus news on Google and Instagram). At most, plaintiffs used Coinbase to check current prices (and, in Underwood's case, historical prices and supply data). Critically, each plaintiff's testimony makes clear that Coinbase's provision of such basic information did not cause either plaintiff's token purchases. Plaintiffs' solicitation theory under *Pinter* prong two thus fails. *See Capri*, 856 F.2d at 478–79 (plaintiffs must show individual defendant actually solicited their investment); *Coinbase I*, 654 F. Supp. 3d at 238–39 (same)[31]; *see, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing Section 12 claim where plaintiff "failed to allege that plaintiff in fact purchased the [securities] as a result of [defendant]'s solicitation"); *BProtocol*, 2021 WL 706549, at *3 (same, where plaintiff did not allege that he "was directly contacted by Defendants or that he purchased securities as a result of any active solicitations by Defendants").

Second, even if Coinbase's publication of basic information had caused plaintiffs' token purchases—and they did not—such conduct did not extend beyond the "collateral" participation in sales that *Pinter* excluded from Section 12 liability. *See Wilson v. Saintine Expl. & Drilling*

---

[31] In *Coinbase II*, the Second Circuit did not reach the issue whether the AC had adequately pled that Coinbase was a statutory seller under *Pinter* prong two. 2024 WL 1478773, at *4 n.7. And this Court did not reach that issue on remand in *Coinbase III*, because it found the AC to have adequately pled that Coinbase was a statutory seller under the first *Pinter* prong. 2025 WL 438547, at *7.

*Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("collateral participants who do not solicit sales cannot be liable under Section 12(1)"). The prices that Coinbase displayed to users were based on real-time supply and demand, per the company's order books. *See, e.g.*, JSF ¶ 55; Second Inv. 56.1 ¶¶ 38–39. Plaintiffs declare, without support, that "[d]isplaying prices is the *sine qua non* of solicitation." Pls. Opp'n at 25. That is incorrect. Were that so, entities that publish securities prices, but that plainly do not fall within *Pinter*'s solicitation prong (including the New York Stock Exchange, the NASDAQ, the Wall Street Journal, Reuters, and Bloomberg) could be deemed sellers and exposed to liability under Section 12. As to Coinbase's social media posts, which Underwood's testimony referenced in passing, plaintiffs have not adduced any evidence as to their content—much less than such constituted successful solicitation. And Coinbase's token pages contained summaries that were high-level and descriptive. *See* JSF ¶¶ 88–89; *see, e.g.*, Second Inv. 56.1 ¶ 91 (Coinbase's page for bitcoin). Moreover, each token page included a disclaimer stating that the information therein was provided "for informational purposes only," "does not constitute a recommendation by Coinbase to buy, sell, or hold" any token, and "does not constitute investment advice, financial advice, [or] trading advice." Matched 56.1 ¶¶ 92–93. Such disclaimers, although not dispositive, were consistent with those pages not qualifying as solicitations.

Coinbase's publication of such information thus falls far short of that required to make Coinbase a seller under *Pinter*'s solicitation prong. *See, e.g.*, *Risley*, 2025 WL 615185, at *3 (allegations that social media posts by decentralized platform touted that platform and its owner's own tokens inadequate to plead solicitation, under *Pinter*, as to other tokens traded via the platform); *Youngers v. Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (same, where defendants were alleged to have distributed marketing materials through company

57

website and other channels); *Ocampo v. Dfinity Stiftung*, 2026 WL 249678, at *10 (Cal. Ct. App. Jan. 30, 2026) (same, where token issuer was alleged to have touted underlying technology).[32]

Plaintiffs counter that Coinbase engaged in three promotional activities constituting solicitation.

First, plaintiffs point to Coinbase's use of "sweepstakes" programs for specific tokens. For example, users who bought or sold at least $100 worth of DOGE (a type of token traded on Coinbase) during a specified time period could win up to $300,000 in DOGE.  Pls. Matched Ex. L ("6/9/21 Email") at 2; *see also* Pls. Matched Ex. J ("10/28/25 Sales Dep.") at 8 (Sales' testimony on Coinbase's DOGE sweepstakes).  Users who did not trade DOGE could also enter the sweepstakes, although Coinbase required such users to submit their application by physical mail.  Pls. Matched Ex. N ("9/19/25 Sales Dep.") at 172; *see id.* at 172–73 (Sales' "educated guess" was that more traders entered the DOGE sweepstakes than non-traders).

Second, plaintiffs cite evidence that Coinbase offered a program called "Learn/Earn." This program "allow[ed] asset issuers to provide a nominal amount of their digital asset to Coinbase consumers," in exchange for consumers' completion of certain tasks, such as watching videos about the asset or downloading an app related to it.  Pls. Matched Ex. M ("5/9/25 Policy") at 6; *see also* 9/19/25 Sales Dep. at 6 (similar).  Coinbase earned service fees from the token issuers for allowing them to distribute tokens under the program.  *See* 5/9/25 Policy at 6; 9/19/25 Sales Dep. at 7; 10/28/25 Sales Dep. at 11–12.  Coinbase did not receive any fees from users in

---

[32] *See also In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1220 (D.N.M. 2010), *aff'd sub nom. Slater v. A.G. Edwards & Sons*, 719 F.3d 1190 (10th Cir. 2013); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Tezos Secs. Litig.*, No. 17 Civ. 6779, 2018 WL 4293341, at *3 (N.D. Cal. Aug. 7, 2018); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 Civ. 0302, 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011).

connection with the program, because these users received such tokens from the issuers for free. *See* Matched 56.1 ¶ 38; JSF ¶¶ 84–85.

Third, plaintiffs adduced evidence that Coinbase allowed its users to "stake" their tokens through Coinbase, in exchange for receiving rewards generated by the issuers' blockchain protocols. "Staking," Sales testified, "helps validate the blockchain and secure the network" of token issuers. 10/28/25 Sales Dep. at 3. Before March 2023, she testified, Coinbase automatically staked users' tokens unless they opted out. *Id.* at 5. After then, customers had to opt into having Coinbase stake their tokens. *Id.* Sales testified that the issuer itself would "pay the customers rewards" by giving those rewards to Coinbase, which would in turn send the rewards to customers. *Id.* By contrast, if a customer were to stake "directly through the [issuer's] protocol" instead of via Coinbase, the customer would receive the rewards directly from the protocol." *Id.* at 3–4. When customers staked via Coinbase, the company earned a fee based on a "percentage of the assets that were staked." *Id.* at 6–7. Sales testified that fees ranged between approximately 25% and 35% of the assets staked. *Id.*

Coinbase makes a substantial argument that these programs do not constitute solicitation under *Pinter*. The Learn/Earn and staking rewards programs do not involve sales at all. And, as this Court held at the pleading stage, the AC's allegations—including that Coinbase "participated in direct promotions" of tokens, such as providing "airdrops" of free tokens "designed to increase trading volume"—were consistent with the "marketing efforts, materials, and services that courts, applying *Pinter*'s second prong, have held insufficient to establish active solicitation by a defendant." *Coinbase I*, 654 F. Supp. 3d at 239 (citation omitted) (collecting cases). The evidence adduced here concerning token sweepstakes, Learn/Earn, and staking rewards indicates

59

that these programs are, likewise, akin to conduct by entities that courts have found did not actively solicit sales.

The Court, however, does not have occasion to resolve whether these activities satisfy that prong, because—as is undisputed—neither Underwood nor Rodriguez bought tokens on Coinbase as a result of these programs.  Neither plaintiff mentioned, even in passing, any of these programs in their depositions in explaining how they came to purchase tokens on Coinbase. Plaintiffs have had ample opportunity to refresh their recollections, and to identify and adduce evidence, if any exists, supporting such reliance.  They have not.[33]  The existence of these programs does not create a material disputed fact as to whether either plaintiff relied on the programs.  The unitary evidence is that they did not.

The record does not contain any evidence that would allow a rational factfinder to conclude that Coinbase successfully solicited plaintiffs' token purchases on its platforms. Summary judgment is thus due defendants, as to the matched transactions, on *Pinter*'s second prong as well as its first.  *See, e.g.*, *Coinbase I*, 654 F. Supp. 3d at 238–39; *Steed Fin. LDC*, 2001 WL 1111508, at *7; *BProtocol*, 2021 WL 706549, at *3.[34]

---

[33] The parties agreed that both Underwood and Rodriguez participated in the Learn/Earn program, although the summary judgment record is silent on that point.  *See* Oral Arg. Tr. at 85–87.  As noted, the Learn/Earn program did not involve token sales.  As to sweepstakes, on June 9, 2011, Underwood received an email from Coinbase concerning such a promotion related to "DOGE" tokens.  *See* 6/9/21 Email at 2.  It stated: "You've successfully opted in to our sweepstakes.  Last step: Buy or sell $100 in Dogecoin on Coinbase by 6/10/2021, and you'll be entered to win $300,000 in Dogecoin."  *Id.*  Although the email indicates that Underwood "opted in" to be eligible for this sweepstakes, there is no evidence that he purchased any DOGE during the time period in question—nor do plaintiffs contend otherwise.

[34] *In re TokenLot, LLC*, an SEC administrative order, which plaintiffs cite, is inapposite.  *See* Securities Act Release No. 10543, Exchange Act Release No. 84075, 2018 WL 4329662, at *2–3 (Sept. 11, 2018).  The SEC there did not analyze *Pinter*'s solicitation prong, but rather found TokenLot liable under Section 15(a) of the Exchange Act for having "broadly solicited"

### 3.    State Law Claims

Coinbase moves for summary judgment, as to the matched transactions, on plaintiffs' claims under California, Florida, and New Jersey law.  These claims fall into two categories: those alleging (1) the offer or sale of unregistered securities (Counts 8, 11, and 13) (the "unregistered-securities claims"), and (2) the unlawful sale of securities by an unregistered broker or dealer (Counts 9, 12, and 14) (the "broker-dealer claims").  *See* AC ¶¶ 1016–1106.  These "blue sky" claims rely on substantially the same allegations as those supporting the federal Securities Act claims: they allege, in sum, that Coinbase offered or sold tokens qualifying as unregistered securities to the plaintiffs.  *Id.*

The Court addresses the two categories of claims in turn.

***State unregistered-securities claims***:  Plaintiffs bring unregistered-securities claims against Coinbase and Coinbase Global under California Corporations Code §§ 25110, 25130, and 25503 (Count 8); Florida Statutes §§ 517.07 and 517.211 (Count 9); and New Jersey Statutes §§ 49:3-60 and 49:3-71 (Count 13), against Coinbase and Coinbase Global.  The parties agree that these state laws were patterned on, and are construed consistently with, Section 12(a)(1), such that the "Section 12(a)(1) claims and their state-law analogs rise or fall together."  Pls. Opp'n at 29–30; *see* Coinbase Mem. at 32–33 (same).[35]

---

investors and directly sold thousands of tokens in connection with initial coin offerings ("ICOs"). *Id.* at *3–4.

[35] *See also Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1406 (N.D. Cal. 1992) (*Pinter*'s statutory seller test dispositive for California unregistered-securities claim); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1260 (M.D. Fla. 2010) ("Florida courts look to [the Securities Act] when interpreting" Florida securities laws); *Metz v. United Cntys. Bancorp*, 61 F. Supp. 2d 364, 380 (D.N.J. 1999) (New Jersey securities laws not "any more or less exacting than the corresponding federal statutes").

For the same reasons above as the Court grants summary judgment for Coinbase on the Section 12(a)(1) claims as to the matched transactions, it grants summary judgment for Coinbase on these unregistered-securities claims.

***State broker-dealer claims***:  Plaintiffs bring broker-dealer claims against Coinbase and Coinbase Global under California Corporations Code §§ 25210 and 25501.5(a) (Count 9); Florida Statutes §§ 517.12(1) and 517.211 (Count 7); and New Jersey Statutes §§ 49:3-56(a) and 49:3-71 (Count 14).  The elements of these claims do not precisely track their federal forebears.  But each requires privity between the defendant and the buyer of securities it sold. *See, e.g.*, *Jackson v. Fischer*, 2015 WL 1143582, at \*22 (N.D. Cal. Mar. 13, 2015) (Cal. Corp. Code § 25501.5 "expressly requires privity of contract" with the party holding "title to the securities"); *Trilogy Props. LLC v. SB Hotel Assocs. LLC*, 2010 WL 7411912, at \*12 (S.D. Fla. Dec. 23, 2010) (same, as to Fla. Stat. § 517.211); *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at \*15 (N.D. Cal. July 11, 2014) (same, as to N.J. Stat. § 49:3-71(a)), *aff'd*, 653 F. App'x 553 (9th Cir. 2016).  For the reasons reviewed above as to *Pinter*'s first prong, it is undisputed that Coinbase did not hold title to the tokens in matched transactions.  The Court thus grants summary judgment for Coinbase as to these broker-dealer claims.

### 4.    Control-Person Claims Against Coinbase Global and Armstrong

Coinbase moves for summary judgment as to the control-person claims, brought against Coinbase Global and Armstrong under Section 15 of the Securities Act, California Corporations Code § 25504, and New Jersey Statutes § 49:1-71(d) (in Counts 2, 10, and 15, respectively).  "To establish Section 15 liability, a plaintiff must show a primary violation of Section 12 and control of the primary violator by defendants." *Nomura Holding Am., Inc.*, 873 F.3d at 99 (cleaned up). Because Coinbase was not a statutory seller as to the matched transactions, as held above,

plaintiffs cannot establish a primary violation of Section 12 as to that category of trades. The Court thus grants summary judgment for defendants, as to the control-person claims against Coinbase Global and Armstrong based on the matched transactions.

**B.      Whether Coinbase Is a Statutory Seller of Tokens in Inventory Transactions with Customers on the Simple Platform**

The second category of transactions consists of Coinbase Simple orders that the company filled from its own corporate inventory of tokens. These constituted approximately 0.03% of total transactions in the 60 tokens during the relevant period on Coinbase, and involved at least $178 million in tokens.[36]

Plaintiffs move for summary judgment on the statutory seller element as to the inventory transactions. They argue that Coinbase holds title in the tokens in its inventory, and passes title to buyers on the Simple platform when, in certain circumstances, it fills those buyers' orders. They argue that Coinbase is thus a direct seller in these transactions under the first *Pinter* prong, and that none of Section 12(a)(1)'s exemptions apply to Coinbase.

Coinbase cross-moves for summary judgment on this element. It does not dispute that, when it fills Simple orders from its corporate inventory, it holds and passes title in tokens. It invokes the "ordinary trading" exemption to Section 12(a)(1) liability. That exemption, under Section 4(a)(1), excludes from such liability "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Coinbase argues that it was not an issuer, underwriter, or dealer. It separately argues, as to dealer status, that plaintiffs have not shown that

---

[36] Coinbase represents that $178 million constitutes the total volume of such sales to users based in the United States. Plaintiffs argue that inventory transactions involving non-U.S. buyers are also within the scope of this case, because Coinbase (the seller) is located in the United States, bringing the total volume of corporate inventory transactions to approximately $288 million. The parties have not briefed, and the Court does not have occasion on these motions, to assess whether inventory transactions with non-U.S. buyers are within the scope of well-pled claims.

inventory transactions occurred within the first 40 days after a public offering or as part of an unsold distribution.  As for the state law claims based on the inventory transactions, Coinbase argues that these fail on the same grounds and that additional state law–specific exemptions apply.  Lastly, it argues that the control-person claims against Coinbase Global and Armstrong fail on similar grounds.

### 1.    Whether Coinbase Acted as a Statutory Seller

Coinbase does not dispute that, during the relevant period, it filled certain Simple orders using tokens in which the company held title as part of its corporate inventory.  *See* JSF ¶¶ 95– 96.  In contrast to its agent role with respect to matched transactions, Coinbase acted as the principal in inventory transactions.  *See, e.g.*, *id.*; Pls. Inv. Ex. G ("10/15/20 SEC Ltr.") at 9 ("When [Coinbase] is directly involved and primarily responsible for fulfilling a customer Crypto Asset order, it is the principal in that transaction as there is no other counterparty providing a good or service to the customer."), 20 ("[Coinbase] acknowledges that for transactions settled with its own inventory, it would have inventory risk, and would be considered the principal in that scenario.").  Under the first *Pinter* prong, Coinbase thus "passed title, or other interest" in the inventory tokens to certain Simple users for value.  486 U.S. at 642; *see also id.* ("[a]t the very least, [Section 12] contemplates a buyer-seller relationship").

### 2.    Whether the Ordinary Trading Exemption Applies

Coinbase argues that, notwithstanding its status as a statutory seller of inventory tokens, it cannot be liable under Section 12(a)(1) because it qualifies for Section 4(a)(1)'s ordinary trading exemption.

This exception provides an affirmative defense to liability under Section 12(a)(1).  It exempts from such liability "transactions by any person other than an issuer, underwriter, or

64

dealer." 15 U.S.C. § 77d(a)(1). It was intended to cover "transactions between individual investors" involving already-issued securities. *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941) ("*Chinese Consol.*"); *see SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006) (same) (citing *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959)). The statute defines "issuer" as any "person who issues or proposes to issue any security," subject to various exceptions not applicable here. 15 U.S.C. § 77b(a)(4). It defines "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security." *Id.* § 77b(a)(11). And it defines "dealer" as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." *Id.* § 77b(a)(12).

"Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy his Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (cleaned up). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (emphasis in original). The non-moving party "must have some evidence permitting a reasonable juror to find in its favor with respect to an affirmative defense." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 97 n.29 (2d Cir. 2016) ("*650 Fifth Ave.*").

Plaintiffs first contend that a determination as to whether that exemption applies is "premature" "in light of the bifurcated posture" of this case. That is wrong. On February 7, 2025—nearly 18 months ago—the Court bifurcated discovery. *Coinbase III*, 2025 WL 438547,

65

at *12.  It directed the parties first to take "full discovery" on whether Coinbase was a statutory seller, "followed by summary judgment motion(s) on that issue." *Id.*  After those motions were resolved, the Court directed, the parties would proceed to discovery and thereafter motions on any remaining issues (including, potentially, whether the tokens constitute "securities" under the Securities Act).  *See id.*  On March 7, 2025, the Court approved the parties' proposed case management plan, which stated that "[a]ll fact discovery regarding issues relevant to whether Defendants acted as 'statutory sellers' for purposes of Section 12(a)(1) of the Securities Act . . . and analogous Blue Sky laws" was to be complete by October 3, 2025.  Dkt. 105 ("CMP") at 1.

On February 18, 2026—after the jointly stipulated period for all fact and expert discovery related to the statutory seller issue had closed—the Court held a pre-motion conference as to the instant motions.  Plaintiffs' counsel stated, for the first time, that he believed plaintiffs had not yet taken discovery relevant to whether the Securities Act's "exemptions" applied.  PMC Tr. at 14.  On questioning by the Court, Coinbase's counsel stated that the defense would argue on summary judgment that a single exemption—the ordinary trading exemption—applied.  *See id.* at 14–17.  Plaintiffs' counsel thereupon agreed that plaintiffs had taken all discovery relevant to that exemption.  *See id.* at 17–24.

The CMP's reference to "*[a]ll* fact discovery regarding issues relevant to whether Defendants acted as 'statutory sellers' for purposes of Section 12(a)(1)" and analogous state laws plainly encompassed discovery relevant to those laws' exemptions.  CMP at 1 (emphasis added).  Plaintiffs had ample notice and opportunity to take discovery related to the exemptions applicable to Section 12(a)(1) and its state analogs.  And their opening and reply briefs on this issue make abundant use of deposition testimony and documentary evidence concerning the

66

exemption—including whether Coinbase qualifies as a dealer or underwriter.  Plaintiffs' claim that it is premature to resolve this issue is meritless.

The Court thus turns to whether the ordinary trading exemption applies.  If Coinbase was an issuer, dealer, or underwriter, it cannot claim refuge from Section 12(a)(1) liability under that carveout.  The parties agree that Coinbase was not an issuer, Pls. Reply at 2 n.2; Coinbase Opp'n at 7, but dispute whether it was a dealer or underwriter.

***Whether Coinbase was a dealer***:  The facts leave no doubt that Coinbase qualified as a dealer, within the meaning of 15 U.S.C. § 77b(a)(12), with respect to the inventory tokens it used to fill Simple orders.

The Securities Act defines "dealer" as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."  15 U.S.C. § 77b(a)(12); *see also Cavanagh*, 445 F.3d at 111.  Coinbase filled certain Simple orders with tokens in which the company held title, as part of its corporate inventory.  *See* JSF ¶¶ 95–96.  It acted as the "principal" insofar as it transferred such ownership interests in those tokens to its customers in exchange for value.  *See, e.g.*, *id.*; 10/15/20 SEC Ltr. at 9 ("When [Coinbase] is directly involved and primarily responsible for fulfilling a customer Crypto Asset order, *it is the principal in that transaction* as there is no other counterparty providing a good or service to the customer." (emphasis added)), 20 ("[Coinbase] acknowledges that for transactions settled with its own inventory, it would have inventory risk, and *would be considered the principal* in that scenario." (emphasis added)).  Brent Paget, Coinbase's director of reporting and technical policy, and Rule 30(b)(6) witness, testified that when the company used its corporate inventory to settle transactions, it acted "in a manner that would be the same as [that of] a dealer."  Pls. Inv. Ex. K

("10/3/25 Paget Dep.") at 5; *see also id.* at 9 (when Coinbase "use[d] its corporate inventory to satisfy [] transactions, it would be entering into a direct transfer of ownership of that specific inventory").  In a June 30, 2020 letter to the SEC, Coinbase sought that agency's non-objection as to the company's "assessment that, even though neither [Coinbase] nor its subsidiaries . . . are broker-dealers registered under the Exchange Act, it undertakes activities that are akin to those of a broker-dealer," so as to enable Coinbase to apply the accounting standard for such entities (ASC 940).  Pls. Inv. Ex. A ("6/30/20 SEC Ltr.") at 7.  Coinbase has not adduced any evidence to the contrary.

Coinbase makes four counterarguments.  None is persuasive.

First, the company asserts that it does not qualify as a dealer because the inventory transactions comprised "a mere 0.03% of all relevant transactions."  Opp'n at 10; *see also* Paget Decl. ¶ 4.  But the Securities Act requires only that a dealer have engaged for at least "part of [its] time" in such activities.  15 U.S.C. § 77b(a)(12); *see also Cavanagh*, 445 F.3d at 111.  Congress defined the term "broadly," and did not cabin it to persons or entities entirely or even primarily devoted to such activities.  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 576 n.26 (S.D.N.Y. 2008).  Moreover, Coinbase's emphasis on the relatively small size of inventory-transaction volume *in comparison to* Coinbase's overall trading volume in the tokens at issue paints an incomplete picture.  The denominator—Coinbase's total transaction volume for these 60 tokens globally—was $1.067 trillion.  Dkt. 194 ("Paget Decl.") ¶ 7.  The numerator—0.03% in inventory transactions—represents approximately $288.6 million in tokens that Coinbase sold from its inventory to users globally (including approximately $178.2 million to U.S.–based users).  *Id.* ¶ 6; *see also* First Inv. 56.1 ¶¶ 13–15.  Although inventory transactions comprised a small fraction of Coinbase's massive overall transaction volume in these tokens, that

68

Coinbase sold at least $178.2 million in such tokens from its corporate inventory during the relevant period shows that, for at least "part of [its] time," it engaged as a principal selling or otherwise trading in securities. 15 U.S.C. § 77b(a)(12); *see Cavanagh*, 445 F.3d at 111; *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d at 576 n.26.

Tellingly, Coinbase has not identified any case within this Circuit that supports its claim that the small percentage of its token sales represented by the $288.6 million (all users) or $178.2 million (U.S. users) in inventory transactions makes it not a dealer. The out-of-Circuit cases it cites either undermine its position or are inapt. In *SEC v. Auctus Fund Mgmt.*, the district court found the SEC to have stated a claim that the defendants *were* dealers under the Exchange Act, based on the "volume" and "regularity" of such transactions, among other factors. 2024 WL 3498593, at *4–5 (D. Mass. July 22, 2024). In *SEC v. Big Apple Consulting USA, Inc.*, the Eleventh Circuit likewise found that the defendants *were* dealers under the Exchange Act, and thus did not qualify for the ordinary trading exemption. 783 F.3d 786, 809–10 (11th Cir. 2015) ("*Big Apple*"). Coinbase emphasizes that *Big Apple* involved defendants whose "*entire* business" was buying and selling securities, but the Eleventh Circuit did not rule that to be a dealer, an entity's trading had to consist of its entire business. *Id.* Such would have contradicted § 77b(a)(12)'s expansive definition of dealer, which covers entities that trade securities for only "part of [their] time." *SEC v. Kenton Cap., Ltd.* is inapposite (and, if anything, undercuts Coinbase's position). There, the court found that defendants were brokers under 15 U.S.C. § 78c(a)(4)—a separate provision of the Exchange Act with a different definition than § 77b(a)(12)'s dealer definition—based mainly on the amounts of money investors pledged and remitted. 69 F. Supp. 2d 1, 12–13 (D.D.C. 1998). And *Radzinskaia v. NH Mountain, LP* applied a different standard under § 78c(a)(5)(B) in finding defendants to be dealers. No. 23 Civ. 21967,

2023 WL 6376457, at *4 (S.D. Fla. Sept. 29, 2023).  In sum, these cases found defendants dealers or brokers, applied a different standard from the one that applies here, or both.

Second, Coinbase argues that it was not a dealer because it did not conduct inventory transactions "for the purpose of turning a profit."  Coinbase Opp'n at 10.  But, even assuming *arguendo* that § 77b(a)(12) requires a profit motive, the record here reflects that Coinbase's primary motivation for filling inventory from tokens was to keep its user base satisfied, and thereby profit from greater trading volume, on which it earned fees.  Coinbase used its corporate inventory to fill Simple orders (1) when the Advanced platform, which would otherwise match transactions, experienced "outages or extreme latency," and (2) when orders were below Coinbase's minimum order amount for a particular token.  First Inv. 56.1 ¶¶ 10, 16.  Coinbase had a profit motive for this line of business even if it did not seek to profit directly from them (*i.e.*, to "take advantage of market conditions").  Opp'n at 4 (quoting Coinbase Ex. 42 at 11).  Coinbase concedes that it used these transactions "to improve the User's experience[] by providing them with uninterrupted service," *id.*, and thus to promote "corporate goodwill," PMC Tr. at 51.  By using inventory sales to ensure reliable and quick execution of token buys on Coinbase Simple, Coinbase unavoidably if indirectly sought to increase its revenue from fees on trades.  *See, e.g.*, Pls. Matched Ex. B ("Dec. 2022 Wyden Ltr.") at 2 (Coinbase letter to Senate Finance Committee Chairman Ron Wyden, stating: "We have built a robust backend technology platform to support the global, real-time, and 24/7/365 demands of crypto asset markets.");  Coinbase Ex. 43 ("FY 2022 10-K") at 5 ("We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.").  As Coinbase's expert stated, Coinbase's trading-platform revenue increases with

70

trading volume because Coinbase collects fees on executed orders. JSF ¶¶ 84–85; Lindsey Rep. ¶ 79. Thus, even accepting Coinbase's premise that, with its inventory transactions, it did not seek to profit from short-term market movements, the record supports that Coinbase used corporate inventory to preserve execution quality, user goodwill, and trading volume—thus indirectly increasing Coinbase's revenues.

Third, Coinbase argues that plaintiffs errantly rely on letters it sent to the SEC, in which it asserted that it acted like a dealer and/or principal when it filled orders from its corporate inventory. *See, e.g.*, 6/30/20 SEC Ltr. at 7; 10/15/20 SEC Ltr. at 9. Because the letters were written "for purposes of determining the appropriate accounting," Coinbase argues, the analogy should not bear on whether Coinbase was, in fact, a dealer or principal under § 77b(a)(12). Coinbase also argues that the fact that the SEC later objected to the company's application of the accounting standard for registered broker-dealers further supports its position here.

Coinbase is correct that its characterizations of its inventory transactions, in advocacy with the SEC on a very different issue involving accounting, do not carry the day for plaintiffs— just as the same did not preclude the Court's finding that summary judgment was appropriate for *Coinbase* because it acted as an agent in matched transactions. As with matched transactions, the factors that weigh by far the most as to the character of the inventory transactions are Coinbase's actual operations with respect to these. But those operations, however characterized to the SEC, overwhelmingly support that Coinbase acted as a dealer by holding title in the tokens and, as a principal, by transferring its ownership in them to Simple users for value. *See* JSF ¶¶ 95–96. Coinbase's own Rule 30(b)(6) witness testified that Coinbase acted "in a manner that would be the same as [that of] a dealer" in such transactions. 10/3/25 Paget Dep. at 5; *see also id.* at 9 (when Coinbase "use[d] its corporate inventory to satisfy [] transactions, it would be

71

entering into a direct transfer of ownership of that specific inventory"). The stipulated facts as to Coinbase's ownership in the tokens and the inventory-transaction process would, standing alone, warrant summary judgment for plaintiffs on this element. Coinbase's letters to the SEC merely provide added support for that conclusion.

Fourth, Coinbase claims, in passing, that even if it was a dealer as to the inventory transactions, the "vast majority" of these transactions fell within another exemption. Opp'n at 14–15 & n.11. That "dealer exemption" excludes from liability all transactions by a dealer *except* (a) those occurring within the first 40 days after (i) the effective date of a security's registration statement or (ii) its public offering, and (b) those constituting part of an unsold allotment to or subscription by the dealer as a participant in the distribution by the issuer or through an underwriter. 15 U.S.C. § 77d(a)(3). Coinbase argues that the record does not reflect evidence that inventory transactions occurred within 40 days of a token's public offering, or as part of an unsold allotment or subscription by Coinbase in the distribution by a token issuer or through an underwriter.

Coinbase, however, expressly waived this argument. At the February 18, 2026 pre-motion conference on these motions, Coinbase's counsel stated: "We are relying on one simple exception for [the] Securities Act. We asserted that there is an additional alternative argument [*i.e.*, based on the dealer exemption] in a footnote [in Coinbase's pre-motion letter], but we are, frankly, moving on the first one I mentioned, [the ordinary trading exemption]." PMC Tr. at 17. The Court then had an extended discussion with both sides that turned on the premise that "we are down to one exemption, the one that [Coinbase's counsel] has just described." *Id.* at 17–18. On that premise, plaintiffs' counsel agreed that sufficient discovery had been taken to render the parties' dispute over whether that one exemption—the ordinary trading exemption—applied ripe

72

for resolution. *Id.* at 18–25. Again on that premise, the Court determined that any additional discovery was unnecessary before resolving these motions. *Id.* at 22. Coinbase thus waived any argument based on a different exemption. The Court will enforce that waiver. *See, e.g.*, *Doe v. Trump Corp.*, 6 F.4th 400, 409 n.6 (2d Cir. 2021) (although courts "have discretion to consider forfeited arguments, a waived argument may not be revived"); *Soukaneh v. Andrzejewski*, 112 F.4th 107, 117 (2d Cir. 2024) (argument waived by counsel's abandonment thereof at oral argument); *cf. EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 625 n.1 (2d Cir. 2007) (failure to raise argument in opening brief constituted waiver).

Even if Coinbase had not waived this argument, it would fail. Because the exemption presents an affirmative defense as to which Coinbase would bear the burden of proof at trial, plaintiffs may move for summary judgment to challenge the legal sufficiency of Coinbase's evidence in support of it, and can "satisfy [their] Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *Giammettei*, 34 F.3d at 54 (cleaned up). Plaintiffs need not adduce evidence "*negating*" the affirmative defense. *Id.* (emphasis in original). Coinbase thus must point to at least "some evidence permitting a reasonable juror to find in its favor with respect to an affirmative defense." *650 Fifth Ave.*, 830 F.3d at 97 n.29. It has not done so. Indeed, its conclusory argument to this effect does not cite any evidence. Summary judgment is thus warranted for plaintiffs on this element.

Because Coinbase was a dealer as to the inventory transactions, it is ineligible for the ordinary trading exemption.

73

***Whether Coinbase was an underwriter***:  Coinbase cannot claim refuge in the ordinary trading exemption for an independent reason—it has failed to carry its burden to show it was not an underwriter.[37]

The Securities Act defines "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security."  15 U.S.C. § 77b(a)(11).  A distribution is the "process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public."  *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (quoting *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966)).  Those who "play[] roles essential in the actual distribution of securities qualify as underwriters."  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 178 (2d Cir. 2011) ("*Lehman Bros.*").  Accordingly, there are "three categories of individuals who qualify as underwriters: (1) persons who purchase from an 'issuer' with a view to distribution; (2) persons who offer or sell for an 'issuer' in connection with the distribution of a security; and (3) persons who participate directly or indirectly in those tasks."  *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 766 (S.D.N.Y. 2018) ("*Longfin II*").  "Whether one acquires shares with a 'view to' distributing them depends on whether one had 'investment intent' or intended only to sell the shares."  *SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 309 (S.D.N.Y. 2015) (citation omitted).  In sum, "the term underwriter is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an issuer to the public."  *SEC v. N. Am. Rsch. & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970) (citation omitted).

---

[37] An entity can be both a dealer and an underwriter.  *See, e.g.*, *Culpepper*, 270 F.2d at 247 ("direct or indirect participation in the distribution brings a dealer within the definition of underwriter"); *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1311 (2d Cir. 1977) (defendant was "clearly" a dealer, "if not also an underwriter").

It is undisputed that Coinbase purchased and owned its corporate inventory of tokens, JSF ¶¶ 95–96, so that it could sell them to users in at least two scenarios: (1) when the Advanced platform experienced "outages or extreme latency," and thus could not be used to fill Simple orders; and (2) when orders were below Coinbase's minimum order amount for a particular token, First Inv. 56.1 ¶¶ 10, 16.[38]  And, in unqualified statements of fact, Coinbase has denied purchasing these inventory tokens as an investment.  In a June 30, 2020 letter to the SEC, it stated:

> *Digital Assets held by the Company are held on a short-term basis, and are not held for the speculative intention of profiting through trading.*  The Company stands ready to fill User orders on the [Simple] Platform when in limited circumstances those orders cannot be matched on the Trading Platform.

6/30/20 SEC Ltr. at 6 (emphasis added).  On November 25, 2020, in another letter to the SEC, it similarly stated that, when Coinbase itself filled Simple orders because the Advanced platform was "down or not responding," it did so "to improve the User's experience, by providing them with uninterrupted service, and not to take advantage of market conditions at the time." Coinbase Ex. 42 ("11/25/20 SEC Ltr.") at 11; *see also* Opp'n at 4.  Coinbase made a similar representation in an August 2023 presentation, stating that the corporate inventory "exist[ed]

---

[38] The parties dispute whether Coinbase also used its corporate inventory in a third way. Plaintiffs argue that Coinbase filled Simple orders to support launches of new tokens that did not, at that time, have an adequately robust market to be filled otherwise.  Coinbase counters that, although it sought to support these nascent tokens, it did not do so by selling them to users. Instead, it asserts, it purchased these assets to pay so-called "gas fees."  Dkt. 193 ("Night Decl.") at ¶¶ 10–11.  These, also called "network fees" or "miner fees," were required by the tokens' respective blockchains to process user-to-user transactions on those networks.  In other words, Coinbase argues that it purchased these new tokens not to distribute them to customers, but instead to pay the tokens' network fees to facilitate users' own transactions.  Because the Court finds that Coinbase was an underwriter based on the two undisputed categories of inventory usage (*i.e.*, technical platform problems and sub–minimum order threshold), it does not have occasion to determine whether Coinbase's ostensible support of new token launches also made it an underwriter.

exclusively for ops [*i.e.*, operational] efficiency, *i.e.*, buffers facilitate client business."  Pls Inv.

Ex. C ("Aug. 2023 Presentation") at 14.  Coinbase's internal policy concerning "Corporate

Digital Asset Transaction and Use," effective May 9, 2025, is to the same effect.  That policy,

under a section titled "Digital Assets Inventory for Operational Purposes," states that, in

executing inventory transactions, "Coinbase does not intend to impact or disrupt digital asset

markets, *nor is Coinbase driven by the intent for such transactions to be profitable*."  Pls. Inv.

Ex. E ("5/9/25 Corporate Token Policy") at 4 (emphasis added).  Coinbase was thus an

underwriter with respect to the inventory transactions because it purchased tokens from issuers

"with a view to" their distribution to its users—not for investment purposes.  *See, e.g.*,

*Longfin II*, 316 F. Supp. 3d at 766 ("In determining whether a person acquired shares with a view

to distribution, courts look to objective evidence, such as the length of time the shares were held

and whether there has been an unforeseeable change in circumstances of the holder."); *SEC v.*

*Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *19–20 (S.D.N.Y. Aug. 25, 2011) (similar);

*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 213 (3d Cir. 2006) (similar).

Coinbase makes three counterarguments, all unavailing.

First, it argues that it did not purchase tokens "with a view to distribute" them because it

sold them only "as a customer accommodation" in the two "limited circumstances" described

above.  Opp'n at 15.  It did not, in other words, primarily seek to profit directly from these

inventory sales.  Viewing the evidence in the light most favorable to Coinbase, that inference is

available.  But the Securities Act's broad definition of "underwriter" does not require such a

person or entity to have intended to turn an immediate and direct profit from the securities

distributions in which it took part.  And Coinbase does not cite any case law supporting that

atextual reading of the statute.  To the contrary, the statutory definition only requires that an

underwriter have purchased securities from an issuer "with a view to" their distribution. 15 U.S.C. § 77b(a)(11). And whether one buys securities "with a view to" distributing them "depends on whether one had investment intent or intended only to sell the shares." *Caledonian Bank Ltd.*, 145 F. Supp. 3d at 309.

Here, Coinbase plainly "intended to sell" the tokens to buyers on the other side of these inventory transactions. It is of no moment, for purposes of the ordinary trading exemption and the statutory definition of "underwriter," that the company did so to ensure that users' buy orders were filled quickly and reliably. In any event, the company did intend to profit, indirectly, from these transactions. As Coinbase stated in the August 2023 presentation, its corporate inventory "exist[ed] exclusively for ops [*i.e.*, operational] efficiency" because these buffers facilitate[d] client business." Pls Inv. Ex. C ("Aug. 2023 Presentation") at 14. By increasing its customer base, building customer goodwill, and the volume of matched trades—which, as Coinbase emphasizes, formed the lion's share of its business—the company increased revenues from fees on such transactions.[39]

Second, Coinbase argues, in two sentences, that it cannot be deemed an underwriter because it did not purchase inventory tokens directly from an issuer. *See* Opp'n at 8 (citing Second Inv. 56.1 ¶¶ 39–41). It points to testimony and a declaration by Nadav Night (Coinbase's senior technical program manager for trading products and Rule 30(b)(6) witness), to the effect that the company acquired the inventory tokens at issue here from "market makers" via Coinbase's "over-the-counter desk." Dkt. 193 ("Night Decl.") ¶ 13; Ex. D ("Night Dep.")

---

[39] Coinbase does not argue, and has not adduced evidence, that it qualified for Rule 144's safe harbor for underwriters. Under it, "[i]f a seller of securities demonstrates compliance with SEC Rule 144, then that seller is not deemed an underwriter with respect to those securities." *Longfin II*, 316 F. Supp. 3d at 757 (citing 17 C.F.R. § 230.144).

at 16. But an issuer includes "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." 15 U.S.C. § 77b(a)(11). Coinbase does not cite case law supporting its argument here. Nor does it identify evidence supporting that these "market makers" were not directly or indirectly controlled by issuers. It did not develop Night's conclusory testimony on this point. Coinbase has thus failed to adduce evidence that Coinbase did not play a direct or indirect role in the distribution of these tokens.

Third, Coinbase argues that it did not sell any inventory tokens "for an issuer." Opp'n at 8–9. It argues that at least two of its agreements with issuers (regarding the "LRC" and "AUCTION" tokens, respectively) were limited to "listing the tokens on the Coinbase platforms for trading—not to sell any tokens for [the issuers]." *Id.* (citing 56.1 ¶ 42); *see* Coinbase Exs. 49 (LRC agreement) & 50 (AUCTION agreement). But a defendant may be an underwriter even absent a "contractual arrangement" with the issuer. *Chinese Consol.*, 120 F.2d at 740–41. And even assuming that Coinbase has identified evidence allowing a reasonable juror to find that the company did not sell these two tokens for their issuers, Coinbase has not done so with respect to the two alternative pathways to making it an underwriter: that it (1) purchased tokens from issuers (or entities directly or indirectly controlled by them) with a view to distribution, and/or (2) participated directly or indirectly in such activities. *See Longfin II*, 316 F. Supp. 3d at 766.

***Overall assessment***: Coinbase undisputedly passed title in the inventory tokens to buyers and thus was a statutory seller under *Pinter*'s first prong. And because Coinbase is both a dealer and an underwriter, it cannot claim refuge from Section 12(a)(1) liability under the ordinary trading exemption. Summary judgment is thus warranted for plaintiffs on these elements of their claims. *See Culpepper*, 270 F.2d at 246 (defendants claiming ordinary trading exemption failed

to carry burden of showing they were not underwriters); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959) (similar); *Longfin II*, 316 F. Supp. 3d at 766 (similar).

### 3. State Law Claims

The parties also cross-move for summary judgment, with respect to the inventory transactions, as to plaintiffs' claims under California, Florida, and New Jersey law. As noted, these fall into two categories: those alleging (1) the offer or sale of unregistered securities (Counts 8, 11, and 13) (the "unregistered-securities claims"), and (2) unlawful sale of securities by an unregistered broker or dealer (Counts 9, 12, and 14) (the "broker-dealer claims"). *See* AC ¶¶ 1016–1106.

As to the unregistered-securities claims, the parties agree that the respective state laws were patterned on, and are construed consistently with, Section 12(a)(1). *See* Coinbase Opp'n at 15–16; Pls. Reply at 13–14.[40] For the reasons above with respect to plaintiffs' Section 12(a)(1) claims, the Court finds undisputed that Coinbase is a statutory seller and not subject to the state-law equivalents of any Section 12(a)(1) exemptions.

As to the broker-dealer claims, the elements of such are not precise replicas of the federal Securities Act. But, as to these, Coinbase argues only that those claims fail because Coinbase was not a dealer with respect to the inventory transactions. With the Court having found the opposite, it follows that Coinbase was a dealer with respect to the inventory transactions, for purposes of the state law claims.

---

[40] *See also Viterbi v. Wasserman*, 123 Cal. Rptr. 3d 231, 238–39 (Cal. Ct. App. 2011) ("when a state law is patterned after a federal law, the two are construed together" (cleaned up)); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1260 (M.D. Fla. 2010) ("Florida courts look to [the Securities Act] when interpreting [Florida securities laws]"); N.J. Stat. Ann. § 49:3-75 (New Jersey Uniform Securities Act shall be construed to "make uniform the law of those states which enact similar laws and to co-ordinate the interpretation and administration of th[e] [A]ct with related federal regulations").

Coinbase makes additional, state-specific arguments.[41]

*California*:    Count 8 seeks to hold Coinbase and Coinbase Global liable for the sale of unregistered securities, under California Corporations Code §§ 25110 and 25130.  Section 25110 bars such conduct in any "issuer transaction," subject to certain exemptions not applicable here, and § 25130 covers the same in any "non-issuer transaction."  Coinbase argues that § 25110 does not apply because Coinbase was not an issuer of any tokens in inventory transactions.  And, it argues, § 25130 does not apply either, because the inventory transactions fell within a California statutory exemption.  That exemption, pursuant to § 25104(a), excludes from liability any "offer or sale of a security by the bona fide owner thereof for his or her own account if the sale (1) is not accompanied by the publication of any advertisement and (2) is not effected by or through a broker-dealer in a public offering."  Cal. Corp. Code § 25104(a).

The parties agree that Coinbase was not the issuer of any of the 60 tokens here, so § 25110 cannot apply.  *See, e.g.*, *Hollifield v. Resolute Cap. Partners Ltd.*, 2023 WL 4291524, at *6 (C.D. Cal. May 12, 2023); *Mirkin v. Wasserman*, 858 P.2d 568, 581 (Cal. 1993); *see also Goller v. Nat'l Life of Fla. Corp.*, 554 F.2d 1349, 1351–52 (5th Cir. 1977) (later transfer not "issuer transaction" under Cal. Corp. Code § 25110).  That is not inherently fatal to Count 8,

---

[41] Plaintiffs argue that it is improper for Coinbase to move for summary judgment with respect to these state-specific exemptions, because that motion was not previewed "at the pre-motion conference."  Pls. Reply at 13–14.  That is wrong.  At the February 18, 2026 conference, Coinbase's counsel stated that the company intended to argue "that we have applicable corresponding blue sky exemptions as well, which I think would be covered within this [*i.e.*, on these summary judgment motions]."  PMC Tr. at 24.  Coinbase's counsel then asserted that all discovery relevant to these state-specific exemptions was complete.  *Id.* at 25.  Plaintiffs' counsel did not challenge, or reference, these assertions during the balance of the conference.  And plaintiffs began their opening brief by noting that the Court had "directed the parties to determine whether summary judgment is warranted on a discrete question: Is Coinbase a statutory seller of the 60 digital assets at issue and thus subject to liability under Section 12(a)(1) *and analogous state laws*?"  Plaintiffs thus recognized that these issues were within the scope of the instant motions, and have had ample opportunity to address them, including in their reply.

however, as it is alternatively based on a violation of § 25130, which covers non-issuer transactions.

The issue is thus whether inventory transactions were (1) "not accompanied by the publication of any advertisement" and (2) "not effected by or through a broker-dealer in a public offering." Cal. Corp. Code §§ 25104(a), 25163. An advertisement is "any written or printed communication or any communication by means of recorded telephone messages or spoken on radio, television, or similar communications media, published in connection with the offer or sale of a security." *Id.* § 25002. "Publish" means "to disseminate to the public" in any manner. *Id.* § 25014. Coinbase has not adduced evidence that it satisfied either prong—both of which must be established for the exemption to apply. As to the first, the record reflects that Coinbase published, on its website and app, significant amounts of written information regarding the tokens available on its platforms. JSF ¶¶ 88–94. And such materials were published "in connection with" Coinbase's services for trading tokens, including through inventory transactions when needed.[42] *Cf. In re Stillwater Cap. Partners Inc. Litig.*, 851 F. Supp. 2d 556 (S.D.N.Y. 2012) ("The Supreme Court has shown a preference for interpreting the phrase 'in connection with' broadly," including with respect to securities fraud statutes (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 88–89 (2006)). Coinbase counters that it did not specifically advertise its inventory transactions, which, it asserts, functioned as an invisible operational backstop. But this exemption broadly requires the absence of any advertisement published in connection with the sale of securities.[43] And, as to the second prong,

---

[42] This result is consistent with the finding that such information did not satisfy the second *Pinter* prong for solicitation, because such requires a more demanding showing than § 25104(a).

[43] *Fox v. Ehrmantraut*, 28 Cal. 3d 127 (1980), on which Coinbase relies, is inapposite. It involved an advertisement to sell an entire business in a single transaction. But the

81

the Court has found that Coinbase acted in a dealer capacity with respect to the inventory transactions. Coinbase has not identified any evidence that it did not sell inventory tokens in public offerings.

Because Coinbase has not carried its burden to show that the § 25104(a) exemption applies, plaintiffs are entitled to summary judgment for plaintiffs on the applicable elements of Count 8.

*Florida and New Jersey*:  Plaintiffs also bring unregistered-securities claims under the laws of Florida (Count 11) and New Jersey (Count 13).  Both laws contain an exemption, additional to those of Section 12(a)(1), for "isolated" transactions.  *See* Fla. Stat. § 517.061(12) (exempting "isolated sale or offer for sale of securities when made by or on behalf of a bona fide owner" of securities); N.J. Stat. Ann. § 49:3-50(b)(1) (exempting "[a]ny isolated non issuer transaction, whether effected through a broker-dealer or not").  Coinbase argues that the isolated transaction exemptions apply to its inventory transactions, due to the small proportion of such transactions relative to Coinbase's overall business in the tokens at issue.  It also argues that both statutes' separate exemption for securities sales to 35 or fewer buyers supports that the isolated transaction exemption "cannot be read to be limited to a particular number" (although it does not claim that that exemption applies).  Coinbase Opp'n at 18–19.  And it cites one case as holding that, under Florida law, transactions are considered "isolated" if they are not "part of a general plan or purpose or by persons in the business of making sales [of securities] in Florida."  Opp'n

---

advertisement did not mention securities, and the transaction only incidentally involved the transfer of outstanding shares. *Id.* at 138–40.  Here, although Coinbase did not advertise its practice of using inventory transactions as a backstop, it undisputedly held itself out as a platform for buying and selling tokens.

at 18 (quoting *Dokken v. Minnesota-Ohio Oil Corp.*, 232 So. 2d 200, 204 (Fla. Dist. Ct. App. 1970)).

For the reasons discussed above with respect to the Court's finding that Coinbase was undisputedly a dealer as to the inventory transactions, Coinbase's sales from inventory of at least $178 million in tokens defeat its claim to have engaged only in "isolated" transactions. And the case Coinbase cites on this point (from a Florida intermediate appellate court in 1970) involved the ad hoc sale of a *single* security—a far cry from Coinbase's programmatic and substantial inventory sales. *See Dokken*, 232 So. 2d at 202–04. The Court thus grants summary judgment for plaintiffs on the applicable elements of these statutes.

### 4.    Control-Person Claims Against Coinbase Global and Armstrong

Lastly, Coinbase moves for summary judgment as to Coinbase Global and Armstrong, on the ground that Coinbase is not a statutory seller so there cannot be a primary violation so as to support such claims. Coinbase Opp'n at 20–21. Because the Court grants summary judgment for plaintiffs on the statutory seller element with respect to the inventory transactions, it denies Coinbase's motion as to the control-person claims.

### CONCLUSION

For the above reasons:

1.      Based on the undisputed evidence, the Court finds that Coinbase was not a statutory seller with respect to matched transactions. The Court accordingly grants Coinbase's motion for summary judgment on all claims, federal and state, to the extent that these claims are based on matched transactions. The Court dismisses the matched-transaction components of all such claims, with respect to all defendants.

83

2.      Based on the undisputed evidence, the Court finds Coinbase to have been a statutory seller with respect to all inventory transactions, and that no federal or state statutory exemption applies.  The Court accordingly grants plaintiffs' motion for summary judgment on the applicable element(s) of their federal and state claims against Coinbase, and denies Coinbase's motion for summary judgment on these claims.  This litigation will proceed on these claims, with discovery to resume on the remaining elements of these claims, including whether the tokens at issue qualify as securities.

The Court grants Coinbase's motion, at docket 208, to seal certain materials and portions thereof, on the grounds that they contain confidential, proprietary, and commercially sensitive information.

Within a week of this decision, the parties are to submit a joint letter, proposing next steps in this case.  The Court will thereafter decide whether to schedule a conference to discuss the issues raised in that letter.

The Clerk of Court is respectfully directed to terminate all pending motions in this case.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 30, 2026
       New York, New York

84